_____

No. 12-1437
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**
_____

**RAYMOND WOOLLARD,** *et al.*,

*Plaintiffs-Appellees,*

**v.**

**DENIS GALLAGHER,** *et al.*,

*Defendants-Appellants.*
_____

On Appeal from the United States District Court
for the District of Maryland
(Benson E. Legg, District Judge)
_____

**BRIEF OF APPELLANTS**
_____

DAN FRIEDMAN
Assistant Attorney General
Office of the Attorney General
Legislative Services Building
90 State Circle
Annapolis, Maryland 21401
Tel. 410-946-5600

June 21, 2012*
*CORRECTED BRIEF

DOUGLAS F. GANSLER
Attorney General of Maryland

MATTHEW J. FADER
STEPHEN M. RUCKMAN
Assistant Attorneys General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
Tel. 410-576-7906

Attorneys for Appellants

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney.  Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case.  Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.  Counsel has a continuing duty to update this information.

No. <u>12-1437</u>        Caption: <u>Raymond Woollard, et al. v. Terrence Sheridan, et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Marcus Brown</u>
(name of party/amicus)

_____

who is _____<u>appellant</u>_____, makes the following disclosure:
        (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                    ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                        ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

# CERTIFICATE OF SERVICE
**************************

I certify that on ___April 16, 2012___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Alan Gura, Esq.                          Cary J. Hansel, Esq.
Gura & Possessky, PLLC                   Joseph, Greenwald & Laake
101 N. Columbus Street, Suite 405        6404 Ivy Lane, Suite 400
Alexandria, VA 22314                     Greenbelt, MD 20770

s/ Matthew J. Fader                          April 16, 2012
_____                  _____
        (signature)                              (date)

11/17/2011
SCC

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney.  Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case.  Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.  Counsel has a continuing duty to update this information.

No. 12-1437        Caption: Raymond Woollard, et al. v. Terrence Sheridan, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Dennis Gallagher
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
       (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?   ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

# CERTIFICATE OF SERVICE
**************************

I certify that on ___April 16, 2012___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Alan Gura, Esq.
Gura & Possessky, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314

Cary J. Hansel, Esq.
Joseph, Greenwald & Laake
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770

___s/ Matthew J. Fader___        ___April 16, 2012___
(signature)                              (date)

- 2 -

11/17/2011
SCC

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney.  Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case.  Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.  Counsel has a continuing duty to update this information.

No. <u>12-1437</u>    Caption: <u>Raymond Woollard, et al. v. Terrence Sheridan, et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Seymour Goldstein</u>
(name of party/amicus)

_____

who is _____<u>appellant</u>_____, makes the following disclosure:
          (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?  ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
      If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?      ☐YES ☑NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?      ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

# CERTIFICATE OF SERVICE
**************************

I certify that on ____April 16, 2012____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Alan Gura, Esq.
Gura & Possessky, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314

Cary J. Hansel, Esq.
Joseph, Greenwald & Laake
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770

s/ Matthew J. Fader                          April 16, 2012
(signature)                                      (date)

- 2 -

11/17/2011
SCC

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney.  Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case.  Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.  Counsel has a continuing duty to update this information.

No. <u>12-1437</u>          Caption:  <u>Raymond Woollard, et al. v. Terrence Sheridan, et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Charles M. Thomas, Jr.</u>
(name of party/amicus)

_____

who is _____appellant_____, makes the following disclosure:
          (appellant/appellee/amicus)

1.     Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.     Does party/amicus have any parent corporations?          ☐YES ☑NO
       If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?          ☐YES ☑NO
       If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

# CERTIFICATE OF SERVICE
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

I certify that on ___April 16, 2012___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Alan Gura, Esq.                          Cary J. Hansel, Esq.
Gura & Possessky, PLLC                   Joseph, Greenwald & Laake
101 N. Columbus Street, Suite 405        6404 Ivy Lane, Suite 400
Alexandria, VA 22314                     Greenbelt, MD 20770

s/ Matthew J. Fader                      April 16, 2012
_____                  _____
(signature)                              (date)

11/17/2011
SCC

# TABLE OF CONTENTS

Page

JURISDICTIONAL STATEMENT ........................................................ 1

ISSUE PRESENTED FOR REVIEW .................................................... 1

STATEMENT OF THE CASE.............................................................. 2

STATEMENT OF FACTS ................................................................... 4

    A.   Maryland Handgun Wear-and-Carry Permits ...................................... 4

    B.   Plaintiff Woollard's Handgun Permits............................................... 8

SUMMARY OF ARGUMENT ............................................................. 9

ARGUMENT ..................................................................................... 11

I.   THE STANDARD OF REVIEW IS *DE NOVO* ...................................... 11

II.   THE SECOND AMENDMENT GUARANTEES AN INDIVIDUAL RIGHT FOR LAW-ABIDING CITIZENS TO KEEP AND BEAR ARMS FOR SELF-DEFENSE IN THE HOME, SUBJECT TO EXCEPTIONS. ...................................... 12

    A.   The Supreme Court Identified a Second Amendment Right for Law-Abiding, Responsible Individuals to Possess a Handgun for Self-Defense in the Home............................................................. 12

    B.   This Court Has Declined to Expand the Core Second Amendment Right of Law-Abiding, Responsible Individuals to Possess a Handgun for Self-Defense in the Home........................... 14

    C.   Most Other Courts to Consider Whether the Second Amendment Right Identified by the Supreme Court in *Heller* Extends Outside the Home Have Held That it Does Not or Have Declined to Resolve the Issue. ........................................................ 17

III.    THE PERMIT STATUTE DOES NOT BURDEN CONDUCT PROTECTED BY
        THE SECOND AMENDMENT. ........................................................................ 18

        A.    The Right to Keep and Bear Arms in English and Early
              American Law Did Not Include the Right to Carry Easily-
              Concealable, Highly-Lethal Weapons in Public Without Good
              and Substantial Reason.................................................................. 20

        B.    The Public Carry of Firearms Has Long Been Subject to
              Regulation. ...................................................................................... 23

              1.    The Public Carry of Firearms Was Subject to Regulation
                    From at Least the Fourteenth Century Through the
                    Founding of the Republic. ....................................................... 23

              2.    The Public Carry of Firearms Continued to Be Subject to
                    Regulation After the Second Amendment Was Ratified........ 27

        C.    *Heller* Did Not Recognize a General Right to Carry Arms in
              Public. ............................................................................................... 31

IV.     EVEN IF THE PERMIT STATUTE BURDENED CONDUCT PROTECTED BY
        THE SECOND AMENDMENT, IT WOULD SATISFY THE APPLICABLE LEVEL
        OF SCRUTINY. ............................................................................................ 36

        A.    The Permit Statute Is Subject to No Greater than Intermediate
              Scrutiny. ........................................................................................... 36

        B.    The Permit Statute Satisfies Intermediate Scrutiny. ......................... 39

              1.    Maryland Has a Compelling Government Interest in
                    Protecting Public Safety and Reducing Handgun
                    Violence. ................................................................................. 40

              2.    The Precise Contours of the Permit Statute Correspond to
                    its Legislative Purpose. .......................................................... 41

              3.    A "Reasonable Fit" Exists Between the Good-and-
                    Substantial-Reason Requirement and the State's Interest
                    in Public Safety and Reducing Handgun Violence................. 44

ii

    C.     Other Courts Have Upheld Similar, and More Restrictive, Permit Statutes Under Intermediate Scrutiny ..................................... 51

    D.     The District Court Erred in Holding that the Permit Statute Is Not a Reasonable Fit with Maryland's Interest in Public Safety and Reducing Handgun Violence ...................................................... 54

CONCLUSION ................................................................................ 58

STATUTORY ADDENDUM

Maryland Code Annotated, Criminal Law Article, § 4-203 (2012)

Maryland Code Annotated, Public Safety Article, § 5-306 (2012)

# TABLE OF AUTHORITIES

## Cases

Page

*Andrews v. State*, 50 Tenn. 165 (1871) ................................................... 29

*Bacon v. City of Richmond*, 475 F.3d 633 (4th Cir. 2007) ................................... 12

*Bateman v. Perdue*, No. 5:10-CV-265-H, 2012 U.S. Dist. LEXIS 47336
    (E.D.N.C. Mar. 29, 2012) ............................................. 17, 31, 38

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) ........................................... 36

*Chatteaux v. State*, 52 Ala. 388 (Ala. 1875) ........................................ 30

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .................................... *passim*

*English v. State*, 35 Tex. 473 (1871) ....................................................... 29

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ........................................ 38

*Fife v. State*, 31 Ark. 455 (1876) ............................................................. 29

*Hightower v. City of Boston*, 822 F. Supp. 2d 38 (D. Mass. 2011) ...................... 53

*Kachalsky v. Cacace*, 817 F. Supp. 2d 235 (S.D.N.Y. 2011) .............. 17, 38, 51, 52

*Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941) ............................ 19

*Kuck v. Danaher*, 822 F. Supp. 2d 109 (D. Conn. 2011) ...................................... 53

*McDonald v. City of Chicago*, ___ U.S. ___, 130 S. Ct. 3020 (2010) ................. 10

*McGuirk v. State*, 64 Miss. 209 (1886) .................................................... 30

*Monumental Paving & Excavating, Inc. v. Pennsylvania Mfrs.' Ass'n
    Ins. Co.*, 176 F.3d 794 (4th Cir. 1999) ........................................ 11

*Monroe v. City of Charlottesville*, 579 F.3d 380 (4th Cir. 2009) .......................... 41

*Moore v. Madigan*, No. 11-cv-02134, 2012 U.S. Dist. LEXIS 12967 (C.D. Ill. Feb. 3, 2012) ................................................................... 17, 53

*New York v. Quarles*, 467 U.S. 649 (1984) .......................................... 36

*Nordyke v. King*, No. 07-16753, 2012 U.S. App. LEXIS 11076 (9th Cir. June 1, 2012)................................................................. 17

*Norfolk Southern R'y Co. v. City of Alexandria*, 608 F.3d 150 (4th Cir. 2010).... 11

*Nunn v. State*, 1 Ga. 243 (1846)........................................................... 29

*People v. Dawson*, 934 N.E.2d 598 (Ill. App. 2010)............................................ 17

*People v. Marin*, 795 N.E.2d 953 (Ill. App. 2003) .................................................. 47

*Peruta v. County of San Diego*, 758 F. Supp. 2d 1106 (S.D. Cal. 2010) .. 38, 49, 53

*Piszczatoski v. Filko*, Civ. No. 10-06110, 2012 U.S. Dist. LEXIS 4293 (D. N.J. Jan. 12, 2012) ................................................... 17, 30, 38, 52

*Robertson v. Baldwin*, 165 U.S. 275 (1897) ..................................................... 13, 35

*Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357 (1997) ...... 36

*Scherr v. Handgun Permit Review Bd.*, 163 Md. App. 417 (2005)......................... 6

*Schall v. Martin*, 467 U.S. 253 (1984).................................................................... 41

*Shepard v. Madigan*, No. 11-cv-405, 2012 U.S. Dist. LEXIS 44828 (S.D. Ill. Mar. 30, 2012) ............................................................. 17

*Sherbert v. Verner*, 374 U.S. 398 (1963) ............................................................. 36

*Snowden v. Handgun Permit Review Bd.*, 45 Md. App. 464 (1980) ...................... 6

*State v. Duke*, 42 Tex. 455 (1874) ........................................................................ 28

*State v. Cole*, 665 N.W.2d 328 (Wis. 2003) ............................................................ 39

*State v. Reid*, 1 Ala. 612 (1840) ............................................................................ 29

*State v. Workman*, 14 S.E. 9 (W. Va. 1891) ..................................................... 28, 34

*Terry v. Ohio*, 392 U.S. 1 (1968) ..................................................................... 36, 45

*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997) ......................................... 56

*United States v. Carter*, 669 F.3d 411 (4th Cir. 2012) .................................... 16, 21

*United States v. Chapman*, 666 F.3d 220 (4th Cir. 2012) .................. 15, 16, 18, 41

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010)................ 14, 18, 37, 38, 44

*United States v. Decastro*, No. 10-3773, 2012 U.S. App. LEXIS 11213 (2d
  Cir. June 1, 2012)............................................................................................. 17

*United States v. Mahin*, 668 F.3d 119, (4th Cir. 2012).................................... 15, 16

*United States v. Marzzarella*, 614 F.3d 85 (3rd Cir. 2010) ............................. 15, 38

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011)........................ *passim*

*United States v. Moore*, 666 F.3d 313 (4th Cir. 2012) ......................................... 15

*United States v. Reese*, 627 F.3d 792 (10th Cir. 2010).......................................... 15

*United States v. Salerno*, 481 U.S. 739 (1987)..................................................... 41

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ........................ 15, 18, 35, 48

*United States v. Staten*, 666 F.3d 154 (4th Cir. 2011) .................. 15, 16, 39, 41, 44

*United States v. Weaver*, Crim. A. No. 2:09-cr-00222, 2012 U.S.
  Dist. LEXIS 29613 (S.D.W.Va. Mar. 7, 2012) ............................... 17-18, 31

*Williams v. State*, 417 Md. 479 (2011) ................................................................ 17

*Wilson v. Arkansas*, 514 U.S. 927 (1994) ............................................................. 36

