No. 12-1437

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

RAYMOND WOOLLARD, et al.,

*Plaintiffs-Appellees,*

v.

DENIS GALLAGHER, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court for the
District of Maryland

BRIEF OF AMICUS CURIAE LEGAL COMMUNITY AGAINST
VIOLENCE IN SUPPORT OF DEFENDANTS-APPELLANTS

Mitchell F. Dolin (member)
Peter Saharko (on brief)
Jonathan Cohen (on brief)
COVINGTON & BURLING, LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 662-6000

June 22, 2012                    *Attorneys for Amicus Curiae*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
## DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney. Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case. Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements. Counsel has a continuing duty to update this information.

No. 12-1437          Caption: Woollard, et al. v. Gallagher, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Legal Community Against Violence
(name of party/amicus)

who is _____amicus_____, makes the following disclosure:
      (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                            ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent
      corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                                ☐ YES ☑ NO
      If yes, identify all such owners:

- 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☐ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

# CERTIFICATE OF SERVICE
***************************

I certify that on ____June 22, 2012____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Alan Gura
GURA & POSSESSKY, PLLC
Suite 405
101 North Columbus Street
Alexandria, VA 22314-0000
Email: alan@gurapossessky.com

Cary Johnson Hansel, III
JOSEPH, GREENWALD & LAAKE, PA
Suite 400
6404 Ivy Lane
Greenbelt, MD 20770-0000
Email: chansel@jgllaw.com

Douglas F. Gansler
Dan Friedman
Office of the Attorney General
Legislative Services Building
90 State Circle
Annapolis, Maryland 21401
Tel. 410-946-5600
dfriedman@oag.state.md.us

Matthew J. Fader
Stephen M. Ruckman
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
mfader@oag.state.md.us

____s/Mitchell F. Dolin____
(signature)

____June 22, 2012____
(date)

- 2 -

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST .......................................................... 1

AUTHORITY TO FILE ................................................................. 1

STATEMENT OF AUTHORSHIP ................................................. 1

INTRODUCTION ......................................................................... 2

ARGUMENT ................................................................................ 4

I. Laws Limiting Public Carry Are Not Within the Scope of the Second Amendment. ................................................................ 4

    A. At the Time of its Ratification, the Second Amendment Was Not Understood to Protect Public Carry. ......................... 5

    B. State Laws Regulating Public Carry Are Part of a Longstanding Tradition in the United States and Thus Do Not Implicate the Second Amendment. ............................... 8

    C. The District Court Erred By Expanding the Second Amendment's Application Beyond Established Precedent. ..................................................................... 12

        1. Judicial Restraint Counsels Against Expanding the Second Amendment. ...................................... 13

        2. Similar State Restrictions Have Been Held Constitutional. ..................................................... 14

II. Even If Laws Limiting the Carrying of Weapons in Public Were Within the Scope of the Second Amendment, Maryland's Law Satisfies Intermediate Scrutiny. .......................... 19

    A. Intermediate Scrutiny Applies to Laws Burdening Second Amendment Rights ............................................. 20

    B. Maryland's "Good and Substantial Reason" Requirement Satisfies Intermediate Scrutiny. ....................... 20

1. There is a Reasonable Fit Between the Regulation and the Government's Interests. ................ 21

2. The District Court Erred in Concluding That the Maryland Statute Does Not Survive Intermediate Scrutiny ................................................................. 26

C. Strict Scrutiny Does Not Apply. ................................................. 29

CONCLUSION ................................................................................................. 32

CERTIFICATE OF SERVICE ......................................................................... 33

# TABLE OF AUTHORITIES

Page

CASES

*Aymette v. State*,
    21 Tenn. 154 (1840) ...................................................................10

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963) ......................................................................31

*Bateman v. Perdue*,
    2012 U.S. Dist. LEXIS 47336 (E.D. N.C. Mar 29, 2012) .......................19

*Citizens United v. FEC*,
    130 S. Ct. 876 (2010) ..................................................................31

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ...............................................................*passim*

*English v. State*,
    35 Tex. 473 (1871) .....................................................................10

*Fife v. State*,
    31 Ark 455 (1876) ......................................................................10

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) .....................................................8

*Imaginary Images, Inc. v. Evans*,
    612 F.3d 736 (4th Cir. 2010) ..................................................26, 27

*In re Preis*,
    573 A.2d 148 (N.J. 1990) .............................................................16

*Kachalsky v. Cacace*,
    817 F. Supp. 2d. 235 (S.D.N.Y. 2011) ...................................17, 18, 28

*Nunn v. State*, 1 Ga. 243 (1846) ...................................................... 11

*Piszczatoski v. Filko*,
    2012 WL 104917 (D.N.J. Jan. 12, 2012) .................................16, 18, 22, 27

*Richards v. County of Yolo*,
821 F. Supp. 2d 1169 (E.D. Cal. 2011)......................................................18

*Snyder v. Phelps*,
131 S. Ct. 1207 (2011)............................................................................30

*State v. Workman*,
14 S.E. 9 (W.Va. 1891)........................................................................9, 10

*Turner Broad. Sys. Inc. v. FCC*,
520 U.S. 180 (1997)................................................................................26

*United States v. Chester*,
628 F.3d 673 (4th Cir. 2010) ...................................................................20

*United States v. Mahin*,
668 F.3d 119 (4th Cir. 2012) ...................................................................12

*United States v. Marzzarella*,
614 F.3d 85 (3d Cir. 2010) ..................................................................8, 31

*United States v. Masciandaro*,
638 F.3d 458 (4th Cir. 2011) ...........................................................*passim*

