In The
# United States Court of Appeals
For The Fourth Circuit

# RAYMOND WOOLLARD;
# SECOND AMENDMENT FOUNDATION, INC.,

*Plaintiffs – Appellees*,

v.

# DENIS GALLAGHER; SEYMOUR GOLDSTEIN;
# CHARLES M. THOMAS, JR.; MARCUS L. BROWN,

*Defendants – Appellants*,

TERRENCE SHERIDAN,

*Defendant.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## AT BALTIMORE

_____

## BRIEF *AMICI CURIAE* OF LEGAL HISTORIANS IN
## SUPPORT OF APPELLANTS AND REVERSAL

_____

Andrew C. White                     Dwight W. Stone, II
Erin Murphy                         WHITEFORD, TAYLOR & PRESTON, LLP
SILVERMAN, THOMPSON, SLUTKIN & WHITE, LLC   Seven Saint Paul Street
201 North Charles Street, 26th Floor   Baltimore, Maryland 21202
Baltimore, Maryland 21201           (410) 347-8700
(410) 385-2225 (Telephone)

*Counsel for Amici Curiae*              *Counsel for Amici Curiae*

# <u>RULE 26.1 CERTIFICATION</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus* Legal Historians make the following disclosure statement:

The Legal Historians who are *amici* on this brief are individuals who are not corporations and are not owned or controlled in any way by corporations.

1.      Are the *amici* publicly held corporations or other publicly held entities?  No.

2.      Do the *amici* have any parent corporations?  No.

3.      Is 10% or more of the stock of any *amici* owned by a publicly held corporation or other publicly held entity?  No.

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  No publicly held corporation or other publicly held entity has a direct financial interest in the outcome of this litigation due to the participation of the *amici*.

5.      Does this case arise out of a bankruptcy proceeding?  No.


_____/S/_____
ANDREW C. WHITE

## <u>RULE 29 CERTIFICATION</u>

Pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure, *amici* received consent from all parties to file this brief.  Pursuant to Rule 29(c)(5), counsel for *amici* state that no party's counsel authored this brief in whole or in part, and tha  no party, party's counsel, or person other than *amici*, its members, or its counsel, contributed money intended to fund preparation of this brief.

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................. ii

STATEMENT OF INTEREST OF *AMICI CURIAE* ................................1

SUMMARY OF ARGUMENT ...............................................................3

    A.    The Scope of the Right to Bear Arms in Founding Era .......................4

        1.    Virginia and Thomas Jefferson: No Recognition of A Right Outside One's Own Property ...........................................5

        2.    Massachusetts: No Right To Travel Armed Recognized ..........7

    B.    Recognition of A Private Right To Bear Arms Outside One's Property Relies on Myths, Rather Than Historical Realities, of Gun Regulation in the Founding Era and Early Republic ...................9

    C.    The Historical Conclusions and Antebellum Case Law Relied On By Judge Niemeyer Do Not Support A Right Outside One's Property ...........................................................................14

CONCLUSION .....................................................................................25

ADDENDUM

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Andrews v. State*,
    50 Tenn. 165 (1871) ......................................................................24

*Aymette v. State*,
    21 Tenn. 154 (1840) ......................................................................17

*Bliss v. Commonwealth*,
    12 Ky. 90 (1822)............................................................................15

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)...............................................................*passim*

*English v. State*,
    35 Tex. 473 (1871) .................................................................13, 18

*Ex parte Thomas*,
    97 P. 260 (Okla. 1908)..................................................................18

*Fife v. State*,
    31 Ark. 455 (1876) ........................................................................18

*Hill v. State*,
    53 Ga. 472 (1874) .........................................................................18

*Nunn v. State*,
    1 Ga. 243 (1846)..............................................................17, 18, 19

*State v. Buzzard*,
    4 Ark. 18 (1842) .....................................................................15, 18

*State v. Duzan*,
    6 Blackf. 31 (Ind. 1841)................................................................16

*State v. Jumel,*
    13 La. Ann. 399 (1858) ................................................................18

*State v. Mitchell,*
    3 Blackf. 229 (Ind. 1833)............................................................16

*State v. Workman,*
    35 W. Va. 367 (1891) .................................................................18

*United States v. Masciandaro,*
    638 F.3d 458 (4th Cir. 2011) ..........................................3, 9, 14, 24

*Walls v. State,*
    7 Blackf. 572 (Ind. 1845)............................................................16

*Woollard v. Sheridan,*
    2012 U.S. Dist. LEXIS 28498 (D. Md. March 2, 2012) ...............24

## CONSTITUTIONAL PROVISION

U.S. CONST. amend. II....................................................................1, 3, 11

U.S. CONST. amend. XIV ..................................................17, 21, 23, 25

## LEGISTLATIVE HISTORY

1876 Wyo. Comp. Laws ch. 52, § 1......................................................19

Ark. Act of Apr. 1, 1881 ......................................................................19

Dodge City, Kan., Ordinance No. 16, § XI (Sept. 22, 1876) ................19

KY. CONST. of 1850 art. XI § 25 ..........................................................15

Tex. Act of Apr. 12, 1871 ....................................................................19

## OTHER AUTHORITIES

2 Edw. 3, c. 3 (1328).............................................................................12

4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND
148-49 (1769).............................................................................................12

6 DOCUMENTARY HIST. 1452 (J. Kaminski & G. Saladino eds. 2000).....................8

*A Bill for Preservation of Deer (1785)*, *in* 2 THE PAPERS OF
THOMAS JEFFERSON 444 (Julian P. Boyd ed., 1950).................................................6

AMERICAN STATE PAPERS. DOCUMENTS, LEGISLATIVE AND
EXECUTIVE OF THE CONGRESS OF THE UNITED STATES . . .
CLASS V. MILITARY AFFAIRS (1832).........................................................................9

*An Act for Regulating and Governing the Militia of the
Commonwealth of Massachusetts*, *in* ACTS AND LAWS, PASSED BY THE
GENERAL COURT OF MASSACHUSETTS 294 (1793) ...................................................7

*Article XVII Constitution of 1780*, *in* THE POPULAR SOURCES OF
POLITICAL AUTHORITY 446 (Oscar Handlin and Mary Handlin, eds., 1966) ...........7

Bishop, Joel Prentiss, COMMENTARIES ON THE CRIMINAL LAW (1868)..................24

Brutus, *Essays of Brutus VII*, *in* 2 THE COMPLETE ANTI-FEDERALIST 358
(Herbert J. Storing ed., 1981)..................................................................................10

Charles, Patrick J., *The Faces of the Second Amendment Outside the Home:
History Versus Ahistorical Standards of Review*,
60 CLEVE. ST. L. REV. 1 (2012) ......................................................................12, 22

Cornell, A WELL REGULATED MILITIA: THE FOUNDING FATHERS AND THE
ORIGINS OF GUN CONTROL IN AMERICA (2006) ...................................................7, 14

Cornell, Saul & Justin Florence, *The Right to Bear Arms in the Era of the
Fourteenth Amendment: Gun Rights or Gun Regulation*,
50 SANTA CLARA L. REV. 1043 (2010).......................................................15, 17, 24

Cornell, Saul & Nathan DeDino, *A Well Regulated Right:
The Early American Origins of Gun Control*,
73 FORDHAM L. REV. 487 (2004)...........................................................................13

Cornell, Saul, *Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller*, 69 OHIO ST. L.J. 625 (2008) ....................................3

Coxe, Tench, "*A Freeman*," PA. GAZETTE, Jan. 23, 1788, *reprinted in* FRIENDS OF THE CONSTITUTION: WRITINGS OF THE "OTHER" FEDERALISTS 88, 95 (Colleen A. Sheehan & Gary L. McDowell eds., 1998)....................................10

Dillon, John Foster, *The Right to Keep and Bear Arms for Public and Private Defense*, 1 CENT. L.J. 259 (1874)..............................................24

Emberton, Carole, *The Limits of Incorporation: Violence, Gun Rights, and Gun Regulation in the Reconstruction South*, 17 STAN. L. & POL'Y REV. 615 (2006)....................................23

Etcheson, Nicole, *Manliness and the Political Culture of the Old Northwest, 1790-1860*, 15 J. EARLY REP. 59 (1995) ....................................15

Ewing, James, A TREATISE ON THE OFFICE AND DUTY OF A JUSTICE OF THE PEACE, SHERIFF, CORONER, CONSTABLE, AND OF EXECUTORS, ADMINISTRATORS, AND GUARDIANS, 70 (1832) ....................................11

Fallon, Jr., Richard H., *Are Originalist Constitutional Theories Principled, or Are They Rationalizations for Conservatism?*, 34 HARV. J.L. & PUB. POL'Y 5 (2011)....................................23

Finkelman, Paul, *It Really Was About A Well Regulated Militia*, 59 SYRACUSE L. REV. 267 (2008) ....................................10

Friedman, Dan, *Tracing the Lineage: Textual and Conceptual Similarities in the Revolutionary-Era State Declarations of Rights of Virginia, Maryland, and Delaware*, 33 RUTGERS L.J. 929 (2002) ....................................6

Hammond, E., A PRACTICAL TREATISE; OR AN ABRIDGEMENT OF THE LAW APPERTAINING TO THE OFFICE OF JUSTICE OF THE PEACE (C.A. Mirick & Co., West Brookfield 1841)....................................21, 23

*Judge Thacher's Charges*, CHRISTIAN REGISTER AND BOSTON OBSERVER, 91 (June 10, 1837)....................................21

Miller, Darrell A.H., *Guns as Smut: Defending the Home-Bound Second Amendment*, 109 COLUM. L. REV. 1278 (2009) .......................................................12

Monkkonen, Eric H., MURDER IN NEW YORK CITY (2001) .....................................16

Novak, William J., THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH-CENTURY AMERICA 51 (1996) ........................................................9, 23

*On Wearing Concealed Arms*, DAILY NAT'L INTELLIGENCER (Sept. 9, 1820)........17

Perley, Jeremiah, THE MAINE CIVIL OFFICER, OR, THE POWERS AND DUTIES OF SHERIFFS, CORONERS, CONSTABLES, AND COLLECTORS OF TAXES (1825)...............................................................................11

Posner, Richard A., *In Defense of Looseness: The Supreme Court and Gun Control*, THE NEW REPUBLIC (Aug. 27, 2008)....................................................3

Purdon, John, A DIGEST OF THE LAWS OF PENNSYLVANIA, FROM THE YEAR ONE THOUSAND SEVEN HUNDRED TO THE TENTH DAY OF JULY, ONE THOUSAND EIGHT HUNDRED AND SEVENTY-TWO (10th ed., Philadelphia 1873) ...................................................................................22

REVISED STATUTES OF THE COMMONWEALTH OF MASSACHUSETTS PASSED NOVEMBER 4, 1836 (Boston 1836)............................................................................20

REVISED STATUTES OF THE STATE OF DELAWARE, TO THE YEAR OF OUR LORD ONE THOUSAND EIGHT HUNDRED AND FIFTY-TWO (Dover, Delaware 1852)...............................................................................................21

Roth, Randolph, AMERICAN HOMICIDE (2009) ...................................................13, 16

STATUTES OF THE STATE OF NEW JERSEY (1847) .........................................................9

Stein, Joshua, *Privatizing Violence: A Transformation in the Jurisprudence of Assault*, 30 L. & HIST. REV. 423 (2012) .......................................16

Stephenson, Mason W. & D. Grier Stephenson, Jr., *To Protect and Defend: Joseph Henry Lumpkin, The Supreme Court of Georgia, and Slavery*, 25 EMORY L. J. 579 (1976) (formerly Journal of Public Law) .................................17

Sunstein, Cass R., *Second Amendment Minimalism: Heller as Griswold*,
122 HARV. L. REV. 246 (2008) ...............................................................3

Thacher, Peter Oxenbridge, TWO CHARGES TO THE GRAND JURY OF THE
COUNTY OF SUFFOLK FOR THE COMMONWEALTH OF MASSACHUSETTS, AT THE
OPENING OF TERMS OF THE MUNICIPAL COURT OF THE CITY OF BOSTON,
ON MONDAY, DECEMBER 5TH, A.D. 1836 AND ON MONDAY, MARCH 13TH,
A.D. (Dutton and Wentworth, 1837) .......................................................21

THE CONDUCTOR GENERALIS, OR, THE OFFICE, DUTY AND AUTHORITY OF
THE JUSTICE OF THE PEACE, 116, 266 (1792)...........................................11

THE REVISED CODE OF THE DISTRICT OF COLUMBIA,
PREPARED UNDER THE AUTHORITY OF THE ACT OF CONGRESS
(A.O.P. Nicholson, Washington 1857) ....................................................22

THE REVISED STATUTES OF NEW HAMPSHIRE (1851).................................9

THE REVISED STATUTES OF THE STATE OF MAINE, PASSED OCTOBER 22, 1840
(William R. Smith & Co., Augusta 1841) ...............................................21

THE REVISED STATUTES OF THE STATE OF WISCONSIN: PASSED AT THE
ANNUAL SESSION OF THE LEGISLATURE COMMENCING JANUARY 13, 1858,
AND APPROVED MAY 17, 1858 (W.B. Keen, Chicago 1858) ...................22

THE STATUTES OF OREGON, ENACTED, AND
CONTINUED IN FORCE, BY THE LEGISLATIVE ASSEMBLY (1855).............22

*Town of Williamsburgh (1780)*, POPULAR SOURCES OF
POLITICAL AUTHORITY, 624 (Oscar Handlin & Mary Handlin, eds., 1966)..............8

*Virginia Declaration of Rights*, PAPERS OF GEORGE MASON ...................5

Volokh, Eugene, *Implementing the Right to Keep and Bear Arms for
Self-Defense: An Analytical Framework and a Research Agenda*,
56 UCLA L. REV. 1443 (2009)........................................................15, 24

Volokh, Eugene, *The First and Second Amendments*,
109 COLUM. L. REV. SIDEBAR 97 (Oct. 27, 2009) ..................................12

Young, George B., THE GENERAL STATUTES OF THE STATE OF MINNESOTA, AS AMENDED SUBSEQUENT LEGISLATION, WITH WHICH ARE INCORPORATED ALL GENERAL LAWS OF THE STATE IN FORCE AT THE CLOSE OF THE LEGISLATIVE SESSION OF 1878 (Davidson & Hall, St. Paul 1879)...........................22

<u>**STATEMENT OF INTEREST OF *AMICI CURIAE***</u>

Saul Cornell is the Paul and Diane Guenther Chair in American History at

Fordham University.  One of the nation's leading authorities on early American

constitutional thought, his work has been widely cited by legal scholars, historians,

and the U.S Supreme Court and several state supreme courts.  His first book, *The*

*Other Founders: Anti-Federalism and the Dissenting Tradition in America,*

*1788-1828* (1999) received the Society of the Cincinnati Book Prize. His second, *A*

*Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in*

*America* (2006), was awarded the Langum Prize for Historical Literature.  He has

written numerous essays for law reviews and historical journals on the origins and

interpretation of the Second Amendment, and edited *Whose Right to Bear Arms*

*Did the Second Amendment Protect?* (2000).  Professor Cornell previously served

as the Director of the Second Amendment Research Center, John Glenn School of

Public Affairs, The Ohio State University (2002-2008).  Professor Cornell was one

of the amici before the U.S. Supreme Court in *District of Columbia v. Heller* and

*McDonald v. City of Chicago*.

Alfred Brophy is the Judge John J. Parker Distinguished Professor of Law at

the University of North Carolina School of Law.  He has written extensively on

race and property law in colonial, antebellum and early Twentieth Century

America.  Before entering teaching in 1994, he was a law clerk to Judge John

Butzner of the United States Court of Appeals for the Fourth Circuit, practiced law with Skadden, Arps, Slate, Meagher & Flom in New York, and was a Mellon Fellow in the Humanities at Harvard University.

William J. Novak is a professor of law at the University of Michigan Law School. A specialist on the legal, political, and intellectual history of the United States, he is the author of *The People's Welfare: Law and Regulation in Nineteenth-Century America*, which won the American Historical Association's Littleton-Griswold Prize and was named Best Book in the History of Law and Society. Professor Novak was one of the amici before the U.S. Supreme Court in *District of Columbia v. Heller* and *McDonald v. City of Chicago*.

Paul Finkelman is the President William McKinley Distinguished Professor of Law at Albany Law School. An expert in constitutional history and constitutional law, he is the author of more than 150 scholarly articles and more than 30 books. He has written extensively on Thomas Jefferson, and his scholarship on the Second Amendment has been cited by the Supreme Court. In 2008 he was listed as one of ten most cited legal historians teaching in law schools. In 2009 he was elected as a member of the American Antiquarian Society. Professor Finkelman was one of the amici before the U.S. Supreme Court in *McDonald v. City of Chicago*.

## SUMMARY OF ARGUMENT

As this Court has recognized: "historical meaning enjoys a privileged interpretative role in the Second Amendment context."[1]  However, reliance on legal scholars over historians can result in inaccurate historical conclusions – a "lawyer's history," rather than a historian's.[2]  Hence, amici offer a historian's expert perspective to assist the Court in evaluating the complex and contradictory historical evidence, and in separating historical myths from historical realities.

The court below relied extensively on the concurring opinion of Judge Niemeyer in *United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011), which concluded that: "Consistent with the historical understanding of the right to keep and bear arms outside the home, the *Heller* Court's description of its actual holding also implies that a broader right exists."[3]  However, when one examines the relevant history – including new historical research that was not available when *Masciandaro* was decided – it becomes clear that Judge Niemeyer's conclusion rests on a number of common historical misconceptions.  Founding era beliefs and

---

[1]  *United States* v. *Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) (internal citations omitted).

[2]  *See* Cass R. Sunstein, *Second Amendment Minimalism: Heller as Griswold*, 122 HARV. L. REV. 246, 260, 263 – 64 (2008); Saul Cornell, *Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller*, 69 OHIO ST. L.J. 625, 639 (2008); Richard A. Posner, *In Defense of Looseness: The Supreme Court and Gun Control*, THE NEW REPUBLIC, Aug. 27, 2008, at 32-33.

[3]  *Masciandaro*, 638 F.3d at 468.

practices indicate that the need for self-defense in the home implies nothing about the existence of a right outside the home.  The historical record is replete with examples of limitations of the right to use firearms outside of one's home.

Self-defense beyond the home implicates far broader questions of public safety, and the historical record indicates that the Founding generation decided to leave the resolution of regulating public carrying to the more flexible standards afforded by the common law and the public policy preferences of individual legislatures.   The fact that weapons were needed to maintain training and hunting also has little bearing on how these weapons might be used outside of the home because pistols were not typically part of the standard weapons of the militia. In some states even traveling to muster was tightly regulated and weapons were required to be unloaded.[4]

### A.    The Scope of the Right to Bear Arms in Founding Era

While Americans may well have believed they had a legal right to defend their homes with deadly force if necessary, there is no evidence that members of the Founding era thought it was necessary to constitutionalize the protection of this right outside of the home.[5]  Balancing the needs of public safety against the

---

[4] *See infra* note 14.

[5] Not even the most expansive statements of the right from the ratification debates can plausibly be read to justify traveling armed, apart from the Pennsylvania Anti-Federalists' discussion of hunting.  *Heller*, 554 U.S. at 604.

exercise of this right was something best left to the individual state legislatures. Clear statements about the need to limit the right to keep and bear arms to one's home or property are found both in Virginia – in particular the views of Thomas Jefferson – and in Massachusetts.

### 1. Virginia and Thomas Jefferson: No Recognition of A Right Outside One's Own Property

Virginia was the first state to draft a new Constitution and Declaration of Rights. George Mason, the primary architect of the Virginia Declaration of Rights, had been a leading patriot and took a major role in the creation of the new state's militia. The language eventually adopted by Virginia stated:

> That a well regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defence of a free state; that standing armies, in time of peace, should be avoided, as dangerous to liberty; and that, in all cases, the military should be under strict subordination to, and governed by, the civil power.[6]

Virginia's Declaration of Rights made no mention of the right to bear arms or a right of self-defense. The absence of such language did not mean that Virginians did not esteem the right of self-defense; it merely underscored the fact that they believed such a right was adequately protected under the common law.

The militia focus of Mason's language troubled Thomas Jefferson, one of the most forward-looking and innovative legal thinkers in the Old Dominion.

---

[6] *Virginia Declaration of Rights*, PAPERS OF GEORGE MASON, 1: 288.

Jefferson proposed his own alternative to Mason's language, which included a more expansive statement of the right of individuals to keep and use firearms.

Jefferson first proposed that "no free man shall ever be debarred the use of arms," but decided to revise his proposal to limit the exercise of this right to an individual's home or lands. His revised proposal, which was not enacted, suggested that the Virginia Declaration of Rights include language asserting that "no free man shall be debarred the use of arms [within his own lands or tenements]." [7]

Elsewhere Jefferson evidenced his view that firearms rights did not extend beyond one's property. In a bill he wrote to deal with poaching, Jefferson included a provision restricting the ability to travel armed with a musket outside of the context of militia activity. The proposed law penalized any individual who "bear[s] a gun out of his enclosed ground, unless whilst performing military duty." [8] The purpose of the statute was to legally distinguish between the different levels of regulation appropriate to the use of firearms in different contexts. In public,

[7] THE PAPERS OF THOMAS JEFFERSON (Julian P. Boyd, ed., 1950) 1: 344 and 1:355. *But see*, Dan Friedman, *Tracing the Lineage: Textual and Conceptual Similarities in the Revolutionary-Era State Declarations of Rights of Virginia, Maryland, and Delaware*, 33 RUTGERS L.J. 929, 973-74 n.198 (2002).

[8] *A Bill for Preservation of Deer (1785)*, *in* 2 THE PAPERS OF THOMAS JEFFERSON 444 (Julian P. Boyd ed., 1950).

militia weapons enjoyed legal protection.  By contrast, the civilian use of guns outside of the home was subject to greater regulation.

