No. 12-1437

In The

# United States Court of Appeals for the Fourth Circuit

RAYMOND WOOLLARD, *et al.*,

Plaintiffs-Appellees,

v.

DENIS GALLAGHER, *et al.*,

Defendants-Appellants.

and

TERRENCE SHERIDAN,

Defendant.

On Appeal from the United States District Court
for the District of Maryland
No. 10-2068 (Legg, J.)

**BRIEF OF *AMICI CURIAE* THE BRADY CENTER TO PREVENT GUN
VIOLENCE, MARYLAND CHIEFS OF POLICE ASSOCIATION,
INTERNATIONAL BROTHERHOOD OF POLICE OFFICERS, AND
MAJOR CITIES CHIEFS ASSOCIATION IN SUPPORT OF APPELLANTS**

JONATHAN E. LOWY
DANIEL R. VICE
Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye Street, N.W., Suite 1100
Washington, D.C. 20005
Tel.: (202) 289-7319
Fax: (202) 371-9615

June 22, 2012

JONATHAN L. DIESENHAUS
S. CHARTEY QUARCOO
MATTHEW C. SULLIVAN
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Tel.: (202) 637-5600
Fax: (202) 637-5910

Counsel for *Amici Curiae*

# RULE 26.1 CERTIFICATION

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici* the Brady Center to Prevent Gun Violence, the Maryland Chiefs of Police Association, International Brotherhood of Police Officers, and Major Cities Chiefs Association make the following disclosure statement:

The Brady Center to Prevent Gun Violence, International Brotherhood of Police Officers, and Major Cities Chiefs Association are § 501(c)(3) non-profit corporations and no publicly held corporation holds their stock.  The Maryland Chiefs of Police Association is a § 501(c)(4) non-profit corporation, and no publicly held corporation holds its stock.

1.   Are the *amici* publicly held corporations or other publicly held entities?  No.

2.   Do the *amici* have any parent corporations?  No.

3.   Is 10% or more of the stock of any *amici* owned by a publicly held corporation or other publicly held entity?  No.

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  No publicly held corporation or other publicly held entity has a direct financial interest in the outcome of this litigation due to the participation of the *amici*.

5.   Does this case arise out of a bankruptcy proceeding?  No.

/s/ Jonathan L. Diesenhaus____
Jonathan L. Diesenhaus

**CONSENT TO FILE**

Pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure, *amici* received consent from all parties to file this brief. No party's counsel authored this brief in whole or in part. No party, party's counsel, or person other than *amici,* their members, or their counsel, contributed money intended to fund preparation and submission of this brief.

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST OF *AMICI CURIAE* ..................................................1

ARGUMENT ..........................................................................................................3

      I.     REGARDLESS OF WHETHER THE SECOND
            AMENDMENT APPLIES OUTSIDE THE HOME,
            MARYLAND'S REGULATIONS PASS THE
            APPROPRIATE LEVEL OF SCRUTINY. .........................................4

      II.    THE MARYLAND STATUTES DO NOT IMPLICATE
            PROTECTED SECOND AMENDMENT ACTIVITY .....................13

            A.     The District Court Erred by Using Dubious
                     "Signposts" To Read a Right To Carry Firearms
                     Outside the Home into Heller and McDonald. .........................14

            B.     The Right Recognized In *Heller* Is Subject To
                     Historical Restrictions and Prohibitions on Public
                     Carrying of Firearms. .................................................................21

            C.     Recognizing a Home-Based Right Is in Keeping
                       with the Historical Responsibility of the State to
                     Protect the Public Good. ...........................................................27

CONCLUSION ......................................................................................................28

CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Andrews v. State*,
    50 Tenn. 165 (1871)..................................................................... 23-24

*Aymette v. State*,
    21 Tenn. 154 (1840)..........................................................................26

*Bliss v. Commonwealth*,
    12 Ky. 90 (1822)..............................................................................26

*Commonwealth v. Robinson*,
    600 A.2d 957 (Pa. Super. Ct. 1991)..................................................10

*Commonwealth v. Romero*,
    673 A.2d 374 (Pa. Super. Ct. 1996)..................................................10

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)...................................................................*passim*

*Dorr v. Weber*,
    749 F. Supp. 2d 993 (N.D. Iowa 2010) ............................................20

*English v. State*,
    35 Tex. 473 (1871)....................................................................*passim*

*Ex parte Thomas*,
    97 P. 260 (Okla. 1908).....................................................................26

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ...........................................................15

*Fife v. State*,
    31 Ark. 455 (1876)...........................................................................25

*Gonzalez v. Village of W. Milwaukee*,
    No. 09CV0384, 2010 WL 1904977 (E.D. Wis. May 11, 2010)........................20

ii

*Hill v. State*,
   53 Ga. 472 (1874) ............................................................................25

*Kachalsky v. Cacace*,
   817 F. Supp. 2d 235 (S.D.N.Y. 2011) ............................................12, 15, 16, 19

*McDonald v. City of Chicago*,
   130 S. Ct. 3020 (2010) ................................................................*passim*

*Nunn v. State*,
   1 Ga. 243 (1846) ..............................................................................24

*People v. Mimes*,
   953 N.E.2d 55 (Ill. App. Ct. 2011) ......................................................7

*People v. Williams*,
   --- N.E.2d ----, 2011 WL 6945667 (Ill. App. Ct. Dec. 30, 2011) ........................7

*People v. Williams*,
   962 N.E.2d 1148 (Ill. App. Ct. 2011) ....................................................19

*People v. Yarbrough*,
   86 Cal. Rptr. 3d 674 (Cal. Ct. App. 2008) ............................................7

*Peruta v. Cnty. of San Diego*,
   758 F. Supp. 2d 1106 (S.D. Cal. 2010) ................................................12

*Piszczatoski v. Filko*,
   --- F. Supp. 2d ----, 2012 WL 104917 (D.N.J. Jan. 12, 2012) ...............12, 13, 19

*Richard v. County of Yolo*,
   821 F. Supp. 2d 1169 (E.D. Cal. 2011) ..............................................20

*Riddick v. United States*,
   995 A.2d 212 (D.C. 2010) ...............................................................20

*Robertson v. Baldwin*,
   165 U.S. 275 (1897) ...............................................................18, 21, 22

*Robertson v. City & Cnty. of Denver*,
   874 P.2d 325 (Colo. 1994) ................................................................5

iii

*State v. Buzzard*,
4 Ark. 18 (1842)............................................................................26

*State v. Cole*,
665 N.W. 2d 328 (Wis. 2003)...........................................................6

*State v. Dawson*,
159 S.E.2d 1 (N.C. 1968)..................................................................6

*State v. Hamdan*,
665 N.W.2d 785 (Wis. 2002).............................................................5

*State v. Jumel*,
13 La. Ann. 399 (1858)...................................................................26

