No. 12-1437

# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**RAYMOND WOOLLARD, *et al.*,**

*Plaintiffs-Appellees,*

**v.**

**DENIS GALLAGHER, *et. al.*,**

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Maryland
(Benson E. Legg, District Judge)

## BRIEF OF THE AMERICAN PUBLIC HEALTH ASSOCIATION AND AMERICAN COLLEGE OF PREVENTIVE MEDICINE AS AMICI CURIAE IN SUPPORT OF APPELLANTS AND REVERSAL

JASON M. ST. JOHN
JENNIFER A. DEROSE
Saul Ewing LLP
500 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
Tel. 410-332-8862

Counsel for Amici Curiae
The American Public Health
Association and American
College of Preventive Medicine

Date: June 22, 2012

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, amici, the American Public Health Association and the American College of Preventive Medicine make the following disclosure statement:

Each of the above-named amici is a non-profit corporation.

1. Are the amici publicly held corporations or other publicly held entities? No.

2. Do the amici have any parent corporations? No.

3. Is 10% or more of the stock of amici owned by a publicly held corporation or other publicly held entity? No.

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))? No.

5. [Not Applicable]

6. Does this case arise out of a bankruptcy proceeding? No.

/s/  Jason M. St. John
Jason M. St. John

# TABLE OF CONTENTS

STATEMENT OF INTEREST OF AMICUS CURIAE ........................................... 1

SUMMARY OF ARGUMENT ............................................................. 2

ARGUMENT .......................................................................... 4

I.   FIREARMS, PARTICULARLY HANDGUNS, ARE ASSOCIATED WITH A
     SUBSTANTIAL PUBLIC HEALTH BURDEN IN THE UNITED STATES; CARRYING OF
     FIREARMS IN PUBLIC IS ASSOCIATED WITH RISKS TO COMMUNITIES AND LAW
     ENFORCEMENT ................................................................. 4

II.  LOOSENING RESTRICTIONS ON CARRYING OF FIREARMS IN PUBLIC TO A RIGHT-
     TO-CARRY (ALSO CALLED SHALL-ISSUE) SYSTEM IS NOT ASSOCIATED WITH
     REDUCTIONS IN HOMICIDE OR VIOLENT CRIMES; SOME EVIDENCE SUGGESTS
     THAT RIGHT-TO-CARRY LAWS ARE ASSOCIATED WITH AN INCREASE IN
     VIOLENT CRIME .............................................................. 8

III. FIREARMS ARE ASSOCIATED WITH MANY MORE HOMICIDES AND VIOLENT
     CRIMES EACH YEAR THAN THE BEST ESTIMATES OF DEFENSIVE USES OF
     FIREARMS .................................................................. 10

IV.  MAKING IT EASIER TO OBTAIN A CARRY PERMIT, VIA A RIGHT-TO-CARRY
     REGIME, WOULD MAKE IT MORE DIFFICULT FOR POLICE TO ENGAGE IN
     PROVEN STRATEGIES THAT REDUCE VIOLENT CRIME IN HIGH RISK
     NEIGHBORHOODS ............................................................. 13

V.   CRITERIA FOR OBTAINING A CARRY PERMIT THAT ARE BASED SOLELY ON AN
     APPLICANT'S ELIGIBILITY TO OWN A FIREARM WILL NOT IDENTIFY ALL
     INDIVIDUALS LIKELY TO BE AT HIGHER RISK WHEN CARRYING A FIREARM IN
     PUBLIC .................................................................... 16

CONCLUSION ....................................................................... 20

# TABLE OF AUTHORITIES

**OTHER AUTHORITIES**

Abhay Aneja et al., *The Impact of Right-to-Carry Laws and the NRC Report: Lessons for the Empirical Evaluation of Law and Policy*, 13 Am. L. & Econ. Rev. 565 (2011)...............................................................................9

Albert J. Reiss et al., *Understanding and Preventing Violence* (1993)..................11

*Concealed Carry Killers,* Violence Policy Center (May 31, 2012), http://www.vpc.org/ccwkillers.htm ................................................. 18

Craig Perkins, *National Crime Victimization Survey: Weapon Use and Violent Crime* (U.S. Dept. of Justice Sept. 2003), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/wuvc01.pdf.........................................5

*Crime in the United States: Expanded Homicide Data Table 15*, Federal Bureau of Investigation, http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/tables/10shrtbl15.xls (last visited June 21, 2012) ................................................................................. 13

