No. 12-1437

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

_____

## RAYMOND WOOLLARD, *et al.*,

*Plaintiffs-Appellees*,

v.

## TERRENCE SHERIDAN, *et al.*,

*Defendants-Appellants*.

_____

On Appeal from the United States District Court for the District of Maryland
(Benson E. Legg, District Judge)

_____

## JOINT APPENDIX

_____

DOUGLAS F. GANSLER
Attorney General of Maryland

ALAN GURA
Gura & Possessky, PLLC
101 N. Columbus Street
Suite 405
Alexandria, Virginia 22314
Tel. (703) 835-9085
Fax. (703) 997-7665
alan@gurapossessky.com

DAN FRIEDMAN
Assistant Attorney General
Office of the Attorney General
Legislative Services Building
90 State Circle
Annapolis, Maryland 21401
Tel. (410) 946-5600  Fax. (410) 946-5601
dfriedman@oag.state.md.us

CARY J. HANSEL
Joseph, Greenwald & Laake
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
Tel. (301) 220-2200
Fax. (301) 220-1214
chansel@jgllaw.com

MATTHEW J. FADER
STEPHEN M. RUCKMAN
Assistant Attorneys General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
Tel. (410) 576-7906    Fax. (410) 576-6955

Attorneys for Appellees

Attorneys for Appellants

June 15, 2012

**JOINT APPENDIX**
**TABLE OF CONTENTS**

Page

Docket .................................................................................................................... 1

Letter from M. Cusimano to R. Woollard, Feb. 2, 2009 .................................... 11

Letter from M. Cusimano to R. Woollard, Apr. 1, 2009 .................................... 12

Letter from M. Cusimano to R. Woollard, July 28, 2009 ................................... 13

Decision of the Handgun Permit Review Board, Nov. 12, 2009 ....................... 14

Declaration of Julianne Versnel, Nov. 12, 2010 ............................................... 17

Declaration of Raymond Woollard, Nov. 9, 2010 .............................................. 19

Amended Complaint ............................................................................................. 22

Answer to Amended Complaint ........................................................................... 30

Plaintiffs' Motion for Summary Judgment .......................................................... 39

Defendants Cross Motion for Summary Judgment ............................................. 40

Declaration of Diana J. Beeson, Mar. 17, 2011 (with Exhibits) ....................... 42

Declaration of Sergeant Michael A. Jones, Mar. 2011 (with Exhibit) .............. 56

Declaration of Philip J. Cook, Mar. 21, 2011 (with Exhibit) ............................ 66

Declaration of Frederick H. Bealefeld, III, Mar. 18, 2011 .............................. 108

Declaration of Terrence B. Sheridan, Mar. 17, 2011 (with Exhibit) ............... 115

Declaration of James W. Johnson, Mar. 18, 2011 ............................................ 126

Letter from S. Brantley to W. Miller, Dec. 4, 2009 ......................................... 135

Memorandum entered Mar. 5, 2012 .................................................................. 137

Order entered March 5, 2012 ............................................................................ 160

Order entered April 2, 2012 .............................................................................. 161

Notice of Appeal ................................................................................................ 164

APPEAL,CLOSED

**U.S. District Court**
**District of Maryland (Baltimore)**
**CIVIL DOCKET FOR CASE #: 1:10-cv-02068-BEL**

| | |
|---|---|
| Woolard et al v. Sheridan et al | Date Filed: 07/29/2010 |
| Assigned to: Judge Benson Everett Legg | Date Terminated: 03/02/2012 |
| Case in other court: Fourth Circuit Court of Appeals, 12-01437 | Jury Demand: None |
| | Nature of Suit: 440 Civil Rights: Other |
| Cause: 42:1983 Civil Rights Act | Jurisdiction: Federal Question |

**Plaintiff**

**Raymond Woollard**     represented by     **Alan Gura**
Gura and Possessky PLLC
101 N Columbus St Ste 405
Alexandria, VA 22314
17038359085
Fax: 17039977665
Email: alan@gurapossessky.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cary Johnson Hansel , III**
Joseph Greenwald and Laake PA
6404 Ivy Ln Ste 400
Greenbelt, MD 20770
13012202200
Fax: 13012201214
Email: chansel@jgllaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Second Amendment Foundation, Inc.**     represented by     **Alan Gura**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cary Johnson Hansel , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Terrence Sheridan**     represented by     **Matthew John Fader**
Maryland Office of the Attorney
General

J.A. 1

200 Saint Paul St
Baltimore, MD 21202
14105767906
Fax: 14105766955
Email: mfader@oag.state.md.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Denis Gallagher**                    represented by **Matthew John Fader**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Seymour Goldstein**                    represented by **Matthew John Fader**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Charles M. Thomas, Jr.**                    represented by **Matthew John Fader**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Marcus L. Brown**                    represented by **Matthew John Fader**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Brady Center to Prevent Gun**                    represented by **Nicholas G Stavlas**
**Violence**                                                            Hogan Lovells US LLP
Harbor East
100 International Dr Ste 2000
Baltimore, MD 21202
14106592700
Fax: 14106592701
Email:
nicholas.stavlas@hoganlovells.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Legal Community Against Violence**                    represented by **Elizabeth Ann Dater Katz**
Covington and Burling LLP
1201 Pennsylvania Ave NW
Washington, DC 20004

J.A. 2

12026625650
Fax: 12027785650
Email: ekatz@cov.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan L Marcus**
Covington and Burling LLP
1201 Pennsylvania Ave NW
Washington, DC 20004
12026626000
Fax: 12027785892
Email: jmarcus@cov.com
*TERMINATED: 05/20/2011*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/29/2010 | 1 | COMPLAINT against Terrance Sheridan, Denis Gallagher, Seymour Goldstein, Charles M. Thomas, Jr. ( Filing fee $ 350 receipt number 0416-2619321.), filed by Raymond Woollard, Second Amendment Foundation, Inc.. (Attachments: # 1 Civil Cover Sheet, # 2 Line for Summons)(Hansel, Cary) Modified on 7/30/2010 (ljs, Deputy Clerk). (Entered: 07/29/2010) |
| 07/30/2010 | | Deficiency Notice as to Second Amendment Foundation, Inc.,. Your Local Rule 103.3 disclosure statement has not been filed. The Statement must be filed by 8/9/2010 (ljs, Deputy Clerk) (Entered: 07/30/2010) |
| 07/30/2010 | 2 | NOTICE by Second Amendment Foundation, Inc., Raymond Woollard re Deficiency Notice, 1 Complaint, *Summons for All Defendants* (Attachments: # 1 Summons, # 2 Summons, # 3 Summons)(Hansel, Cary) (Entered: 07/30/2010) |
| 07/30/2010 | 3 | Summons Issued 21 days as to Denis Gallagher, Seymour Goldstein, Terrence Sheridan, Charles M. Thomas, Jr.. (ljs, Deputy Clerk) (Entered: 07/30/2010) |
| 08/06/2010 | 4 | MOTION to Appear Pro Hac Vice for Alan Gura on behalf of Second Amendment Foundation, Inc., Raymond Woollard by Second Amendment Foundation, Inc., Raymond Woollard (Filing Fee Paid $50.00, Receipt #14637044273)(bmh, Deputy Clerk) (Entered: 08/09/2010) |
| 08/09/2010 | 5 | PAPERLESS ORDER granting 4 Motion to Appear Pro Hac Vice for attorney Alan Gura on behalf of Raymond Woollard and Second Amendment Foundation Inc. Directing attorney Alan Gura to register on-line for CM/ECF at http://www.mdd.uscourts.gov/attorney/registration.asp.. Signed by Clerk on 8/9/10. (cmns, Deputy Clerk) (Entered: 08/09/2010) |
| 08/09/2010 | 6 | Local Rule 103.3 Disclosure Statement by Second Amendment Foundation, Inc.. (Hansel, Cary) (Entered: 08/09/2010) |
| 08/25/2010 | 7 | STIPULATION by Denis Gallagher, Seymour Goldstein, Terrence Sheridan, |

J.A. 3

| | | Charles M. Thomas, Jr.. (Fader, Matthew) (Entered: 08/25/2010) |
|---|---|---|
| 09/20/2010 | 8 | MOTION to Dismiss by Denis Gallagher, Seymour Goldstein, Terrence Sheridan, Charles M. Thomas, Jr. Responses due by 10/7/2010 (Attachments: # 1 Memorandum in Support of Motion to Dismiss, # 2 Exhibit A (November 12, 2009 Handgun Permit Review Board Decision), # 3 Text of Proposed Order)(Fader, Matthew) (Entered: 09/20/2010) |
| 10/07/2010 | 9 | RESPONSE in Opposition re 8 MOTION to Dismiss filed by Second Amendment Foundation, Inc., Raymond Woollard. Replies due by 10/25/2010. (Attachments: # 1 Text of Proposed Order)(Gura, Alan) (Entered: 10/07/2010) |
| 10/25/2010 | 10 | REPLY to Response to Motion re 8 MOTION to Dismiss filed by Denis Gallagher, Seymour Goldstein, Terrence Sheridan, Charles M. Thomas, Jr.. (Fader, Matthew) (Entered: 10/25/2010) |
| 11/12/2010 | 11 | Request for Conference (Fader, Matthew) (Entered: 11/12/2010) |
| 11/15/2010 | 12 | MOTION for Summary Judgment by Second Amendment Foundation, Inc., Raymond Woollard. Responses due by 12/2/2010 (Attachments: # 1 Text of Proposed Order, # 2 Memorandum in Support, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Declaration of Julie Versnel, # 8 Declaration of Raymond Woollard)(Gura, Alan) (Entered: 11/15/2010) |
| 11/15/2010 | 13 | RESPONSE re 11 Request for Conference filed by Second Amendment Foundation, Inc., Raymond Woollard. (Gura, Alan) (Entered: 11/15/2010) |
| 11/17/2010 | 14 | Correspondence regarding status conference. (Motz, J.) (Entered: 11/17/2010) |
| 11/19/2010 | | Status Conference held on 11/19/2010 before Judge J. Frederick Motz. (mdw, Deputy Clerk) (Entered: 11/19/2010) |
| 11/22/2010 | 15 | Correspondence confirming matter discussed during the conference call. (Motz, J.) (Entered: 11/22/2010) |
| 12/29/2010 | 16 | MEMORANDUM. Signed by Judge J. Frederick Motz on 12/29/10. (hmls, Deputy Clerk) (Entered: 12/29/2010) |
| 12/29/2010 | 17 | ORDER GRANTING as to Count II AND DENYING as to Count I 8 Motion of defendants to Dismiss Complaint; GRANTING plaintiffs leave to file an amended complaint. Signed by Judge J. Frederick Motz on 12/29/10. (hmls, Deputy Clerk) (Entered: 12/29/2010) |
| 12/29/2010 | 18 | Correspondence regarding filing the amended complaint. (Motz, J.) (Entered: 12/29/2010) |
| 01/19/2011 | 19 | AMENDED COMPLAINT against All Defendants, filed by Raymond Woollard, Second Amendment Foundation, Inc..(Gura, Alan) (Entered: 01/20/2011) |
| 02/08/2011 | 20 | ANSWER to 19 Amended Complaint by Denis Gallagher, Seymour Goldstein, Terrence Sheridan, Charles M. Thomas, Jr..(Fader, Matthew) (Entered: 02/08/2011) |
| 02/18/2011 | 21 | MOTION for Summary Judgment by Second Amendment Foundation, Inc., |

J.A. 4

| | | |
|---|---|---|
| | | Raymond Woollard. Responses due by 3/7/2011 (Attachments: # 1 Text of Proposed Order)(Gura, Alan) (Entered: 02/18/2011) |
| 02/18/2011 | 22 | Memorandum re 21 MOTION for Summary Judgment filed by Second Amendment Foundation, Inc., Raymond Woollard. (Gura, Alan) (Entered: 02/18/2011) |
| 02/23/2011 | 23 | Consent MOTION for Extension of Time *and to Set Briefing Schedule* by Denis Gallagher, Seymour Goldstein, Terrence Sheridan, Charles M. Thomas, Jr. Responses due by 3/14/2011 (Attachments: # 1 Text of Proposed Order) (Fader, Matthew) (Entered: 02/23/2011) |
| 02/24/2011 | 24 | Paperless ORDER granting 23 Motion for Extension of Time. Signed by Judge J. Frederick Motz on 2/24/11. (Motz, J.) (Entered: 02/24/2011) |
| 03/22/2011 | 25 | Cross MOTION for Summary Judgment by Denis Gallagher, Seymour Goldstein, Terrence Sheridan, Charles M. Thomas, Jr. Responses due by 4/8/2011 (Attachments: # 1 Text of Proposed Order)(Fader, Matthew) (Entered: 03/22/2011) |
| 03/22/2011 | 26 | RESPONSE in Opposition re 21 MOTION for Summary Judgment and MEMORANDUM in Support of 25 Cross MOTION for Summary Judgment filed by Denis Gallagher, Seymour Goldstein, Terrence Sheridan, Charles M. Thomas, Jr.. Replies due by 4/8/2011. (Attachments: # 1 Exhibit Ex. 1, Woollard Decl., # 2 Exhibit Ex. 2, Beeson Decl., # 3 Exhibit Ex. 3, Jones Decl., # 4 Exhibit Ex. 4, Cook Decl., # 5 Exhibit Ex. 5, Bealefeld Decl., # 6 Exhibit Ex. 6, Sheridan Decl., # 7 Exhibit Ex. 7, Johnson Decl.)(Fader, Matthew) Modified on 3/23/2011 (hmls, Deputy Clerk). (Entered: 03/22/2011) |
| 03/22/2011 | 27 | Local Rule 103.3 Disclosure Statement by Brady Center to Prevent Gun Violence. (Stavlas, Nicholas) (Entered: 03/22/2011) |
| 03/22/2011 | 28 | MOTION for Leave to File *Amicus Brief in Support of Defendants* by Brady Center to Prevent Gun Violence Responses due by 4/8/2011 (Attachments: # 1 Exhibit A)(Stavlas, Nicholas) (Entered: 03/22/2011) |
| 03/22/2011 | 29 | MOTION for Leave to File *Amicus Brief in Support of Defendants* by Legal Community Against Violence Responses due by 4/8/2011 (Attachments: # 1 Amicus Brief of Legal Community Against Violence)(Marcus, Jonathan) (Entered: 03/22/2011) |
| 03/23/2011 | 30 | Local Rule 103.3 Disclosure Statement by Legal Community Against Violence. (Marcus, Jonathan) (Entered: 03/23/2011) |
| 04/11/2011 | | Case reassigned to Judge Benson Everett Legg. Judge J. Frederick Motz no longer assigned to the case. (cags, Deputy Clerk) (Entered: 04/11/2011) |
| 04/12/2011 | 31 | Joint MOTION for Extension of Time to File Response/Reply as to 25 Cross MOTION for Summary Judgment by Denis Gallagher, Seymour Goldstein, Second Amendment Foundation, Inc., Terrence Sheridan, Charles M. Thomas, Jr., Raymond Woollard. Responses due by 4/29/2011 (Attachments: # 1 Text of Proposed Order)(Gura, Alan) (Entered: 04/12/2011) |
| 04/13/2011 | 32 | ORDER granting 31 Motion for Extension of Time to File Response re 25 |

J.A. 5

| | | |
|---|---|---|
| | | Cross MOTION for Summary Judgment. Responses due on or before 4/25/2011. Replies due on or before 5/18/2011. Signed by Judge Benson Everett Legg on 4/13/11. (hmls, Deputy Clerk) (Entered: 04/13/2011) |
| 04/21/2011 | 33 | PAPERLESS ORDER GRANTING 28 and 29 Motions for Leave to File Amicus Briefs. Signed by Judge Benson Everett Legg on 4/21/2011. (Legg, Benson Everett) (Entered: 04/21/2011) |
| 04/25/2011 | 34 | RESPONSE in Opposition re 25 Cross MOTION for Summary Judgment filed by Second Amendment Foundation, Inc., Raymond Woollard. Replies due by 5/12/2011. (Attachments: # 1 Exhibit A)(Gura, Alan) (Entered: 04/25/2011) |
| 04/27/2011 | 35 | NOTICE of Hearing: Motions Hearing on Summary Judgment, paper nos. 12, 21 & 25, scheduled for 7/21/2011 at 10:00 AM in Courtroom 7A, 101 West Lombard Street, Baltimore, Maryland 21201, before Judge Benson Everett Legg. (Legg, Benson Everett) (Entered: 04/27/2011) |
| 04/27/2011 | | Telephone Conference re: Status held on 4/27/2011 before Judge Benson Everett Legg. ( Recorded on Tape) (kam, Deputy Clerk) (Entered: 04/28/2011) |
| 05/13/2011 | 36 | Amicus Brief in Support of Defendants by Brady Center to Prevent Gun Violence. (Filed as of 4/21/11) (hmls, Deputy Clerk) (Entered: 05/13/2011) |
| 05/13/2011 | 37 | Amicus Brief in Support of 25 Cross MOTION of Defendants for Summary Judgment and in Opposition to 12, 21 MOTION of Plaintiffs for Summary Judgment filed by Legal Community Against Violence. (Filed as of 4/21/11) (hmls, Deputy Clerk) (Entered: 05/13/2011) |
| 05/18/2011 | 38 | REPLY to Response to Motion re 25 Cross MOTION for Summary Judgment filed by Denis Gallagher, Seymour Goldstein, Terrence Sheridan, Charles M. Thomas, Jr.. (Fader, Matthew) (Entered: 05/18/2011) |
| 05/20/2011 | 39 | NOTICE to Substitute Attorney *for amicus curiae Legal Community Against Violence* (Katz, Elizabeth Ann) (Entered: 05/20/2011) |
| 05/25/2011 | 40 | MARGINAL ORDER approving 39 Notice to Substitute Attorney filed by Legal Community Against Violence. Signed by Judge Benson Everett Legg on 5/24/2011. (aos, Deputy Clerk) (Entered: 05/25/2011) |
| 07/18/2011 | 41 | NOTICE by Second Amendment Foundation, Inc., Raymond Woollard re 21 MOTION for Summary Judgment, 25 Cross MOTION for Summary Judgment *of Newly Decided Authority* (Gura, Alan) (Entered: 07/18/2011) |
| 07/19/2011 | 42 | Letter ORDER re Questions for Summary Judgment Hearing. Signed by Judge Benson Everett Legg on 7/18/11. (hmls, Deputy Clerk) (Entered: 07/19/2011) |
| 07/21/2011 | 43 | Motion Hearing held on 7/21/2011 re 12 MOTION for Summary Judgment filed by Second Amendment Foundation, Inc., Raymond Woollard, 21 MOTION for Summary Judgment filed by Second Amendment Foundation, Inc., Raymond Woollard, 25 Cross MOTION for Summary Judgment filed by Terrence Sheridan, Charles M. Thomas, Jr., Seymour Goldstein, Denis Gallagher before Judge Benson Everett Legg. (Court Reporter: Jackie Sovich) (kmt, Deputy Clerk) (Entered: 07/21/2011) |
| | | |

J.A. 6

| 08/25/2011 | 44 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 7-21-11, before Judge Legg. Court Reporter/Transcriber Jacqueline Sovich, Telephone number 410 962 4537. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER... Redaction Request due 9/15/2011. Redacted Transcript Deadline set for 9/26/2011. Release of Transcript Restriction set for 11/23/2011. (Attachments: # 1 Appendix)(jcs, Court Reporter) (Entered: 08/25/2011) |
| --- | --- | --- |
| 09/08/2011 | 45 | NOTICE by Terrence Sheridan, Marcus L. Brown *of Automatic Substitution of Official Capacity Defendant* (Fader, Matthew) (Entered: 09/08/2011) |
| 09/08/2011 | 46 | NOTICE by Marcus L. Brown, Denis Gallagher, Seymour Goldstein, Charles M. Thomas, Jr. re 21 MOTION for Summary Judgment, 25 Cross MOTION for Summary Judgment *of Supplemental Authority* (Attachments: # 1 Exhibit Kachalsky v. Cacace Opinion and Order)(Fader, Matthew) (Entered: 09/08/2011) |
| 09/14/2011 | 47 | NOTICE by Second Amendment Foundation, Inc., Raymond Woollard re 21 MOTION for Summary Judgment, 25 Cross MOTION for Summary Judgment, 46 Notice (Other), *Response to Defendants' Supplemental Authority* (Gura, Alan) (Entered: 09/14/2011) |
| 10/03/2011 | 48 | NOTICE by Marcus L. Brown, Denis Gallagher, Seymour Goldstein, Charles M. Thomas, Jr. re 21 MOTION for Summary Judgment, 25 Cross MOTION for Summary Judgment *of Supplemental Authority* (Fader, Matthew) (Entered: 10/03/2011) |
| 01/19/2012 | 49 | NOTICE by Marcus L. Brown, Denis Gallagher, Seymour Goldstein, Charles M. Thomas, Jr. re 21 MOTION for Summary Judgment, 25 Cross MOTION for Summary Judgment *of Supplemental Authority* (Attachments: # 1 Exhibit Piszczatoski v. Filko)(Fader, Matthew) (Entered: 01/19/2012) |
| 01/23/2012 | 50 | NOTICE by Second Amendment Foundation, Inc., Raymond Woollard re 48 Notice (Other), 21 MOTION for Summary Judgment, 49 Notice (Other), 25 Cross MOTION for Summary Judgment *of Supplemental Authority, and response to Defendants' Notices* (Gura, Alan) (Entered: 01/23/2012) |
| 01/27/2012 | 51 | NOTICE by Second Amendment Foundation, Inc., Raymond Woollard re 21 MOTION for Summary Judgment, 25 Cross MOTION for Summary Judgment *of Supplemental Authority* (Gura, Alan) (Entered: 01/27/2012) |
| 03/02/2012 | 52 | MEMORANDUM. Signed by Judge Benson Everett Legg on 3/2/2012. (aos, Deputy Clerk) (Entered: 03/05/2012) |
| 03/02/2012 | 53 | ORDER denying as moot 12 Motion by plaintiff for Summary Judgment; granting 21 Motion by plaintiff for Summary Judgment; denying 25 Motion for Summary Judgment; directing clerk to close the case. Signed by Judge Benson Everett Legg on 3/2/2012. (aos, Deputy Clerk) Modified on 3/5/2012 (aos, Deputy Clerk). (Entered: 03/05/2012) |
| 03/07/2012 | 54 | MOTION to Alter/Amend Judgment as permitted by 53 Order on Motion for |

J.A. 7

| | | |
|---|---|---|
| | | Summary Judgment,,,,, *pursuant to Rule 59(e)*, MOTION for Other Relief *Motion for Clarification pursuant to Rule 59(e)*, MOTION to Stay re 53 Order on Motion for Summary Judgment,,,,, by Marcus L. Brown, Denis Gallagher, Seymour Goldstein, Charles M. Thomas, Jr. Responses due by 3/26/2012 (Attachments: # 1 Text of Proposed Order)(Fader, Matthew) (Entered: 03/07/2012) |
| 03/07/2012 | 55 | Consent MOTION to Expedite *Briefing Schedule on Motion for Clarification and Stay* by Marcus L. Brown, Denis Gallagher, Seymour Goldstein, Charles M. Thomas, Jr. Responses due by 3/26/2012 (Attachments: # 1 Text of Proposed Order)(Fader, Matthew) (Entered: 03/07/2012) |
| 03/08/2012 | 56 | ORDER granting 55 Motion to Expedite Briefing Schedule on Motion for Clarification and Stay. Signed by Judge Benson Everett Legg on 3/8/2012. (aos, Deputy Clerk) (Entered: 03/08/2012) |
| 03/09/2012 | 57 | Supplemental to 54 MOTION to Alter/Amend Judgment as permitted by 53 Order on Motion for Summary Judgment,,,,, *pursuant to Rule 59(e)* MOTION for Other Relief *Motion for Clarification pursuant to Rule 59(e)* MOTION to Stay re 53 Order on Motion for Summary Judgment,,,,, filed by Marcus L. Brown, Denis Gallagher, Seymour Goldstein, Charles M. Thomas, Jr. . (Attachments: # 1 Text of Proposed Order)(Fader, Matthew) (Entered: 03/09/2012) |
| 03/16/2012 | 58 | Consent MOTION for Extension of Time *to File the Bill of Costs and Attorneys' Fee Motion* by Raymond Woollard Responses due by 4/2/2012 (Attachments: # 1 Text of Proposed Order)(Hansel, Cary) (Entered: 03/16/2012) |
| 03/16/2012 | 59 | RESPONSE in Opposition re 54 MOTION to Alter/Amend Judgment as permitted by 53 Order on Motion for Summary Judgment,,,,, *pursuant to Rule 59(e)* MOTION for Other Relief *Motion for Clarification pursuant to Rule 59 (e)* MOTION to Stay re 53 Order on Motion for Summary Judgment,,,,, filed by Second Amendment Foundation, Inc., Raymond Woollard. Replies due by 4/2/2012. (Gura, Alan) (Entered: 03/16/2012) |
| 03/16/2012 | 60 | ORDER granting 58 Motion for Extension of Time to File the Bill of Costs and Attorneys' Fee Motion. Signed by Judge Benson Everett Legg on 3/16/2012. (aos, Deputy Clerk) (Entered: 03/19/2012) |
| 03/20/2012 | 61 | ORDER scheduling teleconference re 54 Defendants Motion for Clarification and for a Stay Pending Appeal. Signed by Judge Benson Everett Legg on 3/20/12. (jnls, Deputy Clerk) (Entered: 03/20/2012) |
| 03/22/2012 | | Telephone Conference held on 3/22/2012 before Judge Benson Everett Legg. ( Recorded on Tape) (kam, Deputy Clerk) (Entered: 04/03/2012) |
| 03/29/2012 | 62 | NOTICE by Marcus L. Brown, Denis Gallagher, Seymour Goldstein, Charles M. Thomas, Jr. re 54 MOTION to Alter/Amend Judgment as permitted by 53 Order on Motion for Summary Judgment,,,,, *pursuant to Rule 59(e)* MOTION for Other Relief *Motion for Clarification pursuant to Rule 59(e)* MOTION to Stay re 53 Order on Motion for Summary Judgment,,,,, , 53 Order on Motion for Summary Judgment,,,,, *of Filing Draft Order* (Attachments: # 1 Exhibit |

J.A. 8

| | | Draft Order)(Fader, Matthew) (Entered: 03/29/2012) |
|---|---|---|
| 03/30/2012 | 63 | ORDER granting 54 MOTION to Alter/Amend Judgment as permitted by 53 Order on Motion for Summary Judgment,,,,, *pursuant to Rule 59(e)* MOTION for Other Relief *Motion for Clarification pursuant to Rule 59(e)* MOTION to Stay re 53 Order on Motion for Summary Judgment. Signed by Judge Benson Everett Legg on 3/30/2012. (aos, Deputy Clerk) (Entered: 04/02/2012) |
| 04/02/2012 | 64 | NOTICE OF APPEAL as to 63 Order, 53 Order on Motion for Summary Judgment,,,,, 52 Memorandum Opinion by Marcus L. Brown, Denis Gallagher, Seymour Goldstein, Charles M. Thomas, Jr.. Appeal Record due by 5/7/2012. (Fader, Matthew) (Entered: 04/02/2012) |
| 04/03/2012 | 65 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 64 Notice of Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices. (bf2, Deputy Clerk) (Entered: 04/03/2012) |
| 04/03/2012 | | USCA Appeal Fees received $ 455 receipt number 146370568404 re 64 Notice of Appeal filed by Marcus L. Brown, Charles M. Thomas, Jr., Seymour Goldstein, Denis Gallagher. (bf2, Deputy Clerk) (Entered: 04/03/2012) |
| 04/06/2012 | 66 | USCA Case Number 12-1437 for 64 Notice of Appeal filed by Marcus L. Brown, Charles M. Thomas, Jr., Seymour Goldstein, Denis Gallagher. (Case Manager - Donna Lett) (bf2s, Deputy Clerk) (Entered: 04/06/2012) |
| 04/10/2012 | | Assembled Electronic Record Transmitted to Fourth Circuit -- Initial. (bf2, Deputy Clerk) (Entered: 04/11/2012) |
| 04/19/2012 | 67 | MOTION to Stay re 63 Order, 53 Order on Motion for Summary Judgment,,,,, 52 Memorandum Opinion *Under Rule 62(c) (Renewed)* by Marcus L. Brown, Denis Gallagher, Seymour Goldstein, Charles M. Thomas, Jr. Responses due by 5/7/2012 (Fader, Matthew) (Entered: 04/19/2012) |
| 04/19/2012 | 68 | RESPONSE in Support re 54 MOTION to Alter/Amend Judgment as permitted by 53 Order on Motion for Summary Judgment,,,,, *pursuant to Rule 59(e)* MOTION for Other Relief *Motion for Clarification pursuant to Rule 59(e)* MOTION to Stay re 53 Order on Motion for Summary Judgment,,,,, , 67 MOTION to Stay re 63 Order, 53 Order on Motion for Summary Judgment,,,,, 52 Memorandum Opinion *Under Rule 62(c) (Renewed)* filed by Marcus L. Brown, Denis Gallagher, Seymour Goldstein, Charles M. Thomas, Jr.. Replies due by 5/7/2012. (Attachments: # 1 Exhibit A. Declaration of Marcus L. Brown, # 2 Exhibit B. NRC Report, # 3 Exhibit C. Webster & Ludwig Article, # 4 Exhibit D. Aneja, Donohue, Zhang, # 5 Exhibit E. Luo Article, # 6 Exhibit F. Sun-Sentinel 1/28/07, # 7 Exhibit G. Sun-Sentinel 1/29/07)(Fader, Matthew) (Entered: 04/19/2012) |
| 05/09/2012 | 69 | RESPONSE re 68 Response in Support of Motion,,, , Memorandum filed by Second Amendment Foundation, Inc., Raymond Woollard. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Gura, Alan) (Entered: 05/09/2012) |
| 05/23/2012 | 70 | REPLY to Response to Motion re 67 MOTION to Stay re 63 Order, 53 Order |

J.A. 9

|  |  | on Motion for Summary Judgment,,,,, 52 Memorandum Opinion *Under Rule 62(c) (Renewed)* filed by Marcus L. Brown, Denis Gallagher, Seymour Goldstein, Charles M. Thomas, Jr.. (Attachments: # 1 Exhibit)(Fader, Matthew) (Entered: 05/23/2012) |

J.A. 10



MARTIN O'MALLEY
GOVERNOR

ANTHONY G. BROWN
LT. GOVERNOR

STATE OF MARYLAND
**MARYLAND STATE POLICE**

Licensing Division
1111 Reisterstown Road
Pikesville, Maryland 21208
(410) 653-4500



COLONEL
TERRENCE B. SHERIDAN
SUPERINTENDENT

February 2, 2009

Raymond E. Woollard
19109 St. Abrahams Court
Hampstead, Maryland 21074

Dear: Mr. Woollard:

A review of your handgun permit application **438#65541** by the Maryland State Police
Licensing Division Handgun Permit Unit revealed that additional information is required as
follows:

1. **Evidence is needed to support apprehended fear (I.e. -copies of police reports for
assaults, threats, harassments, stalking).**

If the above item(s) are not received in this office by **March 2, 2009**, your application will be
**disapproved.**

Please return this letter and requested documentation to the Handgun Permit Unit at the above
address. **If you have any questions or need additional information, please contact Cpl. Cusimano, at**
(410) 653-4500.