## United States Constitution, Statutes, and Rules

United States Constitution, amendment II ..................................................... *passim*

United States Constitution, amendment IV ............................................................ 1

United States Code
    28 U.S.C. § 1291 .......................................................................... 1
    28 U.S.C. § 1331 .......................................................................... 1
    28 U.S.C. § 1343 .......................................................................... 1
    42 U.S.C. § 1983 .......................................................................... 1

Federal Rule of Appellate Procedure 34(a)(1) ..................................................... 58

Federal Rule of Civil Procedure 59(e) ................................................................. 1

United States Court of Appeals for the Fourth Circuit, Local Rule 34(a) ............. 58

## Maryland Constitution and Statutes

Annotated Code of Maryland

Criminal Law Article
    § 4-202 ..................................................................................... 41
    § 4-202(5) ) ............................................................................... 11
    § 4-203(a) ................................................................................... 5
    § 4-203(b) ............................................................................. 2, 18
    § 4-203(b)(2) ............................................................................. 5
    § 4-203(b)(3) ............................................................................. 5
    § 4-203(b)(4) ........................................................................ 5, 34
    § 4-203(b)(5) ............................................................................. 5
    § 4-203(b)(6) ........................................................................ 4, 13
    § 4-203(b)(7) ............................................................................. 5

Public Safety Article

    §§ 5-301-5-314 ......................................................... 5

    §§ 5-302-5-312 ......................................................... 7

    § 5-306(a) ............................................................ 1, 6, 18

    § 5-306(a)(5)(ii) ................................................. *passim*

    § 5-309(a) ................................................................. 7

    § 5-312(a) ................................................................. 7

    § 5-312(b) ................................................................. 7

    § 5-312(c) ................................................................. 7

    § 5-312(e)(1) ............................................................. 8

State Government Article

    § 10-222.1 ................................................................ 8

    Session Laws

1894 Laws of Maryland, ch. 547 ......................................... 30

## Other Historical Statutory References

    England

English Bill of Rights, 1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441
    (1689) ................................................................... 20

Statute of Northhampton, 2 Edw. III, c. 3 (1328) ................... 23

    Alabama

1839 Ala. Acts 67, Act of Feb. 1, 1839, no. 77 ..................... 27

    Arkansas

1837 Ark. Acts 280 ...................................................... 27

    District of Columbia

Revised Code of the District of Columbia, 1857 (A.O.P. Nicholson 1857) ......... 26

Indiana

1820 Ind. Acts 39, Act of Jan. 14, 1820, ch. 23.......................................... 27

Kentucky

1813 Ky. Acts 100, Act of Feb. 3, 1813, ch. 59, § 1 .................................... 27

Louisiana

1813 La. Acts 172, Act of Mar. 25, 1813 .................................................... 27

Maine

Revised Statutes of the State of Maine
(Hallowell: Glazier, Masters & Smith 1847) ............................................ 26

1821 Laws of Maine, ch. 76, § 1................................................................ 26

Massachusetts

Revised Statutes of the Commonwealth of Massachusetts (Dutton &
Wentworth 1836) .................................................................................... 26

Michigan

2 General Statutes of the State of Michigan (Callaghan & Co. 1883).................. 26

Minnesota

General Statutes of the State of Minnesota (West 1881)........................................ 26

Pennsylvania

Digest of the Laws of Pennsylvania (Kay & Brother 1873).................................. 26

Texas

Tex. Act of Apr. 12, 1871, ch. 34, § 1 .................................................... 28

Virginia

1838 Va. Acts 76, Act of Feb. 2, 1838, ch. 101 ..................................................... 27

West Virginia

1882 W. Va. Acts, ch. 135 ................................................................................... 27

Wisconsin

Revised Statutes of the State of Wisconsin (W.B. Keen, Chicago 1858) ............. 26

**Miscellaneous Authorities**

1 Blackstone, William. *Blackstone's Commentaries* (St. George Tucker, ed. 1803) ........................................................................................................... 24

1 Blackstone, William. *Commentaries on the Laws of England* (Clarendon Press 1765) ...................................................................................... 21, 22

4 Blackstone, William. *Commentaries on the Laws of England* (Clarendon Press 1769) ............................................................................ 24, 25, 33

Charles, Patrick. "Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review," 60 Clev. St. L. Rev. 1 (forthcoming 2012) ................................................................................... 24

3 Coke, Edward. *Institutes of the Laws of England* (E. & R. Brooke 1797) .................................................................... 23, 24, 33

Cook, Philip J., *et al.* "Criminal Records of Homicide Offenders," J. Am. Med. Ass'n., 294(5): 598-601 (2005) ............................................... 50

Cornell, Saul. *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (2006) .................................................. 27

Dalton, Michael. *The Country Justice* (1690) ...................................................... 26

Fed. Bureau of Investigation. *Law Enforcement Officers Feloniously Killed, 1996-2005* .............................................................................. 45

Leaming, Aaron & Spicer, Jacob, eds. *The Grants, Concessions & Original Constitutions of the Province of New Jersey* (Lawbook Exch. 2002)... 25, 26

Maryland Governor's Office of Crime Control & Prevention. *Maryland 2010 Crime Totals* ....................................................... 45

Maryland State Police. *2010 Annual Report* (2011)................................................ 7

Mayors Against Illegal Guns. *Trace the Guns* (2010).......................................... 47

Minnesota Drug & Violent Crime Task Forces. *2011 Annual Report* .................. 50

National Drug Intelligence Center. *Maryland Drug Threat Assessment* (August 2002) .............................................................................. 45

Officer Down Memorial Page, Inc. "Fallen Officers in Maryland," http://www.odmp.org/search/browse?state=MD ........................................ 46

Officer Down Memorial Page, Inc. "Honoring All Fallen Members of the Baltimore City Police Department," http://www.odmp.org/agency/214-baltimore-city-police-department-maryland ..................................................................... 46

Perkins, Craig. "Weapon Use & Violent Crime," U.S. Dep't of Justice, Bureau of Justice Statistics (2001) ............................................ 45

Rogers, Brian. "Self-Defense Case Hinges on Video of Incident," Houston Chron. June 7, 2012, at B1 ......................................................... 47

Rosenthal, Lawrence. "Second Amendment Plumbing After Heller: Of Standards of Scrutiny, Incorporation, Well-Regulated Militias, & Criminal Street Gangs," 41 Urb. Law. 1 (2009) ........................................ 49

Sullivan, Jennifer & Martin, Jonathan. "A life full of rage, a shocking final act," Seattle Times, June 1, 2012, at A1...................................... 51

U.S. Dep't of Justice, Bureau of Justice Statistics. *Crime In The United States* (2010) ......................................................................... 45, 46

Webster, D.W., Vernick, J.S., & Hepburn, L.M. "Relationship between licensing, registration, and other gun sales laws and the source of state crime guns," 7 Injury Prevention 1 (2001) ........................................... 47-48

Winkler, Adam. "Scrutinizing the Second Amendment," 105 Mich. L. Rev. 683 (2007) ................................................................................. 39

Zimring, Franklin E. "Firearms, Violence, and the Potential Impact of Firearms Control," 32 J.L. Med. & Ethics 34 (2004) ............................ 48-49

## JURISDICTIONAL STATEMENT

The plaintiffs-appellees ("Plaintiffs") brought this action under 42 U.S.C. § 1983, alleging that § 5-306(a)(5)(ii) of the Public Safety Article of the Maryland Code violates the Second and Fourteenth Amendments to the United States Constitution to the extent that it conditions issuance of a permit to wear, carry, or transport a handgun in public on having a "good and substantial reason" to do so. The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. In an order entered on March 5, 2012 ("March 5 Order"), the district court granted Plaintiffs' motion for summary judgment and denied the cross-motion for summary judgment of the defendants-appellants ("Defendants"). (J.A. 160.) On March 7, 2012, Defendants moved under Federal Rule of Civil Procedure 59(e) for clarification or amendment of the March 5 Order. In an order entered on April 2, 2012 ("April 2 Order"), the district court resolved the Rule 59(e) motion and amended the March 5 Order. (J.A. 161-63.) On April 2, 2012, Defendants timely noted their appeal. This Court has jurisdiction under 28 U.S.C. § 1291 to review the March 5 Order and the April 2 Order, which together constitute a final order disposing of all claims of the parties.

## ISSUE PRESENTED FOR REVIEW

Did the district court err in holding that Maryland's handgun wear-and-carry permit statute violates the Second Amendment to the extent that it requires

individuals seeking to wear, carry, and transport a handgun in public to demonstrate that they have good and substantial reason to do so, where the terms of the statute do not restrict the possession, wear, or carry of handguns in one's home, on one's property, in one's business, or in connection with hunting, organized military activity, target practice, target shoots, sport shooting events, or other specified activities, and the statute does not apply to rifles, shotguns, or other long guns?

## STATEMENT OF THE CASE

Maryland law does not require a permit to possess, wear, or carry a handgun in one's home or business, on other property one owns, or in connection with hunting, organized military activity, target shoots, formal or informal target practice, a sport shooting event, or trapping, among other activities. *See* Md. Code Ann., Crim. Law ("CL") § 4-203(b). Subject to these excepted locations and activities, Maryland generally requires a permit to wear and carry a handgun in public spaces. The criteria for issuing a permit include a requirement that the applicant, after an investigation by the Maryland State Police ("MSP"), be found to have "good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger." Md. Code Ann., Pub. Safety ("PS") § 5-306(a)(5)(ii).

On July 29, 2010, Plaintiffs Raymond Woollard and the Second Amendment Foundation filed a complaint against Defendants, the Superintendent of the Maryland State Police and three members of Maryland's Handgun Permit Review Board, in their official capacities. (J.A. 3.) The complaint, as amended on January 19, 2011, challenged the good-and-substantial-reason requirement, which Plaintiffs contended violates the Second Amendment (Count I) and the Equal Protection Clause of the Fourteenth Amendment (Count II). (J.A. 22-29.) Plaintiffs sought a permanent injunction against enforcement of the good-and-substantial-reason requirement.

The parties filed cross-motions for summary judgment. (J.A. 39-41.) In a memorandum opinion accompanying the March 5 Order, the district court held that Maryland's handgun wear-and-carry permit statute implicates activity protected by the Second Amendment, although it also held that activity to be outside the "core" of conduct protected by that amendment. (J.A. 143-49.) Purportedly applying intermediate scrutiny, the district court concluded that, although the State had identified a compelling interest in public safety and crime prevention, the good-and-substantial-reason requirement "is insufficiently tailored to" that interest and, therefore, violates the Second Amendment. (J.A. 159.) The district court rejected Plaintiffs' Equal Protection claim on the ground that the Second Amendment, not the Fourteenth, provides the appropriate analytic framework. (J.A. 157-58.) In the

accompanying order, the court granted Plaintiffs' motion for summary judgment and denied Defendants' cross-motion, but did not address Plaintiffs' request for injunctive relief. (J.A. 160.)

On March 7, 2012, Defendants moved under Federal Rule of Civil Procedure 59(e) for clarification of the district court's intent with respect to injunctive relief. Defendants simultaneously moved for a stay pending appeal. In its April 2 Order, the district court amended the March 5 Order to award injunctive relief permanently prohibiting Defendants from enforcing the good-and-substantial-reason requirement and ordering Defendants to process Mr. Woollard's 2009 permit renewal application without consideration of whether he has a good and substantial reason to wear and carry a handgun in public. (J.A. 161-63.) In the April 2 Order, the district court also temporarily stayed the effect of the injunction pending its ruling on Defendants' request for a stay pending appeal. (J.A. 162.)

This appeal followed.

## STATEMENT OF FACTS

### A.  Maryland Handgun Wear-and-Carry Permits

Under Maryland law, individuals qualified to own a firearm are allowed, without a permit, to possess, wear, carry, and transport a handgun within their home, business, or any property they own. CL § 4-203(b)(6). Individuals are also

allowed, without a permit, to wear, carry, or transport a handgun in public in connection with, among other activities:

- hunting, trapping, a target shoot, formal or informal target practice, a sport shooting event, certain firearms and hunter safety classes, or an organized military activity, CL § 4-203(b)(4);

- the moving of a gun collection for exhibition by a bona fide gun collector, CL § 4-203(b)(5);

- a supervisory employee's activities in the course of business under certain conditions, CL § 4-203(b)(7); and

- while transporting the handgun, unloaded and secured, between places or activities where the individual is allowed to possess it, including the place of legal purchase or sale, a bona fide repair shop, residences, and businesses, CL § 4-203(b)(3).

Aside from these and other statutorily protected places and activities, Maryland law generally requires a permit to wear and carry a handgun in public. CL § 4-203(a), (b)(2).[1]

An individual is eligible to obtain a handgun wear-and-carry permit (a "Permit") if that person is an adult who has not been convicted of certain criminal offenses; is not an alcoholic, addict, or habitual drug user; and, based on an MSP investigation, (1) has not exhibited a propensity for violence or instability that may render possession of a handgun a danger, and (2) "has good and substantial reason

---

[1] The criminal and permit statutes relevant to this case apply only to handguns. *See* CL § 4-203; Md. Code Ann., Pub. Safety §§ 5-301—5-314. Maryland's permit laws do not apply to other firearms, including rifles, shotguns, or other "long guns."

to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger." PS § 5-306(a) (the "Permit Statute"). It is the last of these conditions, the good-and-substantial-reason requirement, that Plaintiffs challenge in this lawsuit.