*United States v. Miller*,
604 F. Supp. 2d 1162 (W.D. Tenn. 2009) ...............................................21

*United States v. Playboy Entm't Grp., Inc.*,
529 U.S. 803 (2000) ................................................................................29

*United States v. Skoien*,
587 F.3d 803 (7th Cir. 2009) ...................................................................31

*United States* v. *Staten*,
666 F.3d 154 (4th Cir. 2011) .......................................................21, 26, 29

*Williams v. State*,
10 A.3d 1167 ..............................................................................14, 15, 18

*Young v. Hawaii*,
2009 WL 1955749 (D. Haw. Jul. 2, 2009) .........................................16, 18

**UNITED STATES CONSTITUTION, STATUTES, AND RULES**

United States Constitution, amendment I .....................................30, 31, 32

United States Constitution, amendment II............................................*passim*

Federal Rule of Appellate Procedure 29............................................................1

**STATE AND HISTORICAL STATUTES AND CONSTITUTIONS**

Ark. Act of Apr. 1, 1881, ch. 96, § 1 .....................................................9

Haw. Rev. Stat. Ann. § 134-9 ...............................................................16

Md. Code Ann., Crim. Law § 4-203(a)(1)...............................................15

Md. Code. Ann., Crim. Law § 4-203(b)(2).........................................2, 22

Md. Code. Ann., Crim. Law § 4-203(b)(3)-(7) .................................25, 26

Md. Code Ann., Pub. Safety §§ 5-302-312..........................................24

Md. Code Ann., Pub. Safety § 5-306(a) ........................................2, 22, 24

N.J. Stat. §§ 2C:39-5(b) .......................................................................16

N.Y. Penal Law § 400.00(2)(f) .............................................................17

Statute of Northampton, 2 Edw. III, . 3 ...............................................6

1879 Tenn. Pub. Acts ch. 186, § 1 ........................................................9

Tex. Act of Apr. 12, 1871, ch. 34, § 1 ..................................................8

W. Va. Code ch. 148, § 7 .....................................................................10

1876 Wyo. Comp. Laws ch. 52, § 1.......................................................9

**OTHER AUTHORITIES**

4 William Blackstone, *Commentaries on the Laws of England* 148-
49 (1769) .........................................................................................7

*By the Quenne Elizabeth I: A Proclamation Against the Carriage of Dags, and For Reformation of Some Other Great Disorders* .................. 6

Centers for Disease Control & Prevention, *WISQARS Injury Mortality Reports*, 1999-2007 ...................................................... 2

Centers for Disease Control & Prevention, *WISQARS Nonfatal Injury Reports*, 2001-2010 .................................................... 2

Clayton E. Cramer, *Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* .................... 9

Dennis Henigan, *The Heller Paradox*, 56 UCLA L. Rev. 1171 (2009) ................................................................................. 31

John Dillon, *The Right to Keep and Bear Arms for Public and Private Defence* ................................................................. 11

John Norton Pomeroy, *An Introduction to the Constitutional Law of the United States* (1868) ........................................... 11

Md. Dep't of State Police, *2010 Annual Report* (2011) ............... 24

Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1 (2012) .................................................. 5, 6, 7

Patrick J. Charles, S*cribble Scrabble, the Second Amendment, and Historical Guideposts: A Short Reply to Lawrence Rosenthal and Joyce Lee Malcolm*, 105 Nw. U.L. Rev Colloquy 227 (2011). ........ 7

Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (2006) ........................ 8

U.S. Dep't of Justice, Bureau of Justice Statistics, *Crime in the United States* (2009 and 2010) ........................................... 2

## STATEMENT OF INTEREST

Legal Community Against Violence ("LCAV") submits this *amicus curiae* brief under Rule 29 of the Federal Rules of Appellate Procedure to assist the Court in its evaluation of the district court's application of the Second Amendment. LCAV is a national law center dedicated to preventing gun violence. Founded after an assault-weapon massacre at a San Francisco law firm in 1993, LCAV provides legal and technical assistance in support of gun violence prevention. LCAV tracks and analyzes federal, state, and local firearms legislation, as well as legal challenges to firearms laws. As an *amicus*, LCAV has appeared in a number of Second Amendment cases, including *McDonald v. City of Chicago* and *District of Columbia v. Heller*.

## AUTHORITY TO FILE

All of the parties have consented to the filing of this brief.

## STATEMENT OF AUTHORSHIP

This brief was not authored in whole or in part by counsel for any party. No party or counsel for a party contributed money intended to fund preparation or submission of this brief. No person—other than Legal Community Against Violence, its members, and its counsel—contributed money that was intended to fund preparation or submission of this brief.

**INTRODUCTION**

This brief urges reversal of the district court's ruling striking down the part of Maryland's permit process for public carry of handguns that requires applicants to establish a "good and substantial reason" for the permit. Md. Code. Ann., Crim. Law, § 4-203(b)(2) (2011), Md. Code Ann., Pub. Safety § 5-306(a)(5)(ii) (2003). The district court erred in concluding that the "good and substantial reason" requirement is unconstitutional.

Maryland's "good and substantial reason" requirement is a legitimate exercise of the state's police power aimed at limiting the threat that handguns pose to public safety. Firearms cause over 30,000 deaths and almost 70,000 injuries in the United States each year.[1] In Maryland, 598 firearm murders were committed in 2009 and 2010, more than 95 percent of which were committed with handguns.[2]

_____

[1] Centers for Disease Control & Prevention, *WISQARS Injury Mortality Reports*, 1999-2007, available at http://webappa.cdc.gov/sasweb/ncipc/mortrate10_sy.html; *Id.*, *WISQARS Nonfatal Injury Reports*, 2001-2010, available at http://www.cdc.gov/injury/wisqars/nonfatal.html

[2] U.S. Dep't of Justice, Bureau of Justice Statistics, *Crime in the United States* (2009), Expanded Homicide Data Table 20, available at http://www2.fbi.gov/ucr/cius2009/data/table_20.html; *Id.* (2010), Expanded Homicide Data Table 20, available at

Maryland has the right—indeed, the duty—to protect its citizens, and the state's law regulating the carrying of handguns in public does not violate the Second Amendment.