## 2. Massachusetts: No Right To Travel Armed Recognized

Massachusetts was the first state to introduce language that expressly protected a right to keep and bear arms.  The 1780 Constitution adopted by the state declared that:

> The People have a right to keep and bear arms for the common defense. And as in time of peace armies are dangerous to liberty they ought not to be maintained without the consent of the legislature; and the military power shall always be held in exact subordination to the civil authority and be governed by it.[9]

The convention's inclusion of the word "keep" built on an assumption implicit in the state's militia statute, which had been enacted in the colonial era.  Apart from the poor, most white male citizens were required to outfit themselves with military quality weapons.  As was true for virtually every state's militia laws, muskets, not pistols, were the legally designated weapon of the militia. The only exception to this was the horsemen's pistol required for dragoons and other mounted units.[10]

---

[9] *Article XVII Constitution of 1780*, *in* THE POPULAR SOURCES OF POLITICAL AUTHORITY 446 (Oscar Handlin and Mary Handlin, eds., 1966).

[10] *See* Saul CORNELL, A WELL REGULATED MILITIA:  THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA (2006).  For an example from the Second Amendment era, *see An Act for Regulating and Governing the Militia of the Commonwealth of Massachusetts*, *in* ACTS AND LAWS, PASSED BY THE GENERAL COURT OF MASSACHUSETTS 294 (1793).

One of the most remarkable features of the framing and ratification of the Massachusetts Constitution was the decision to submit the draft constitution to the towns for comments. These responses provide a rare glimpse into popular constitutional ideas in the Founding era, including ideas about armed self-defense. Although individual towns produced dozens of detailed responses to the proposed constitution, the clause on the right to keep and bear arms did not prompt extensive commentary. The response of the western town Williamsburgh, however, did fault the constitution's exclusive focus on common defense and proposed the following alternative:

> 1st. that we esteem it an essential privilege to keep Arms **in our houses** for Our Own Defense and while we Continue honest and Lawfull Subjects of Government we Ought Never to be deprived of them.[11]

(emphasis added). This alternative formulation clearly frames the right in terms similar to *Heller's* core right of self -defense in the home.

This limited formulation of the right was also evidenced in the language chosen by Samuel Adams in his proposed amendment submitted to, but ultimately rejected by, the Massachusetts convention.[12]

---

[11] *Town of Williamsburgh (1780)*, POPULAR SOURCES OF POLITICAL AUTHORITY, 624 (Oscar Handlin & Mary Handlin, eds., 1966).

[12] 6 DOCUMENTARY HIST. 1452, 1453 (J. Kaminski & G. Saladino eds. 2000) (Samuel Adams' proposal).

**B.**    **Recognition of A Private Right To Bear Arms Outside One's Property Relies on Myths, Rather Than Historical Realities, of Gun Regulation in the Founding Era and Early Republic**

In *Masciandaro*, Judge Niemeyer reasoned that the right protected by *Heller* had to extend beyond the home, because of the need to hunt and participate in the militia.[13]  However, while Judge Niemeyer extrapolated a right to carry firearms from an unquestioned historical assumption about the way the militia functioned, in fact, states regulated the exercise of this right in a robust manner, including prohibiting militiamen from traveling with an armed weapon to muster or parade.[14]  These types of regulations were an uncontroversial exercise of the state's police powers.[15]  As Jefferson's proposed statute suggests, the use of militia weapons outside of the home was treated far differently than the use of pistols for non-militia purposes.  Indeed, the Founding generation had little trouble accepting that one might have different legal standards for the use of arms within the home and in public.

---

[13] *Masciandaro*, 638 F.3d at 468.

[14] STATUTES OF THE STATE OF NEW JERSEY (1847) at 765; THE REVISED STATUTES OF NEW HAMPSHIRE (1851) at 161 ; Parade in this context is an essential part of the muster in which weapons are inspected and fines levied, *see* AMERICAN STATE PAPERS.  DOCUMENTS, LEGISLATIVE AND EXECUTIVE OF THE CONGRESS OF THE UNITED STATES . . . CLASS V. MILITARY AFFAIRS (1832) at 451-52.

[15] WILLIAM J. NOVAK, THE PEOPLE'S WELFARE:  LAW AND REGULATION IN NINETEENTH-CENTURY AMERICA 51-82 (1996).

Although there were hundreds of essays published both for and against the Constitution, the subject of hunting and the right of self-defense outside the home produced little commentary.[16]  There is strong evidence that Federalists and Anti-Federalists each saw these issues as matters best left to the state legislatures.  For example, while Federalist Tench Coxe and the Anti-Federalist author Brutus agreed on few things, they were in complete agreement that "it ought to be left to the state governments to provide for the protection and defence of the citizen against the hand of private violence, and the wrongs done or attempted by individuals to each other . . . ."[17]

Further, militia weapons were granted far greater legal protection than non-militia weapons.  Although state laws varied, a number of states expressly provided that weapons owned in relation to militia service were exempt from seizure in any legal proceedings for debt or delinquent taxes.  For example, a Philadelphia guidebook for justices of the peace, sheriffs, and constables, in discussing goods subject to a "distress for rent" action, noted that while tradesmen's tools were exempt, no provision was made for firearms, apart from

---

[16] Paul Finkelman, *It Really Was About A Well Regulated Militia*, 59 SYRACUSE L. REV. 267 (2008).

[17] Brutus, *Essays of Brutus VII*, *in* 2 THE COMPLETE ANTI-FEDERALIST 358, 401 (Herbert J. Storing ed., 1981).  Compare Tench Coxe, "*A Freeman*," PA. GAZETTE, Jan. 23, 1788, *reprinted in* FRIENDS OF THE CONSTITUTION: WRITINGS OF THE "OTHER" FEDERALISTS 88, 95 (Colleen A. Sheehan & Gary L. McDowell eds., 1998).

muskets and rifles owned by militiamen.[18]  Similarly, in a guide written for sheriffs

and tax collectors in Maine, published more than three decades later, militia

firearms were exempt. [19]

Given the language of the Second Amendment, the notion that the use of

militia weapons outside of the home enjoyed greater protection than the use of

pistols outside of the home makes perfect sense.  Although *Heller* held that

self-defense in the home was one core value enshrined in the Second Amendment,

it is hard to dispute that the Amendment also protects the goal of arming the

militia.   Since pistols had little value in hunting, and were not standard equipment

for ordinary militia men, it made sense to carve out a broader right to travel with a

musket or a rifle as these weapons were needed for training and were suitable for

hunting.  Yet, even this right was subject to extensive regulation and limitation.

Finally, the common law constrained the use of firearms outside of one's

property in the Founding era and early republic. The Statute of Northampton

---

[18]  THE CONDUCTOR GENERALIS, OR, THE OFFICE, DUTY AND AUTHORITY OF THE
JUSTICE OF THE PEACE, 116, 266 (1792).

[19]  JEREMIAH PERLEY, THE MAINE CIVIL OFFICER, OR, THE POWERS AND DUTIES OF
SHERIFFS, CORONERS, CONSTABLES, AND COLLECTORS OF TAXES 29-30 (1825)
"every citizen enrolled, and providing himself with the arms, ammunition, and
accoutrements required by law, shall hold the same exempt from all suits,
distresses, execution, or sale for debts, or for the payment of taxes.").  The statute
describing this legal exemption had been passed in 1792.  For similar discussions
from a New Jersey guide from the same period, *see* JAMES EWING, A TREATISE ON
THE OFFICE AND DUTY OF A JUSTICE OF THE PEACE  70 (1832).

(1328) instructed individuals to "bring no force in affray of the peace, nor to go ride armed by night nor by day, in fairs, markets."[20]  Modern scholars are divided over how to interpret the application of this statute in early American law.  In the view of Daryl Miller and Patrick Charles, the Statute of Northampton (1328) prohibited armed travel.[21]  Eugene Volokh, a leading academic champion of gun rights, argues that this "statute was understood by the Framers as covering only those circumstances where carrying arms was unusual and therefore terrifying."[22]  Volokh cites the interpretation of this statue by Sir William Hawkins, an English legal commentator familiar to lawyers in the Founding era, who read the prohibition in terms of traveling with "unusual and dangerous weapons."

The interpretation of the Statute of Northampton by Volokh and Sir Hawkins is subtly different than that of Sir William Blackstone.[23]  Blackstone did not describe the crime of affray in terms of traveling with "unusual and dangerous weapons," but described the statute's prohibition in terms of carrying "dangerous

---

[20] 2 Edw. 3, c. 3 (1328).

[21] Darrell A.H. Miller, *Guns as Smut: Defending the Home-Bound Second Amendment*, 109 COLUM. L. REV. 1278 (2009); and Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 CLEVE. ST. L. REV. 1 (2012).

[22] Eugene Volokh, *The First and Second Amendments*, 109 COLUM. L. REV. SIDEBAR 97 (Oct. 27, 2009).

[23] 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 148-49 (1769).

or unusual weapons."[24]  The Founders were familiar with both English commentators and it seems likely that there may have been a range of views on interpreting this question.

The *Heller* Court relied on Blackstone in discussing permissible limitations on the right.  *Heller*, 554 U.S. at 627.  The *Heller* Court also referred approvingly to the "historical tradition" of prohibiting public carrying, citing *English v. State*, 35 Tex. 473 (1871) (*see Heller*, 554 U.S. at 627), in which the Texas Supreme Court upheld a conviction for carrying a pistol in public under a statute banning the public carry of deadly weapons, including handguns.

The historical record supports this traditionally understood limitation of the right.  After all, Founding era public policy on firearms had several objectives:  to disarm dangerous and disloyal groups, provide for the safe storage of gun powder and firearms, and arm and regulate the militia.[25]  In the Founding era, inter-personal violence – including gun violence – was simply not a problem that warranted enough attention to produce legislation.[26]  When cheaper, more reliable and more concealable weapons became more common in the early 19th century,

---

[24]  *Id*.

[25]  For a discussion of early American gun regulation, *see* Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 491-94 (2004).

[26]  RANDOLPH ROTH, AMERICAN HOMICIDE (2009).

legislatures responded with greater restrictions and prohibitions on their public carrying, as will be discussed below.

**C.** **The Historical Conclusions and Antebellum Case Law Relied On By Judge Niemeyer Do Not Support A Right Outside One's Property**

As cheaper and more reliable handguns began to proliferate in large numbers and society underwent a host of profound social and economic changes in the early decades of the nineteenth century, handguns and knives gradually became a social problem. In response to a growing perception that these easily concealable weapons posed a serious threat to public safety, a number of states passed the first modern style weapons control laws.[27] These laws triggered the first cases testing the scope of the constitutional right to keep and bear arms under state law.[28] For the first time in American history, courts were faced with deciding this issue: was the constitutional right to bear arms implicated when one armed oneself with a pistol or a knife outside of the home?

In *Masciandaro*, Judge Niemeyer relied on law Professor Volokh's answer to that question for considering *Heller*'s applicability outside the home. Unfortunately, this framework rests on a number of historical assumptions and claims that are questionable at best, inaccurate at worst. In particular, the

---

[27] CORNELL, A WELL REGULATED MILITIA, *supra* note 10.

[28] *Id.*

contention that the "pre-Civil-War American legal practice of treating open

carrying of weapons as not only legal but constitutionally protected"[29] rests more

on historical mythology and a highly selective reading of the evidence than it does

on sound historical research.  In reality, significant antebellum case law on the

right to bear arms, such as  *State v. Buzzard*, 4 Ark. 18, 21 (1842), limited the right

to travel armed, although a few outlier decisions embraced a broader, more

libertarian view, as in *Bliss* v. *Commonwealth*, 12 Ky. 90 (1822).  Most legal

commentators in the era of the Fourteenth Amendment viewed *Buzzard*, not *Bliss*,

as the orthodox view – indeed, even in Kentucky, the people superseded *Bliss* by

amendment.[30]

Mischaracterizing the antebellum jurisprudence is not the only problem with

Volokh's gun rights version of history.  Volokh is a legal scholar, not a historian,

and as such he is best trained to deal with doctrinal analysis, relying mostly on case

law.  However, in matters where there was a broad constitutional consensus and

laws were not challenged, there would not be a body of case law.  Much legal

---

[29]  Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443 (2009); Eugene Volokh, *The First and Second Amendments*, 109 COLUM. L. REV. SIDEBAR 97, 102 (Oct. 27, 2009).

[30]  *See* Saul Cornell & Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L. REV. 1043 (2010); and KY. CONST. of 1850 art. XI, § 25 (superseding *Bliss*).

scholarship on the right to bear arms, including Volokh's work, strikingly omits any attention to the legal standards outside of the South.[31]

It is not surprising that the vast majority of the early cases testing the limits and scope of the right to bear arms came from the South. By the 1820s the antebellum South was the most violent region in the new nation.[32] As the South's homicide rates were more than double that of the North's most populous cities, New York and Philadelphia, it is not surprising that this region led the way in passing the first modern style gun control laws. These new laws generated the first test cases of the meaning of the right to bear arms under state constitutional law.

If one looks closely at the foundation for Professor Volokh's claim about the right to carry, it consists of a single and quite remarkable statement by a Richmond grand jury published in 1820, in which the grand jury denounced the pernicious practice of carrying concealed weapons, while affirming the right to carry

_____

[31] Nearly all of the antebellum gun cases were decided in the South, and the most important counter examples are a trio of Indiana cases that may in part be accounted for by Southern migration into Indiana. *State v. Mitchell*, *3* Blackf. 229 (Ind. 1833); *Walls v. State*, 7 Blackf. 572 (Ind. 1845); *State v. Duzan*, 6 Blackf. 31 (Ind. 1841); Nicole Etcheson, *Manliness and the Political Culture of the Old Northwest*, *1790-1860*, 15 J. EARLY REP. 59 (1995).

[32] RANDOLPH ROTH, AMERICAN HOMICIDE (2009). Urban areas also underwent a significant increase in violence, particularly in assaults with weapons, on this point *see* ERIC H. MONKKONEN, MURDER IN NEW YORK CITY (2001). Joshua Stein, *Privatizing Violence: A Transformation in the Jurisprudence of Assault*, 30 L. & HIST. REV. 423, 445 (2012). Stein notes that in the three decades between 1810 and 1840 assaults rose dramatically as did the likelihood that such assaults would involve a weapon.

arms[33] – hardly the sort of historical evidence that could support his broad

Constitutional conclusion.

The idea that one might ban concealed carry only if one allowed open carry

garners some support in the Supreme Court of Georgia's decision in *Nunn v. State*,

1 Ga. 243, 246 (1846). But even *Nunn*'s holding may not be as broad as some

suggest, as the Court also was troubled that under the challenged law "[i]t might be

insisted, and with much plausibility, that even sheriffs, and other officers therein

enumerated, might be convicted for keeping, as well as carrying, any of the

forbidden weapons, while not in the actual discharge of their respective duties."[34]

Further, not only are the pro-slavery views of *Nunn*'s author, Judge Lumpkin,

anathema today, but there is little evidence that this case was understood to be a

controlling precedent even in the South.[35] *See, e.g.*, *Aymette v. State*, 21 Tenn.

154, 159-61 (1840) ("The Legislature, therefore, have a right to prohibit the

wearing or keeping weapons dangerous to the peace and safety of the citizens, and

which are not usual in civilized warfare, or would not contribute to the common

---

[33] *On Wearing Concealed Arms*, DAILY NAT'L INTELLIGENCER (Sept. 9, 1820).

[34] *Nunn*, 1 Ga. at 246.

[35] For the pro-slavery beliefs of Judge Lumpkin, the author of the Nunn decision, *see* Mason W. Stephenson & D. Grier Stephenson, Jr., *To Protect and Defend: Joseph Henry Lumpkin, The Supreme Court of Georgia, and Slavery*, 25 EMORY L. J. 579 (1976) (formerly Journal of Public Law). For a discussion of how the antebellum tradition was interpreted during the era of the Fourteenth Amendment, *see* Cornell & Florence, *supra* note 30.

defence."); *State v. Buzzard*, 4 Ark. 18, 21 (1842); *State v. Jumel*, 13 La. Ann. 399, 400 (1858). Indeed, *Nunn* did not even represent the view of the Supreme Court of Georgia for long. In *Hill v. State*, 53 Ga. 472, 474 (1874), that Court was "at a loss to follow the line of thought that extends the guarantee"—the state constitutional "right of the people to keep and bear arms" – "to the right to carry pistols, dirks, Bowie-knives, and those other weapons of like character, which, as all admit, are the greatest nuisances of our day."

In a post-Civil War case relied on by the *Heller* Court, the Supreme Court of Texas, in *English v. State*, relied on centuries-old traditions of prohibiting arms in public places and found it "little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into a church . . . or any other place where ladies and gentlemen are congregated together." 35 Tex. 473, 478-79 (1871). Numerous other courts similarly found that prohibitions or extensive restrictions on the carrying of firearms in public were constitutionally permissible. *See*, *e.g.*, *Fife v. State*, 31 Ark. 455 (1876) (upholding carrying prohibition as a lawful "exercise of the police power of the State without any infringement of the constitutional right" to bear arms); *State v. Workman*, 35 W. Va. 367, 373 (1891); *Ex parte Thomas*, 97 P. 260, 262 (Okla. 1908) ("Practically all of the states under constitutional provisions similar to ours have held that acts

of the Legislatures against the carrying of weapons concealed did not conflict with such constitutional provision denying infringement of the right to bear arms, but were a valid exercise of the police power of the state."). The idea that Americans recognized a right to carry firearms in public is more supported by Hollywood than history; even in Dodge City, that epitome of the Wild West, Wyatt Earp prohibited gun carrying. *See* Dodge City, Kan., Ordinance No. 16, § XI (Sept. 22, 1876); *see also* 1876 Wyo. Comp. Laws ch. 52, § 1 (1876 Wyoming law prohibiting anyone from "bear[ing] upon his person, concealed or openly, any firearm or other deadly weapon, within the limits of any city, town or village"); Ark. Act of Apr. 1, 1881; Tex. Act of Apr. 12, 1871.

*Nunn* clearly had no impact on practices in the North and much of the Mid-West and West – though much scholarship on the right to bear arms has been strangely silent about legal ideas and practices in these other areas of the nation, which included the vast majority of the free population. Evidence from these regions supports an alternative model of the right to carry, one narrowly limited to situations where there was a reasonable cause to fear imminent violence.

Outside of the South, the model of regulation that emerged and gained widespread acceptance allowed for banning the open and concealed carry of handguns and other weapons, as long as one allowed an exception for cases in

which an individual had a reasonable fear of violence.  In 1836, Massachusetts

passed a sweeping law that severely limited the right to travel armed:

> If any person shall go armed with a dirk, dagger, sword, pistol, or other
> offensive and dangerous weapon, without reasonable cause to fear an assault
> or other injury, or violence to his person, or to his family or property, he
> may on complaint of any person having reasonable cause to fear an injury,
> or breach of the peace, be required to find sureties for keeping the peace.[36]

The respected jurist Peter Oxenbridge Thatcher commented on this law in a

grand jury charge that drew praise in the contemporary press.  Thatcher shared the

dominant cultural view of the day that the practice of arming oneself with

concealed weapons was craven, if not dastardly.  The alternative to concealed

carry, however, was not open carry, but rigorous enforcement of the law, which

forbade arming oneself except in unusual situations:

> In our own Commonwealth [of Massachusetts], ***no person may go armed
> with a dirk, dagger, sword, pistol, or other offensive and dangerous
> weapon, without reasonable cause to apprehend an assault or violence to
> his person, family, or property***.  Where the practice of wearing secret arms
> prevails, it indicates either that the laws are bad; or that they are not
> executed with vigor; or, at least, it proves want of confidence in their
> protection.  It often leads to the sudden commission of acts of atrocious
> injury; and induces the individual to rely for defense on himself, rather than
> on society.  But how vain and impotent is the power of a single arm,
> however skilled in the science of defense, to protect its possessor from the
> many evil persons who infest society. The possession of a concealed dagger
> is apt to produce an elation of mind, which raises itself about the dictates
> both of prudence and law. The possessor, stimulated by a sensitive notion of
> honor, and constituting himself the sole judge of his rights, may suddenly
> commit a deed; for which a life of penitence will hardly, even in his own

---

[36] REVISED STATUTES OF THE COMMONWEALTH OF MASSACHUSETTS PASSED
NOVEMBER 4, 1836 at 750 (Boston 1836).

estimation, atone. When you survey the society to which you belong, and consider the various wants of its members;—their numbers, their variety of occupation and character,—their conflicting interests and wants . . . what is it, permit me to ask, preserves the common peace and safety? I know of no answer, but THE LAW. [37]

(Emphasis added). Thatcher describes a narrowly defined right to carry arms in public. According to this view, the state may ban all carrying of firearms as long as it acknowledged a legal exception when there was a clear and tangible danger which would warrant arming oneself.

By the dawn of the era of the Fourteenth Amendment, this narrow conception of the right to carry had emerged clearly in Maine, Delaware, the District of Columbia, Wisconsin, Pennsylvania, Minnesota, and Oregon.[38] Rather

---

[37] PETER OXENBRIDGE THACHER, TWO CHARGES TO THE GRAND JURY OF THE COUNTY OF SUFFOLK FOR THE COMMONWEALTH OF MASSACHUSETTS, AT THE OPENING OF TERMS OF THE MUNICIPAL COURT OF THE CITY OF BOSTON, ON MONDAY, DECEMBER 5TH, A.D. 1836 AND ON MONDAY, MARCH 13TH, A.D. at 27-28 (Dutton and Wentworth, 1837). The section of the grand jury charge dealing with traveling armed was excerpted and reprinted in the press, *see Judge Thacher's Charges*, CHRISTIAN REGISTER AND BOSTON OBSERVER, p. 91 (June 10, 1837). For additional discussion of the Massachusetts model, *see* E. HAMMOND, A PRACTICAL TREATISE; OR AN ABRIDGEMENT OF THE LAW APPERTAINING TO THE OFFICE OF JUSTICE OF THE PEACE at 184 (C.A. Mirick & Co., West Brookfield 1841).