*State v. Knight*,
218 P.3d 1177 (Kan. Ct. App. 2009) ...............................................19

*State v. Workman*,
35 W. Va. 367 (1891) .....................................................................26

*Trinen v. City of Denver*,
53 P.3d 754 (Colo. Ct. App. 2002) ................................................ 5-6

*United States v. Carter*,
669 F.3d 411 (4th Cir. 2012) ...........................................................4

*United States v. Chester*,
628 F.3d 673 (4th Cir. 2010) ..............................................6, 15, 21

*United States v. Hart*,
726 F. Supp. 2d 56 (D. Mass. 2010).............................................20

*United States v. Hayes*,
555 U.S. 415 (2009)..........................................................................2

*United States v. Laurent*,
--- F. Supp. 2d ----, 2011 WL 6004606 (E.D.N.Y. Dec. 2, 2011)......................20

*United States v. Mahin*,
668 F.3d 119 (4th Cir. 2012) ...........................................................3

*United States v. Masciandaro*,
   683 F.3d 458 (4th Cir. 2011) .....................................................................*passim*

*United States v. Moore*,
   666 F.3d 313 (4th Cir. 2012) ..................................................................... 3

*United States v. Staten*,
   666 F.3d 154 (4th Cir. 2011) ..................................................................... 4

*United States v. Tooley*,
   717 F. Supp. 2d 580 (S.D.W. Va. 2010).................................................. 20

*United States v. Walker*
   380 A.2d 1388 (D.C. 1977) ....................................................................... 7

*Williams v. State*,
   10 A.3d 1167 (Md. 2011), *cert. denied*, 132 S. Ct. 93
   (U.S. Oct. 3, 2011) .............................................................. 14, 16, 18

*Woollard v. Sheridan*,
   --- F.Supp.2d ----, 2012 WL 695674 (D. Md. Mar. 2, 2012) ....................*passim*

## STATUTES

720 ILCS 5/24-1...............................................................................................17

720 ILCS 5/24-1.6............................................................................................17

Ark. Act of Apr. 1, 1881 ................................................................................25

D.C. Code § 22-4504 ......................................................................................17

Kan., Ordinance No. 16, § XI ........................................................................25

Stat. of Northampton, 2 Edw. III, c.3 ...............................................22, 23, 24, 25

Tex. Act of Apr. 12, 1871 ..............................................................................25

Wyo. Comp. Laws ch. 52, § 1...............................................................25


**CONSTITUTIONAL PROVISIONS**

Ky. Const. of 1850, art. XIII, § 25.......................................................26

U.S. Const., amend. II...............................................................*passim*


**OTHER AUTHORITIES**

Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683
    (2007)..............................................................................................5

Charles C. Branas *et al.*, *Investigating the Link Between Gun Possession and
    Gun Assault*, 99 AMER. J. PUB. HEALTH 2034 (Nov. 2009) ................9

Darrell A.H. Miller, *Guns As Smut: Defending the Home-Bound Second
    Amendment*, 109 COLUM. L. REV. 1278 (2009)............................24, 28

David Hemenway & Deborah Azrael, *The Relative Frequency of Offensive
    and Defensive Gun Uses: Results From a National Survey*, 15 VIOLENCE
    & VICTIMS 257 (2000) .......................................................................8

David Hemenway, *Road Rage in Arizona: Armed and Dangerous*, 34
    ACCIDENT ANALYSIS AND PREVENTION 807-14 (2002) .....................10

David McDowall *et al.*, *Easing Concealed Firearms Laws: Effects on
    Homicide in Three States*, 86 J. CRIM. L. & CRIMINOLOGY 193 (1995) ...........8, 9

Dennis A. Henigan, *The* Woollard *Decision and the Lessons of the Trayvon
    Martin Tragedy*, 71 Md. L. Rev. ___ (forthcoming 2012)..................4

Don B. Kates, *Handgun Prohibition and the Original Meaning of the
    Second Amendment*, 82 MICH. L. REV. 204 (1983) ...........................27

Ernst Freund, *The Police Power, Public Policy and Constitutional Rights*
    (1904) ..............................................................................................27

Eugene Volokh, *The First and Second Amendments*, 109 COLUM. L. REV. SIDEBAR 97 (2009) ............................................................................25

Hashem Dezhbakhsh & Paul Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime*, 88 AM. ECON. REV. 468 (May 1998) ..........................................................................................................9

Hon. John Dillon, *The Right to Keep and Bear Arms for Public and Private Defense (Part 3),* 1 CENT. L. J. 259 (1874) ......................................................27

Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data*, 18 INT'L REV. L. & ECON. 239 (1998)............................8

Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 125 (1868) ..............26

John Donohue, *Guns, Crime, and the Impact of State Right-To-Carry Laws*, 73 FORDHAM L. REV. 623 (2004) ..........................................................................9

John Donohue, *The Impact of Concealed-Carry Laws, in* EVALUATING GUN POLICY EFFECTS ON CRIME AND VIOLENCE 289 (2003) ........................................8

John Norton Pomeroy, *An Introduction to the Constitutional Law of the United States* (1868) ..............................................................................................27

Lisa M. Hepburn & David Hemenway, *Firearm Availability and Homicide: A Review of the Literature*, 9 AGGRESSION & VIOLENT BEHAV. 417 (2004)........7

Mark Duggan, *More Guns, More Crime*, 109 J. POL'Y. ECON. 1086 (2001) ............7

Matthew Miller *et al.*, *Firearm Availability and Unintentional Firearm Deaths*, 33 ACCIDENT ANALYSIS & PREVENTION 477 (Jul. 2000) ........................7

Matthew Miller *et al.*, *Rates of Household Firearm Ownership and Homicide Across US Regions and States*, *1988–1997*, 92 AM. J. PUB. HEALTH 1988 (Dec. 2002) ....................................................................................7

Matthew Miller *et al.*, *State-Level Homicide Victimization Rates in the US in Relation to Survey Measures of Household Firearm Ownership, 2001-2003*, 64 SOC. SCI. & MED. 656 (Feb. 2007)..........................................................7

Patrick J. Charles, *The Faces of the Second Amendment Outside the Home*, 60 CLEVELAND ST. L. REV. 1 (2012)......................................................23, 24, 25

Patrick J. Charles, *Scribble Scrabble, The Second Amendment and Historical Guideposts: A Short Reply to Lawrence Rosenthal and Joyce Lee Malcolm,* 105 Nw. U. L. Rev. 1821 (2011).......................................................28

Philip Cook *et al.*, *Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. Rev. 1041 (2009) ...........................10

Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, 90 J. Pub. Econ. 379 (2006)...............................................................................................10

Violence Policy Center, *Concealed Carry Killers* (2011).........................................8

IN THE

# United States Court of Appeals for the Fourth Circuit

―――――――――

RAYMOND WOOLLARD, *et al.*,

Plaintiffs-Appellees,

v.