*Crime in the United States:  Expanded Homicide Data Table 20,* Federal Bureau of Investigation, http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/tables/10tbl20.xls (last visited June 21, 2012) ................................................................................................6

*Crime in the United States: Law Enforcement Officers Killed and Assaulted, Table 27*, Federal Bureau of Investigation, http://www.fbi.gov/about-us/cjis/ucr/leoka/leoka-2010/tables/table27-leok-feloniously-type-of-weapon-01-10.xls (last visited June 21, 2012) .....................................................6

*Crime in the United States:  Murder by State, Types of Weapons, Table 20*, Federal Bureau of Investigation, http://www2.fbi.gov/ucr/cius2009/data/table_20.html (last visited June 21, 2012) ................................................................................................6

David Hemenway et al., *Gun use in the United States: Results from Two National Surveys*, 6 Injury Prevention 263 (2000) ............................................ 11

David Hemenway, *Survey Research and Self-Defense Gun Use: An Explanation of Extreme Overestimates*, 87 J. Crim. L. & Criminology 1430 (1997)................................................................................. 11, 12

David Hemenway & Deborah Azrael, *The Relative Frequency of Offensive and Defensive Gun Uses: Results from a National Survey*, 15 Violence and Victims 257 (2000).................................................................... 12

David McDowall & Brian Wiersema, *The Incidence of Defensive Firearm Use by US Crime Victims, 1987 Through 1990*, 84 Am. J. Pub. Health 1982 (1994)...................................................................................... 13

Deanna L. Wilkinson & Patrick J. Carr, *Violent Youths' Responses to High Levels of Exposure to Community Violence: What Violent Events Reveal About Youth Violence*, 36 J. Cmty. Psychol. 1026 (2008)............................... 7, 8

Edmund F. McGarrell et al., *Reducing Firearms Violence Through Directed Police Patrol*, 1 Criminology & Pub. Pol'y 119 (2001).................................... 15

Franklin E. Zimring & Gordon Hawkins, *Crime is Not the Problem: Lethal Violence in America* (1999) ........................................................... 7, 8

Franklin E. Zimring, *Is Gun Control Likely to Reduce Violent Killings?*, 35 U. Chi. L. Rev. 721 (1968) ...................................................................7

Garen J. Wintemute et al., *Prior Misdemeanor Convictions as a Risk Factor for Later Violent and Firearm-Related Criminal Activity among Authorized Purchasers of Handguns*, 280 JAMA 2083 (1998) ....................... 17

Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense With a Gun*, 86 J. Crim. L. & Criminology 150 (1995)........................................................................................... 10

Ian Ayers & John J. Donohue, *Shooting Down the More Guns, Less Crime Hypothesis*, 55 Stan. L. Rev. 1193 (2003)........................................... 10

Jacqueline Cohen & Jens Ludwig, *Policing Crime Guns*, in *Evaluating Gun Policy* 217 (Jens Ludwig & Philip J. Cook eds., 2003).................................... 15

James D. Wright & Peter H. Rossi, *Armed and Considered Dangerous* (1986)............................................................................................5

James Q. Wilson, *Just Take Away Their Guns: Forget Gun Control*, N. Y. Times Magazine, Mar. 20, 1994, at 46. ........................................... 14

iv

Jennifer L. Truman, *National Crime Victimization Survey: Criminal Victimization, 2010* (U.S. Dept. of Justice Sept. 2011), *available at* http://www.bjs.gov/content/pub/pdf/cv10.pdf.......................................................5

Jessica K. Witt & James R. Brockmole, *Action Alters Identification: Wielding a Gun Increases the Bias to See Guns*, J. Experimental Psychol.: Human Perception and Performance (forthcoming 2012)...................8

John R. Lott & David Mustard, *Crime, Deterrence and Right-to-Carry Concealed Handguns*, 26 J. of Legal Stud. 1 (1997)...........................................9

Katherine A. Vittes et al., *Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership*, Injury Prevention (forthcoming 2012)........................................................................ 18

Lawrence W. Sherman et al., *The Kansas City Gun Experiment: National Institute of Justice Research in Brief* (U.S. Dept. of Justice Jan. 1995), *available at* https://www.ncjrs.gov/pdffiles/kang.pdf ........................................ 15

Matthew Miller et al., *Rates of Household Firearm Ownership and Homicide Across US Regions and States, 1988-1997*, 92 Am. J. Pub. Health 1988 (2002) ...............................................................................................7

Matthew Miller et al., *State-Level Homicide Rates in the US in Relation to Survey Measures of Household Firearm Ownership, 2001-2003*, 64 Soc. Sci. & Med. 656 (2007) ............................................................................................7