Sincerely,

M. Cusimano — Corporal
Supervisor
Handgun Permit Section

29-13(1/2003)

*"Maryland's Finest"*

J.A. 11



MARTIN O'MALLEY
GOVERNOR

ANTHONY G. BROWN
LT. GOVERNOR

STATE OF MARYLAND
**MARYLAND STATE POLICE**

Licensing Division
1111 Reisterstown Road
Pikesville, Maryland 21208
(410) 653-4500



COLONEL
TERRENCE B. SHERIDAN
SUPERINTENDENT

April 1, 2009

Raymond E. Woollard
19109 St. Abrahams Court
Hampstead, Maryland 21074

Dear Mr. Woollard:

Title 5-306, of the Annotated Code of Maryland, establishes the qualifications and procedures for the issuance of a handgun permit. Based on that criteria, your request for a handgun permit has been **disapproved.**

You have ten (10) days from the receipt of this notice to request an informal review of your application with the Superintendent. An Informal Review Request has been attached at the bottom of this letter. If you do not want an informal review, you may appeal the Superintendent's decision directly to the Handgun Permit Review Board, also with ten (10) days of the receipt of this notice.

The Handgun Permit Review Board has the authority to sustain, reverse, or modify the Superintendent's decision. Your request to the Handgun Permit Review Board must be in writing to the following address, 300 E. Joppa Road, Suite 1000, Baltimore, Maryland 21286.

Sincerely,

M. Cusimano – Corporal
Handgun Permit Section

---

438-65541        **Informal Review Request**        Date: 4-07-09

Send To: Maryland State Police, Handgun Permit Unit, 1111 Reisterstown Road, Pikesville, Maryland 21208.

NAME: Raymond Earle Woollard Current Address: 19109 ST, ABRAHAMS Court

Phone Number: #

Hampstead, Maryland 21074

C-

29-9 (11/2006)    Received 4-04-09

*"Maryland's Finest"*

J.A. 12



MARTIN O'MALLEY
GOVERNOR

ANTHONY G. BROWN
LT. GOVERNOR

STATE OF MARYLAND
**MARYLAND STATE POLICE**

Licensing Division
1111 Reisterstown Road
Pikesville, Maryland 21208
(410) 653-4500

July 28, 2009



**COLONEL**
TERRENCE B. SHERIDAN
SUPERINTENDENT

Raymond Woollard
19109 St. Abrahams Court
Hampstead, Maryland 21074

Dear Mr. Woollard:

Title 5-306, of the Annotated Code of Maryland, establishes the qualifications and procedures for the issuance of a handgun permit. Based on that criteria, your request for a handgun permit has been **disapproved.**

You have ten (10) days from the receipt of this notice to request an informal review of your application with the Superintendent. An Informal Review Request has been attached at the bottom of this letter. If you do not want an informal review, you may appeal the Superintendent's decision directly to the Handgun Permit Review Board, also with ten (10) days of the receipt of this notice.

The Handgun Permit Review Board has the authority to sustain, reverse, or modify the Superintendent's decision. Your request to the Handgun Permit Review Board must be in writing to the following address, 300 E. Joppa Road, Suite 1000, Baltimore, Maryland 21286.

Sincerely,



M. Cusimano – Corporal
Handgun Permit Section

---

438-65541                    **Informal Review Request**                    Date:_____

Send To: Maryland State Police, Handgun Permit Unit, 1111 Reisterstown Road, Pikesville, Maryland 21208.

NAME:_____    Current Address: _19109 St. ADRAHAMS Court_

Phone Number:                                    _Hampstead, Md. 21074_

29-9 (11/2006)

*"Maryland's Finest"*

| | | |
|---|---|---|
| In the matter of the review of the | * | Before the |
| decision of the Superintendent of the | | |
| Maryland State Police denying the | * | Handgun Permit Review Board |
| Renewal application for a | | |
| handgun permit to Raymond Woollard | * | Case No. 09-4138 |
| 19109 St. Abrahams Court | | |
| Hampstead, Maryland 21286 | * | MSP No. 438-65541 |

*     *     *     *     *     *     *     *     *     *     *

## DECISION OF THE HANDGUN PERMIT REVIEW BOARD

### Statement of the Case

The applicant, Raymond Woollard, is appealing to the Handgun Permit Review Board (Board) from the decision of the Superintendent of the Maryland State Police (MSP) denying his renewal application for a handgun permit.

### Background

The applicant, Raymond Woollard, submitted a renewal application for a handgun permit to the MSP on October 3, 2008. Mr. Woollard listed his occupation as electrician and his employer as the University of Maryland. The Superintendent of the MSP denied the permit application, because he concluded that the applicant had not demonstrated a good and substantial reason to wear, carry, or transport a handgun as a reasonable precaution against apprehended danger.

On November 3, 2009, the Board held a hearing on Raymond Woollard's appeal. Present at the hearing were Board members: Charles L. Washington, Denis Gallagher, Seymour Goldstein and Charles M. Thomas, Jr – Acting Chair. Present for the Maryland State Police was Sgt. Arthur Griffies. The applicant, Raymond Woollard was present as well as two witnesses, Deborah Woollard and Charles Knott. Testimony at the hearing was received from Raymond Woollard, Deborah Woollard, Charles Knott and Sgt. Griffies.

### Applicant's Testimony

The applicant, Raymond Woollard, testified he was assaulted by his son-in-law, Mr. Kris Lee Abbott, on Christmas Eve 2002. The applicant stated that at the time Mr. Abbott was on drugs and had come to the house to get the applicant's

daughter's car to drive to Baltimore City and acquire more drugs. The applicant testified he would not let Mr. Abbott into his house so Mr. Abbott began calling the house from outside on a cell phone. The applicant testified Mr. Abbott began running around the house rapping on each window when the phone calls were disconnected. The applicant testified Mr. Abbott broke into his house through a glass door and attacked him. The applicant stated his son came out of a room and aimed a shotgun at Mr. Abbott and told him to stop. The applicant testified at that time everyone went downstairs and waited for the police to arrive. The applicant stated that due to problems with the 9-1-1 system and the misunderstanding about which county the applicant's house was in it took the Baltimore County Police 2 ½ hours to respond to the call.

The applicant stated he has had no contact with his son-in-law since the incident. In addition, the applicant feels strongly that the reason his son-in-law has not approached him is due to the fact that his son-in-law knows he had a handgun permit.

## MSP Testimony

At the November 3, 2009 hearing, the MSP testified that the applicant was originally issued a permit in 2003. The MSP stated the applicant was a key witness in a trial that led to a conviction and the incarceration of his son-in-law, Kris Abbott. The MSP further stated the applicant's first renewal was based on information that Mr. Abbott was released from confinement in 2006 and Mr. Abbott had apprehended fear there would be retaliation.

The MSP testified the applicant was advised that in order for his renewal to be approved he would need to submit documented threats or incidents that had occurred in the last three years. The MSP stated the applicant failed to submit any documentation. The MSP testified the applicant was told to contact them immediately if his situation changed or if he received threats.

## Findings of Fact

The Board finds the applicant was attacked by his son-in-law in December 2002 at his residence. The Board further finds the applicant has not had any contact with his son-in-law since then. In addition, the Board finds the applicant has not submitted any documentation to verify threats occurring beyond his residence, where he can already legally carry a handgun.

## Conclusions of Law

Based upon its findings of fact, the Board finds that the applicant has not demonstrated a good and substantial reason to wear, carry, or transport a handgun as a reasonable precaution against apprehended danger in the State of Maryland.

## Order

On a motion to uphold the Maryland State Police, by a majority vote, with Charles Washington abstaining, the decision of the Board is to uphold the action of the Superintendent of the Maryland State Police.

Charles M. Thomas, Jr. – Acting Chair
Date: November 12, 2009

J.A. 16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| RAYMOND WOOLLARD, et al., | )  Case No. 1:10-cv-02068-JFM |
| | ) |
| Plaintiffs, | )  DECLARATION OF |
| | )  JULIANNE VERSNEL |
| v. | ) |
| | ) |
| TERRENCE SHERIDAN, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

DECLARATION OF JULIANNE VERSNEL

I, Julianne Versnel, am competent to state, and testify to the following based on my personal knowledge:

1.    I am the Director of Operations for the Second Amendment Foundation, Inc. ("SAF").

2.    SAF is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF has over 650,000 members and supporters nationwide. The purposes of SAF include promoting the exercise of the right to keep and bear arms; and education, research, publishing and legal action focusing on the Constitutional right to privately own and possess firearms, and the consequences of gun control. Plaintiff Second Amendment Foundation ("SAF")

3.    SAF has numerous members and supporters throughout Maryland. Most of SAF's members and supporters are gun owners who enjoy exercising their right to bear arms for self-defense.

4.    Owing to its mission, SAF's organizational resources are taxed by inquiries regarding the implementation of Maryland's gun carrying regulations, which deprive the members and supporters of SAF of their ability to carry firearms for self-defense.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 12 day of November, 2010.

_Julianne Versnel_

Julianne Versnel

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| RAYMOND WOOLLARD, et al., | ) | Case No. 1:10-cv-02068-JFM |
| | ) | |
| Plaintiffs, | ) | DECLARATION OF |
| | ) | RAYMOND WOOLLARD |
| v. | ) | |
| | ) | |
| TERRENCE SHERIDAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

DECLARATION OF RAYMOND WOOLLARD

I, Raymond Woollard, am competent to state, and testify to the following based on my

personal knowledge:

1.      I am an honorably-discharged Navy veteran, residing on a farm in a remote part of

Baltimore County.

2.      On Christmas Eve, 2002, I was at my home with my wife, son, daughter, and my

daughter's children, when an intruder broke into the home by shattering a window. I trained my

shotgun on the intruder, but he wrested the shotgun away, and a fight broke out between us. The

fight ended when my son retrieved another gun and restored order pending the police's arrival.

3.      My wife called the police, but it took the police approximately 2.5 hours to arrive,

owing to some confusion on their part as to the county in which our house is located.

4.      The intruder was convicted of first degree burglary, receiving a sentence of three

years probation. The probation was violated with an assault on a police officer and another

burglary at a different residence, which finally landed him in prison.

5.       I was issued a permit to carry a handgun, which was renewed in 2005 shortly after the intruder was released from prison. The intruder lives approximately three miles from us.

6.       I applied to renew my handgun carry permit a second time, but on February 2, 2009, was advised that my application was incomplete: "Evidence is needed to support apprehended fear (i.e. - copies of police reports for assaults, threats, harassments, stalking)." Exhibit A is a true and correct copy of the letter I received from the state police to that effect.

7.       On April 1, 2009, Terrence Sheridan denied my handgun carry permit renewal application. Exhibit B is a true and correct copy of the letter I received from the state police to that effect.

8.       I requested an informal review of the permit renewal application denial. The informal review resulted in a second denial on July 28, 2009. Exhibit C is a true and correct copy of the letter I received from the state police to that effect.

9.       I administratively appealed to the Handgun Permit Review Board. In a November 12, 2009 decision by Defendants Gallagher, Goldstein, and Thomas, the Board affirmed the denial of my application, finding that I had "not submitted any documentation to verify threats occurring beyond [my] residence, where [I] can already legally carry a handgun." Accordingly, the Board found I had "not demonstrated a good and substantial reason to wear, carry or transport a handgun as a reasonable precaution against apprehended danger in the State of Maryland." Exhibit D is a true and correct copy of the Board's decision.

10.      In addition to and quite apart from any threat posed by the man who invaded our home, I would carry a functional handgun in public for self-defense, but refrain from doing so because I fear arrest, prosecution, fine, and imprisonment as I do not possess a license to carry a handgun.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the _9_ day of November, 2010.

Raymond Woolllard

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| RAYMOND WOOLLARD ) | Case No. 1:10-CV-2068-JFM |
| 19109 St. Abraham's Court ) | |
| Hampstead, Maryland 21074 ) | |
| ) | |
| and ) | |
| ) | |
| SECOND AMENDMENT FOUNDATION, INC. ) | |
| 12500 10th Place NE ) | |
| Bellevue, Washington 98005 ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| TERRENCE SHERIDAN, ) | |
| serve:  Maryland State Police ) | |
|            1201 Reisterstown Road ) | |
|            Pikesville, Maryland 21208, ) | |
| ) | |
| DENIS GALLAGHER, ) | |
| SEYMOUR GOLDSTEIN, and ) | |
| CHARLES M. THOMAS, JR. ) | |
| serve:  Handgun Permit Review Board ) | |
|            300 E. Joppa Road, Suite 1000 ) | |
|            Towson, Maryland 21286 ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

**COME NOW** the Plaintiffs, Raymond Woollard and Second Amendment Foundation,

Inc., by and through undersigned counsel, and complain of the defendants as follows:

THE PARTIES

1.      Plaintiff Raymond Woollard is a natural person and a citizen of the United States

and of the State of Maryland.

2.      Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF has over 650,000 members and supporters nationwide, including Maryland. The purposes of SAF include promoting the exercise of the right to keep and bear arms; and education, research, publishing and legal action focusing on the Constitutional right to privately own and possess firearms, and the consequences of gun control. SAF brings this action on behalf of itself and its members.

3.      Defendant Terrence B. Sheridan is the Secretary and Superintendent of the Maryland State Police. Defendant Sheridan is responsible for executing and administering the State of Maryland's laws, customs, practices, and policies at issue in this lawsuit; has enforced the challenged laws, customs and practices against plaintiffs, and is in fact presently enforcing the challenged laws, customs and practices against plaintiffs. Defendant Sheridan is sued in his capacity as the licensing official for Maryland handgun carry permits.

4.      Defendant Denis Gallagher is a member of the Maryland Handgun Permit Review Board and is sued in that capacity. Defendant Gallagher is responsible for executing and administering the State of Maryland's laws, customs, practices, and policies at issue in this lawsuit; has enforced the challenged laws, customs and practices against plaintiffs, and is in fact presently enforcing the challenged laws, customs and practices against plaintiffs.

5.      Defendant Seymour Goldstein is a member of the Maryland Handgun Permit Review Board and is sued in that capacity. Defendant Goldstein is responsible for executing and administering the State of Maryland's laws, customs, practices, and policies at issue in this

lawsuit; has enforced the challenged laws, customs and practices against plaintiffs, and is in fact presently enforcing the challenged laws, customs and practices against plaintiffs.

6.      Defendant Charles M. Thomas, Jr. is a member of the Maryland Handgun Permit Review Board and is sued in that capacity. Defendant Thomas is responsible for executing and administering the State of Maryland's laws, customs, practices, and policies at issue in this lawsuit; has enforced the challenged laws, customs and practices against plaintiffs, and is in fact presently enforcing the challenged laws, customs and practices against plaintiffs.

JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983.

8.      Venue lies in this Court pursuant to 28 U.S.C. § 1391.

STATEMENT OF FACTS

9.      The Second Amendment to the United States Constitution provides: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

10.      The Second Amendment guarantees individuals a fundamental right to carry functional handguns in non-sensitive public places for purposes of self-defense.

11.      The Second Amendment right to keep and bear arms applies as against the states by operation of the Fourteenth Amendment.

12.      Maryland generally prohibits the public carrying of handguns without a license. Md. Criminal Law Code § 4-203; Md. Public Safety Code § 5-303.  The unlicensed carrying of a

3

handgun is a misdemeanor offense, carrying a penalty of 30 days to 3 years imprisonment and/or fine ranging from $250 to $2500 for a first offense. Md. Criminal Law Code § 4-203(c)(2)(i).

13.     Handgun carry permits are issued by the Secretary of the State Police. Md. Public Safety Code § 5-301.

14.     To qualify for a handgun carry permit, an applicant must establish that he or she is an adult; has not been convicted, without pardon, of a felony or misdemeanor for which a term of over 1 year imprisonment has been imposed; has not been convicted of drug crimes; is not an alcoholic or drug addict; and has not exhibited a propensity for violence or instability that may render the applicant's possession of a handgun dangerous.

15.     Additionally, the Superintendent must determine that the applicant "has good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger." Md. Public Safety Code § 5-306(a)(5)(ii).

16.     Plaintiff Raymond Woollard, an honorably-discharged Navy veteran, resides on a farm in a remote part of Baltimore County.

17.     On Christmas Eve, 2002, Woollard was at his home with his wife, son, daughter, and the daughter's children, when an intruder broke into the home by shattering a window. Woollard trained his shotgun on the intruder, but the latter wrested the shotgun away, and a fight broke out between the two. The fight ended when Woollard's son retrieved another gun and restored order pending the police's arrival.

18.     Woollard's wife called the police, but it took the police approximately 2.5 hours to arrive, owing to some confusion on their part as to the county in which Woollard's house was

4

located. The intruder was convicted of first degree burglary, receiving a sentence of three years probation. The probation was violated with an assault on a police officer and another burglary at a different residence, which finally landed him in prison.

19.  Woollard was issued a permit to carry a handgun, which was renewed in 2005 shortly after the intruder was released from prison. The intruder lives approximately three miles from Woollard.

20.  Woollard applied to renew his handgun carry permit a second time, but on February 2, 2009, was advised that his application was incomplete: "Evidence is needed to support apprehended fear (i.e. - copies of police reports for assaults, threats, harassments, stalking)."

21.  On April 1, 2009, Defendant Sheridan denied Plaintiff Woollard's handgun carry permit renewal application.

22.  Plaintiff Woollard requested an informal review of his permit renewal application denial. The informal review resulted in a second denial on July 28, 2009.

23.  Plaintiff Woollard administratively appealed to the Handgun Permit Review Board.

24.  In a November 12, 2009 decision by Defendants Gallagher, Goldstein, and Thomas, the Board affirmed the denial of Woollard's application, finding that Woollard "has not submitted any documentation to verify threats occurring beyond his residence, where he can already legally carry a handgun." Accordingly, the Board found Plaintiff Woollard "has not demonstrated a good and substantial reason to wear, carry or transport a handgun as a reasonable precaution against apprehended danger in the State of Maryland."

5

25.     In addition to and quite apart from any threat posed by the man who invaded Woollard's home, Plaintiff Woollard would carry a functional handgun in public for self-defense, but refrains from doing so because he fears arrest, prosecution, fine, and imprisonment as he does not possess a license to carry a handgun.

COUNT I
U.S. CONST., AMEND. II, 42 U.S.C. § 1983

27.     Paragraphs 1 through 26 are incorporated as though fully stated herein.

28.     Individuals cannot be required to prove their "good and substantial reason" for the exercise of fundamental constitutional rights, including the right to keep and bear arms.

29.     Individuals cannot be required to demonstrate that carrying a handgun is "necessary as a reasonable precaution against apprehended danger," or that they face a greater than average level of danger, as a prerequisite for exercising their Second Amendment rights.

30.     Maryland Public Safety Code § 5-306(a)(5)(ii)'s requirement that handgun carry permit applicants demonstrate "good and substantial reason to wear, carry, or transport a handgun, such . . . that the permit is necessary as a reasonable precaution against apprehended danger," violates the Second Amendment to the United States Constitution, damaging Plaintiffs in violation of 42 U.S.C. § 1983.  Plaintiffs are therefore entitled to permanent injunctive relief against the enforcement of this provision.

31.     Defendants' application of Maryland Public Safety Code § 5-306(a)(5)(ii)'s requirement that handgun carry permit applicants demonstrate "good and substantial reason to wear, carry, or transport a handgun, such . . . that the permit is necessary as a reasonable precaution against apprehended danger," violates the Second Amendment to the United States

Constitution, damaging Plaintiffs in violation of 42 U.S.C. § 1983.  Plaintiffs are therefore

entitled to permanent injunctive relief against the enforcement of this provision.

COUNT II

U.S. CONST., AMEND. XIV, EQUAL PROTECTION, 42 U.S.C. § 1983

32.     Paragraphs 1 through 31 are incorporated as though fully stated herein.

33.     Maryland Public Safety Code § 5-306(a)(5)(ii)'s requirement that handgun carry

permit applicants demonstrate cause for the issuance of a permit impermissibly classifies

individuals with respect to the exercise of a fundamental constitutional right. The provision

creates two classification of individuals. Applicants who have demonstrated to Defendants'

satisfaction that a handgun carry permit is "necessary as a reasonable precaution against

apprehended danger," or that they face a greater than average level of danger, are given permits;

applicants who cannot satisfy that burden are not given permits. The classification system is

inherently arbitrary, irrational, and deprives individuals of their fundamental right to bear arms

based on criteria that cannot be justified under any means-ends level of scrutiny for the security

of a fundamental constitutional right.  The provision thus violates Plaintiffs' Fourteenth

Amendment right to equal protection of the law, damaging them in violation of 42 U.S.C. §

1983.  Plaintiffs are therefore entitled to permanent injunctive relief against the enforcement of

this provision.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against

Defendants as follows:

1.     An order permanently enjoining defendants, their officers, agents, servants,

7

employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing Maryland Public Safety Code § 5-306(a)(5)(ii);

    2.     An order permanently enjoining defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from denying a permit to carry firearms on grounds that the applicant does not face a level of danger higher than that which an average person would reasonably expect to encounter.

    3.     An order commanding Defendants to renew Plaintiff Woollard's permit to carry a handgun;

    4.     Costs of suit, including attorney fees and costs pursuant to 42 U.S.C. § 1988;

    5.     Declaratory relief consistent with the injunction; and

    6.     Any other further relief as the Court deems just and appropriate.

Dated: January 19, 2011               Respectfully submitted,

| | |
|---|---|
| Alan Gura* | Cary J. Hansel |
| Gura & Possessky, PLLC | Joseph, Greenwald & Laake |
| 101 N. Columbus Street, Suite 405 | 6404 Ivy Lane, Suite 400 |
| Alexandria, VA 22314 | Greenbelt, MD 20770 |
| 703.835.9085/Fax 703.997.7665 | 301.220.2200/Fax 301.220.1214 |
| Lead Counsel | Local Counsel |
| *admitted pro hac vice | |

By:  /s/ Alan Gura_____
         Alan Gura

         Attorneys for Plaintiffs

8

J.A. 29

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

**RAYMOND WOOLLARD,** *et al.*,          *

                                        *

            *Plaintiffs*,

                                        *

    v.                                  Civil Case No. 1:10-cv-02068-JFM

                                        *

**TERRENCE SHERIDAN,** *et al.*,

                                        *

            *Defendants*.

                                        *

*   *   *   *   *   *           *   *   *   *   *   *

**ANSWER TO FIRST AMENDED COMPLAINT**

Defendants Terrence Sheridan, Denis Gallagher, Seymour Goldstein, and Charles M. Thomas, Jr., through their undersigned counsel, file this Answer to plaintiffs' first amended Complaint and state the following:

1.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in Paragraph 1 of the first amended Complaint and, therefore, deny those averments.

2.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the averments in Paragraph 2 of the first amended Complaint and, therefore, deny those averments.

3.      Defendants admit the allegations of the first sentence of Paragraph 3 of the first amended Complaint.   With respect to the second sentence, Defendants admit only that Defendant Sheridan is responsible, as Secretary of the Department of State Police, for receiving, processing, and approving, denying, or revoking applications to obtain or renew handgun wear and carry permits, and then for issuing handgun wear and carry permits when applications are approved.   Defendants further admit that Defendant Sheridan approved the issuance of two handgun wear and carry permits to Plaintiff Woollard, and, in 2009, denied issuance of a third permit.   Defendants deny the remaining allegations of the second sentence of Paragraph 3.   The third sentence of Paragraph 3 is a statement of Plaintiffs' intention and does not require a response.

4.      Defendants admit the first part of the first sentence of Paragraph 4 of the first amended Complaint, namely that Defendant Denis Gallagher is a member of the Maryland Handgun Permit Review Board.   The second part of the first sentence of Paragraph 4 is a statement of Plaintiffs' intention and does not require a response.   With respect to the second sentence, Defendants admit only that the Board is responsible for reviewing the decisions of the Secretary of the Department of State Police regarding denial or revocation of applications to obtain or maintain handgun wear and carry permits.   This responsibility includes sustaining, reversing, or modifying decisions of the Secretary after reviewing relevant evidence. Defendants deny the remaining allegations of the second sentence of Paragraph 4, except that they admit that the Handgun Permit Review Board, after conducting a hearing, sustained the denial of Mr. Woollard's application for a second renewal of his handgun wear and carry permit.

2

5.      Defendants admit the first part of the first sentence of Paragraph 5 of the first amended Complaint, namely that Defendant Seymour Goldstein is a member of the Maryland Handgun Permit Review Board.   The second part of the first sentence of Paragraph 5 is a statement of Plaintiffs' intention and does not require a response. With respect to the second sentence, Defendants incorporate by reference their response in Paragraph 4 above.  Defendants deny the remaining allegations of the second sentence of Paragraph 5.

6.      Defendants admit the first part of the first sentence of Paragraph 6 of the first amended Complaint, namely that defendant Charles M. Thomas, Jr. is a member of the Maryland Handgun Permit Review Board.  The second part of the first sentence of Paragraph 6 is a statement of Plaintiffs' intention and does not require a response.  With respect to the second sentence, Defendants incorporate by reference their response in Paragraph 4 above.  Defendants deny the remaining allegations of the second sentence of Paragraph 6.

7.      Paragraph 7 of the first amended Complaint states a legal conclusion as to which no response is required.

8.      Paragraph 8 of the first amended Complaint states a legal conclusion as to which no response is required.

9.      Paragraph 9 of the first amended Complaint purports to quote a written document that speaks for itself and Defendants defer to that document.   Moreover, Plaintiffs have misquoted the document, the actual text of which is: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

3

10.     Paragraph 10 of the first amended Complaint states a legal conclusion as to which no response is required.  To the extent any response is required, Defendants deny the allegations.

11.     Paragraph 11 of the first amended Complaint states a legal conclusion as to which no response is required.

12.     Paragraph 12 of the first amended Complaint states legal conclusions as to which no response is required.  Moreover, Paragraph 12 purports to summarize statutory provisions that are in writing and speak for themselves.  Defendants deny Plaintiffs' attempt to characterize and summarize the statutes, and defer to the text of the statutes for their requirements.

13.     Defendants deny the allegation of Paragraph 13 of the first amended Complaint as phrased.  Handgun wear and carry permits are issued by the Secretary of the Department of State Police pursuant to Md. Code, Ann., Public Safety § 5-306.

14.     Paragraph 14 of the first amended Complaint purports to summarize the text of a statute that is in writing and speaks for itself.  Defendants deny Plaintiffs' attempt to characterize and summarize that statute, and defer to the text of the statute for its requirements.

15.     Defendants incorporate by reference their answer to Paragraph 14.  By way of further response, Defendants admit that Plaintiffs have accurately quoted Md. Code Ann., Public Safety § 5-306(a)(5)(ii).

16.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16 of the first amended Complaint and, therefore, deny those allegations.

17.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17 of the first amended Complaint and, therefore, deny those allegations.  By way of further response, upon information and belief, the "intruder" mentioned in Paragraph 17 of the first amended Complaint was Plaintiff Woollard's son-in-law, Kris Lee Abbott, who arrived at Plaintiff Woollard's home unarmed; the shotgun involved in the altercation was introduced by Mr. Woollard; and the only person at whom Mr. Abbott pointed the gun was Mr. Abbott himself, not Mr. Woollard or members of Mr. Woollard's family.

18.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18 of the first amended Complaint and, therefore, deny those allegations.

19.     Defendants admit that Plaintiff Woollard was issued a handgun wear and carry permit and that this permit was renewed once, in 2006.  With respect to the remaining allegations in Paragraph 19 of the first amended Complaint, Defendants lack knowledge or information sufficient to form a belief as to their truth and, therefore, deny those allegations.

20.     Defendants admit that Plaintiff Woollard applied to renew his handgun wear and carry permit a second time.  The remaining allegations in Paragraph 20 of the first amended Complaint are an attempt to summarize a written document that speaks for itself and Defendants defer to that document in its entirety.  By way of further response, Defendants admit that Plaintiffs have accurately quoted a portion of that document.

21.     Defendants admit that Plaintiff Woollard's 2008 handgun wear and carry permit renewal application was denied on April 1, 2009, but deny the remaining allegations of

Paragraph 21 of the first amended Complaint as phrased.  By way of further response, Plaintiff Woollard's 2008 handgun wear and carry permit renewal application was denied by Defendant Sheridan acting through personnel of the Department of State Police.

22.     Defendants admit the allegations of Paragraph 22 of the first amended Complaint.

23.     Defendants admit the allegations of Paragraph 23 of the first amended Complaint.

24.     Defendants admit the allegations of the first part of the first sentence of Paragraph 24 of the first amended Complaint, namely that the Board affirmed the denial of Plaintiff Woollard's application to renew his handgun wear and carry permit on November 12, 2009. The remaining allegations in Paragraph 24 of the first amended Complaint purport to summarize a written document that speaks for itself and Defendants defer to that entire document. Defendants deny Plaintiffs' attempts to characterize the contents of the document out of context. By way of further response, Defendants admit that Plaintiffs have accurately quoted isolated portions of the document.

25.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25 of the first amended Complaint and, therefore, deny those allegations.

J.A. 35

27.     Paragraph 27[1] of the first amended Complaint is not a substantive allegation to which any response is required.  To the extent a response is required, Defendants incorporate by reference their responses in paragraphs 1-25 above.

28.     Paragraph 28 of the first amended Complaint states legal conclusions as to which no response is required.  To the extent a response is required, Defendants deny the allegations.