Permit applications are processed by MSP's Handgun Permit Unit. (J.A. 56.) MSP has identified four non-exclusive categories of "good and substantial reason[s]": (1) business activities involving heightened risk, such as the need to carry cash or other "street valued" commodities; (2) participation in "regulated professions," including security guards and armored car personnel; (3) participation in "assumed risk" professions that involve the ability to restrict civil liberties, including judges, prosecutors, police officers, public defenders, and correctional officers; and (4) "personal protection." (J.A. 58-59.)

In assessing an application based on a need for "personal protection," MSP's Handgun Permit Unit follows guidance from Maryland's appellate courts. (J.A. 59-60 (citing *Snowden v. Handgun Permit Review Bd.*, 45 Md. App. 464 (1980), and *Scherr v. Handgun Permit Review Bd.*, 163 Md. App. 417 (2005).) A good and substantial reason must "reflect more than 'personal anxiety' and evidence a level of threat beyond that faced by the average citizen." (J.A. 59-60.) In reviewing an application, MSP's Handgun Permit Unit applies the following factors: (1) the "nearness" or likelihood of a threat or presumed threat; (2) whether

the threat can be verified; (3) whether the threat is particular to the applicant; (4) if the threat can be presumed to exist, the basis for the presumption; and (5) the length of time since the initial threat occurred. (J.A. 60.) If a threat is especially urgent, MSP's Handgun Permit Unit can make permits available on a same-day basis. (J.A. 60-61.)

Initial permits are valid for up to three years and may be renewed for additional three-year terms. PS § 5-309(a). From 2006 through 2010, MSP's Handgun Permit Unit received 22,035 original or renewal applications, and issued 20,674 permits, for an approval rate of 93.8%. MSP, 2010 Annual Report (2011) at 37, *available at* http://www.mdsp.org/LinkClick.aspx?fileticket=dGo4s4z Bg6I%3D&tabid=429&mid=1074.

If a permit application is denied, the applicant may appeal to the Handgun Permit Review Board, an independent five-person board appointed by the Governor. *See* PS §§ 5-302—5-312. The Board reviews documentation submitted by the MSP and the applicant and takes testimony from witnesses. *See* PS § 5-312(a) – (c). In the last 20 years, the Board has affirmed MSP's denial of an application only 54% of the time, reversed it 38% of the time, and modified or remanded it 8% of the time. (J.A. 43.) An applicant aggrieved by a decision of the Board has a right of appeal to the circuit court of the county in which the applicant

resides, and thereafter to the State's appellate courts. *See* PS § 5-312(e)(1); Md. Code Ann., State Gov't § 10-222.1.

## B.     Plaintiff Woollard's Handgun Permits

On December 24, 2002, Mr. Woollard was at home when his son-in-law, Kris Lee Abbott, shattered a window and broke in with the intent of retrieving keys to Mr. Abbott's wife's car for the purpose of driving to Baltimore City to buy drugs. (J.A. 14-15, 19.) Mr. Woollard aimed a shotgun at his son-in-law, who then grabbed the barrel of the shotgun, pulled it to his own head, and "told Woollard to pull the trigger." (J.A. 19, 64.) Mr. Abbott eventually took the shotgun away from Mr. Woollard, proceeded downstairs, and "stated that he was going [to] kill himself." (J.A. 64.) Although not mentioned in the original police report (J.A. 64-65), Mr. Woollard claims order was restored after his son retrieved a different gun (J.A. 25). Mr. Woollard does not allege that Mr. Abbott possessed or used a gun of his own, or that, at any time, Mr. Abbott aimed a weapon at anyone other than at Mr. Abbott himself.

Following this incident, Mr. Woollard applied for and received a Permit for personal protection. (J.A. 15.) In 2006, MSP renewed that Permit for another three-year term. (*Id.*) When Mr. Woollard applied for a second renewal in 2009, MSP asked him to provide evidence to support his claim of "apprehended fear."

(J.A. 20.)  Mr. Woollard failed to submit any evidence (J.A. 15), and his renewal application was denied (J.A. 15, 20).

Mr. Woollard appealed to the Handgun Permit Review Board, which held a hearing in which it took testimony from Mr. Woollard, two witnesses appearing on Mr. Woollard's behalf, and an MSP representative.  (J.A. 14.)  After considering the evidence, the Handgun Permit Review Board upheld the denial of the Permit, concluding that Mr. Woollard had not had any contact with Mr. Abbott since 2002, and that there was no evidence of any threat "occurring beyond [Mr. Woollard's] residence, where he can already legally carry a handgun."  (J.A. 14-15.)  Mr. Woollard failed to appeal that decision.

## SUMMARY OF ARGUMENT

At issue in this case is whether the individual right to keep and bear arms protected by the Second Amendment secures a right to wear and carry, in public, easily-concealable, highly-lethal handguns in circumstances not related to hunting, organized military activities, target shooting, sport shooting, or related activities, where the individual cannot demonstrate a reasonable self-defense or other justification for doing so.  Plaintiffs claim the Second Amendment secures a right for individuals to bring loaded handguns onto crowded city streets and into public transportation centers, shopping malls, and other public gathering places based on nothing more than a desire to have a handgun available in case they subjectively

perceive a need to brandish or fire it while in a public space.  Their claim is not supported by the Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, ___ U.S. ___, 130 S. Ct. 3020 (2010), this Court's decisions addressing Second Amendment challenges following *Heller*, or the historical understanding of the right codified in the Second Amendment.

In *Heller* and *McDonald*, the Supreme Court struck down total bans on the possession of handguns within the homes of citizens in the District of Columbia and Chicago.  In doing so, the Court held that the Second Amendment guarantees an individual right for law-abiding, responsible individuals to possess and carry handguns for self-defense *in the home*.  In describing the contours of the pre-existing right that was codified in the Second Amendment, the Court identified, as purposes served by the right:  self-defense; membership in the militia; and, at least for some, hunting.  The Court did not identify any general right to carry firearms *outside* the home, much less the right to carry easily-concealable firearms outside the home in circumstances where one cannot articulate a reasonable self-defense or other need.  To the contrary, the public carry of firearms, especially easily-concealable firearms, has long been subject to regulation in the interest of public safety.  Maryland's Permit Statute does not burden any conduct within the scope of the Second Amendment identified in *Heller*.

10

Even if Maryland's Permit Statute could be construed to burden, in some way, conduct within the scope of the Second Amendment, it is reasonably adapted to Maryland's compelling government interest in public safety and the reduction of handgun violence. Maryland's Permit Statute, including its good-and-substantial-reason requirement, was enacted with the express purpose of reducing handgun violence in public places "to preserve the peace and tranquility of the State and to protect the rights and liberties of the public." CL § 4-202(5). The good-and-substantial-reason requirement is reasonably adapted to that interest, as it seeks to ensure that individuals with a demonstrable need to carry a handgun are able to do so while minimizing risks to public safety from the carry of handguns in public spaces by individuals without a good and substantial reason to carry them in public.

## ARGUMENT

### I. THE STANDARD OF REVIEW IS *DE NOVO*.

This Court reviews district court rulings on summary judgment under a *de novo* standard. *Norfolk Southern Ry. Co. v. City of Alexandria*, 608 F.3d 150, 156 (4th Cir. 2010). In conducting this review, the Court "consider[s] the facts in the light most favorable to the non-moving party," *Monumental Paving & Excavating, Inc. v. Pennsylvania Mfrs.' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999), by

"resolving all doubts and inferences in favor of the non-moving party," *Bacon v. City of Richmond*, 475 F.3d 633, 637-38 (4th Cir. 2007) (citation omitted).

## II.  THE SECOND AMENDMENT GUARANTEES AN INDIVIDUAL RIGHT FOR LAW-ABIDING CITIZENS TO KEEP AND BEAR ARMS FOR SELF-DEFENSE IN THE HOME, SUBJECT TO EXCEPTIONS.

### A.  The Supreme Court Identified a Second Amendment Right for Law-Abiding, Responsible Individuals to Possess a Handgun for Self-Defense in the Home.

The Second Amendment provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  In *District of Columbia v. Heller*, the Supreme Court reviewed a District of Columbia law that imposed a "complete prohibition" on the possession of handguns in the home, "where the need for defense of self, family, and property is most acute."  554 U.S. at 629. After engaging in a lengthy textual and historical analysis of the Second Amendment, the Court concluded:  (1) that the right codified by the amendment was a pre-existing right, *id.* at 592; (2) that this right is an individual right, not dependent on militia service, *id.*; and (3) that, "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *id.* at 635.   Maryland law expressly protects this right by allowing

individuals qualified to own a firearm to possess, carry, and transport handguns within, among other places, their homes. CL § 4-203(b)(6).

Although the Supreme Court declined to speculate about other conduct that might fall *within* the protection of the Second Amendment, *id.*, the Court observed that, notwithstanding the amendment's unconditional language, "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. Indeed, the Court identified, by way of example, a number of types of laws that it presumed would fall *outside* the protection of the amendment.

First, the Court observed that a majority of nineteenth-century courts had upheld the constitutionality of complete prohibitions on the carry of concealed weapons. *See id.* at 626; *see also Robertson v. Baldwin*, 165 U.S. 275, 281-82 (1897) ("[T]he right of the people to keep and bear arms (art. 2) is not infringed by laws prohibiting the carrying of concealed arms."). Second, the Court identified as "presumptively lawful regulatory measures": (i) longstanding bans on "the possession of firearms by felons and the mentally ill"; (ii) bans on "the carrying of firearms in sensitive places such as schools and government buildings"; and (iii) "laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27 & n.26. Third, the Court recognized that the right was limited to weapons "in common use at the time." *Id.* at 627. The Court's list,

which contained only "examples" of presumptively lawful regulations, did "not purport to be exhaustive." *Id.* at 627 n.26.

Two years after *Heller*, in *McDonald v. City of Chicago*, the Supreme Court held that the individual Second Amendment right is "fully applicable to the States." 130 S. Ct. at 3026. Although *McDonald* did not further clarify the substantive scope of the Second Amendment right, it promised that "'state and local experimentation with reasonable firearms regulation will continue under the Second Amendment.'" *Id.* at 3047 (quoting Brief of State of Texas, *et al.* as *Amici Curiae* at 23).

### B. This Court Has Declined to Expand the Core Second Amendment Right of Law-Abiding, Responsible Individuals to Possess a Handgun for Self-Defense in the Home.

*Heller* and *McDonald* left many questions unanswered, including the extent, if any, to which the Second Amendment's protections apply outside the home. In a series of cases, this Court has confirmed the limited scope of the core right identified by the Supreme Court in *Heller*, and has declined to expand that scope.

In *United States v. Chester*, this Court adopted a two-pronged approach to Second Amendment challenges. *See* 628 F.3d 673, 680 (4th Cir. 2010). The first question is "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id.* (internal quotation marks omitted). If not, the challenged law is valid. If, on the other hand, the

burdened conduct is found to be within the scope of the Amendment, then the second prong requires the reviewing court to apply "an appropriate form of means-end scrutiny." *Id.* This two-pronged approach has been adopted by the majority of federal courts to have reviewed Second Amendment claims after *Heller*. *See, e.g.*, *United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 (3rd Cir. 2010); *United States v. Skoien*, 614 F.3d 638, 639-43 (7th Cir. 2010) (*en banc*).

This Court has reiterated on multiple occasions the scope of the "core" Second Amendment right identified in *Heller*: the "clearly-defined fundamental right to possess firearms for self-defense *within* the home." *United States v. Masciandaro*, 638 F.3d 458, 467 (4th Cir. 2011) (emphasis added); *see also United States v. Mahin*, 668 F.3d 119, 123 (4th Cir. 2012) (*Heller* recognized "'the right of law-abiding responsible citizens to use arms in defense of hearth and home.'" (quoting *Heller*, 554 U.S. at 635)); *United States v. Moore*, 666 F.3d 313, 319 (4th Cir. 2012) (same); *United States v. Chapman*, 666 F.3d 220, 224 (4th Cir. 2012) (same); *United States v. Staten*, 666 F.3d 154, 158 (4th Cir. 2011) (same). There is a "considerable degree of uncertainty . . . as to the scope of [the Second Amendment] right beyond the home." *Masciandaro*, 638 F.3d at 467; *see also Mahin*, 668 F.3d at 124 ("[T]he Supreme Court has not clarified, and we have not held, that the Second Amendment extends beyond the home . . . .").

This Court has thus far declined to resolve that uncertainty, instead first assessing whether each statute that has come before it would survive the applicable level of scrutiny assuming, *arguendo*, that the Second Amendment were implicated.  *See Masciandaro*, 638 F.3d at 467; *Mahin*, 668 F.3d at 124; *Moore*, 666 F.3d at 319 n.7; *Chapman*, 666 F.3d at 225; *Staten*, 666 F.3d at 160-61; *United States v. Carter*, 669 F.3d 411, 416 (4th Cir. 2012).  As this Court explained:

> There simply is no need in this litigation to break ground that our superiors have not tread. To the degree that we push the right beyond what the Supreme Court in *Heller* declared to be its origin, we circumscribe the scope of popular governance, move the action into court, and encourage litigation in contexts we cannot foresee. This is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights.