This brief advances two points, each of which precludes the plaintiffs' constitutional challenge:

*First*, there is no Second Amendment right to carry a handgun in public. The Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), recognized no such right, and the "good and substantial reason" requirement is in line with longstanding, widely accepted regulations restricting the carry of handguns outside the home, regulations historically understood to be consistent with the Second Amendment. Because the district court incorrectly expanded the scope the Second Amendment, its ruling must be reversed.

*Second*, even to the extent that the Second Amendment *does* afford some right to carry a handgun in public, state regulations that arguably burden such a right are subject to intermediate scrutiny.

http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/tables/10tbl20.xls

Although the district court announced the correct standard of review, it failed appropriately to apply that standard. Because the "good and substantial reason" requirement reasonably fits a substantial government interest, it satisfies intermediate scrutiny.

**ARGUMENT**

## I. Laws Limiting Public Carry Are Not Within the Scope of the Second Amendment.

The Second Amendment, which has been held to protect the right to possess a handgun in the home for self-defense purposes, does not protect the right to carry such a weapon in public. *Heller* did not decide otherwise. Instead, the Court held that there is no Second Amendment "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. The Court further observed that most "19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *Id.*

Indeed, "public carry" laws are outside the scope of the Second Amendment because they have been widely accepted throughout American history, including at the time of the ratification of the Constitution, as well as in England prior to American independence.

Because the district court erroneously held that Maryland's "good and substantial reason" requirement, which is part of this longstanding tradition of laws, is within the purview of the Second Amendment, its ruling should be reversed.

### A. At the Time of its Ratification, the Second Amendment Was Not Understood to Protect Public Carry.

Because the Second Amendment "codified a *pre-existing right*," *Heller*, 554 U.S. at 592, the Court should examine the historical record as an aid to determine its meaning. Indeed, it was on the basis of historical analysis that *Heller* concluded that the Second Amendment protects the private right to possess a handgun *in the home* for self-defense purposes. *Id.* at 635.[3] *Heller* confirms that the Framers based their understanding of Second Amendment rights on English law. *See* Patrick J. Charles, *The Faces of the Second Amendment Outside the*

---

[3] *Heller* relied on the 1689 Declaration of Right, which provided "[t]hat the subjects which are Protestants may have arms for their defence suitable to their [c]onditions and as allowed by law" as evidence of an individual right to bear arms preceding the Second Amendment. 554 U.S. at 593.

*Home: History Versus Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1, 31 (2012) (citing *Heller*, 554 U.S. at 593, 599).[4]

English law prohibited the public carry of guns for centuries before the ratification of the U.S. Constitution. Under the Statute of Northampton, subject to an exception for one conducting the King's business, no person was permitted to "go nor ride armed by Night nor by Day, in Fairs, Markets, nor in the Presence of the justices or other Ministers, nor in no Part elsewhere . . . ." Statute of Northampton, 2 Edw. III, c. 3 (1328) (Eng.). "What the Statute of Northampton primarily stands for is preventing the carrying or use of dangerous arms among the concourse of the people, for in these instances one's personal security is divesting with a well-regulated society." Charles, 60 Clev. St. L. Rev. at 36. Indeed, Queen Elizabeth I subsequently proclaimed public carry of pistols to be "to the terrour of all people professing to travel and live peaceably . . . ." *Id.* at 22 (quoting *By the Quenne Elizabeth I: A Proclamation Against the Carriage of Dags, and For Reformation of Some Other Great Disorders* 1 (London, Christopher Barker 1594)).

---

[4] Electronic copy available at http://ssrn.com/abstract=1938950.

Contemporaneous English legal scholarship confirms that there was no unfettered right to carry guns outside the home in England before American independence. William Blackstone, a "preeminent authority on English law for the founding generation," *Heller*, 554 U.S. at 593-94 (citation omitted), affirmed the continuing applicability of the Statute of Northampton in the 18th century. 4 William Blackstone, *Commentaries on the Laws of England* 148-49 (1769) ("The offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the [S]tatute of Northampton.") (internal citation and emphasis omitted).

English laws restricting public carry were embraced in early America. Virginia, North Carolina, and Massachusetts each expressly incorporated the Statute of Northampton into its own laws "immediately after the adoption of the Constitution." Charles, 60 Clev. St. L. Rev. at 31-32 (citations omitted); *see also* Patrick J. Charles, *Scribble Scrabble, the Second Amendment, and Historical Guideposts: A Short Reply to Lawrence Rosenthal and Joyce Lee Malcolm*, 105 Nw. U.L. Rev. Colloquy 227, 237 (2011).

**B. State Laws Regulating Public Carry Are Part of a Longstanding Tradition in the United States and Thus Do Not Implicate the Second Amendment.**

In the 19th century, as technological advances rendered firearms smaller and more dangerous, many states adopted public carry restrictions in the English and early American tradition. Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 137-38 (2006). Contemporaneous courts and scholars repeatedly affirmed the constitutionality of these laws, some of which bore a close resemblance to Maryland's "good and substantial reason" requirement. Indeed, because Maryland's law is part of a longstanding tradition of similar restrictions, it is "presumptively lawful"—that is, outside the purview of the Second Amendment. *Heller v. District of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011) ("activities covered by a longstanding regulation are presumptively not protected from regulation by the Second Amendment"); *United States v. Marzzarella*, 614 F.3d 85, 90-95 (3d Cir. 2010) (same).