[38] THE REVISED STATUTES OF THE STATE OF MAINE, PASSED OCTOBER 22, 1840 at 709 (William R. Smith & Co., Augusta 1841) ("Any person, going armed with any dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without a reasonable cause to fear an assault on himself . . . ."); REVISED STATUTES OF THE STATE OF DELAWARE, TO THE YEAR OF OUR LORD ONE THOUSAND EIGHT HUNDRED AND FIFTY-TWO at 333 (Dover, Delaware 1852) ("Any justice of the peace may also cause to be arrested . . . all who go armed offensively to the terror of the

than demonstrate a consensus on a right to open carry, as Volokh suggests, the

historical record demonstrates that outside of the South, a far more limited

conception of the right to travel armed emerged.  To assert this right one had to be

able to demonstrate clear evidence of a reasonable fear of imminent danger before

---

people, or are otherwise disorderly and dangerous."); THE REVISED CODE OF THE
DISTRICT OF COLUMBIA, PREPARED UNDER THE AUTHORITY OF THE ACT OF
CONGRESS at 570 (A.O.P. Nicholson, Washington 1857) ("If any person shall go
armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon,
without reasonable cause to fear an assault or other injury or violence to his person
. . . ."); THE REVISED STATUTES OF THE STATE OF WISCONSIN: PASSED AT THE
ANNUAL SESSION OF THE LEGISLATURE COMMENCING JANUARY 13, 1858, AND
APPROVED MAY 17, 1858 at 985 (W.B. Keen, Chicago 1858) ("If any person shall
go armed with a dirk, dagger, sword, pistol or pistols, or other offensive and
dangerous weapon, without reasonable cause to fear an assault or other injury or
violence to his person . . . ."); JOHN PURDON, A DIGEST OF THE LAWS OF
PENNSYLVANIA, FROM THE YEAR ONE THOUSAND SEVEN HUNDRED TO THE TENTH
DAY OF JULY, ONE THOUSAND EIGHT HUNDRED AND SEVENTY-TWO 376 (10th ed.,
Philadelphia 1873) ("If any person, not being an officer on duty in the military or
naval service of the state or of the United States, shall go armed with a dirk,
dagger, sword or pistol, or other offensive or dangerous weapon, without
reasonable cause to fear an assault or other injury or violence . . . ."); GEORGE B.
YOUNG, THE GENERAL STATUTES OF THE STATE OF MINNESOTA, AS AMENDED
SUBSEQUENT LEGISLATION, WITH WHICH ARE INCORPORATED ALL GENERAL LAWS
OF THE STATE IN FORCE AT THE CLOSE OF THE LEGISLATIVE SESSION OF 1878 at 629
(Davidson & Hall, St. Paul 1879) ("Whoever goes armed with a dirk, dagger,
sword, pistol or pistols, or other offensive and dangerous weapons, without
reasonable cause to fear an assault or other injury or violence to his person . . . .");
THE STATUTES OF OREGON, ENACTED, AND CONTINUED IN FORCE, BY THE
LEGISLATIVE ASSEMBLY at 243 (1855).  For a discussion of these laws in the
context of the Statute of Northampton, *see* Charles *supra* note 21 and
accompanying text.

one might legally arm oneself[39] – a standard similar to that embodied in the

Maryland law at issue here.

The idea that courts would use the Fourteenth Amendment to incorporate an

isolated strand of the slave South's legal vision to recognize a right to public carry

turns history on its head.  The relevant sources that one might plausibly consult to

establish the original meaning or understanding of the Fourteenth

Amendment – including Framers, ratifiers, the typical informed reader, or the

public at large – would have embraced the more common Massachusetts model,

not the exceptional Southern one.[40] Indeed, Reconstruction era Republicans were

strong supporters of generally applicable and racially neutral gun regulations,

including in some cases, bans on traveling armed and bans on handguns.[41]

---

[39]  These statutes acknowledged a common law exception by allowing individuals
to arm themselves in cases of imminent danger, and relied on a common law
enforcement mechanism, surety of peace. In an age before modern police forces,
when most American lived in smaller rural communities, and there was no modern
regulatory or administrative state, adopting this common law approach would have
seemed quite natural.  *See* HAMMOND, A PRACTICAL TREATISE, *supra* note 37;
NOVAK, THE PEOPLE'S WELFARE, *supra* note 15.

[40]  For a good introduction to the methodological and interpretive issues relevant to
the debate over originalism, *see* Richard H. Fallon, Jr., *Are Originalist
Constitutional Theories Principled, or Are They Rationalizations for
Conservatism?*, 34 HARV. J.L. & PUB. POL'Y 5 (2011).

[41]  Carole Emberton, *The Limits of Incorporation: Violence, Gun Rights, and Gun
Regulation in the Reconstruction South*, 17 STAN. L. & POL'Y REV. 615 (2006).
While modern gun rights advocates have attempted to portray Reconstruction era
Republicans as radical gun rights advocates, the historical reality is far more

The importance of the reasonable threat exception to broad restrictions on the public carrying of arms was analyzed by the eminent jurist, John Foster Dillon, and by another celebrated legal theorist of this era, Joel Prentiss Bishop.[42] Both men acknowledged that the law had to balance the legitimate rights of individual self-defense against the needs of public safety.  Dillon's discussion of this issue was especially thoughtful.  Drawing on the recently – decided *Andrews* v. *State*, 50 Tenn. 165, 188 (1871), Dillon concluded that "every good citizen is bound to yield his preference as to the means [of self-defense] to be used, to the demands of the public good."[43]  The state's compelling interest in promoting public safety did not alter the fact that there "are circumstances under which to disarm a citizen would

---

complex.  Abolitionists were divided over the legitimacy of armed self-defense. Antebellum abolitionism existed along a spectrum that ran from John Brown's insurrectionary theory to Quaker pacifism.  Reconstruction era Republicans were also heirs to the antebellum Whig ideal of the well regulated state. For additional evidence of Reconstruction era support for racially neutral gun regulations intended to promote public safety, *see* Cornell & Florence, *supra* note 30.

[42]  Volokh, *supra* note 29;  Judge Niemeyer and Judge Legg in the Fourth Circuit may have erred in putting too much faith in Volokh's version of the past, *see* Judge Niemeyer's concurrence in *United States v. Masciandaro*, and Judge Legg's opinion in *Woollard v. Sheridan*, F. Supp. 2d., 2012 U.S. Dist. LEXIS 28498 (D. Md. March 2, 2012).

[43]  John Foster Dillon, *The Right to Keep and Bear Arms for Public and Private Defense*, 1 CENT. L.J. 259 (1874). *See generally* JOEL PRENTISS BISHOP, COMMENTARIES ON THE CRIMINAL LAW (1868).

be to leave his life at the mercy of treacherous and plotting enemy."[44]  Dillon's

solution to this dilemma was not permissive open carry.  He turned to a common

law rule that had been absorbed into the Massachusetts statute prohibiting traveling

armed.  If one armed oneself contrary to a legal prohibition and a genuine threat

existed, and "if such a state of facts were clearly proven," he opined, it would

"clearly be said to fall within that class of cases in which the previously existing

common law interpolates exceptions upon subsequently enacted statutes."[45]

The claim that there was a broad consensus in American law on a right to

carry firearms openly is incorrect, and mistakenly extrapolates from one distinctive

strain within Southern law, while ignoring the more dominant contrary authority,

in the South and elsewhere.

## CONCLUSION

The proposition that the Founding era understood the right of self-defense to

include a constitutionally protected right to travel armed with a pistol is not

supported by the best historical evidence.  And there is no merit in the proposition

that, by the era of the Fourteenth Amendment, the right to carry firearms openly

had gained widespread acceptance in American law.  The right to keep and bear

---

[44] *Id*.

[45] *Id*.

arms, as historically understood in American history and its historical antecedents,

simply did not embrace a right to carry firearms in public places.

Respectfully submitted,

/s/ Andrew C. White
ANDREW C. WHITE
ERIN MURPHY
SILVERMAN, THOMPSON,
SLUTKIN & WHITE, LLC
201 North Charles Street,
26th Floor
Baltimore, Maryland 21201
(410) 385-2225

/s/ Dwight W. Stone, II
DWIGHT W. STONE, II
WHITEFORD, TAYLOR & PRESTON, LLP
Seven Saint Paul Street
Suite 1500
Baltimore, MD 21202
(410) 347-8700
*Counsel for Amici Curiae*

Dated: June 22, 2012

# ADDENDUM

**ADDENDUM**

**Page**

Arkansas Acts of 1838 and 1881 ...................................................Add. 1

Tex. Act of Apr. 12, 1871, as codified in
Tex. Penal Code (1879) .................................................................Add. 3

W. Va. Code ch. 148, § 7 (1870) ...................................................Add. 5

*Connecticut v. Hungerford* (June 1810) .........................................Add. 6

Ewing, James, A TREATISE ON THE OFFICE AND DUTY OF A
JUSTICE OF THE PEACE, SHERIFF, CORONER, CONSTABLE, AND OF
EXECUTORS, ADMINISTRATORS, AND GUARDIANS (1832) .................Add. 9

Bishop, Joel Prentiss, COMMENTARIES ON THE
CRIMINAL LAW 195 (1868)............................................................Add. 12

Bishop, Joel Prentiss, COMMENTARIES ON THE
CRIMINAL LAW 570 (1868)............................................................Add. 15

THE CONDUCTOR GENERALIS, OR, THE OFFICE DUTY AND
AUTHORITY OF THE JUSTICE OF THE PEACE, 116, 266 (1792) .........Add. 18

THE REVISED CODE OF THE DISTRICT OF COLUMBIA, PREPARED UNDER
THE AUTHORITY OF THE ACT OF CONGRESS 570 (1857)...................Add. 26

THE REVISED STATUTES OF THE STATE OF MAINE, PASSED
OCTOBER 22, 1840 REVISED STATUTES OF THE COMMONWEALTH OF
MASSACHUSETTS PASSED NOVEMBER 4, 1836 (1836) .....................Add. 33

*An Act for Regulating and Governing the Militia of the Commonwealth
of Massachusetts*, IN ACTS AND LAWS, PASSED BY THE
GENERAL COURT OF MASSACHUSETTS 294 (1793).........................Add. 36

STATUTES OF THE STATE OF NEW JERSEY (1847) at 765 .................Add. 39

THE STATUTES OF OREGON, ENACTED, AND CONTINUED IN FORCE,
BY THE LEGISLATIVE ASSEMBLY (1855) at 243 ................................................Add. 43

Purdon, John, A DIGEST OF THE LAWS OF PENNSYLVANIA,
FROM THE YEAR ONE THOUSAND SEVEN HUNDRED TO THE TENTH DAY
OF JULY, ONE THOUSAND EIGHT HUNDRED AND SEVENTY-TWO 376
(10th ed., Philadelphia 1873) ........................................................................Add. 53

Peter Oexenbridge Thacher, TWO CHARGES TO THE GRAND JURY OF THE
COUNTY OF SUFFOLK FOR THE COMMONWEALTH OF MASSACHUSETTS,
AT THE OPENING OF TERMS OF THE MUNICIPAL COURT OF THE CITY OF
BOSTON, ON MONDAY, DECEMBER 5TH, A.D. 1836
AND ON MONDAY, MARCH 13TH, A.D. (1837)...................................................Add. 54

THE REVISED STATUTES OF THE STATE OF WISCONSIN:
PASSED AT THE ANNUAL SESSION OF THE LEGISLATURE COMMENCING
JANUARY 13, 1858, AND APPROVED MAY 17, 1858 at 985 (1858)...................Add. 58

1876 Wyo. Comp. Laws ch. 52, § 1 (1876).....................................................Add. 59

**Arkansas**

1838

Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which the said offence shall have been committed, shall be fined in any sum not less than twentyfive dollars, nor more than one hundred dollars, one half to be paid into the county treasury, the other half to the informer, and shall also be imprisoned not less than one, nor more than six months.

(Reprinted from Clayton E. Cramer, *Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 150 (1999).)

1881

Ark. Act of Apr. 1, 1881, as codified in Ark. Stat., chap. 45 (1884).

Section 1907. Any person who shall wear or carry in any manner whatever as a weapon any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. *Provided*, that officers whose duties require them to make arrests, or to keep and guard prisoners, together with persons summoned by such officers to aid them in the discharge of such duties,

4a

while actually engaged in such duties, are exempted from the provisions of this act. *Provided, further*, that nothing in this act be so construed as to prohibit any person from carrying any weapon when upon a journey or upon his own premises.

Section 1908. Any person, excepting such officers or persons on a journey and on their premises as are

mentioned in section 1907, who shall wear or carry any such pistol as is used in the army or navy of the United States, in any manner except uncovered and in his hand, shall be deemed guilty of a misdemeanor.

Section 1909. Any person who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person, any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol of any kind whatever, except such as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge for any pistol, or any person who shall keep any such arms or cartridges for sale, shall be guilty of a misdemeanor.

Section 1910. Any person convicted of a violation of any of the provisions of this act shall be punished by a fine of not less than fifty nor more than two hundred dollars.

**Texas**

Tex. Act of Apr. 12, 1871, as codified in Tex. Penal Code (1879).

Art. 163. If any person, other than a peace officer, shall carry any gun, pistol, bowie knife, or other dangerous weapon, concealed or unconcealed, on any day of election, during the hours the polls are open, within the distance of one-half mile of any poll or voting place, he shall be punished as prescribed in article 161 of this Code.

Art. 316. If any person shall discharge and gun, pistol or fire-arm of any description, on or across any public square, street or alley in any city, town or village in this state, he shall be fined in a sum not exceeding one hundred dollars.

Art. 318. If any person in this state shall carry on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold, for purposes of offense or defense, he shall be punished by fine of not less than twenty-five nor more than one hundred dollars; and, in addition thereto, shall forfeit to the county in which he is convicted, the weapon or weapons so carried.

Art. 319. The preceding article shall not apply to a person in actual service as a militiaman, nor to a peace officer or policemen, or person summoned to his aid, nor to a revenue or other civil officer engaged in the discharge of official duty, nor to the carrying

28a

of arms on one's own premises or place of business nor to person traveling, nor to one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attacked, upon legal process.

Art. 320. If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for sacrament or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball-room social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other fire-arm, dirk, dagger, slungshort, sword-cane, spear, brass-knuckles, bowieknife, or any other kind of a knife manufactured and sold for the purpose of offense and defense, he shall be punished by fine not less than fifty nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person.

**West Virginia**

W. Va. Code ch. 148, § 7 (1870)

If any person, habitually, carry about his person, hid from common observation, any pistol, dirk, bowie knife, or weapon of the like kind, he shall be fined fifty dollars. The informer shall have one half of such fine.

W. Va. Code ch. 153, § 8 (1870)

If any person go armed with a deadly or dangerous weapon, without reasonable cause to fear violence to his person, family, or property, he may be required to give a recognizance, with the right of appeal, as before provided, and like proceedings shall be had on such appeal.

3 of 549 DOCUMENTS

THE STATE OF CONNECTICUT against JOSEPH E.   HUNGERFORD.

[NO NUMBER IN ORIGINAL]

SUPREME COURT OF ERRORS OF CONNECTICUT

4 Day 383; 1810 Conn. LEXIS 29

June, 1810, Decided

**PRIOR HISTORY:**   **[\*\*1]**   WRIT of error.

This was an information by a grand juror against Hungerford, on the statute tit.   112. c. 6. s. 1. for discharging a musket, on a day of company exercise and review, without the order of a commissioned officer.

The information alleged that Hungerford was a soldier in the 6th company of the 35th regiment of Connecticut militia; that on the 5th day of September, 1808, which was a day of military exercise for said company, he appeared, by order of the captain, at the usual place of parade, and performed the exercises of the day, agreeably to the orders of the captain; and that after he had served in said company as aforesaid, and after he was duly dismissed, by the commanding officer of said company, from any further military services on said day, and before the going down of the sun, on or near the parade of said company, without any orders, or being commanded by any commissioned officer of said company, he discharged his musket, which was loaded with powder.

The section of the act on which the information was founded is as follows: "That if any person or persons, belonging to either of the militia companies in this **state**, shall fire any field-piece, or **[\*\*2]**   discharge his musket or pistol, or suffer the same to be done by others, on any regimental, battalion, or company days of exercise, or review, excepting by order of a commissioned officer, he shall, for each offence, forfeit and pay a fine of four dollars, to be recovered by bill, plaint or information thereof made, and conviction had, before any proper court to try the same, for the use and benefit of him who shall prosecute the same to effect."

On the trial before the county court, the witnesses in behalf of the **state** testified, that Hungerford discharged his musket on the day mentioned in the information, after the company was dismissed for the day; and this was the only firing proved. The defendant then offered witnesses to prove, that after the company was dismissed, the captain ordered him to discharge his musket; to which the attorney for the **state** objected. The court decided that the defendant could not by law introduce that testimony, or any other, to prove any order, direction or permission of the captain, after the company was dismissed for the day.

The defendant was found guilty. He then filed his bill of exceptions to the decision of the court above stated, and **[\*\*3]** brought a writ of error. The superior court reversed the judgment of the county court. The attorney for the **state** then brought the present writ of error, assigning the general errors.

**DISPOSITION:** Judgment affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant militia member was charged with discharging a musket, after company exercise and review, without a commissioned officer's order. The case was tried in county court (Connecticut), where the **State** presented its witnesses. Defendant offered witnesses to prove that the captain ordered him to discharge his musket. The trial court sustained the **State's** objection to such testimony and defendant was found guilty. He sought appellate review.

**OVERVIEW:** The militia member contended that he had discharged his musket upon the direct order of the commissioned captain of his militia company. The court held that discharging a musket at any time was not a crime at common law, but became a crime only in cases where it was prohibited by law. The court held that firing a musket by the order and direction of a commissioned officer, during any time in the day, was not a firing without orders, and could not constitute the offence charged in the information, and which was prohibited by statute. The court held that the testimony offered by defendant was proper and relevant on the issue, and should have been admitted before the trial court.

**OUTCOME:** The court affirmed the trial court's judgment.

**CORE TERMS:** musket, commissioned officer, militia, captain, firing

### LexisNexis(R) Headnotes

*Governments > Courts > Common Law*
[HN1] Merely to discharge a musket at any time is no crime at common law; it becomes an offence in those cases only in which it is prohibited by statute.

**HEADNOTES**

It is not an offence within the stat. tit. 112. c. 6. s. 1. for a soldier to discharge a musket on a day of company exercise and review, by order of a commissioned officer, after the company are dismissed for the day.

**COUNSEL:** Hosmer, for the plaintiff in error. The general question arising on this record is, whether the order stated in the bill of exceptions, given after the company was dismissed for the day, was an order within the exception of the statute?

1. An order is an authoritative mandate, making obedience a duty. Advice, permission, or direction, is not an order; because it leaves the person to whom it is addressed at liberty to comply with it or not. The term frequently occurs in the militia act; and is invariably used in this imperative sense. Tit. 112. c. 1. s. 12, 13, 14. 18, 19. 26, 27. This is not only the legal import of the term, but its ordinary acceptation. Those only who can coerce obedience are said to give orders.

2. After a company is dismissed for the day, the authority of the captain is terminated. He then becomes a private citizen. When the captain in this case issued the order in question, he was a citizen only, and had no command; the defendant was a citizen [**4] also, and owed no obedience. Dismission, ex vi termini, is a discharge from military duty. If the defendant had refused to obey this order of the captain to discharge his musket, could he be punished for disobedience? This is the test.

3. There is no room for construction in this case. Whatever the reason giving birth to the statute was, the object of the legislature is clearly expressed, and the line is defined. It was not thought necessary to trust in the discretion of military officers after dismission of their companies; and no such discretion is given.

Daggett and C. Whittelsey, for the defendant in error. The statute prohibits the firing of a musket on any day of company exercise; immediately after which follows the exception in these words: "Excepting by order of a commissioned officer." The exception is coextensive with the prohibiting clause, so that if the statute prohibits firing after the company are dismissed, a firing by order of a commissioned officer, at that time, is excepted. The mischief which existed under the old law, was the irregular firing of soldiers on the morning of training day, while they were on the parade, and while returning home, by which [**5] the peace was disturbed, and the lives of themselves and others endangered. This mischief it was thought best to guard against; but it was sufficient to subject all firing on that day to the discretion of the military officers. These are men appointed by the legislature, in whom special confidence is reposed. The court will not limit their powers by construction farther than is necessary to restrain the mischief. It is very necessary that they should have the power to order soldiers to discharge their pieces, which happen to be loaded after the company are dismissed. The militia law requires soldiers to be furnished with ball cartridges; their muskets may be charged with these; and if the officers had not power to order them to be discharged, except on parade, very serious injury might be done.

The statute is silent as to the place of firing; but it would not suppress the mischief to restrict the prohibition to the parade ground. Whenever power is given by statute for a certain purpose, so much power is given necessarily as is requi-

site to effect that purpose. In Avery v. Bulkley, 1 Root, 275. it was decided, that the officer had authority over his soldiers while they were going **[\*\*6]** to the place of review. [SWIFT, J. In the report of that case the facts are not correctly stated.] Further, it does not appear in this case, that the firing was not on the parade ground.

The defendant is charged with a crime, not at common law, but made so by statute, with an exception in favour of those who act under the order of a commissioned officer. The defendant did act by the order of a commissioned officer. Can this court say that the officer could not give the order? This is a question exclusively of military cognisance. If the person whose conduct is called in question is a military subject, a court of law cannot interfere.

**JUDGES:** TRUMBULL, J. The other judges severally concurred in this opinion.

**OPINION BY:** TRUMBULL

 **OPINION**

 **[\*386]**   TRUMBULL, J.   [HN1] Merely to discharge a musket at any time is no crime at common law; it becomes an offence in those cases only in which it is prohibited by statute.

The statute enacts, "that if any person or persons belonging to either of the militia companies in this **state,**   **[\*387]** shall fire any field-piece, or discharge his musket or pistol, or suffer the same to be done by others, on any regimental, battalion, or company days of exercise, excepting **[\*\*7]**   by order of a commissioned officer, he shall, for each offence, forfeit and pay a fine of four dollars."