DENIS GALLAGHER, *et al.*,

Defendants-Appellants.

and

TERRENCE SHERIDAN,

Defendant.

―――――――――

On Appeal from the United States District Court
for the District of Maryland
No. 10-2068 (Legg, J.)

―――――――――

**BRIEF OF *AMICI CURIAE* THE BRADY CENTER TO PREVENT GUN VIOLENCE, MARYLAND CHIEFS OF POLICE ASSOCIATION, INTERNATIONAL BROTHERHOOD OF POLICE OFFICERS, AND MAJOR CITIES CHIEFS ASSOCIATION IN SUPPORT OF APPELLANTS**

―――――――――

<u>STATEMENT OF INTEREST OF *AMICI CURIAE*</u>

*Amicus* Brady Center to Prevent Gun Violence is the nation's largest non-partisan, non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy. Through its Legal Action Project, it has filed numerous *amicus curiae* briefs in cases involving firearms regulations,

including *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3095 n. 13, 3105 n. 30, 3107 n. 34 (2010) (Stevens, J., dissenting) (citing Brady Center brief), *United States v. Hayes*, 555 U.S. 415, 427 (2009) (citing Brady Center brief), and *District of Columbia v. Heller*, 554 U.S. 570 (2008). *Amicus* brings a broad and deep perspective to the issues raised here and has a compelling interest in ensuring that the Second Amendment does not impede reasonable governmental action to prevent gun violence.

*Amicus* The Maryland Chiefs of Police Association, Inc. ("MCPA") is a professional association with a membership of more than 350 Chiefs of Police, Sheriffs, other law enforcement members, directors of private security entities, and interested parties in related professions. Within their collective membership most of the 130 law enforcement agencies in Maryland are represented. Gun safety and regulation are critical to ensuring the well-being of officers who constantly find themselves in harm's way when protecting the public. Maryland's regulation of firearms is a critical component of protecting officers and the public. The MCPA has a compelling interest in maintaining the reasonable regulatory framework established by the General Assembly.

*Amicus* The International Brotherhood of Police Officers is one of the largest police unions in the country, representing more than 50,000 members.

*Amicus* Major Cities Chiefs Association is a professional association representing the largest cities in the United States and Canada. Its membership is comprised of chiefs and sheriffs of the 70 largest law enforcement agencies in those countries. They serve more than 76.5 million people (68 U.S., 8.5 Canada) with a combined sworn workforce of 177,150 (159,300 U.S., 17,850 Canada) officers.

## ARGUMENT

In *United States v. Masciandaro*, 683 F.3d 458, 475 (4th Cir. 2011), this Court warned against "push[ing] *Heller* beyond its undisputed core holding," which would "circumscribe the scope of popular governance, move the action into court, and encourage litigation in contexts we cannot foresee." This Court cautioned that Second Amendment interpretation "is serious business"—aggressive interpretations could be "responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights." *Id.* Thus *Masciandaro* advised entering the "vast *terra incognita*" of *Heller*'s scope "only upon necessity and only then by small degree." *Id.* On four separate occasions since then, this Court has continued to exercise caution concerning the Second Amendment's scope. *See United States v. Mahin*, 668 F.3d 119, 124 (4th Cir. 2012); *United States v. Moore*, 666 F.3d 313, 319 n.7

(4th Cir. 2012); *United States v. Carter*, 669 F.3d 411, 416 (4th Cir. 2012); *United States v. Staten*, 666 F.3d 154, 160 (4th Cir. 2011).

The District Court did not. Dennis A. Henigan, *The* Woollard *Decision and the Lessons of the Trayvon Martin Tragedy*, 71 Md. L. Rev. ___ (forthcoming 2012), manuscript at 3-5 (noting that *Woollard* "ignored the Fourth Circuit's wise counsel, as [it] distorted the *Heller* ruling beyond recognition"). It expanded *Heller*'s scope in an unprecedented way to apply "wherever [a] person happens to be" and not to "stop at one's front door" based on "signposts" it read into prior precedents. *Woollard v. Sheridan*, --- F.Supp.2d ----, 2012 WL 695674, at *6-7 (D. Md. Mar. 2, 2012). The District Court justified its foray into the *terra incognita* of the Second Amendment's scope on the basis of its conclusion that Maryland's permitting process could not survive intermediate scrutiny.

That conclusion is incorrect, rendering the foray into the Second Amendment's scope—which was substantively incorrect—unnecessary. The District Court should be reversed.

## I. REGARDLESS OF WHETHER THE SECOND AMENDMENT APPLIES OUTSIDE THE HOME, MARYLAND'S REGULATIONS PASS THE APPROPRIATE LEVEL OF SCRUTINY.

The District Court concluded that Maryland's permitting process did not satisfy intermediate scrutiny. *See Woollard*, 2012 WL 695674, at *5-6. That,

however, is wrong.  Maryland's permitting provisions satisfy the appropriate level of scrutiny, which alone warrants reversal.

"[A]s we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense."  *Masciandaro*, 683 F.3d at 470.  Thus, even assuming *arguendo* that *Heller* extends beyond the home, "a lesser showing" than strict scrutiny would be "necessary with respect to laws that burden the right to keep and bear arms outside of the home."  *Id.*  Indeed, requiring a tight means-ends fit runs counter to *Heller*'s recognition that legislatures retain "a variety of tools for combating" the "problem of handgun violence," *Heller*, 554 U.S. at 636, and its characterization—without any analysis, much less application of heightened scrutiny—of a host of existing firearms regulations as "presumptively lawful."  *Id.* at 626-27 & n.26.

Thus this Court rejected strict scrutiny for regulation of firearms outside the home and applied intermediate scrutiny—again, assuming that the Second Amendment applied at all in that context.[1]  *Masciandaro*, 638 F.3d at 471.  That

---

[1]     Courts construing analogous state rights to bear arms have long applied a "reasonable regulation" test.  *See* Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683, 686-87, n. 12 (2007) (describing "hundreds of opinions" by state supreme courts that adopted the "reasonableness" standard for right-to-bear-arms cases).  By that test, a state "may regulate the exercise of that right under its inherent police power so long as the exercise of that power is reasonable."  *Robertson v. City & Cnty. of Denver*, 874 P.2d 325, 328 (Colo. 1994).  Though more deferential than intermediate scrutiny, the test is more demanding than rational basis or Justice Breyer's "interest balancing" test, because it does not permit prohibition of all firearm ownership.  *State v. Hamdan*, 665 N.W.2d 785, 799 (Wis. 2002); *Trinen v. City of*

test requires a showing that the regulation at issue "is reasonably adapted to a substantial government interest." *Id.* "[I]ntermediate scrutiny does not require that a regulation be the least intrusive means of achieving the relevant government objective, or that there be no burden whatsoever on the individual right in question." *Id.* at 474. Instead, a "reasonable fit" is required. *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010).