Mona A. Wright & Garen J. Wintemute, *Felonious or Violent Criminal Activity that Prohibits Firearm Ownership Among Prior Purchasers of Handguns: Incidence and Risk Factors*, 69 J. Trauma 948 (2010)................... 18

National Research Council, *Firearms and Violence: A Critical Review* (Charles F. Wellford et al. eds., 2005)................................................................9

Philip J. Cook et al., *Criminal Records of Homicide Offenders*, 294 JAMA 598 (2005) ................................................................................................... 17, 18

Philip J. Cook et al., *The Gun Debate's New Mythical Number: How Many Defensive Uses Per Year?* 16 J. Po'y Analysis & Mgmt. 463 (1997)............... 13

Philip J. Cook & Jens Ludwig, *Gun Violence: The Real Costs* (2000)....................5

Philip J. Cook & Jens Ludwig, *Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use* (1996) 11, 12

*Web-based Injury Statistics Query and Reporting System (WISQARS) Cost of Injury Reports*, Centers for Disease Control, http://wisqars.cdc.gov:8080/costT/ (last updated May 2, 2012) ..........................5

*Web-based Injury Statistics Query and Reporting System (WISQARS) Fatal Injury Reports*, Centers for Disease Control, http://www.cdc.gov/injury/wisqars/fatal.html (last updated Dec. 1, 2011) .... 4, 7

*Web-based Injury Statistics Query and Reporting System (WISQARS) Non-Fatal Injury Reports*, Centers for Disease Control, http://www.cdc.gov/injury/wisqars/nonfatal.html (last updated Dec. 19, 2010) .....................................................................................................................4

## STATEMENT OF INTEREST OF AMICUS CURIAE

The American Public Health Association and the American College of Preventive Medicine respectfully submit this brief as amici curiae.[1] The amici's interest in this case is in providing the Court with information that supports the public safety justification for laws limiting the carrying of firearms in public.

The American Public Health Association ("APHA") is the oldest and most diverse organization of public health professionals in the world and has been working to improve public health since 1872. The Association aims to protect all Americans, their families and their communities from preventable, serious health threats and strives to assure that community-based health promotion and disease prevention activities and preventive health services are universally accessible in the United States. APHA represents a broad array of health professionals and others who care about their own health and the health of their communities.

The American College of Preventive Medicine ("ACPM") is the national professional society for physicians committed to disease prevention and health promotion. ACPM's 2,000 members are engaged in preventive medicine practice, teaching, and research. Many serve on ACPM committees and task forces and

---

[1] Pursuant to Federal Rule of Appellate Procedure 29, amici certify that all parties have consented to the filing of this brief. Amici further certify that no party's counsel authored the brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person other than amici, their members or their counsel, contributed money that was intended to fund preparing or submitting the brief.

represent preventive medicine in national forums, contributing to the organization's role as a major national resource of expertise in disease prevention and health promotion. ACPM was established in 1954. Its members are specialists in preventive medicine and are uniquely trained in both clinical medicine and public health. They have the skills needed to understand and reduce the risks of disease, disability, and death in individuals and in population groups.

## SUMMARY OF ARGUMENT

The public health burden associated with firearms in the United States is profound. There were more than 55,000 firearm-related homicides and assaultive injuries in the U.S. in 2009. Another 337,000 violent crimes were committed with a firearm in 2010.

Much of the societal burden of firearms is associated with handguns. Their easy concealability makes handguns the firearms of choice for criminals. Handguns are associated with the majority of firearm homicides, felonious law enforcement officer shootings, and other firearm-related violent crimes. In Maryland alone, more than 95% of the more than 300 firearm-related homicides in 2009 were committed with a handgun. Carrying of handguns in public places can produce an effect analogous to a disease contagion, in which persons feel the need to arm themselves – and to more readily fire those weapons – when they perceive that others are also carrying firearms.

2

Yet some have argued that carrying of handguns in public places by carry permit holders is associated with beneficial societal outcomes, specifically reductions in violent crime. However, the best available research indicates that right-to-carry ("RTC") laws do not produce reductions in violent crime, and are likely associated with increases in aggravated assaults. A National Research Council panel of experts has concluded that research by John Lott and others, suggesting reductions in violent crime associated with RTC laws, is unpersuasive. Similarly, research suggesting that law-abiding citizens use firearms millions of times per year to prevent a criminal attack is likely to greatly exaggerate such defensive gun uses. The best available evidence suggests that there are many more violent crimes per year with firearms than there are defensive uses by law-abiding citizens.