29.     Paragraph 29 of the first amended Complaint states legal conclusions as to which no response is required.  To the extent a response is required, Defendants deny the allegations.

30.     Paragraph 30 of the first amended Complaint states legal conclusions as to which no response is required.  To the extent a response is required, Defendants deny the allegations.

31.     Paragraph 31 of the first amended Complaint states legal conclusions as to which no response is required.  To the extent a response is required, Defendants deny the allegations.

32.     Paragraph 32 of the first amended Complaint is not a substantive allegation to which any response is required.  To the extent a response is required, Defendants incorporate by reference their responses in paragraphs 1-25 and 28-31 above.

33.     Paragraph 33 of the first amended Complaint states legal conclusions as to which no response is required.  To the extent a response is required, Defendants deny the allegations.

---

[1]     The first amended Complaint does not include a numbered paragraph 26.  For ease of reference, this Answer refers to the paragraphs after paragraph 25 by the number designated in the first amended Complaint.

7

AFFIRMATIVE DEFENSES

1.     The first amended Complaint fails to state facts sufficient to constitute a claim upon which relief can be granted.

2.     This action is barred by plaintiffs' failure to exhaust administrative remedies, including, but not limited to, internal administrative procedures and/or statutory administrative procedures, and to appeal within the State of Maryland judicial system, and therefore this Court lacks jurisdiction over plaintiffs' claims.

3.     Plaintiff Second Amendment Foundation lacks standing to maintain this action.

4.      Defendants are entitled to judgment against Plaintiffs to the extent Plaintiffs have an adequate remedy at law.

5.     Defendants are entitled to judgment against Plaintiffs to the extent Plaintiffs' claims for relief are barred by laches, estoppel, or waiver.


Respectfully submitted,

DOUGLAS F. GANSLER
Attorney General of Maryland


DAN FRIEDMAN (Bar ID. 24535)
Assistant Attorney General
Office of the Attorney General
Legislative Services Building
90 State Circle
Annapolis, Maryland 21401
(410) 946-5600
dfriedman@oag.state.md.us

8

_____/s/_____
MATTHEW J. FADER (Bar ID. 29294)
Assistant Attorney General
STEPHEN M. RUCKMAN (Bar ID. 28981)
Attorney
Office of the Attorney General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-7906
mfader@oag.state.md.us
sruckman@oag.state.md.us

Dated: February 8, 2011

J.A. 38

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| RAYMOND WOOLLARD, et al., | ) | Case No. 1:10-cv-02068-JFM |
| | ) | |
| Plaintiffs, | ) | PLAINTIFFS' MOTION FOR |
| | ) | SUMMARY JUDGMENT |
| v. | ) | |
| | ) | |
| TERRENCE SHERIDAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**COME NOW** the Plaintiffs, Raymond Woollard and Second Amendment Foundation,

Inc., by and through undersigned counsel, and move this Honorable Court pursuant to Fed. R.

Civ. Proc. 56 for entry of Summary Judgment on their behalf and against Defendants, as

Plaintiffs are entitled to a judgment as a matter of law and there are no material factual disputes

among the parties. The motion is based upon the attached Memorandum in Support, Exhibits and

Declarations previously filed on motion for summary judgment, the Court's file, and any matter

of which the Court may take judicial notice. A proposed order is attached.

Dated: February 18, 2011        Respectfully submitted,

Alan Gura                      Cary J. Hansel
Gura & Possessky, PLLC        Joseph, Greenwald & Laake
101 N. Columbus Street, Suite 405    6404 Ivy Lane, Suite 400
Alexandria, VA 22314          Greenbelt, MD 20770
703.835.9085/Fax 703.997.7665    301.220.2200/Fax 301.220.1214

By: /s/ Alan Gura             By: /s/ Cary J. Hansel
      Alan Gura                    Cary J. Hansel

                            Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RAYMOND WOOLLARD, et al.,    *

    *Plaintiffs*,    *

    v.    *    Civil Case No. 1:10-cv-2068-JFM

TERRENCE SHERIDAN, et al.,    *

    *Defendants*.    *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

The defendants, Terrence Sheridan, Superintendent of the Maryland State Police, and Denis Gallagher, Seymour Goldstein, and Charles M. Thomas, Jr., members of Maryland's Handgun Permit Review Board, move the Court to enter judgment in their favor as to both counts of the plaintiffs' complaint for the reasons stated in Defendants' Memorandum in Support of Their Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, which is being filed simultaneously herewith.

          Respectfully submitted,

          DOUGLAS F. GANSLER
          Attorney General of Maryland

          DAN FRIEDMAN (Bar ID 24535)
          Assistant Attorney General
          Office of the Attorney General
          Legislative Services Building
          90 State Circle
          Annapolis, Maryland 21401
          Tel. 410-946-5600

dfriedman@oag.state.md.us

_____/s/_____

MATTHEW J. FADER (Bar ID 29294)
Assistant Attorney General
STEPHEN M. RUCKMAN (Bar ID 28981)
Attorney
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
Tel. 410-576-7906
Fax. 410-576-6955
mfader@oag.state.md.us
March 22, 2011                    sruckman@oag.state.md.us

2

J.A. 41

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **RAYMOND WOOLLARD, et al.,** | * | |
| *Plaintiffs*, | * | |
| v. | * | Civil Case No. 1:10-cv-2068-JFM |
| **TERRENCE SHERIDAN, et al.,** | * | |
| *Defendants*. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## DECLARATION OF DIANA J. BEESON

I, Diana J. Beeson, am competent to state and testify to the following, based on my personal knowledge.

1.     I am the Administrator to the Handgun Permit Review Board ("Board"), a position I have held since June, 2006.  My responsibilities in that capacity include sending letters concerning Board hearings to all parties involved, scheduling hearing dates, and keeping the business records of the Board, including records of the official dispositions of appeals coming before the Board.

2.     Attached as Exhibit A is a true and correct copy of the written statement that Raymond Woollard submitted to the Board as part of his hearing testimony for *In re: Raymond Woollard*, Case No. 09-4138 ("*In re: Woollard*").

3.     Attached as Exhibit B is a true and correct copy of the decision rendered by the Board on November 12, 2009 for *In re: Woollard*.

1

J.A. 42

4.     The Board maintains data on the number of meetings it holds, the number of appeals held, and the number of actions taken (affirmances, reversals, and modifications).   Based on data maintained by the Board, in the last twenty years the Board has affirmed the Secretary's denial of an application approximately 54% of the time, reversed it approximately 38% of the time, and modified or remanded it approximately 8% of the time.   A chart setting forth the specific totals of appeals, affirmances, reversals, and modifications over each of the last 20 years is attached as Exhibit C.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 17, 2011, Baltimore, Maryland

_____
Diana J. Beeson

2

# Exhibit A

About 3 years ago I had a real problem at my home in rural Baltimore County. My farm is in a very remote location.

I was taking care of my daughter and 2 grandchildren at the farm. I had loaned them a lot of money, not knowing it was going up in smoke. The reason for this was that my son-in-law was a drug addict (Heroin).

It was Christmas Eve 2002 about 9:00 pm. He called the house, was high on drugs of some kind, and said he was coming over to my house. Every one in the house told him to come over tomorrow. He would not listen and he said he was coming in and didn't care what happened. I said if he was going to cause trouble I was calling the Police, and he said he told me to go to Hell.

I followed through with my word and so did he. I called 911 and that was my first problem. I got the Maryland State Police, because of what they thought was a Carroll County address. We said we needed help and they told us that we were in BC and needed to contact the BC Police, The MSP at this time transferred us to the BCP and I got a recording. Needless to say it went downhill from there. He arrived and began calling the house from outside with threatening comments. We would hang up on him and he would run around the house rapping on each window, very un-settling. He then broke in the house threatening everyone, (even me, and I had a shotgun on him). I kept telling him to leave and he kept pushing at me. I didn't want to hurt him so I tried to keep my wits about me. When we got to the top of the steps, on the second floor of my house, I knew I had to stop him there. He made a play for the gun. I grabbed him by the neck (his hands were very bloody from breaking through the glass on my door) and at this time he grabbed me also. Every one was screaming behind me, but I refused to let him hurt somebody else. My son came from the bedroom behind me with another shotgun and told him to stop!! and said for him to go down to the kitchen, and we would all wait for the police. (seemed like forever). While this was all going on my wife was talking to the police, on the phone. From the time we called 911, until the BCP arrived it was 2-1/2 hrs later.

*All of this and he didn't come to see his family on Christmas Eve. He wanted to get her car to go to Baltimore for a deal.*

They took him into custody and went to the police station. The man called everyone, my family and his own he even called and threatened his own Mother and Father, if the didn't bail him out. They didn't and he spent 90 days in jail. He then got charged 1st degree burglary. He went to court lied about having a job and that he was going to go back with my daughter. They gave him 3 years supervised probation, and couldn't come any where near me. My daughter moved back in her house. Within 3 weeks he had broken probation, my daughter had to call the Police, on him again, they came and he pushed one the police and they took him back to jail. I could go on and on with this but he went back to court went back to jail and spent a short period and was out again.

He then came into my daughter's house stole the keys to her new car and took it to

App. Ex 1

J.A. 45

Baltimore to make a deal. On the way back, he rolled the car twice, and had it towed to her house and had it dropped at her front door. Can you imagine waking up the next morning to go to work and seeing this?

There was even a time before all of this happening when he rear ended a man on I-83, left the scene. He went to court, the trooper wasn't there and neither was the person that was injured so the Judge threw it out. Since then, he broke in another lady's house in the middle of the night and he spent the rest of the 3 years in Carroll County Detention Center and now is out on Work Release.

I applied for and received a Maryland Handgun Permit-March 2003 unrestricted, I have taken 3 NRA handgun courses, I am a veteran of USN, and in 1998 I had the pleasure of getting Cancer and getting a Bone Marrow Transplant, and have a perfect Police and driving record.( Haven't had a ticket since 1966)

# Exhibit B

| | | |
|---|---|---|
| In the matter of the review of the | * | Before the |
| decision of the Superintendent of the | | |
| Maryland State Police denying the | * | Handgun Permit Review Board |
| Renewal application for a | | |
| handgun permit to Raymond Woollard | * | Case No. 09-4138 |
| 19109 St. Abrahams Court | | |
| Hampstead, Maryland 21286 | * | MSP No. 438-65541 |

*     *     *     *     *     *     *     *     *     *     *

<u>DECISION OF THE HANDGUN PERMIT REVIEW BOARD</u>

<u>Statement of the Case</u>

The applicant, Raymond Woollard, is appealing to the Handgun Permit Review Board (Board) from the decision of the Superintendent of the Maryland State Police (MSP) denying his renewal application for a handgun permit.

<u>Background</u>

The applicant, Raymond Woollard, submitted a renewal application for a handgun permit to the MSP on October 3, 2008.  Mr. Woollard listed his occupation as electrician and his employer as the University of Maryland.  The Superintendent of the MSP denied the permit application, because he concluded that the applicant had not demonstrated a good and substantial reason to wear, carry, or transport a handgun as a reasonable precaution against apprehended danger.

On November 3, 2009, the Board held a hearing on Raymond Woollard's appeal.  Present at the hearing were Board members: Charles L. Washington, Denis Gallagher, Seymour Goldstein and Charles M. Thomas, Jr – Acting Chair.  Present for the Maryland State Police was Sgt. Arthur Griffies.  The applicant, Raymond Woollard was present as well as two witnesses, Deborah Woollard and Charles Knott.  Testimony at the hearing was received from Raymond Woollard, Deborah Woollard, Charles Knott and Sgt. Griffies.

<u>Applicant's Testimony</u>

The applicant, Raymond Woollard, testified he was assaulted by his son-in-law, Mr. Kris Lee Abbott, on Christmas Eve 2002.  The applicant stated that at the time Mr. Abbott was on drugs and had come to the house to get the applicant's

daughter's car to drive to Baltimore City and acquire more drugs. The applicant testified he would not let Mr. Abbott into his house so Mr. Abbott began calling the house from outside on a cell phone. The applicant testified Mr. Abbott began running around the house rapping on each window when the phone calls were disconnected. The applicant testified Mr. Abbott broke into his house through a glass door and attacked him. The applicant stated his son came out of a room and aimed a shotgun at Mr. Abbott and told him to stop. The applicant testified at that time everyone went downstairs and waited for the police to arrive. The applicant stated that due to problems with the 9-1-1 system and the misunderstanding about which county the applicant's house was in it took the Baltimore County Police 2 ½ hours to respond to the call.

The applicant stated he has had no contact with his son-in-law since the incident. In addition, the applicant feels strongly that the reason his son-in-law has not approached him is due to the fact that his son-in-law knows he had a handgun permit.

### MSP Testimony

At the November 3, 2009 hearing, the MSP testified that the applicant was originally issued a permit in 2003. The MSP stated the applicant was a key witness in a trial that led to a conviction and the incarceration of his son-in-law, Kris Abbott. The MSP further stated the applicant's first renewal was based on information that Mr. Abbott was released from confinement in 2006 and Mr. Abbott had apprehended fear there would be retaliation.

The MSP testified the applicant was advised that in order for his renewal to be approved he would need to submit documented threats or incidents that had occurred in the last three years. The MSP stated the applicant failed to submit any documentation. The MSP testified the applicant was told to contact them immediately if his situation changed or if he received threats.

### Findings of Fact

The Board finds the applicant was attacked by his son-in-law in December 2002 at his residence. The Board further finds the applicant has not had any contact with his son-in-law since then. In addition, the Board finds the applicant has not submitted any documentation to verify threats occurring beyond his residence, where he can already legally carry a handgun.

Raymond Woollard                                     -3-                                     Case No. 09-4138

## Conclusions of Law

Based upon its findings of fact, the Board finds that the applicant has not demonstrated a good and substantial reason to wear, carry, or transport a handgun as a reasonable precaution against apprehended danger in the State of Maryland.

## Order

On a motion to uphold the Maryland State Police, by a majority vote, with Charles Washington abstaining, the decision of the Board is to uphold the action of the Superintendent of the Maryland State Police.

Charles M. Thomas, Jr. – Acting Chair
Date: November 12, 2009

J.A. 50

# Exhibit C

HANDGUN PERMIT REVIEW BOARD STATISTICS
1990 - 2010

| Year | No. of Meetings | No. of Appeals Heard | Action Taken | |
|------|-----------------|----------------------|--------------|---|
| 1990 | 21 | 29 | Affirmed: | 18 |
| | | | Reversed: | 9 |
| | | | Modified: | 2 |
| | | | Total: | 29 |
| 1991 | 23 | 29 | Affirmed: | 19 |
| | | | Reversed: | 7 |
| | | | Modified: | 3 |
| | | | Total: | 29 |
| 1992 | 35 | 45 | Affirmed: | 16 |
| | | | Reversed: | 27 |
| | | | Modified: | 2 |
| | | | Total: | 45 |
| 1993 | 24 | 35 | Affirmed: | 16 |
| | | | Reversed: | 16 |
| | | | Modified: | 3 |
| | | | Total: | 35 |
| 1994 | 33 | 42 | Affirmed: | 21 |
| | | | Reversed: | 16 |
| | | | Modified: | 5 |
| | | | Total: | 42 |
| 1995 | 26 | 35 | Affirmed: | 19 |
| | | | Reversed: | 11 |

J.A. 52

|      |    |    | Modified: | 5 |
|------|----|----|-----------|---|
|      |    |    | Total:    | 35 |

| 1996 | 19 | 19 | Affirmed: | 11 |
|------|----|----|-----------|----|
|      |    |    | Reversed: | 7  |
|      |    |    | Modified: | 1  |
|      |    |    | Total:    | 19 |

| 1997 | 17 | 22 | Affirmed: | 13 |
|------|----|----|-----------|----|
|      |    |    | Reversed: | 9  |
|      |    |    | Modified: |    |
|      |    |    | Total:    | 22 |

| 1998 | 28 | 28 | Affirmed: | 18 |
|------|----|----|-----------|----|
|      |    |    | Reversed: | 8  |
|      |    |    | Modified: | 2  |
|      |    |    | Total:    | 28 |

| 1999 | 17 | 17 | Affirmed: | 10 |
|------|----|----|-----------|----|
|      |    |    | Reversed: | 6  |
|      |    |    | Remand:   | 1  |
|      |    |    | Total:    | 17 |

| 2000 | 17 | 25 | Affirmed: | 19 |
|------|----|----|-----------|----|
|      |    |    | Reversed: | 5  |
|      |    |    | Modified: | 1  |
|      |    |    | Total:    | 25 |

| 2001 | 18 | 28 | Affirmed: | 15 |
|------|----|----|-----------|----|
|      |    |    | Reversed: | 12 |

|      |    |    | Modified:  | 1   |
|------|----|----|------------|-----|
|      |    |    |            | 28  |
| 2002 | 10 | 13 | Affirmed:  | 7   |
|      |    |    | Reversed:  | 5   |
|      |    |    | Modified:  | 1   |
|      |    |    | Total:     | 13  |
| 2003 | 14 | 20 | Affirmed:  | 12  |
|      |    |    | Reversed:  | 5   |
|      |    |    | Modified:  | 3   |
|      |    |    | Total:     | 20  |
| 2004 | 17 | 19 | Affirmed:  | 8   |
|      |    |    | Reversed:  | 8   |
|      |    |    | Modified:  | 3   |
|      |    |    | Total:     | 19  |
| 2005 | 17 | 16 | Affirmed:  | 6   |
|      |    |    | Reversed:  | 6   |
|      |    |    | Modified:  | 4   |
|      |    |    | Total:     | 16  |
| 2006 | 9  | 14 | Affirmed:  | 8   |
|      |    |    | Reversed:  | 6   |
|      |    |    | Modified   | 0   |
|      |    |    | Total:     | 14  |
| 2007 | 9  | 11 | Affirmed   | 3   |

|      |    |    |                            |    |
|------|----|----|----------------------------|----|
|      |    |    | Reversed                   | 6  |
|      |    |    | Modified                   | 2  |
|      |    |    | Total:                     | 11 |
| 2008 | 8  | 10 | Affirmed                   | 5  |
|      |    |    | Reversed                   | 5  |
|      |    |    | Modified                   | 0  |
|      |    |    | Total:                     | 10 |
| 2009 | 12 | 19 | Affirmed                   | 8  |
|      |    |    | Reversed                   | 9  |
|      |    |    | Modified                   | 1  |
|      |    |    | Tie Vote (MSP stands)      | 1  |
|      |    |    | Total                      | 19 |
| 2010 | 18 | 27 | Affirmed                   | 15 |
|      |    |    | Reversed                   | 5  |
|      |    |    | Case settled –permit issued | 2  |
|      |    |    | Modified                   | 0  |
|      |    |    | To be heard                | 5  |
|      |    |    | Total                      | 27 |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **RAYMOND WOOLLARD, et al.,** | * | |
| *Plaintiffs,* | * | |
| v. | * | Civil Case No. 1:10-cv-2068-JFM |
| **TERRENCE SHERIDAN, et al.,** | * | |
| *Defendants.* | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DECLARATION OF MICHAEL A. JONES, SERGEANT

I, Michael A. Jones, am competent to state and testify to the following, based on my personal knowledge.

1.    I am the Section Supervisor within Licensing Division ("Division") of the Maryland State Police ("MSP") Support Services Bureau, a position I have held since May, 2010. As Section Supervisor, I am responsible for overseeing the daily operation of handgun wear and carry permit applications that are being processed by the Division for the MSP.

2.    Prior to assuming this position, I served in the Firearms Enforcement Section of the Division, where I reviewed handgun purchases.

**How Handgun Wear and Carry Permit Applications Are Processed**

3.    The MSP Handgun Permit Unit is the unit of the MSP designated to review all applications for handgun wear and carry permits, and make recommendations to the Superintendent on whether to grant or deny such applications.

4. With the exception of applications that require immediate attention, as described further below, applications that are received by the MSP Handgun Permit Unit, after being checked for administrative errors, are processed by first requesting criminal records checks and background investigations. This initial stage is to identify factors, such as a disqualifying criminal conviction, that would absolutely prohibit the applicant from wearing, carrying, or transporting a handgun. If any such factor is identified, the application is immediately disapproved and the applicant is sent a disapproval letter.

5. If no such factors are identified, the application is then reviewed utilizing the criteria set forth in COMAR 29.03.02.04. One of these criteria—consistent with Md. Code, Public Safety § 5-306(a)(5)(ii)—is the applicant's stated purpose for seeking a wear and carry permit, which is reviewed in order to determine whether it is a "good and substantial reason." COMAR 29.03.02.04G.

6. In determining whether the applicant has "good and substantial reason" to carry a handgun, information is requested and considered based on the stated purpose for seeking a handgun carry permit.

7. To demonstrate a "good and substantial reason" to wear and carry a handgun, an applicant is generally expected to submit information to the Handgun Permit Unit in the form of: (1) a letter explaining the reason(s) that caused him or her to apply; and (2) any documentation (police reports, affidavits, restraining orders, etc.) supporting the stated reason(s).

8. There are four primary categories under which a handgun permit is considered:(1) for business activities, either at the business owner's request or on behalf

2

of an employee; (2) for regulated professions (security guard, private detective, armored car driver, and special police officer); (3) for "assumed risk" professions (e.g., judge, police officer, public defender, prosecutor, orcorrectional officer); and (4) for personal protection. For the first three categories, the "good and substantial reason" is usually apparent from the business activity or profession itself.

9.     For each category, documentation is required that is appropriate to the type of permit being requested. For business activities, this includes: (a) a copy of a business license or other document verifying a legitimate business; (b) a description of when and why the business owner wants/needs to carry a firearm; (c) a letter from a bank verifying the existence of a business account into which the business owner is making deposits; and (d) documentation verifying that there is a potential "street valued" commodity involved in the owner's business, for example sums of cash that the owner transports from his or her place of business to a bank for deposit. If the business activity permit is for an employee, the documentation would include a verification of the employee's employment and an explanation as to when and where the employee is to be wearing, carrying, and/or transporting the handgun. Permits in this category generally contain restrictions limited to the activities at issue.

10.     For regulated professions, such as security guard, private detective, armored car driver, and special police officer, the applicant's required documentation includes: (a) an employment verification letter or other written request bythe employing entity for the applicant to be armed; (b) a firearms score sheet with a passing range score of 70% or better; (c) a letter from entity specifying if the permit is to be for the job site

J.A. 58

only or for movement between the employee's residence and the job site; and (d) verification that the applicant is licensed or certified to work in the capacity of a security guard, private investigator, special police officer, etc. Permits in this category generally contain restrictions limited to the activities at issue.

11. For assumed risk professions, such as judge, active or retired police officer, public defender, prosecutor, or correctional officer, the applicant's documentation should contain: (a) a letter verifying his or her employment in good standing; (b) a letter verifying that he or she works in a capacity that exposes him or her to threats; and (c) verification of firearms rules and regulations pertaining to his or her employer's standard operating procedures.

12. For permits that are requested for personal protection, the applicant's documentation should contain: (a) a letter explaining the reason/events that caused him or her to apply; (b) if available, a police report verifying the statements made by the applicant in his or her letter; and (c) affidavits verifying the statements made, written by reliable sources.

13. In determining whether an applicant seeking a permit for personal protection has provided a "good and substantial reason," the Handgun Permit Unit follows the guidance provided by the Court of Special Appeals, in the cases of *Snowden v. Handgun Permit Review Board*, 413 A.2d 295, 298 (Md. Ct. Spec. App. 1980), and also *Scherr v. Handgun Permit Review Board*, 880 A.2d 1137 (Md. Ct. Spec. App. 2005). According to these cases, a "good and substantial reason" must reflect more than "personal anxiety" and evidence a level of threat beyond that faced by the average

4

J.A. 59

citizen. Importantly, however, these cases also caution the Unit against relying exclusively on apprehended threats.   Thus, although one of the criteria listed in the regulations is "[w]hether the permit is necessary as a reasonable precaution for the applicant against apprehended danger," COMAR 29.03.02.04O, failure to meet this criterion is not dispositive.

14.   Consistent with this court guidance, the Handgun Permit Unit also takes the following factors into consideration when judging the proffered "good and substantial reason": (1) the "nearness" or likelihood of a threat or presumed threat; (2) whether the threat can be verified; (3) whether the threat is particular to the applicant, as opposed to the average citizen; (4) if the threat can be presumed to exist, what is the basis for the presumption; and (5) the length of time since the initial threat occurred.  These factors are not exhaustive; the Handgun Permit Unit takes the applicant's entire situation into account when considering whether a "good and substantial reason" exists.

15.   If the Handgun Permit Unit determines, based on the above analysis, that a "good and substantial reason" exists, it issues an initial wear and carry permit with the approval of the Secretary of the MSP.  Original permits are valid for between two and three years from the date of issuance, depending on the birth date of the applicant in relation to the time of application.   Permits may be renewed for three-year terms and there is no limit on the number of times the permit may be renewed.

16.   The process described above can be expedited where an applicant faces an immediate threat to his or her safety, such as an assault victim learning his or her attacker is being released from prison that day.  In some such cases, permits have been issued on a

5

same-day basis, with the steps above being taken promptly afterward.  If the person is ultimately found not to qualify, the permit can be revoked.

## Raymond Woollard's Handgun Wear and Carry Permit

17.    The MSP Handgun Permit Unit reviewed the handgun wear and carry permit applications of plaintiff Raymond Woollard.

18.    Attached as Exhibit A is a true and correct copy of a December 24, 2002 police report, filed by Mr. Woollard as part of both his original application for a handgun wear and carry permit and his first renewal application.  This was maintained in the MSP Handgun Permit Unit file for Mr. Woollard.

## Firearm Data Generally

19.    Based on data maintained by the MSP Support Services Bureau, 88,162 applications were made to purchase firearms in Maryland in 2010, of which roughly 45% (39,542) were handguns and roughly 55% (48,620) were long guns.  We use the number of applications, which are tracked because they trigger background checks, as the best proxy for the number of sales, for which we do not have statistical data.  The numbers of

6

applications for prior years, in which an even greater portion of applications were for long guns, are:

| Year | # of long gun purchase applications | # of handgun purchase applications | Total purchase applications | # of handgun applications as % of total |
|------|------|------|------|------|
| 2010 | 48,620 | 39,542 | 88,162 | 44.9% |
| 2009 | 49,615 | 45,576 | 95,191 | 47.9% |
| 2008 | 49,581 | 40,002 | 89,583 | 44.7% |
| 2007 | 47,148 | 33,101 | 80,249 | 41.2% |
| 2006 | 52,485 | 29,722 | 82,207 | 36.2% |
| 2005 | 52,323 | 28,624 | 80,947 | 35.4% |
| 2004 | 52,280 | 25,201 | 77,481 | 32.5% |
| 2003 | 51,260 | 27,010 | 78,270 | 34.5% |
| 2002 | 50,977 | 27,787 | 78,764 | 35.3% |
| 2001 | 53,331 | 30,016 | 83,347 | 36.0% |

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on March ___, 2011, Baltimore, Maryland

Michael A. Jones

7

J.A. 62

# Exhibit A

Sent With ORIGINAL
1082

# BALTIMORE COUNTY POLICE DEPARTMENT
SUPPLEMENT

"INTEGRITY...
FAIRNESS...
SERVICE"

| | | 1a. DIV. 07 | 2a. PC 07 | 3a. CC NUMBER 02-358-1381 |
|---|---|---|---|---|

PENSE / INCIDENT
Degree Burglary

5a. VICTIM / PROS / COMPLAINANT NAME (LAST, FIRST, MIDDLE)
Woollard, Raymond Earle

3b. DATE OF ORIGINAL REPORT
12-24-02

SUPPLEMENT STATUS:   [✓] CONTINUATION  OR  [ ] FOLLOW-UP

6. IF MULTIPLE CLEARANCES, LIST CC NUMBERS

RATIVE:  DO NOT REPEAT RESULTS OF PRELIMINARY INVESTIGATION (CLARIFY DATA, SCREENING FACTORS, PROBABLE CAUSE, ETC.), ENTER ANY INFORMATION THAT IS PERTINENT.
DO NOT SUMMARIZE UNLESS NECESSARY.

MARYLAND
STATE POLICE

AGE
o. 2

10a. ARREST
DATA

11a. NAME (LAST, FIRST, MIDDLE)

ARREST NUMBER / BCI NUMBER / MISCELLANEOUS INFORMATION

AUG 0 4 2005

HANDGUN
PERMIT SECTION

VICTIM

EFERENCE
K NUMBER

12a. NARRATIVE
Location: 4130 Beckleysville Road, Hampstead MD 21074

On 12-24-02 at approximately 2204 hrs the undersigned was dispatched to a harassment call at 4130
kleysville road. The victim Raymond Woollard advised that his daughter's estranged husband was at the house
ng to take her car. While enroute to the call the undersigned received additional information via police radio that the
pect who would be identified as Kris Lee Abbott had broken into the kitchen as was now in the house. Additional
rmation was relayed to the undersigned via police dispatched that the suspect had now taken a shotgun from Mr.
ollard and was holding it himself.  Upon arrival the undersigned and Officer Siwek #3122 approached the house and
erved several people in the kitchen area. The undersigned observed that the glass to the inside wooden door had
n broken out.

While looking into the kitchen the undersigned observed a white female come to the kitchen door and open it.
cer Siwek ordered the woman who would be identified as Dawn Abbott, out of the house. When Mrs. Abbott exited
house she advised that her husband was in the kitchen and he was not armed. The undersigned and Cpl. Wilt
'61 made entry into the kitchen and took the suspect Kris Lee Abbott into custody.

The undersigned then spoke with Mr. Raymond Woollard. Mr. Woollard advised that his estranged son-in-law
ne to his house and was walking around the house tapping on all the windows. Mr. Woollard advised that he told the
pect Abbott to leave. Mr. Woollard then advised that he went upstairs with his family and he heard the glass to the
hen door break. Mr. Woollard then advised that the suspect Abbott came up the steps to the bedroom. Mr. Woollard
rised that when the suspect Abbott came into the bedroom he pointed a shotgun at him and told him to leave. Mr.
oollard advised that the suspect Abbott grabbed the barrel of the shotgun and put it to his head and told Mr. Woollard
pull the trigger. Mr. Woollard then advised that the suspect Abbott took the shotgun away from him and went down to
kitchen were he stated that he was going kill himself.