*Masciandaro*, 638 F.3d at 475-76.[2]  Recognizing that the Supreme Court expressly left this issue unresolved, this Court observed that "[i]t is not far-fetched to think the *Heller* Court wished to leave open the possibility that such a danger would rise exponentially as one moved the right from the home to the public square."  *Id.*

---

[2] Judge Niemeyer, who otherwise wrote for a unanimous Court, disagreed with the majority on this point and wrote, only for himself, that the Second Amendment right extends, "at least in some form," outside the home.  *Id.* at 467.

**C.** **Most Other Courts to Consider Whether the Second Amendment Right Identified by the Supreme Court in *Heller* Extends Outside the Home Have Held That it Does Not or Have Declined to Resolve the Issue.**

Of the numerous courts outside the Fourth Circuit that have addressed whether the individual Second Amendment right extends outside the home, the vast majority either have held that it does not, *see, e.g.*, *Shepard v. Madigan*, No. 11-cv-405, 2012 U.S. Dist. LEXIS 44828, at *29-*30 (S.D. Ill. Mar. 30, 2012); *Moore v. Madigan*, No. 11-cv-03134, 2012 U.S. Dist. LEXIS 12967, at *14-*22 (C.D. Ill. Feb. 3, 2012); *Williams v. State*, 417 Md. 479, 496 (2011); *People v. Dawson*, 934 N.E.2d 598, 605 (Ill. App. Ct. 2010), have declined to resolve the issue while expressing significant doubt about whether the Second Amendment right extends outside the home, *see, e.g.*, *Kachalsky v. Cacace*, 817 F. Supp. 2d 235, 264-66 (S.D.N.Y. 2011); *Piszczatoski v. Filko*, Civ. No. 10-06110, 2012 U.S. Dist. LEXIS 4293, at *14-*48 (D.N.J. Jan. 12, 2012), or have declined to address the issue at all, *see, e.g.*, *Nordyke v. King*, No. 07-15763, 2012 U.S. App. LEXIS 11076, at *5-*6 (9th Cir. June 1, 2012); *United States v. Decastro*, No. 10-3773, 2012 U.S. App. LEXIS 11213, *11-*12 n.3 (2d Cir. June 1, 2012).

To date, only three federal district courts, including the court below, have concluded that the individual Second Amendment right identified by the Supreme Court in *Heller* extends outside the home. *See Bateman v. Perdue*, No. 5:10-CV-265-H, 2012 U.S. Dist. LEXIS 47336, at *10-*12 (E.D.N.C. Mar. 29, 2012);

17

*United States v. Weaver*, Crim. A. No. 2:09-cr-00222, 2012 U.S. Dist. LEXIS 29613, at \*11-\*13 (S.D. W. Va. Mar. 7, 2012).  All three courts did so largely based on the reasoning of Judge Niemeyer's concurrence in *Masciandaro*, discussed below at pages 31-35.  Notably, Judge Niemeyer's conclusion that the Second Amendment right extends outside the home "in some form," even if accepted, would not mean the right is implicated by Maryland's Permit Statute, which allows the wear and carry of multiple types of firearms outside the home without a permit; allows the wear and carry of handguns outside the home without a permit in connection with a number of specified activities; and allows the wear and carry of handguns outside the home with a permit for self-defense, provided the MSP finds it is "necessary as a reasonable precaution against apprehended danger."  CL § 4-203(b); PS § 5-306(a).

## III. THE PERMIT STATUTE DOES NOT BURDEN CONDUCT PROTECTED BY THE SECOND AMENDMENT.

The threshold inquiry is whether Maryland's Permit Statute "imposes a burden on conduct falling within the scope of the Second Amendment's guarantee as historically understood."  *Chapman*, 666 F.3d at 225 (citing *Chester*, 628 F.3d at 680).  This threshold "scope" inquiry presents the need to identify with specificity the "conduct" regulated by the statute, which in this case is narrowly circumscribed due to the operation of five important features of Maryland's statutory scheme.

The only conduct subject to the good-and-substantial-reason requirement is: (1) the wear, carry, or transport (2) of handguns, which are easily-concealable and highly-lethal, (3) in public, (4) in circumstances unconnected with hunting, organized military activities, target shoots, target practice, sport shooting events, certain safety classes, trapping, or the moving of a gun collection, and (5) without any demonstrable self-defense or other justification. The appropriate inquiry, therefore, is whether the Second Amendment protects *this specific* conduct, not whether it extends beyond the home in any form at all.

The focus of the historical component of the threshold inquiry is the scope of the pre-existing right codified in the Second Amendment at the time of ratification. *Heller*, 554 U.S. at 605-10. When examining this history, it is important to recognize the difference between our ancestors' *policy choices* regarding firearm restrictions, on the one hand, and the scope of the pre-existing *right*, on the other. The two are not synonymous. *See Skoien*, 614 F.3d at 641 (*Heller* sends the message that "exclusions [from the Second Amendment right] need not mirror limits that were on the books in 1791"). Founding-era firearms laws reflected the policy choices of that time, based on the public safety needs the people of that era confronted. Those choices did not necessarily reflect an understanding that different or more restrictive laws would have violated the pre-existing right. *Cf. Klaxon Co. v. Stentor Electric Mfg. Co.* 313 U.S. 487, 496 (1941) (states may enact

different policies "within the limits permitted by the Constitution"). As discussed below, the pre-existing right did not protect any conduct burdened by the Permit Statute.

A.    **The Right to Keep and Bear Arms in English and Early American Law Did Not Include the Right to Carry Easily-Concealable, Highly-Lethal Weapons in Public Without Good and Substantial Reason.**

The acknowledged predecessor to our Second Amendment, the 1689 English Bill of Rights, provides: "'That the subjects which are Protestants may have arms for their defense suitable to their conditions and as allowed by law.' 1 W. & M. c. 2, § 7, in 3 Eng. Stat. at Large 441 (1689)." *Heller* 554 U.S. at 593. This right, which came subject to the express caveat that it neither reached all arms nor offered protection against legislation by Parliament, was the foundation of the pre-existing right that was codified in the Second Amendment. *Id.*

As described in *Heller*, the pre-existing right was generally understood to protect a number of different uses of arms, none of which can properly be read to include the public carry of easily-concealed, highly-lethal handguns without a demonstrable self-defense or other justification. First, as explained in *Heller*, the pre-existing right protected "above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635. Although the Supreme Court did not foreclose the possibility that this self-

defense right might extend outside the home, the Court certainly did not hold that it does. *See, e.g.*, *United States v. Carter*, 669 F.3d at 415 ("The [Supreme] Court did not decide whether, or to what extent, the Second Amendment protects a right to self-defense outside of the home.")

Second, the right to keep and bear arms secured and protected the ability to maintain an effective militia. *Heller*, 554 U.S. at 598-99. Indeed, this was the purpose for which the pre-existing common law right was codified in the Second Amendment. *Id.* The Framers deemed it crucial to maintain a "well-regulated militia" that would be properly trained and ready when needed. *Id.* at 597-98. That objective obviously could not be achieved if the citizens comprising the militia did not both physically possess their militia weapons and have sufficient training and familiarity with them to be able to make effective use of them if and when called upon. *Id.*

Third, the right to keep and bear arms was a right to "resist tyranny" or to "oppose an oppressive military force if the constitutional order broke down." *Heller*, 554 U.S. at 598, 599. According to Blackstone, this right was one of five auxiliary rights, meant to be used chiefly to safeguard the three "great primary rights" of life ("personal security"), liberty ("personal liberty"), and property. 1 William Blackstone, *Commentaries on the Laws of England* 136 (Clarendon Press 1765). The first four auxiliary rights were the constitution, powers, and privileges

of parliament; the limitation on the king's prerogative; the right to petition the courts; and the right to petition the king or parliament for redress of grievances. *Id.* at 136-39. If the primary rights were not secured through these first four auxiliaries, the "fifth and last auxiliary right . . . is that of having arms for their defence, suitable to their condition and degree, and such as are allowed by law." *Id.* at 139. Blackstone described this as a "public allowance, under due restrictions, of the natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression." *Id.*

Fourth, some authorities also identified a right to keep and bear arms for hunting, which served both as a sport and as a means of providing the basic necessities of life for many Americans. *See Heller*, 554 U.S. at 599 (noting that most Americans "undoubtedly thought [the pre-existing right] even more important for self-defense and hunting").

The historical evidence does not suggest that the pre-existing right was commonly understood to protect an unqualified right to carry firearms in public, much less the carry in public of easily-concealable, highly-lethal firearms without any justification beyond a general desire to have a handgun in case a subjectively-perceived need to brandish or fire the gun arises.

### B. The Public Carry of Firearms Has Long Been Subject to Regulation.

#### 1. The Public Carry of Firearms Was Subject to Regulation From at Least the Fourteenth Century Through the Founding of the Republic.

The long history of significant restrictions on the public carry of firearms in the interest of public safety, including limits and bans on easily-concealable firearms, demonstrates that the pre-existing *right* was not generally understood to extend to the public carry of easily-concealable, highly-lethal firearms without a good and substantial reason. Restrictions on the public carry of arms in England date back to at least 1328 and the Statute of Northampton. That statute provided that, except while on the king's business, no man was permitted to "go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure." 2 Edw. 3, c. 3 (1328) (Eng.); *see also* 3 Edward Coke, *Institutes of the Laws of England* 160 (E. & R. Brooke 1797)).

The Statute of Northampton remained in place through the time of the Framers. In the words of Blackstone, whose works "constituted the preeminent authority on English law for the founding generation," *Heller*, 554 U.S. at 593-94 (internal quotation omitted):

> The offence of *riding or going armed* with dangerous or unu[s]ual weapons is a crime again[s]t the public peace, by terrifying the good people of the land; and is particularly prohibited by the [s]tatute of Northampton, 2 Edw. III. c. 3 upon pain of forfeiture of the arms and impri[s]onment during the king's plea[s]ure: in like manner as, by the laws of Solon, every Athenian was finable who walked about the city in armor.

4 William Blackstone, *Commentaries on the Laws of England* 148-49 (Clarendon Press 1769). Edward Coke's treatise also recognized the ongoing validity of the statute, and discussed the case of Sir Thomas Figett, who "went armed under his garments, as well in the palace," and was convicted and imprisoned for violating the Statute of Northampton notwithstanding his defense that he had gone armed to "[s]afeguard of his life." 3 Coke, *Institutes* at 161-62.

Versions of the Statute of Northampton were also expressly incorporated into the laws of Massachusetts, North Carolina, and Virginia. *See* 1 *Blackstone's Commentaries* 146 n.5, 149 n.14 (St. George Tucker, ed. 1803) ("*Tucker's Blackstone*") (referencing Virginia's adoption of the statute at L.V. 1794, c. 21); Patrick Charles, "Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review," 60 Clev. St. L. Rev. 1, 32 n.167 (forthcoming 2012), *available at* http://ssrn.com/abstract=1938950 (last visited June 15, 2012).

Although some commentators interpreted the Statute of Northampton to except from its scope the carry of weapons that was not conducted in such a

manner as to "terrify[] the good people of the land," others, including Blackstone, recognized the carry of "dangerous or unusual weapons" as an act that by its nature had the effect of "terrifying the good people of the land."  4 Blackstone at 148; *see also* Charles, 60 Clev. St. L. Rev. at 6 (Statute of Northampton "did not solely seek to regulate a particular conduct with the intent to terrify, but the activity of carrying arms among the public concourse"); *id.* at 33.  The Statute of Northampton, which predated, survived, and then co-existed with the English Bill of Rights, was apparently never deemed inconsistent with the pre-existing right codified in the Second Amendment.

American colonies and, subsequently, states also adopted other laws restricting the public carry of weapons, especially concealable weapons.  For example, in 1686, New Jersey passed a law providing that "no person . . . shall presume privately to wear any pocket pistol, skeines, stilladers, daggers or dirks, or other unusual or unlawful weapons within this Province," and that no planter other than a government officer, soldier, or foreign traveler passing peacefully through "shall ride or go armed with sword, pistol, or dagger."  An Act against wearing Swords, &c., *reprinted in The Grants, Concessions & Original Constitutions of the Province of New Jersey* 289-90 (Aaron Leaming & Jacob Spicer eds., Lawbook Exch. 2002).  By 1836, Massachusetts law required any person who went "armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon,

without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property," to find sureties for keeping the peace upon complaint by any person having reasonable cause to fear an injury or breach of the peace. Revised Statutes of the Commonwealth of Massachusetts 750, ch. 134 § 16 (Dutton & Wentworth 1836). Similar statutes were enacted in Maine, the District of Columbia, Wisconsin, Pennsylvania, Minnesota, and Michigan.[3]

Even where not expressly restricted by statute, the public carry of weapons remained actionable under the common law, enforced by American constables, magistrates, and justices of the peace. *See, e.g.*, Michael Dalton, *The Country Justice*, ch. 9, p. 37 (1690) (printed in the Maryland State Archives collection for 1690, *available at*: http://www.aomol.net/000001/000153/html/index.html) ("So of such as shall carry any Guns, Daggs, or Pistols that be charged, or that shall go apparelled with privy Coats or Doublets, the Justice may cause them to find Sureties for the Peace, and may take away such Weapons"); A Bill for the Office of Coroner and Constable (Mar. 1, 1682), *reprinted in Grants, Concessions & Original Constitutions* at 251 (constable oath) ("I will endeavour to arrest all such

_____

[3] Revised Statutes of the State of Maine 709 (Hallowell: Glazier, Masters & Smith 1847) (citing §1, chapter 76, of the 1821 Laws of Maine); Revised Code of the District of Columbia, 1857, 570 (A.O.P. Nicholson 1857); Revised Statutes of the State of Wisconsin 985 (W.B. Keen, Chicago 1858); Digest of the Laws of Pennsylvania, 376 (Kay & Brother 1873); General Statutes of the State of Minnesota 930 (West 1881); 2 General Statutes of the State of Michigan 2282 (Callaghan & Co. 1883).

persons, as in my presence, shall ride or go arm'd offensively."). The scope of the Second Amendment at the time it was ratified would have been understood in the context of this long history of regulation.