In Texas, for example, an individual could not carry a gun unless he had "reasonable grounds for fearing an unlawful attack on his person" and the fear of attack was "immediate and pressing." Tex. Act

of Apr. 12, 1871, ch. 34, § 1. Wyoming went further, prohibiting the carry of firearms in any "city, town, or village." 1876 Wyo. Comp. Laws ch. 52, § 1. Likewise, Tennessee prohibited public carry of pistols and revolvers "except the army or navy pistol, usually used in warfare." 1879 Tenn. Pub. Acts ch. 186, § 1; *see also* Ark. Act of Apr. 1, 1881, ch. 96, § 1 ("That any person who shall wear or carry, in any manner whatever, as a weapon, . . . any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor . . . ."). And whereas the Maryland statute merely regulates and limits public carry of handguns, statutes banning concealed carry of handguns were enacted in Kentucky (1813), Louisiana (1813), Indiana (1820), Virginia (1838), and Alabama (1839). *See* Clayton E. Cramer, *Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 143-46, 150-52 (1999).

Nineteenth century courts routinely held that such restrictions were constitutional. In *State v. Workman*, 14 S.E. 9 (W.Va. 1891), the West Virginia Supreme Court of Appeals affirmed the constitutionality of a statute restricting concealed carry of pistols (among other weapons) to those who "had good cause to believe, and did

believe, that he was in danger of death or great bodily harm at the hands of another person, and that he was, in good faith, carrying such weapons in self-defence and for no other purpose. . . ." *Id.* at 10-11 (evaluating W. Va. Code ch. 148, § 7 (1870)). The court held that the Second Amendment "should be constructed with reference to the provisions of the common law," citing the Statute of Northampton in upholding the law. *Id.* at 11.

Similarly, in *Fife v. State*, 31 Ark 455 (1876), an Arkansas court held that a statute generally prohibiting carrying pistols was a permissible "exercise of the police power of the State." *Id.* at 461; *see also Aymette v. State*, 21 Tenn. 154, 159 (1840) ("The Legislature . . . [has] a right to prohibit the wearing or keeping [of] weapons dangerous to the peace and safety of the citizens . . . ."); *English v. State*, 35 Tex. 473, 477 (1871) ("It is useless to talk about personal liberty being infringed by laws such as that under consideration. The world has seen too much licentiousness cloaked under the name of natural or personal

liberty; natural and personal liberty are exchanged, under the social compact of states, for civil liberty.").[5]

Contemporaneous legal scholars also accepted the constitutionality of such laws. John Norton Pomeroy's treatise, cited in *Heller* as a representative "post-Civil War 19th-century source[]," 554 U.S. at 618, stated that the right to keep and bear arms "is certainly not violated by laws forbidding persons to carry dangerous or concealed weapons . . . ." John Norton Pomeroy, *An Introduction to the Constitutional Law of the United States* 152-53 (1868). Moreover, John Dillon, the noted 19th century jurist and professor, wrote that the law must "strike some sort of balance between . . ." the right to bear arms and "the peace of society and the safety of peaceable citizens . . . [seeking] protection against the evils which result from permitting other citizens to go armed with dangerous weapons." John Dillon, *The*

---

[5] Although 19th century courts regularly upheld restrictions on public carry, the contemporaneous decisions of which we are aware that are to the contrary are readily distinguishable. Unlike the laws at issue in these cases, the statute challenged here does not ban public carry. *See, e.g., Nunn v. State*, 1 Ga. 243, 246-47 (1846) (upholding ban on concealed carry, but ruling that open carry ban was unconstitutional).

*Right to Keep and Bear Arms for Public and Private Defense (Part 3)*, 1 Cent. L.J. 259, 287 (1874).

Regulations governing the public carry of firearms—including regulations limiting public carry to certain uses and to those with a demonstrated need for self-defense—comprise a longstanding, historically accepted tradition in the United States. Because Maryland's "good and substantial reason" requirement is part of that tradition, it does not implicate the Second Amendment—and thus must be upheld.

## C. The District Court Erred By Expanding the Second Amendment's Application Beyond Established Precedent.

The district court, which largely ignored the historical tradition of laws similar to Maryland's, relied on Judge Niemeyer's separate opinion in *United States v. Masciandaro* and held that the Second Amendment right extended to public carry of handguns. (J.A. 146, 149) (citing 638 F.3d 458, 468 (4th Cir. 2011) (Niemeyer, J., concurring)). As this Court has observed, however, "the Supreme Court has not clarified, and [the Fourth Circuit] ha[s] not held, that the Second Amendment extends beyond the home." *See United States v.*

*Mahin*, 668 F.3d 119, 124 (4th Cir. 2012). The district court's ruling not only violates the Fourth Circuit's own admonition that lower courts should not create new Second Amendment rights, but also stands in contrast to the vast majority of courts that have declined to extend Second Amendment rights beyond those embraced in *Heller*.

### 1. Judicial Restraint Counsels Against Expanding the Second Amendment.

The district court's ruling takes issue with this Court's explicit warning that lower courts should not extend Second Amendment rights beyond established bounds. In *Masciandaro*, the panel majority declined to expand upon *Heller* by recognizing Second Amendment rights outside the home, explaining that:

> To the degree that we push the right beyond what the Supreme Court in *Heller* declared to be its origin, we circumscribe the scope of popular governance, move the action into court, and encourage litigation in contexts we cannot foresee. This is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights. It is not far-fetched to think the *Heller* Court wished to leave open the possibility that such a danger would rise exponentially as one moved the right from the home to the public square.