By the bill of exceptions, it appears that *Hungerford* offered witnesses to prove that after said company was dismissed on said day, the commissioned captain of said company ordered and directed him to discharge and fire his said musket; and on objection, the county court decided that he could not by law introduce said testimony, nor any testimony to prove any order, direction, or permission of said captain after the company was dismissed for the day; and said testimony was not admitted.

It is urged by the counsel for the **state,** that on a field day, an officer has no military command after the company is dismissed from the ground, and that his orders, having then no force or authority, cannot avail to excuse the delinquent.

What command an officer of militia on a day of review has over his men after his company is dismissed, and what power he may have to enforce any particular orders he may issue, are points not necessary to be investigated in the determination of this case. Firing by the order and direction of a commissioned officer, during any time in the day, is not a firing **[\*\*8]**   without orders, and cannot constitute the offence charged in the information, and prohibited by the statute.

The testimony offered was proper and relevant on the issue, and ought to have been admitted before the county court.

The other judges severally concurred in this opinion.

Judgment affirmed.



Ewing, James. *A treatise on the office and duty of a justice of the peace, sheriff, coroner, constable, and of executors, administrators, and guardians : in ...* 2nd ed., rev. and corr. / by a member of the bar. Trenton, N.J., 1832. 510pp. *American Law: Administration of Justice.*

Full Citation | eTable of Contents | List of Illustrations

Title Page | Index      Page # 70   OR   Image # 72   of 510      GO      Scale 33%      Rotate Original position

Search results
9 relevant page(s)

| page number | image number |
| --- | --- |
| 15 | 17 |
| 16 | 18 |
| 29 | 31 |
| 37 | 39 |
| 38 | 40 |
| 70 | 72 |
| 213 | 215 |
| 218 | 221 |
| 256 | 259 |

Add. 9

70                 ACTION.

DUTY OF THE CONSTABLE ON EXECUTIONS.

1. *Of proceedings against the goods and chattels.*
2. *Of proceedings against the body.*

1. *Proceedings against the goods and chattels.*

*Of the levy and inventory.*] On receiving the execution, it is the duty of the constable immediately to make a note on the execution of the time of receiving it, and to make a levy, without delay, upon the defendant's goods and chattels, and make out an inventory of so much as he levies upon, with the time of making the same, and sign his name to such levy and inventory, and annex them to the execution, and the property is bound from the time of making the levy. *Rev. L.* 636.

*Of advertising and sale.*] The constable, having made his levy, is to give notice, by advertisements signed by himself, and put up in three of the most public places in the township where they were taken, of the time and place when and where they will be exposed to sale, at least five days before the sale. *Ib.*

The advertisements must describe the goods and chattels to be sold. Rev. L. 636. The most advisable course is, to attach an inventory to the advertisement.

At the time and place so appointed, the constable is to expose them to sale by public vendue, and strike them off to the highest bidder.

*Of the proceeds of sale.*] The constable is to pay the moneys arising from the sale to the plaintiff, or, in his absence, to the justice, until the plaintiff's demand is satisfied. *Rev. L.* 637.

If there be a surplus, and there be no execution on the property, he may pay the surplus to the defendant. If there be other executions on the goods, he is to dispose of the surplus according to the manner before directed. *See priority of executions, p.* 65.

*Of the return of the execution.*] Within thirty days from the time of receiving it, he is to make return to the justice who issued it of his proceedings, and the justice is to make a record thereof. *Rev. L.* 637.

*Of the property not liable to execution.*] One bed and bedding, and one cow, if the debtor have a family, are reserved for their use, and cannot be taken. Rev. L. 637. Also the arms and accoutrements of a militiaman cannot be taken in execution. *Rev. L.* 589.

**Source Library:** Yale Law School Library

**Source Citation:** Ewing, James. *A treatise on the office and duty of a justice of the peace, sheriff, coroner, constable, and of executors, administrators, and guardians : in which is particularly laid down, the rules for conducting an action in the Court for the Trial of Small Causes : with a variety of approved forms.* 2nd ed., rev. and corr. / by a member of the bar. Trenton, N.J., 1832. *The Making of Modern Law.* Gale. 2012. Gale, Cengage Learning. 06 June 2012 <http://galenet.galegroup.com/servlet/MOML?af=RN& ae=F3705988329&srchtp=a&ste=14>

Add. 10

**Gale Document Number:** F3705988329

Top of page

◀  _____ Search Result 180 of 1169 _____  ▶

Help | Search Tips | Gale Databases | Contact Us | CommentsComments

GALE
CENGAGE Learning™        Copyright and Terms of Use

Add. 11



Search Result 10 of 56

Bishop, Joel Prentiss. **Commentaries on the criminal law.** 4th ed., rev. and enl. Boston, 1868. 810pp. Vol. 1 of 2 (2 vols. available).*American Law: Criminal Law.*

Full Citation | eTable of Contents | List of Illustrations

| | Page # | Image # | | Scale | Rotate |
|---|---|---|---|---|---|
| Title Page | Table of Contents | Index | 195 OR 225 of 810 | GO | 33% | Original position |

Search results
8 relevant page(s)

| page number | image number |
|---|---|
| 154 | 184 |
| 194 | 224 |
| 195 | **225** |
| 221 | 251 |
| 288 | 319 |
| 294 | 325 |
| 295 | 326 |
| 383 | 415 |

Add. 12

CHAP. XV.]    PARTICULAR WORDS AND PHRASES.    § 337.

sword is not drawn or the pistol not pointed.[1] And a pistol may be regarded as a dangerous weapon, even without proof of its having been loaded.[2]

§ 336. *Loaded Arms.* A pistol loaded with gunpowder and ball, yet having its touch-hole so plugged that it cannot possibly be fired, is not "loaded arms" within the English statute of 9 Geo. 4, c. 31, § 11 and 12;[3] the words of which are, — "shall, by drawing a trigger, or in any other manner, attempt to discharge any kind of loaded arms at any person." And where one sent to another a tin box, with three pounds of gunpowder in it, and two detonators to ignite the gunpowder when the box should be opened, intending to destroy the person opening the box, — the court held, that this was not an attempt to discharge loaded arms at him.[4]

§ 337. *Offensive Weapon.* These words occur in several present and repealed English statutes, which forbid the doing of certain things, "armed with fire-arms or other offensive arms or weapons,"[5] "carrying offensive arms or weapons,"[6] "with an offensive weapon or instrument,"[7] and other like expressions. No exact definition has been given to the words "offensive weapon"; yet they are understood to include, not only guns, pistols, daggers, and instruments of war; together with bludgeons, properly so called, clubs, and other things used only as weapons;[8] but also heavy walking-sticks, crutches, and the like, which latter are deemed offensive weapons or not, according to the intent with which the person uses or carries them.[9] On the other hand, a common horsewhip;[10] bats, being long poles employed by smugglers with which to convey away tubs of spirits;[11] and large sticks, some three feet long, with knobs at the ends, and with some prongs, the natural growth of the timber;[12] have severally been held not to be offensive weapons: the impression indeed seems to have prevailed, that, to be offensive, they must be what the law calls dangerous.[13]

[1] United States *v.* Wood, 3 Wash. C. C. 440.
[2] United States *v.* Wilson, Bald. 78.
[3] Rex *v.* Harris, 5 Car. & P. 159.
[4] Rex *v.* Mountford, 7 Car. & P. 242, 1 Moody, 441.
[5] 9 Geo. 2, c. 35, § 10; 6 Geo. 4, c. 108, § 56.
[6] 3 & 4 Will. 4, c. 53, § 60.
[7] 7 Geo. 2, c. 21.
[8] Cozan's case, 1 Russ. Crimes, Gren. Ed. 119, 1 Leach, 4th ed. 342, note.

[9] Rex *v.* Palmer, 1 Moody & R. 70; Rex *v.* Johnson, Russ. & Ry. 492, 2 East P. C. 488, 1 Russ. Crimes, Gren. Ed. 120; Rex *v.* Fry, 2 Moody & R. 42; note, § 334.
[10] Rex *v.* Fletcher, 1 Leach, 4th ed. 23, 342, note, 2 Stra. 1166.
[11] Rex *v.* Noakes, 5 Car. & P. 326.
[12] Rex *v.* Ince, 1 Leach, 4th ed. 342, note.
[13] And see 1 Russ. Crimes, Gren. Ed. 119, 120; Rex *v.* Grice, 7 Car. & P. 803.

[ 195 ]

**Source Library:** Harvard Law School Library

**Source Citation:** Bishop, Joel Prentiss. *Commentaries on the criminal law.* 4th ed., rev. and enl. Vol. 1. Boston, 1868. 2 vols. *The Making of Modern Law.* Gale. 2012. Gale, Cengage Learning. 20 June 2012 <http://galenet.galegroup.com/servlet/MOML?af=RN&ae=F3702851969&srchtp=a&ste=14>

Add. 13

**Gale Document Number:** F3702851969

Top of page

◀ _____ Search Result 10 of 56 _____ ▶

Help | Search Tips | Gale Databases | Contact Us | Comments

GALE
CENGAGE Learning™          Copyright and Terms of Use

Add. 14



Help

Search Tips

Gale Databases

**Page Image Full View**

Search Result 10 of 56

[Reformat for Reading]

Bishop, Joel Prentiss. **Commentaries on the criminal law.** 4th ed., rev. and enl. Boston, 1868. 810pp. Vol. 1 of 2 (2 vols. available).*American Law: Criminal Law.*

Full Citation | eTable of Contents | List of Illustrations

Print/ View PDF

Mark this page

Back to Results

Search This Work

| Title Page | Table of Contents | Index | Page # 570 | OR | Image # 603 | of 810 | GO | Scale 33% | Rotate Original position |

Search results
6 relevant page(s)

| page number | image number |
| --- | --- |
| 25 | 55 |
| 57 | 87 |
| 142 | 172 |
| 195 | 225 |
| 570 | 603 |
| 768 | 800 |

Add. 15

§ 981     WHAT CONSTITUTES CRIME, CONSIDERED, ETC.     [BOOK IX.

is required. Thus, sending a challenge, either verbal or written, to fight a duel ;[1] going about armed, with unusual and dangerous weapons ;[2] riotously driving in a carriage through the streets of a populous city, so as to hazard the safety of the inhabitants ;[3] spreading false news,[4] publishing libels[5] even in some extreme cases uttering words[6] calculated to stir up resentments and quarrels ; eavesdropping ;[7] being a common scold ;[8] and the like ; are cognizable criminally by the common law. For we have seen, that every man is presumed to intend the natural and even probable consequences of his act ; also, that usually, if one attempts unsuccessfully to do a criminal thing, — intending to do it, and performing an act toward the doing, — he is indictable therefor.[9]

§ 981. We have also that triangle of analogous offences, barratry, maintenance, and champerty ; which are rather actual than attempted disturbances of the repose of the community. The gist of them severally is, that they embroil men in lawsuits and other like quarrels. Blackstone defines barratry to be the " frequently exciting and stirring up of suits and quarrels between his majesty's subjects, either at law or otherwise " ;[10] maintenance, " an officious intermeddling in a suit that no way belongs to one, by maintaining or assisting either party, with money or otherwise, to prosecute or defend it " ;[11] champerty, " a bargain with a plaintiff or defendant to divide the land or other matter sued for between them, if they prevail at law, whereupon the champertor is to carry on the party's suit at his own expense."[12]   The sale of real estate,

[1] 4 Bl. Com. 150 ; Rex v. Newdigate, Comb. 10 ; Reg. v. Langley, 2 Ld. Raym. 1029, 1031 ; Smith v. The State, 1 Stew. 506.
[2] The State v. Huntly, 3 Ire. 418 ; Sir John Knight's case, 3 Mod. 117, Comb. 38.
[3] United States v. Hart, Pet. C. C. 390.
[4] 4 Bl. Com. 149 ; ante, § 923 et seq.
[5] Commonwealth v. Clap, 4 Mass. 163, 168, 169 ; Commonwealth v. Chapman, 13 Met. 68 ; Rex v. Topham, 4 T. R. 126 ; Reg. v. Collins, 9 Car. & P. 456 ; Rex v. Kinnersley, 1 W. Bl. 294 ; Reg. v. Lovett, 9 Car. & P. 426 ; Rex v. Pain, Comb. 358 ; The State v. Burnham, 9 N. H. 34.
[6] Reg. v. Taylor, 2 Ld. Raym. 879 ; Ex parte Malborough, 1 New Sess. Cas. 195, 13 Law J. N. s. M. C. 105, 8 Jur. 664 ; ante, § 921.

[7] The State v. Williams, 2 Tenn. 108, 4 Bl. Com. 168.
[8] 4 Bl. Com. 168 ; Reg. v. Foxby, 6 Mod. 11 ; James v. Commonwealth, 12 S. & R. 220 ; United States v. Royall, 3 Cranch C. C. 620.
[9] Ante, § 657 et seq. 665.
[10] 4 Bl. Com. 134 ; Case of Barratry, 8 Co. 36 b, 37 b ; Rex v. ——, 3 Mod. 97 ; The State v. Chitty, 1 Bailey, 379 ; Commonwealth v. McCullock, 15 Mass. 227
[11] 4 Bl. Com. 134 ; Bosan v. Beauchamp, 5 T. B. Monr. 415.
[12] 4 Bl. Com. 135 ; Thurston v. Percival, 1 Pick. 415 ; Rust v. Larue, 4 Litt. 411, 417 ; Douglass v. Wood, 1 Swan, Tenn. 393 ; Knight v. Sawin, 6 Greenl. 361 ; Byrd v. Odem, 9 Ala. 755 ; Key v. Vatier, 1 Ohio, 132 ; McMullen v. Guest, 6 Texas, 275 ; Lathrop v. Amherst Bank, 9 Met. 489 ; Holloway v. Lowe, 7 Port. 488.

[ 570 ]

**Source Library:** Harvard Law School Library

**Source Citation:** Bishop, Joel Prentiss. *Commentaries on the criminal law.* 4th ed., rev. and enl. Vol. 1. Boston, 1868. 2 vols. *The Making of Modern Law*. Gale. 2012. Gale, Cengage Learning. 20 June 2012 <http://galenet.galegroup.com/servlet/MOML?af=RN&ae=F3702852347&srchtp=a&ste=14>

Add. 16

**Gale Document Number:** F3702852347

Top of page

◀ _____ Search Result 10 of 56 _____ ▶

Help | Search Tips | Gale Databases | Contact Us | Comments

GALE
CENGAGE Learning™          Copyright and Terms of Use

Add. 17

# THE
# CONDUCTOR GENERALIS:

## OR, THE

## OFFICE, DUTY AND AUTHORITY

### OF

## JUSTICES OF THE PEACE,

### HIGH-SHERIFFS, UNDER-SHERIFFS, CORONERS, CONSTABLES, GAOLERS, JURY-MEN, AND OVERSEERS OF THE POOR.

### AS ALSO,

## THE OFFICE OF CLERKS OF ASSIZE, AND OF THE PEACE, &c.

Compiled chiefly from BURN's Justice, and the several other Books on those Subjects, by JAMES PARKER, late one of the Justices of the Peace for *Middlesex* County, in NEW-JERSEY; and now revised and adapted to the UNITED STATES of AMERICA.

### BY A GENTLEMAN OF THE LAW.

The whole Alphabetically digested under the several Titles; with a TABLE directing to the ready finding out the proper Matter under those Titles.

---

### TO WHICH ARE ADDED,

The EXCISE and MILITIA LAWS of the UNITED STATES; and the ACTS called the TEN POUND ACT of the STATES of PENNSYLVANIA and NEW-YORK.

---

PHILADELPHIA:
## PRINTED FOR ROBERT CAMPBELL.

### 1792.

Add. 18

And if the coroner omits his duty in this case, the inquisition may be made by the comiffioners of gaol delivery, oyer and terminer, or of the peace. 1 *H. H.* 419.

---

# DISTRESS.

THE remedy for recovering rent by way of diftrefs feems first to have come over to us from the civil law. For anciently in the feudal law, the not paying attendance at the lord's courts, or not doing the feudal fervice was a forfeiture of the eftate : But this feudal forfeitures were afterwards turned into diftreffes, according to the pignorary method of the civil law ; that is, the land that is let ou' to the tenant is hypothecated, or as a pledge in his hands, to anfwer the rent agreed to be paid to the landlord, and the whole profits arifing from the land are liable to the lord's feizure for the payment and fatisfaction thereof.

Concerning which we will fhew,

I. For what caufe a diftrefs fhall be.
II. What goods may be diftrained, and what not.
III. At what time the diftrefs fhall be taken.
IV. Where the diftrefs fhall be made.
V. That reafonable diftrefs fhall be taken.
VI. Manner of making diftrefs.
VII. Diftrefs how to be demeaned.
VIII. Of refcous and pound breach.
IX. Replevying the diftrefs.
X. Scale of the diftrefs.
XI. Irregularity in the proceedings.
XII. Landlord re-entering on non-payment.
XIII. Cafe of tenant holding over.
XIV. Rent in cafe of an execution.
XV. Rent how far recoverable by executors or adminiftrators.
XVI. Of diftrefs by warrant of juftices of the peace.

## I. For what caufes a diftrefs fhall be.

Diftrefs for rent muft be, for rent in arrear ; therefore it may not be made on the fame day on which the rent becomes due ; for if the rent is paid in any part of that day, whilft a man can fee to count money, the payment is good.

It muft not be after tender of payment ; for if the landlord come to diftrain the goods of his tenant for rent behind before the diftrefs, the tenant may upon the land tender the arrehrages, and if after the

a diftrefs be taken, it is wrongful ². And if the landlord have dif-trained ; if the tenant, before the impounding thereof, tender the arrearages, the landlord ought to deliver the diftrefs, and if he doth not, the detainer is unlawful. Even fo it is, in cafe of diftrefs for damage feafant (or damage done by cattle trefpaffing) the tender of amends before the diftrefs, maketh the diftrefs unlawful ; and after the diftrefs, and before the impounding, the detainer unlawful. 2 *Inft.* 107.

But in this cafe, altho' the owner tender fufficient amends, yet he cannot take his beafts out of the pound, if the amends be refufed ; but he muft replevy : and if it be found at the trial that the amends was not fufficient, the perfon on whom they trefpaffed fhall have damages ; if the amends tendered were fufficient, then the owner of the beafts fhall have damages. *Dr. & St.* 112.

Note, there are three kinds of rents ; rent *fervice*, rent *charge*, and rent *feck*.

Rent *fervice* is, where the tenant holdeth his land of his lord, by fealty and certain rent ; or by homage, fealty, and certain rent ; or by other fervice, and certain rent. And it is called a rent fervice, becaufe it hath fome corporal fervice incident to it, which at the leaft is fealty. 1 *Inft.* 141, 142.

Rent *charge* is fo called becaufe the land for payment thereof, is charged with diftrefs ; but before this act fuch diftrefs could not be fold, but only detained till the rent fhould be paid. 4 *G.* 2. *c.* 28.

If the rent be referved, without any claufe put in the deed of diftrefs for the fame, then it is called a rent *feck*, *redditus ficcus*, or dry rent : and the difference between a rent charge and a rent feck is, that there is a claufe of diftrefs annexed to one, and no fuch claufe to the other ; and therefore the one is a charge upon the land, but for the other the grantee had formerly no remedy but to charge the perfon of the grantor in a writ of annuity. 1 *Inft.* 143.

Rents of *affize* are the certain rents of freeholders and ancient copy-holders, fo called becaufe they are affixed and certain, and thereby diftinguifhed from *redditus mobiles*, farm rents for life, years, or at will, which are variable and uncertain. 2 *Inft.* 19.

Where the agreement is not by deed, the landlord may recover a reafonable fatisfaction, in an action on the cafe. 11 *G.* 2. *c.* 19. *f.* 14.

So an action of debt may be brought againft a tenant for life, in purfuance of the ftatute of the 8 *An. c.* 14. which enacteth, that whereas before the faid ftatute no action of debt did lie againft a tenant for life or lives, for any arrears of rent during the continu-ance of fuch eftate for life or lives ; it fhall be lawful, for any perfon having any rent in arrear or due upon any leafe or demife for life or lives, to bring an action of debt for fuch arrears, in like manner as he might have done in cafe fuch rent was referved upon a leafe for years. *f.* 4.

Perfons having rent in arrear, upon any leafe determined, may diftrain for fuch arrears after the determination of the leafe, in the fame manner as if it had not been determined ; provided that fuch diftrefs be made in fix months after the determination of fuch leafe, and during the continuance of fuch landlord's title or intereft, and

Add. 20

during the poffeffion of the tenant from whom fuch arrear became due. 8 *An. c.* 14. *f.* 6. 7.

Before the ftatute of the 17 *C.* 2. *c.* 7. in cafe a diftrefs was too little where fufficient diftrefs was to be had, a man could not diftrain again, be the demand ever fo great ; for it was his folly that at firft he diftrained no more. *Mo.* 7. *Comb.* 546.

But now, by the faid ftatute, in all cafes where the value of the cattle diftrained fhall not be found to be to the full value of the arrears diftrained for ; the party to whom fuch arrears were due, his executors or adminiftrators, may diftrain again for the refidue of the faid arrears. *f.* 4.

If any diftrefs and fale fhall be made, for rent in arrear and due, when none is in truth due, the owner fhall recover double value with full cofts. 2. *W. Seff.* 1. *c.* 5. *f.* 5.

And if the diftrefs be taken of goods without caufe, the owner may make *refcous* ; but if they be diftrained without caufe and impounded, the owner cannot break the pound and take them out, becaufe they are in the cuftody of the law. 1 *Inft.* 47.

## II. *What goods may be diftrained, and what not.*

Diftrefs for rent muft be of a thing, whereof a valuable property is in fomebody ; and therefore, dogs, bucks, does, conies, and the like, that are *feræ naturæ,* cannot be diftrained. 1 *Inft.* 47.

Altho' it be of valuable property, as a horfe ; yet when a man or woman is riding on him, or an ax in a man's hand cutting of wood, and the like, they are for that time privileged, and cannot be diftrained. 1 *Inft.* 47.