Maryland's laws satisfy intermediate scrutiny. Maryland has a substantial interest in public safety. Indeed, "[a]lthough the government's interest need not be 'compelling' under intermediate scrutiny, cases have sometimes described the government's interest in public safety in that fashion." *Masciandaro*, 638 F.3d at 473. There are profound rationales for restricting guns in public:

> In his home, an individual generally may be better able to accurately assess a threat to his safety due to his familiarity with his surroundings and knowledge of his household's occupants. In public, however, there is no comparable familiarity or knowledge, and, thus, an increased danger that an individual carrying a loaded firearm will jump to inaccurate conclusions about the need to use a firearm for self-defense. The extensive training law enforcement officers undergo concerning the use of firearms attests to the degree of difficulty and level of skill necessary to competently assess potential threats in public situations and moderate the use of force.

---

*Denver*, 53 P.3d 754, 757 (Colo. Ct. App. 2002); *State v. Dawson*, 159 S.E.2d 1, 11 (N.C. 1968). The test properly focuses on whether "the restriction . . . is a reasonable exercise of the State's inherent police powers" and not "merely on whether any conceivable rationale exists under which the legislature may have concluded the law could promote the public welfare." *State v. Cole*, 665 N.W.2d 328, 338 (Wis. 2003).

*People v. Williams*, --- N.E.2d ----, 2011 WL 6945667 (Ill. App. Ct. Dec. 30, 2011) (quoting *People v. Mimes*, 953 N.E.2d 55, 77 (Ill. App. Ct. 2011)); *accord People v. Yarbrough*, 86 Cal. Rptr. 3d 674, 682 (Cal. Ct. App. 2008); *United States v. Walker*, 380 A.2d 1388, 1390 (D.C. 1977) (noting "inherent risk of harm to the public of such dangerous instrumentality being carried about the community and away from the residence or business of the possessor"). The carrying of firearms in public introduces risks not presented by firearm possession in the home. Three aspects are worthy of special note.

First, carrying firearms outside the home threatens the safety of a broader range of individuals. Firearms kept in the home are primarily a threat to their owners, family members, friends, and houseguests.[2] But firearms carried in public present a threat to strangers, law enforcement officers, random passersby, and other citizens. Such guns expose all members of society to great risks, as guns are used "far more often to kill and wound innocent victims than to kill and wound criminals . . . [and] far more often to intimidate and threaten than they are used to

---

[2] *See, e.g.*, Matthew Miller *et al.*, *State-Level Homicide Victimization Rates in the US in Relation to Survey Measures of Household Firearm Ownership, 2001-2003*, 64 Soc. Sci. & Med. 656 (Feb. 2007); Lisa M. Hepburn & David Hemenway, *Firearm Availability and Homicide: A Review of the Literature*, 9 Aggression & Violent Behav. 417 (2004); Matthew Miller *et al.*, *Rates of Household Firearm Ownership and Homicide Across US Regions and States*, *1988–1997*, 92 Am. J. Pub. Health 1988, 1988 (Dec. 2002); Mark Duggan, *More Guns, More Crime*, 109 J. Pol'y. Econ. 1086 (2001); Matthew Miller *et al.*, *Firearm Availability and Unintentional Firearm Deaths*, 33 Accident Analysis & Prevention 477 (Jul. 2000).

thwart crimes." David Hemenway & Deborah Azrael, *The Relative Frequency of Offensive and Defensive Gun Uses: Results From a National Survey*, 15 VIOLENCE & VICTIMS 257, 271 (2000). In the last four years, concealed handgun permit-holders have shot and killed over 400 people, including twelve law enforcement officers. *See* Violence Policy Center, *Concealed Carry Killers* (2011), http://vpc.org/ccwkillers.htm (last visited June 19, 2012). States have a stronger need to protect their citizens from individuals carrying guns in public than from individuals carrying guns in their homes.

Second, carrying firearms in public is not an effective form of self-defense and, in fact, has repeatedly been shown to *increase* the chances that one will fall victim to violent crime. Most states that enact laws broadly allowing concealed carrying of firearms in public appear to "experience increases in violent crime, murder, and robbery when [those] laws are adopted." John Donohue, *The Impact of Concealed-Carry Laws*, *in* EVALUATING GUN POLICY EFFECTS ON CRIME AND VIOLENCE 289, 320 (2003). Such laws "have resulted, if anything, in an *increase* in adult homicide rates." Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data*, 18 INT'L REV. L. & ECON. 239 (1998). Likewise, "firearms homicides increased in the aftermath of [enactment of these] laws," and may "raise levels of firearms murders" and "increase the frequency of homicide." David McDowall *et al.*, *Easing Concealed Firearms*

8

*Laws: Effects on Homicide in Three States*, 86 J. CRIM. L. & CRIMINOLOGY 193, 202-203 (1995). Similarly, "[f]or robbery, many states experience increases in crime" after concealed carry laws are enacted. Hashem Dezhbakhsh & Paul Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime*, 88 AM. ECON. REV. 468 (May 1998).

Analyses of the connection between increased gun prevalence and crime "indicate a rather substantial increase in robbery," John Donohue, *Guns, Crime, and the Impact of State Right-To-Carry Laws*, 73 FORDHAM L. REV. 623, 633 (2004), while "policies to *discourage* firearms in public may help prevent violence." McDowall *et al.*, *Easing Concealed Firearms Laws*, 86 J. CRIM. L. & CRIMINOLOGY at 203. Another study found that "gun possession by urban adults was associated with a significantly increased risk of being shot in an assault," and that "guns did not seem to protect those who possessed them from being shot in an assault." Charles C. Branas *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, 99 AMER. J. PUB. HEALTH 2034 (Nov. 2009). Likewise, another study found that:

> Two-thirds of prisoners incarcerated for gun offenses reported that the chance of running into an armed victim was very or somewhat important in their own choice to use a gun. Currently, criminals use guns in only about 25 percent of noncommercial robberies and 5 percent of assaults. If increased gun carrying among potential victims causes criminals to carry guns more often themselves, or become

quicker to use guns to avert armed self-defense, the end result could
be that street crime becomes more lethal.

Philip Cook *et al.*, *Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. REV. 1041, 1081 (2009).

Third, the carrying of firearms in public portends societal ills not implicated by firearms in the home. For one, if drivers are allowed to carry loaded guns, road rage can become a more serious and potentially deadly phenomenon. David Hemenway, *Road Rage in Arizona: Armed and Dangerous*, 34 ACCIDENT ANALYSIS AND PREVENTION 807-14 (2002). And an increase in gun prevalence in public may cause an intensification of criminal violence. Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, 90 J. PUB. ECON. 379, 387 (2006).