One goal of laws restricting who may obtain a firearm carrying permit is to reduce the likelihood that potentially high-risk persons will be able to lawfully carry firearms in public. But the minimum standards applicable to the purchase and possession of firearms may not adequately distinguish the truly law-abiding from higher-risk persons. This is especially important for purposes of determining who should be permitted to engage in the potentially risky activity of carrying firearms in public. For example, a study in Illinois showed that although a large

majority of homicide offenders had prior criminal records, only 43% would have been prohibited from possessing firearms as a result of a prior felony conviction.

The amici believe that the data and research summarized in its brief may assist the Court in considering the public health implications of the case at issue. This information helps to bolster the public safety justification for laws limiting carrying of firearms in public.

**ARGUMENT**

## I. FIREARMS, PARTICULARLY HANDGUNS, ARE ASSOCIATED WITH A SUBSTANTIAL PUBLIC HEALTH BURDEN IN THE UNITED STATES; CARRYING OF FIREARMS IN PUBLIC IS ASSOCIATED WITH RISKS TO COMMUNITIES AND LAW ENFORCEMENT

Gun violence has long been a significant public safety and social problem in the U.S., and the societal burden associated with firearms is substantial. In 2009, gun violence resulted in 11,493 homicides and an additional estimated 44,466 assaultive gunshot injuries serious enough to warrant a hospital emergency room visit. *Web-based Injury Statistics Query and Reporting System (WISQARS) Fatal Injury Reports*, Centers for Disease Control, http://www.cdc.gov/injury/wisqars/fatal.html (last updated Dec. 1, 2011); *Web-based Injury Statistics Query and Reporting System (WISQARS) Non-Fatal Injury*

4

*Reports*, Centers for Disease Control, http://www.cdc.gov/injury/wisqars/nonfatal.html (last updated Dec. 19, 2010).

The lifetime medical and lost productivity costs from U.S. homicide and assaultive shootings totaled an estimated $19.2 billion in 2009. *Web-based Injury Statistics Query and Reporting System (WISQARS) Cost of Injury Reports*, Centers for Disease Control, http://wisqars.cdc.gov:8080/costT/ (last updated May 2, 2012). When lost quality of life, psychological and emotional trauma, decline in property values, and other societal and legal consequences are taken into account, the cost is likely much higher. Philip J. Cook & Jens Ludwig, *Gun Violence: The Real Costs* (2000).

Guns are also used to threaten and coerce; in fact, most crimes committed with guns do not result in physical injuries or death. This is demonstrated by the large number of non-fatal violent crimes – an estimated 337,960 in 2010 – committed with guns each year. Jennifer L. Truman, *National Crime Victimization Survey: Criminal Victimization, 2010* 8 (U.S. Dept. of Justice Sept. 2011), *available at* http://www.bjs.gov/content/pub/pdf/cv10.pdf.

The easy concealability of handguns makes them the firearms of choice among criminals. Most firearms used in non-fatal violent crimes and homicides are handguns. James D. Wright & Peter H. Rossi, *Armed and Considered Dangerous* 161-63 (1986). Between 1993 and 2001, an estimated 87% of violent crimes

committed with a gun were committed with a handgun. Craig Perkins, *National Crime Victimization Survey: Weapon Use and Violent Crime* 3 (U.S. Dept. of Justice Sept. 2003), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/wuvc01.pdf. In 2010, handguns were used in about 89% of gun homicides in which the type of gun was known. *Crime in the United States: Expanded Homicide Data Table 20,* Federal Bureau of Investigation, http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/tables/10tbl20.xls (last visited June 21, 2012). In addition, in 2010, 98% of law enforcement officers who were feloniously killed in the line of duty were killed with a firearm. Sixty-nine percent of these firearm-related homicides of law enforcement officers were committed with a handgun. *Crime in the United States: Law Enforcement Officers Killed and Assaulted, Table* 27, Federal Bureau of Investigation, http://www.fbi.gov/about-us/cjis/ucr/leoka/leoka-2010/tables/table27-leok-feloniously-type-of-weapon-01-10.xls (last visited June 21, 2012).