The undersigned spoke with the suspect Abbott. Mr. Abbott advised that he came over to see his kids after he
d his wife had an argument on the phone. The suspect Abbott stated that when he couldn't get in to see the kids he

| | 13a. INITIAL SCREENING FACTOR | A. 12 | B. 0 | C. 0 | D. 0 | E. 0 | F. 0 | 14a. TOTAL SCREENING FACTORS | 12 | 15a. CASE STATUS (CIRCLE ONE) |
|---|---|---|---|---|---|---|---|---|---|---|
| REENING CTORS | | | | | | | | | | OPEN |
| REVISED TAL | REVISED SCREENING FACTOR | A. 12 | B. 0 | C. 0 | D. 0 | E. 0 | F. 0 | | | C-CLEAR |
| | 16a. INVESTIGATING OFFICER | | | 18a. SUPERVISOR'S APPROVAL | | | 20a. DATE | | | INACT |
| TRATOR | R N York          #3014 | | | B. Bradford | | | 2092   11/25/04 | | | SUSP. |
| | 21a. REPORT REVIEW OFFICER | 22a. REPORTING AREA 070090 | | 23a. DATE REC'D BY CENTRAL RECORDS | | | 24a. TELEX NUMBER | | | CLOSED |

m 11 (Rev. 3/00)

*Sent with Original*

## BALTIMORE COUNTY POLICE DEPARTMENT
### SUPPLEMENT

"INTEGRITY
FAIRNESS
SERVICE"

| | | | | 1a. DIV. 07 | 1b. PC .07 | 1c. CC NUMBER 02-358-1381 |
|---|---|---|---|---|---|---|

| 2. OFFENSE / INCIDENT | 3a. VICTIM / FIRM / COMPLAINANT NAME (LAST, FIRST, MIDDLE) | | 3c. DATE OF ORIGINAL REPORT |
|---|---|---|---|
| Degree Burglary | Woollard, Raymond Earle | | 12-24-02 |

SUPPLEMENT STATUS:   [ ] CONTINUATION  OR  [ ] FOLLOW-UP      3b. IF MULTIPLE CLEARANCES, LIST CC NUMBERS

NARRATIVE:  DO NOT REPEAT RESULTS OF PRELIMINARY INVESTIGATION (CLARIFY DATA, SCREENING FACTORS, PROBABLE CAUSE, ETC), ENTER ANY INFORMATION THAT IS PERTINENT.
DO NOT SUMMARIZE UNLESS NECESSARY.

| PAGE NO. 3 | 11a. ARREST DATA | NAME (LAST, FIRST, MIDDLE) | | | |
|---|---|---|---|---|---|
| | | ARREST NUMBER / BCI NUMBER / MISCELLANEOUS INFORMATION | | VICTIM [ ] ADULT OR [ ] JUVENILE |

| REFERENCE XXX NUMBER | 12a. NARRATIVE: Location: 4130 Beckleysville Road, Hampstead MD 21074 |
|---|---|

stupid for 30 seconds and broke into the house. Mr. Abbott advised that he did not want to kill himself or anyone e that he just did something stupid because he couldn't see his kids.

   The suspect Abbott cut his hands when he broke out he glass to the kitchen door. Carroll County Medic #49 ponded and treated him for his cuts. EMS# 02014334.

   The above events occurred in Baltimore County.

is Officers next available Trial Dates are:
   01/28/03, 02/10/03, 04/29/03

-4) Woollard, Deborah Carroll W, F 7/28/48  4130 Beckleysville Road Hampstead MD 21074  410-239-7904

-5) Woollard, Bradley Thomas W/M 7/11/77 4130 Beckleysville Road Hampstead MD 21074  410-239-7904

MARYLAND
STATE POLICE

AUG 0 4 2005

HANDGUN
PERMIT SECTION

| 13a. SCREENING FACTORS | 13b. INITIAL SCREENING FACTOR | A. 12 | B. 0 | C. 0 | D. 0 | E. 0 | F. 0 | 14a. CASE CONTINUANCE | | 1a. CC NUMBER 02-358-1381 |
|---|---|---|---|---|---|---|---|---|---|---|
| REVISED TOTAL | 13c. REVISED SCREENING FACTOR | A. 12 | B. 0 | C. 0 | D. 0 | E. 0 | F. 0 | 14b. TOTAL SCREENING FACTORS  12 | 15a. CASE STATUS [CIRCLE ONE] OPEN | |
| | 15b. INVESTIGATING OFFICER  #3014 | | | 16a. SUPERVISOR'S APPROVAL  B. Bradford | | 16b. DATE 10/25/02 | | | (X-CLEAR) | |
| | 17a. REPORT REVIEW OFFICER | 17b. REPORTING AREA  070090 | | 18a. DATE REC'D BY CENTRAL RECORDS | | 18b. TELEX NUMBER | | | SUSP. | |
| | | | | | | | | | CLOSED | |

rm e11 (Rev. 3/00)

J.A. 65

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RAYMOND WOOLLARD, et al.,　　　*

　　　*Plaintiffs*,　　　　　　　　　*

　　　v.　　　　　　　　　　　　*　　Civil Case No. 1:10-cv-2068-JFM

TERRENCE SHERIDAN, et al.,　　　*

　　　*Defendants*.　　　　　　　　*

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

**DECLARATION OF PHILIP J. COOK**

　　Philip J. Cook, declares and states as follows, under penalties of perjury:

## I.　Credentials

1.　My current academic appointment is at Duke University, where I am ITT/Sanford

Professor of Public Policy, Professor of Economics and Sociology, and Senior

Associate Dean of the Sanford School of Public Policy.　I began my research

program on firearms violence in 1975, and since then have co-authored scholarly

books and articles on a variety of related topics, including the economic costs of

gun violence, the illicit markets for guns, the consequences of weapon choice in

robbery and assault, the influence of gun availability on gun use in crime, the use

of guns in self-defense, and the effectiveness of gun control regulations.　I have

served on expert panels for the National Academy of Sciences that dealt with

violence prevention, "smart" guns, rampage shootings in schools, and injury

control.　I also served as Consultant to the Enforcement Division of the United

1

States Department of Treasury (1999-2000), which at that time included the Bureau of Alcohol, Tobacco and Firearms.  I was elected fellow of the American Society of Criminology in 2000, and elected Member of the Institute of Medicine of the National Academies in 2001.  A full curriculum vitae is Appendix A of this declaration.

## II. Summary

2.  This declaration will present empirical evidence and my expert opinions concerning several issues arising out of this litigation:

   a.  Gun violence is a serious public health and safety problem that has social and economic consequences.

   b.  The type of weapon used by a perpetrator of violent crime is an important determinant of whether the victim is killed.

   c.  Weapon choice by violent offenders is influenced by the availability of firearms and has a direct effect on the criminal homicide rate

   d.  The prevalence of firearms does not affect rates of assault, robbery, or rape but has a direct positive effect on the lethality of these crimes.

   e.  Most crime guns are handguns.

   f.  Gun carrying away from home contributes directly to the use of guns in violent crime.

   g.  If law enforcement officials were required to issue CCW licenses to all adult applicants without a serious criminal record, a majority of future felony arrestees would qualify to carry concealed handguns in public.

J.A. 67

### III.  Opinions

### a.  Gun Violence is a Serious Public Health and Safety Problem that has Social and Economic Consequences.

3.  A great many Americans die by gunfire.  The gun deaths from homicide, accident and suicide have totaled close to one million during the last three decades. Firearms play a dominant role in the most serious violent crimes. In 2007, the most recent year for which the National Center for Health Statistics provides data on injury deaths, there were 18, 361 criminal homicides, of which 69% were committed with guns.  Emergency rooms treated nearly 50,000 nonfatal gunshot injuries from assaults. And there were a total of over 300,000 assaults and robberies in that year in which the perpetrator used a gun.[1]

4.  Criminal homicide is not evenly distributed across the population, but highly concentrated among youthful minority males.  In 2007, homicide victimization rates were 15 times as high for black men aged 15-34, as for white non-Hispanic men in this age group.  Homicide is the leading cause of death for black males age 15-34, and the second-leading cause of death for Hispanic males in this age group.

5.  Firearms also pose a particular threat to public officials and law enforcement officers.  Fourteen of the 15 direct assaults against Presidents, Presidents-elect, and presidential candidates in United States history were perpetrated with firearms, including the five resulting in death.  (The one exception, a failed attack

---

1 http://www2.fbi.gov/ucr/cius2009/data/table_19.html accessed January 17, 2011.

3

with a hand grenade against President George W. Bush, occurred overseas.)[2]  Of
the 536 law enforcement officers who were feloniously killed between 2000 and
2009, 490 (91%) were assaulted with a firearm and 73 % of those were with a
handgun.[3]

6.  I have conducted extensive research on the societal costs of gun violence and the
threat of gun violence.  The costs of gun violence to society are more evenly
distributed across the population than victimization statistics would suggest.  I and
my colleagues estimated the costs of treating gunshot wounds to be $2 billion per
year.[4]

7.  The threat of being shot causes private citizens and public institutions to undertake
a variety of costly measures to reduce this risk.  Furthermore, the threat of gun
violence is in some neighborhoods an important disamenity, causing residents to
be fearful and to take special precautions to protect themselves and their children.
That threat depresses property values and puts a drag on economic development.
Together with economist Jens Ludwig, I quantified the overall magnitude of these
social costs by conducting a contingent-valuation survey that asked individuals
what they would be willing to pay to reduce gun violence in their community.

---

2 http://www.fas.org/sgp/crs/misc/RS20821.pdf  accessed 1/10/11.  Congressional Research Service Report to
Congress, "Direct Assaults on Presidents, Presidents-Elect, and Candidates" Jan 7, 2008.

3 http://www2.fbi.gov/ucr/killed/2009/data/table_27.html

4 PJ Cook, B Lawrence, J Ludwig, and T Miller (1999) "The Medical Costs of Gunshot Wounds" Journal of the
American Medical Association 282(5), August 4,  447-454.

4

J.A. 69

Based on their responses we estimated an overall cost of violent crime with firearms to be $80 billion in 1995.[5]

**b. The Type of Weapon Used by a Perpetrator of Violent Crime is an Important Determinant of Whether the Victim is Killed.**

8. The government has an interest in reducing the number of guns used in violent crime in order to reduce the number of deaths and life-threatening injuries that are produced when guns rather than less deadly weapons are used in crime.

9. Guns are intrinsically more deadly than other weapons that are commonly used in criminal assault, in that they provide a means of inflicting a fatal wound quickly, from a distance, with little personal risk, determination, involvement, or strength required. Gun use in an assault increases the likelihood of death by making it easier to kill. As a result, while only a small fraction (5 percent) of criminal assaults are perpetrated with guns, over two-thirds of fatal assaults (murders and non-negligent homicides) are perpetrated with guns.

10. In two seminal articles, Franklin Zimring provided systematic evidence that the weapon type used in an assault affects the likelihood the victim will be killed.[6] Zimring drew on crime data from Chicago to show that case-fatality rates in gun attacks are a multiple of those in knife attacks, despite the fact that the

---

5 J Ludwig and PJ Cook (2001), "The Benefits of Reducing Gun Violence: Evidence from Contingent-Valuation Survey Data" Journal of Risk and Uncertainty 22(3): 207-226.

6 FE Zimring (1968). "Is gun control likely to reduce violent killings?" University of Chicago Law Review, 35, 721-737; FE Zimring (1972). "The medium is the message: Firearm caliber as a determinant of death from assault." Journal of Legal Studies, 1, 97-124.

J.A. 70

circumstances are generally quite similar.   In serious attacks, he concluded, the difference between whether the victim lived or died was often a matter of chance rather than a difference in intent, and the chances of death were higher with a gun than a knife. Zimring  found further confirmation in comparing the case-fatality rates among shootings involving guns of different caliber.[7] He demonstrated that victims were more likely to die in larger-caliber shootings, again suggesting that the intrinsic lethality of the weapon, and not just the assailant's intent, affected the outcome – a result that I have dubbed the "instrumentality effect."[8]

11. Research on the specific crime of robbery provides further confirmation for the instrumentality effect.  About half of victims of non-commercial robbery included in the National Crime Victimization Survey ("NCVS") report being physically attacked by the robber (rather than just threatened), and one-fifth require medical treatment.  Some victims are seriously wounded or killed.  In 2005 the FBI classified 921 murders as robbery-related (6 percent of all murders), implying that on the order of 1 in 1,000 robberies resulted in death that year. Since the most serious potential outcome of a robbery is the victim's death, it is of considerable interest to know what distinguishes fatal robberies from the great majority in which the victim survives.  One of my studies compared robbery murders (as documented by the FBI's Supplementary Homicide Reports) to non-fatal

---

7 *Id.,* 1972

8 PJ Cook (1991) "The Technology of Personal Violence" in Michael Tonry, ed. Crime and Justice:  An Annual Review of Research Vol. 14, University of Chicago Press.

6

J.A. 71

robberies, finding similar statistical patterns with respect to the characteristics of the offenders.[9] The most prominent *difference* between robbery and robbery murder was with respect to the types of weapons used. About *two*-thirds of robbery murders are committed with guns, while less than *one*-third of robberies involve guns. Gun robberies are three times more likely to result in the death of the victim than knife robberies, and knife robberies three times more likely to result in death than robberies with other weapons.[10] A regression analysis of changes in robbery-murder rates in 43 cities found a close relationship between the robbery rate and the robbery murder rate, as if the latter were simply a probabilistic byproduct of the former. Every additional 1,000 gun robberies added 4 robbery murders to the city's total, while an additional 1,000 nongun robberies added just one murder.[11] The conclusion is that whether the victim of an assault or robbery dies is not just a reflection of the offender's intent. The type of weapon used by the offender in an assault or robbery has a causal effect on whether the victim lives or dies. If the weapon used is a loaded firearm, the victim is much more likely to die than if the weapon is a knife or club. If the fraction of assaults or robberies involving guns increases, then the death rate will also increase.

---

9  PJ Cook (1987) "Robbery Violence." Journal of Criminal Law & Criminology. 78(2), 1987, 366.

10 *Id.*

11 *Id.,* 373.  See also W Wells and J Horney (2002) "Weapon effects and individual intent to do harm; influences on the escalation of violence" Criminology 40(2), May, 265-296.

**c.  Weapon Choice by Violent Offenders is Influenced by the Availability of Firearms and Has a Direct Effect on the Criminal Homicide Rate.**

12. The likelihood that a gun will be used in crime is closely linked to the general availability of guns, and especially handguns. Currently about one in three households nationwide are in possession of at least one firearm, and one in five households are in possession of a handgun.  The prevalence of gun ownership differs widely across the states, and is somewhat lower in Maryland than in the overall United States.

13. On average it is easier for youths and criminals to obtain guns in jurisdictions in which gun ownership is common than when gun ownership is relatively rare.  The types of transactions by which youths and felons obtain guns include loans from family members and friends, off-the-books sales, and thefts from homes and vehicles.  In a high-prevalence area, the informal off-the-books transactions of this sort are easier to arrange and may well be cheaper than in markets where gun ownership is relatively rare.[12]  For example, the prevalence of gun ownership has a direct effect on the likelihood that a residential burglary will result in the theft of one or more firearms.[13]

14. My research has provided strong evidence that the prevalence of gun ownership is closely linked to the likelihood that robbers or assailants will use a gun as opposed

---

12 PJ Cook, J Ludwig, SA Venkatesh and AA Braga (2007) "Underground Gun Markets" The Economic Journal, 117 (524), 588-618.

13 PJ Cook and J Ludwig (2003) "Guns and Burglary" in J. Ludwig and PJ Cook (eds.) Evaluating Gun Policy: Effects on Crime and Violence Washington, DC: Brookings Institution Press, 74-107.

to a knife or other weapon.  In articles published in scientific journals, I and my

coauthors have analyzed the effect of changes in the prevalence of gun ownership

on several crime-related outcomes.

- In a cross-section analysis of data from a survey of adolescent males, I found that the prevalence of gun ownership has a strong positive relationship to the probability of gun carrying by adolescent males.[14] Thus an increase in gun prevalence is associated with an increase in gun carrying by adolescent males.  (Gun prevalence has no effect on the likelihood of carrying a knife or other type of weapon.)

- In an analysis of Uniform Crime Reports data for the 200 largest counties over 20 years, I found that an increase in the prevalence of gun ownership also increases the percentage of robberies committed with a gun.[15]

- In another study of the 200 largest counties, I found that an increase in the prevalence of gun ownership had a direct positive effect on the criminal-homicide rate.[16]

**d. The prevalence of firearms does not affect rates of assault, robbery, or rape but has a direct positive effect on the lethality of these crimes.**

15. My research has demonstrated that the prevalence of firearms has little effect (if

any) on the rates of assault, robbery, or rape.[17]  I conclude that an increase in gun

ownership has on balance no deterrent effect on violent crime.  Thus the

---

14 PJ Cook and J Ludwig  (2004) "Does Gun Prevalence Affect Teen Gun Carrying After All?" Criminology 42(1), 27-54.

15 Cook, Ludwig and Venkatesh (2007); and  PJ Cook (1979) "The Effect of Gun Availability on Robbery and Robbery Murder:  A Cross-Section Study of Fifty Cities" Policy Studies Review Annual, Volume 3, Sage Publications, pp. 743-781.

16 PJ Cook and J Ludwig (2006) "The Social Costs of Gun Ownership" Journal of Public Economics  90(1-2), January: 379-391.
17 Id. Cook 1979;  Id. Cook and Ludwig 2006.

J.A. 74

prevalence of firearms does not affect the *volume* of violence, but has a positive effect on the death rate in assault and robbery (e.g., the criminal homicide rate).

16. These results help explain international differences in violence. The rates of assault and robbery in the United States are similar to those in Canada, Western Europe, and Australia. But our criminal homicide rate is far higher. The difference is that firearms are more prevalent and readily available in the United States, and as a result violent offenders in the United States are far more likely to use a firearm. As a result, the death rates in the United States are higher.

**e. Most Crime Guns are Handguns.**

17. While only about one third of the firearms in private possession are handguns (pistols or revolvers, as opposed to rifles or shotguns), the vast majority of gun assaults and robberies are perpetrated with handguns. For example, in 2009, 88% of all criminal homicides involving known types of guns were committed with handguns.[18] Over 90% of gun robberies involve handguns. Assailants choose handguns over long guns in part because handguns are smaller and more conveniently carried on the person or in a vehicle and can be readily concealed from law enforcement officers, potential victims, and the public at large. Because handguns pose a particular hazard to public safety, they have traditionally been subjected to more stringent regulation than rifles and shotguns (which are commonly used for hunting and other sporting purposes). For example, the federal Gun Control Act limits sales of handguns by dealers to those age 21 or older, whereas the minimum age for long gun sales is 18. A number of states

---

18 www2.fbi.gov/ucr.cius2009/offenses/expanded_information/data/shrtable_08.html, accessed 3/21/11.

require that anyone intending to acquire a handgun first obtain a special license or permit from state or local authorities; for seven states that requirement only applies to handguns.  Similarly, six states limit the purchase of handguns (but not rifles or shotguns) to one per month.

### f.  Gun Carrying Away from Home Contributes Directly to the Use of Guns in Violent Crime.

18. For an offender to use a gun logically requires that the offender is carrying a gun or has ready access to one at the time of the commission of a crime.[19]  For that reason the state has a legitimate interest in the regulation of whether and how guns are carried in public, and by whom.

19. Concern about the criminal use of guns in public has engendered state and local regulations that limit carrying.  In many cities, police departments have adopted targeted patrol against illegal gun carrying in an effort to reduce gun misuse.[20]

20. Targeted patrol against illicit gun carrying has been shown to be effective.  For example, in 1998, the Pittsburgh Police Department instituted a Firearm Suppression Patrol against illegal carrying.  This program involved expansion of patrol activities during high crime periods of the week, in two high crime areas of the city.  A careful analysis found that the program, which increased the number of

---

19 L Sherman (2000). "Gun carrying and homicide prevention." Journal of the American Medical Association, 283(9), 1193-1195.
20 PJ Cook, J Ludwig, SA Venkatesh, and AA Braga  (2007) "Underground Gun Markets" The Economic Journal, 117 (524) November: 588-618; PJ Cook and J Ludwig (2006)  "The Social Costs of Gun Ownership." Journal of Public Economics 90(1-2), 379-391; AA Braga and DL Weisburd (2010) Policing Problem Places: Crime Hot Spots and Effective Prevention.

stops of suspicious vehicles and pedestrians, had the effect of reducing gun misuse, including "shots fired" calls and gunshot injuries.[21]

21. All but three states currently either ban carrying a concealed firearm or (more commonly) restrict carrying to those who have obtained a license or permit for that purpose. In 33 states the statute requires the relevant authority to issue a license to any applicant who meets certain minimum requirements and pays the required fee; both the requirements and the fee differ among these "shall issue" states. In other states the issuing authority has some discretion in responding to an application. These "may issue" states, including Maryland, generally require that the applicant, in addition to meeting minimum requirements and paying a fee, demonstrate a good cause or justifiable need to carry a concealed weapon.

**g. If Law Enforcement Officials Were Required to Issue Concealed Carry Licenses to All Adult Applicants Without a Serious Criminal Record, a Majority of Future Felony Arrestees Would Qualify to Carry Concealed Handguns in Public.**

22. In shall-issue states where authorities are required to issue concealed-carry permits to all applicants who meet certain minimum conditions, the list of conditions typically includes a minimum age provision (usually 21) and the list of provisions of the federal Gun Control Act that limit lawful possession. Those provisions include a prior felony conviction, a misdemeanor conviction for domestic violence, an involuntary commitment for mental illness, and a current felony indictment. Of those provisions, the one that is most consistently documented in

---

21 J Cohen & J Ludwig (2003). "Policing gun crimes." In J Judwig & PJ Cook (eds), <u>Evaluating gun policy</u>. 217-239. Washington, DC: Brookings Institution Press.

J.A. 77

computerized databases that are available to law enforcement authorities is felony conviction.

23. It is sometimes alleged that most gun crimes are committed by active criminals who can be readily identified as such. For that reason, it is claimed that issuing concealed-carry permits to applicants who are not identified as criminals from public records poses no risk to the public safety. But this claim is false. In particular, the evidence indicates that a majority of criminal homicides and other serious crimes are committed by individuals who have not been convicted of a felony.

24. One of the first systematic studies of this subject was conducted using data from Illinois. I, together with two colleagues, found that just 43% of adults arrested for criminal homicide during the 1990s had a felony conviction on their record.[22]

25. Likewise, recent statistics for New York State demonstrate that most adults arrested for felonies do not have a prior felony conviction. Of adults (age 21 and over) arrested for a felony in New York State overall, just 33% of the 109,705 adults arrested for a felony in 2009 had a prior felony conviction.

26. These statistics demonstrate that most adults who are arrested for felony homicide would not have been barred from obtaining a permit to carry a concealed firearm prior to that arrest, *if* the only requirements for obtaining a permit were a lack of

---

22 PJ Cook, J Ludwig, and A Braga (2005) "Criminal Records of Homicide Offenders" Journal of the American Medical Association  294(5), August 3: 598-601.

13

prior felony conviction (and minimum age).  The same conclusion holds for those who are arrested for other felonies.

27. In other words, if the goal is to protect the public against dangerous criminals, then it is not enough to just screen out those with felony convictions.  That group constitutes only a minority of future arrestees for serious crimes, including felony homicide.

28. Concealed-carry permit systems in shall-issue states are intended to screen out some other groups besides those with a felony conviction record.  Following the federal Gun Control Act requirements for legal gun possession, they typically deny a permit to applicants who are known to have been convicted of misdemeanor domestic violence (or subject to a domestic restraining order), are under indictment for a felony or a fugitive, have been involuntarily committed to a mental institution, are an illegal alien, or are a user of illicit drugs.  Unfortunately, local officials have only limited access to public records that would identify which applicants have been convicted of domestic violence, or have been involuntarily committed to a private mental institution.

29. In any event, there is good reason to believe that of all the disqualifying conditions, felony conviction is the most common.  Statistics from the US Bureau of Justice Statistics indicate that a felony record is by far the most common

14

characteristic that blocks firearms transfers by firearms dealers when they conduct background checks of buyers.[23]

**h.  Conclusion**

30. I conclude that there is a legitimate public purpose in restricting the issuance of permits to carry concealed firearms, and providing local law enforcement officials with some discretion in this regard.  This public purpose is to reduce the incidence of firearms use in violent crime, and thereby reduce the rate of criminal homicide. A more lenient permit system that entitles all adults who lack a felony record to obtain a permit would qualify the majority of those who are later arrested for a felony.   It is reasonable to conclude that future felons will have greater access to firearms in a shall-issue regime, than in a may-issue regime.

Pursuant to 28 U.S.C. ' 1746 I declare under penalty of perjury that the foregoing is true and correct.  Executed on March 21st,  2011.

_Phily J Cook_
PHILIP J. COOK

---

23 http://bjs.ojp.usdoj.gov/content/pub/html/bcft/2009/bcft09st.pdf,  Table 4, accessed January 9, 2011.

J.A. 80

# Appendix A

February 17, 2011

# PHILIP JACKSON COOK

ITT/Terry Sanford Professor of Public Policy Studies   Telephone: 919 613-7360
Professor of Economics and Sociology                          FAX:   919 681-8288
Sanford School of Public Policy
Box 90245
Duke University                                    E-mail: pcook@duke.edu
Durham, NC 27708

Education:

   B.A. (with high distinction) University of Michigan, 1968
   Ph.D. (Economics) University of California, Berkeley, 1973

Positions held:

| | |
|---|---|
| 2009- | Senior Associate Dean for Faculty, Sanford School of Public Policy |
| 2008-9 | Schelling Visiting Professor of Public Policy, University of Maryland |
| 2003 | Residency, Bellagio Study and Conference Center (September-October) |
| 2000 | Visiting Scholar, Kennedy School of Government, Harvard University |
| 1997-99 | Director, Sanford Institute of Public Policy; Chair, Department of Public Policy Studies |
| 1994- | ITT/Terry Sanford Professor of Public Policy Studies |
| 1992- | Professor of Public Policy Studies, Economics, & Sociology, Duke University |
| 1989-90 | Visiting Professor, Fuqua School of Business, Duke University |
| 1985-89 | Director, Institute of Policy Sciences and Public Affairs, Duke University and Chairman, Department of Public Policy Studies |
| 1984- | Professor of Public Policy and Economics, Duke University |
| 1979-84 | Associate Professor; 1973-79  Assistant Professor, Duke University |

1

J.A. 82

1982        Expert (part time) Office of Policy and Management Analysis, Criminal
            Division, U.S. Department of Justice

Fall 1980   Visiting Scholar, Institute for Research in Social Science, University of
            North Carolina, Chapel Hill


Fellowships and Academic Honors:
Raymond Vernon Memorial Prize for best paper in *JPAM*, 2008
Richard A. Stubbing Teacher Mentor Award, 2008
Member, Institute of Medicine, National Academy of Sciences, 2001-
*Who's Who in America 2001and subsequent issues*
Fellow of the American Society of Criminology, 2000-
Vernon Prize for best paper in *Journal of Policy Analysis & Management* (v. 16), 1997
Research Associate, National Bureau of Economic Research 1996-
*Who's Who in Economics* 3rd edition (1996)
Kenneth J. Arrow Award (for best paper published in health economics), 1994
National Science Foundation Fellowship, 1968-1970
Special Career Fellowship (Ford Foundation), 1968-1972
National Merit Scholar, 1964-1968
Sims Award, Economics Department, University of Michigan, 1967
Phi Beta Kappa

2

J.A. 83

<u>Publications</u>

A.  Health and Safety Regulation

1.  Books and Edited Volumes

PJ Cook and JW Vaupel, eds. <u>Law and Contemporary Problems</u>, Autumn 1976.  Issue entitled "Valuing Lives: When and How Should Society Spend its Scarce Resources to Decrease Mortality"

<u>Law and Contemporary Problems</u>, Winter 1988.  Editor for issue entitled "Vice."

PJ Cook and A Scharff <u>Recommendations Concerning Administration and Rate Structure for Excise Taxation in Romania</u> Distributed by Tax Advisory Program, US Treasury Department, August 1994.

<u>Paying the Tab: The Economics of Alcohol Policy</u>  Princeton, NJ: Princeton University Press, 2007.
Chapters 10 and 12 serialized in <u>Milken Economic Review</u>  10(1) First Quarter, 2008)

2.  Articles

PJ Cook and D Graham "The Demand for Insurance and Protection: The Case of Irreplaceable Commodities" <u>Quarterly Journal of Economics</u>, February 1977, 143-156. Reprinted in Georges Dionne and Scott Harrington (eds.) <u>Foundations of Insurance Economics</u> Kluwer Academic Press, 1991.

"The Value of Human Life in the Demand for Safety: Comment" <u>The American Economic Review</u>, September 1978, 710-711.

"Discussion" (on Martin Bailey's paper on Safety Decisions and Insurance) <u>American Economics Association Papers and Proceedings</u>, May 1978, 300.

"The Effect of Liquor Taxes on Drinking, Cirrhosis, and Auto Fatalities," in Mark Moore and Dean Gerstein, eds. <u>Alcohol and Public Policy:  Beyond the Shadow of Prohibition</u>, National Academy of Sciences, 1981, 255-285; and in Richard Zeckhauser and Derek Leebaert, eds. <u>What Role for Government</u>? Duke University Press, 1983, 203-220.

PJ Cook and G Tauchen "The Effect of Liquor Taxes on Heavy Drinking" <u>Bell Journal of Economics</u>, Autumn 1982, 379-390.

"Alcohol Taxes as a Public Health Measure" <u>British Journal of Addiction</u>, September 1982, 245-250; and in Marcus Grant, Martin Plant, and Alan Williams, eds. <u>Economics and Alcohol</u>,  Croom Helm Ltd., 1983.

J.A. 84

PJ Cook and G Tauchen, "The Effect of Minimum Drinking Age Legislation on Youthful Auto Fatalities, 1970-77" Journal of Legal Studies 13, January 1984, 169-190. *reprinted in* The Economics of Health Behaviours, John H. Cawley and Donald S. Kenkel, eds., Cheltenham, UK: Edward Elgar Publishing Ltd., 2008.

"Increasing the Federal Alcohol Excise Tax" in Dean Gerstein, ed. Toward the Prevention of Alcohol Problems: Government, Business, and Community Action, National Academy Press, Washington, DC, 1984, 24-32.

"The Economics of Alcohol Consumption and Abuse" in Louis Jolyon West, ed. Alcoholism and Related Problems: Issues for the American Public, Prentice-Hall, 1984, 56-77.