### 2. The Public Carry of Firearms Continued to Be Subject to Regulation After the Second Amendment Was Ratified.

The early nineteenth century saw a proliferation of easily-concealable weapons, including handguns that had become both more common, more dangerous, and more of a threat to public safety. *See* Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 138-41 (2006). State legislatures reacted, beginning in 1813, initially with laws generally banning the concealed carry of such weapons. *Id.* at 141.[4] As public safety concerns increased, a number of states enacted statutes generally banning the concealed and open carry of such weapons.

For example, in 1882, West Virginia made it a misdemeanor to carry, either openly or concealed, "any revolver or other pistol, dirk, bowie-knife, razor, slung shot, billy, metalic or other false knuckles, or any other dangerous or deadly weapon of like kind or character." 1882 W. Va. Acts, ch. 135. Notably, the statute

---

[4] *See, e.g.*, 1813 Ky. Acts 100, 100, Act of Feb. 3, 1813, ch. 59, § 1; 1813 La. Acts 172, Act of Mar. 25, 1813; 1820 Ind. Acts 39, Act of Jan. 14, 1820, ch. 23; 1837 Ark. Acts 280; 1838 Va. Acts 76, Act of Feb. 2, 1838, ch. 101; 1839 Ala. Acts 67, Act of Feb. 1, 1839, no. 77.

excepted "keeping or carrying" such weapons in one's home, and also provided an affirmative defense to prosecution upon a showing that the individual was quiet, peaceable, of good character and standing, *and* that at the time he was carrying "he had good cause to believe, and did believe, that he was in danger of death or great bodily harm at the hands of another person." *Id.* Maryland law today similarly allows individuals to wear or carry a handgun as "a reasonable precaution against apprehended danger," provided they obtain a permit. PS § 5-306(a)(5)(ii). The West Virginia high court, upholding the constitutionality of that state's statute, held that simply having been threatened with violence was not sufficient to allow invocation of the "good cause" exception. *State v. Workman*, 14 S.E. 9, 12 (W. Va. 1891).

Similarly, Texas, in 1871, made it a misdemeanor for any person to carry certain concealable weapons, including "any pistol." Tex. Act of Apr. 12, 1871, ch. 34, § 1. The Texas law was also subject to exceptions for carry in one's home or business and provided an affirmative defense based on a showing that the defendant had "reasonable grounds for fearing an unlawful attack on his person" that was "immediate and pressing." *Id.*; *see also State v. Duke*, 42 Tex. 455, 456 (1874). In rejecting a constitutional challenge, the Texas Supreme Court held that the statute "undertakes to regulate the place where, and the circumstances under which, a pistol may be carried; and in doing so, it appears to have respected the

right to carry a pistol openly when needed for self-defense or in the public service, and the right to have one at the home or place of business." *Id.* at 459. The same statute was upheld in *English v. State*, 35 Tex. 473 (1871), a case cited in *Heller* as supporting the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" 554 U.S. at 627.

Other nineteenth-century courts also upheld the constitutionality of complete bans on the concealed and open carry of easily-concealable weapons. For example, in *Andrews v. State*, also cited in *Heller*, 554 U.S. at 629, the Tennessee Supreme Court upheld a complete ban on the carry of a "belt or pocket pistol." 50 Tenn. 165, 171 (1871). The court invalidated a similar ban on the carry of revolvers, not because a restriction on public carry of such revolvers would not be permissible but because that ban applied to an individual's carry of a weapon "about his own home, or on his own premises," or traveling to a repair shop, or shooting a rabid dog in the street. *Id.* at 187; *see also Fife v. State*, 31 Ark. 455, 455 (1876) (upholding constitutionality of a law criminalizing "carrying a pistol as a weapon"); *but see Nunn v. State*, 1 Ga. 243, 251 (1846) (upholding ban on concealed, but not open, carry); *State v. Reid*, 1 Ala. 612, 616-17 (1840) (upholding ban on concealed carry where statute permitted open carry and suggesting ban on open carry would be unconstitutional).

Many states with nineteenth-century concealed-carry bans similarly recognized exceptions for an objectively-reasonable need for personal protection. *See*, *e.g.*, *McGuirk v. State*, 64 Miss. 209, 212 (1886) (upholding conviction for concealed carry of a pistol where defendant could not demonstrate he was "threatened in such manner as to afford good and sufficient reason to apprehend an attack"); *Chatteaux v. State*, 52 Ala. 388, 390 (1875) (affirming conviction for carry of a concealed pistol even though earlier the same day, in a different location, the individual had "good reason to apprehend an attack"). Likewise, Maryland's 1894 ban on the concealed carry of certain easily-concealable weapons provided an exception for weapons carried as a "reasonable precaution against apprehended danger." 1894 Laws of Maryland, ch. 547. That same language is included in the challenged Permit Statute as an example of a good and substantial reason.

With the rise of regulatory schemes, states began adopting statutes requiring permits to carry easily-concealable firearms in public. Regulatory regimes that authorized permits to be issued to wear and carry handguns, and that required a demonstration of "good cause," date back nearly a century. *See Piszczatoski*, 2012 U.S. Dist. LEXIS 4293, at *45-*48 (tracing adoption of need requirement in New Jersey law back to at least 1924 and "proper cause" requirement in New York law back to at least 1919). Maryland's own Permit Statute, enacted in 1972, is now 40 years old.

### C. *Heller* Did Not Recognize a General Right to Carry Arms in Public.

To date, only three federal district courts, including the court below, have held that the Second Amendment right recognized in *Heller* extends in any form beyond the home.  Those three courts relied significantly on that portion of Judge Niemeyer's analysis in *Masciandaro*, not joined by the rest of the panel, in which he concluded that there is "a plausible reading of *Heller* that the Second Amendment provides such a right [to possess a loaded handgun for self-defense outside the home], *at least in some form*."  *Masciandaro*, 638 F.3d at 467 (emphasis added); *see* J.A. 145-49 (court below); *Bateman*, 2012 U.S. Dist. LEXIS 47336, at *10-*12; *Weaver*, 2012 U.S. Dist. LEXIS 29613, at *11-*13.  However, especially after placing into context the statements from *Heller* on which Judge Niemeyer relied, neither those statements nor Judge Niemeyer's analysis support the Plaintiffs' broad claims in this case.

In the course of tracing the evolution of the right codified in the Second Amendment to determine whether it was an individual or group right, the Supreme Court observed that the pre-existing right secured by the English Bill of Rights was understood to be "an individual right protecting against both public and private violence."  *Heller*, 554 U.S. at 594.  Judge Niemeyer relied on this observation in reaching his conclusion that the right extends beyond the home.  However, viewed in its context within the *Heller* opinion, this statement distinguishes between

"public violence" (an armed defense against an oppressive government, which is Blackstone's fifth auxiliary right) and "private violence" (an attack by private citizen(s) against private citizen(s)). *See Heller*, 554 U.S. at 593-94. The terms "public" and "private" in this passage are used to distinguish the *type* of violence, not the location where the violence might occur. *See id.*

Judge Niemeyer's analysis also relied on the Supreme Court's statement that the Second Amendment guarantees "the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. That statement, however, was made in connection with the Court's exploration of whether the Second Amendment secures an individual or group right, and particularly its conclusion that "bear" was not solely a military term. The statement does not indicate what types of confrontation might justify invocation of the right, or under what circumstances, and in what locations. Although the Supreme Court declined to reach such questions in *Heller*, Judge Niemeyer concluded that because an individual might need to exercise self-defense both inside and outside a home, a right to keep and bear arms for self-defense must necessarily "extend[] to public areas beyond the home." *Masciandaro*, 638 F.3d at 468.

This conclusion, even if justified, does not implicate the scope of the Maryland Permit Statute in light of the availability of permits where there is a need for personal protection. Morever, the conclusion is not necessarily warranted in

light of the sharp line drawn by English and early American law with respect to the right of self-defense *within*, as opposed to *outside*, the home. Englishmen, and subsequently Americans, had the right to protect their homes with deadly force. 4 Blackstone, at 223. A man was even permitted to assemble "his friends and neighbours, to keep his hou[s]e against tho[s]e that come to rob, or kill him, or to offer him violence in it," and was protected from prosecution for doing so. 3 Coke, *Institutes* at 161-62. However, the same right did not apply outside the home, even for self-defense: "But he cannot a[ss]emble force, though he be extre[me]ly threat[e]ned, to go with him to church, or market, or any other place, but that is prohibited by this act." *Id.*[5]

Even if the Second Amendment were construed to provide a right to wear and carry a handgun in public for self-defense, that would not imply a right to do so simply because one believes it is theoretically possible to encounter a situation in which it might prove advantageous to brandish or fire a handgun. Indeed, firearms regulations have long recognized exceptions to laws banning concealed or all carry of concealable weapons where the carrier had, for example, "good cause

---

[5] Under the common law, violent self-defense was actively discouraged, and an individual had a duty to retreat from attack "as far as he conveniently or [s]afely can, to avoid the violence of the a[ss]ault, before he turns upon his a[ss]ailant." 4 Blackstone, *supra* at 184-85. That an individual retained the right eventually to turn upon his assailant if necessary does not imply a right to arm oneself preemptively in public without good and substantial reason.

to believe, and did believe, that he was in danger of death or great bodily harm at the hands of another person." *Workman*, 14 S.E. 9; *see also* discussion above at 25-26, 27-30. With its provision allowing permits for individuals who can demonstrate they need one "as a reasonable precaution against apprehended danger," PS § 5-306(a)(5)(ii), Maryland's Permit Statute includes the modern, regulatory version of these exceptions.

Judge Niemeyer's conclusion that the Second Amendment right likely extends "at least in some form" outside the home also relies on statements in *Heller* indicating that the pre-existing right was for "membership in a militia and for hunting." *Masciandaro*, 638 F.3d at 468 (citing *Heller*, 554 U.S. at 598-99). Maryland law does not burden either of these activities. *See* CL § 4-203(b)(4) (statute does not prohibit "the wearing, carrying, or transporting by a person of a handgun used in connection with an organized military activity, . . . [or] hunting . . .").

Finally, Judge Niemeyer opined that the *Heller* Court's phrasing of its holding "implies that a broader right exists" because *Heller* refers to the home as the place where the need for self-defense is "most acute," and lists, as an example of a presumptively lawful regulation, laws banning firearm possession in "sensitive places." *Masciandaro*, 638 F.3d at 468. In light of the Supreme Court's explicit statements about the limitations of its analysis, confirmation that its list of

presumptively-lawful regulations was not exhaustive, and the Court's pointed decision to limit its holding to the home, *see Heller*, 554 U.S. at 626, 635, *Heller* itself counsels against drawing inferences from the opinion that would broaden a holding the Court expressly kept narrow, *see Skoien*, 614 F.3d at 640 (language in *Heller* "warns readers not to treat *Heller* as containing broader holdings than the Court set out to establish"). To be sure, the Supreme Court did not rule out the possibility of a broader right, but its careful effort to narrowly limit the scope of its holding should not be disregarded. *Id.*; *see also Masciandaro*, 638 F.3d at 475-76.

In sum, even if it were appropriate to read isolated phrases from *Heller* as implying a Second Amendment right to possess a handgun outside the home for self-defense, "at least in some form," *Masciandaro*, 638 F.3d at 467, no passage in *Heller*, and no part of the historical understanding of the pre-existing right, justifies expanding the Second Amendment right in the manner urged by Plaintiffs. The Supreme Court has held that the Second Amendment, like the First Amendment, must be construed in accord with the way it was understood at the time of ratification. *See Heller*, 554 U.S. at 595 ("Thus, we do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose*." (emphasis in original)); *see also Baldwin*, 165 U.S. at 281 ("[T]he first ten amendments to the Constitution . . . [were intended]

simply to embody certain guaranties and immunities which we had inherited from our English ancestors, and which had from time immemorial been subject to certain well-recognized exceptions," such as the prohibition on speech "injurious to public morals or private reputation.").[6]  Maryland's Permit Statute does not burden any conduct within the scope of the Second Amendment and is therefore constitutional.