638 F.3d at 475-76.

*Masciandaro* affirms that, as a matter of deference to state legislative choice and judicial restraint, any decision to expand the reach of the Second Amendment is best left to the Supreme Court. *Id.* at 475 ("On the question of *Heller's* applicability outside the home environment, we think it prudent to await direction from the Court itself.") (citing *Williams v. State*, 10 A.3d 1167, 1177 (Md. 2011) (described below at § I.C.2)). That rationale applies with equal force in this case. Given Maryland's public safety responsibilities, lower courts should defer to state choices in this area absent clear contrary direction from the Supreme Court.

### 2. Similar State Restrictions Have Been Held Constitutional.

Maryland is one of a number of states to require citizens to show a particularized need to acquire a handgun carry permit, and post-*Heller* courts have almost uniformly rejected constitutional challenges to such laws. We discuss those decisions below, after first addressing the Maryland high court's prior consideration of the restrictions at issue here.

<u>Maryland.</u>   Maryland's public carry restrictions were recently upheld by the Maryland high court in *Williams v. State*, 10

14

A.3d 1167 (Md. 2011), a decision cited with approval by this Court in *Masciandaro*, 638 F.3d at 475. In *Williams*, the defendant invoked the Second Amendment in seeking to overturn his conviction for carrying a handgun in public in violation of Md. Code Ann., Crim. Law § 4-203(a)(1)(i). The Court of Appeals unanimously rejected the challenge and upheld the law, concluding that Maryland's statute was "outside the scope of the Second Amendment." *Williams*, 10 A.3d at 1178. The Court of Appeals concluded that it was "clear that prohibition of firearms *in the home* was the gravamen of the certiorari questions in both *Heller* and *McDonald* and their answers. If the Supreme Court, in this dicta, meant its holding to extend beyond home possession, it will need to say so more plainly." *Id.* at 1177 (emphasis added). Although the Court of Appeals did not consider the permitting requirements and procedures themselves, its refusal to recognize Second Amendment rights beyond the home makes plain that such requirements and procedures would have been held to fall outside of the Second Amendment's ambit, given that they do not purport to require a permit to possess a gun in one's home or on one's property.

New Jersey.  New Jersey residents may obtain a carry permit only after demonstrating a "justifiable need to carry a handgun." N.J. Stat. §§ 2C:39-5(b); 2C:58-4.  Under this standard, applicants must show "an urgent necessity for self-protection" based on "specific threats or previous attacks demonstrating a special danger to the applicant's life that cannot be avoided by other means."  *In re Preis*, 573 A.2d 148, 152 (N.J. 1990).  New Jersey's law was recently upheld as constitutional on the ground that it does not burden conduct protected by the Second Amendment.  "If the Supreme Court majority had intended to create a broader general right to carry for self-defense outside the home, *Heller* would have done so explicitly."  *Piszczatoski v. Filko*, 2012 WL 104917, at *7 (D.N.J. Jan. 12, 2012), *appeal docketed*, No. 12-1150 (3d Cir. Jan. 24, 2012).

Hawaii.  Hawaii, like Maryland and New Jersey, requires a permit applicant  to demonstrate need to carry a handgun outside the home.  Haw. Rev. Stat. Ann. § 134-9.  In *Young v. Hawaii*, 2009 WL 1955749  (D. Haw. Jul. 2, 2009), the district court rejected a challenge to Hawaii's law, ruling that it could not "identify . . . the possession of an unconcealed firearm in public as a fundamental right."  *Id.* at *9.

New York. Applicants for concealed carry permits in New York must establish that "proper cause exists for the issuance thereof." N.Y. Penal Law § 400.00(2)(f). To meet this standard, an applicant must establish "a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession." *Kachalsky v. Cacace*, 817 F. Supp. 2d. 235, 240 (S.D.N.Y. 2011), *appeal docketed*, No. 11-3642 (2d Cir. Sept. 9, 2011). The Southern District of New York upheld New York's law against a constitutional challenge, concluding that "the scope of the Second Amendment right . . . does not extend to invalidate regulations . . . on carrying handguns." *Id.* at 260. Although the law at issue regulated concealed carry, the decision did not turn on any distinction between concealed and compact (but unconcealed) weapons. *Id.* at 262 (rejecting argument that "state concealed carry bans are constitutional only where the state provides for unconcealed, or open, carry as well").

The decisions identified above, in contrast to the decision under review here, declined to extend substantive Second Amendment rights beyond *Heller*, which held that the right protected by the Second Amendment is the right to bear arms for self-defense *in the home*. *See,*

*e.g., Kachalsky*, 817 F. Supp. 2d. at 264 (public carry restrictions do not burden conduct protected by the Second Amendment); *Piszczatoski*, 2012 WL 104917 at *7 (*Heller* "deliberately limited the scope of the right recognized to the home."); *Young*, 2009 WL 874517 at *5 (*Heller* inapplicable because challenged statute "pertains only to the carrying of weapons on one's person and does not constitute a complete ban to the carrying of weapons or pertain to possessing weapons in one's home."); *Williams*, 10 A.3d at 1178 (*Heller* merely "permitt[ed] home possession"); *see also Richards v. County of Yolo*, 821 F. Supp. 2d 1169, 1174 n.4 (E.D. Cal. 2011), *appeal docketed*, No. 11-16255 (9th Cir. May 19, 2011) ("[t]he Supreme Court], both in *Heller*, and subsequently in *McDonald*, took pain-staking effort to clearly enumerate that the scope of *Heller* extends only to the right to keep a firearm *in the home* for self-defense purposes").