But it is faid, that if one be riding upon an horfe damage feafant, the horfe may be led to the pound with the rider upon him. 1 *Sid.* 422, 440.

And it hath been held, that horfes joined to a cart, with a man upon it, cannot be diftrained for rent (altho' they may for damage feafant) ; but both cart and horfes may, if the man be not upon the cart. 1 *Vent.* 36.

Valuable things fhall not be diftrained for rent, for benefit and maintenance of trades, which by confequence are for the commonwealth, and are there by authority of law : as a horfe in a fmith's fhop fhall not be diftrained for the rent iffuing out of the fhop, nor a horfe in a hoftry, nor the materials in a weaver's fhop for making cloth, nor cloth or garments in a tailor's fhop, nor facks of corn or meal in a mill, nor any thing diftrained for damage feafant, for it is in cuftody of the law ; and the like. 1 *Inft.* 47.

Beafts belonging to the plough fhall not be diftrained (which is the ancient common law of *England,* for no man fhall be diftrained of the utenfils or inftruments of his trade or profeffion, as the ax of the carpenter, or the books of a fcholar) while goods or other beafts may be diftrained. 1 *Inft.* 47.

But this rule holds only in diftreffes for rent arrear, amercements, and the like ; but doth not extend to cafes, where a diftrefs is given, in the nature of an execution, by any particular ftatute, as for poor rates and the like. 3 *Salk.* 136.

Furnaces, cauldrons, or other things fixed to the freehold, or the doors or windows of a houfe, or the like cannot be diftrained. 1 *Inft.* 47.

Things for which a replevin will not lie, fo as to be known again, as money out of a bag, cannot be diftrained. 2 *Bac. Abr.* 109.

But money in a bag fealed may be diftrained ; for that the bag fealed may be known again.

By the 2 *W. feff.* 1. *c.* 5. Perfons having rent arrear on any de-mife. leafe or contract, may feize and fecure any fheaves or cocks of corn, or corn loofe or in the ftraw, or hay being in any barn or granary, or upon any hovel, ftack, or rick, or otherwife upon any part of the land charged with the rent, and may lock up or detain the fame in the place where found, in the nature of a diftrefs ; fo as the fame be not removed to the damage of the owner, out of the place where found and feized, but be kept there (as impound) till replevied or fold. *f.* 3.

Where a ftranger's beafts efcape into the land, they may be diftrained for rent, tho' they have not been levant and couchant (that is, tho' they have not been in the ground for a good fpace of time, or fo long as to have laid down and rofe up again to feed) pro-vided they are trefpaffers : But if the tenant of the land is in default, is not repairing his fences, whereby the beafts came into the land, the leffor cannot diftrain fuch beafts, tho' they have been levant and couchant, unlefs he have given notice to the owner, and he fuffer them to remain there afterwards. *Lutw.* 364.

In cafe of rent referved upon a leafe for years, the leffor cannot diftrain fuch cattle, until they be levant and couchant ; for if the leffor had had the lands in his own hands, he ought to have repaired the fences ; and when he puts in a leffee, he ought by covenant to oblige him to repair : and therefore in that cafe, if the law would allow the leffor to diftrain the cattle of a ftranger which come in by efcape, before that they be levant and couchant, it would be in effect to allow a man to take advantage of his own wrong. Ther-fore if the cattle come in by default of the owner of the cattle, then they may be diftrained before they be levant and couchant ; but if in default of the tenant of the land, there they cannot be diftrained un-til they have been levant and couchant, that is to fay, for rent upon leafes for years. And in fuch cafe, the leffor fhall not take the cattle before that he has given notice to the owner, that they are upon the land liable to his diftrefs ; and if he doth not come to take them away, then they become diftrainable. And by *Treby* chief juftice ; Where the cattle efcape accidentally, there they are not dif-trainable, until they have been levant and couchant ; but if they efcape by default of their owner, they are diftrainable the firft minute. L. *Raym.* 168, 9.

If ten head of cattle are doing damage, a man cannot take one of them and keep it till he be fatisfied for the whole damage ; but he may bring an action of trefpafs for the reft. 12 *Mod.* 660. H. 13 W. Vafper and Edwards.

If a man hath common for ten cattle, and he puts in more ; the furplufage above ten may be taken damage feafant. 1 *Roll's Abr.* 665.

I 3

If a man come to diftrain, and fee the beafts in his ground, and the owner chace them out, of purpofe before the diftrefs taken ; yet the owner of the foil cannot diftrain them, and if he doth the owner of the cattle may refcue them, for the beafts muft be damage feafant at the time of the diftrefs. 1 *Inft.* 161.

For the diftrefs damage feafant is the ftricteft diftrefs that is ; and the thing diftrained muft be taken in the very act ; for if the goods are once off, tho' on frefh purfuit, the owner of the ground cannot take them. 12 *Mod.* 661.

### III. *At what time the diftrefs fhall be taken.*

For a rent or fervice the lord cannot diftrain in the night; but in the day time ; and fo it is of a rent charge ; but for damage feafant, one may diftrain in the night, otherwife it may be, the beafts will be gone before he can take them. 1 *Inft.* 142.

For before fun rifing, or after fun fet, no man may diftrain but for damage feafant. *Mirrour c.* 2. *f.* 26.

### IV. *Where the diftrefs fhall be made.*

The king's officers, as fheriffs and others, fhall not take diftrefs in the fees wherewith churches in times paft have been endowed ; but diftreffes may be taken in poffeffions of the church newly purchafed. 9 *Ed.* 2. *c.* 9.

A man may diftrain in places or lands within the fee, liable to diftrefs, and not elfewhere. 52 *H.* 3. *c.* 15. 2 *Inft.* 131. *Mir. c.* 2. *f.* 26.

And by the 11 *G.* 2. *c.* 19. The landlord may diftrain any cattle or ftock of the tenant, depafturing on any common appendant or appurtenant, or any ways belonging to the premifes demifed. *f.* 8.

No perfon (except the king's officers) fhall take diftreffes in the king's highway. 52 *H.* 3. *c.* 15.

And the reafon is, becaufe the king's fubjects ought to have free paffage, as well to fairs and markets, as about their other affairs. But yet this fhall not be taken, to make the diftrefs utterly unlawful, fo as to take advantage thereof in bar to an avowry, but to this purpofe that if the lord diftrain in the highway, the tenant may have an action againft him upon this ftatute. 2 *Inft.* 131, 132.

But by the 11 *G.* 2. *c.* 19. If any tenant for life, years, at will, fufferance, or otherwife, fhall fraudulently or clandeftinely convey off the premifes, his goods or chattels, to prevent the landlord from diftraining ; fuch landlord, or any perfon by him lawfully empowered, may in 30 days next after fuch conveying away, feize the fame wherever they fhall be found, and difpofe of them in fuch manner, as if they had been diftrained on the premifes. *f.* 1.

But no landlord fhall diftrain any goods fold *bona fide*, and for a valuable confideration, before fuch feizure made, to any perfon not privy to fuch fraud. *f.* 2.

And if any tenant fhall fo fraudulently remove and convey away his goods or chattels, or if any perfon or perfons fhall wilfully and knowingly aid or affift him in fuch fraudulent conveying away or carrying

Nor may the leffor enter into the tenant's houfe, unlefs the doors are open. *Read.* Diftr. 2 *Bac. Abr.* 111.

Upon a queftion about taking a diftrefs, it was held by the lord chief juftice *Hardwicke,* at the fummer affizes at *Exeter,* 1735, that a padlock put upon a barn door could not be opened by force, to take the corn by way of diftrefs. *Vin.* Diftr. (E. 2.) 6.

Where any goods or chattels fraudulently or clandeftinely conveyed or carried away, fhall be put, placed, or kept in any houfe, barn, ftable, outhoufe, yard, clofe, or place, locked up, faftened, or otherwife fecured, fo as to prevent fuch goods or chattels from being taken and feized as a diftrefs for arrears of rent; it fhall be lawful for the landlord, or his fteward, bailiff, receiver, or other perfon or perfons impowered, to take and feize, as a diftrefs for rent, fuch goods and chattels (firft calling to his affiftance the conftable, of the diftrict, or place, where the fame fhall be fufpected to be concealed, and in cafe of a dwelling houfe, oath being alfo firft made before a juftice of the peace, of a reafonable ground to fufpect that fuch goods or chattels are therein) in the day time to break open and enter into fuch houfe, barn, ftable, outhoufe, yard, clofe, and place; and to take and feize fuch goods and chattels for the faid arrears of rent, as he might have done if they had been in any open place.   11 *G.* 2. *c.* 19. *f.* 7.

But except it be in this cafe where the goods are clandeftinely conveyed, it may feem from what hath been faid, that the landlord hath no mean to come at the goods in order to make diftrefs, if the tenant fhall think fit to lock up his gates, and fhut the doors: And the like may be obferved in cafes of diftrefs for the levying a penalty, by warrant of juftices of the peace.  Which matter may feem to require fome confideration.

If a landlord comes into a houfe, and feizes upon fome goods as a diftrefs in the name of all the goods of the houfe; that will be a good feizure of all.   6 *Mod.* 215.

### VII. *Diftrefs how to be demeaned.*

By the 52 H. 3. c. 4.  *None fhall caufe any diftrefs that he hath taken, to be driven out of the county where it was taken: and if one neighbour do fo to another of his own authority* (as for damage feafant, or rent charge, 2 Inft. 106.) *he fhall make fine as for a thing done againft the peace; and if the lord fo prefume to do againft his tenant, he fhall be grievoufly punifhed by amerciament.*

Before this act, at the common law, a man might have driven the diftrefs to what county he pleafed: which was mifchievous, for two caufes; 1. Becaufe the tenant was bound to give the beafts being impounded in an open pound fuftenance, and being carried into another county, by common intendment he could have no knowledge where they were. 2. He could not know where to have a replevy; but the party was, before this ftatute driven to his action upon the cafe.  2 *Inft.* 106.

And albeit this ftatute be in the negative, yet if the tenancy be in one county, and the manor in another county, the lord may drive the diftrefs which he taketh in the tenancy to his manor in the other

states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be enrolled in the militia by the captain or commanding officer of the company, within whose bounds such citizen shall reside, and that within twelve months after the passing of this act. And it shall at all times hereafter be the duty of every such captain or commanding officer of a company to enrol every such citizen, as aforesaid, and also those who shall from time to time, arrive at the age of eighteen years or being of the age of eighteen years and under the age of forty five years (except as before excepted) shall come to reside within his bounds; and shall without delay notify such citizen of the said enrolment, by a proper non-commissioned officer of the company, by whom such notice may be proved. That every citizen so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch with a box therein to contain not less than twenty four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball: or with a good rifle, knapsack, shotpouch and powder-horn, twenty-balls suited to the bore of his rifle, and a quarter of a pound of powder; and shall appear, so armed, accoutred and provided, when called out to exercise, or into service, except, that when called out on company-days to exercise only, he may appear without a knapsack. That the commissioned officers shall severally be armed with a sword or hanger and espontoon, and that from and after five years from the passing of this act, all muskets for arming the militia as herein required, shall be of bores sufficient for balls of the eighteenth part of a pound. And every citizen so enrolled, and providing himself with the arms, ammunition and accoutrements required, as aforesaid, shall hold the same exempted from all suits, distresses, executions or sales, for debt or for the payment of taxes.

II. *And be it further enacted*, That the Vice President of the United States; the officers, judicial and executive of the government of the United States; the members of both houses of Congress, and their respective officers; all custom-house officers with their clerks; all post officers, and stage drivers, who are employed in the care and conveyance of the mail of the post-office of the United States; all ferrymen employed at any ferry on the post road; all inspectors of exports; all pilots; all mariners actually employed in the sea service of any citizen or merchant within the United States; and all persons who now are or may hereafter be exempted by the laws of the respective states, shall be, and are hereby exempted from militia duty, notwithstanding their being above the age of eighteen, and under the age of forty-five years.

III. *And be it further enacted*, That within one year after the passing of this act, the militia of the respective states shall be arranged into divisions, brigades, regiments, battalions and companies, as the legislature of each state shall direct; and each division, brigade, and regiment, shall be numbered at the formation thereof; and a record made of such numbers in the adjutant-general's office in the

District of Columbia. Laws, statutes, etc.
Codes

THE

# REVISED CODE

OF THE

## DISTRICT OF COLUMBIA,

PREPARED

UNDER THE AUTHORITY OF THE ACT OF CONGRESS,

ENTITLED

"AN ACT TO IMPROVE THE LAWS OF THE DISTRICT OF COLUMBIA,
AND TO CODIFY THE SAME," APPROVED MARCH 3, 1855.

---

WASHINGTON:

A. O. P. NICHOLSON, PUBLIC PRINTER.

1857.

Sec. 2. On the trial of every indictment, the party accused shall be allowed to be heard by counsel, and he may defend himself, and he shall have a right to produce witnesses and proofs in his favor, and to be confronted with the witnesses who are produced against him.

Sec. 3. No person indicted for an offence shall be convicted thereof, unless by confession of his guilt in open court, or by admitting the truth of the charge against him by his plea or demurrer, or by the verdict of a jury, accepted and recorded by the court.

Sec. 4. No person shall be held to answer on a second indictment for any offence of which he has been acquitted by the jury, upon the facts and merits, on a former trial; but such acquittal may be pleaded by him in bar of any subsequent prosecution for the same offence, notwithstanding any defect in the form or in the substance of the indictment on which he was acquitted.

Sec. 5. No person who is charged with any offence against the law, shall be punished for such offence, unless he shall have been duly and legally convicted thereof in a court having competent jurisdiction of the cause and of the person.

# CHAPTER 141.

## OF PROCEEDINGS TO PREVENT AND DETECT THE COMMISSION OF CRIMES.

SECTION

1. Officers authorized to keep the peace.
2. Complaint; how made.
3. Arrest.
4. Trial; recognizance to keep the peace.
5. Party; when to be discharged.
6. Refusing to recognise, to be committed.
7. Party, when discharged; and complainant, when to pay costs.
8. Payment of costs in other cases.
9. Appeal allowed.
10. On appeal, witnesses to recognise.
11. Proceedings upon an appeal.
12. Recognizance; when to remain in force.
13. Persons committed for not recognising; how discharged.
14. Recognizances to be transmitted to the court.

SECTION

15. Recognizances; when to be required on view of the court or magistrate.
16. Persons who go armed may be required to find sureties for the peace, &c.
17. Proceedings when person is suspected of selling liquor contrary to law.
18. Surety may surrender his principal, who may recognise anew.

SEARCH WARRANTS.

19. Search warrants for property stolen.
20. In what other cases to be issued.
21. } Warrant; to whom directed, and when
22. } and how executed.
23. Property seized may be kept as evidence, and then restored to owner or destroyed.

Digitized by Google

SECTION

CORONERS' INQUESTS.

24. Coroners' inquests; when to be held.
25. Coroner to issue a warrant to constable to summon jury. Form of warrant.
26. Penalty for constable's or juror's neglect.
27. Jurors; how empanneled and sworn.
28. Witness; how summoned, &c.
29. Oath of witnesses.
30. When and how post mortem to be made, or chemical analysis to detect poison; and fees, &c., for same.
31. Testimony of witnesses reduced to writing.
32. Inquisition; how taken, and form thereof.

SECTION

33. Coroner; duty in case of felonious killing, &c.
34. Burial of dead body and payment of costs.
35. Jury to report money, &c., found; and same, how disposed of.
36. When coroner to publish description of deceased.
37. Duty of officer in relation to such money.
38. Coroner, failing to pay over same.
39. Property on body to be sold and disposed of as money.
40. When justice of the peace to act as coroner.

SECTION 1. The judge of the criminal court, or any judge of the circuit court, in vacation as well as in term, and also all justices of the peace, shall have power to cause all laws made for the preservation of the public peace to be kept, and, in the execution of that power, may require persons to give security to keep the peace, or for their good behavior, or both, in the manner provided in this chapter.

SEC. 2. Whenever complaint shall be made to any such magistrate that any person has threatened to commit an offence against the person or property of another, the magistrate shall examine the complainant, and any witness who may be produced, on oath, and reduce such complaint to writing, and cause the same to be subscribed by the complainant. A wife may pray surety of the peace against her husband, or anybody else may pray such surety, in her behalf, against him, and such person shall, in such proceeding, be deemed the complaining witness.

SEC. 3. If, upon examination, it shall appear that such affidavit is made only to secure the protection of the law, and not from anger or malice, and that there is just cause to fear that any such offence may be committed, the magistrate shall issue a warrant under his hand, reciting the substance of the complaint, and requiring the officer to whom it may be directed forthwith to apprehend the person complained of and bring him before such magistrate, or some other magistrate or court having jurisdiction of the cause.

SEC. 4. When the party complained of is brought before the magistrate, he shall be heard in his defence, and he may be required to enter into a recognizance, with sufficient sureties, in such sum as the

magitrate shall direct, to keep the peace towards all the people of this District, and especially towards the person requiring such security, for such term as the magistrate may order, not exceeding one year, but shall not be bound over to the next court, unless he is also charged with some other offence for which he ought to be held to answer at such court.

Sec. 5. Upon complying with the order of the magistrate, the party complained of shall be discharged.

Sec. 6. If the person so ordered to recognise shall refuse or neglect to comply with such order, the magistrate shall commit him to the county jail during the period for which he was required to give security, or until he shall so recognise; stating in the warrant the cause of commitment, with the sum and the time for which security was required.

Sec. 7. If, upon examination, it shall not appear that there is just cause to fear that any such offence will be committed by the party complained of, he shall be forthwith discharged; and if the magistrate shall deem the complaint unfounded, frivolous, or malicious, he shall order the complainant to pay the costs of prosecution, who shall thereupon be answerable to the magistrate and the officer for their fees as for his own debt.

Sec. 8. When no order respecting the costs is made by the magistrate, they shall be allowed and paid in the same manner as costs before justices in criminal prosecution; but in all cases where a person is required to give security for the peace, or for his good behavior, the court or magistrate may further order that the costs of prosecution, or any part thereof, shall be paid by such person, who shall stand committed until such costs are paid, or he is otherwise legally discharged.

Sec. 9. Any person aggrieved by the order of any justice of the peace requiring him to recognise as aforesaid, may, on giving the security required, appeal to the criminal court at its next session to be discharged therefrom.

Sec. 10. The magistrate from whose order an appeal is so taken shall require such witnesses as he may think necessary to support the complaint, to recognise for their appearance at the court to which the appeal is made.

Sec. 11. The criminal court may affirm the order of the justice or

Digitized by Google

discharge the appellant, or may require the appellant to enter into a new recognizance, with sufficient sureties, in such sum and for such time as the court shall think proper, and may also make such order in relation to the costs of prosecution as may be deemed just and reasonable.

SEC. 12. If any party appealing shall fail to prosecute his appeal, his recognizance shall remain in full force and effect, as to any breach of the condition, without an affirmation of the judgment or order of the magistrate, and shall also stand as a security for any costs which shall be ordered by the court appealed to, to be paid by the appellant.

SEC. 13. Any person committed for not finding sureties, or refusing to recognise, as required by the court or magistrate, may be discharged by any judge or justice of the peace on giving such security as was required.

SEC. 14. Every recognizance taken pursuant to the foregoing provisions shall be transmitted by the magistrate to the criminal court on or before the first day of the next term, and shall be there filed by the clerk.

SEC. 15. Every person who shall, in the presence of any officer mentioned in the first section of this chapter, make an affray, or threaten to kill or beat another, or to commit any violence or outrage against his person or property, and every person who, in the presence of such officer, shall contend with hot and angry words, to the disturbance of the peace, may be ordered, without process or any other proof, to recognise for keeping the peace, or being of good behavior, for a term not exceeding one year, and in case of refusal may be committed as before directed.

SEC. 16. If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace for a term not exceeding six months, with the right of appealing as before provided.

SEC. 17. If any justice of the peace suspect any person of selling, by retail, wine or ardent spirits, or a mixture thereof, contrary to law, he shall summon the person and such witnesses as he may think

proper, to appear before him; and, upon such person appearing, or failing to appear, if the justice, on examining the witnesses on oath, find sufficient cause, he shall inform the district attorney, or other proper officer, that a prosecution or suit may be instituted, and shall recognise the material witnesses to appear at the next term of the court before which the case is heard. Such justice may also require the person suspected to enter into a recognizance to keep the peace and be of good behavior for any time not exceeding one year. If such recognizance be given, the condition thereof shall be deemed to be broken if, during the period for which it is given, such person shall sell, by retail, wine or ardent spirits, or a mixture thereof, contrary to law.

SEC. 18. Any surety in a recognizance to keep the peace, or for good behavior, or both, shall have authority and right to take and surrender his principal, and, upon such surrender, shall be discharged and exempt from all liability for any act of the principal, subsequent to such surrender, which would be a breach of the condition of the recognizance. Such person may recognise anew, with sufficient sureties, before any justice of the peace, for the residue of the term, and be thereupon discharged.

### SEARCH WARRANTS.

SEC. 19. When complaint shall be made on oath to any magistrate authorized to issue warrants in criminal cases, that personal property has been stolen or embezzled, or obtained by false tokens or pretences, and that the complainant believes that it is concealed in any particular house or place, the magistrate, if he be satisfied that there is reasonable cause for such belief, shall issue a warrant to search for such property.

SEC. 20. Any such magistrate may also, upon a like complaint made on oath, issue search warrants, when satisfied that there is reasonable cause, in the following cases, to wit:

First, to search for and seize any counterfeit or spurious coin, forged bank notes, and other forged instruments, or any tools, machines, or materials, prepared or provided for making either of them;

Secondly, to search for and seize any books pamphlets, ballads, printed papers, or other things containing obscene language, or obscene prints, pictures, figures, or descriptions, manifestly tending

Digitized by Google

refusing to recognize, as required by the court or magistrate, may be discharged by any judge or justice of the peace, on giving such security, as was required.

CHAP. **169.**

may be taken after commitment.

SECT. 14. Every recognizance, taken pursuant to the foregoing provisions, shall be transmitted to the district court, on or before the first day of the next ensuing term, and shall there be filed by the clerk, as of record.