Further, law enforcement's ability to protect themselves and the public could be greatly restricted if officers were required to presume that a person carrying a firearm in public was doing so lawfully. When the carrying of guns in public is restricted, "possession of a concealed firearm by an individual in public is sufficient to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the individual and briefly detain him in order to investigate whether the person is properly licensed." *Commonwealth v. Robinson*, 600 A.2d 957, 959 (Pa. Super. Ct. 1991); *accord Commonwealth v. Romero*, 673 A.2d 374, 377 (Pa. Super. Ct. 1996). By contrast, under an expansive Second

Amendment regime, an officer might not be deemed to have cause to arrest, search, or stop a person seen carrying a loaded gun, even though far less risky behavior could justify police intervention. Law enforcement should not have to wait for a gun to be fired before protecting the public.

States have significant interests in averting the spike in gun crimes and accidental shootings that result from unrestricted public carrying. Maryland's laws are well-tailored to accomplish its interests in fostering a safe public sphere for all.

The District Court disagreed, characterizing Maryland's laws as a "rationing system." *Woollard*, 2012 WL 695674, at \*11. It acknowledged that "each possibility" above "presents an unquestionable threat to public safety," but nevertheless considered Maryland's permitting process to "do[] no more to combat them than would a law indiscriminately limiting the issuance of a permit to every tenth applicant." *Id.* As such, the District Court found that Maryland "simply make[s] th[e] right more difficult to exercise," which could not "be considered 'reasonably adapted' to a government interest, no matter how substantial that interest may be." *Id.*

That is incorrect for at least two reasons. First, Maryland's system does more than "indiscriminately" limit the issuance of permits. Instead, like other states with similar laws, it "calls for individualized, case-by-case determinations regarding whether full-carry permit applicants have an actual and articulable—

rather than merely speculative, potential, or even specious—need for self-defense."
*Kachalsky v. Cacace*, 817 F. Supp. 2d 235, 271 (S.D.N.Y. 2011); *accord Peruta v. Cnty. of San Diego*, 758 F. Supp. 2d 1106, 1117 (S.D. Cal. 2010).[3] As such, Maryland does not "*simply* mak[e] th[e] right more difficult to exercise." *Woollard*, 2012 WL 695674, at *11 (emphasis added). Instead, its laws serve an important function of determining whether individuals have a bona fide need to carry a firearm in public.

And second, in reviewing Maryland's laws, "[t]he judiciary's role is 'to assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence,'" *Piszczatoski v. Filko*, --- F. Supp. 2d ----, 2012 WL 104917, at *21 (D.N.J. Jan. 12, 2012), because "it is the job of the legislature, not the Court, to weigh the conflicting evidence and make policy choices (within constitutional parameters)." *Kachalsky*, 817 F. Supp. 2d at 272. The District Court, however, constitutionalized a policy decision rightfully left to the legislature when it concluded that "Maryland's 'good and substantial reason' requirement will not prevent those who meet it from having their guns taken from

---

[3] The District Court suggested that cases involving concealed carry might be distinguishable. *See Woollard*, 2012 WL 695675, at *12 & n.11. But "[n]otwithstanding the emphasis placed on the interest in regulating concealed carry, the same rationales apply equally, or almost equally, to the regulation of open carry." *Kachalsky*, 817 F. Supp. 2d at 270.

them, or from accidentally shooting themselves or others, or from suddenly turning to a life of crime." *Woollard*, 2012 WL 695674, at *11.

That narrow view erroneously assumes that Maryland's responsibility for safety can be fulfilled only by controlling the behavior of specific individuals with guns.  It fails to consider the reasonable conclusion that limiting public carry of firearms to those with a genuine need for it will *in the aggregate* promote public safety. Maryland may make the "reasonable inference that given the obviously dangerous and deadly nature of handguns, requiring a showing of particularized need for a permit to carry one publicly serves the State's interests in public safety." *Piszczatoski*, 2012 WL 104917, at *21.  The District Court's disagreement with that inference does not elevate its policy preference to constitutional right.

By substituting its policy judgments for that of the Maryland legislature, the District Court applied intermediate scrutiny erroneously, perforce rendering its interpretation of *Heller*'s scope superfluous.  This alone warrants reversal, but there is more.  The District Court's analysis of the Second Amendment's scope was not only unnecessary, but wrong.

## II.    THE MARYLAND STATUTES DO NOT IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY.

If the Court reaches the issue of the Second Amendment's scope, it should follow Maryland's highest court and courts across the nation that have

overwhelmingly recognized that *Heller* does not extend beyond the home or restrict the state's police-power authority to regulate public gun carrying. *See, e.g.*, *Williams v. State*, 10 A.3d 1167, 1177 (Md. 2011), *cert. denied*, 132 S. Ct. 93 (2011).

### A. The District Court Erred by Using Dubious "Signposts" To Read a Right To Carry Firearms Outside the Home into Heller and McDonald.

The District Court found four "signposts" from *Heller* that supposedly "point to the conclusion" that the Second Amendment "is not limited to the home":

- Because *Heller* described the home as the place where the need for self-defense "is most acute," there must be a place where it is "not most acute."

- The right was understood to allow for militia membership and hunting, neither of which is a "household activity."

- The word "bear" indicates that the right "does not stop at one's front door."

- Describing certain restrictions as "presumptively" lawful implies that they must "pass muster under a heightened standard of review."

*Woollard*, 2012 WL 695674, at *7.

That is wrong for at least four reasons. First, it overstates the probative value of the "signposts." Second, it ignores the evidence from *Heller* indicating that it did *not* embrace a broad right to carry firearms outside the home. Third, it misses the growing consensus among district and state courts that *Heller* does not

14

extend beyond the home.  And fourth, it fails to undertake the "historical inquiry

. . . to determine whether the conduct at issue was understood to be within the

scope of the right at the time of ratification" required by *Chester*.  628 F.3d at 680.

The District Court overstated the value of its "signposts."  *Heller*'s deeming

of the right as "most acute" in the home did not implicitly suggest a "less acute"

right everywhere else.  That suggests that the Court kept the broadest, most

extensive part of its holding unspoken—a small tail wagging an enormous dog.

*Heller*'s inclusion of gun bans in "sensitive places" among its non-exhaustive list

of presumptively lawful regulations simply counseled courts to not strike down

certain existing firearms laws, including federal law barring guns in federal

courthouses.  554 U.S. at 626.  Reading that language as implying a right to carry

in non-sensitive places utterly ignores the Court's statement that those examples

are only examples in a non-exhaustive list.  *Ezell v. City of Chicago*, 651 F.3d 684

(7th Cir. 2011), provides an example of a "less acute" right to carry guns outside

the home—there, for required training—related to the "core" right.