In Maryland alone, there were 316 homicides with a firearm in 2009. *Web-based Injury Statistics Query and Reporting System (WISQARS) Fatal Injury Reports, supra.* Of these, more than 95% were committed with a handgun. *Crime in the United States: Murder by State, Types of Weapons, Table 20,* Federal Bureau of Investigation, http://www2.fbi.gov/ucr/cius2009/data/table_20.html (last

visited June 21, 2012). Maryland's rate of firearm homicide (5.54 per 100,000) ranks as the 4th highest among states in the nation. *Web-based Injury Statistics Query and Reporting System (WISQARS) Fatal Injury Reports*, *supra*. States and regions with higher rates of gun ownership have higher rates of homicide, even after controlling for rates of poverty, urbanization, alcohol and drug use, and non-fatal crime. Matthew Miller et al., *State-Level Homicide Rates in the US in Relation to Survey Measures of Household Firearm Ownership, 2001-2003*, 64 Soc. Sci. & Med. 656 (2007); Matthew Miller et al., *Rates of Household Firearm Ownership and Homicide Across US Regions and States, 1988-1997*, 92 Am. J. Pub. Health 1988 (2002). There is no clear evidence that the presence of a firearm increases the likelihood that an altercation or crime will occur, but use of a firearm greatly increases the likelihood that the outcome of an altercation will be lethal. Franklin E. Zimring & Gordon Hawkins, *Crime is Not the Problem: Lethal Violence in America* 114 (1999). Research shows that assaults with firearms are five times more deadly than assaults with knives, which are the second most lethal type of weapon. Franklin E. Zimring, *Is Gun Control Likely to Reduce Violent Killings?*, 35 U. Chi. L. Rev. 721, 733 (1968).

The perception that one's peers have and are willing to use guns often motivates people to carry and use guns themselves. Deanna L. Wilkinson & Patrick J. Carr, *Violent Youths' Responses to High Levels of Exposure to*

*Community Violence: What Violent Events Reveal About Youth Violence*, 36 J. Cmty. Psychol. 1026, 1040 (2008); Franklin E. Zimring & Gordon Hawkins, *supra*, at 113. Because neither party wants to be the second one to reach for a gun, the presence or perception that a gun is present in an altercation can lead combatants to be more inclined to shoot someone who could potentially pose a deadly threat. Deanna L. Wilkinson & Patrick J. Carr, *supra*, at 1040. Moreover, recent research suggests that simply holding a gun causes one to be more likely to assume that others are also holding guns and, thus, to engage in threat-induced behavior. Jessica K. Witt & James R. Brockmole, *Action Alters Identification: Wielding a Gun Increases the Bias to See Guns*, J. Experimental Psychol.: Human Perception and Performance (forthcoming 2012).

## II. LOOSENING RESTRICTIONS ON CARRYING OF FIREARMS IN PUBLIC TO A RIGHT-TO-CARRY (ALSO CALLED SHALL-ISSUE) SYSTEM IS NOT ASSOCIATED WITH REDUCTIONS IN HOMICIDE OR VIOLENT CRIMES; SOME EVIDENCE SUGGESTS THAT RIGHT-TO-CARRY LAWS ARE ASSOCIATED WITH AN INCREASE IN VIOLENT CRIME

In an effort to counter the profound public health and societal burden of firearms, some have argued that allowing most individuals to carry weapons outside of their homes, through RTC laws, is actually associated with societal benefits, specifically a reduction in violent crime. This argument is not supported by the best available research.

Over the past 15 years, a relatively large body of research on the effects of RTC laws has emerged. Research by John Lott, Jr. suggests that RTC laws have led to significant reductions in violent crime. John R. Lott & David Mustard, *Crime, Deterrence and Right-to-Carry Concealed Handguns*, 26 J. of Legal Stud. 1 (1997). But the research showing crime-reducing effects of RTC laws, including Lott's, has been carefully reviewed by a 2005 National Research Council (part of the U.S. National Academies of Science) panel of experts and found to be unpersuasive. As a result, the National Research Council concluded: "… with the current evidence it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." National Research Council, *Firearms and Violence: A Critical Review* 150 (Charles F. Wellford et al. eds., 2005).

The most thorough examinations of Lott's research identified the following serious flaws: errors in the crime data used; incorrect data on RTC laws; failure to control for the effects of police and incarceration levels; failure to control for the confounding effects of the emergence of crack cocaine in the late 1980s and early 1990s; and the use of statistical techniques which rest upon assumptions later proven to be incorrect. Abhay Aneja et al., *The Impact of Right-to-Carry Laws and the NRC Report: Lessons for the Empirical Evaluation of Law and Policy*, 13 Am. L. & Econ. Rev. 565 (2011); National Research Council, *supra*, at 150; Ian

Ayers & John J. Donohue, *Shooting Down the More Guns, Less Crime Hypothesis*, 55 Stan. L. Rev. 1193 (2003).