"The Impact of Distilled Spirits Taxes on Consumption, Auto Fatalities and Cirrhosis Mortality" Control Issues in Alcohol Abuse Prevention: Strategies for States and Communities in Harold D. Holder, ed., Advances in Substance Abuse, Suppl: 1, Jai Press, Greenwich, CT, 1987, Pages 159-167.

"Comment" in John D. Graham (ed.) Preventing Automobile Injury: New Findings for Evaluation Research, Dover, MA: Auburn House Publishing Company, 1988, pp. 181-183.

DC Chapman, PJ Cook *et al.* "The Cultural Dimensions of Alcohol Policy Worldwide", Health Affairs, summer 1989, 48-62.

"The Social Costs of Drinking," in The Expert Meeting on the Negative Social Consequences of Alcohol Abuse Norewegian Ministry of Health and Social Affairs, Oslo, Norway, 1991.

PJ Cook and MJ Moore "Taxation of Alcoholic Beverages" in M. Hilton and G. Bloss, eds. Economic Research on the Prevention of Alcohol-Related Problems, NIAAA, NIH Publication No. 93-3513, 1993, 33-58.

PJ Cook and MJ Moore "Economic Perspectives on Reducing Alcohol-Related Violence" in Susan E. Martin, ed. Alcohol and Interpersonal Violence: Fostering Multidisciplinary Perspectives NIH Publication No. 93-3496, 1993, 193-212.

PJ Cook and MJ Moore "Violence Reduction through Restrictions on Alcohol Availability" Alcohol Health & Research World 17(2), 1993, 151-156.

PJ Cook and MJ Moore "Drinking and Schooling" Journal of Health Economics, 12, 1993, 411-429. *reprinted in* The Economics of Health Behaviours, John H. Cawley and Donald S. Kenkel, eds., Cheltenham, UK: Edward Elgar Publishing Ltd., 2008.

4

P.J. Cook and O-J Skog, "*Alcool, alcoolisme, alcoolisation*" by S. Ledermann" Alcohol Health & Research World 19(1), 1995, 30-32.

"Social Costs of Alcohol, Tobacco and Drug Abuse" and  "Tax Laws, Alcohol" in J.H. Jaffe, ed. The Encyclopedia of Drugs and Alcohol, New York: Macmillan Publishing Co, 1996.

"Comment" in Brookings Papers on Economic Activity: Microeconomics, 1994 162-166.

PJ Cook and MJ Moore "This Tax's for You" National Tax Journal September 1994, pp. 559-573.

KE Warner, PJ Cook, *et al.* "Criteria for Determining an Optimal Cigarette Tax: the Economists' Perspective" Tobacco Control Winter 1995 4(4), 380-86.

PJ Cook, A Parnell, MJ Moore, D Pagnini. "The Effects of Short-Term Variation in Abortion Funding on Pregnancy Outcomes" Journal of Health Economics 1999 18(2), 241-258. *reprinted in* The Economics of Health Behaviours, John H. Cawley and Donald S. Kenkel, eds., Cheltenham, UK: Edward Elgar Publishing Ltd., 2008.

PJ Cook and MJ Moore, "Alcohol" in AJ Culyer and JP Newhouse, eds. Handbook of Health Economics Vol 1B (New York: North-Holland) 2000, 1629-1673.

PJ Cook and MJ Moore, "Environment and Persistence in Youthful Drinking Patterns" in J Gruber, ed. Risky Behavior Among Youths: An Economic Analysis (Chicago: University of Chicago Press), 2001, 375-437.

PJ Cook and MJ Moore, "The Economics of Alcohol Abuse and Alcohol-Control Policies" Health Affairs 21(2), March/April 2002: 120-133.

"Pricing and Taxation of Alcohol: What is the 'Right' Tax Rate?  Comment on *Alcohol: No Ordinary Commodity*" Addiction, 98 (10), October 2003: 1356-7.

PJ Cook, J Ostermann, and FA Sloan "The Net Effect of an Alcohol Tax Increase on Death Rates in Middle Age" American Economic Review 95(2), May 2005: 278-281.

PJ Cook and P Reuter "When is Alcohol Just Another Drug" Addiction 102, June 2007: 1182-88.

PJ Cook and R Hutchinson "Smoke Signals: Adolescent Smoking and School Continuation" in Marina Bianchi (ed.) Advances in Austrian Economics Vol. 10, The Evolution of Consumption: Theories and Practices  2007: 157-188.

C Carpenter and PJ Cook "Cigarette Taxes and Youth Smoking: New Evidence from National, State, & Local Youth Risk Behavior Surveys" Journal of Health Economics

J.A. 86

27(2), March 2008: 287-299.

"A Free Lunch" Journal of Drug Policy Analysis 1(1), article 2.
http://www.bepress.com/jdpa/vol1/iss1/art2

Comment on "Explaining change and stasis in alcohol consumption"
17:6 of Addiction Research & Theory Journal 17:6, December 2009.

"Leave the minimum drinking age to the states" in Natasha A. Frost, Joshua D. Freilich, and Todd R. Clear (eds.) Contemporary Issues in Criminal Justice Policy Belmont, MA: Wadsworth, 2009: 99-106.

FJ Chaloupka, PJ Cook, RM Peck, and JA Tauras "Enhancing compliance with tobacco control policies" in Kathryn M. Neckerman, ed. Tobacco Policy New York: Columbia University Press, forthcoming.

P.J. Cook and Maeve Gearing, "The minimum drinking age: 21 as an artifact" in Helene R. White & David L. Rabiner  (eds.) College Student Drinking and Drug Use: Multiple Perspectives on a Complex Problem, Guilford Press 2011.

3.  Editorial

"Increasing the Federal Excise Taxes on Alcoholic Beverages" Journal of Health Economics 7(1), March 1988, 89-91.

B.  Economics of State Lotteries

1.  Book

CT Clotfelter and PJ Cook Selling Hope:  State Lotteries in America Harvard University Press, 1989. Paperback edition, 1991.

2.  Articles

CT Clotfelter and PJ Cook "Implicit Taxation in Lottery Finance" National Tax Journal, December, 1987

CT Clotfelter and PJ Cook "Redefining 'Success' in the State Lottery Business" Journal of Policy Analysis and Management 9(1), Winter 1990, 99-104.

CT Clotfelter and PJ Cook "On the Economics of State Lotteries" Journal of Economic Perspectives, Fall, 1990, 105-120.
Reprinted (in shorter version) in The Conference Board Economic Times 2(4), April 1991.  Reprinted (in revised version) in Samuel H. Baker and Catherine S. Elliott, eds. Readings in Public Finance 2nd ed., Cincinnati: South-Western College Publishers, 1997, 457-472.

6

CT Clotfelter and PJ Cook "What Kind of Lottery for North Carolina?" <u>Popular Government</u> 56(4), Spring 1991, pp. 25-29.

CT Clotfelter and PJ Cook "Lotteries in the Real World", <u>Journal of Risk and Uncertainty</u> 4(3), July 1991, 227-232.

CT Clotfelter and PJ Cook "Lotteries", in Peter Newman, Murray Milgate, and John Eatwell, eds. <u>The New Palgrave Dictionary of Money and Finance</u> Macmillan Press, London, 1992.

PJ Cook and CT Clotfelter "The Peculiar Scale Economics of Lotto" <u>American Economic Review</u>, June 1993, 634-643.

CT Clotfelter and PJ Cook "The Gambler's Fallacy in Lottery Play", <u>Management Science,</u> December 1993.

CT Clotfelter, PJ Cook, J Edell, and M Moore, State Lotteries at the Turn of the Century: Report to the National Gambling Impact Study Commission. June 1, 1999.

CT Clotfelter and PJ Cook, "Ends and Means in State Lotteries: The Importance of a Good Cause"   in Alan Wolfe and Erik C. Owens, eds. <u>Gambling: Mapping the American Moral Landscape</u> Waco:  Baylor University Press, 2009, 11-38.

3.  OpEd. Pieces (with Charles T. Clotfelter)

<u>New York Times</u>, August 20, 1987;
<u>The Atlanta Constitution</u>, February 12, 1989;
<u>The News and Observer</u> (Raleigh), May 27, 1990;
<u>Newsday</u>, July 24, 1990;
<u>San Diego Union</u>, April 1991.
<u>The News & Observer</u> (Raleigh), February 14, 1999
<u>The News & Observer</u> (Raleigh), March 1, 2007

C.  Crime and Criminal Justice Policy

1.  Monographs and Edited Volumes

<u>Robbery in the United States</u>, National Institute of Justice, September 1983.

PJ Cook and D Slawson <u>The Costs of Adjudicating Murder Cases in North Carolina</u> Administrative Office of the Courts, Raleigh, NC, 1993.

PJ Cook, J Ludwig, and J McCrary (eds.) <u>Controlling Crime: Strategies and Tradeoffs</u> Chicago: University of Chicago Press, 2011 (forthcoming).

7

J.A. 88

2. Symposium editor

"Explaining the growth in the prison population" <u>Criminology and Public Policy</u> 8(1), February 2009.

3. Articles

"The Correctional Carrot: The Prospect of Reducing Recidivism through Improved Job Opportunities" <u>Policy Analysis</u>, January 1975, 11-54.
*Reprinted* in *The Economics of Crime,* edited by Isaac Ehrlich and Zhiquiang Liu Northampton, MA: Edward Elgar Publishing, Inc., 2006.

"Punishment and Crime: A Critique of Recent Findings on the Preventive Effects of Punishment" <u>Law and Contemporary Problems</u>, Winter 1977, 164-204; and in Ralph Andreano and John Siegfried, eds. <u>The Economics of Crime</u>, John Wiley, 1980, 137-180.

"The Clearance Rate as a Measure of Criminal Justice System Effectiveness" <u>Journal of Public Economics</u> 11, 1979, 135-142; and in Egon Bittner and Sheldon L. Messinger, eds. <u>Criminology Review Yearbook</u>, Volume 2, Sage Publications, 1980.

"The Implications of Deterrence and Incapacitation Research for Policy Evaluation" in Cleon Foust and Robert Webster, eds. <u>An Anatomy of Criminal Justice</u>, D.C. Health, Lexington, 1980, 55-77.

"Research in Criminal Deterrence: Laying the Groundwork for the Second Decade" in Norval Morris and Michael Tonry, eds.  <u>Crime and Justice:  An Annual Review of Research, Volume 2</u>, University of Chicago, 1980, 211-268.

"Costs of Crime" in Sanford H. Kadish, ed. <u>Encyclopedia of Crime and Justice</u>, Macmillan Publishing Company, 1983.

"The Use of Criminal Statutes to Regulate Product Safety: Comment on Wheeler" <u>Journal of Legal Studies</u>, August 1984, 619-622.

PJ Cook and G Zarkin "Crime and the Business Cycle" <u>Journal of Legal Studies</u>, January 1985.

JQ Wilson and PJ Cook "Unemployment and Crime--What is the Connection?" <u>The Public Interest</u>, 79, Spring, 1985, 3-8.

PJ Cook and G Zarkin "Homicide and Economic Conditions" <u>Journal of Quantitative Criminology</u>, March 1986, Vol. 2, No. 1.

"The Demand and Supply of Criminal Opportunities" in Michael Tonry and Norval Morris, eds. Crime and Justice:  An Annual Review of Research, Vol. 7, University of Chicago Press, 1986, 1-28.

"Criminal Incapacitation Effects Considered in an Adaptive Choice Framework" in Derek Cornish and Ron Clarke, eds. The Reasoning Criminal, New York:  Springer-Verlag, 1986, 202-216.

PJ Cook and JH Laub "The (Surprising) Stability of Youth Crime Rates" Journal of Quantitative Criminology 2 (3) September 1986, 265-278.

"The Economics of Criminal Sanctions" in Martin L. Friedland (ed.) Sanctions and Rewards in the Legal System, University of Toronto Press, 1987.

PJ Cook and JH Laub "Trends in Child Abuse and Juvenile Delinquency" in Francis X. Hartman, ed. From Children to Citizens:  The Role of the Juvenile Court, Springer-Verlag, New York, 1987, Vol. II, Chapter 7, pp.109-127.

"Notes on an Accounting Scheme for a Juvenile Correctional System" in Francis X. Hartman (ed.) From Children to Citizens:  The Role of the Juvenile Court, Springer-Verlag, New York, 1987, Vol. II, Chapter 19, pp. 362-370.

PJ Cook and J Laub, "The Unprecedented Epidemic in Youth Violence" in Michael Tonry and Mark H. Moore eds., Youth Violence University of Chicago Press, 1998, 101-138.

PJ Cook, "The Epidemic of Youth Gun Violence" Perspectives on Crime and Violence: 1997-1998 Lecture Series (Washington, DC: National Institute of Justice), 1998, 107-125.

"Forward" to BC Welsh, DP Farrington, and LW Sherman (eds.) Costs and Benefits of Preventing Crime (Boulder, CO; Westview Press) 2001.

PJ Cook and JH Laub, "After the Epidemic: Recent Trends in Youth Violence in the United States" in Michael Tonry ed. Crime and Justice: A Review of Research Chicago, University of Chicago Press, 2002: 117-153.

"Meeting the Demand for Expert Advice on Drug Policy" Criminology and Public Policy 2(3), July 2003: 565-570.

"Comment" on "Catching Cheating Teachers" in William G. Gale and Janet Rothenberg Pack, eds., Brookings-Wharton Papers on Urban Affairs 2003 Washington, DC: Brookings Institution Press, 2003: 210-215.

9

J.A. 90

PJ Cook and N Khmilevska, "Cross-National Patterns in Crime Rates" in Michael Tonry and David P. Farrington, eds. Crime and Punishment in Western Countries, 1980-1999 Chicago: University of Chicago Press, 2005: 331-345.

PJ Cook and J Ludwig "Assigning Youths to Minimize Total Harm" in Kenneth A. Dodge, Thomas J. Dishion, and Jennifer E. Lansford (eds.) Deviant Peer Influences in Programs for Youth: Problems and Solutions The Guilford Press, 2006: 67-89.

"Symposium on Deterrence: Editorial Introduction" Criminology & Public Policy 5(3), August        2006: 413-416.

"Crime"  in Robert P. Inman, ed. MAKING CITIES WORK:  Prospects and Policies for Urban America  Princeton University Press, 2009: 297-327.

"Robbery" in Michael Tonry (ed.) Handbook on Crime and Justice  Oxford University Press, 2009.

Crime Control in the City:  A Research-Based Briefing on Public and Private Measures Cityscape: A Journal of Policy Development and Research 11(1), March, 2009: 53-80.

Potential Savings from Abolition of the Death Penalty in North Carolina  American Law and Economics Review 10, 2009: doi: 10.1093/aler/ahp022.

PJ Cook, DC Gottfredson, and C Na  "School crime control and prevention" in Michael Tonry, ed. Crime and Justice  University of Chicago Press, 2010.

"Property crime – yes; violence – no: Comment on Lauritsen and Heimer" Criminology & Public Policy 9(4), November 2010: 693-697.

"Comment" on "What do economists know about crime?" in R. DiTella, S. Edwards, and E. Schargrodsky The Economics of Crime: Lessons for & from Latin America  Chicago: University of Chicago Press, 2010: 302-304.

PJ Cook and J MacDonald  "Public safety through private action: An economic assessment of BIDs"  The Economic Journal (forthcoming).

"Co-Production in deterring crime," Criminology & Public Policy 2011 (forthcoming).

P.J. Cook and J. Ludwig, "Economical Crime Control," in Controlling Crime: Strategies and Tradeoffs, edited by P.J. Cook, J. Ludwig, and J. McCrary (2011), University of Chicago Press

P.J. Cook and J. MacDonald, "The role of private action in controlling crime," in Controlling Crime: Strategies and Tradeoffs, edited by P.J. Cook, J. Ludwig, and J. McCrary, University of Chicago Press, Chicago, 2011.

10

P.J. Cook & J. Ludwig, "The Economist's guide to crime busting" The Wilson Quarterly (Winter, 2011), pp. 62-66.

D.   Weapons and Violent Crime
  1.  Monographs and Edited Volumes

PJ Cook and D Nagin Does the Weapon Matter?  An Evaluation of a Weapon - Emphasis Policy in the Prosecution of Violent Offenders Institute of Law and Social Research, Washington, DC, 1979.

Annals of the American Academy of Political and Social Science, May 1981.  Issue entitled "Gun Control" (special editor).

PJ Cook and J Ludwig Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use Washington, D.C.: The Police Foundation, 1997.

Law and Contemporary Problems (special editor) "Kids, Guns, and Public Policy" 59(1): Winter 1996.

PJ Cook and J Ludwig Gun Violence: The Real Costs New York: Oxford University Press, 2000.

J Ludwig and PJ Cook (eds.) Evaluating Gun Policy: Effects on Crime and Violence Washington, DC: Brookings Institution Press, 2003.

  2.  Articles

"A Strategic Choice Analysis of Robbery" in Wesley Skogan (ed.) Sample Surveys of the Victims of Crimes, Ballinger, 1976, 173-187.

"Causal Linkages between Gun Control Ordinances and Crime: A Conceptualization and Review of the Literature" Hearings on the Treasury Department's proposed gun regulations, before the Subcommittee on Crime, Committee on the Judiciary, U.S. House of Representatives, 95th Congress, 2nd Session, Appendix 4, May 4 and 18, 1978.

"The Effect of Gun Availability on Robbery and Robbery Murder:  A Cross-Section Study of Fifty Cities" Policy Studies Review Annual, Volume 3, Sage Publications, 1979, pp. 743-781.  Also published in Hearings; see above.

"Reducing Injury and Death Rates in Robbery" Policy Analysis, 6(1) Winter 1980, 21-45.

PJ Cook and J Blose "State Programs for Screening Handgun Buyers" Annals of the American Academy of Political and Social Science, May 1981, 80-91. Reprinted in M. Gittell, ed. State Politics and the New Federalism ( NY: Longman, 1986).

11

J.A. 92

"The Effect of Gun Availability on Violent Crime Patterns," Annals of the American Academy of Political and Social Science, May 1981; and in Federal Regulation of Firearms (A Report prepared by Congressional Research Service for the U.S. Senate Judiciary Committee) USGPO, May 1982; and in Neil Alan Weiner, Margaret A. Zahn and Rita J.Sagi, eds., Violence:  Patterns, Causes, Public Policy  (San Diego:  Harcourt Brace Jovanovich, 1990).

PJ Cook and K Hawley "North Carolina's Pistol Permit Law:  An Evaluation" Popular Government, May 1981, 1-6.

"Guns and Crime: the Power of Long Division" Journal of Policy Analysis and Management, Fall 1981, 120-125.

"The 'Saturday Night Special': An Assessment of Alternative Definitions from a Policy Perspective" Journal of Criminal Law and Criminology 72:4, Winter 1981, 1735-1745.

"The Role of Firearms in Violent Crime" in Marvin E. Wolfgang and Neil A. Weiner, eds.  Criminal Violence (Sage Publications, 1982), 236-289; also titled "The Influence of Gun Availability on Violent Crime Patterns" in Norval Morris and Michael Tonry, eds. Crime and Justice: An Annual Review of Research, Volume 4, University of Chicago Press, 1983, 49-90.

"The Case of the Missing Victims:  Gunshot Woundings in the National Crime Survey" Journal of Quantitative Criminology, March 1985, 91-102.

"Is Robbery Becoming More Violent?  An Analysis of Robbery Murder Trends Since 1968" Journal of Criminal Law and Criminology, 76 (2), Summer 1985, 480-489.

"The Relationship Between Victim Resistance and Injury in Noncommercial Robbery" Journal of Legal Studies, XV (1), June 1986, 405-416.

"Robbery Violence" Journal of Criminal Law & Criminology, 78(2), 1987, 357-376. Reprinted in Robert Hornsby and Richard Hobbs (eds.) Gun Violence Ashgate Publishing Ltd.  Forthcoming.

"The Technology of Personal Violence" in Michael Tonry, ed. Crime and Justice: An Annual Review of Research Vol. 14, University of Chicago Press, 1991. Reprinted (in part) in Lee Nisbet (ed.) The Gun Control Debate: You Decide 2nd ed. (Chicago: Prometheus Books, 2001).

"Notes on the Availability and Prevalence of Firearms" American Journal of Preventive Medicine 9(3,supp), 1993.

12

PJ Cook and MH Moore "Gun Control" in James Q. Wilson and Joan Petersilia, eds. Crime (San Francisco: ICS Press, 1995), 267-294.

PJ Cook, S Molliconi, and T Cole "Regulating Gun Markets" Journal of Criminal Law & Criminology 86(1), 1995, 59-92.

PJ Cook and T Cole "Editorial: Strategic Thinking About Gun Markets and Violence" Journal of the American Medical Association 275(22), June 12, 1996, 1765-7.

PJ Cook and J Leitzel "Perversity, Futility, Jeopardy: An Economic Analysis of the Attack on Gun Control" Law and Contemporary Problems 59(1): Winter 1996: 91-118.

PJ Cook, J Ludwig, and D Hemenway, "The Gun Debate's New Mythical Number: How Many Defensive Uses Per Year" Journal of Policy Analysis and Management 16(3) Summer 1997, 463-9.

PJ Cook and J Leitzel, "Gun Control" New Palgrave Dictionary of Economics and Law, 1998.

J Ludwig, PJ Cook, and TW Smith, "The Gender Gap in Reporting Household Gun Ownership" American Journal of Public Health, v. 88, no. 11, Nov. 1998: 1715-1718.

PJ Cook and MH Moore, "Guns, Gun Control, and Homicide: A Review of Research and Public Policy" in M. Dwayne Smith and Margaret A. Zahn, eds., Homicide: A Sourcebook of Social Research Sage Publications, 1998, 277-296.  Also in M. Dwayne Smith and Margaret A. Zahn, eds., Studying and Preventing Homicide: Issues and Challenges, Sage Publications, 1998, 246-273.

PJ Cook and J Ludwig, "Defensive Gun Uses: New Evidence from a National Survey" Journal of Quantitative Criminology 14(2), 1998: 111-131 .

SP Teret, DW Webster, JS Vernick, TW Smith, D Leff, GJ Wintemute, PJ Cook, DF Hawkins, AL Kellermann, SB Sorenson, S DeFrancesco, "Support for New Policies to Regulate Firearms: Results of two national surveys" New England Journal of Medicine 339, Sept. 17, 1998: 813-818.

AL Kellermann and PJ Cook, "Armed and Dangerous: Guns in American Homes" in MA Bellesiles, ed., Lethal Imagination: Violence and Brutality in American History New York University Press, 1999, 425-440.

PJ Cook, B Lawrence, J Ludwig, and T Miller, "The Medical Costs of Gunshot Wounds" Journal of the American Medical Association 282(5), August 4, 1999, 447-454.

J.A. 94

J Ludwig and PJ Cook, "Homicide and Suicide Rates Associated with Implementation of the Brady Handgun Violence Prevention Act" Journal of the American Medical Association 284(5), August 2, 2000: 585-591.

J Ludwig and PJ Cook, "The Benefits of Reducing Gun Violence: Evidence from Contingent-Valuation Survey Data" Journal of Risk and Uncertainty 22(3), 2001: 207-226.

PJ Cook, MH Moore, and A Braga, "Gun Control" in James Q. Wilson and Joan Petersilia, eds. Crime: Public Policies For Crime Control, ICS Press, Oakland CA., 2002: 291-329.

PJ Cook and A Braga, "Comprehensive Firearms Tracing: Strategic and Investigative Uses of New Data on Firearms Markets" Arizona Law Review 43(2) 2001:277-309. Reprinted with minor changes as "New Law Enforcement Uses for Comprehensive Firearms Trace Data" in Bernard E Harcourt (ed.) Guns, Crime, and Punishment New York: NYU Press, 2003: 163-187.

PJ Cook and JA Leitzel, "'Smart' Guns: A Technological Fix for Regulating the Secondary Gun Market" Contemporary Economic Problems 20(1) January 2002: 38-49.

PJ Cook and J Ludwig, "The Costs of Gun Violence Against Children" The Future of Children 12(2), Summer/Fall 2002: 87-99.

PJ Cook and J Ludwig, "Litigation as Regulation: Firearms" WK Viscusi, ed. Regulation Through Litigation Washington, DC: Brookings Institution Press, 2002: 67-93
AA Braga, PJ Cook, DM Kennedy, and MH Moore "The Illegal Supply of Firearms" in Michael Tonry ed. Crime and Justice: A Review of Research Chicago, University of Chicago Press, 2002: 229-262.

PJ Cook and J Ludwig, "The Effects of Gun Prevalence on Burglary: Deterrence vs Inducement" in J Ludwig and PJ Cook (eds.) Evaluating Gun Policy Washington, DC: Brookings Institution Press, 2003: 74-118.

PJ Cook and J Ludwig, "Pragmatic Gun Policy" in J Ludwig and PJ Cook (eds.) Evaluating Gun Policy Washington, DC: Brookings Institution Press, 2003: 1-37.

PJ Cook and J Ludwig, "The Effects of the Brady Act on Gun Violence" in BE Harcourt (ed.) Guns, Crime, and Punishment in America New York: NYU Press, 2003: 283-298. reprinted in Steven D. Levitt and Thomas J. Miles (eds.) Economics of the Criminal Law Edward Elgar Publishing, 2007.

PJ Cook and Jens Ludwig "Fact-Free Gun Policy" University of Pennsylvania Law Review 151(4), April 2003: 1329-1340.

14

J.A. 95

D Azrael, PJ Cook, and M Miller "State and Local Prevalence of Firearms Ownership: Measurement, Structure, and Trends" Journal of Quantitative Criminology 20(1) March 2004: 43-62.

PJ Cook and J Ludwig "Does Gun Prevalence Affect Teen Gun Carrying After All?" Criminology 42(1) February 2004: 27-54.

"Youths' Involvement with Guns: Motivation vs. Availability" Archives of Pediatrics & Adolescent Medicine July, 2004: 705.

PJ Cook and J Ludwig "Principles for Effective Gun Policy" Fordham Law Review 73(2), November, 2004: 589-613.

PJ Cook, J Ludwig, and A Braga "Criminal Records of Homicide Offenders" Journal of the American Medical Association 294(5), August 3, 2005: 598-601.

GJ Wintemute, PJ Cook, and M Wright "Risk Factors among Handgun Retailers for Frequent and Disproportionate Sales of Guns Used in Violent and Firearm-Related Crimes" Injury Prevention December, 2005: 357-363.

PJ Cook and J Ludwig "The Social Costs of Gun Ownership" Journal of Public Economics 90(1-2), January 2006: 379-391.

PJ Cook and SB Sorenson "The Gender Gap Among Teen Survey Respondents: Why are Boys more Likely to Report a Gun in the Home than Girls?" Journal of Quantitative Criminology 22(1) March, 2006: 61-76.

PJ Cook and J Ludwig "Aiming for evidence-based gun policy" Journal of Policy Analysis and Management 25(3), Summer 2006: 691-735.

"Use and Control of Firearms" Encyclopedia of Law & Society, Sage Publications, Inc., 2007.

PJ Cook, J Ludwig, SA Venkatesh, and AA Braga "Underground Gun Markets" The Economic Journal, 117 (524) November, 2007: 588-618.

SB Sorenson and PJ Cook "'We've Got a Gun?': Comparing Reports of Adolescents and their Parents about Household Firearms" Journal of Community Psychology 36(1), January 2008: 1-19.

PJ Cook and J Ludwig "Firearms Violence" in Michael Tonry (ed.) Oxford Handbook on Crime and Public Policy Oxford University Press, 2009.

"Robbery" in Michael Tonry (ed.) Oxford Handbook on Crime and Public Policy Oxford University Press, 2009.

15

PJ Cook, J Ludwig, and AM Samaha  "Gun Control After *Heller*:  Threats and Sideshows from a Social Welfare Perspective" <u>UCLA Law Review</u>  56(5), June 2009: 1041-1093.

PJ Cook, W Cukier, and K Krause "The Illicit Firearms Trade in North America" <u>Criminology and Criminal Justice</u> 9(3) 2009: 265-286.

PJ Cook, J Ludwig, and AM Samaha  "Gun Control After *Heller*:  Litigating against Regulation" in Daniel Kessler, ed., <u>Regulation versus Litigation</u>  Chicago: University of Chicago Press, 103-135.

PJ Cook, A Braga, and MH Moore  "Gun Control" <u>Crime and Public Policy</u>  New York: Oxford University Press, 2010:  257-292.

"Post-*Heller* Strategies to Reduce Gun Violence"  <u>Journal of Catholic Social Thought</u> 8(1) Winter, 2011: 93-110.

3.  OpEd Pieces

"Making Handguns Harder to Hide, <u>The Christian Science Monitor</u>, May 29, 1981.

PJ Cook and J Ludwig "Has the Brady Act Been Successful?" <u>The Charlotte Observer</u> August 15, 2000.

PJ Cook and J Ludwig "Toward Smarter Gun Laws" <u>The Christian Science Monitor</u> Feb. 6, 2001.

PJ Cook and J Ludwig "Protecting the Public in Presidential Style" <u>News & Observer</u> June 10, 2001.

PJ Cook and J Ludwig "What did the sniper case teach us?  Lessons in Gun Control" <u>News & Observer</u> Nov. 3, 2002, 25A.

PJ Cook and J Ludwig  "Will wider availability of guns improve public safety?  No" <u>CQ Researcher</u> Oct. 31, 2008.

E.  Income Distribution

1.  Book

RH Frank and PJ Cook <u>The Winner-Take-All Society</u> (New York: The Free Press, 1995). Named a "Notable Book of the Year, 1995" by the *New York Times Book Review;* named one of the ten Best Business Books of 1995 by *Business Week*; given The Critics' Choice Award 1995-96 by the *San Francisco Review of Books*.  Paperback edition (Penguin

16

Books, 1996). Named "One of Ten best books of the year, 1996" by *The China Times*. Portuguese, Korean, Chinese, and Japanese editions.

RH Frank and PJ Cook  "Preface to the new edition"  The Winner-Take-All Society (London:  Virgin Books, Random House, 2010).

2. Article

PJ Cook and RH Frank "The Growing Concentration of Top Students at Elite Schools" in Charles T. Clotfelter and Michael Rothschild, eds. Studies of Supply and Demand in Higher Education (Chicago: University of Chicago Press, 1993).