## IV.  EVEN IF THE PERMIT STATUTE BURDENED CONDUCT PROTECTED BY THE SECOND AMENDMENT, IT WOULD SATISFY THE APPLICABLE LEVEL OF SCRUTINY.

### A.  The Permit Statute Is Subject to No Greater than Intermediate Scrutiny.

In *Heller*, the Supreme Court declined to identify the appropriate level of scrutiny applicable to Second Amendment challenges, other than to proscribe the use of rational basis review.  *See* 554 U.S. at 628 n.27.  In fashioning a standard of review for Second Amendment challenges, this Court has observed that, even for fundamental rights, "the level of scrutiny we apply depends on the nature of the

---

[6] The Second Amendment is not the only constitutional right whose exercise can give rise to public safety concerns.  In numerous cases, the Supreme Court has recognized that constitutional rights can be regulated or limited in the interest of public safety.  *See, e.g.*, *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 376 (1997) (First Amendment); *Wilson v. Arkansas*, 514 U.S. 927, 935-36 (1994) (Fourth Amendment); *New York v. Quarles*, 467 U.S. 649, 655-56 (1984) (Fifth Amendment); *Brandenburg v. Ohio*, 395 U.S. 444, 447-48 (1969) (First Amendment); *Terry v. Ohio*, 392 U.S. 1, 7 (1968) (Fourth Amendment); *Sherbert v. Verner*, 374 U.S. 398, 403 (1963) (First Amendment).

conduct being regulated and the degree to which the challenged law burdens the right." *Chester*, 628 F.3d at 682. Using the flexible and context-specific approach developed in First Amendment cases "as a guide in developing a standard of review for the Second Amendment," *id.*, this Court has applied intermediate scrutiny to laws that burden conduct falling outside the core Second Amendment right "of law-abiding responsible citizens to use arms in defense of hearth and home," *id.* at 683; *Masciandaro*, 638 F.3d at 471.

In *Masciandaro*, this Court reviewed a challenge to the constitutionality of a federal ban on possession of a loaded firearm in a vehicle within a national park, a law that burdened only conduct outside the home. 638 F.3d at 459-60. Finding that the "core *Heller* right" applies only within the home, this Court observed that, "as we move outside the home, firearm rights have always been more limited, *because public safety interests often outweigh individual interests in self-defense*." *Id.* at 470 (emphasis added). As a result, although the Court found "the application of strict scrutiny important to protect the core right of the self-defense of a law-abiding citizen in his home," it concluded that "a lesser showing is necessary with respect to laws that burden the right to keep and bear arms outside of the home." *Id.* at 471 (internal citation omitted). In that case, this Court applied intermediate scrutiny, which requires the government to demonstrate that the challenged regulation "is reasonably adapted to a substantial government interest." *Id.*; *see*

*also Chester*, 628 F.3d at 683 (under intermediate scrutiny, "the government must demonstrate . . . that there is a 'reasonable fit' between the challenged regulation and a 'substantial' government objective"). Applying that test to the regulation before it, the Court readily determined that the regulation's prohibition was reasonably adapted to the government's "substantial interest in providing for the safety of individuals who visit and make use of the national parks." *Masciandaro*, 638 F.3d at 473-74.

Other courts have similarly concluded that statutes that do not burden the core right identified by the Supreme Court in *Heller* are subject to no greater than intermediate scrutiny. *See, e.g.*, *Marzzarella*, 614 F.3d at 96-97; *Reese*, 627 F.3d at 801-02; *Skoien*, 614 F.3d at 642; *Kachalsky*, 817 F. Supp. 2d at 268; *Piszczatoski*, 2012 U.S. Dist. LEXIS 4293, at *56-*59; *Peruta v. County of San Diego*, 758 F. Supp. 2d 1106, 1116-17 (S.D. Cal. 2010).[7] Because Maryland's

---

[7] Two federal courts recently applied a more stringent standard of scrutiny to laws challenged under the Second Amendment, but in both cases the courts did so because they determined that the laws implicated the exercise of the Second Amendment right in the home. *See Ezell v. City of Chicago*, 651 F.3d 684, 704, 708-09 (7th Cir. 2011) (applying "not quite 'strict scrutiny'" to a law that, the court found, prevented individuals from becoming proficient in using handguns); *Bateman*, 2012 U.S. Dist. LEXIS 47336, at *16 (applying strict scrutiny where the challenged law "prohibits law abiding citizens from purchasing and transporting to their homes firearms and ammunition needed for self-defense"). Neither *Ezell* nor *Bateman* involved a challenge to a handgun wear-and-carry permit statute.

Permit Statute does not burden "core" Second Amendment conduct, it is subject to no greater than intermediate scrutiny.[8]

## B. The Permit Statute Satisfies Intermediate Scrutiny.

Under intermediate scrutiny, "the government bears the burden of establishing a reasonable fit between [the challenged statute] and a substantial governmental objective." *Staten*, 666 F.3d at 161 (quoting *Chester*, 628 F.3d at 683). Once the Court identifies a substantial governmental objective, the Court considers whether there is a "reasonable fit" between the challenged law and that objective. *Staten*, 666 F.3d at 162. The government is not required to prove that the challenged law "is the least intrusive means" of supporting its substantial

---

[8] In *Masciandaro*, this Court determined that intermediate scrutiny is the appropriate standard of review applicable to Second Amendment challenges to statutes that regulate firearms outside of the home. *See* 468 F.3d at 471. A more appropriate standard, in Defendants' view, is the "reasonable regulation" standard that has been adopted by the vast majority of state courts, usually in the context of constitutional challenges under their own state analogs to the Second Amendment. *See* Adam Winkler, "Scrutinizing the Second Amendment," 105 Mich. L. Rev. 683, 686-87 n.12 (2007). Under this standard, which is more demanding than rational basis review, a government's regulation of the right to bear arms under its police power is constitutional if the exercise of that power is reasonable. *See, e.g.*, *State v. Cole*, 665 N.W.2d 328, 338 (Wis. 2003) (standard focuses on whether "the restriction . . . is a reasonable exercise of the State's inherent police powers," not "merely on whether any conceivable rationale exists under which the legislature may have concluded the law could promote the public welfare"). In light of this Court's adoption of the intermediate scrutiny standard applicable to laws regulating firearms outside of the home, Defendants present this issue to preserve it for appeal, but the remainder of this brief will focus on the intermediate scrutiny standard.

government objective, "or that there be no burden whatsoever" on the challenger's alleged Second Amendment right. *Id.* "In other words, the fit needs to be reasonable; a perfect fit is not required." *Id.*

## 1. Maryland Has a Compelling Government Interest in Protecting Public Safety and Reducing Handgun Violence.

Maryland's Permit Statute, including the good-and-substantial-reason requirement, serves the State's substantial interest in protecting public safety and reducing handgun violence. This purpose is reflected in codified legislative findings:

> The General Assembly finds that:
>
> (1) the number of violent crimes committed in the State has increased alarmingly in recent years;
>
> (2) a high percentage of violent crimes committed in the State involves the use of handguns;
>
> (3) the result is a substantial increase in the number of deaths and injuries largely traceable to the carrying of handguns in public places by criminals;
>
> (4) current law has not been effective in curbing the more frequent use of handguns in committing crime; and
>
> (5) additional regulations on the wearing, carrying, and transporting of handguns are necessary to preserve the peace and tranquility of the State and to protect the rights and liberties of the public.

CL § 4-202.  This purpose is also reflected in the testimony of Maryland law enforcement officers contained in the record.  (J.A. 109-10 (Bealefeld); 116-17 (Sheridan); 126-27 (Johnson).)[9]

As the district court recognized, it is "[b]eyond peradventure [that] public safety and the prevention of crime are substantial, indeed compelling, government interests."  (J.A. 154.)  The "primary concern of every government" is "a concern for the safety and indeed the lives of its citizens" and "the Government's general interest in preventing crime" is "compelling."  *United States v. Salerno*, 481 U.S. 739, 755, 750 (1987); *see Schall v. Martin*, 467 U.S. 253, 264 (1984) ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted." (internal quotation and citation omitted)); *Monroe v. City of Charlottesville*, 579 F.3d 380, 390 (4th Cir. 2009) ("The government's interest in protecting the citizenry from crime is without question compelling.").

## 2. The Precise Contours of the Permit Statute Correspond to its Legislative Purpose.

To examine a statute's "reasonable fit" with a government interest, the Court must first determine its precise contours.  *Chapman*, 666 F.3d at 227; *Staten*, 666

---

[9] The record contains the testimony, by declaration, of three of Maryland's then-highest-ranking law enforcement officers, with a combined 108 years of law enforcement experience:  (1) Frederick H. Bealefeld, III, Commissioner of the Baltimore Police Department (J.A. 108-14); (2) Terrence B. Sheridan (now retired), Superintendent of the Maryland State Police (J.A. 115-25); and (3) James W. Johnson, Chief of the Baltimore County Police Department (J.A. 126-34).

F.3d at 162.  This inquiry largely mirrors the inquiry into what conduct the statute burdens.  The Permit Statute requires that an individual who wants (1) to wear, carry, or transport (2) a handgun (3) in public, (4) in circumstances that do not involve hunting, organized military activities, target shoots, target practice, sport shooting events, certain firearms and hunter safety classes, trapping, or the moving of a gun collection, (5) must be found to have a good and substantial reason for doing so, "such as a finding that a permit is necessary as a reasonable precaution against apprehended danger."  PS § 5-306(a)(5)(ii).

The Permit Statute is thus narrow in several respects, as a result of the locations and activities it exempts, its provision for permits for those who can demonstrate a good and substantial reason for them, and its limitation only to handguns, the particular class of firearm that is by far the most disruptive of public safety, the most responsible for killings, and the most frequently used in criminal activity.  In light of the Supreme Court's discussion of handguns in *Heller*, the Permit Statute's limitation to handguns bears further comment.

In *Heller*, the Supreme Court rejected an argument that the District of Columbia could ban the possession of handguns in the home so long as it permitted possession of long guns.  554 U.S. at 629.  The Court observed that the American people "have considered the handgun to be the quintessential self-defense weapon," and noted a number of reasons "that a citizen may prefer a handgun *for*

*home defense*." *Id.* (emphasis added). For several reasons, the analysis changes once the right, and the arms, move outside the home. Initially, "as we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense." *Masciandaro*, 638 F.3d at 470; *see also id.* at 475-76 (risk of "some unspeakably tragic act of mayhem" might "rise exponentially as one moved the [Second Amendment] right from the home to the public square").

Moreover, possession and carrying of handguns outside the home pose different, and greater, dangers than they do inside the home. The same factors that make handguns the weapon of choice for defense of the home also make them the weapon of choice for criminals outside the home, because their small size, light weight, and ready concealability make them ideal for individuals who use stealth and the element of surprise in criminal activities. (J.A. 109-10 (Bealefeld); 116-17 (Sheridan); 126-27 (Johnson).) Similarly, an individual's possession of a handgun in his own home obviously does not present the same risks to public safety as does his carry of the same handgun in public. Handguns are also likely to be less effective for self-defense outside the home than in. Because the element of surprise is often greater in a violent altercation outside one's home or business, a potential victim has less of an opportunity to make use of a handgun for self-defense outside the home. (J.A. 111-12 (Bealefeld); 118-19, 120 (Sheridan);

43

129-30 (Johnson).) Moreover, assailants outside the home are more likely to be able to wrest handguns away from potential victims who do not have sufficient training to use the handgun effectively for self-defense. (J.A. 111-12 (Bealefeld); 119-20, 121 (Sheridan); 128-29 (Johnson).)

> **3.** **A "Reasonable Fit" Exists Between the Good-and-Substantial-Reason Requirement and the State's Interest in Public Safety and Reducing Handgun Violence.**

Under intermediate scrutiny, the government bears the burden of demonstrating that the challenged law bears a "reasonable fit" to the State's compelling interest in public safety and reducing handgun violence. *Chester*, 628 F.3d at 683. In making this inquiry, it is appropriate to consider evidence, common sense, case law, logic, and the judgment of government officials charged with public safety. *See*, *e.g.*, *Staten*, 666 F.3d at 167; *Masciandaro* 638 F.3d at 473 (considering judgment of the Secretary of the Interior, who "could have reasonably concluded that, when concealed within a motor vehicle, a loaded weapon becomes even more dangerous").

Handguns, far more than any other type of firearm, play a major role in violence perpetrated in the United States. In 2010, of 6,836 murders committed

with an identified type of firearm, 87.9% were committed with handguns.[10] Between 1993 and 2001, 87.4% of all nonlethal violent crimes involving a firearm—including 93.7% of robberies by firearm and 84% of assaults by firearm—were committed with handguns.[11] Handguns are also the primary cause of non-traffic fatalities among law enforcement officers.[12] *See Terry v. Ohio*, 392 U.S. 1, 23-24 & n.1 (1968) (recognizing significant threat to law enforcement officers from "handguns easily secreted about the person").

Maryland is a relatively small, densely-populated state with significant illegal drug problems.[13] Although 2010, the latest year for which data are available, produced Maryland's lowest rates of overall violent crime and homicide since reporting began,[14] Maryland continues to suffer from a violent crime rate that

[10] U.S. Dep't of Justice, Bureau of Justice Statistics, *Crime in the United States* (2010) ("CIUS 2010"), Expanded Homicide Data Table 8, *available at* http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/tables/10shrtbl08.xls.