The district court's decision thus runs contrary to the overwhelming majority of decisions, which have upheld similar state

laws regulating the public carry of handguns.  This Court should follow

suit and reverse the district court.[6]

## II. Even If Laws Limiting the Carrying of Weapons in Public Were Within the Scope of the Second Amendment, Maryland's Law Satisfies Intermediate Scrutiny.

As discussed in Part I, Maryland's regulation of public carry

is part of a tradition of similar laws and thus does not implicate the

Second Amendment in the first instance.  But even if the Second

Amendment were held to protect the right to carry a handgun in public,

Maryland's law would easily satisfy constitutional muster under

intermediate scrutiny, which is the standard that this Court has found

applicable with respect to laws that arguably burden Second

Amendment rights outside the home.  The district court, which

---

[6] We are aware of one post-*Heller* case in which a district court granted an as-applied challenge to a state law prohibiting the possession and carry of guns.  *Bateman v. Perdue*, 2012 U.S. Dist. LEXIS 47336 (E.D. N.C. Mar. 29, 2012).  *Bateman* is readily distinguishable.  Unlike the statute challenged here, the law at issue in *Bateman* prohibited "law abiding citizens from purchasing and transporting *to their homes* firearms and ammunition needed for self-defense" and allowed state officials, in certain circumstances, to "outright ban" the possession of guns in the home.  *Id.* at 16 (emphasis added).  Maryland's statute does neither of these things and does not burden home possession at all. Moreover, while the statute challenged here does not burden firearms other than handguns, the statute at issue in *Bateman* "applie[d] equally to . . . all classes of firearms."  *Id.*; *see also* § II.B.1, below.

acknowledged that standard of review, in practice applied a more rigorous standard.

## A. Intermediate Scrutiny Applies to Laws Burdening Second Amendment Rights.

To the extent that the Second Amendment protects the right to bear arms outside the home, laws burdening that right are subject to intermediate scrutiny. This Court has already so held, thus rendering any argument to the contrary untenable. *Masciandaro*, 638 F.3d at 470 (unanimously holding that intermediate scrutiny applies, noting that "as we move outside the home, firearms rights have *always* been more limited. . . .").

## B. Maryland's "Good and Substantial Reason" Requirement Satisfies Intermediate Scrutiny.

The district court erred by subjecting Maryland's law to a more onerous standard than is called for under intermediate scrutiny analysis. Intermediate scrutiny requires only a "reasonable fit" between the challenged regulation and a "substantial" government interest. *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (intermediate scrutiny appropriate in as-applied challenge to federal statute criminalizing home possession of firearms by domestic violence misdemeanants). As this Court has held, regulations subject to

intermediate scrutiny need *not* reflect "'the least intrusive means of achieving the relevant government objective'" or impose "'no burden whatsoever on the individual right in question.'" *United States* v. *Staten*, 666 F.3d 154, 159 (4th Cir. 2011) (quoting *Masciandaro*, 638 F.3d at 474). Rather, intermediate scrutiny "by definition, permits [the government] to paint with a broader brush." *United States v. Miller*, 604 F. Supp. 2d 1162, 1172 (W.D. Tenn. 2009).

The parties agree that the government's interests here are substantial, given the undisputed primacy of the State of Maryland in the realm of law enforcement. The only dispute is over whether there is a reasonable fit between the regulation and those governmental interests.

### 1. There is a Reasonable Fit Between the Regulation and the Government's Interests.

Maryland's law strikes a sensible balance between the needs for self-defense and public safety. The statutory provision challenged here governs only the permit requirement for public carry of handguns. There is, of course, no dispute that Maryland recognizes the rights of its citizens to bear handguns and other arms in their homes, on their property, and at their places of business. Similarly, Maryland allows

handgun owners to transport handguns outside of the home for various reasons without a permit.

The permit requirement is necessary only for residents who seek a broader ability to carry a handgun in public. Under the Maryland law at issue, those residents who have a "good and substantial reason" to carry a handgun and obtain a permit may do so. Md. Code Ann., Crim. Law § 4-203(b)(2); Md. Code Ann., Pub. Safety § 5-306(a)(5)(ii). A reasonable fit exists between this regulation and the state's interests for the following reasons:

*First*, unregulated public carry of handguns creates an increased risk of violence and violent crime. *See Piszczatoski,* 2012 WL 104917 at *22 ("The legislature has continually made the reasonable inference that given the obviously dangerous and deadly nature of handguns, requiring a showing of particularized need for a permit to carry one publicly serves the State's interests in public safety."); *see also* Appellant's Brief at 40-51.

*Second*, Maryland residents who can demonstrate a particularized need to carry a handgun in public for self-defense may do so. To obtain a permit, the applicant must submit an application, which

is reviewed by an official from the Maryland State Police's Handgun Permit Unit, who verifies that the applicant is qualified. (J.A. 56.) The official confirms, among other information,[7] that the applicant needs the handgun for self-defense. *Id.* The range of permissible self-defense rationales is broad and encompasses "(1) business activities involving heightened risk, such as the need to carry cash and other 'street valued commodities'; (2) participation in 'regulated professions,' including security guards and armored car personnel; (3) participation in 'assumed risk' professions that involved the ability to restrict or take away civil liberties, including judges, prosecutors, police officers, public defenders, and correctional officers; and (4) 'personal protection.'" (J.A. 58-59.) In reviewing an application based on a need for personal protection, the official considers, *inter alia*, the physical and temporal proximity of the threat, whether the threat is particular to the applicant, and whether the threat can be verified. (J.A. 60.)