Return of such recognizance.

SECT. 15. Whoever, in the presence of any magistrate, mentioned in the second section of this chapter, or before any court of record, shall make any affray or threaten to kill or beat another, or commit any violence against his person or property, or shall contend, with hot and angry words, to the disturbance of the peace, may be ordered, without process or any other proof, to recognize for keeping the peace, or being of the good behavior for a term, not exceeding three months, and, in case of refusal, may be committed to prison as before directed.

When magistrate may require sureties, without a formal complaint, &c.

SECT. 16. Any person, going armed with any dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without a reasonable cause to fear an assault on himself, or any of his family or property, may, on the complaint of any person having cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace for a term, not exceeding one year, with the right of appeal as before provided.

Persons going armed, without reasonable cause.
1821, 76, § 1.

SECT. 17. In a suit, on such recognizance taken in a criminal case, if a forfeiture is found or confessed, the court, on petition, may remit the penalty, or such part of it as they may think proper, on such terms as they may think right.

Power of court, to remit the penalty of a recognizance.
1821,.50, § 4.

SECT. 18. Any surety in a recognizance may surrender the principal in the same manner, as if he had been his bail in a civil cause, and, on such surrender, shall be discharged from all liability for any act of the principal after such surrender, which would be a breach of the recognizance; and, upon such surrender, the principal may recognize anew with sufficient surety or sureties for the residue of the term, before any justice of the peace, and shall thereupon be discharged.

Sureties on recognizances may surrender their principals as in case of bail in civil actions.

# CHAPTER 170.

OF THE POWER AND PROCEEDINGS OF JUSTICES OF THE PEACE IN CRIMINAL CASES.

SECT. 1. Justices may require aid, on view, without a warrant.
2. Their jurisdiction.
3. When a justice shall issue his warrant.
4. Examination, on trial, of the party accused.
5. Of commitment or binding over to a higher court.

SECT. 6. Duty of justices, as to arrests, and examinations into treasons, felonies, &c.
7. Trial and sentence within their jurisdiction.
8. Respondent may appeal; but required to recognize.
9. To carry up copies of the case.

Digitized by Google

Add. 32

# REVISED STATUTES

OF THE

## State of Maine,

### Passed October 22, 1840.

———————

Entered according to act of Congress, in the year 1841, by PHILIP C. JOHNSON, Secretary of
the State of Maine, in trust for said State, in the clerk's office of the district court of Maine.



Digitized by Google

# THE

# REVISED STATUTES

OF THE

## Commonwealth of Massachusetts,

PASSED NOVEMBER 4, 1835;

TO WHICH ARE SUBJOINED,

AN ACT IN AMENDMENT THEREOF, AND AN ACT EXPRESSLY TO
REPEAL THE ACTS WHICH ARE CONSOLIDATED THEREIN,

BOTH PASSED IN FEBRUARY 1836;

AND TO WHICH ARE PREFIXED,

## THE CONSTITUTIONS

OF THE

### United States and of the Commonwealth of Massachusetts.

PRINTED AND PUBLISHED, BY VIRTUE OF A RESOLVE OF NOV. 3, 1835;

UNDER THE SUPERVISION AND DIRECTION OF

## THERON METCALF AND HORACE MANN.



## Boston:
PUBLISHED BY DUTTON & WENTWORTH, STATE PRINTERS.
Nos. 10 & 12 Exchange Street.
..............

1836.

Digitized by Google

said, may, on giving the security required, appeal to the court of common pleas, next to be held in the same county, or, in the city of Boston, to the municipal court.

**On appeal, witnesses to recognize.** SECT. 10. The magistrate, from whose order an appeal is so taken, shall require such witnesses, as he may think necessary to support the complaint, to recognize for their appearance at the court to which the appeal is made.

**Proceedings on appeal.** SECT. 11. The court, before which such appeal is prosecuted, may affirm the order of the justice, or discharge the appellant, or may require the appellant to enter into a new recognizance, with sufficient sureties, in such sum, and for such time, as the court shall think proper, and may also make such order, in relation to the costs of prosecution, as may be deemed just and reasonable.

**Recognizance, when to remain in force.** SECT. 12. If any party appealing shall fail to prosecute his appeal, his recognizance shall remain in full force and effect, as to any breach of the condition, without an affirmation of the judgment or order of the magistrate, and shall also stand as a security for any costs, which shall be ordered, by the court appealed to, to be paid by the appellant.

**Persons committed for not recognizing, how discharged.** SECT. 13. Any person, committed for not finding sureties, or refusing to recognize, as required by the court or magistrate, may be discharged by any judge or justice of the peace, on giving such security as was required.

**Recognizances to be transmitted to the court.** SECT. 14. Every recognizance, taken pursuant to the foregoing provisions, shall be transmitted to the magistrate to the court of common pleas for the county, or, in the city of Boston, to the municipal court, on or before the first day of the next term, and shall be there filed of record by the clerk.

**— when to be required on view of the court or magistrate.** SECT. 15. Every person who shall, in the presence of any magistrate mentioned in the first section of this chapter, or before any court of record, make an affray, or threaten to kill or beat another, or to commit any violence or outrage against his person or property, and every person, who in the presence of such court or magistrate, shall contend with hot and angry words, to the disturbance of the peace, may be ordered, without process or any other proof, to recognize for keeping the peace, or being of good behavior, for a term not exceeding three months, and in case of refusal, may be committed, as before directed.

**Persons who go armed may be required to find sureties for the peace, &c. 1794, 26, § 2.** SECT. 16. If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

**Court may remit part of penalty. 7 Mass. 397. 1810, 80.** SECT. 17. Whenever, upon a suit brought on any such recognizance, the penalty thereof shall be adjudged forfeited, the court may remit such portion of the penalty, on the petition of any defendant, as the circumstances of the case shall render just and reasonable.

**Surety may surrender his** SECT. 18. Any surety in a recognizance to keep the peace, or for good behavior, or both, shall have the same authority and right

Digitized by Google



# Acts *and* Laws,

## Paſſed by the GENERAL COURT of *Maſſachuſetts :*

Begun and held at Boston, in the County of Suf-
folk, on Wedneſday the Twenty-ninth Day of
May, Anno Domini, 1793.

### C H A P. I.

An Act for regulating and governing the Militia
of the Commonwealth of Maſſachuſetts, and for
repealing all Laws heretofore made for that Pur-
poſe ; excepting an Act, intitled " An Act for
eſtabliſhing Rules and Articles for governing the
Troops ſtationed in Forts and Garriſons, within
this Commonwealth, and alſo the Militia, when
called into actual Service."

*W*HEREAS *the Laws for regulating and governing the Mili-*
*tia of this Commonwealth, have become too complicated for* Preamble.
*practical uſe, by reaſon of the ſeveral alterations which have from*
*time to time been made therein :* Therefore,

I. BE *it enacted by the* Senate *and* House *of* Represen-
tatives *in General Court aſſembled, and by the authority of the* Laws repealed.
*ſame,* That the ſeveral Laws heretofore made for governing and
regulating

months abfence, without leave of fuch Officer, from the diftrict of his command : And no Officer fhall confider himfelf exempted from the duties of his ftation, until he fhall have been difcharged in one or other of the methods aforefaid : And if by the Commander in Chief, not until he fhall have received a certificate of fuch difcharge : No Officer fhall be allowed to refign his commiffion when under arreft ; and no General or Field-Officer fhall approve the refignation of any other Officer, until fuch Officer fhall have lodged in his hands all fuchMilitia laws and orderly books as he fhall have been furnifhed with by the Government ; and fuch General or Field-Officer fhall deliver the laws and orderly books which he fhall thus have received, to the next fucceeding Officer who fhall be commiffioned in the place of him who fhall have refigned.

XII. *And be it further enacted by the authority aforefaid,* That the Governor, with the advice of Council, be and hereby is authorized to complete the cavalry in each brigade of the Militia, to two full companies or troops ; and the cavalry in each brigade, when completed, fhall be formed into battalions or fquadrons; in thofe brigades where there are or may be two or three troops, they fhall form fquadrons, and each fquadron fhall be commanded by a Major ; in thofe brigades where there are already more than three troops, they fhall form battalions, and each battalion fhall be entitled to a Lieutenant-Colonel, Major, Adjutant and Quarter-Mafter : *Provided always,* That in thofe brigades where there are already two troops raifed, they fhall not be augmented ; and in thofe brigades where there are already more than two troops, they fhall not be reduced. *Provided alfo,* That the companies of cavalry which are by any former Act, annexed to any regiment, fhall continue to be fo attached to fuch regiment in which it is raifed. The Officers of cavalry fhall furnifh themfelves with good horfes, at leaft fourteen hands and a half high ; and fhall be armed with a pair of piftols, and a good fword, the holfters of which fhall be covered with bearfkin caps : Each horfeman fhall furnifh himfelf with a ferviceable horfe, of at leaft fourteen hands and a half high ; a good faddle, bridle, mailpillion and valife; holfters, a breaftplate, and crupper ; a pair of boots and fpurs, a pair of piftols ; a fabre, and cartridge-box, to contain twelve cartridges for piftols. No man fhall be enlifted into any troop of cavalry, unlefs he fhall own and conftantly keep a fuitable horfe, and furniture, for that fervice ; and if any man who fhall belong to any troop of cavalry, fhall be deftitute of a fuitable horfe and furniture, for more than three months at one time, he fhall be difcharged from fuch corps, and enrolled in the ftanding company in which he refides. And whenever any draft or detachment fhall be made from a troop of cavalry, for actual fervice, the men thus drafted or detached, fhall march with their own horfes ; and before they march, the horfes fhall

*Cavalry organized.*

*Provifo's.*

*Officers and men to furnifh themfelves complete with horfes and every other equipment.*

XVIII. *And be it further enacted by the authority aforesaid,* That every non-commissioned Officer and Private of the infantry shall constantly keep himself provided with a good musket, with an iron or steel rod, a sufficient bayonet and belt, two spare flints, a priming wire and brush, and a knapsack; a cartridge-box, or pouch with a box therein, to contain not less than twenty-four cartridges, suited to the bore of his musket; each cartridge to contain a proper quantity of powder and ball; or with a good rifle, knapsack, shot-pouch, powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder : And shall appear so armed, accoutred and provided, whenever called out, except that when called out to exercise only, he may appear without a knapsack, and without cartridges loaded with ball. *Provided always,* that whenever a man appears armed with a musket, all his equipments shall be suited to his musket; and whenever a man appears armed with a rifle, all his equipments shall be suited to his rifle : And that from and after five years from the passing of this Act, all muskets for arming the Militia, as herein required, shall be of bores sufficient for balls of the eighteenth part of a pound : And every citizen enrolled and providing himself with arms ammunition and accoutrements, required as aforesaid, shall hold the same exempted from all suits, distresses, executions or sales for debt, or for payment of taxes. *[margin: Necessary articles of equipments.]* *[margin: Proviso.]* *[margin: Arms &c. to be exempted from suits.]*

XIX. *And be it further enacted by the authority aforesaid,* That every non-commissioned Officer or Private of the infantry, who shall neglect to keep himself armed and equipped as aforesaid, or who shall on a muster-day, or at any other time of examination, be destitute of, or appear unprovided with the arms and equipments herein directed (except as before excepted) shall pay a fine not exceeding *twenty shillings,* in proportion to the articles of which he shall be deficient, at the discretion of the Justice of the Peace, before whom trial shall be had : And all parents, masters and guardians shall furnish those of the said Militia who shall be under their care and command, with the arms and equipments aforementioned, under the like penalties for any neglect : And whenever the Selectmen of any town shall judge any inhabitant thereof, belonging to the Militia, unable to arm and equip himself in manner as aforesaid, they shall at the expence of the town provide for and furnish such inhabitant with the aforesaid arms and equipments, which shall remain the property of the town at the expence of which they shall be provided ; and if any soldier shall embezzle or destroy the arms and equipments with which he shall be furnished, he shall, upon conviction before some Justice of the Peace, be adjudged to replace the article or articles, which shall by him be so embezzled or destroyed, and to pay the cost arising from the process against him : And if he shall not perform the same within fourteen days after such adjudication, it shall be in the power of *[margin: Fine for neglect.]* *[margin: Parents and masters to equip their children & servants.]* *[margin: Persons unable, to be furnished by the town.]* *[margin: Penalty, in case.]*

C the

HeinOnline -- 1793 297 1793

# STATUTES

OF THE

# STATE OF NEW JERSEY.

REVISED AND PUBLISHED

**Under** the authority of the Legislature.



TRENTON:

PRINTED BY PHILLIPS & BOSWELL.

1847.

Digitized by Google

Add. 39

situation; to each troop of horse, there shall be one captain, two lieutenants, and one cornet, four sergeants, four corporals, one saddler, one farrier, and one trumpeter, and not more than sixty-four, nor less than forty troopers, said companies of horse to be raised hereafter only by the permission of the commander-in-chief; to each company of artillery, there shall be one captain and two lieutenants, four sergeants, four corporals, one drummer, one fifer, not more than six, nor less than three gunners, not more than six, nor less than three bombardiers, and not more than sixty-two, nor

Regimental staff. less than fifteen matrosses; there shall be a regimental staff, to consist of one adjutant and one quartermaster, to rank as lieutenants, one paymaster to each battalion, one surgeon and one surgeon's mate, one chaplain, one sergeant major, one drum major,

Rank. one fife major, and one quartermaster sergeant: all officers shall take rank according to the date of their commissions, and when two of the same grade bear equal date, then their rank shall be determined by lot, to be drawn by them before the commanding officer of the division, brigade, regiment, battalion, company, or

How commissioned. detachment. The regimental staff, except the paymasters, shall be appointed by the field officers; the brigade and regimental staff officers shall be commissioned by the commander-in-chief, on certificates of their appointment, under the hands and seals of the officers making the same; the noncommissioned regimental staff shall receive warrants from the commanding officers of the regiments and independent battalions: *and further*, there shall be one adjutant, one quartermaster, and one surgeon, or surgeon's mate, to each squadron of cavalry and each independent battalion. The noncommisioned officers and music to be appointed by the captain and subalterns.

Oath to be taken. 4. *And be it enacted*, That each and every officer, who has been or may hereafter be appointed and commissioned in the manner aforesaid, and who shall not already have taken the same, shall, previous to their entering on the execution of their respective offices, give assurance of fidelity and attachment to the government of this state, by taking and subscribing the following oath or affirmation, before some general or field officer of the brigade :

I, ———— do sincerely profess and swear, (or affirm, as the case may be,) that I will and do bear true faith and allegiance to the government established in this state, under the authority of the people, and will with integrity execute the office of ———— of the militia of New Jersey, according to the best of my abilities. So help me God.

Certificate. And a certificate thereof shall be made upon the back of every commission, by the general or field officer before whom the said oath or affirmation shall have been taken and subscribed.

Digitized by Google

TIT. XXVI.
CHAP. I.

posed upon them, they shall be relieved therefrom by producing to the company or battalion court, to whom the same may be returned, a receipt for the payment of hospital money during the time they may have been so fined.

Fines for other delinquencies.

7. *And be it enacted,* That the same fines and penalties shall be respectively paid by every officer, noncommissioned officer, and private, who shall be absent at either roll-call, or leave the parade of his regiment, battalion, squadron, troop, or company, without permission obtained from the commanding officer, before the said regiment, battalion, squadron, troop, or company shall be discharged, which said fines shall and may be recovered in the manner directed in this act; and if any militiaman shall appear on parade without his musket or firelock, or if a trooper without his sword

Proviso.

and pistols, he shall forfeit and pay fifty cents; *provided,* that no militiaman shall be liable to such fines, who in the opinion of the company court, created by this act, may be deemed unable to procure arms and equipments, or either of them; but when any militiaman shall be called into actual service, he shall appear fully equipped with every article required by act of congress, or be subject to a fine, if an officer, of ten dollars, or if a private, two.

Fines, how ascertained.

8. *And be it enacted,* That, in order to ascertain those persons who by their absence on days of exercise shall be liable to the fines and forfeitures of this act, an orderly or first sergeant, appointed by the captain or commanding officer of every troop or company, shall, on every day of training, in presence of said captain or commanding officer of said troop or company, one hour after the time appointed for the meeting of the troop, company, battalion, squadron, or regiment, and also after the exercise is

Roll to be called.

over, and before the men are dismissed, call over the muster-roll of the said troop or company, noting those who are absent at each roll-call, and also all those who are deficient in arms or equipments, and the particular article or articles for want of which they are liable to be fined, and shall, six days prior to the day appointed for the meeting of the company court, by a written or printed notice, put up in three public places within the bounds of the company, a

Names advertised.

return of the names of the delinquents of said company, the amount of the fine or fines by them incurred, the day when and the place

Company court.

where the company court will meet, and shall deliver a true and particular return of all such delinquents and deficiencies, on oath or affirmation, to the president of said company court, which oath or affirmation shall be in the following form:

Oath of orderly.

I, ———— orderly sergeant of the ———— company (or troop, as the case may be,) of the ———— battalion (or squadron, as the case may be,) within the ———— regiment of the ———— brigade, do, in

Digitized by Google

battalion, or squadron to which such company or troop may belong,
for such neglect or refusal he shall be cashiered, or fined, at the ——— discretion of a general court martial, in any sum not exceeding one hundred dollars.

43. *And be it enacted,* That if any militiaman shall desert while Desertion. he is on a tour of duty, he shall be fined in any sum, not exceeding one hundred dollars, for every such offence, or may be imprisoned for any term, not exceeding two months, at the discretion of a regimental court martial; and if a noncommissioned officer, he shall also be degraded and placed in the ranks.

44. *And be it enacted,* That it shall not be lawful for any non- Loaded guns commissioned officer or private to come on parade with a loaded prohibited. or charged musket, gun, rifle, fusee, or pistol, nor to discharge any firearms within one mile of the place of parade, on any day that they shall be ordered out for improvement or inspection, without an order or permission from a commissioned officer; and if any noncommissioned officer or private shall so load or charge, or fire or discharge, any firearms without such order or permission, he shall forfeit one dollar for every offence, and the orderly sergeant of the company is hereby directed to read this section immediately after calling the roll of the company; and the commissioned officers are hereby enjoined to cause the names of the persons who shall offend to be returned to the regimental court martial.

45. *And be it enacted,* That the militia of this state shall be con- Time of military discipline from the rising until the military discipline. setting sun of the same day that they shall be ordered out for improvement or inspection, and that no officer, noncommissioned officer, or private, belonging to the same, during the time aforesaid, shall be subject to be arrested on any civil process.

46. *And be it enacted,* That the militia, on the days of exercise, Time of exercise. may be detained under arms on duty in the field six hours; *provided,* they are not kept above three hours under arms at any one time, without allowing them a proper time to refresh themselves.

47. *And be it enacted,* That any person who shall bring any kind Spirits prohibited. of spirituous liquors to the place of exercise, or within one mile thereof, for the purpose of retailing, shall forfeit such liquors for the use of the poor belonging to the city or township where such exercise is had, and the commanding officer of the regiment, battalion, squadron, or company, is charged with the execution of this article.

48. *And be it enacted,* That the rules of discipline for the militia Rules of discipline. of this state, shall be the same at all times as those established by congress for disciplining the regular troops of the United States.

49. *And be it enacted,* That the commander-in-chief be, and he To be published.

Digitized by Google

THE

# STATUTES OF OREGON.

ENACTED, AND CONTINUED IN FORCE, BY THE

## LEGISLATIVE ASSEMBLY,

AT THE

**Fifth and Sixth Regular Sessions thereof.**

STANFORD LIBRARY

OREGON:
ASAHEL BUSH, PUBLIC PRINTER.

1855

Digitized by Google

and be there detained until such day, in like manner as if the offence charged had been committed within this territory; and if the person so recognizing shall fail to appear according to the condition of his recognizance, he shall be defaulted, and the like proceedings shall be had as in the case of other recognizances entered into before such court or magistrate; but if such person be charged with a capital crime, he shall be committed to prison, and there detained until the day so appointed for his appearance before the court or magistrate.

SEC. 5. If the person so recognized or committed shall appear before the court or magistrate upon the day ordered, he shall be discharged, unless he be demanded by some person authorized by the warrant of the executive to receive him, or unless the court or magistrate shall see cause to commit him, or require of him to recognize anew for his appearance at some other day; and if, when ordered, he shall not so recognize, he shall be committed and detained as before provided; whether the person so appearing shall be recognized, committed or discharged, any person authorized by the warrant of the executive, may at all times take him into custody, and the same shall be a discharge of the recognizance, if any, and shall not be deemed an escape. *Discharge of person recognized, etc.*

SEC. 6. The complainant in such cases, shall be answerable for the actual costs and charges, and for the support in prison of any person so committed, and shall advance to the jailor one week's board at the time of commitment, and so from week to week so long as such person shall remain in jail; and if he fail to do so, the jailor may forthwith discharge such person from his custody. *Complainant liable for costs, etc.*

---

# CHAPTER XVI.

## PROCEEDINGS TO PREVENT COMMISSION OF CRIMES.

SEC. 1. Certain officers conservators of the public peace.
    2. Proceedings when complaint is made to magistrate.
    3. Magistrate when to issue warrant.
    4. Proceedings on examination before magistrate.
    5. Privilege of defendant.
    6. Recognizance, when required.
    7. Defendant, when to be committed.
    8. Discharge of defendant; complainant; when to pay costs.
    9. In other cases, costs, how and when paid.
   10. Appeal, when allowed.
   11. When magistrate may require witnesses to recognize.
   12. Proceedings on appeal by District Court.
   13. Consequence of appellant failing to prosecute appeal.
   14. After commitment, defendant may be discharged on giving security.
   15. Recognizance to be transmitted to District Court.
   16. When person may be ordered to recognize without warrant.
   17. Armed persons, when required to find sureties.
   18. Suit on recognizance.
   19. Surety may surrender principal.