Further, *Heller*'s discussion of "bear" as carrying arms for confrontation

merely supported the Court's conclusion that the right is not limited to militia use

("public" confrontation) but allows for use in "private" confrontation.  Nowhere

does that discussion suggest that the right may be exercised outside the home.  *See*

*Kachalsky*, 817 F. Supp. 2d at 262 ("This textual interpretation does not stand on

its own, however, but rather appears within the context of, and is provided solely to support, the Court's holding that the Second Amendment gives rise to an individual right, rather than a collective right connected to service in a militia."); *Williams*, 10 A.3d at 1177. As for the Court's discussion of hunting, "[t]his argument too is unavailing, as hunting does not involve handguns, and therefore falls outside the ambit of the challenged statute." *Kachalsky*, 817 F. Supp. 2d at 263.

The theory that labeling firearms regulations "presumptively lawful" somehow implies heightened scrutiny fails to explain how the Court could conclude—without substantive analysis—that "nothing" in its most expansive exposition of gun rights could be "taken to cast doubt on" those regulations if previously-unused heightened scrutiny was now to apply. *Heller*, 554 U.S. at 626. Nor did the District Court reconcile that interpretation of *Heller*'s "presumptively valid," historically-recognized gun regulations with Justice Scalia's explicit statement in *McDonald* that "traditional restrictions go to show the *scope* of the right." 130 S. Ct. at 3056 (Scalia, J., concurring) (emphasis added).

"Signposts" aside, the Court's only discussion of where the right can be exercised was in its holding: The Second Amendment protects "the right of law-abiding, responsible citizens to use arms *in defense of hearth and home*." *Heller*, 554 U.S. at 635 (emphasis added). The Court recognized only the right "to carry []

16

in the home," *id.*, and did not endorse the carrying of firearms in public.  It focused

on the historical recognition of the right of individuals "to keep and bear arms to

defend their homes, families or themselves," *id.* at 615 (internal quotation marks

omitted), and the continuing need to keep and use firearms "in defense of hearth

and home."  *Id.* at 635.  Thus it held no more than that "the District's ban on

handgun possession *in the home* violates the Second Amendment, as does its

prohibition against rendering any lawful firearm *in the home* operable for the

purpose of immediate self-defense."  *Id.* at 635 (emphasis added).

       *Heller* consistently took care to limit its holding to the home, and the District

Court's "signposts" cannot explain why the Court expounded upon a host of gun

laws not directly at issue, yet left untouched the District's laws that barred (and

still bar) Mr. Heller from carrying guns in public.  Indeed, the Court's repeated

statements that it was only granting him a right to "carry [] in the home," against

the backdrop of the District's laws, *Heller* at 635; *see also* D.C. Code § 22-4504,

indicates that the right *is* confined to the home.  *McDonald* was no different.  It

"repeat[ed]" *Heller*'s "assurances" about its limited scope, and reiterated that "state

and local experimentation with reasonable firearms regulations will continue under

the Second Amendment."  *McDonald*, 130 S. Ct. at 3046-47 (internal citation

omitted).  And again, even though Illinois, like the District, barred carrying

firearms in public—whether openly or concealed, *see* 720 ILCS 5/24-1, 5/24-1.6—

the *McDonald* Court cast its holding as limited to the home, despite being otherwise willing to venture beyond the scope of the question presented.

In addition, *Heller* expressly approved of decisions upholding concealed carry bans, and never cast doubt on the Court's statement in *Robertson v. Baldwin*, 165 U.S. 275, 281-82 (1897), that "the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapon." The District Court never explained why the Court explicitly outlined this limit, yet left only Rorschach-blot "signposts" to point courts toward concluding that some form of public carrying must be permitted.

Courts across the country agree that *Heller* and *McDonald*'s holdings go no further than the home. Maryland's highest court, for example, held:

> *Heller* and *McDonald* emphasize that the Second Amendment is applicable to statutory prohibitions against home possession, the dicta in *McDonald* that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home," notwithstanding. Although Williams attempts to find succor in this dicta, it is clear that prohibition of firearms in the home was the gravamen of the certiorari questions in both *Heller* and *McDonald* and their answers. If the Supreme Court, in this dicta, meant its holding to extend beyond home possession, it will need to say so more plainly.

*Williams*, 10 A.3d at 1177 (quoting *McDonald*, 130 S. Ct. at 3044). This Court has echoed that note of caution, noting:

> This is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial

18

chambers we miscalculated as to Second Amendment rights. It is not far-fetched to think the *Heller* Court wished to leave open the possibility that such a danger would rise exponentially as one moved the right from the home to the public square.

*Masciandaro*, 638 F.3d at 475.

Other federal courts have also cabined *Heller* to the home. A district court, for instance, rejected a challenge to New Jersey's strong restrictions on open and concealed gun carrying, holding that "the Second Amendment does not include a general right to carry handguns outside the home." *Piszczatoski*, 2012 WL 104917, at *3; *see also Kachalsky*, 817 F. Supp. 2d at 261, 264 (noting that "a right to carry a concealed weapon under the Second Amendment has not been recognized to date" and open carrying "is likewise outside the core Second Amendment concern articulated in *Heller:* self-defense in the home").

State appellate courts beyond Maryland have also agreed that *Heller* is confined to the home. *See, e.g.*, *People v. Williams*, 962 N.E.2d 1148, 1152 (Ill. App. Ct. 2011) ("[T]he rulings in both *Heller* and *McDonald* made clear that the only type of firearms possession they were declaring to be protected under the second amendment was the right to possess handguns in the home for self-defense purposes."); *State v. Knight*, 218 P.3d 1177, 1189 (Kan. Ct. App. 2009) ("It is clear that the [*Heller*] Court was drawing a narrow line regarding the violations related solely to use of a handgun in the home for self-defense purposes."). At least 40

19

courts have either concluded that the Second Amendment does not extend beyond the home or upheld restrictions or prohibitions on public carrying. [4]

Thus the vast majority of courts have limited *Heller* to the home. The District Court barely acknowledged this robust body of case law, *see Woollard*, 2012 WL 695674, at *7 n.9, focusing instead on its theory that because self-defense is associated with the Second Amendment (and self-defense could happen anywhere), the Amendment must apply everywhere.

The appeal of that argument is its syllogistic simplicity.[5] But as shown above, it has no basis in law. Not only does it embrace an overreaching interpretation of *Heller*, it fails to conduct the actual inquiry required by this Court with respect to the Second Amendment's scope. In this Circuit, the question of

---

[4]      *See, e.g.*, *United States v. Laurent*, --- F. Supp. 2d ----, 2011 WL 6004606, at *22 (E.D.N.Y. Dec. 2, 2011) ("The right to self-defense in the home belongs to 'law-abiding citizens for lawful purposes.' It does not prohibit government regulation of firearms outside of the home . . . ." (quoting *Heller*, 554 U.S. at 627)); *Richard v. County of Yolo*, 821 F. Supp. 2d 1169, 1174 & n.4 (E.D. Cal. 2011); *Gonzalez v. Village of W. Milwaukee*, No. 09CV0384, 2010 WL 1904977, at *4 (E.D. Wis. May 11, 2010) ("The Supreme Court has never held that the Second Amendment protects the carrying of guns outside the home."); *Dorr v. Weber*, 749 F. Supp. 2d 993, 1005 (N.D. Iowa 2010) ("[A] right to carry a concealed weapon under the Second Amendment has not been recognized to date."); *United States v. Hart*, 726 F. Supp. 2d 56, 60 (D. Mass. 2010); *United States v. Tooley*, 717 F. Supp. 2d 580, 596 (S.D.W. Va. 2010) ("[P]ossession of a firearm outside of the home or for purposes other than self-defense in the home are not within the 'core' of the Second Amendment right as defined by *Heller*."); *Riddick v. United States*, 995 A.2d 212, 222 (D.C. 2010).