In the most comprehensive study of the effects of RTC laws, published after the National Research Council report, Aneja and colleagues first provide evidence of the flaws in much of the prior research on RTC laws. They then correct these errors in their analyses. In the models which best addressed the flaws in prior studies, and used the most up-to-date data, the only statistically significant effects of RTC laws indicated that RTC laws were associated with small increases in rates of aggravated assaults (1.5 to 4.3 percent) and rapes (1.2 to 2.6 percent). There was no credible evidence in these analyses that RTC laws affect other types of crime. Abhay Aneja et al., *supra*, at 603.

### III. FIREARMS ARE ASSOCIATED WITH MANY MORE HOMICIDES AND VIOLENT CRIMES EACH YEAR THAN THE BEST ESTIMATES OF DEFENSIVE USES OF FIREARMS

To justify eliminating restrictions on carrying of firearms in public, some have claimed that firearms are used millions of times each year by law-abiding citizens to defend against criminal attacks. In fact, Gary Kleck has argued that firearms are used as often as 2.5 million times per year to prevent an actual or threatened criminal attack. This estimate comes from a telephone survey of approximately 5,000 U.S. adults conducted in 1993. Other telephone surveys have yielded similar estimates. Gary Kleck & Marc Gertz, *Armed Resistance to Crime:*

*The Prevalence and Nature of Self-Defense With a Gun*, 86 J. Crim. L. & Criminology 150 (1995).

Telephone surveys may be, however, an ill-suited methodology for estimating defensive gun use, potentially overstating estimates by orders of magnitude. David Hemenway, *Survey Research and Self-Defense Gun Use: An Explanation of Extreme Overestimates*, 87 J. Crim. L. & Criminology 1430, 1437-38 (1997). One research team whose telephone survey estimates were similar to Kleck's even concluded that the methodology producing those estimates was prone to bias that likely greatly exaggerated the number of defensive gun uses. Philip J. Cook & Jens Ludwig, *Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use* 71 (1996).

One reason survey-based estimates are likely to greatly overestimate the incidence of defensive gun use is that survey respondents may not be completely objective or accurate in assessing whether their actions with a gun were truly "defensive." Albert J. Reiss et al., *Understanding and Preventing Violence* 266 (1993). For example, a survey by Harvard researchers asked a nationally representative sample of adults to describe their interpersonal encounters with firearms. Respondents were twice as likely to report that they had initiated a hostile or offensive use of a gun than they were to report a defensive use of a gun. More than two-thirds of these incidents were unprovoked acts of aggression or a

response to an argument. David Hemenway & Deborah Azrael, *The Relative Frequency of Offensive and Defensive Gun Uses: Results from a National Survey*, 15 Violence and Victims 257, 260 (2000). In a separate article based on these survey data, the researchers asked criminal court judges to review the respondents' descriptions of their "defensive" gun uses. The majority of these incidents were deemed by the judges to have been most likely illegal uses of the guns. David Hemenway et al., *Gun use in the United States: Results from Two National Surveys*, 6 Injury Prevention 263, 265 (2000).

In addition, survey-based estimates often produce findings that are not consistent with known facts about gun violence. For example, survey respondents' statements about whether they wounded or killed their attacker—if true—would imply more gun uses *alone* than *all causes* of firearm-related deaths and serious non-fatal injuries in the United States, as identified by commonly-accepted national vital statistics data. Cook & Ludwig, *Guns in America, supra*, at 71; Hemenway, *Survey Research and Self-Defense Gun Use, supra*, at 1442.

By comparison, the National Crime Victimization Survey (NCVS) is a nationally representative household survey conducted by the U.S. Department of Justice. It now includes approximately 40,000 households and 75,000 persons interviewed twice per year. Although not designed specifically to address defensive gun use (survey respondents are asked about defensive acts after they

report being the victim of a crime), the survey suggests many fewer defensive gun uses per year than violent crimes with guns. For example, one analysis of NCVS data indicated an average of just 64,615 self-defensive uses of guns per year by crime victims from 1987 to 1990, compared with more than 800,000 persons victimized by an offender with a gun in 1990. David McDowall & Brian Wiersema, *The Incidence of Defensive Firearm Use by US Crime Victims, 1987 Through 1990*, 84 Am. J. Pub. Health 1982, 1983 (1994). A later analysis using NCVS data estimated the number of defensive gun uses per year at approximately 108,000—still far fewer than the number of gun crimes. Philip J. Cook et al., *The Gun Debate's New Mythical Number: How Many Defensive Uses Per Year?*, 16 J. Pol'y Analysis & Mgmt. 463, 468 (1997). Finally, the FBI reported just 232 "justifiable homicides" by a private citizen with a firearm nationwide in 2010. *Crime in the United States: Expanded Homicide Data Table 15*, Federal Bureau of Investigation, http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2010/crime-in-the-u.s.-2010/tables/10shrtbl15.xls (last visited June 21, 2012).