PJ Cook and RH Frank "The Economic Payoff of Attending an Ivy-League Institution" in Richard Delgado and Jean Stefancic, eds., Critical White Studies: Looking Behind the Mirror Temple University Press, 1997.

RH Frank and PJ Cook "The winner-take-all society" in William Darity, ed., The International Encyclopedia of the Social Sciences, 2nd ed.  Gale, 2007.

3. OpEd and Magazine Articles (with Robert Frank)
    *USA Today*, October 9, 1995, p. 13A
    *Washington Post*, November 12, 1995
    *Washington Monthly*, December 1995
    *Chronicle of Higher Education*, January 5, 1996

F. Other topics

"A 'One Line' Proof of the Slutsky Equation" The American Economic Review, March 1972, 139.

PJ Cook and Robert H. Frank "The Effect of Unemployment Dispersion on the Rate of Wage Inflation" Journal of Monetary Economics 1, 1975, 241-249.

PJ Cook and JW Vaupel "What Policy Analysts Do:  Three Research Styles" Journal of Policy Analysis and Management, 4 (3) Spring, 1985, 427-8.

PJ Cook and J Ludwig "Weighing the Burden of 'Acting White'; Are there Race Differences in Attitudes Towards Education?" Journal of Policy Analysis and Management 16(2), Spring 1997, 256-278.  (Winner of the Vernon Prize for best paper in Volume 16)

PJ Cook and Jens Ludwig "The Burden of 'Acting White:' Do Black Adolescents Disparage Academic Achievement?" in Christopher Jencks and Meredith Phillips (eds.)

17

The Black-White Test Score Gap Brookings Institution Press, Washington DC, 1998: 375-400.  Reprinted in Minority status, Oppositional Culture and Academic Engagement John U. Ogbu, Ed.  New York: RoutledgeFarmer, forthcoming.

PJ Cook, R MacCoun, C Muschkin, and J Vigdor "The Negative Impacts of Starting Middle School in Sixth Grade" Journal of Policy Analysis and Management Winter 2008, 104-121.  (winner of the Raymond Vernon Memorial Prize, 2008)

"Acting White" in William Darity, ed. International Encyclopedia of the Social Sciences, 2nd ed. Gale, 2007.

R MacCoun, PJ Cook, C Muschkin, and J Vigdor "Distinguishing Spurious and Real Peer Effects: Evidence from Artificial Societies, Small-Group Experiments, and Real Schoolyards" Review of Law and Economics  4(3), 2008: 695-714.

E H-W Kim and PJ Cook, The continuing importance of children in relieving elder poverty: evidence from Korea Ageing & Society 2011, forthcoming.

Book reviews

Of Jack P. Gibbs, Crime, Punishment, and Deterrence in Contemporary Psychology 21:5, 1976.

Of Kenneth Dolbeare (ed.) Public Policy Evaluation in Policy Analysis, Fall 1977, 604-606.

Of David T. Stanley, Prisoners Among Us in Policy Analysis, Winter 1978, 139-141.

Of John Heineke, Economic Models of Criminal Behavior in Southern Economic Journal, April 1980, 1255-1257 (with Anne Witte).

Of Laurence Ross, Deterring the Drinking Driver in Journal of Health Politics, Policy, and Law, Winter 1983, 958-961; and in Popular Government, Winter 1983, 37-38.

Of Robert H. Frank, Choosing the Right Pond:  Human Behavior and the Quest for Status in Journal of Policy Analysis and Management, Fall 1986.

Of Michael D. Laurence, John R. Snortum, and Franklin Zimring. eds., Social Control of the Drinking Driver, in Science, July 29, 1988.

Of Michael Tonry and Norval Morris, eds., Drugs and Crime in Journal of Policy Analysis and Management 10(3), Summer 1991.

18

Of Mark A.R. Kleiman, <u>Against Excess: Drug Policy for Results</u>; and Franklin E. Zimring and Gordon Hawkins, <u>The Search for Rational Drug Control Policy</u> in <u>Journal of Policy Analysis and Management</u> 11(4), Fall 1992.

Of H. Laurence Ross, <u>Confronting Drunk Driving: Social Policy for Saving Lives</u> in <u>Journal of Health Politics, Policy and Law</u> 18(1) Spring 1993, 235-237.

Of Willard Manning et al, <u>The Costs of Poor Health Habits</u> in <u>Policy Currents</u> 2(4), Nov. 1992.

Of Gary Kleck, <u>Point Blank: Guns and Violence in America</u> in <u>New England Journal of Medicine</u> February 3, 1994.

Of Robert L. Rabin and Stephen D. Sugarman, eds., <u>Smoking Policy: Law Politics and Culture</u> in <u>Science</u> 262, December 10, 1993.

Of Trudy Ann Karlson and Stephen W. Hargarten, <u>Reducing Firearm Injury and Death: A public health sourcebook on guns</u> in <u>New England Journal of Medicine</u>, February 5, 1998.

Of Tyler Cowen, <u>What Price Fame?</u> in <u>Journal of Economic Literature</u> September 2001, 933-935.

Of Felix Gutzwiller and Thomas Steffen, <u>Cost-Benefit Analysis of Heroin Maintenance Treatment</u> in <u>Addiction</u> 2001, v. 96, 1071-2.

Of Robert J. MacCoun and Peter Reuter <u>Drug War Heresies</u> in <u>Journal of Policy Analysis and Management</u> v. 21(2), Spring 2002, 303-306.

Of James B. Jacobs <u>Can Gun Control Work?</u> in <u>Journal of Policy Analysis and Management</u> 23(1), Winter 2004, 198-201.

Of S. Selvanathan and E.A. Selvanathan <u>The Demand for Alcohol, Tobacco, and Marijuana: International Evidence</u> in <u>Addiction</u> 102, 2007: 830.

Of Harold Winter <u>The Economics of Crime: An introduction to rational crime analysis</u> in <u>Journal of Economic Literature</u> v. 47: Sept. 2009.

Unpublished monographs

"The Effect of Legitimate Opportunities on the Probability of Parolee Recidivism," Institute of Policy Sciences and Public Affairs, Duke University, 1973.

"Citizen Cooperation with the Criminal Justice System," Institute of Policy Sciences and Public Affairs, Duke University, 1976.

19

"A Summary of State Legal Codes Governing Juvenile Delinquency Proceedings" (with Joseph Austin and Richard Levi), Institute of Policy Sciences and Public Affairs, Duke University, 1977.

"Life, Liberty, and the Pursuit of Self Hazardous Behavior" (with James Vaupel), Institute of Policy Sciences and Public Affairs, Duke University, 1978.

"Regulating Handgun Transfers: Current State and Federal Procedures, and an Assessment of the Feasibility and Cost of the Proposed Procedures in the Handgun Crime Control Act of 1979" (with James Blose), Institute of Policy Sciences and Public Affairs, Duke University, 1980.

Selected Research grants

Principal investigator, "Evaluating Policy Options to Increase Citizen Cooperation in Urban Law Enforcement," A Durham Observatory Project, 1975.

Principal investigator, "The Processing of Gun Crimes in D.C. District Court," Institute of Law and Social Research, 1977.

Principal investigator, "Empirical Studies of Robbery and Handgun Control," U.S. Department of Justice.

Principal investigator, "Evaluating Alternative Policy Strategies for Controlling the Distribution of Handguns" (with Mark Moore), Ford Foundation, 1977-79.

Principal investigator, "A Review of the Major Gun Regulation Proposals," Center for the Study and Prevention of Handgun Violence, 1979-80.

Principal investigator, "A Review of Robbery Literature," National Institute of Justice, 1981.

Principal investigator, "Robbery Violence," National Institute of Justice, 1983-85.

Principal investigator, "Vice,"  The Chicago Resource Center, 1987

Principal investigator, "Costs of the Death Penalty in North Carolina," NC Administrative Office of the Courts, 1991-93.

Principal investigator, "Causes and Effects of Youthful Drinking," National Institute on Alcohol Abuse and Alcoholism, 1992-1994.

20

Principal investigator, "Markets for Stolen Guns," Harry Frank Guggenheim Foundation, 1993-4.

Principal investigator, "The Costs of Gunshot Wounds," The Joyce Foundation, 1997-99.

Principal investigator, "Community Gun Prevalence and Crime," The Joyce Foundation, 2000-2003.

Investigator Award In Health Policy Research, Robert Wood Johnson Foundation, 2003-4.

Principal Investigator, "evaluations of two programs in Milwaukee designed to reduce serious criminal violence" Joyce Foundation, 2007-2008.

Principal Investigator, "Fiscal Costs of Capital Punishment in NC" Z. Smith Reynolds Foundation, 2007-2008.

Principal Investigator, "An Experimental Evaluation of the Milwaukee Prisoner Re-entry Program" Smith Richardson Foundation, 2008-2011.

Co-Investigator, "Preventing truancy in urban schools through provision of social services by truancy officers: A Goal 3 randomized efficacy trial"   US Department of Education/IES: 2010 – 2014.

21

Service and Administrative Activities at Duke University

> Director of Undergraduate Studies, Institute of Policy Sciences and Public Affairs, 1974-75, 1992.
>
> Director of Graduate Studies, Institute of Policy Sciences and Public Affairs, 1977-79, 1984, and 1994-95.
>
> Chairman, Graduate Curriculum Committee, Institute of Policy Sciences and Public Affairs, 1977-79.
>
> Member, Undergraduate Faculty Council of Arts and Sciences, 1977-78, 1991-93.
>
> Author of an evaluation of undergraduate admission policy, commissioned by the Undergraduate Faculty Council, 1978.
>
> Member, Academic Council, Duke University, 1978-79, 1982-84, 1993-95, 1998-2000 Elected to the Executive Committee of the Academic Council, 1982-83.
>
> Associate Director, Institute of Policy Sciences and Public Affairs, 1979-1985, 2005-.
>
> Pre-Major Advisor, 1981-85.
>
> Member, UFCAS Committee on Admissions, 1984-86.
>
> Member, University Committee on Undergraduate Admissions and Financial Aid, 1986 - 87.
>
> Author of a special report on predicting yields from undergraduate admissions, 1987.
>
> Member, Dean White's Ad Hoc Committee on Undergraduate Internships, 1987.
>
> Member, President's Administrative Oversight Committee, 1987-90.
>
> Chairman, Public Policy Studies Committee on Appointments and Promotion, 1990-93.
>
> Chair, Provost's committee to review Dean Earl Dowell for reappointment, 1992.
>
> Member, Arts and Sciences Committee on Planning and Priorities, 1993-95. Chair, 1994-95.
>
> Member, Dean Search Committee, Fuqua School of Business, 1994.
>
> Chair, PPS Diversity Committee, 1994-95.

J.A. 103

Member, Executive Committee of the Graduate School, 1995-96

Member, steering committee, Child and Family Policy initiative, 1999

Member, Dean's Search Committee, Duke Law School, 1999

Member, Planning Committee, Institute for Genome Sciences and Policy, 1999

Chair, Arts & Sciences Council Task Force on the Budget, 2001-2

Public and Professional Service

Chairman, Weapons and Violent Crime Workshop, NILECJ, LEAA, U.S. Department of Justice, February 1978.

Presenter, N.C. Governor's Crime Commission, June and September, 1979.

Panel member, National Research Council Study of Alternative Policies Affecting the Prevention of Alcohol Abuse and Alcoholism, 1978-1981.

Member, N.C. Governor's Task Force on Drunken Driving, 1982.

Member, Ad Hoc Workshop on the Future of Criminal Justice Research, U.S. Department of Justice and National Research Council, March 1982.

Testified on alternative gun-control policies before the U.S. Senate Criminal Law Subcommittee, March 4, 1982.

Testified on alcohol tax policy before the Social Security Advisory Council, May 25, 1982.

Participant, Sixty-Sixth American Assembly (Public Policy on Alcohol Problems), Harriman, NY, April 26-29, 1984.

Member, Executive Session on the Juvenile Justice System, Harvard University, 1984-85.

Member, Policy Council of the American Society of Criminology, 1985-86, and 1990-91.

Invited participant, Conference on the Cigarette Excise Tax sponsored by the Harvard Institute for the Study of Smoking Behavior, Washington, DC, April 17, 1985.

Member, "Crime and Violence" working group of the NAS Committee on Basic Research, 1985.

Member, Research Advisory Committee of the U.S. Sentencing Commission, 1986-91 (Chair, 1986).

Associate, Canadian Institute of Advanced Research, 1986.

Member, Board of Advisors, Public Policy Program, College of William & Mary, 1987-1992.

Member, National Academy of Sciences Committee on Law and Justice, 1987-1993.

Treasurer, Association of Public Policy Analysis and Management, 1987-1994.

Testified on the use of alcohol taxation as a public-health measure before the U.S. Senate Committee on Governmental Affairs, September 27, 1988.

Member, Workshop on Health Economics, National Institute of Alcohol Abuse and Alcoholism, September 1988.

Member, National Research Council's Panel on the Understanding and Control of Violent Behavior, 1988-91.

Member, Advisory Board to the Injury Prevention Research Center, University of North Carolina, 1990-.

Witness, "Problems and Prospects for a N.C. Lottery" North Carolina Economic Future Commission, December 5, 1990.

Invited participant, CDC's Forum on Youth Violence in Minority Communities, Atlanta, December 10-12, 1990.

Member, President's Advisory Board of the H. John Heinz III School of Public Policy and Management, Carnegie Mellon University, 1992-96 and subsequently (including 2007).

Consultant, Tax Advisory Program, US Department of Treasury, 1994-95.

Steering Committee, National Consortium on Violence Research, 1995-1997.

Member, Center for Gun Policy Research, Johns Hopkins University, 1995-.

Invited participant, White House Leadership Conference on Youth, Drug Use, and Violence, March 7, 1996.

Invited speaker, U.S. Senate Democratic Policy Council, Wilmington, DE, April 26, 1996.

Member, National Academy of Sciences (IOM) Committee on Injury Prevention and Control, 1997-8.

Member, Advisory Committee to the Harvard Injury Control Research Center, 1998-.

Consultant, US Department of Treasury, Enforcement Division, 1999-2000.

Member, National Academy of Sciences (NRC) Case Studies of School Violence Committee, 2001-2002.

Member, Division Committee for the Behavioral and Social Sciences and Education, National Research Council, 2001-2004.

Member, "Committee to Develop a Strategy to Prevent and Reduce Underage Drinking", Institute of Medicine 2002-3.

Member, Panel on Assessing the Feasibility, Accuracy, and Technical Capability of a National Ballistics Database, The National Academies 2004-5.

Member, *Crime and Justice* editorial board, 2007-1010.

Member, National Research Council Workshop on Understanding Crime Trends, 2007-8

Co-Director, NBER Economics of Crime Working Group, 2007-

Vice Chair, National Research Council Committee on Law and Justice, 2006-2010.

Vice President, Association of Public Policy and Management, 2008-2009 (two years).

Panel member, International Benchmarking Review of UK Sociology: 2009-2010. http://www.esrcsocietytoday.ac.uk/ESRCInfoCentre/Support/Evaluation/ibr/IBR_Sociology.aspx

Member, International Scientific Advisory Board,  Netherlands Institute for the Study of Crime and Law Enforcement (NSCR), 2010-.

Member, National Research Council Committee on Deterrence and the Death Penalty, August 2010 – November 2011.

Refereeing

Associate editor, <u>Law and Contemporary Problems</u>, 1974-78.

25

Editorial consultant, <u>Journal of Criminal Law and Criminology</u>, 1982-.

Member, Editorial Board, <u>Journal of Policy Analysis and Management</u>, 1986- 2002.

Associate Editor, <u>Criminology</u>, 1987-91.

Editorial board, <u>Criminology & Public Policy</u>  2010-

Occasional refereeing: American Economic Review, Journal of Political Economy, Journal of Public Economics, Economic Inquiry, Journal of Legal Studies, Journal of Law and Economics, New England Journal of Medicine, Journal of the American Medical Association, Criminology and other professional journals.

J.A. 107

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **RAYMOND WOOLLARD, et al.,** | * | |
| *Plaintiffs,* | * | |
| v. | * | Civil Case No. 1:10-cv-2068-JFM |
| **TERRENCE SHERIDAN, et al.,** | * | |
| *Defendants.* | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## DECLARATION OF FREDERICK H. BEALEFELD, III

I, Frederick H. Bealefeld, III, am competent to state and testify to the following, based on my personal knowledge.

1.    I am the Commissioner of the Baltimore Police Department ("Department"), a position I have held since July, 2007.

2.    I have been a member of the Baltimore Police Department for nearly 30 years, joining the Department in May, 1981. During my tenure, I served on foot patrol in the Western District; served as Sergeant for 13 years, which included extensive work in the Criminal Investigation Division's Homicide Unit; and served as Lieutenant for 3 years, which also included extensive work in the Criminal Investigation Division. I have served as commander of the Drug Enforcement Section, Southern District, and Chief of the Criminal Investigation Division. During this period I was awarded 2 Bronze Stars, and 3 Unit Citations for my efforts related to drug enforcement, gun enforcement, and reducing the homicide rate.

1

J.A. 108

3.     Counsel informs me that plaintiffs in this action are challenging the requirement that applicants for a handgun wear and carry permit demonstrate a "good and substantial reason" to do so.  I am submitting this affidavit to explain my views on the impact of eliminating this element of the handgun permit application process, based on my experience as a law enforcement officer in Baltimore City.

**Handgun violence in Baltimore**

4.     According to U.S. Department of Justice statistics published in its annual "Crime in the United States" report, Baltimore has one of the highest violent crime rates in the United States, and consistently ranks in the top ten U.S. cities for violent crime (including murder, non-negligent manslaughter, forcible rape, robbery, and aggravated assault) generally, and homicide specifically.   In 2010, according to figures our department recently released, there were 9,607 reported incidents of violent crime in Baltimore, of which 223 were homicides.

5.     Although far too high, these statistics actually represent a substantial improvement over the past 30 years.  By comparison, in 2000, there were 16,003 reported incidents of violent crime in Baltimore, of which 261 were homicides.  In 1993, at the height of the violent crime epidemic in Baltimore, there were 21,945 reported incidents of violent crime in the city, of which 353 were homicides.  The Department is committed every day to reducing the level of violent crime in Baltimore.

6.     The vast majority of violent crime in Baltimore is committed with handguns.  Of Baltimore's 223 homicides in 2010, 167—or 75%—were committed with a gun, usually a handgun.  Similarly, the vast majority of Baltimore's 420 non-fatal

2

shootings in 2010 were committed with handguns.  Last year, there were 832 aggravated assaults committed with guns, and at least 75% of those involved handguns.  Last year, there were also 1,634 armed robberies carried out with guns, and again at least 75% of those involved handguns.  The vast majority of crimes committed with some type of firearm are committed with handguns.

7.     These statistics highlight the extensive nature of the problem of violence, and particularly handgun violence, in Baltimore, but they do not capture the full extent of the devastating impact that handgun violence has on the Baltimore community, and the individual communities that are most afflicted.

8.     Handgun violence also greatly impacts the safety of Baltimore police officers.  Of the 77 officers who have died in the line of duty from non-vehicular, non-natural causes, 65—or 84%—died as the result of intentional gunfire.  Handguns were used in 85% of the firearms deaths for which the type of gun used is known.  It is no exaggeration to say that the greatest threat to the safety of our officers is handguns.

9.     Handguns are the weapon of choice for criminal activity in Baltimore because they are small, relatively lightweight, easy to carry and conceal, easy to load and fire, deadly at short range, and ideal for surprise attacks.  Accordingly, preventing would-be criminals from possessing or obtaining handguns, or having greater or easier access to handguns than they currently do, is a chief focus of the Baltimore Police Department in its efforts to reduce overall violent crime.

**Effects of abandoning the "good and substantial reason" requirement**

3

10.    If Maryland could no longer limit handgun wear and carry permits to individuals with a good and substantial reason to have them, based on my experience, handgun violence in Baltimore would increase and my officers' jobs would become harder to perform and less safe.

11.    Increasing the number of handguns carried publicly in Baltimore would increase the availability of guns to criminals.  We know from experience that the city's criminals are always looking for ways to better arm themselves, and the Department is constantly engaged in a struggle to disarm them, having seized over 2,000 guns from them last year alone.  We also know from experience that these criminals often target people they know have handguns *precisely because* they possess handguns, which criminals cannot lawfully obtain.  The Department has frequently investigated homicides and robberies where it appears that one, if not the primary, goal of the attacker was to deprive the victim of his handgun or other weapons.   Obtaining handguns and ammunition is also one of the main reasons why police officers' homes and vehicles have sometimes been targeted for robberies and break-ins.

12.    Although many people believe that they will be able to maintain possession of their handgun in a confrontation with a criminal attacker, that is often not the case, especially in instances of surprise attacks.  In fact, the Department recently spent over $1 million for further training of already highly-trained police officers on how to better protect their handguns from being wrestled away from them as a result of incidents in which that happened.  Civilian training cannot adequately prepare most people to use and protect handguns in tense situations such as being under attack by criminals.  In fact, the

4

vast majority of homicides in Baltimore are the result of surprise attacks that would not provide the victim sufficient time to defend himself even if armed with a handgun. Nearly every police officer killed in the line of duty in Baltimore was armed with a handgun at the time, and some of those have died at the hand of their own service weapon. In surprise attacks, it is highly unlikely that less-well-trained individuals would be able to successfully use a handgun to defend themselves. I am aware of only one incidence during my entire career as a police officer where the intended victim was able to defend himself against a robbery with a handgun, and that robbery happened in the intended victim's store, where he could already lawfully wear and carry a handgun without a permit.

13.   In addition to the probability of more guns falling into the hands of criminals, placing more handguns on the streets in the hands of people without good and substantial reason to carry them would increase significantly the likelihood that basic confrontations between individuals would turn deadly. Most assaults in Baltimore arise out of petty disputes between otherwise law-abiding citizens. In the midst of these petty disputes, tempers flare and violence can erupt even in the absence of lethal weapons. The presence of a handgun in an altercation, however petty, greatly increases the likelihood that it will escalate into potentially lethal violence. Given the enormous number of aggravated assaults already occurring in Baltimore—an average of 6,037 reported aggravated assaults per year over the last 5 years, as documented by U.S. Department of Justice "Crime in the United States" reports—facilitating the introduction of more guns onto the city's streets would only increase the potential lethality of these assaults.

5

14.     Increasing the number of handguns on the streets in the hands of people without good and substantial reason to carry them would also increase the possibility that handguns in the hands of law-abiding citizens will hamper police efforts in confrontations with criminals with potentially tragic consequences.  In a confrontation between a police officer and a criminal, an additional person bearing a gun might cause confusion as to which side of the confrontation the person is on, which could lead to hesitation by the police officer and the potential for innocent victims, including the permit holder, innocent bystanders, and police officers.  This type of problem already occurs with existing permit holders, and would become far more common if permits were not limited to people with good and substantial reason to carry a handgun in public.

15.     Having more legal carriers of handguns in the streets, without good and substantial reason to carry a handgun, would also force police officers who spot someone carrying a handgun to choose between creating a potential disturbance by unholstering their own weapon or potentially putting their safety at risk by approaching the carrier without drawing their weapon.  Police officers would also have a harder time identifying potential security risks if more people without good and substantial reason to carry a handgun were able to do so, making it more difficult to respond when necessary.

16.     It has been the Department's experience that most law-abiding citizens with a legitimate need to carry a handgun have been able to obtain a permit under the current system, which strikes a proper balance between ensuring access to handgun permits for those who need them while preventing a greater-than-necessary proliferation of handguns in public places that, as described above, increases risks to public safety.

6

17.     Moreover, it has also been the Department's experience that the vast majority of victims of violent crime in Baltimore have backgrounds that would have precluded them from lawfully carrying a handgun for self-protection even without the good and substantial reason requirement.  In 2010 alone, 89% of the homicide victims in Baltimore would have been precluded from obtaining a handgun wear and carry permit as a result of being juveniles or having disqualifying criminal records at the time of their death.  Abandoning the "good and substantial reason" requirement would not have enabled these victims to protect themselves.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 18, 2011, Baltimore, Maryland

Frederick H. Bealefeld, III

7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RAYMOND WOOLLARD, et al.,          *

    *Plaintiffs,*                              *

    v.                                    *          Civil Case No. 1:10-cv-2068-JFM

TERRENCE SHERIDAN, et al.,          *

    *Defendants.*                            *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## DECLARATION OF TERRENCE B. SHERIDAN

I, Terrence B. Sheridan, am competent to state and testify to the following, based on my personal knowledge.

1.    I am the Superintendent of the Maryland State Police ("MSP"), a position I have held since June, 2007. The mission of the MSP is to protect the citizens of the State of Maryland from foreign and domestic security threats, to fight crime, and to promote roadway safety by upholding the laws of the State.

2.    Prior to my appointment as Superintendent, I served as Chief of Police in Baltimore County for over ten years, since April 1996. As Chief of Police, I commanded a police force with over 2,400 members. During my tenure there, overall crime fell in Baltimore County.

3.    Before my time as Chief of Police, I served with the MSP for 30 years, retiring with the rank of Lieutenant Colonel. My assignments included patrol, criminal investigation, internal affairs, and drug enforcement.

4.     I am active in regional and national law enforcement efforts, and currently serve on the Board of Directors of the Harvard Associates in Police Science and the Mid-Atlantic Regional Community Policing Institute Advisory Board.  I am also a member of the International Association of Chiefs of Police; the Police Executive Research Forum; and the Maryland Chiefs of Police Association.

## Handgun violence in Maryland

5.     Maryland has the eighth highest violent crime rate in the United States.  As reported in the U.S. Department of Justice's "Crime in the United States" report for 2009, 33,623 incidents of violent crime occurred in Maryland in 2009.  Of these incidents, 438 were homicides, giving Maryland the third highest homicide rate of any state in 2009. 12,007 of these incidents were robberies, giving Maryland the second highest robbery rate of any state in 2009.   These stark numbers actually represent a significant improvement over past violent crime, homicide, and robbery totals.

6.     Handguns are used far more often than any other type of weapon to commit homicide in Maryland.  Of Maryland's 438 homicides in 2009, 297—or 68%—were committed with a handgun.  Of the 305 homicides involving firearms, all but 8 were committed with handguns.  Thus, an alarming 97.4% of all homicides by firearm were committed with handguns.

7.     Handguns are also the weapon of choice for robberies in Maryland.  Out of 8,257 reported robberies in 2009, 3,810 were carried out with firearms, more than any other type of weapon, and although the State does not keep statewide statistics on

2

robberies broken down by weapon type, I know from experience that the vast majority of the firearms used were handguns.

8.     Handguns are also the weapon of choice for carjackings.  There were 632 reported carjackings in Maryland in 2009.  Of the 472 of these that were known to be carried out with a weapon, 378—or 80%—were carried out with a handgun.

9.     Handguns also pose the largest threat to the lives of Maryland's law enforcement officers.  According to statistics kept by the Officer Down Memorial Page, Inc., in coordination with the National Law Enforcement Officer's Memorial Fund, of the 158 Maryland law enforcement officers who have died in the line of duty from non-vehicular, non-natural causes, 132—or 83.5%—died as the result of intentional gunfire, usually from a handgun.  Eighty-two Maryland law enforcement officers were assaulted with a firearm in 2009 alone, and the average between 2005 and 2009 was 89 assaults by firearm.  Handguns were by far the most common firearm used in these assaults.

10.     Gunfire is the number one non-vehicular cause of death for State Troopers in the line of duty.  All of the State Troopers who have died in the line of duty from non-vehicular, non-natural causes died as the result of intentional gunfire.  The majority of these killings were carried out with handguns.

11.     Because handguns pose special dangers, Maryland police officers are required to complete extensive firearms training, approved by Maryland's Police Training Commission ("PTC"), before they can use or carry handguns.  The entry-level training alone must include a minimum of 35 hours of classroom instruction, range training, and qualification on a variety of topics, including safe handling and storage of

3

handguns. For State Troopers, entry-level training must include a minimum of 90 hours of classroom instruction, training, and qualification, and must involve the firing of over 1,500 rounds.    PTC also requires 2 hours of additional classroom instruction plus additional range training every year.   State Troopers are required to complete an additional 14 hours beyond that, which must cover training for daytime and nighttime use in a variety of body positions and at a variety of different distances.

12.    Because the risks created by handguns are different in different settings, Maryland police officers are required to be instructed separately on the safe handling and storage of handguns at home, in a law enforcement facility, on the firing line, and on patrol. The training also must include at least three days of intensive training on a firing range with their specific handgun, with the prospective officer scoring at least 70 percent target accuracy—at different distances away from the target, in different positions, and at different speeds—to pass.   It must also include training using the Firearms Training Simulator, known as "FATS," an immersive training that presents officers with simulated armed threats and tracks and scores how they respond with their handgun to those threats. Once certified in the use and carry of handguns, Maryland police officers must still complete annual training on proper use and carry, again tailored to their specific handgun. For State Troopers, this training is semiannual, and includes training on how to use and carry a handgun at different times of day or night.

13.    Because the risks created by handguns are especially challenging outside the context of a person's home, Maryland police officers are given specific instructions for the safe handling of handguns in public situations. These include an instruction never

4

to store one's handgun in the glove box or unlocked trunk or under the seat of one's vehicle, never to use a handgun at or from a moving vehicle except under very limited circumstances, and never to carry a handgun when off duty and in a situation where alcohol may be consumed.

14.    Possible shooting situations are not only physically challenging, but mentally and emotionally challenging.  Accordingly, Maryland police officers are also required to be trained in to develop the mental and emotional preparation needed to responsibly confront these situations.  This training includes a discussion of the enormous value of human life.

**Effects of abandoning the "good and substantial reason" requirement**

15.    The good and substantial reason requirement to obtain a permit to wear and carry handgun advances public safety in Maryland by reducing handgun violence.  Based on my extensive law enforcement experience, if Maryland were to abandon the requirement, handgun violence would increase and State Troopers' jobs would become much harder to perform and more dangerous.

16.    If the MSP were required to issue handgun wear and carry permits to individuals without a good and substantial reason to carry, State Troopers would be in greater danger because they would encounter more armed individuals.  Based on my extensive law enforcement background, abandoning the good and substantial reason requirement would result in putting more handguns in the hands of criminals.  The MSP is well aware that criminals in Maryland are constantly looking for ways to arm

5

themselves with handguns, including by stealing them from others. It is not uncommon for criminals to obtain these guns during street altercations.