[11] Craig Perkins, "Weapon Use & Violent Crime," U.S. Dep't of Justice, Bureau Of Justice Statistics 2 (2003), *available at* http://www.bjs.gov/content/pub/pdf/wuvc01.pdf; *see also* (J.A. 70, 75-76.)

[12] Fed. Bureau of Investigation, *Law Enforcement Officers Feloniously Killed, 1996-2005*, *available at* http://www2.fbi.gov/ucr/killed/2005/table28.htm.

[13] *See* National Drug Intelligence Center, Maryland Drug Threat Assessment (August 2002), *available at* http://www.justice.gov/ndic/pubs1/1827/overview.htm.

[14] Maryland Governor's Office of Crime Control & Prevention, *Maryland 2010 Crime Totals*, *available at* http://www.goccp.maryland.gov/msac/crime-statistics.php (last visited June 15, 2012).

is far too high, and its largest city, Baltimore, consistently ranks as one of the ten most violent cities in the country.  (J.A. 109 (Bealefeld).)

The firearm of choice for Maryland's criminals is the handgun.  Of the 293 firearm murders committed in Maryland in 2010, 272—92.8%—were committed with handguns.[15]  Of the State and local law enforcement officers killed by intentional gunfire from a firearm of known type since 1857, 78.75% of those statewide, and 85% in Baltimore City, were caused by a handgun.[16]  Handguns are the single greatest threat to the safety of Maryland law enforcement officers. (J.A. 110 (Bealefeld), 117 (Sheridan), 133 (Johnson).)  More than just numbers, the impact of handgun violence on Maryland is devastating to the communities in which it occurs.  (J.A. 109-10 (Bealefeld); 130-31, 133 (Johnson).)

The good-and-substantial-reason requirement decreases the likelihood that basic confrontations will turn deadly.   (J.A. 112 (Bealefeld); 132 (Johnson).) Many assaults arise from petty disputes, and the presence of handguns greatly

---

[15] CIUS 2010, *supra*, Table 20, *available at* http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/tables/10tbl20.xls.

[16] Officer Down Memorial Page, Inc. ("ODMP"), "Fallen Officers in Maryland," http://www.odmp.org/search/browse?state=MD (last visited June 15, 2012) (63 of 80 law enforcement officers killed statewide by firearm of known type involved handgun); ODMP, "Honoring All Fallen Members of the Baltimore City Police Department," http://www.odmp.org/agency/214-baltimore-city-police-department-maryland  (last visited June 15, 2012) (23 of 27 Baltimore City law enforcement officers killed by firearm of known type involved handgun).

increases the likelihood that the disputes will become violent and deadly.[17]

(J.A. 112 (Bealefeld).)  The public presence of handguns can lead to "accidents with loaded guns on public streets or the escalation of minor public altercations into gun battles or . . . the danger of a police officer stopping a car with a loaded weapon on the passenger seat." *People v. Marin*, 795 N.E.2d 953, 962 (Ill. App. Ct. 2003).  A gun holder's "otherwise 'innocent' motivations may transform into culpable conduct because of the accessibility of weapons as an outlet for subsequently kindled aggression." *Id.*  Indeed, just the presence of a handgun on a crowded public sidewalk may lead to a dangerous panic or a confrontation.

The good-and-substantial-reason requirement also helps to decrease the availability of handguns to criminals.  (J.A. 73-74 (Cook);[18] 111 (Bealefeld); 119-20 (Sheridan).)[19]  Many criminals and would-be criminals, including many

---

[17] In one example from recent headlines, a Texas holder of a concealed handgun permit who brought a gun with him to complain about the noise at a party ended up shooting three people, killing one, when the confrontation escalated.  Brian Rogers, "Self-Defense Case Hinges on Video of Incident," Houston Chron. June 7, 2012, at B1.  The shooter's attorney described the shooter as "the kind of [concealed handgun license] holder who wears a holstered gun and an extra clip to go outside." *Id.*

[18] References to "Cook" in the joint appendix refer to the expert witness testimony of Professor Philip J. Cook, a professor of public policy at Duke University who has been researching firearms violence since 1975.  (J.A. 66-107.)

[19] A number of studies have demonstrated the beneficial impact on crime of more stringent gun laws.  *See, e.g.*, Mayors Against Illegal Guns, *Trace the Guns* (2010), *available at* www.tracetheguns.org/report.pdf (demonstrating the impact of various types of gun laws on the rate of export of "crime guns"); D.W. Webster, J.S.

juveniles, are not lawfully permitted to obtain handguns, the weapon of choice in criminal activity. One source of handguns for them is robbery or theft from law-abiding citizens. Indeed, police officers are sometimes targets of robberies and burglaries precisely because they are known to keep guns. (J.A. 111 (Bealefeld); 120 (Sheridan); 123 (Johnson).) This problem is exacerbated because a handgun can be very difficult to control and retain when its owner is under attack from a criminal, especially the type of surprise attack that is more likely to occur outside one's home. (J.A. 110-12 (Bealefeld); 128-30 (Sheridan).)

The good-and-substantial-reason requirement also limits the likelihood that victims of violent crimes will be killed. Research has shown that: (1) the use of handguns in violent crimes substantially increases the likelihood that the victim will be killed; (2) the likelihood a handgun will be used in a violent crime is closely linked to the general availability of guns; and, therefore (3) the prevalence of firearms has a direct positive effect on the lethality of crimes. (J.A. 70-75 (Cook).) *See Skoien*, 614 F.3d at 642 ("guns are about five times more deadly than knives" (citing Franklin E. Zimring, "Firearms, Violence, and the Potential Impact

Vernick, & L.M. Hepburn, "Relationship between licensing, registration, and other gun sales laws and the source of state crime guns," 7 Injury Prevention 1, 184 (2001), *available at* http://injuryprevention.bmj.com/content/7/3/184.full (concluding that "states with registration and licensing systems appear to do a better job than other states of keeping guns initially sold within the state from being recovered in crimes").

of Firearms Control," 32 J.L. Med. & Ethics 34 (2004))); *Peruta*, 758 F. Supp. 2d at 1117 ("The government also has an important interest in reducing the number of concealed handguns in public because of their disproportionate involvement in life-threatening crimes of violence, particularly in streets and other public places").

The good-and-substantial-reason requirement also reduces interference with the ability of law enforcement officers to protect public safety. (J.A. 113 (Bealefeld); 131-32 (Johnson).) A proliferation of publicly-carried handguns by individuals without a good and substantial reason to have them would make it much more difficult for law enforcement officers to prevent criminal activity by confronting individuals who are observed carrying a handgun before they commit a crime. Interdiction efforts have been effective tools in stopping criminal activity before it has a chance to develop. (J.A. 76-77 (Cook); J.A. 121 (Sheridan).) This method of preventing criminal activity will become more difficult if individuals without good and substantial reason are allowed to carry handguns in public. *See* Lawrence Rosenthal, "Second Amendment Plumbing After Heller: Of Standards of Scrutiny, Incorporation, Well-Regulated Militias, & Criminal Street Gangs," 41 Urb. La. 1, 31-44 (2009).

The good-and-substantial-reason requirement also helps to reduce the risk of accidental discharges of firearms in public. (J.A. 133 (Johnson).) Unlike individuals who might choose to be in a home in which a handgun is kept, innocent

bystanders in public will not have had the same choice. Indeed, persons carrying handguns in public settings may actually increase the risk of serious injury or death to themselves and others. Citizens are not typically trained to develop proper responses to potentially violent confrontations, and impulsive or inadvertent actions can turn deadly when one or both parties possess a handgun. (J.A. 112-13 (Bealefeld), 118-19 (Sheridan), 129, 132-33 (Johnson).)

Additionally, in the absence of a good-and-substantial-reason requirement, Maryland would likely be required to issue permits to individuals who will use their handguns to commit crimes. Although the primary factor used to disqualify individuals from receiving a permit in "shall-issue" jurisdictions is whether they have a past felony conviction, studies have found that fewer than half of adults arrested for criminal homicide have prior felony convictions. (J.A. 78-79 (Cook).) *See* Philip J. Cook, et al., "Criminal Records of Homicide Offenders," J. Am. Med. Ass'n, 294(5): 598-601 (2005), *available at* http://jama.jamanetwork.com/ pdfaccess.ashx?ResourceID=1966033&PDFSource=13. Using prior history of felony convictions as the primary determinant of who receives a carry permit does not adequately predict who is likely to use a handgun for criminal activity, and could result, for example, in gang members without criminal records obtaining permits. (J.A. 128 (Johnson).) *See* Minnesota Drug & Violent Crime Task Forces, 2011 Annual Report at 6, *available at* http://archive.leg.state.mn.us/docs/2011/

other/110935.pdf (reporting that it is not unusual for members of gangs, especially of outlaw motorcycle gangs, to have "a permit to carry a firearm" in Minnesota, a "shall-issue" state).[20]

### C. Other Courts Have Upheld Similar, and More Restrictive, Permit Statutes Under Intermediate Scrutiny.

In the wake of the Supreme Court's decisions in *Heller* and *McDonald*, lawsuits have been brought challenging numerous firearm laws around the country. Although no federal appeals court has yet ruled in any of these cases, the district courts—with the sole exception of the court below—have uniformly upheld the constitutionality of handgun permit statutes that are similar to, and in some cases stricter than, Maryland's.

In *Kachalsky v. Cacace*, the United States District Court for the Southern District of New York upheld New York's requirement that an applicant for a concealed carry permit demonstrate that "proper cause exists for the issuance" of the permit. *See* 817 F. Supp. 2d 235, 240 (S.D.N.Y. 2011) (New York courts have interpreted "proper cause" to mean "'a special need for self-protection distinguishable from that of the general community or of persons engaged in the

---

[20] In another example from recent headlines, on May 30, 2012, a Washington State holder of a concealed carry permit killed five other people before taking his own life. *See* Jennifer Sullivan & Jonathan Martin, "A Life Full of Rage, a Shocking Final Act," *Seattle Times*, June 1, 2012, at A1. The shooter apparently had a history of trouble, but nothing in his background disqualified him from receiving a concealed carry permit in Washington State. *See id.*

same profession.'") (internal citation omitted).[21]  Assuming, for purposes of its analysis, that New York's permit statute burdened protected conduct, the court held that it would survive intermediate scrutiny because the statute's restriction is substantially related to New York's compelling interest in protecting public safety. *See id.* at 271 (observing that New York's "proper cause" requirement was not a ban, but a requirement that individuals demonstrate an "actual and articulable" need for self-defense).

Similarly, in *Piszczatoski*, the district court rejected a challenge to a New Jersey law that requires a permit applicant to demonstrate a "justifiable need to carry a handgun."  2012 U.S. Dist. LEXIS 4293, at *2.  In upholding the law, the court held that "[t]he Second Amendment does not protect an absolute right to carry a handgun for self-defense outside the home," *id.* at *15, and that the provision at issue is the sort of "longstanding" licensing provision that the Supreme Court found to be presumptively lawful in *Heller*, *id.* at *44.  The court further ruled that the "justifiable need" requirement did not unconstitutionally burden a Second Amendment right "because this requirement is sufficiently tailored to address an important state interest" in public safety.  *Id.* at *49, *60-*67.

---

[21] Unlike Maryland, New York does not allow open carry of handguns at all, and requires a permit even to possess a handgun in one's home.  *Kachalsky*, 817 F. Supp. 2d at 240.

Other courts have recently rejected constitutional challenges to other statutes regulating, and even banning, the carry of handguns in public based on similar analyses. *See, e.g.*, *Moore*, 2012 U.S. Dist. LEXIS 12967 (upholding Illinois law banning the public carry of firearms, even though the Illinois law contains no provision by which a citizen may receive a carry permit); *Kuck v. Danaher*, 822 F. Supp. 2d 109, 120, 129-30 (D. Conn. 2011) (upholding, on intermediate scrutiny analysis, Connecticut law requiring a handgun carry permit applicant to demonstrate he intends to use the handgun for a lawful purpose and is a "suitable person" to receive such a permit); *Hightower v. City of Boston*, 822 F. Supp. 2d 38, 44, 61-65 (D. Mass. 2011) (rejecting as unripe a challenge to Massachusetts law requiring a firearm carry permit applicant to demonstrate to a licensing authority that he is "a suitable person to be issued such license," but adding, in dicta, that the challenged law would survive intermediate scrutiny); *Peruta*, 758 F. Supp. 2d at 1114-15 (upholding, on intermediate scrutiny analysis, California law requiring "good cause" for issuance of concealed carry permit; statute permitted limited exception allowing open carry of a loaded handgun for "immediate self-defense"). With the lone exception of the district court below, no federal court after *Heller* has invalidated a handgun wear-and-carry permit statute under the Second Amendment.