---

[7] Such as the applicant's age, criminal record, mental health and medical history, use of alcohol and other drugs, information received from business and personal references, and the applicant's propensity for violence.

Section 5-306 states that "the Secretary *shall issue* a permit" upon concluding that the applicant is qualified. § 5-306(a) (emphasis added). According to publicly available reports, 89.9 percent of original applicants are issued permits. Md. Dep't of State Police, *2010 Annual Report* (2011) (between 2006 and 2010, Maryland received 9,498 original applications for permits and granted 8,536).[8]

*Third*, as even the district court recognized, state officials do not have "unbridled discretion" to decide whether an applicant has established a "good and substantial reason" to carry a handgun. (J.A. 150-51.) Maryland requires application of objective criteria to carry permit applications, and decisions are subject to administrative and judicial review. Md. Code Ann., Pub. Safety §§ 5-302-312, 5-312(a)-(c), 5-312(e)(1). Indeed, if a permit application is denied, the applicant may appeal to the Handgun Permit Review Board, an independent panel appointed by the Governor. *Id.* Over the past 20 years, the Board has reversed or revised approximately 46 percent of appealed permit denials. (J.A. 43.)

---

[8] Available at http://www.mdsp.org/LinkClick.aspx?fileticket= dGo4s4zBg6I%3D&tabid=429&mid=1074.

After applying the above-described criteria, Maryland officials granted plaintiff Raymond Woollard two successive permits that allowed him to carry a handgun for six years after an unarmed family member broke into his home. It was only after Mr. Woollard failed to show any continuing need for self-defense sufficient to justify the public carry of a handgun, approximately seven years after that incident, that his renewal request was denied. (J.A. 15, 20.)

*Fourth*, Maryland law is tailored such that guns may be carried in many other circumstances. The "good and substantial reason" requirement applies only to public carry of handguns. Maryland does not restrict the carry or possession of guns (including handguns) on the gun owner's private property or in the gun owner's place of business. Md. Code. Ann., Crim. Law § 4-203(b)(6)-(7). Nor does Maryland restrict the carry of an unloaded handgun to and from designated places, including the owner's home or business, the place of purchase, shooting ranges, hunting sites, gun exhibitions, and others. *Id.* § 4-203(b)(3), (4), & (5). Moreover, Maryland residents may carry long guns in public without a permit.

"These established facts along with logic and common sense," *Staten*, 666 F.3d at 167, compel the conclusion that the "good and substantial reason" requirement, which applies only to those who wish to carry handguns in public, survives intermediate scrutiny.

### 2. The District Court Erred in Concluding That the Maryland Statute Does Not Survive Intermediate Scrutiny.

In ruling that Maryland's permitting requirement is unconstitutional, the district made three key errors.

*First*, the district court ignored the discretion afforded under intermediate scrutiny to the legislature's considered choices. *Turner Broad. Sys. Inc. v. FCC*, 520 U.S. 180, 195 (1997) (legislature is better equipped than the judiciary to amass and evaluate data bearing upon legislative questions); *cf. Imaginary Images, Inc. v. Evans*, 612 F.3d 736, 748, 740 (4th Cir. 2010) (upholding under intermediate scrutiny Virginia's regulation restricting the sale of mixed drinks at erotic dance clubs, concluding that "legislatures must have some leeway to draw a regulatory middle ground") (internal quotations, alterations, and citations omitted). Indeed, "[a] local policymaking body knows the streets better than [courts] do. It is entitled to rely on that knowledge;

and if its inferences appear reasonable, we should not say there is no basis for its conclusion." *Id.* at 748.

It is entirely reasonable that Maryland would want to determine objectively on an individualized basis whether public carry is necessary for self-defense. Individualized determinations allow the state to limit uncontrolled public carry of handguns in the cases of "those who feel the subjective need based on nothing more than 'general fears' to go about their daily lives prepared to use deadly force. . . . A ruling mandating such a result would illegally interfere with the . . . legislature's repeated determinations . . . that this alternative . . . would not meet the state interest in preventing gun-related injury, including the ultimate injury, death." *Piszczatoski*, 2012 WL 104917 at *22. If the individual demonstrates that a handgun is reasonably necessary for self-defense, that individual is granted a permit, as appears to be the case with respect to 89.9 percent of applicants (including the plaintiff twice previously).

*Second*, the district court mischaracterized the challenged regulation as a "rationing system" that "does no more to combat [threats to public safety] than would a law indiscriminately limiting the

issuance of a permit to every tenth applicant." (J.A. 154, 155.) Not only is the phrase "rationing system" an inapt description of a law under which 89.9 percent of permit applications are granted, but Maryland's permitting process is *not* a random one. Rather, it calls for "individualized, case-by-case determinations regarding whether full-carry permit applicants have an actual and articulable—rather than merely speculative, potential, or even specious—need for self-defense." *Kachalsky*, 817 F. Supp. 2d. at 271.

*Third*, and finally, the district court erred in concluding that Maryland's statute does not provide at least a reasonable fit for what the district court concluded was an "undoubtedly legitimate end." (J.A. 154.) The district court concluded that the "good and substantial reason" requirement was overly broad and identified four specific regulations that Maryland might have enacted in its stead, some of which are actually more strict than the Maryland legislature's approach. *Id.*

That a hypothetical permit process might be more narrowly tailored is not the point. As this Court has made clear, Maryland is not required to satisfy strict scrutiny, under which a law can burden no

more of a right than is necessary to advance the interest in question. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000) (strict scrutiny requires the government to choose the least restrictive alternative to promote its interest). "Intermediate scrutiny does not require a perfect fit; rather only a reasonable one." *Staten*, 666 F.3d at 167. Therefore, the arguable existence of less restrictive means of advancing an interest does not undermine Maryland's policy choices. *See Masciandaro*, 638 F.3d at 474. Maryland's law is constitutional not because it is as narrowly tailored as possible, but because it reflects a reasonable fit with a substantial government interest.