SECTION 1. The judges of the several courts of record, in vacation as well as in open court, and all justices of the peace, shall have power to cause all laws made for the preservation of the public peace, to be kept, and in the execution of that power, may require persons *Keeping the peace.*

16

Digitized by Google

CHAP. 16. to give security to keep the peace, or for their good behavior, or both, in the manner provided in this chapter.

When sure-
ties may be
required. 17
Wen.   181;
28 do. 639. SEC. 2. Whenever complaint shall be made to any such magistrate, that any person has threatened to commit an offence against the person or property of another, the magistrate shall examine the complainant, and any witness who may be produced on oath, and reduce such complaint to writing, and cause the same to be subscribed by the complainant.

Warrant to
issue. SEC. 3. If, upon examination, it shall appear that there is just cause to fear that such offence may be committed, the magistrate shall issue a warrant under his hand, reciting the substance of the complaint, and requiring the officer to whom it may be directed, forthwith to apprehend the person complained of, and bring him before such magistrate, or some other magistrate or court having jurisdiction of the cause.

Examination SEC. 4. The magistrate before whom any person is brought upon charge of having made threats as aforesaid, shall, as soon as may be, examine the complainant, and the witnesses to support the prosecution, on oath, in the presence of the party charged, in relation to any matters connected with such charge, which may be deemed pertinent.

Privilege of
defendant. SEC. 5. After the testimony to support the prosecution, the witnesses for the prisoner, if he have any, shall be sworn and examined, and he may be assisted by counsel in such examination, and also in the cross-examination of the witnesses in support of the prosecution.

Recogni-
zance, when
required. SEC. 6. If, upon examination, it shall appear that there is just cause to fear that any such offence will be committed by the party complained of, he shall be required to enter into recognizance, with sufficient sureties, in such sum as the magistrate shall direct, to keep the peace towards all the people of this territory, and especially towards the person requiring such security, for such term as the magistrate shall order, not exceeding six months ; but he shall not be ordered to recognize for his appearance at the District Court, unless he is charged with some offence for which he ought to be held to answer at said court.

When to be
committed.
23 Wen. 639. SEC. 17. If the person so ordered to recognize, shall refuse or neglect to comply with such order, the magistrate shall commit him to the county jail during the period for which he was required to give security, or until he shall so recognize, stating in the warrant the cause of commitment, with the sum and time for which security was required.

Complainant
when to pay
costs. SEC. 8. If, upon examination, it shall not appear that there is just cause to fear that any such offence will be committed by the party complained of, he shall be forthwith discharged ; and if the magistrate shall deem the complaint unfounded, frivolous or malicious, he shall order the complainant to pay the costs of prosecution, who shall thereupon be answerable to the magistrate and the officer for their fees, as for his own debt.

Costs. SEC. 9. When no order respecting the costs is made by the ma-

Digitized by Google

gistrate, they shall be allowed and paid in the same manner as costs CHAP. 16. before justices in criminal prosecutions; but in all cases where a person is required to give security for the peace, or for his good behavior, the magistrate may further order the costs of prosecution, or any part thereof, to be paid by such person, who shall stand committed until such costs are paid, or he is otherwise legally discharged.

SEC. 10. Any person aggrieved by the order of any justice of Appeal. the peace, requiring him to recognize as aforesaid, may, within ten days after the decision of the justice, on giving the security required, appeal to the District Court, next to be holden in the same county, or that county to which said county is attached for judicial purposes.

SEC. 11. The magistrate, from whose order an appeal is to be Witnesses when to retaken, shall require such witnesses as he may deem necessary to cognize. support the complaint, to recognize for their appearance at the court to which appeal is made.

SEC. 12. The court before which such appeal is prosecuted, may Power of appellate court. affirm the order of the justice, or discharge the appellant, or may require the appellant to enter into a new recognizance, with sufficient sureties, in such sum and for such time as the court shall think proper, and may also make such order in relation to the costs of prosecution, as it may deem just and reasonable.

SEC. 13. If any party appealing, shall fail to prosecute his appeal, Failing to prosecute his recognizance shall remain in full force and effect, as to any appeal. breach of the condition, without an affirmation of the judgment or order of the magistrate, and shall also stand as security for any cost which shall be ordered by the court appealed to, to be paid by the appellant.

SEC. 14. Any person committed for not finding sureties, or refu- Discharge of party committed. sing to recognize as required by the court or magistrate, may be dis- charged by any judge or justice of the peace, on giving such security as was required.

SEC. 15. Every recognizance taken in pursuance of the fore- Recognizances when to going provisions, shall be transmitted by the magistrate to the Dis- be transmitted. trict Court for the county, on or before the first day of the next term, and shall be there filed of record by the clerk.

SEC. 16. Any person, who shall, in the presence of any magis- Order to recognize trate mentioned in the first section of this chapter, or before any without court of record, make an affray, or threaten to kill, or beat another, warrant. or to commit any violence or outrage against his person or property, and every person, who, in the presence of such court or magistrate, shall contend with hot and angry words, to the disturbance of the peace, may be ordered, without process or any other proof, to recognize for keeping the peace, and being of good behavior for a term not exceeding six months, and in case of a refusal, may be committed as before directed.

SEC. 17. If any person shall go armed with a dirk, dagger, sword, Armed persons, when pistol, or other offensive and dangerous weapon, without reasonable required to cause to fear an assault, injury, or other violence to his person, or to find sureties.

Digitized by Google

Add. 46

CHAP. 17. his family or property, he may, on complaint of any other person, having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace for a term not exceeding six months, with the right of appealing as before provided.

Suit on recognizance.

SEC. 18. Whenever on a suit brought on any such recognizance, the penalty thereof shall be adjudged forfeited, the court may remit such portion of the penalty on the petition of any defendant, as the circumstances of the case shall render just and reasonable.

Surety may surrender principal.

SEC. 19. Any surety in a recognizance to keep the peace, or for good behavior, or both, shall have the same authority and right to take and surrender his principal, as if he had been bail for him in a civil case, and upon such surrender, shall be discharged and exempted from all liability for any act of the principal, subsequent to such surrender, which would be a breach of the condition of the recognizance; and the person so surrendered may recognize anew, with sufficient sureties, before any justice of the peace for the residue of the term, and thereupon shall be discharged.

# CHAPTER XVII.

## ARRESTS.

SEC. 1. Arrest defined.
2. Arrest, how and by whom made.
3. Every person must aid officer in making arrest, if required.
4. Arrest for felony and misdemeanor, when may be made.
5. As to what constitutes arrest.
6. Officer may pursue fugitive into other counties.
7. When an officer or private person may arrest without warrant.
8. Arrest, how made in such case.
9. Escape and capture of prisoner.

Arrest.

SECTION 1. Arrest is the taking a person into custody, that he may be held to answer for a public offence.

How made.

SEC. 2. An arrest may be either by a peace officer under a warrant, or without a warrant, or by a private person.

Assisting officer.

SEC. 3. Every person shall aid an officer in the execution of a warrant, if the officer require his aid, and be present and acting in its execution.

Arrest when to be made.

SEC. 4. If the offence charged be a felony, the arrest may be made on any day, and at any time of the day or night; if it be a misdemeanor, the arrest shall not be made on Sunday, or at night, unless upon the direction of the magistrate indorsed upon the warrant.

What constitutes arrest.

SEC. 5. An arrest is made by an actual restraint of the person of the defendant, or by his submission to the custody of the officer.

Pursuit.

SEC. 6. If any person, against whom a warrant may be issued for an alleged offence committed in any county, shall, either before or after the issuing of such warrant, escape from, or be out of the county, the sheriff, or other officer to whom such warrant may be

Digitized by Google

# Criminal Procedure.

## I. PROCEEDINGS TO DETECT THE COMMISSION OF CRIMES.

1. Writs of arrest, &c. Subpœnas. Expenses.
2. Escapes into another county.
3. Backing warrants. Bail. Removal.
4. Magistrates backing such warrants to be indemnified.
5. Disposition of property supposed to be stolen, found in the possession of one accused.
6. Surety of the peace.
7. Bail.
8. Surrender of bail.
9. Settlement of criminal cases.
10. Power to take recognisances in criminal cases.

## II. INDICTMENTS AND PLEADINGS.

11. Grand jurors authorized to administer oaths.
12. Form of indictments. Formal objections to indictment to be made before the jury is sworn. Amendments on demurrer, &c.
13. Variances between written instruments, as produced and laid in the indictment, amendable.
14. Immaterial variances between indictment and proof amendable.
15. Manner of laying the ownership of property in cases of partners and joint owners.
16. Manner of charging frauds against partners and joint owners.
17. Manner of laying property of counties, cities, townships, &c.
18. Forms of indictment in cases of forging, stealing and embezzling, or cheating by false pretences.
19. Forms in other cases.
20. Intent to defraud particular persons need not be alleged or proven in cases of forging, uttering or false pretences.
21. In indictments for murder and manslaughter, means by which the injury was inflicted need not be specified.
22. Requisites of an indictment for perjury.
23. Requisites of an indictment for subornation of perjury.
24. Indictment for duelling.
25. Counts for receiving and stealing may be joined.
26. Issue and trial in criminal cases.
27. Prisoners standing mute.
28. Prosecutor's name to be indorsed on the indictment.
29. Distinct acts of embezzlement may be charged in the same indictment.
30. *Nolle prosequi.*
31. Plea of autrefois convict or autrefois acquit.
32. Arraignment of prisoners.
33. Indictment for involuntary manslaughter.

## III. COURTS OF CRIMINAL JURISDICTION.

34. Courts of oyer and terminer.
35. Quarter sessions. When causes to be certified to the oyer and terminer. Powers of the courts.
36. Writs of error and *certiorari.*

## IV. OF THE TRIAL.

37. Persons under bail not to be placed in the criminal bar.
38. Persons indicted for treason to have a copy of the indictment.
39. Peremptory challenges.
40. Challenges by the commonwealth.
41. How challenges are to be conducted.
42. How challenges are to be determined.
43. Of the trial of persons jointly indicted, and joint challenges.
44. How *tales* may be awarded and juries summoned.
45. Of juries *de medietate linguæ.*
46. Of the place of trial of treason.
47. Of the place of trial of accessories before the fact.
48. Of the place of trial of accessories after the fact.
49. Of felonious striking or poisoning in one county, and death in another.
50. Of felonious striking or poisoning in the state, and death out of the state.
51. Proof of offences committed near county lines.
52. Proof of offences committed during journeys.
53. Party indicted for felony or misdemeanor may be found guilty of attempt to commit the same.
54. Persons tried for misdemeanor not to be acquitted, if the offence turn out to be felony.
55. Witnesses entitled to restitution to be competent.
56. Cure of defects in jury process, by verdict.
57. Of the trial of prisoners committed.
58. Witnesses in forgeries.
59. Witnesses not to be imprisoned, except in certain cases.
60. Bills of exception and writs of error allowed.
61. Written opinions to be filed.
62. Granting of writs of error regulated.
63. From whence writ of error shall issue.
64. Proceedings after affirmance or reversal of judgment.

## V. OF COSTS.

65. Power of grand and petit jurors over costs.
66. Of the defendant's costs.
67. Of payment of costs generally.
68. Costs where separate bills are presented against joint offenders.
69. Jury fee to be taxed.
70. Payment of costs in certain counties.

## VI. GENERAL PROVISIONS.

71. Insane prisoners. Jury to find the fact of insanity. Defendant to be detained in custody.
72. Where defendant is found insane upon arraignment.
73. Where prisoner brought up to be discharged appears to be insane.
74. Insane defendant to be delivered up to his friends or to the overseers, on security being given.
75. How expenses to be paid in such cases.
76. Civil actions against felons.
77. Executions upon sentences of restitution.
78. Outlawry.
79. Sentences of separate or solitary confinement.
80. Sentences of separate or solitary confinement of less than one year, and simple imprisonments.
81. Executions in capital cases.
82. Limitation of prosecutions.
83. Fines to be decreed to be paid to the state for the use of the county.
84. Deduction from sentences, in case of good conduct.

## VII. SPECIAL JURISDICTION OF JUSTICES.

85. Criminal jurisdiction, in certain counties.
86. Proceedings on the trial.
87. Jury trials regulated.
88. How juries to be summoned. How impannelled.
89. Duties of constables.
90. Talesmen. Fees of constables.
91. Witnesses. Costs.
92. Effect of verdict. Proceedings on *certiorari.* New trials.
93. Sentences. Appropriation of fines.
94. Fees of justices.
95. Penalty on defaulting jurors.
96. When courts to be held by justices.
97. Recognisances for appearance. Continuances. Commitments.
98. Selection of juries. Counsel.
99. Larceny exceeding $10 excepted from jurisdiction of justices.
100. Cases of affray.
101. Violation of liquor laws, in Bradford county.
102. Reversal on *certiorari,* not to operate as an acquittal.
103. Pay of jurors.
104. Costs, where defendant is convicted in the quarter sessions of an offence within the jurisdiction of justices.
105. Power to impannel a new jury, in case of disagreement.

Digitized by Google

## I. Proceedings to detect the commission of crimes.

31 March 1860 § 1.
P. L. 284.

Warrants of arrest, &c.

Subpœnas.

Expenses.

Ibid. § 2.

Escapes into another county.

Ibid. § 3.

Backing warrants.

Bail

1. The judges of the supreme court, of the court of oyer and terminer and jail delivery, of the courts of quarter sessions, or any of them, shall and may direct their writs and precepts to the sheriffs and coroners of the several counties within this commonwealth, when need shall be, to take persons indicted for felonies, or other offences, before them, who may dwell, remove or be received into another county; and it shall and may be lawful to and for the said judges, or any of them, to issue *subpœnas* into any county of the commonwealth, for summoning and bringing any person to give evidence in any matter or cause before them, or any of them, and to compel obedience to such writs, precepts or *subpœnas*, by attachment or otherwise, and under such pains and penalties as other writs or *subpœnas* are or ought by law to be granted and awarded;(a) and that it shall be lawful for said judges, or any of them, if they see fit to direct such writ, precept, summons, *subpœna* or attachments, to be executed by the sheriff of the county in which the same is awarded, which said writ, precept, summons or *subpœna*, shall be the sufficient warrant of such sheriff for executing the same throughout this commonwealth, as fully and effectually as if directed to and executed by the sheriff of the proper county where issued: *Provided*, That the reasonable expenses of executing such process, when issued on behalf of the commonwealth, shall be paid out of the funds of the county where issued; and the expenses of removing any person charged with having committed an offence in one county into another county, or of transporting any person charged with having committed any offence in this state from another state into this state for trial, or for conveying any person, after conviction, to the penitentiary, shall be paid out of the treasury of the county where the offence is charged to have been committed (b)

2. Where any person charged with having committed any felony(c) in any city or county of this commonwealth, shall go or escape into any other county thereof, it shall and may be lawful for the president, or any judge of the court of common pleas in the county where the said person may be found, to issue his warrant, authorizing and requiring the sheriff of the said county, to take the said person and conduct him to the proper county, where the said felony is alleged to have been committed; the expenses of which shall be paid to the said sheriff by the county to which the said person is conducted.(d)

3. In case any person, against whom a warrant may be issued by any judge or alderman of any city, or justice of the peace of any county in this commonwealth, for any offence there committed, shall escape, go into, reside or be in any other city or county out of the jurisdiction of the judge, alderman, justice or justices of the city or county granting such warrant as aforesaid, it shall and may be lawful for, and it is hereby declared to be the duty of any alderman, justice or justices of the city or county where such person shall escape, go into, reside or be, upon proof being made, upon oath or affirmation, of the handwriting of the judge, alderman, justice or justices granting such warrant, to indorse his or their name or names on such warrant, which shall be sufficient authority to the person or persons bringing such warrant, and to all other persons to whom such warrant was originally directed, to execute the same in such other city or county, out of the jurisdiction of the alderman, justice or justices, granting such warrant as aforesaid, and to apprehend and carry such offender before the alderman, justice or justices who indorsed such warrant, or some other alderman, justice or justices of such other city and county where such warrant was indorsed. And in case the offence for which such offender shall be so apprehended, shall be bailable in law by an alderman or justice of the peace, and such offender shall be willing and ready to give bail for his appearance at the next court of general jail delivery or quarter sessions, to be held in and for the city and county where the offence was commit-

(a) Justices of the peace were empowered, by the 8th section of the act of 22 May 1722, to issue *subpœnas* and other warrants, into any county or place, within the province, for summoning or bringing any person or persons to give evidence in and upon any matter or cause whatsoever, examinable or triable by or before them, under such pains or penalties as *subpœnas* or warrants of that kind usually are or ought by law to be granted or awarded. 1 Sm. 138. This section is one of those repealed, as to criminal proceedings, by the act of 1860 § 79. This would appear to take away the power of justices to issue *subpœnas* and attachments into other counties.

(b) This section is composed of the 8th section of the act of 22 May 1722, 1 Sm. 138; of the 14th section of the act of 23 September 1791, 3 Sm. 43; and of the 2d

section of the act of 25 April 1846. P. L. 406. It is not proposed to repeal all the 8th section of the act of 1722, because part of it equally applies to civil as well as criminal proceedings. Report on the Penal Code 39. The county is not liable for the expenses incurred in an unsuccessful attempt to arrest a fugitive from justice, who has taken refuge in another state. *Andrus* v. *Warren County*, 32 Penn. St. R. 540.

(c) This does not extend to misdemeanors; a fugitive charged with having committed a misdemeanor in another county, can only be arrested under the provisions of the succeeding section. *Boyd's Case*, 1 Gr. 218.

(d) This section is taken from the 3d section of the act of 4 April 1807. 4 Sm. 393. Report on the Penal Code 39.

31 March 1860.

ted, such alderman, justice or justices shall and may take such bail for his appear-
ance, in the same manner as the alderman or justice of the peace of the proper
city or county might have done; and the said alderman, justice or justices of the
peace of such other city or county so taking bail, shall deliver or transmit such
recognisance and other proceeding to the clerk of the court of general jail de-
livery or quarter sessions, where such offender is required to appear by virtue of
such recognisance; and such recognisance and other proceedings shall be as good
and effectual in law, as if the same had been entered into, taken or acknowledged
in the proper county where the offence was committed, and the same proceedings
shall be had therein.  And in case the offence for which such offender shall be
apprehended in any other city or county, shall not be bailable in law by an alder-
man or justice of the peace, or such offender shall not give bail for his appear-
ance at the proper court having cognisance of his crime, to the satisfaction of the
alderman or justice before whom he shall be brought, then the constable or other
person so apprehending such offender, shall carry and convey him before one of
the aldermen or justices of the peace of the proper city or county where such
offence was committed, there to be dealt with according to law (a)

4.  No action of trespass or false imprisonment, or information or indictment,
shall be brought, sued, commenced, exhibited or prosecuted by any person,
against the alderman, justice or justices who shall indorse such warrant, for or
by reason of his or their indorsing the same; but such person shall be at liberty
to bring or prosecute his or their action or suit against the alderman or justice
who originally granted the warrant.(b)

5.  When any person shall be accused before a magistrate, upon oath or affirma-
tion, of the crime of burglary, robbery or larceny, and the said magistrate shall
have issued his warrant to apprehend such person or persons, or to search for
such goods as have been described, on oath or affirmation, to have been stolen
goods, if any shall be found in the custody or possession of such person or persons,
or in the custody or possession of any other person or persons, for his, her or
their use, and there is probable cause, supported by oath or affirmation, to suspect
that other goods, which may be discovered on such search, are stolen, it shall and
may be lawful for the said magistrate, to direct the said goods to be seized, and to
secure the same in his own custody, unless the person in whose possession the
same were found, shall give sufficient surety to produce the same at the time of
his or her trial.  And the said magistrate shall forthwith cause an inventory to
be taken of the said goods, and shall file the same with the clerk of that court in
which the accused person is intended to be prosecuted, and shall give public
notice in the newspapers, or otherwise, by advertising the same in three or more
public places in the city or county where the offence is charged to have been
committed, before the time of trial, noting in such advertisement the said inven-
tory, the person charged, and time of trial.  And if, on such trial, the accused
party shall be acquitted, and no other claimant shall appear or suit be commenced,
then, at the expiration of three months, such goods shall be delivered to the party
accused, and he, she or they shall be discharged, and the county be liable to the
costs of prosecution; but if he be convicted of larceny only, and after restitu-
tion made to the owner and the sentence of the court being fully complied with,
shall claim a right in the residue of the said goods, and no other shall appear or
claim the said goods, or any part of them, then it shall be lawful, notwithstanding
the claim of the said party accused, to detain such goods for the term of nine
months, to the end that all persons having any claim thereto may have full oppor-
tunity to come, and to the satisfaction of the court, prove their property in them;
on which proof, the said owner or owners, respectively, shall receive the said goods,
or the value thereof, if, from their perishable nature, it shall have been found
necessary to make sale thereof, upon paying the reasonable charges incurred by
the securing the said goods and establishing their property in the same; but if no
such claim shall be brought and duly supported, then the person so convicted
shall be entitled to the remainder of the said goods, or the value thereof, in case
the same shall have been sold agreeably to the original inventory.  But if, upon
an attainder of burglary or robbery, the court shall, after due inquiry, be of
opinion that the said goods were not the property of such burglar or robber, they
shall be delivered, together with a certified copy of the said inventory, to the

Ibid. § 4.
Magistrates back-
ing such warrants
to be indemnified.

Ibid. § 5.
Disposition of pro-
perty supposed to
be stolen, found in
the possession of
one accused.

Inventory.

Notice.

Restitution.

When to be deliv-
ered to county
commissioners

Removal.