[5] Of course, that simple logic runs into the obvious problem that *Heller* never recognized a Second Amendment right extending everywhere. Judge Niemeyer's minority opinion in *Masciandaro* acknowledged this, concluding that the right "extends in some form to wherever those activities or needs [such as self-defense] occur" but also, without explanation, that the right is not "all-encompassing such that it extends to all places . . . , as the Supreme Court has explicitly recognized." 638 F.3d at 468.

"whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee" is a "historical inquiry" that "seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification." *Chester*, 628 F.3d at 680. The District Court's syllogisms and "signposts," however, fail to engage with any history. That alone warrants reversal, but if this Court sees fit to undertake the *Chester* inquiry, history supports a conclusion that the right does not extend beyond the home.

**B.    The Right Recognized In *Heller* Is Subject To Historical Restrictions and Prohibitions on Public Carrying of Firearms.**

The Supreme Court has stated that the Second Amendment was a preexisting right, "inherited from our English ancestors . . . subject to certain well-recognized exceptions . . . which continue to be recognized as if they had been formally expressed." *Robertson*, 165 U.S. at 281; *see also Heller*, 554 U.S. at 592-95, 600-03, 605-19, 626-28 (tracing the right to bear arms through Anglo-American origins and state analogues); *McDonald*, 130 S. Ct. at 3056 ("[T]raditional restrictions" on the Second Amendment "show the scope of the right," just as they do "for *other* rights.") (Scalia, J., concurring). Thus "determining the limits on the scope of the right is necessarily a matter of historical inquiry," *Chester*, 628 F.3d at 678, since *Heller* did not "cast doubt on longstanding prohibitions" in the history of Anglo-American jurisprudence. *Heller*, 554 U.S. at 626.

Among the "longstanding prohibitions" cited in *Heller* were "prohibitions on carrying concealed weapons." *Id.*; *see also Robertson*, 165 U.S. at 281-82 ("[T]he right of the people to keep and bear arms . . . is not infringed by laws prohibiting the carrying of concealed weapons . . . ."). *Heller* also recognized the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,' " a limitation historically construed to allow for prohibitions on the public carrying of handguns. *Id.*

*Heller* cited as authority for this "historical tradition" the 19th-century case of *English v. State*, 35 Tex. 473 (1871) (cited in *Heller*, 554 U.S. at 627), in which the Texas Supreme Court upheld a conviction for carrying a pistol in public under a statute banning the public carry of deadly weapons, including handguns. In reaching that conclusion, the court traced the history of analogous statutes, noting that Blackstone had characterized "the offense of riding around or going around with dangerous or unusual weapons" as a crime. 35 Tex. at 476. The *English* Court did not stop with Blackstone; it traced the roots of such statutes back further through "the statute of Northampton (2 Edward III, c.3)," the "early common law of England," and even to "the laws of Solon" in ancient Greece. *Id.* The court was dismissive of the argument that the Second Amendment prohibited such laws, noting that it was "useless to talk about personal liberty being infringed by laws such as that under consideration." *Id.* at 477. As such, it was a "little short of

ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into a church . . . or any other place where ladies and gentlemen are congregated together." *Id.* at 478-79. Accordingly, the historic scope of the right to keep and bear arms properly includes the understanding that restricting and—as seen in *English*—the banning of public carry was not understood to implicate the right.[6]

As *English* recognized, among the chief historical guideposts that point to the ability and responsibility of the state to protect the public good through the regulation of public carry of arms is the Statute of Northampton. That statute "stipulated that no person shall 'go nor ride armed by Night nor by Day in Fairs, Markets, nor in the Presence of the Justices or other Ministers nor in no Part elsewhere,' and was a staple in the American legal system before and after the adoption of the Constitution." Patrick J. Charles, *The Faces of the Second Amendment Outside the Home*, 60 CLEVELAND ST. L. REV. 1, 8 (2012) (hereinafter Charles, *Outside the Home*) (quoting 2 Edw. 3, c.3 (1328) (Eng.)). As such, the Statute of Northampton regulated publicly "carrying arms by itself," because "the act of arming in the public concourse . . . terrified the people" of its own force. *Id.*

---

[6]     *Heller* cited two other 19th-century cases that struck down severe restrictions, both of which involved laws that could prohibit the carrying of guns in the home. *Andrews v. State*, 50

at 20.[7]  Consistent with the well-accepted principle that "the authority to ensure the public peace rested with the local government authorities," similar statutes and decrees extended throughout the English realm through the sixteenth century.  *See generally id.* at 11-23.

*English* also recognized that restrictions and prohibitions on public carrying were widespread: "It is safe to say that almost, if not every one of the states of this Union have a similar law upon their statute books, and, indeed, so far as we have been able to examine them, they are more rigorous than the act under consideration."  35 Tex. at 479.  Indeed, the Statute of Northampton, and its principle of restricting or prohibiting the public carrying of arms, "was expressly incorporated by Massachusetts, North Carolina, and Virginia in the years immediately after the adoption of the Constitution."  Charles, *Outside the Home*, at 31-32.  North Carolina adopted the Statute "almost verbatim," prohibiting "going armed at night or day 'in fairs, markets, nor in the presence of the King's Justices, or other ministers, *nor in no part elsewhere*.'"  *Id.* at 32.  As such, the historical guideposts of the Statute of Northampton and its counterparts throughout England

---

Tenn. 165, 188–189 (1871); *Nunn v. State*, 1 Ga. 243, 246 (1846).