In sum, the more reliable data suggest that a gun is much more likely to be used in a crime than in legitimate self-defense.

**IV. MAKING IT EASIER TO OBTAIN A CARRY PERMIT, VIA A RIGHT-TO-CARRY REGIME, WOULD MAKE IT MORE DIFFICULT FOR POLICE TO ENGAGE IN PROVEN STRATEGIES THAT REDUCE VIOLENT CRIME IN HIGH RISK NEIGHBORHOODS**

In 1994, noted criminologist James Q. Wilson argued that one of the most effective ways to reduce violent crime would be to target the illegal carrying of firearms in high crime public places (also called "hot spots"). James Q. Wilson, *Just Take Away Their Guns: Forget Gun Control*, N. Y. Times Magazine, Mar. 20, 1994, at 46. Since then, police departments across the country have focused increased attention on illegal weapons carrying. Several of these efforts have been subjected to rigorous scientific evaluation. In sum, research indicates that these law enforcement strategies are among the most effective means of reducing violence in high crime areas, without simply shifting that violence to neighboring areas. However, allowing nearly anyone to obtain a permit to carry a concealed weapon, under an RTC system, could seriously threaten the use of this lifesaving police tactic.

From July 1992 to January 1993, police in Kansas City conducted what came to be known as the "Kansas City Gun Experiment." Police first identified a particularly high crime part of the city and then conducted extra patrols in that area. The patrols were devoted exclusively to identifying and confiscating illegally-carried firearms, whether in cars or on the street. Police used a number of different techniques to identify potentially unlawful concealed weapon carriers, including stop-and-frisks when reasonable suspicion that a weapon was present could be articulated, and searches incident to a lawful arrest. During the twenty-

nine week period in which the special patrols were conducted, the number of guns seized increased by 65% and gun crime declined 49%, compared with the prior twenty-nine weeks. Importantly, neighboring areas of Kansas City experienced no significant changes, suggesting that crime had not merely shifted to nearby places. Lawrence W. Sherman et al., *The Kansas City Gun Experiment: National Institute of Justice Research in Brief* 6, 7 (U.S. Dept. of Justice Jan. 1995), *available at* https://www.ncjrs.gov/pdffiles/kang.pdf.

Research conducted in two other cities, examining similar gun-carrying suppression efforts by police, have also produced impressive results. In Indianapolis, during a 90-day period in 1997, police focused on stopping vehicles in two high-crime neighborhoods. In the neighborhood in which police specifically targeted illegal firearms, the number of guns seized increased by 50% compared with 1996 levels. Homicides in the intervention area declined from 11 in 1996 to just 1 in 1997, with no significant change in non-intervention comparison neighborhoods. Edmund F. McGarrell et al., *Reducing Firearms Violence Through Directed Police Patrol*, 1 Criminology & Pub. Pol'y 119, 135-36 (2001). Similarly, in Pittsburgh special police units targeting gun carrying were associated with a 71% reduction in assault-related gun-shot wounds treated in hospitals in 1998. Jacqueline Cohen & Jens Ludwig, *Policing Crime Guns*, in *Evaluating Gun Policy* 217, 220 (Jens Ludwig & Philip J. Cook eds., 2003).

The ability for police to conduct these targeted gun-carrying suppression efforts may depend, in part, on the legal regime in place. When most firearm carrying in public is illegal, it is much easier for police to justify focusing on this presumptively unlawful activity. However, when virtually anyone legally permitted to own a firearm may carry that weapon in public, the potential deterrence associated with these police patrols may be substantially limited. In addition, police may find it more difficult to articulate a reasonable suspicion that an illegal activity is occurring – to justify a stop and frisk – when much weapon carrying in public becomes legal.