17.    In fact, State Troopers are equipped with special holsters that require a two-step unholstering process, precisely to reduce the risk that their service weapon will be taken from them during an altercation. Moreover, uniformed State Troopers on patrol must wear ballistic vests that are designed specifically to withstand the caliber of round that could be fired from their own handgun. Ordinary civilians are not required to own such holsters or wear such vests, making it more likely that handguns they carry about their person could be taken from them and used against them with deadly results.

18.    The fact that criminals often seek out gun owners for robbery or theft is demonstrated by a number of incidents in which the homes and vehicles of law enforcement officers have been targeted. Law enforcement officers are frequently targeted by criminals looking to acquire handguns. In 2010, several homes were targeted for burglaries because they were known to be the dwellings of police officers. The criminals would wait until the officers were not home, and then break into their homes and steal handguns. Law enforcement officers' vehicles have also been targeted on several occasions, as recently as January of this year. (See Maryland Law Enforcement Bulletins, attached as Exhibit A, for recent reports about such burglaries and vehicle thefts.) In a similar fashion, we know of cases where criminals targeted civilians they knew owned handguns for burglaries. Allowing more people without a "good and substantial reason" to carry a handgun to carry one would increase the availability of guns to criminals.

6

19.     Because the demand among criminals to obtain handguns is already great, we have set up dedicated task forces in Maryland to prevent handguns and other firearms from getting into their hands. These task forces are focused on those regions in Maryland where efforts by criminals to obtain handguns appear to be the greatest: Baltimore, Salisbury, Prince George's County, and the national capital region. As we reported in our 2009 Annual Report, the Baltimore Gun Tracing Task Force seized 449 guns—mainly handguns—in 2009, and the Firearms Interdiction Task Force, which covers the national capital region, seized 217 guns—mainly handguns—in 2009. Abandoning the "good and substantial reason" requirement would enable a greater proliferation of handguns in public that could fall into criminal hands.

20.     Fourth, abandoning the "good and substantial reason" requirement would increase the presence of armed individuals on roadways and other public places in Maryland who have not received more than basic training in handgun use, which would in turn increase the likelihood of gun theft and associated violence against them. As described above, Maryland law enforcement officers must go through extensive training before they can ever wear and carry a particular handgun, in part to prevent situations where their handgun may be taken and possibly turned against them. Indeed, our officers are specifically trained in how to prevent their handgun from being wrested away from them. Ordinary citizens are far more likely to mishandle their handgun, making their use of a handgun much less likely to be effectual in preventing crime and much more likely to have the handguns end up in the possession of criminals.

7

21.     The good and substantial reason requirement strikes an appropriate balance between ensuring that law-abiding people who need to be able to wear and carry handguns in public places can do so, while preventing a greater-than-necessary proliferation of handguns in public places, a proliferation that, as described above, increases risks to public safety.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 17, 2011, Baltimore, Maryland

_____
Terrence B. Sheridan

8

J.A. 122

# Exhibit A

*UNCLASSIFIED//FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE*



# WESTERN MARYLAND
# INFORMATION CENTER

## Request for Assistance
FREDERICK POLICE DEPARTMENT

1-866-969-WMIC (9642)          Fax: 301-600-7133          *WMIC@FrederickCountyMD.gov*

*August 19, 2010*                                                  *Number 2010-113*

## Law Enforcement Employee's Residence Burglarized
### MULTIPLE HANDGUNS STOLEN



1. Beretta 950B 22 Short (#646721). 2. Dreyse 6.35mm Pocket Pistol (#1400). 3. Union 6.35mm Pocket Pistol (#101).
4. Canon PowerShot A55 IS Digital Camera. 5. Army Duffle Bag. 6. iPod Classic 80 GB. 7. JVC GR-DVP3 Video Camera.
8. Compaq Presario V5209US Laptop. 9. Motorcycle Sunglasses. 10. V-Moda Earbuds.

View detailed photos of handguns at ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

On Wednesday, August 18, 2010, between 8:00 A.M. and 5:15 P.M., a burglary occurred at a Frederick County Sheriff's Office employee's residence on ▓▓▓▓▓▓▓▓▓ in Frederick, MD. In this case, three handguns, a laptop, iPod, digital camera, video camera, sunglasses, prescription pain medication, condoms and a U.S. Army duffle bag were stolen after entry was made through a side window. Several long guns and two larger handguns were left at the scene. The suspect(s) tampered with several bottles of prescription medication; however, only stole one bottle of Percocet. The stolen duffle bag has the victim's name, "▓▓▓▓▓▓▓▓▓▓▓▓," and social security number stamped on the side.

Any agency with similar cases or possible suspect information, please contact Det. Lege, Frederick Police Department, 301-600-3918 / glege@frederickmdpolice.org

Intelligence Bulletins are a service of the Western Maryland Information Center. The content of this document is FOR OFFICIAL USE ONLY and is considered LAW ENFORCEMENT SENSITIVE. Any request for disclosure of this document or the information contained herein should be referred to: Western Maryland Information Center Commander– 1-866-969-9642.

*UNCLASSIFIED//FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE*

*UNCLASSIFIED//FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE*



MARYLAND COORDINATION AND ANALYSIS CENTER
Intelligence Analysis Division

# Officer Safety Bulletin

Phone: 443-436-8800                                          Fax: 443-436-8825

26 October 2010                                              *Number 1168*

## Theft from Law Enforcement Vehicles

There have been recent thefts of police equipment taken from marked police vehicles, unmarked/covert vehicles, Fraternal Order of Police-tagged (FOP) vehicles, as well as law enforcement-owned vehicles with blue and black emblem. Although there may be no connection among these thefts, it is imperative that ALL law enforcement officers be aware of these increased occurrences.

The MCAC recommends that police officers ensure that their personal and agency vehicles are locked, and any weapons and equipment be removed or properly secured.

Additionally, the MCAC requests from all Maryland Law Enforcement agencies any information regarding thefts from police vehicles (marked or unmarked/covert), and civilian vehicles with police identifiers to determine the depth and breadth of the problem, and identify if a pattern exists. Please submit details on location, vehicle type, police affiliated markings as well as types of equipment taken to the MCAC at feedback@mcac-md.gov with a subject title of "Stolen Police Equipment." Any questions in reference to this bulletin should be directed to Dwight Styles at 443-436-7711.

*UNCLASSIFIED//FOR OFFICIAL USE ONLY//LAW ENFORCEMENT SENSITIVE*

J.A. 125

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**RAYMOND WOOLLARD, et al.,**          *

    *Plaintiffs,*          *

    v.          *          Civil Case No. 1:10-cv-2068-JFM

**TERRENCE SHERIDAN, et al.,**          *

    *Defendants.*          *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### DECLARATION OF JAMES W. JOHNSON

I, James W. Johnson, am competent to state and testify to the following, based on my personal knowledge.

1. I am the Chief of the Baltimore County Police Department ("BCPD" or "Department"), a position I have held since 2007.

2. Prior to my appointment as Chief, I served as Chief of the BCPD Operations Bureau, and prior to that, at various points in my career, I held nearly every position within the BCPD, having started out as a cadet 34 years ago.

3. During my time as Chief, violent crime has fallen in Baltimore County to 1972 lows. In 2010, Baltimore County had a 38-year low of 19 homicides.

**Handguns and violent crime**

4. Handguns, more than any other type of weapon, pose special risks to law enforcement officers due to their small size, light weight, and concealability. Unlike long guns, handguns can readily be hidden in pants or jacket pockets, and can be very difficult

1

to spot in a crowd or other busy scene. They can also be placed in the glove boxes of cars and stowed under car seats in ways that retain their ready accessibility, making them more of a threat for officers conducting traffic stops.

5.     There is no doubt that handguns are the firearm of choice for all types of crime in Baltimore County.

6.     The BCPD has a handgun unit that actively seeks to reduce the number of handguns on the street in a number of ways, including by identifying people who unlawfully possess handguns, pursuing that information through records of the sale of ammunition, monitoring weapons moved from gun stores and conducting regular search and seizure operations.

**Why the "good and substantial reason" requirement is important**

7.     Counsel has informed me that the plaintiffs in this case are challenging the requirement that applicants for a permit to wear and carry a handgun in Maryland demonstrate that they have "good and substantial reason" to do so. Eliminating this requirement would permit many more individuals without a good and substantial reason for wearing and carrying a handgun in public to do so legally.

8.     Requiring a good and substantial reason requirement to wear and carry a handgun has been effective in reducing handgun violence in Baltimore County. Violent crime rates in Baltimore County are at the lowest they have been since 1972. A significant part of that is attributable to the permit law limiting the number of handguns that can be legally carried on the streets by people without good and substantial reason.

2

9.     One important concern is that many dangerous potential criminals—individuals with ties to criminal activity but without prior felony convictions or even prior criminal history—could be legally entitled to wear and carry a handgun if we did not have a good and substantial reason requirement. BCPD maintains a list of "verified" gang members—individuals who, through an investigatory process, have been determined to exhibit certain key characteristics (active ties to known criminals, frequent exhibition of gang colors, etc.) that go well beyond simple suspicion—that includes 1,152 individuals. Of these, 536 are adults aged 21 or over, and of these 536, 87 are eligible to purchase a firearm lawfully. A requirement to issue handgun permits to individuals without a good and substantial reason might result in a significant number of these gang members getting the right to carry handguns legally in public. That is a significant risk to public safety in itself, but letting these gang members carry handguns in public would also make those handguns more readily available, in public, to gang members with more serious felony records. Increased accessibility of handguns will lead to more violence.

10.     I am vehemently opposed to the unfettered wearing and carrying of handguns that would result from abandoning the "good and substantial reason" requirement because I believe it would adversely impact public safety in Baltimore County and also present a huge officer safety issue.

11.     One problem is that many civilians without sufficient training to use and maintain control of their weapons, particularly under tense circumstances, pose a danger to officers and other civilians. Baltimore County police officers train extensively before they are allowed to wear or carry a handgun. Indeed, our recruits must first learn to be

3

J.A. 128

comfortable carrying a simulated weapon before they are ever issued an actual handgun. This training is designed in part to develop their awareness of their weapon, so that they will be less likely to holster it improperly or leave it in an unsecured location; recruits are disciplined for violations of proper weapon care protocol, for instance if they leave their weapon in a bathroom. Once given a real handgun, our recruits are required to undergo 99 hours of training. This training is not just in the use of handguns but also in handgun discipline, so that they can know how or if to use a handgun in tense or uncertain situations. Experience has shown us that knowing how to effectively use a handgun in a confrontation with an assailant requires substantial training.    Inadequately trained civilians with handguns in public pose a risk to officers and other civilians.

12.    Moreover, many civilians unfortunately lack sufficient psychological and emotional development to fully appreciate the awesome responsibility that comes with wielding a handgun in public. Our officers' training includes an evaluation of officers' psychological and emotional strengths and weaknesses, to ensure that each officer possesses not only the physical and intellectual skills but also the psychological and emotional skills necessary to carry and use a handgun in public responsibly, particularly in uncertain or otherwise frightening situations. Civilians with handguns who are not sufficiently psychologically or emotionally equipped to handle them in public pose a risk to officers and other civilians.

13.    In addition to the training mentioned above, Baltimore County police officers are trained and equipped to reduce the likelihood of handgun theft. For example, standard holsters make handguns susceptible to theft by attackers, especially surprise

4

attackers. BCPD invested in the best retaining device we could find to holster our handguns. These devices, which cost $300 each, have two independent mechanisms that must be disengaged before the handgun can be unholstered, and they are designed to allow only the wearer of the holster to disengage them. Handguns that are susceptible to theft simply put more guns in the hands of criminals.

14.    Along these lines, Baltimore County police officers must also abide by a strict set of regulations governing how to handle a handgun that is removed from an arrestee. These regulations, which include promptly depositing the handgun in a locked safe in the precinct, are in place to prevent the improper use of a handgun by an arrestee who is likely emotionally and psychologically distraught at the time of arrest.

15.    More people carrying handguns will also likely lead to more guns in the hands of criminals because many people will leave handguns in cars when they are entering places they are not permitted to, or do not want to, carry their handguns (schools, daycare, government buildings, stadium parking lots, churches, the gym, hospitals). Observant criminals will target such individuals, if they have identified them as handgun carriers, for vehicle theft.

16.    More people carrying handguns will also likely lead to more guns in the hands of youths. Handguns already make their way into County schools with alarming frequency, and then get passed from youth to youth. Just within the last several weeks, we have recovered two handguns that made their way into a school building that had been removed by youths from the homes of parents who were lawful handgun possessors. If a school teacher who wears and carries a handgun leaves that handgun in a glove box

5

in a vehicle parked on school property, the risks of youths recovering that handgun are great, particularly if youths have seen that teacher openly wearing and carrying his or her handgun.

17.     Significantly increasing the number of citizens on the streets carrying guns without a good and substantial reason for doing so will also both severely increase the risks to officer safety and, as a result, interfere with the relationship between police officers and citizens that can be very important to effective community policing techniques for reducing crime. The increased risk to officer safety comes from the increased number of encounters—from stops of people engaged in suspicious activity to simple traffic stops—in which people will have handguns. Any time a handgun is introduced into an interaction between police officers and citizens the risk to police officers is greatly increased. Moreover, community policing is most effective when police can engage citizens in a direct, but friendly, way. If the number of legal handguns on the streets increased significantly, my officers would have no choice but to take extra precautions before engaging citizens, effectively treating encounters between police and the community that now are routine, friendly, and trusting, as high-risk stops, which demand a much more rigid protocol and a strategic approach. I understand this to be the way certain police departments in states with more lenient permit laws now operate.

18.     Increasing the number of people legally carrying handguns in the streets will also force BCPD officers to spend more resources responding to reports about handgun sightings and engaging handgun carriers to ensure they are doing so lawfully. In light of limited resources, the increased probability of encountering armed citizens in

6

traffic stops may force a choice between adequately protecting officer safety by moving from single-officer patrols to multiple-officer patrols and adequately monitoring Maryland's roads for unsafe drivers.

19.     In addition, allowing a significant expansion in the number of citizens carrying handguns without a good and substantial reason to do so will likely result in an increase in the number of crimes of passion that result in serious injury or death. In my experience, handguns are used more than any other weapon in crimes of passion—crimes that are not premeditated but result from altercations that arise unexpectedly. Incidents such as bar fights and road rage that now often end with people upset, but not lethally wounded, take on deadly implications when handguns are involved. According to the most recent "Crime in the United States" report put out by the Department of Justice, in 2009 alone, 91 homicides by handgun arose out of brawls due to the influence of alcohol or narcotics. Maryland's corresponding crime report, "Crime in Maryland 2009," put out by the Maryland State Police, shows that *zero* homicides by handgun occurred in Baltimore County—or anywhere in Maryland—in 2009 that arose out of brawls due to the influence of alcohol or narcotics. In fact, only *one* homicide by handgun has occurred in Maryland in the last five years that arose out of a brawl due to the influence of alcohol or narcotics, as our annual State crime reports show. I attribute this in large part to the fact that fewer handguns are on these scene during these encounters in Maryland, reducing the possibility of lethal escalation and enabling more cool-off time as well). Given that my Department responded to 204 assaults at restaurants and bars during the

7

last 3 years alone, it is critical that handguns do not unnecessarily enter the mix in these situations.

20.    I am also deeply concerned about the problem of suicide, and the use of handguns in committing suicide. Many suicides occur outside of the home, and I believe, based on my experience, that the ability to legally carry a handgun, the most effective method of committing suicide, outside of the home, along with the increased prevalence of handguns generally, will result in an increase in suicides. In Baltimore County during the past 3 years, 24 suicides by gun took place outside the home, amounting to 41% of all suicides outside the home for those years.

21.    Finally, I am deeply concerned about the problem of accidental discharges. Just in recent weeks, a civilian in Baltimore County died from an accidental discharge from a handgun she lawfully owned. The more a weapon is handled—removed from the home, holstered, unholstered for placement in a glove box, removed from the glove box and holstered, etc.—the more likely it will be accidentally discharged. Such accidental discharges often lead to tragedy.   Even after 34 years on the force, I still exercise very great caution when handling my handgun, knowing as I do the risks of accidental discharges.

8

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 18, 2011, Baltimore, Maryland

James W. Johnson

9

Douglas F. Gansler
Attorney General

Katherine Winfree
Chief Deputy Attorney General

John B. Howard, Jr.
Deputy Attorney General



Dan Friedman
Counsel to the General Assembly

Sandra Benson Brantley
Bonnie A. Kirkland
Kathryn M. Rowe
Assistant Attorneys General

# The Attorney General of Maryland

## Office of Counsel to the General Assembly

December 4, 2009

The Honorable Warren E. Miller
202 House Office Building
Annapolis MD  21401

Dear Delegate Miller:

You have asked for advice about State laws regarding the open carry of long guns. Generally, there is no prohibition against the open carry of a long gun in Maryland. There are, however, some exceptions to the general rule. Below is an overview of the applicable law.

Criminal Law Article § 4-101(c) prohibits a person from carrying a *concealed* "dangerous weapon." The definition of weapon under this provision excludes handguns, but would include a long gun. CR § 4-101(a)(5).[1] Nevertheless, a person cannot carry a dangerous weapon "openly with the intent or purpose of injuring an individual in an unlawful manner." CR § 4-101(c). Additionally, there is an exception for "an individual who carries the weapon as a reasonable precaution against apprehended danger, subject to the right of the court in an action arising under this section to judge the reasonableness of the carrying of the weapon, and the proper occasion for carrying it … ." CR § 4-101(b)(4).

State law also prohibits certain classes of individuals from carrying a firearm. Those persons include:  individuals who have been convicted of a felony (CR § 5-622); respondents in domestic violence cases subject to protective orders where the judge has ordered such (FL §§ 4-505 and 4-506); an attendant accompanying a hunting dog being trained during off hunting season (NR § 10-413); persons using spotlights to cast lights with the attempt or intent to locate deer (NR § 10-416); persons with mental disorders (PS § 5-205); individuals who have been convicted of certain disqualifying crimes or are addicted to dangerous substances (PS § 5-133); inmates in a home detention program (COMAR 12.02.26.08); Patuxent Institution inmates on leave, work release or school release (COMAR 12.12.07.06; 12.12.28.05; 12.12.29.07); and offenders assigned to home detention (COMAR 12.13.01.08). Moreover, it is a separate crime

---

[1] Criminal Law Article § 4-203 addresses the carrying of handguns. The provision prohibits the open or concealed carry of a handgun, with certain exceptions. The exceptions allow certain authorized individuals to carry handguns such as law enforcement officers and persons holding a permit to wear, carry or transport a handgun. CR § 4-203(b).

104 Legislative Services Building · 90 State Circle · Annapolis, Maryland 21401-1991
410-946-5600 · 301-970-5600 · Fax 410-946-5601 · TTY 410-946-5401 · 301-970-5401

The Honorable Warren E. Miller
December 4, 2009
Page 2

for an individual, among other things, to carry a firearm related to criminal acts. *See, e.g.*, CR § 5-621 (drug trafficking crime); CR § 3-202 (assault); PS § 5-140 (gun trafficking).

State law also prohibits the carrying of firearms, including long guns, in certain places, except for authorized individuals such as law enforcement personnel. Those places are school property (CR § 4-102); within 1,000 feet of a demonstration in a public place (CR § 4-208); dredge boats – no more than "two shotguns not larger than a number ten gauge and using shot not larger than number one" (NR § 4-1013); legislative buildings (SG § 2-1702); an aircraft engaged in air commerce services (TR § 5-1008); lodging establishments where the owner reasonably believes the individual possesses property that may be dangerous to other individuals such as a firearm (BR § 15-203(a)); State public buildings and grounds (COMAR 04.05.01.03); Chesapeake Forest Lands (COMAR 08.01.07.14); State Forests (COMAR 08.07.01.04); State Parks (COMAR 08.07.06.04); State highway rest areas (COMAR 11.04.07.12); community adult rehabilitation centers (12.02.03.10); and, except for small centers located in residences, child care centers (COMAR 13A.16.10.04).

Please let me know if you need any other information.

Sincerely,

Sandra Benson Brantley
Assistant Attorney General

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RAYMOND WOOLLARD, et al.

          Plaintiffs

    v.                                     Civil Case No. L-10-2068

TERRENCE SHERIDAN, et al.

          Defendants

o0o

**<u>MEMORANDUM</u>**

     This case calls upon the Court to determine whether the State of Maryland's handgun regulation statute violates the Second Amendment to the United States Constitution insofar as it requires an applicant to demonstrate "good and substantial reason" for the issuance of a handgun permit.  Plaintiffs Raymond Woollard and The Second Amendment Foundation[1] bring suit against Terrence Sheridan, Secretary of the Maryland State Police, and three members of the Maryland Handgun Permit Review Board.  The facts of the case are undisputed, and both sides have moved for summary judgment.  <u>See</u> Docket Nos. 21 and 25.[2]  The issues have been comprehensively briefed and the Court has heard oral argument.

---

[1]     The Second Amendment Foundation is a non-profit organization, the stated purposes of which include "promoting the exercise of the right to keep and bear arms; and education, research, publishing and legal action focusing on the Constitutional right to privately own and possess firearms, and the consequences of gun control."  Am. Compl. 2.  For ease of reference, Plaintiffs will be collectively referred to as "Woollard" throughout.

[2]     The Court thanks counsel for their thorough and skillful briefs.  The Court also thanks <u>amici curiae</u>, the Brady Center to Prevent Gun Violence and the Legal Community Against Violence, for their useful submissions.

1

Because the "good and substantial reason" requirement is not reasonably adapted to a substantial government interest, the Court finds this portion of the Maryland law to be unconstitutional.  Woollard is entitled to summary judgment.

## I.      BACKGROUND

The state of Maryland prohibits the carrying of a handgun outside the home, openly or concealed, without a permit.  See MD. CODE ANN., CRIM. LAW § 4-203; MD. CODE ANN., PUB. SAFETY § 5-303.[3]  The Secretary of the State Police ("Secretary") is required to issue permits, but only to individuals who meet certain enumerated conditions.  An applicant must establish that he has not been convicted of a felony or a misdemeanor for which a term of imprisonment greater than one year was imposed, has not been convicted of a drug crime, is not an alcoholic or drug addict, and has not exhibited a propensity for violence or instability.  Of significance to this case, the Secretary must also make a determination that the applicant "has good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger."  MD. CODE ANN., PUB. SAFETY § 5-306(a)(5)(ii).

In deciding whether the applicant has satisfied these criteria, the Handgun Permit Unit ("Permit Unit"), which reviews applications as the Secretary's designee, is required to take various factors into consideration.  These include "the reasons given by the applicant as to whether those reasons are good and substantial," "whether the applicant has any alternative

---

[3]      Maryland law does allow the transport of an unloaded handgun to and from places where it may legally be possessed without a permit, such as the owner's home, a repair shop, a target range, or a gun show.  See MD. CODE ANN., CRIM. LAW § 4-203(b).  With limited exceptions, Maryland also allows the unrestricted carrying of a "long gun," i.e., a rifle or shotgun, outside the home.

available to him for protection other than a handgun permit," and "whether the permit is necessary as a reasonable precaution for the applicant against apprehended danger." MD. CODE REGS. 29.03.02.04.

An individual whose permit application has been denied may appeal the decision to the Handgun Permit Review Board (the "Board"). MD. CODE ANN., PUB. SAFETY, § 5-312. The Board may sustain, reverse, or modify the Permit Unit's decision. Id.

Plaintiff Raymond Woollard lives on a farm in a remote part of Baltimore County, Maryland. On Christmas Eve, 2002, Woollard was at home with his wife, children, and grandchildren when an intruder shattered a window and broke into the house. The intruder was Kris Lee Abbott, Woollard's son-in-law. Abbott, who was high on drugs and intent on driving into Baltimore city to buy more, was looking for his wife's car keys. Woollard grabbed a shotgun and trained it on Abbott, but Abbott wrested the shotgun away. Woollard's son restored order by pointing a second gun at Abbott. Woollard's wife called the police, who took two-and-a-half hours to arrive.

Abbott was convicted of first degree burglary and sentenced to three years' probation. He was later incarcerated after he violated his probation by assaulting a police officer and by committing another burglary.

In 2003, Woollard applied for, and was granted, a handgun carry permit. He was allowed to renew the permit in 2006, shortly after Abbott was released from prison.[4] In 2009, however, when Woollard again sought to renew his permit, he was informed that his request was incomplete. He was directed to submit evidence "to support apprehended fear (i.e. –copies of

---

[4]      Permits expire "on the last day of the holder's birth month following two years after the date the permit is issued" and may be renewed for successive three-year terms. MD. CODE ANN., PUB. SAFETY, § 5-309.

J.A. 139

police reports for assaults, threats, harassments, stalking).”  Letter from M. Cusimano, Handgun

Permit Section Supervisor, to Robert Woollard (Feb. 2, 2009), Pls.’ Mot. Summ. J. Ex. A,

Docket No. 12-3.  Because Woollard was unable to produce evidence of a current threat, his

application was denied.

Woollard appealed this decision, first through the Handgun Permit Unit’s informal

review procedures and eventually to the Board.  On November 12, 2009, in a decision by

Defendants Gallagher, Goldstein, and Thomas, the Board affirmed the denial of Woollard’s

application, finding that Woollard “ha[d] not submitted any documentation to verify threats

occurring beyond his residence, where he can already legally carry a handgun.”  The Board

concluded that Woollard “ha[d] not demonstrated a good and substantial reason to wear, carry or

transport a handgun as a reasonable precaution against apprehended danger in the State of

Maryland.”  Pls.’ Mot Summ. J. Ex. D, Docket No. 12-6.

On July 29, 2010, Woollard filed the instant suit, arguing that Maryland’s handgun

permitting scheme is facially violative of both the Second Amendment and the Equal Protection

Clause of the Fourteenth Amendment.  He avers that, separate and apart from any concern he

may have regarding Abbott, he wishes to wear and carry a handgun for general self-defense.


## II.     LEGAL STANDARD

The Court may grant summary judgment when “the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law.”  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); see also

Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (recognizing that trial

judges have "an affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial).   Nevertheless, in determining whether there is a genuine issue of material fact, the Court must view the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party.  Pulliam Inv. Co. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987).  Hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment.  See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro, 64 F.3d 962, 967 (4th Cir. 1995).

"When both parties file motions for summary judgment . . . [a] court applies the same standard of review."  McCready v. Standard Ins. Co., 417 F. Supp. 2d 684, 695 (D. Md. 2006) (citing Taft Broad. Co. v. United States, 929 F.2d 240, 248 (6th Cir. 1991)).  Furthermore, "each motion [will be considered by a court] separately on its own merits to determine whether either of the parties deserves judgment as a matter of law."  Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003).

### III.    ANALYSIS

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II.  These 27 words, so long untroubled by significant judicial scrutiny, have become newly fertile ground for interpretation following the Supreme Court's 2008 decision in District of Columbia v. Heller, 554 U.S. 570 (2008).  In brief, Heller presented the question whether the Second Amendment confers an individual right to bear arms, or protects only the right to possess and carry a firearm in connection with militia service.  After a lengthy examination of the historical record, the Heller majority held that the Constitution guarantees

5

"the individual right to possess and carry weapons in case of confrontation," but left the contours of that right largely undefined. Id. at 592. Two years later, in McDonald v. City of Chicago, 130 S. Ct. 3020 (2010), the Supreme Court held that the Second Amendment's protections, whatever their bounds, apply fully to the States through the Fourteenth Amendment.

This case requires the Court to answer two fundamental questions. The first asks whether the Second Amendment's protections extend beyond the home, "where the need for defense of self, family, and property is most acute." Heller, 554 U.S. at 628. This question was left unanswered in Heller, and has not been authoritatively addressed in the Fourth Circuit's post-Heller decisions. Second, if the right to bear arms does extend beyond the home, the Court must decide whether Maryland's requirement that a permit applicant demonstrate "good and substantial reason" to wear or carry a handgun passes constitutional muster. In undertaking these inquiries, the Court is guided by the Fourth Circuit's recent opinion in United States v. Masciandaro, 638 F.3d 458 (4th Cir. 2011), which helpfully laid the foundation for resolution of the case at bar.

**A.  Level of Scrutiny**

The Supreme Court has traditionally chosen among three levels of scrutiny when examining laws challenged on constitutional grounds. The rational basis test presumes the law's validity and asks only whether the law is rationally related to a legitimate state interest. City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985). Intermediate scrutiny requires more; the government's interest must be "significant," "substantial," or "important," see, e.g., Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 662 (1994), and the "fit" between the challenged regulation and the asserted objective must be reasonable, though not perfect. See, e.g., Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 556 (2001). Finally, strict scrutiny requires the

6

government to show that the law "furthers a compelling interest and is narrowly tailored to achieve that interest." Citizens United v. FEC, 130 S. Ct. 876, 898 (2010) (citing FEC v. Wisconsin Right To Life, Inc., 551 U.S. 449, 464 (2007)).

The Heller majority declined to articulate the level of constitutional scrutiny that courts must apply when examining laws that are in tension with the Second Amendment.  It determined that the regulation then under consideration would have failed "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." 554 U.S. at 628.  The majority did, however, reject both rational basis review, see id. at 628 n.27, and the "freestanding 'interest-balancing' approach" advocated by Justice Breyer in dissent.  Id. at 634–35; see also id. at 689–90 (Breyer, J., dissenting).

The case of United States v. Chester, 628 F.3d 673 (4th Cir. 2010), called upon the Fourth Circuit Court of Appeals to decide the level of scrutiny applicable in a challenge to 18 U.S.C. § 922(g)(9), which prohibits the possession of a firearm by any person convicted of a misdemeanor crime of domestic violence.[5]  Because Chester's prior conviction put him outside the ambit of the "core right identified in Heller—the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense," the court determined that intermediate scrutiny was more appropriate than strict scrutiny.  Id. at 683 (emphasis original).

Soon thereafter, Masciandaro presented the Fourth Circuit with another case involving the assertion of Second Amendment rights outside the "core" territory staked out by Heller. Sean Masciandaro was convicted of possessing a loaded handgun in a motor vehicle within a

---

[5]      Commonly referred to as the "felon in possession" statute, § 922(g) is best known for proscribing the possession of a firearm or ammunition by anyone convicted of a crime punishable by a term of imprisonment exceeding one year.   Lesser-known subsections also forbid firearm possession to those who have been dishonorably discharged from the armed forces, illegal aliens, and domestic violence misdemeanants.

national park, a combination made unlawful at the time by a federal regulation, 36 C.F.R.