**D.    The District Court Erred in Holding that the Permit Statute Is Not a Reasonable Fit with Maryland's Interest in Public Safety and Reducing Handgun Violence.**

The district court properly recognized the State's compelling government interest in public safety.  (J.A. 154-55.)  However, the court erroneously concluded that the Permit Statute employs "overly broad means by which . . . to advance" the State's "undoubtedly legitimate end."  (J.A. 154.)  The Permit Statute, the district court mistakenly concluded, is a "rationing system" that "does no more to combat [public safety threats] than would a law indiscriminately limiting the issuance of a permit to every tenth applicant"[22] (*id.*), and is "not tailored to the problem it is intended to solve" because the issuance of permits to individuals who demonstrate a good and substantial reason will itself give rise to public safety risks.  (J.A. 155-56.)  Furthermore, the district court concluded, Maryland must show individually why each applicant should not be entitled to wear and carry easily-concealable, highly-lethal handguns in public, rather than require applicants to provide evidence of a good and substantial reason.  (J.A. 156.)  The district court's conclusions are erroneous in several respects.

First, the district court misapplied the intermediate scrutiny standard, effectively requiring a perfect fit, not a reasonable fit, to the State's compelling

---

[22] The district court's reference to "every tenth applicant" has no foundation in the record.  During the most recent five years for which statistics are available, more than 93% of applicants received a permit. *See* discussion above at 7.

interest in public safety. The district court implicitly recognized that the good-and-substantial-reason requirement in fact combats threats to public safety, (J.A. 155 ("the challenged regulation does *no more* to combat [threats to public safety] than would" a categorical limitation on the award of permits)), but demanded that the Permit Statute be tailored precisely to specific types of harm by limiting restrictions to particular types of people or particular locations (J.A. 154). Such tailoring would not be sufficient to address the State's public safety interest, which, as discussed above, is not limited to specific, identifiable individuals and locations. Moreover, such tailoring is not required by intermediate scrutiny.

Second, the fact that issuing permits to applicants who demonstrate a good and substantial reason may itself give rise to public safety threats does not mean that the Permit Statute is not reasonably adapted to the State's interest in public safety. To the contrary, the Maryland General Assembly reasonably concluded that the demonstrable need of individuals with good and substantial reason to wear and carry a handgun in public outweighed the accompanying risks. That does not in any way diminish the State's substantial concern about the public safety effect of abandoning the good-and-substantial-reason requirement, which would allow the wear and carry in public of handguns by a potentially larger subset of individuals who lack any demonstrable self-defense or other justification to do so. Those are precisely the types of judgments generally entrusted to the legislative

branch, *see, e.g.*, *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997), and they are not foreclosed by the Second Amendment.

Finally, the district court's conclusion ignores the evidence showing that the reasonable fit of the Permit Statute is grounded in *which* people receive permits. Permits are issued to individuals who, whether through occupational requirements, inherent occupational threats, or actual personal safety threats, have a reason to wear and carry a handgun that goes beyond mere anxiety. The good-and-substantial-reason requirement is thus fashioned to ensure that people who legitimately need the protection of a handgun while in public have it, while simultaneously avoiding the public safety threats that would accompany the introduction of more handguns carried in public spaces by individuals without good and substantial reason to do so. Even if it is not a *perfect* fit for the State's public safety concerns, that mechanism is certainly a *reasonable* one.[23]

---

[23] In its memorandum opinion, the district court rejected Plaintiffs' Equal Protection challenge. (J.A. 157-58.) The court properly held that the Equal Protection challenge, Count II of the amended complaint, was simply an effort to restate the Second Amendment claim in "an effort to obtain review under a more stringent standard than [] intermediate scrutiny." (J.A. 158.) Noting that such an effort would "erase, in one broad stroke, the careful and sensible distinctions that the Fourth Circuit and other courts have drawn between core and non-core Second Amendment protections," the district court declined to adopt Plaintiffs' argument and rejected their equal protection claim. (J.A. 158.) Nevertheless, in its order entered contemporaneously with the opinion, the district court granted Plaintiffs' motion for summary judgment in full and denied the cross-motion filed by the State Defendants in full. (J.A. 160.) Based on its proper rejection of Plaintiffs' equal protection challenge, the district court erred in failing to deny Plaintiffs'

Lacking any articulable self-defense or other good and substantial reason to wear and carry a handgun in public when his permit renewal application was denied in 2009, Mr. Woollard thus cannot demonstrate that the Permit Statute is unconstitutional as applied to him. Plaintiffs' facial challenge must, therefore, be rejected as well. *Masciandaro*, 638 F.3d at 474.

---

motion for summary judgment, and in failing to grant the State Defendants' cross-motion, as to Count II of the amended complaint.

# CONCLUSION

The judgment of the United States District Court for the District of Maryland should be reversed, and the Court should direct entry of judgment in favor of Appellants.

Pursuant to Federal Rule of Appellate Procedure 34(a)(1) and Local Rule 34(a), Appellants request that this matter be scheduled for oral argument. As described more fully above, this case involves questions of significant importance and of first impression in this Circuit relating to the scope and application of the right secured by the Second Amendment.

DOUGLAS F. GANSLER
Attorney General of Maryland

s/ Matthew J. Fader

DAN FRIEDMAN                          MATTHEW J. FADER
Assistant Attorney General           STEPHEN M. RUCKMAN
Office of the Attorney General       Assistant Attorneys General
Legislative Services Building        200 St. Paul Place, 20th Floor
90 State Circle                      Baltimore, Maryland 21202
Annapolis, Maryland 21401            Tel. 410-576-7906
Tel. 410-946-5600

June 21, 2012*                       Attorneys for Appellants
CORRECTED BRIEF

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**No.** 12-1437     **Caption:** Raymond Woollard, et al. v. Denis Gallagher, et al.

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

- ☑ this brief contains _____13,816_____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

- ☐ this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

- ☑ this brief has been prepared in a proportionally spaced typeface using
  Microsoft Word _____ [*identify word processing program*] in
  14 pt, Times New Roman _____ [*identify font size and type style*]; **or**

- ☐ this brief has been prepared in a monospaced typeface using
  _____ [*identify word processing program*] in
  _____ [*identify font size and type style*].

(s) Matthew J. Fader _____

Attorney for Appellants _____

Dated: June 21, 2012 _____

**STATUTORY ADDENDUM**

Maryland Code Annotated, Criminal Law Article, § 4-203 (2012)

§ 4-203. Wearing, carrying, or transporting handgun

(a) Prohibited. --

    (1) Except as provided in subsection (b) of this section, a person may not:

        (i) wear, carry, or transport a handgun, whether concealed or open, on or about the person;

        (ii) wear, carry, or knowingly transport a handgun, whether concealed or open, in a vehicle traveling on a road or parking lot generally used by the public, highway, waterway, or airway of the State;

        (iii) violate item (i) or (ii) of this paragraph while on public school property in the State; or

        (iv) violate item (i) or (ii) of this paragraph with the deliberate purpose of injuring or killing another person.

    (2) There is a rebuttable presumption that a person who transports a handgun under paragraph (1)(ii) of this subsection transports the handgun knowingly.

(b) Exceptions. -- This section does not prohibit:

    (1) the wearing, carrying, or transporting of a handgun by a person who is on active assignment engaged in law enforcement, is authorized at the time and under the circumstances to wear, carry, or transport the handgun as part of the person's official equipment, and is:

        (i) a law enforcement official of the United States, the State, or a county or city of the State;

        (ii) a member of the armed forces of the United States or of the National Guard on duty or traveling to or from duty;

        (iii) a law enforcement official of another state or subdivision of another state temporarily in this State on official business;

        (iv) a correctional officer or warden of a correctional facility in the State;

        (v) a sheriff or full-time assistant or deputy sheriff of the State; or

        (vi) a temporary or part-time sheriff's deputy;

(2) the wearing, carrying, or transporting of a handgun by a person to whom a permit to wear, carry, or transport the handgun has been issued under Title 5, Subtitle 3 of the Public Safety Article;

(3) the carrying of a handgun on the person or in a vehicle while the person is transporting the handgun to or from the place of legal purchase or sale, or to or from a bona fide repair shop, or between bona fide residences of the person, or between the bona fide residence and place of business of the person, if the business is operated and owned substantially by the person if each handgun is unloaded and carried in an enclosed case or an enclosed holster;

(4) the wearing, carrying, or transporting by a person of a handgun used in connection with an organized military activity, a target shoot, formal or informal target practice, sport shooting event, hunting, a Department of Natural Resources-sponsored firearms and hunter safety class, trapping, or a dog obedience training class or show, while the person is engaged in, on the way to, or returning from that activity if each handgun is unloaded and carried in an enclosed case or an enclosed holster;

(5) the moving by a bona fide gun collector of part or all of the collector's gun collection from place to place for public or private exhibition if each handgun is unloaded and carried in an enclosed case or an enclosed holster;

(6) the wearing, carrying, or transporting of a handgun by a person on real estate that the person owns or leases or where the person resides or within the confines of a business establishment that the person owns or leases;

(7) the wearing, carrying, or transporting of a handgun by a supervisory employee:

(i) in the course of employment;

(ii) within the confines of the business establishment in which the supervisory employee is employed; and

(iii) when so authorized by the owner or manager of the business establishment;

(8) the carrying or transporting of a signal pistol or other visual distress signal approved by the United States Coast Guard in a vessel on the waterways of the State or, if the signal pistol or other visual distress signal is unloaded and carried in an enclosed case, in a vehicle; or

(9) the wearing, carrying, or transporting of a handgun by a person who is carrying a court order requiring the surrender of the handgun, if:

(i) the handgun is unloaded;

(ii) the person has notified the law enforcement unit, barracks, or station that the handgun is being transported in accordance with the court order; and

(iii) the person transports the handgun directly to the law enforcement unit, barracks, or station.

(c) Penalty. --

(1) A person who violates this section is guilty of a misdemeanor and on conviction is subject to the penalties provided in this subsection.

(2) If the person has not previously been convicted under this section, § 4-204 of this subtitle, or § 4-101 or § 4-102 of this title:

(i) except as provided in item (ii) of this paragraph, the person is subject to imprisonment for not less than 30 days and not exceeding 3 years or a fine of not less than $ 250 and not exceeding $ 2,500 or both; or

(ii) if the person violates subsection (a)(1)(iii) of this section, the person shall be sentenced to imprisonment for not less than 90 days.

(3) (i) If the person has previously been convicted once under this section, § 4-204 of this subtitle, or § 4-101 or § 4-102 of this title:

1. except as provided in item 2 of this subparagraph, the person is subject to imprisonment for not less than 1 year and not exceeding 10 years; or

2. if the person violates subsection (a)(1)(iii) of this section, the person is subject to imprisonment for not less than 3 years and not exceeding 10 years.

(ii) The court may not impose less than the applicable minimum sentence provided under subparagraph (i) of this paragraph.

(4) (i) If the person has previously been convicted more than once under this section, § 4-204 of this subtitle, or § 4-101 or § 4-102 of this title, or of any combination of these crimes:

1. except as provided in item 2 of this subparagraph, the person is subject to imprisonment for not less than 3 years and not exceeding 10 years; or

2. A. if the person violates subsection (a)(1)(iii) of this section, the person is subject to imprisonment for not less than 5 years and not exceeding 10 years; or

B. if the person violates subsection (a)(1)(iv) of this section, the person is subject to imprisonment for not less than 5 years and not exceeding 10 years.

(ii) The court may not impose less than the applicable minimum sentence provided under subparagraph (i) of this paragraph.

Maryland Code Annotated, Public Safety Article, § 5-306 (2012)

§ 5-306. Qualifications for permit

(a) In general. -- Subject to subsection (b) of this section, the Secretary shall issue a permit within a reasonable time to a person who the Secretary finds:

(1) is an adult;

(2) (i) has not been convicted of a felony or of a misdemeanor for which a sentence of imprisonment for more than 1 year has been imposed; or

(ii) if convicted of a crime described in item (i) of this item, has been pardoned or has been granted relief under 18 U.S.C. § 925(c);

(3) has not been convicted of a crime involving the possession, use, or distribution of a controlled dangerous substance;

(4) is not presently an alcoholic, addict, or habitual user of a controlled dangerous substance unless the habitual use of the controlled dangerous substance is under legitimate medical direction; and

(5) based on an investigation:

(i) has not exhibited a propensity for violence or instability that may reasonably render the person's possession of a handgun a danger to the person or to another; and

(ii) has good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger.

(b) Applicant under age of 30 years. -- An applicant under the age of 30 years is qualified only if the Secretary finds that the applicant has not been:

(1) committed to a detention, training, or correctional institution for juveniles for longer than 1 year after an adjudication of delinquency by a juvenile court; or

(2) adjudicated delinquent by a juvenile court for:

(i) an act that would be a crime of violence if committed by an adult;

(ii) an act that would be a felony in this State if committed by an adult; or

(iii) an act that would be a misdemeanor in this State that carries a statutory penalty of more than 2 years if committed by an adult.

# CERTIFICATE OF SERVICE

I certify that, on this 21st day of June 2012, I electronically filed with the Clerk of the Court via the CM/ECF System the foregoing Brief of Appellants. Two bound hard copies of the foregoing Brief of Appellant will also be sent by first-class mail, postage prepaid on June 22, 2012, to the following:

Alan Gura, Esq.
Gura & Possessky, PLLC
101 N. Columbus Street, Suite 405
Alexandria, Virginia 22314

Cary J. Hansel, Esq.
Joseph, Greenwald & Laake
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770

/s Matthew J. Fader
Matthew J. Fader