The carrying of a handgun outside the home involves risks that are too plain to require elaboration. These dangers implicate the state's substantial and compelling interests in protecting public safety and preventing crime. A regulation such as Maryland's—that has for 40 years appropriately harmonized these potentially conflicting values—easily passes intermediate scrutiny.

## C. Strict Scrutiny Does Not Apply.

In an effort to subject the "good and substantial reason" requirement to strict scrutiny, plaintiffs argued below that the First

Amendment "prior restraint" doctrine applies here. Although "prior restraints" on protected speech are subject to heightened scrutiny, no court has taken the "quantum leap" of applying the doctrine in the Second Amendment context, "for which it was never designed." (J.A. 150-51.) Any invitation by plaintiffs to do so here would be untenable.

Unlike the First Amendment, which protects the right to speak on matters of public concern, *Snyder v. Phelps*, 131 S. Ct. 1207, 1215, 1218 (2011), the Second Amendment protects the inherently *private* right of "law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635.

Because the First and Second Amendments embody different values, it is not reasonable to simply lift First Amendment doctrinal principles and apply them in the Second Amendment context. As the district court correctly stated, "[t]hose courts that painstakingly developed and expounded the prior restraint analysis on which Woollard relies today surely did not have Second Amendment challenges in mind when they did so." (J.A. 151.)

It is thus unsurprising that the approach plaintiffs urged below is inconsistent with recent Second Amendment law. That many

firearms restrictions have been recognized as "presumptively lawful" by the Supreme Court, *Heller*, 554 U.S. at 627 n.26, conflicts directly with the principle that prior restraints on speech must overcome a "heavy presumption against . . . constitutional validity," *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963); *see also United States v. Skoien*, 587 F.3d 803, 812 (7th Cir. 2009); *Marzzarella*, 595 F. Supp. 2d at 604 ("the Court's willingness to presume the validity of several types of gun regulations is arguably inconsistent with the adoption of a strict scrutiny standard of review"); Dennis Henigan, *The Heller Paradox*, 56 UCLA L. Rev. 1171, 1197-98 (2009) ("the *Heller* majority . . . implicitly rejected strict scrutiny" by describing certain gun control measures as presumptively lawful).

Although more speech rather than less is the governing First Amendment rule, *Citizens United v. FEC*, 130 S. Ct. 876, 911 (2010), that is not the case in the Second Amendment context, in which, for reasons of public safety, many types of restrictions on gun ownership—including some that might be described colloquially as "prior restraints"—have long been considered constitutional. In sum, the

prior restraint doctrine is ill-suited to the Second Amendment, and it would be improper to apply it here.

## CONCLUSION

Maryland's public carry regulation does not implicate the Second Amendment right announced in *Heller*, and even if it did, the regulation represents a reasonable effort to advance the paramount government interest in public safety. This Court should reverse the district court's holding that the permit requirement is unconstitutional.

.                         Respectfully submitted,

s/Mitchell F. Dolin
Mitchell F. Dolin
Peter Saharko
Jonathan Cohen
COVINGTON & BURLING, LLP
1201 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 662-6000

*Attorneys for Amicus Curiae*

June 22, 2012

# CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of June, I electronically filed with the Clerk of the Court via the CM/ECF System the foregoing Amicus Brief and mailed eight paper copies of the brief to the Clerk via overnight mail.  Pursuant to Rule 31(d)(2), the following parties were served electronically: :

*Counsel for Appellee*

| | |
|---|---|
| Alan Gura<br>GURA & POSSESSKY, PLLC<br>Suite 405<br>101 North Columbus Street<br>Alexandria, VA 22314-0000<br>Email: alan@gurapossessky.com | Cary Johnson Hansel, III<br>JOSEPH, GREENWALD & LAAKE, PA<br>Suite 400<br>6404 Ivy Lane<br>Greenbelt, MD 20770-0000<br>Email: chansel@jgllaw.com |

*Counsel for Appellant*

| | |
|---|---|
| Douglas F. Gansler<br>*Attorney General of Maryland*<br>Dan Friedman<br>*Assistant Attorney General*<br>Office of the Attorney General<br>Legislative Services Building<br>90 State Circle<br>Annapolis, Maryland 21401<br>Tel. 410-946-5600<br>dfriedman@oag.state.md.us | Matthew J. Fader<br>Stephen M. Ruckman<br>*Assistant Attorneys General*<br>200 St. Paul Place, 20th Floor<br>Baltimore, Maryland 21202<br>mfader@oag.state.md.us<br>sruckman@oag.state.md.us |

<u>s/Mitchell F. Dolin</u>
Mitchell F. Dolin
Peter Saharko
Jonathan Cohen
COVINGTON & BURLING, LLP
1201 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 662-6000

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**No.** 12-1437          **Caption:** Woollard et al. v. Gallagher et al.

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [✓]   this brief contains _____ 6,049 _____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ]   this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [✓]   this brief has been prepared in a proportionally spaced typeface using
   Microsoft Word _____ [*identify word processing program*] in
   Century Schoolbook 14 point _____ [*identify font size and type style*]; **or**

   [ ]   this brief has been prepared in a monospaced typeface using
   _____ [*identify word processing program*] in
   _____ [*identify font size and type style*].

(s) Mitchell F. Dolin _____

Attorney for Legal Community Against Violence

Dated: June 22, 2012 _____

04/13/2012
SCC