(a) A warrant issued by a justice of the peace in one
county, and indorsed by a justice of another county,
charging a misdemeanor to have been committed in the
county whence the warrant issued, will not justify the de-
tention of the offender in the jail of the county where the
warrant was indorsed.  Boyd's Case, 1 Gr. 218.
(b) The 3d and 4th sections are taken from the act of
16 April 1827.  9 Sm. 424.  Report on the Penal Code 39

31 March 1860.    commissioners of the county, who shall indorse a receipt therefor on the origina.
                  inventory, register the said inventory in a book, and also cause the same to be
                  publicly advertised, giving notice to all persons claiming the said goods, to prove
                  their property therein to the said commissioners ; and unless such proof shall be
                  made within three months from the date of such advertisement, the said goods
Disposition of pro-  shall be publicly sold, and the net moneys arising from such sale shall be paid
ceeds.            into the county treasury for the use of the commonwealth : *Provided always,*
                  That if any claimant shall appear within one year, and prove his or her property
                  in the said goods, to the satisfaction of the commissioners, or in the case of dispute,
                  shall obtain the verdict of a jury in favor of such claim, the said claimant shall
                  be entitled to recover and receive from the said commissioners or treasurer, the
                  net amount of the moneys paid as aforesaid into the hands of the said commis-
                  sioners, or by them paid into the treasury of this commonwealth.(*a*)

Ibid. § 6.        6. If any person shall threaten the person of another to wound, kill or destroy
Surety of the peace.  him, or to do him any harm in person or estate,(*b*) and the person threatened shall
                  appear before a justice of the peace, and attest, on oath or affirmation, that he
                  believes that, by such threatening, he is in danger of being hurt in body or estate,
                  such person so threatening as aforesaid, shall be bound over, with one sufficient
                  surety, to appear at the next sessions,(*c*) according to law, and in the meantime
                  to be of his good behavior, and keep the peace toward all citizens of this com-
                  monwealth.(*d*)   If any person, not being an officer on duty in the military or
                  naval service of the state or of the United States, shall go armed with a dirk,
                  dagger, sword or pistol, or other offensive or dangerous weapon, without reason-
                  able cause to fear an assault or other injury or violence to his family, person or
                  property, he may, on complaint of any person having reasonable cause to fear
                  a breach of the peace therefrom, be required to find surety of the peace as afore-
                  said.(*e*)

Ibid. § 7.        7. In all cases, the party accused, on oath or affirmation, of any crime or mis-
Bail.             demeanor against the laws, shall be admitted to bail by one or more sufficient
                  sureties, to be taken before any judge, justice, mayor, recorder or alderman where
                  the offence charged has been committed, except such persons as are precluded
                  from being bailed by the constitution of this commonwealth :(*g*) *Provided also,*
                  That persons accused as aforesaid of murder or manslaughter, shall only be
                  admitted to bail by the supreme court or one of the judges thereof, or a president
                  or associate law judge of a court of common pleas : persons accused, as aforesaid,
                  of arson, rape, mayhem, sodomy, buggery, robbery or burglary, shall only be bail-
                  able by the supreme court, the court of common pleas, or any of the judges
                  thereof, or a mayor or recorder of a city.(*h*)

Ibid. § 8.        8. All sureties, mainpernors, and bail in criminal cases, whether bound in
Surrender of bail.  recognisances for a particular matter, or for all charges whatsoever, shall be
                  entitled to have a bail-piece, duly certified by the proper officer or person before
                  whom or in whose office the recognisance of such surety, mainpernors or bail
                  shall be or remain, and upon such bail-piece, by themselves, or their agents, to
                  arrest and detain, and surrender their principals, with the like effect as in cases
                  of bail in civil actions ;(*i*) and such bail-piece shall be a sufficient warrant or
                  authority for the proper sheriff or jailer to receive the said principal, and have
                  him forthcoming to answer the matter or matters alleged against him : *Provided,*
                  That nothing herein contained shall prevent the person thus arrested and detained
                  from giving new bail or sureties for his appearance, who shall have the same right
                  of surrender hereinbefore provided.(*k*)

(*a*) This section is taken from the 10th section of the act 23 September 1791, 3 Sm. 42. Report on the Penal Code 39.

(*b*) Surety of the peace is demandable of right by any individual who will make the necessary oath. *Commonwealth v. Duane,* 1 Binn. 102 n. See *Commonwealth v. Edwards,* 1 Ash. 46. *Case of Aldermen,* 2 Pars. 458.

(*c*) A committing magistrate has no authority to bind a person to keep the peace, or for his good behavior, longer than the next term of the court. *Case of Aldermen,* 2 Pars. 458.

(*d*) Surety for good behavior may be ordered by the court, after the acquittal of a prisoner, in such sum, and for such length of time, as the public safety requires. *Respublica v. Donagan,* 2 Y. 437. *Bamber v. Commonwealth,* 10 Penn. St. R. 339. *State v. Parish,* 2 Hayw. 7:-4.

(*e*) This section is partly taken from the act of 1700, 1 Sm. 5 ; the addition thereto provided by this section,

against the unnecessarily carrying deadly weapons, is introduced from an obvious necessity, arising from daily experience and observation. Report on the Penal Code 39.

(*g*) A justice may take bail, after commitment for trial. *Moore v. Commonwealth,* 6 W. & S. 314. *Case of Aldermen,* 2 Pars. 458. And see *Steel v. Commonwealth,* 7 W. 454. *Commonwealth v. Holloway,* 5 Binn. 512. *Respublica v. Jacob,* 1 Sm. 57 n. A recognisance taken by a justice, to answer the charge of arson, is *coram non judice,* and void. *Commonwealth v. Philips,* 2 U. S. Law Mag. 316.

(*h*) This section is a consolidation of the first clause of the act of 1705, 1 Sm. 56 ; and the first section of the act of 30 April 1832. P. L. 388. Report on the Penal Code 39.

(*i*) See 1 T. & H. Pr. 320–6.

(*k*) This section is taken from the 3d section of the act of 10 April 1848. P. L. 449. Report on the Penal Code 40.

Digitized by Google

9. In all cases where a person shall, on the complaint of another, be bound by <span style="float:right">31 March 1860 ⁹ 9.</span> recognisance to appear, or shall, for want of security, be committed, or shall be <span style="float:right">Settlement of criminal cases</span> indicted for an assault and battery or other misdemeanor, to the injury and dam- age of the party complaining, and not charged to have been done with intent to commit a felony, or not being an infamous crime, and for which there shall also be a remedy, by action, if the party complaining shall appear before the magistrate who may have taken recognisance, or made the commitment, or before the court in which the indictment shall be, and acknowledge to have received satisfaction for such injury and damage, it shall be lawful for the magistrate, in his discretion, to discharge the recognisance, which may have been taken for the appearance of the defendant, or in case of committal, to discharge the prisoner, or for the court also where such proceeding has been returned to the court, in their discretion, to order a *nolle prosequi* to be entered on the indictment, as the case may require, upon payment of costs: *Provided*, That this act shall not extend to any assault and battery, or other misdemeanor, committed by or on any officer or minister of justice.(a)

10. When any one is arrested on a warrant or bail-piece in any criminal case <span style="float:right">24 Feb. 1870 ⁹ 1.</span> in which a justice of the peace would, by existing laws, be allowed to take recog- <span style="float:right">P. L. 227.</span> nisance of bail for his appearance to answer the offence or crime complained of, <span style="float:right">Power to take recognisances in criminal cases.</span> the officer or person making the arrest may take the accused before a justice and have him released on the requisite security being given; and his return, when properly made, shall exonerate him from further liability.(b)

## II. Indictments and pleadings.

11. The foreman of any grand jury, or any member thereof, is hereby author- <span style="float:right">31 March 1860 ⁹ 10.</span> ized and empowered to administer the requisite oaths or affirmations to any <span style="float:right">P. L. 433.</span> witness whose name may be marked by the district-attorney on the bill of in- <span style="float:right">Grand jurors may administer oaths.</span> dictment.(c)

12. Every indictment shall be deemed and adjudged sufficient and good in law, <span style="float:right">Ibid. ⁹ 11.</span> which charges the crime substantially in the language of the act of the assembly prohibiting the crime, and prescribing the punishment, if any such there be, or, <span style="float:right">Form of indictments.</span> if at common law, so plainly that the nature of the offence charged may be easily understood by the jury.(d) Every objection to any indictment for any formal <span style="float:right">Formal objections to indictments.</span> defect.(e) apparent on the face thereof, shall be taken by demurrer, or on motion to quash such indictment, before the jury shall be sworn, and not afterward;(g) <span style="float:right">Amendments on demurrer, &c.</span> and every court before whom any such objection shall be taken for any formal defect, may, if it be thought necessary, cause the indictment to be forthwith amended in such particular,(h) by the clerk or other officer of the court, and thereupon the trial shall proceed as if no such defect appeared.(i)

(a) This section is an extension of the existing law of the 17 March 1806, 4 Sm. 318. Report on the Penal Code 40.

(b) The title of this act refers only to Crawford county, but the enactment is general. The 3d section of the act 13 April 1867, P. L. 1232, relating to the jurisdiction of justices of the peace in Erie county, provides that in all cases of arrest, upon warrant, of any person charged with any crime of a grade of which the quarter sessions has jurisdiction, the defendant, upon the preliminary hearing before the magistrate, may *subpœna* and produce and examine witnesses in his or her behalf. This section is not, in terms, restricted to Erie county : *quere ?* whether it is a general law ?

(c) This is taken from the 1st section of the act 5 April 1826. 9 Sm. 184. That witnesses, whose names had not been marked by the district-attorney on the bill of indictment, were sworn and examined by the foreman of the grand jury, is not pleadable in bar ; at most, it is only ground for a motion to quash. *Tillard v. Commonwealth*, 13 Leg. Int. 132.

(d) See *Commonwealth v. Henry*, 2 Brewst. 566. *Commonwealth v. Byerly*, Ibid. 568. *Commonwealth v. Stacey*, 28 Leg. Int. 20. *Commonwealth v. Keenan*, 67 Penn. St. R. 203.

(e) A substantial defect is not cured by this section. *Commonwealth v. Hill*, 4 Luz. Obs. 54. *Phillips v. Commonwealth*, 44 Penn. St. R. 197. See *Fleming v. People*, 27 N. Y. 329.

(g) Formal defects must be taken advantage of, before the jury is sworn. *Phillips v. Commonwealth*, 44 Penn. St. R. 197. Afterwards, the indictment cannot be quashed, or the judgment arrested. *Commonwealth v. Frey*, 50 Penn.

St. R. 245. This clause does not prevent the defendant from demurring. *Commonwealth v. Galbraith*, 6 Phila. 281. And see *Commonwealth v. France*, 2 Brewst. 568.

(h) As to what defects are amendable, see *Commonwealth v. O'Brien*, 2 Brewst. 566. *Commonwealth v. Seymour*, Ibid. 567. *Commonwealth v. Lenox*, 3 Brewst. 249. *Commonwealth v. Kaus*, Ibid. 422. *Commonwealth v. Harris*, 3 Leg. Gaz. 306.

(i) Sections 11 to 22 are all new, and are, certainly, not the least important in the proposed amendments of our penal system. The history of criminal administration abounds with instances in which the guilty have escaped, by reason of the apparently unreasonable nicety required in indictments. Lord HALE, one of the best, and most humane of English judges, long since remarked, that such niceties were "grown to be a blemish and an inconvenience in the law, and the administration thereof; that more offenders escaped by the easy ear given to exceptions to indictments, than by the manifestations of their innocence, and that the grossest crimes had gone unpunished, by reason of these unseemly niceties." The reason for recognising these subtilities, by the common law, no doubt, arose from the humanity of the judges, who, in administering a system in which the punishment of death followed almost every conviction of felony, were naturally disposed, in favor of life, to hold the crown to the strictest rules. Since, however, the reform of the penal laws, and the just apportionment of punishment to crimes, according to their intrinsic atrocity and danger, the reason which led to the adoption of these technical niceties has ceased, and with the cessation of the reason, the technicalities themselves should be expunged from our system. The 11th section of this act proposes what the commissioners believe will

*Pennsylvania. Statutes*

# A Digest

OF THE

# LAWS OF PENNSYLVANIA,

FROM THE YEAR

## ONE THOUSAND SEVEN HUNDRED

TO THE TENTH DAY OF JULY,

## ONE THOUSAND EIGHT HUNDRED AND SEVENTY-TWO.

ORIGINALLY COMPILED BY

JOHN PURDON, Esq.

TENTH EDITION,

Revised, with Notes to the Judicial Decisions.

BY

FREDERICK C. BRIGHTLY, Esq.,

AUTHOR OF THE "UNITED STATES DIGEST," "FEDERAL DIGEST," ETC.

## VOL. I.

NEW YORK
PUBLIC
LIBRARY

PHILADELPHIA:

KAY & BROTHER, 17 AND 19 SOUTH SIXTH STREET,

LAW BOOKSELLERS, PUBLISHERS AND IMPORTERS.

1873.

B.A.

Digitized by Google

Add. 53



Search Result 6 of 13

Massachusetts. Municipal Court (Boston). *Two charges to the Grand jury of the county of Suffolk : for the Commonwealth of Massachusetts, at the opening of the terms of the Municipal ...* Boston, 1837. 30pp. *American Law: Practice & Procedure.*

Full Citation | eTable of Contents

Title Page

Page # 27 OR Image # 26 of 30 GO

Scale 33%

Rotate Original position

27

acts of violence and blood, committed in the streets of
our most populous cities, where we should expect to
witness the greatest proofs of civilization ?  In our own
Commonwealth, no person may go armed with a dirk,
dagger, sword, pistol, or other offensive and dangerous
weapon, without reasonable cause to apprehend an as-
sault or violence to his person, family, or property.*
Where the practice of wearing secret arms prevails, it in-
dicates either that the laws are bad ; or that they are not
executed with vigor ; or, at least, it proves want of con-
fidence in their protection.   It often leads to the sudden
commission of acts of atrocious injury ; and induces the
individual to rely for defence on himself, rather than on
society.  But how vain and impotent is the power of a
single arm, however skilled in the science of defence, to
protect its possessor from the many evil persons who
infest society.  The possession of a concealed dagger is
apt to produce an elation of mind, which raises itself
above the dictates both of prudence and law.   The pos-
sessor, stimulated by a sensitive notion of honor, and
constituting himself the sole judge of his rights, may sud-
denly commit a deed, for which a life of penitence will
hardly, even in his own estimation, atone.  When you
survey the society to which you belong, and consider the
various wants of its members ;—their numbers, their
variety of occupation and character,—their conflicting
interests and wants,—the multitudes who are idle and
unwilling to labor, or who are poor and dependent, and
cannot labor,—how many live by vice and plunder, and
how many derive a revenue from the arts of deceit and
corruption ;—what is it, permit me to ask, preserves the
common peace and safety ?  I know of no answer, but

* R. S. ch. 134, § 16.

**Source Library:** Harvard Law School Library



◄ ———— Image number 26 of 30 ———— ►

**Source Citation:** *Two charges to the Grand jury of the county of Suffolk : for the Commonwealth of Massachusetts, at the opening of the terms of the Municipal Court of the city of Boston, on Monday, December 5th, A.D. 1836, and on Monday, March 13th, A.D. 1837 / by Peter Oxenbridge Thacher.*

Add. 55

Boston, 1837. *The Making of Modern Law*. Gale. 2012. Gale, Cengage Learning. 08 June 2012
<http://galenet.galegroup.com/servlet/MOML?af=RN&ae=F3703347897&srchtp=a&ste=14>

**Gale Document Number:** F3703347897

Top of page



Search Result 6 of 13

Help | Search Tips | Gale Databases | Contact Us | Comments

Copyright and Terms of Use

Add. 56

SECTION 18.  If any person shall go armed with a dirk, dag- CHAP. 176.
ger, sword, pistol or pistols, or other offensive and dangerous Persons going
weapon, without reasonable cause to fear an assault or other armed to give
injury or violence to his person, or to his family or property, he security, &c.
may, on complaint of any other person having reasonable cause
to fear an injury or breach of the peace, be required to find
sureties for keeping the peace, for a term not exceeding six
months, with the right of appealing as before provided.

SECTION 19.  Whenever, upon an action brought on any such Court may re-
recognizance, the penalty thereof shall be adjudged forfeited, mit penalty.
the court may remit such portion of the penalty, on the petition
of any defendant, as the circumstances of the case shall render
just and reasonable.

SECTION 20.  Any surety in a recognizance to keep the peace, Surety may
or for good behavior, or both, shall have the same authority and surrender
right to take and surrender his principal, as if he had been bail principal.
for him in a civil cause, and upon such surrender, shall be dis-
charged and exempt from all liability for any act of the princi-
pal subsequent to such surrender, which would be a breach of the
condition of the recognizance, and the person so surrendered
may recognize anew, with sufficient sureties, before any justice
of the peace, for the residue of the term, and thereupon shall be
discharge l.

SECTION 21.  If any magistrate or officer mentioned in the When justice,
first section of this chapter, shall have any knowledge that any &c., to issue
assault and battery is about to be committed, or that any affray own knowl-
is about to occur, he shall forthwith issue a warrant and proceed edge.
as is directed when complaint has been made; and if any such
offense is committed, threatened, or attempted in his presence,
he shall immediately arrest the offender, or cause it to be done,
and for this purpose no warrant or process shall be necessary,
but the officer may summon to his assistance any sheriff, coro-
ner, or constable, and all other persons there present, whose duty
it shall be to aid the officer in preserving the peace, arresting
and securing the offenders, and all such as obstruct or prevent
the officer or any of his assistants in the performance of their
duty, and any person who shall, when summoned to aid in
arresting and securing an offender, refuse to give such assist-
ance, shall forfeit the sum of five dollars.

# CHAPTER CLXXVI.

## OF THE ARREST AND EXAMINATION OF OFFENDERS, COMMITMENT FOR
TRIAL, AND TAKING BAIL.

SECTION 1.  For the apprehension of persons charged with Officer empow-
offenses, the judges of the several courts of record, in vacation ered to enforce
as well as term time, court commissioners, and all justices of this chapter.
the peace, are authorized to issue process to carry into effect the
provisions of this statute.

SECTION 2.  Upon complaint made to any such magistrate, Complaint

Digitized by Google

* Long Islai. histor.
ne 5, 1911.

THE

# REVISED STATUTES

OF THE

# STATE OF WISCONSIN:

PASSED AT THE

ANNUAL SESSION OF THE LEGISLATURE COMMENCING

JAN. 13, 1858, AND APPROVED MAY 17, 1858.

TO WHICH ARE PREFIXED

## THE DECLARATION OF INDEPENDENCE

AND THE

## CONSTITUTIONS OF THE UNITED STATES AND THE STATE OF WISCONSIN.

### With an Appendix,

CONTAINING CERTAIN ACTS REQUIRED TO BE PUBLISHED THEREWITH.

Printed and Published pursuant to Law, under the Superintendence of one of the Revisers.

CHICAGO, ILL.:

## PUBLISHED BY W. B. KEEN.

1858.

Digitized by Google

# THE COMPILED

# LAWS OF WYOMING

INCLUDING ALL THE

LAWS IN FORCE IN SAID TERRITORY AT THE CLOSE OF
THE FOURTH SESSION OF THE LEGISLATIVE ASSEMBLY OF SAID
TERRITORY, TOGETHER WITH SUCH LAWS OF THE UNITED STATES
AS ARE APPLICABLE TO SAID TERRITORY; ALSO THE TREATIES MADE WITH
THE SIOUX AND SHOSHONE TRIBES OF INDIANS IN THE YEAR
1868; WITH A SYNOPSIS OF THE PRE-EMPTION, HOME-
STEAD AND MINING LAWS OF THE UNITED STATES.

PUBLISHED BY AUTHORITY OF THE ACT OF THE FOURTH LEGISLATIVE ASSEMBLY OF
SAID TERRITORY, ENTITLED
"AN ACT TO COMPILE AND PUBLISH THE LAWS OF WYOMING IN ONE VOLUME."

J. R. WHITEHEAD, SUPERINTENDENT OF COMPILATION.

H. GLAFCKE:
LEADER STEAM BOOK AND JOB PRINT, CHEYENNE, WYOMING.
1876.

Digitized by Google

# CHAPTER 52.

AN ACT to Prevent the Carrying of Fire Arms and Other Deadly Weapons.

*Be it enacted by the Council and House of Representatives of the Territory of Wyoming:*

**Carrying weapons within city, town or village limits, prohibited.** SECTION. 1. That hereafter it shall be unlawful for any resident of any city, town or village, or for any one not a resident of any city, town or village, in said Territory, but a sojourner therein, to bear upon his person, concealed or openly, any fire arm or other deadly weapon, within the limits of any city, town or village.

**Non-resident to be first notified.** SEC. 2. That if any person not a resident of any town, city or village of Wyoming Territory, shall, after being notified of the existence of this act by a proper peace officer, continue to carry or bear upon his person any fire arm or other deadly weapon, he or she, shall be deemed to be guilty of a violation of the provisions of this act and shall be punished accordingly.

**Violation of this act a misdemeanor.**

**Penalty.** SEC. 3. Any person violating any of the provisions of this act shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be punished by a fine of not less than five dollars nor more than fifty dollars, and, in the default of the payment of any fine which may be assessed against him, shall be imprisoned in the county jail for not less than five days nor more than twenty days.

**In force.** SEC. 4. This act shall take effect and be in force from and after its passage.

Approved, December 2nd, 1875.

Digitized by Google

# <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*6,779*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: June 22, 2012      /s/ Andrew C. White
                                     *Counsel for Amici Curiae*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 22nd day of June, 2012, I caused this Brief *Amici Curiae* of Legal Historians in Support of Appellants and Reversal to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Alan Gura
GURA & POSSESSKY, PLLC
101 North Columbus Street, Suite 405
Alexandria, Virginia  22314
(703) 835-9085

Cary Johnson Hansel, III
JOSEPH, GREENWALD &
 LAAKE, PA
6404 Ivy Lane, Suite 400
Greenbelt, Maryland  20770
(301) 220-2200

*Counsel for Appellants*

*Counsel for Appellants*

Matthew John Fader
OFFICE OF THE ATTORNEY GENERAL OF MARYLAND
200 Saint Paul Place
Baltimore, Maryland  21202
mfader@oag.state.md.us

*Counsel for Appellees*

I further certify that on this 22nd day of June, 2012, I caused the required copies of the Brief *Amici Curiae* of Legal Historians in Support of Appellants and Reversal to be hand filed with the Clerk of the Court.

/s/ Andrew C. White
*Counsel for Amici Curiae*