[7]     *See also* Darrell A.H. Miller, *Guns As Smut: Defending the Home-Bound Second Amendment*, 109 COLUM. L. REV. 1278, 1318 n.246 (2009) (noting that Blackstone compared the Statute of Northampton to "the laws of Solon," under which "every Athenian was finable who walked about the city in armour") (quoting 2 William Blackstone, Commentaries *149).

and early America indicate that historical sources support a construction of the Second Amendment that properly preserves the ability of state and local governments to regulate and prohibit the public carrying of arms.[8]

That same historic recognition of the Second Amendment's limits holds true across the country, including Wyatt Earp's prohibition on gun carrying in Dodge City. *See* Dodge City, Kan., Ordinance No. 16, § XI (Sept. 22, 1876); 1876 Wyo. Comp. Laws ch. 52, § 1 (1876 Wyoming law prohibiting anyone from "bear[ing] upon his person, concealed or openly, any firearm or other deadly weapon, within the limits of any city, town or village"); Ark. Act of Apr. 1, 1881; Tex. Act of Apr. 12, 1871; *Fife v. State*, 31 Ark. 455 (1876) (upholding carrying prohibition as a lawful "exercise of the police power of the State without any infringement of the constitutional right" to bear arms); *Hill v. State*, 53 Ga. 472, 474 (1874) ("at a loss to follow the line of thought that extends the guarantee"—the state constitutional "right of the people to keep and bear arms"—"to the right to carry pistols, dirks, Bowieknives, and those other weapons of like character, which, as all admit, are

---

[8] Some have argued that the Statute of Northampton was "understood by the Framers as covering only those circumstances where carrying of arms was unusual and therefore terrifying." Eugene Volokh, *The First and Second Amendments*, 109 COLUM. L. REV. SIDEBAR 97, 101 (2009), http://www.columbialawreview.org/Sidebar/volume/109/97_Volokh.pdf. Such an interpretation is at odds with *English*—relied on by *Heller*—and "make[s] false assumptions as to what behavior the Statute of Northampton sought to prevent." Charles, *Outside the Home*, at 9. Indeed, "no historian has found any substantiating evidence supporting the Second Amendment extended to preparatory self-defense among the public concourse." *Id.* at 35. "Such claims are based on a mythical Second Amendment rather than historical reality." *Id.*

the greatest nuisances of our day."); *State v. Workman*, 35 W. Va. 367, 373 (1891);

*Ex parte Thomas*, 97 P. 260, 262 (Okla. 1908) ("Practically all of the states under

constitutional provisions similar to ours have held that acts of the Legislatures

against the carrying of weapons concealed did not conflict with such constitutional

provision denying infringement of the right to bear arms, but were a valid exercise

of the police power of the state."); *Aymette v. State*, 21 Tenn. 154, 159-61 (1840)

("The Legislature, therefore, have a right to prohibit the wearing or keeping

weapons dangerous to the peace and safety of the citizens, and which are not usual

in civilized warfare, or would not contribute to the common defence."); *State v.

Buzzard*, 4 Ark. 18, 21 (1842); *State v. Jumel*, 13 La. Ann. 399, 400 (1858).[9]

Noted scholars and commentators have also long recognized that a right to

keep and bear arms does not prevent states from restricting or forbidding guns in

public places.  For example, John Norton Pomeroy's Treatise, which *Heller* cited

as representative of "post-Civil War 19th-century sources" commenting on the

right to bear arms, 554 U.S. at 618, stated that the right to keep and bear arms "is

certainly not violated by laws forbidding persons to carry dangerous or concealed

---

[9]     *Bliss v. Commonwealth*, 12 Ky. 90, 91, 93 (1822), in which Kentucky's Supreme Court held Kentucky's concealed-weapons ban in conflict with its Constitution, is recognized as an exception to this precedent.  *See* Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 125, at 75-76 (1868).  In fact, the legislature later corrected the anomalous decision by amending its constitution to allow a concealed weapons ban.  *See* Ky. Const. of 1850, art. XIII, § 25.

weapons . . . ."  John Norton Pomeroy, *An Introduction to the Constitutional Law of the United States* 152-53 (1868).  Similarly, Judge John Dillon explained that even where there is a right to bear arms, "the peace of society and the safety of peaceable citizens plead loudly for protection against the evils which result from permitting other citizens to go armed with dangerous weapons."  Hon. John Dillon, *The Right to Keep and Bear Arms for Public and Private Defense (Part 3),* 1 CENT. L.J. 259, 287 (1874).  And an authoritative study published in 1904 concluded that the Second Amendment and similar state constitutional provisions had "not prevented the very general enactment of statutes forbidding the carrying of concealed weapons," which demonstrated that "constitutional rights must if possible be so interpreted as not to conflict with the requirements of peace, order and security."  Ernst Freund, *The Police Power, Public Policy and Constitutional Rights* (1904).[10]

C. **Recognizing a Home-Based Right Is in Keeping with the Historical Responsibility of the State to Protect the Public Good.**

As the *English* court explained, prohibiting the public carry of deadly weapons was consistent with "one of the undisputed functions of government"—

---

[10]     An authority cited by *Heller* on the Second Amendment's original meaning concluded that the only public carrying of firearms protected by the Amendment "is such transportation as is implicit in the concept of a right to possess—*e.g.*, transporting them between the purchaser or owner's premises and a shooting range, or a gun store or gun smith and so on." Don B. Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 267 (1983).

namely, "to take precautions against crime before it has been committed"—and that there existed a "right inherent in society to ward off crimes against itself by antecedent precautions." 35 Tex. at 478. Such "restrictions began appearing on the carrying or using of 'arms' as a means to prevent public injury" since "the Norman Conquest." Patrick J. Charles, *Scribble Scrabble, The Second Amendment and Historical Guideposts: A Short Reply to Lawrence Rosenthal and Joyce Lee Malcolm,* 105 Nw. U. L. Rev. 1821, 1822 (2011); *see also* Miller, *supra*, at 1351, 1354 (2009). To hold that the Constitution dictates that public carry *must* be permitted carves into stone a rule that ties the hands of states and prevents them from adopting arms regulations which have been recognized since antiquity as a way in which government protects the public good.

## CONCLUSION

For all of the foregoing reasons, as well as those contained in Appellants' brief, this Court should reverse the decision of the District Court.

Respectfully submitted,

/s/ Jonathan L. Diesenhaus
JONATHAN L. DIESENHAUS
S. CHARTEY QUARCOO
MATTHEW C. SULLIVAN
Hogan Lovells US LLP
555 13th Street, N.W.
Washington, D.C. 20004
(202) 637-5600

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that this brief contains 6977 words, excluding the portions of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.


/s/ Jonathan L. Diesenhaus_____
Jonathan L. Diesenhaus

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of June, 2012, the foregoing Brief for Amici Curiae was filed with the Court's ECF system, which will send notice of this filing to the following registered CM/ECF users:

Alan Gura
GURA & POSSESSKY, PLLC
Suite 405
101 North Columbus Street
Alexandria, VA 22314-0000
Telephone: 703-835-9085
Email: alan@gurapossessky.com

Matthew John Fader
OFFICE OF THE ATTORNEY
GENERAL OF MARYLAND
200 St. Paul Place
Baltimore, MD 21202
Email: mfader@oag.state.md.us

Cary Johnson Hansel, III
JOSEPH, GREENWALD & LAAKE,
PA
Suite 400
6404 Ivy Lane
Greenbelt, MD 20770-0000
Telephone: 301-220-2200
Email: chansel@jgllaw.com

/s/ Jonathan L. Diesenhaus_____
Jonathan L. Diesenhaus