## V. CRITERIA FOR OBTAINING A CARRY PERMIT THAT ARE BASED SOLELY ON AN APPLICANT'S ELIGIBILITY TO OWN A FIREARM WILL NOT IDENTIFY ALL INDIVIDUALS LIKELY TO BE AT HIGHER RISK WHEN CARRYING A FIREARM IN PUBLIC

One goal of laws restricting who may obtain a firearm carrying permit is to reduce the likelihood that potentially high-risk persons will be allowed to lawfully carry firearms in public. But the minimum standards applicable to the purchase and possession of firearms may not adequately distinguish the law-abiding from higher-risk persons, for purposes of determining who should be permitted to engage in the societally risky activity of carrying of firearms in public.

In fact, research shows that certain groups of legal firearm purchasers have higher rates of subsequent criminal offending than others, supporting the argument

for greater restrictions on carrying of firearms in public. Philip J. Cook et al., *Criminal Records of Homicide Offenders*, 294 JAMA 598 (2005); Garen J. Wintemute et al., *Prior Misdemeanor Convictions as a Risk Factor for Later Violent and Firearm-Related Criminal Activity among Authorized Purchasers of Handguns*, 280 JAMA 2083 (1998). For example, researchers in California examined the effects on handgun purchasers of a new state law that prohibited purchase for persons previously convicted of a violent misdemeanor. Individuals whose handgun purchase applications were denied were less likely to commit a new crime of violence than were violent misdemeanants whose applications had been approved during the years just prior to the new restriction. Garen J. Wintemute et al., *Prior Misdemeanor Convictions as a Risk Factor for Later Violent and Firearm-Related Criminal Activity among Authorized Purchasers of Handguns*, 280 JAMA 2083 (1998). A similar study of legal handgun purchasers in California found that handgun purchasers who had previously been arrested but not convicted of a crime were nine times more likely to subsequently commit a serious violent crime (e.g., murder, rape, robbery, aggravated assault) than were handgun purchasers who had no prior criminal history. Mona A. Wright & Garen J. Wintemute, *Felonious or Violent Criminal Activity that Prohibits Firearm Ownership Among Prior Purchasers of Handguns: Incidence and Risk Factors*, 69 J. Trauma 948 (2010).

A recent study looked at the criminal histories of state prison inmates who used a gun in their offense in 13 states with the least restrictive firearm laws. Study findings showed that 29% of the offenders would have been prohibited from purchasing or possessing a firearm prior to committing the offense that landed them in state prison had the exclusionary criteria in their states been broader. Importantly, an even larger proportion (31%) of the offenders in the study had no prior offenses and would not have been prohibited even under the strictest exclusionary criteria. Katherine A. Vittes et al., *Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership*, Injury Prevention (forthcoming 2012).

Findings from a study in Illinois show that, although a large majority of homicide offenders had prior criminal records, only 43% would have been prohibited from possessing firearms as a result of a prior felony conviction. Philip J. Cook et al., *Criminal Records of Homicide Offenders, supra*, at 599.

Persons who obtain carry permits sometimes go on to use a handgun to commit murder or other illegal activities. According to an ongoing tally kept by the Violence Policy Center, 440 people have been shot and killed by legal concealed handgun carriers over the past five years; 12 of these murder victims were police officers. *Concealed Carry Killers,* Violence Policy Center (May 31,

2012), http://www.vpc.org/ccwkillers.htm. Given the authors' reliance on news reports, the actual numbers may be even higher.

These studies demonstrate that: 1) some legal purchasers of firearms, who would likely meet the legal criteria to obtain a carry permit in an RTC state, are at heightened risk of committing serious criminal offenses, and 2) current exclusionary criteria for possessing firearms, that are used to determine who may legally carry firearms in public in RTC states, may miss many potentially dangerous people.

## CONCLUSION

With more than 11,000 firearm-related homicides, 44,000 assaultive injuries, and 330,000 violent crimes each year, firearms are associated with a substantial public health and safety burden in the United States. Although some have argued that loosening restrictions on carrying of firearms in public is associated with public safety benefits, the best available scientific evidence indicates that this is not the case. In fact, right-to-carry firearm laws could make it more difficult for police to reduce violent crime in high risk neighborhoods. The amici respectfully ask the Court to consider these public health implications as it weighs its decision.

Respectfully submitted,

/s/ Jason M. St. John

JASON M. ST. JOHN
JENNIFER A. DEROSE
Saul Ewing LLP
500 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
Tel. 410-332-8862

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 4,353 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Times New Roman 14-point font.

/s/ Jason M. St. John
Jason M. St. John

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of June, 2012, the foregoing Brief for Amici Curiae was electronically served on all parties through the ECF system.

/s/  Jason M. St. John
Jason M. St. John