§ 2.4(b).  638 F.3d at 459.  On appeal, Masciandaro argued that because the Second Amendment

guaranteed him the right to possess and carry a weapon in case of confrontation, it shielded him

from prosecution for exercising that right in a national park.  The Fourth Circuit, in upholding

Masciandaro's conviction, rejected his argument that the regulation should be tested under strict

scrutiny.  It noted that while Masciandaro, unlike Chester, was a law-abiding citizen with a clean

criminal record, he possessed the handgun not in his home but in a public park.  Id. at 469–70.

> Drawing from First Amendment jurisprudence, the appeals court reasoned as follows:

> > [W]e might expect that courts will employ different types of
> > scrutiny in assessing burdens on Second Amendment rights,
> > depending on the character of the Second Amendment question
> > presented.
> >
> > * * * *
> >
> > As we observe that any law regulating the content of speech is
> > subject to strict scrutiny, we assume that any law that would
> > burden the "fundamental," core right of self-defense in the home
> > by a law-abiding citizen would be subject to strict scrutiny.  But, as
> > we move outside the home, firearm rights have always been more
> > limited, because public safety interests often outweigh individual
> > interests in self-defense.

Id. at 470 (citation omitted).

The court concluded that "a lesser showing is necessary with respect to laws that burden

the right to keep and bear arms outside of the home," and determined that intermediate scrutiny

was appropriate to Masciandaro's challenge.  Id. at 471.  The court cited with approval precedent

applying intermediate scrutiny to content-neutral time, place, and manner restrictions on speech

in general, and on commercial speech in particular "in light of its 'subordinate position in the

scale of First Amendment values.' "  Id. (citing Ward v. Rock Against Racism, 491 U.S. 781,

791 (1989), and Bd. of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 477 (1989)).

8

Woollard's asserted right falls within this same category of non-core Second Amendment protection.  He already enjoys an unchallenged right to possess a handgun in his home; but, like Masciandaro, he also seeks to carry one into the wider world for general self-defense.  The statute he challenges, therefore, is properly viewed through the lens of intermediate scrutiny, which places the burden on the Government to demonstrate a reasonable fit between the statute and a substantial governmental interest.  See Chester, 628 F.3d at 683.

**B.  Scope of the Right**

In Masciandaro, Judge Wilkinson, writing for the panel on this issue only,[6] found it "unnecessary to explore in this case the question of whether and to what extent the Second Amendment right recognized in Heller applies outside the home."  638 F.3d at 474.  Judge Wilkinson reasoned that, if the right to carry a handgun outside the home does exist, the burden placed on that right by the regulation at issue clearly withstood intermediate scrutiny.  He then determined that that the principle of constitutional avoidance counseled that the case be resolved on this narrower ground.  See id. at 475 (citing Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)).  Because the Supreme Court had not clearly articulated the Second Amendment's reach, the Fourth Circuit declined to forge ahead into what Judge Wilkinson characterized as "a vast terra incognita."  Id.  Rather, the court concluded that "[t]here simply is no need in this litigation to break ground that our superiors have not tread."  Id.

In considering the case at bar, this Court is mindful of Judge Wilkinson's admonition that one should venture into the unmapped reaches of Second Amendment jurisprudence "only upon necessity and only then by small degree."  Id.  Today, however, such necessity exists.  Woollard

---

[6]        Though the balance of the opinion is authored by Judge Niemeyer, his view as to the necessity of reaching the question of the Second Amendment's scope did not garner support from a majority of the three-judge panel.  Thus, Judge Wilkinson's position on that issue is controlling.

has squarely presented the question, and resolution of his case requires an answer.  While we may leave for another day the dauntingly nuanced "litigation over schools, airports, parks, public thoroughfares, and various additional government facilities," see id., the instant suit does require the Court to determine whether Maryland's broad restriction on handgun possession outside the home burdens any Second Amendment right at all.

In undertaking this imposing task, the Court finds a ready guide in Judge Niemeyer's analysis in Masciandaro.  While a majority of the panel found that Judge Niemeyer's reasoning was not essential to disposition of the case, it is both sound and persuasive.  As Judge Niemeyer points out, the Heller Court's description of its holding as applying to the home, where the need "for defense of self, family, and property is most acute," suggests that the right also applies in some form "where that need is not 'most acute.' "  Id. at 468 (Niemeyer, J., concurring)  (quoting Heller, 554 U.S. at 628).  This reasoning is consistent with the Supreme Court's historical understanding of the right to keep and bear arms as "an individual right protecting against both public and private violence."  Heller, 554 U.S. at 594.  In addition to self-defense, the right was also understood to allow for militia membership and hunting.  See id. at 598.  To secure these rights, the Second Amendment's protections must extend beyond the home: neither hunting nor militia training is a household activity, and "self-defense has to take place wherever [a] person happens to be."  Masciandaro, 638 F.3d at 468 (Niemeyer, J., concurring) (quoting Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L. Rev. 1443, 1515–18 (2009)).

Heller's  definition of one of the Amendment's central terms, "bear," further suggests that the right, though it may be subject to limitations, does not stop at one's front door: "To 'bear arms,' as used in the Second Amendment, is to 'wear, bear, or carry . . . upon the person or in the

clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person.' "  554 U.S. at 584 (citation omitted).  The same proposition finds additional support in McDonald, in which the Supreme Court characterized Heller as holding that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home."  130 S. Ct. at 3044 (emphasis supplied).

 In addition to its exposition of the Second Amendment's affirmative protections, the Heller Court took pains to clarify that nothing it had written "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms," measures that it identified as "presumptively lawful."  554 U.S. at 571 & n.26.[7]  What, if any, bearing this language has on the extent of the Second Amendment's reach beyond the home is not self-evident.  As the Fourth Circuit acknowledged in Chester, "[i]t is unclear . . . whether Heller was suggesting that 'longstanding prohibitions' such as these were historically understood to be valid

---

[7] The Court reiterated this point in McDonald:

> It is important to keep in mind that Heller, while striking down a law that prohibited the possession of handguns in the home, recognized that the right to keep and bear arms is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." We made it clear in Heller that our holding did not cast doubt on such longstanding regulatory measures as "prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." We repeat those assurances here. Despite municipal respondents' doomsday proclamations, incorporation does not imperil every law regulating firearms.

130 S. Ct. at 3047 (citations omitted).

limitations on the right to bear arms or did not violate the Second Amendment for some other reason."  628 F.3d at 679.

Stated otherwise, there are two ways of conceptualizing presumptively lawful restrictions.  First, these restrictions may be so ingrained in our understanding of the Second Amendment that there is little doubt that they withstand the applicable level of heightened scrutiny.  Alternatively, the right itself can be seen as failing to extend into areas where, historically, limitations were commonplace and well accepted.  While the Fourth Circuit was not required in Masciandaro to choose between these two interpretations, it did seem to indicate that the former reading is more likely correct than the latter: "The Court's use of the word 'presumptively' suggests that the articulation of sensitive places may not be a limitation on the scope of the Second Amendment, but rather on the analysis to be conducted with respect to the burden on that right."  Masciandaro, 638 F.3d at 472.

This Court shares that view.  The Supreme Court's choice of phrasing connotes that the restrictions it termed "presumptively lawful" pass muster under a heightened standard of review.  It would likely not have used the modifier "presumptively" if those restrictions were subject, not to any form of elevated scrutiny, but only to the rational basis review that all laws are presumed to satisfy.  If this is correct, and laws limiting the carrying of firearms in sensitive places are indeed implicated by the Second Amendment's protections, then those protections necessarily extend outside the home, at least to some degree.[8]

---

[8]      Definitive resolution of this quandary is not essential.  To say that Heller's "presumptively lawful" regulations regarding sensitive places (e.g., schools, government buildings) are implicated by, but do not violate, a right to bear arms outside of the home obviously presumes the existence of such a right.  A determination that "presumptively lawful" regulations are outside the ambit of the Amendment's protections altogether, however, says nothing about where else those protections might extend.  This latter reading would not,

For all of these reasons, the Court finds that the right to bear arms is not limited to the home.  The signposts left by recent Supreme Court and Fourth Circuit case law all point to the conclusion that Woollard's "claim to self-defense—asserted by him as a law-abiding citizen . . . —does implicate the Second Amendment, albeit subject to lawful limitations."  Masciandaro, 638 F.3d at 468 (Niemeyer, J., concurring).[9]

### C. Constitutionality of the "Good and Substantial Reason" Requirement

Having determined that the Second Amendment's protections extend beyond the "core" right identified in Heller to reach the challenged statute, and having identified the proper level of scrutiny, the Court now proceeds to the substance of Woollard's challenge.  Woollard attacks Maryland's statutory scheme on three separate fronts.  First, he contends that it amounts to an unconstitutional prior restraint on the exercise of his Second Amendment rights because it vests unbridled discretion in the officials responsible for issuing permits.  Second, he argues that while the State has an undeniable interest in public safety, the law is not sufficiently tailored to that interest to withstand intermediate scrutiny.  Finally, he urges that, even if the law does comport with the Second Amendment, it violates the Equal Protection Clause of the Fourteenth Amendment.  The Court addresses each of these arguments in turn.

#### i.   Prior Restraint

The Court declines Woollard's request to apply a prior restraint analysis to laws challenged on Second Amendment grounds.  In the First Amendment context, any law that makes "freedoms which the Constitution guarantees contingent upon the uncontrolled will of an

---

therefore, preclude application of heightened scrutiny to the statutory provision at issue in this case, which does not fall within any of Heller's presumptively lawful categories.

[9]     The Court acknowledges that courts in other jurisdictions have reached the opposite conclusion on this point.  See Moore v. Madigan, --- F. Supp. 2d ----, 2012 WL 344760 (C.D. Ill. Feb. 3, 2012); Piszczatoski v. Filko, --- F. Supp. 2d ----, 2012 WL 104917 (D.N.J. Jan. 12, 2012).

official—as by requiring a permit or license which may be granted or withheld in the discretion

of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those

freedoms." Staub v. City of Baxley, 355 U.S. 313, 322 (1958) (citations omitted).

A licensing or permitting scheme is unconstitutional when characterized by "unbridled

discretion" of a government official or agency, which exists "when a licensing scheme does not

impose adequate standards to guide the licensor's discretion." Chesapeake B & M, Inc. v.

Harford Cnty., 58 F.3d 1005, 1009 (4th Cir. 1995) (en banc). Standards governing prior

restraints must be "narrow, objective and definite." Shuttlesworth v. Birmingham, 394 U.S. 147,

151 (1969). If the scheme "involves appraisal of facts, the exercise of judgment, and the

formation of an opinion," the danger of censorship is considered too great. Forsyth Cnty. v.

Nationalist Movement, 505 U.S. 123, 131 (1992) (quoting Cantwell v. Connecticut, 310 U.S.

296, 305 (1940)).

Woollard argues that the Second Amendment's right to keep and bear arms is among the

"freedoms which the Constitution guarantees" within the meaning of Staub, and that the danger

of chilling protected activity is just as great in the Second Amendment sphere as it is in free

speech cases. He further contends that, far from being guided by the type of narrow, objective,

and definite standards demanded of statutes requiring the issuance of a permit, Maryland's

regulations are "entirely arbitrary, subjective, and boundless." Pls.' Mot. Summ. J. 17.

It is true that courts have often looked to First Amendment law for guidance in navigating

uncharted Second Amendment waters.[10] No court has yet taken the quantum leap that Woollard

---

[10]     See, e.g., Ezell v. City of Chicago, 651 F.3d 684, 708 (7th Cir. 2011) ("Labels aside, we can distill this First Amendment doctrine and extrapolate a few general principles to the Second Amendment context."); Chester, 628 F.3d at 682 ("[W]e agree with those who advocate looking to the First Amendment as a guide in developing a standard of review for the Second

14

proposes, however.  Moreover, while the First Amendment undoubtedly provides a useful framework for analysis of laws burdening Second Amendment rights, especially when choosing the appropriate level of scrutiny, this Court would be hesitant to import constitutional doctrine wholesale from one field of law into another for which it was never designed.  Those courts that painstakingly developed and expounded the prior restraint analysis on which Woollard relies today surely did not have Second Amendment challenges in mind when they did so.

Even if a prior restraint inquiry were appropriate, the Court rejects Woollard's assertion that Maryland's permitting scheme vests officials with unbridled discretion as regards its application.  In support of his position, Woollard dusts off a 1967 case in which this Court struck down a provision of the Baltimore County Code providing that no permit for a public gathering would be issued unless the person, club, association, or corporation was deemed "fit, responsible and proper" to receive one by the chief of police.  See Norton v. Ensor, 269 F. Supp. 533, 536 (D. Md. 1967).  The Court ruled the law an unconstitutional prior restraint on the freedoms of speech and assembly, notwithstanding the defendants' assertion that police review was necessary to preserve the public safety in a time when racially charged rallies and demonstrations often threatened to devolve into violence.  Id. at 536.

While Norton is superficially similar to the case at bar, the discretion of State officials who review handgun permit applications is, in point of fact, curtailed in several important respects.  It is true, as Woollard highlights, that these officials are empowered to judge whether the "[r]easons given by the applicant . . . are good and substantial," MD. CODE REGS. 29.03.02.04(G), and in so doing take into account such seemingly nebulous considerations as "[i]nformation received from personal references and other persons interviewed," and

---

Amendment.") (citing United States v. Marzzarella, 614 F.3d 85, 89 n.4 (3d Cir. 2010)); United States v. Skoien, 587 F.3d 803, 813–14 (7th Cir. 2009).

"[i]nformation received from business or employment references as may be necessary in the discretion of the investigator."  MD. CODE REGS. 29.03.02.04(J), (K).  The above does not, however, constitute the full extent of the reviewing officials' guidance.

The Secretary has identified four general categories of "good and substantial reason" to carry a handgun in public: (1) business activities that involve heightened risk, such as the need to carry cash or other "street valued" commodities, (2) participation in "regulated professions," such as security guards or armored car personnel, (3) participation in "assumed risk" professions that involve the ability to restrict or take away civil liberties, such as judges, prosecutors, police officers, public defenders, and correctional officers, and (4) "personal protection."  Decl. of Sgt. Michael Jones, Maryland State Police Licensing Division Supervisor, Defs.' Mot. Summ. J. Ex. 3, at ¶¶ 8–12.  Applicants claiming to fit within each category are required to submit specific supporting documentation.  See id.

In assessing "personal protection" applications such as the one filed by Woollard, the Permit Unit is further guided by two cases from the Maryland Court of Special Appeals: Snowden v. Handgun Permit Review Bd., 413 A.2d 295 (Md. Ct. Spec. App. 1980), and Scherr v. Handgun Permit Review Bd., 880 A.2d 1137 (Md. Ct. Spec. App. 2005).  While not overly detailed, these cases provide useful interpretation of the requirement that issuance of a permit be necessary as a reasonable precaution against apprehended danger.  As construed by the Court of Special Appeals, this requirement calls for some sort of objectively heightened threat, above and beyond the " 'personal anxiety' " or "apprehension of an average person."  See Scherr, 880 A.2d at 1148 (quoting Snowden, 413 A.2d at 298).  Simply living in a dangerous or high-crime area, for example, is not enough.  See id.

16

Consistent with these cases, the Permit Unit considers several factors listed as persuasive by the Court of Special Appeals, including (1) the nearness or likelihood of a threat or presumed threat, (2) whether the threat can be verified, (3) whether the threat is particular to the applicant, as opposed to the average citizen, (4) if the threat can be presumed to exist, the basis for such a presumption, and (5) the length of time since the initial threat occurred.  Jones Decl. ¶ 14.

Finally, decisions of the Permit Unit may be appealed to the full Board, whose rulings are, in turn, subject to judicial review.   This judicial review yields published cases such as Scherr and Snowden, which provide further superintendence.  In sum, the Permit Unit and the Board do not enjoy unbridled discretion in the issuance of permits.  While the applicant bears the burden of demonstrating a "good and substantial reason," licensing officials are not simply left to their own views of what such a good reason might be.  Cf. Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150 (1969) (striking down a permitting requirement for parades, pursuant to which "the members of the Commission were to be guided only by their own ideas of 'public welfare, peace, safety, health, decency, good order, morals or convenience' "); Staub, 355 U.S. at 322 (finding unconstitutional a statute allowing the mayor and city council to deny a permit, required to solicit membership in any organization, "if they do not approve of the applicant or of the union or of the union's 'effects upon the general welfare of citizens of the City of Baxley' ").

### ii.    Intermediate Scrutiny

As stated, Maryland's permitting scheme, insofar as it requires a "good and substantial" reason for a law-abiding citizen to carry a firearm outside his home, is subject to intermediate scrutiny.  In order to prevail, the State must demonstrate that the challenged regulation is reasonably adapted to a substantial governmental interest.  Under this standard, the "degree of fit" between the regulation and "the well-established goal of promoting public safety need not be

17

perfect; it must only be substantial." <u>Heller v. Dist. of Columbia</u>, 698 F. Supp. 2d 179, 191 (D.D.C. 2010).

Beyond peradventure, public safety and the prevention of crime are substantial, indeed compelling, government interests. <u>See, e.g.</u>, <u>United States v. Salerno</u>, 481 U.S. 739, 748–50 (1987) (noting that "the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest" and holding that the government's interest in preventing crime is not only important, but compelling); <u>Schall v. Martin</u>, 467 U.S. 253, 264 (1984) ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted.") (citations and quotation marks omitted).

The Maryland statute's failure lies in the overly broad means by which it seeks to advance this undoubtedly legitimate end.  The requirement that a permit applicant demonstrate "good and substantial reason" to carry a handgun does not, for example, advance the interests of public safety by ensuring that guns are kept out of the hands of those adjudged most likely to misuse them, such as criminals or the mentally ill.  It does not ban handguns from places where the possibility of mayhem is most acute, such as schools, churches, government buildings, protest gatherings, or establishments that serve alcohol.  It does not attempt to reduce accidents, as would a requirement that all permit applicants complete a safety course.  It does not even, as some other States' laws do, limit the carrying of handguns to persons deemed "suitable" by denying a permit to anyone "whose conduct indicates that he or she is potentially a danger to the public if entrusted with a handgun." <u>See</u> <u>Kuck v. Danaher</u>, No. 3:07cv1390(VLB), 2011 WL 4537976 at *11 (D. Conn. Sept. 29, 2011).

Rather, the regulation at issue is a rationing system.  It aims, as Defendants concede, simply to reduce the total number of firearms carried outside of the home by limiting the

privilege to those who can demonstrate "good reason" beyond a general desire for self-defense. In support of this limitation, Defendants list numerous reasons why handguns pose a threat to public safety in general and why curbing their proliferation is desirable. For example, they argue that an assailant may wrest a handgun away from its owner, and cite evidence that this possibility imperils even trained police officers. <u>See</u> Defs.' Mot. Summ. J. 15, Docket No. 26. They note that when a police officer is engaged in a confrontation with a criminal, the presence of an armed civilian can divert the officer's attention. <u>Id.</u> at 16. In addition, Defendants urge that while most permit holders are law-abiding, there is no guarantee that they will remain so. They cite studies purporting to show that the majority of murderers have no previous felony conviction that would have prevented them from obtaining a permit. <u>Id.</u> at 35. Thus, they argue, a permitting scheme that merely denies permits to convicted felons is inadequate.

These arguments prove too much. While each possibility presents an unquestionable threat to public safety, the challenged regulation does no more to combat them than would a law indiscriminately limiting the issuance of a permit to every tenth applicant. The solution, then, is not tailored to the problem it is intended to solve. Maryland's "good and substantial reason" requirement will not prevent those who meet it from having their guns taken from them, or from accidentally shooting themselves or others, or from suddenly turning to a life of crime. Indeed, issuing permits specifically to those applicants who can demonstrate an increased likelihood that they may need a firearm would seem a strange way to allay Defendants' fear that "when handguns are in the possession of potential victims of crime, their decision to use them in a public setting may actually increase the risk of serious injury or death to themselves or others." <u>Id.</u> at 15. If anything, the Maryland regulation puts firearms in the hands of those <u>most</u> likely to

use them in a violent situation by limiting the issuance of permits to "groups of individuals who are at greater risk than others of being the victims of crime." Id. at 40.

A law that burdens the exercise of an enumerated constitutional right by simply making that right more difficult to exercise cannot be considered "reasonably adapted" to a government interest, no matter how substantial that interest may be. Maryland's goal of "minimizing the proliferation of handguns among those who do not have a demonstrated need for them," id. at 40, is not a permissible method of preventing crime or ensuring public safety; it burdens the right too broadly. Those who drafted and ratified the Second Amendment surely knew that the right they were enshrining carried a risk of misuse, and states have considerable latitude to channel the exercise of the right in ways that will minimize that risk. States may not, however, seek to reduce the danger by means of widespread curtailment of the right itself. "[E]ven the most legitimate goal may not be advanced in a constitutionally impermissible manner." Carey v. Brown, 447 U.S. 455, 464–65 (1980).

At bottom, this case rests on a simple proposition: If the Government wishes to burden a right guaranteed by the Constitution, it may do so provided that it can show a satisfactory justification and a sufficiently adapted method. The showing, however, is always the Government's to make. A citizen may not be required to offer a "good and substantial reason" why he should be permitted to exercise his rights. The right's existence is all the reason he needs.

The Court wishes to emphasize the limits of this decision. While it finds Maryland's requirement that a permit applicant demonstrate "good and substantial reason" to be unconstitutional, the Court does not address any of the State's other regulations relating to the possession and use of firearms, many of which would qualify as presumptively lawful. Nor does

J.A. 156

the Court speculate as to whether a law that required a "good and substantial reason" only of law-abiding citizens who wish to carry a <u>concealed</u> handgun would be constitutional.[11]  Finally, the Court does not speak to Maryland's ability to declare that a specific applicant is unfit for a permit because of some particular aspect of the applicant's character or history.

### iii.    Fourteenth Amendment Challenge

Woollard has also challenged the Maryland statute under the Equal Protection Clause of the Fourteenth Amendment, which provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  The Equal Protection clause "is essentially a direction that all persons similarly situated should be treated alike."  <u>City of Cleburne</u>, 473 U.S. at 440.

The Court declines to conduct a separate analysis under the Equal Protection Clause for several reasons.  First, the above Second Amendment inquiry provides an adequate basis for resolution of the case.  As such, there is no need to venture further into unmapped territory by determining whether or not Maryland's permitting scheme would also be unconstitutional on Woollard's alternative grounds.

Second, while the Equal Protection Clause provides its own source of substantive protection, separate and apart from other provisions of the Constitution, Woollard's equal protection claim is essentially a restatement of his Second Amendment claim.  In the First

---

[11]    Maryland law does not differentiate between open and concealed use, but some courts have held that states have a greater interest in reducing the number of concealed handguns "because of their disproportionate involvement in life-threatening crimes of violence, particularly in streets and other public places."  <u>Peruta v. Cnty. of San Diego</u>, 758 F. Supp. 2d 1106, 1117 (S.D. Cal. 2010).

J.A. 157

Amendment context, courts regularly refuse to hear substantive First Amendment arguments recast as equal protection claims.[12]  The same logic obtains here.

Finally, Woollard's equal protection challenge is, in part, an effort to obtain review under a more stringent standard than the intermediate scrutiny the Court has already found to be appropriate.  Woollard argues that, because the right to keep and bear arms is "fundamental" within the meaning of Fourteenth Amendment jurisprudence, the challenged law must be "given the most exacting scrutiny."  See Clark v. Jeter, 486 U.S. 456, 461 (1988).  Of course, to accept this theory would be to erase, in one broad stroke, the careful and sensible distinctions that the Fourth Circuit and other courts have drawn between core and non-core Second Amendment protections and to ignore the principle that differing levels of scrutiny are appropriate to each. The Court declines such an approach.[13]

---

[12]    See, e.g., Orin v. Barclay, 272 F.3d 1207, 1213 n.3 (9th Cir. 2001) (finding that equal protection claim was "no more than a First Amendment claim dressed in equal protection clothing" and was "subsumed by, and co-extensive with" plaintiff's First Amendment claim); Lee v. York Cnty. Sch. Div., 418 F. Supp. 2d 816, 834 (E.D. Va. 2006) (finding it inappropriate to address equal protection argument that was " 'a mere rewording of a First Amendment claim' " because plaintiff "asks this court to do under the Fourteenth Amendment what he asks it to do under the First Amendment: to evaluate the constitutionality of [the challenged statute]") (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 250 (4th Cir. 1999)) (brackets omitted).

[13]    Nor is Woollard necessarily correct that strict scrutiny would apply to an equal protection challenge.  Again, analogy to First Amendment law is useful.  Though regulations that burden fundamental rights are generally subject to strict scrutiny, when a regulation "discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized."  Carey, 447 U.S. at 461–62 (emphasis supplied); see also Lucas v. Curran, 856 F. Supp. 260, 272 (D. Md. 1994) ("It is now well-settled that if a statute discriminates between persons exercising their First Amendment rights (placing greater or lesser burdens on the exercise of those rights by some, but not others), based upon the content of their speech, the Equal Protection Clause requires [the intermediate scrutiny standard articulated in Carey].").

J.A. 158

**IV.     CONCLUSION**

The Court finds that Maryland's requirement of a "good and substantial reason" for issuance of a handgun permit is insufficiently tailored to the State's interest in public safety and crime prevention.  The law impermissibly infringes the right to keep and bear arms, guaranteed by the Second Amendment.  The Court will, by separate Order of even date, GRANT Woollard's Motion for Summary Judgment and DENY Defendants' Motion for Summary Judgment.

Dated this 2nd day of March, 2012

/s/
_____
Benson Everett Legg
United States District Judge

23

J.A. 159

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

RAYMOND WOOLLARD, et al.

       Plaintiffs

    v.

TERRENCE SHERIDAN, et al.

       Defendants

:

:

:

:

:

:

Civil Case No. L-10-2068

o0o

**<u>ORDER</u>**

For the reasons set forth in the accompanying Memorandum of even date, it is, this 2nd day of March, 2012, hereby ORDERED as follows:

1. Plaintiffs' Motion for Summary Judgment (Docket No. 21) is hereby GRANTED,

2. Defendants' Motion for Summary Judgment (Docket No. 25) is hereby DENIED,

3. Plaintiffs' prior Motion for Summary Judgment (Docket No. 12) is DENIED AS MOOT, and

4. The Clerk is directed to CLOSE the case.

/s/
_____
Benson Everett Legg
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RAYMOND WOOLLARD, *et al.*,       *

     *Plaintiffs*,             *

     v.                    *      Civil Case No. 1:10-cv-2068-BEL

MARCUS BROWN, *et al.*,        *

     *Defendants*.            *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## ORDER

Upon consideration of the defendants' Rule 59(e) motion for clarification or amendment (ECF No. 54), the plaintiffs' response (ECF No. 59), and for the reasons stated in the Court's Memorandum Opinion filed on March 5, 2012 (ECF No. 52), it is hereby:

ORDERED that the defendants' motion for clarification or amendment (ECF No. 54) is GRANTED to the extent expressly stated in this Order. The Court has requested additional briefing with respect to the defendants' request for a stay pending appeal, made as part of the same motion as the defendants' motion for clarification or amendment. The Court has not resolved that part of the defendants' motion, but will rule on that request at a later date; and it is further

ORDERED that the Court's March 5, 2012 Order (ECF No. 53) is amended, effective as of the date of this Order, to include the following injunctive relief:

1. The defendants, their officers, agents, and employees are hereby permanently enjoined from enforcing § 5-306(a)(5)(ii) of the Public Safety Article of the Maryland Code, which conditions eligibility for a handgun wear-and-carry permit on a finding that an applicant "has good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger" (the "Good and Substantial Reason Requirement.") With the exception of the Good and Substantial Reason Requirement, the remainder of § 5-306 of the Public Safety Article remains valid and is unaffected by this Order;

2. Defendant Superintendent of the Maryland State Police Marcus Brown or his delegates shall promptly inform Plaintiff Raymond Woollard of the information required by the Maryland State Police to process Mr. Woollard's 2009 handgun wear-and-carry permit renewal application. Upon receipt of that additional information from Mr. Woollard, Superintendent Brown or his delegates shall process Mr. Woollard's 2009 handgun wear-and-carry permit renewal application without consideration of the Good and Substantial Reason Requirement; and it is further

ORDERED that the Court's March 5, 2012 Order (ECF No. 53), as amended by this Order, is hereby STAYED until the earlier of a further order of the Court dissolving the stay or a ruling on the defendants' request for a stay pending appeal under Rule 62(c); and it is further

ORDERED that the following schedule is established for the parties to submit additional briefs, of no more than 10 pages each (not including exhibits or passages of previous filings incorporated by reference), addressing the defendants' motion for stay

pending appeal, and specifically addressing the three questions posed by the Court during

the March 22, 2012 telephone conference:

1.    The defendants shall submit an opening brief on or before April 19, 2012;

2.    The plaintiffs shall submit a response brief on or before May 9, 2012; and

3.    The defendants shall submit a reply brief on or before May 23, 2012.

Dated: March 30, 2012

Benson Everett Legg
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RAYMOND WOOLLARD, *et al.*,      *

    *Plaintiffs*,      *

    v.      *      Civil Case No. 1:10-cv-2068-BEL

MARCUS BROWN, *et al.*,      *

    *Defendants*.      *

*   *   *   *   *   *   *   *   *   *   *   *   *

**NOTICE OF APPEAL**

Notice is hereby given that all defendants appeal to the United States Court of Appeals for the Fourth Circuit from the March 5, 2012 Order (ECF No. 53) of the United States District Court for the District of Maryland granting the plaintiffs' motion for summary judgment and denying the defendants' motion for summary judgment, and the March 30, 2012 Order (ECF No. 63) amending the March 5 Order.

Respectfully submitted,

DOUGLAS F. GANSLER
Attorney General of Maryland

DAN FRIEDMAN (Bar ID 24535)
Assistant Attorney General
Office of the Attorney General
Legislative Services Building
90 State Circle
Annapolis, Maryland 21401
Tel. 410-946-5600
dfriedman@oag.state.md.us

_____/s/_____
MATTHEW J. FADER (Bar ID 29294)
STEPHEN M. RUCKMAN (Bar ID 28981)
Assistant Attorneys General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
Tel. 410-576-7906
Fax. 410-576-6955
mfader@oag.state.md.us
sruckman@oag.state.md.us

April 2, 2012                               Counsel for Defendants

2

J.A. 165