No. 12-1437

# In the United States Court of Appeals for the Fourth Circuit

RAYMOND WOOLLARD
AND SECOND AMENDMENT FOUNDATION, INC.,

Plaintiffs-Appellees,

v.

DENIS GALLAGHER, SEYMOUR GOLDSTEIN,
CHARLES M. THOMAS, JR., MARCUS L. BROWN,

Defendants-Appellants,

TERRENCE SHERIDAN,

Defendant.

Appeal from a Judgment of the United States District Court
for the District of Maryland, The Hon. Benson E. Legg, District Judge
(District Court No. 01:10-CV-02068-BEL)

## APPELLEES' BRIEF

Cary Hansel
Joseph, Greenwald & Laake
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
301.220.2200/301.220.1214

July 30, 2012

Alan Gura
Gura & Possessky, PLLC
101 N. Columbus St., Suite 405
Alexandria, VA 22314
703.835.9085/703.997.7665

Attorneys for Appellees

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney. Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case. Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements. Counsel has a continuing duty to update this information.

No. __12-1437__          Caption: __Raymond Woollard, et al. v. Terrence Sheridan, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Raymond Woollard__
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
          (appellant/appellee/amicus)

1.     Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.     Does party/amicus have any parent corporations?                    ☐ YES ☑ NO
       If yes, identify all parent corporations, including grandparent and great-grandparent
       corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
       other publicly held entity?                              ☐ YES ☑ NO
       If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, identify any trustee and the members of any creditors' committee:

# CERTIFICATE OF SERVICE
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

I certify that on _____April 16, 2012_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Alan Gura                                                April 16, 2012
_____                          _____
(signature)                                                      (date)

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
## DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form needs to be completed for a party even if the party is represented by more than one attorney. Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case. Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements. Counsel has a continuing duty to update this information.

No. <u>12-1437</u>       Caption: <u>Raymond Woollard, et al. v. Terrence Sheridan, et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Second Amendment Foundation, Inc.</u>
(name of party/amicus)

_____

who is _____<u>appellee</u>_____, makes the following disclosure:
       (appellant/appellee/amicus)

1.     Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.     Does party/amicus have any parent corporations?                    ☐YES ☑NO
       If yes, identify all parent corporations, including grandparent and great-grandparent
       corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
       other publicly held entity?                                        ☐YES ☑NO
       If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

## CERTIFICATE OF SERVICE
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

I certify that on _____April 16, 2012_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

| /s/ Alan Gura | April 16, 2012 |
|---|---|
| (signature) | (date) |

# TABLE OF CONTENTS

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Statement of Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    1. *The Regulatory Framework* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    2. *Defendants' Application of the Challenged Provision*
       *Against Plaintiffs.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I.    THIS COURT CANNOT AVOID THE CONSTITUTIONAL QUESTION
     PROPERLY BEFORE IT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II.   THE SECOND AMENDMENT SECURES THE RIGHT TO
     CARRY ARMS IN PUBLIC FOR SELF-DEFENSE. . . . . . . . . . . . . . . . . 14

    A.    Text and History, Not Political Opinions of
         Self-Described Experts, Determine the Content
         of Our Fundamental Constitutional Rights. . . . . . . . . . . . . 14

    B.    The Supreme Court Did Not Limit the Right to
         Bear Arms to the Home. . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    C.    The Right to Bear Arms Has Traditionally Extended
         Beyond the Home for Various Purposes, Including
         Self-Defense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

D.    The Second Amendment's Original Public Meaning Confirms the Right to Publicly Carry Arms for Self-Defense.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

E.    Historical Restrictions of the Right to Bear Arms Confirm Its Existence. . . . . . . . . . . . . . . . . . . . . . . . . . . 35

      1.    *Concealed Carry.* . . . . . . . . . . . . . . . . . . . . . . . 36

      2.    *Dangerous and Unusual Weapons.* . . . . . . . . . 40

      3.    *Late Nineteenth-Century Handgun Laws..* . . . . 45

III.    MARYLAND'S "GOOD AND SUBSTANTIAL REASON" REQUIREMENT IS AN UNCONSTITUTIONAL PRIOR RESTRAINT. . . . . . . . . . . . . . . 50

IV.    MARYLAND'S "GOOD AND SUBSTANTIAL REASON" REQUIREMENT FAILS ANY LEVEL OF MEANS-ENDS SCRUTINY.. . . . . . . . . . . . . . 58

    A.    Laws Broadly Restricting the Right of Law-Abiding, Responsible Individuals to Bear Arms Are Subject to Strict Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

    B.    Barring Law-Abiding, Responsible Americans from Bearing Arms Serves No Government Interest. . . . . . . . . 61

    C.    The GSR Requirement Does Not Properly Serve Any Regulatory Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Statement Requesting Oral Argument.. . . . . . . . . . . . . . . . . . . . . . 69

Statutory Addendum. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Add. 1

## TABLE OF AUTHORITIES

Cases

*Adamson* v. *California*,
    332 U.S. 46 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Andrews* v. *State*,
    50 Tenn. 165 (1871). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 47

*Baraket* v. *Holder*,
    632 F.3d 56 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Bateman* v. *Perdue*, No. 5:10-CV-265-H,
    2012 U.S. Dist. LEXIS 47336 (E.D.N.C. Mar. 29, 2012). . . 25, 26, 28,
                                                   65, 66

*Beal* v. *Stern*,
    184 F.3d 117 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Bliss* v. *Commonwealth*,
    12 Ky. 90 (1822). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Buck* v. *Bell*,
    274 U.S. 200 (1927). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Cantwell* v. *Connecticut*,
    310 U.S. 296 (1940). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53

*Chesapeake B & M, Inc.* v. *Harford County*,
    58 F.3d 1005 (4th Cir. 1995) (en banc). . . . . . . . . . . . . . . . . . . . 53

*Child Evangelism Fellowship* v. *Anderson Sch. Dist. Five*,
    470 F.3d 1062 (4th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*City of Las Vegas* v. *Moberg*,
    82 N.M. 626, 485 P.2d 737 (N.M. Ct. App. 1971). . . . . . . . . . . . . 34

*Clark* v. *City of Lakewood*,
259 F.3d 996 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Clark* v. *Jeter*,
486 U.S. 456 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Cohens* v. *Virginia*,
19 U.S. (6 Wheat.) 264 (1821). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Commonwealth* v. *Blanding*,
20 Mass. 304 (1825). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*District of Columbia* v. *Heller*,
554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*English* v. *State*,
35 Tex. 473 (1871) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 46

*Ex parte Thomas*,
21 Okla. 770, 97 P. 260 (1908) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Ezell* v. *City of Chicago*,
651 F.3d 684 (7th Cir. 2011).. . . . . . . . . . . . . 15, 24, 25, 28, 51, 60, 61

*FCC* v. *Fox Television Stations, Inc.*,
556 U.S. 502 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Fife* v. *State*,
31 Ark. 455 (1876) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Fletcher* v. *Haas*, No. 11-10644-DPW,
2012 U.S. Dist. LEXIS 44623 (D. Mass. Mar. 30, 2012). . . . . . . . . . 66

*Forsyth County* v. *Nationalist Movement*,
505 U.S. 123 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*FW/PBS* v. *City of Dallas*,
493 U.S. 215 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Green* v. *City of Raleigh*,
523 F.3d 293 (4th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Hague* v. *Committee for Indus. Org.*,
307 U.S. 496 (1937) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Heller* v. *District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . 61

*Hill* v. *State*,
53 Ga. 472 (1874). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

*In re Application of McIntyre*,
552 A.2d 500 (Del. Super. 1988).. . . . . . . . . . . . . . . . . . . . . . 39

*In re Brickey*,
8 Idaho 597, 70 P. 609 (1902).. . . . . . . . . . . . . . . . . . . . . . . . 34

*Johnson* v. *Eisentrager*,
339 U.S. 763 (1950). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Kellogg* v. *City of Gary*,
562 N.E.2d 685 (Ind. 1990).. . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Kent* v. *Dulles*,
357 U.S. 116 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Kuck* v. *Danaher*,
822 F. Supp. 2d 109 (D. Conn. 2011) . . . . . . . . . . . . . . . . . . . 55

*Kunz* v. *New York*,
340 U.S. 290 (1951). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Largent* v. *Texas*,
   318 U.S. 418 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Malloy* v. *Hogan*,
   378 U.S. 1 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Marbury* v. *Madison*,
   5 U.S. (1 Cranch) 137 (1803). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*McDonald* v. *City of Chicago*,
   130 S. Ct. 3020 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Minnesota* v. *Carter*,
   525 U.S. 83 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Mosby* v. *Devine*,
   851 A.2d 1031 (R.I. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Muscarello* v. *United States*,
   524 U.S. 125 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Myers* v. *United States*,
   272 U.S. 52 (1926). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Nat'l Fed'n of the Blind* v. *FTC*,
   420 F.3d 331 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Nordyke* v. *King*,
   681 F.3d 1041 (9th Cir. 2012) (en banc). . . . . . . . . . . . . . . . . . . . 9

*Norris* v. *United States*,
   687 F.2d 899 (7th Cir. 1982).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Nunn* v. *State*,
   1 Ga. 243 (1846) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Owen* v. *State,*
31 Ala. 387 (1858) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*O'Neill* v. *State,*
16 Ala. 65 (1849) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Parker* v. *District of Columbia,*
478 F.3d 370 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . 19, 51, 54, 67

*Patsone* v. *Pennsylvania,*
232 U.S. 138 (1914) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Payton* v. *New York,*
445 U.S. 573 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*People* v. *Yanna,* No. 304293,
2012 Mich. App. LEXIS 1269 (Mich. App. June 26, 2012) . . . . 26, 28

*People* v. *Zerillo,*
219 Mich. 635, 189 N.W. 927 (1922) . . . . . . . . . . . . . . . . . . . . . . . 56

*Peruta* v. *County of San Diego,*
678 F. Supp. 2d 1046 (S.D. Cal. 2010) . . . . . . . . . . . . . . . . . . . . . . 24

*Peruta* v. *County of San Diego,*
758 F. Supp. 2d 1106 (S.D. Cal. 2010), *appeal
pending,* No. 10-56971 (9th Cir. filed Dec. 14, 2010) . . . . . . . . . . . . 36

*Piszczatoski* v. *Filko,* No. 10-CV-06110,
2012 U.S. Dist. LEXIS 4293 (D.N.J. Jan. 12, 2012),
*appeal pending,* No. 12-1150 (3d Cir. Jan. 24, 2012) . . . . . . . . . . . 27

*Pittston Co.* v. *United States,*
199 F.3d 694 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Respublica* v. *Oswald,*
1 U.S. (1 Dall.) 319 (Pa. 1788) . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Rex* v. *Knight*,
  90 Eng. Rep. 330 (K.B. 1686). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Richards* v. *County of Yolo*, No. 2:09-CV-01235
  2011 U.S. Dist. LEXIS 51906 (E.D. Cal. May 16, 2011),
  *appeal pending*, No. 11-16255 (9th Cir. filed May 16, 2011). . . . . . 27

*Robertson* v. *Baldwin*,
  165 U.S. 275 (1897). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Scherr* v. *Handgun Permit Review Bd.*,
  163 Md. App. 417, 880 A.2d 1137 (Md. App. 2005) . . . . . . . . . . . . . 3

*Schubert* v. *De Bard*,
  398 N.E.2d 1339 (Ind. App. 1980). . . . . . . . . . . . . . . . . . . . . . . 33, 57

*Scott* v. *Sandford*,
  60 U.S. (19 How.) 393 (1857) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Seminole Tribe of Fla.* v. *Florida*,
  517 U.S. 44 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Shuttlesworth* v. *City of Birmingham*,
  394 U.S. 147 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 53, 54

*Silverman* v. *United States*,
  365 U.S. 505 (1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Simpson* v. *State*,
  13 Tenn. 356 (1833) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 44

*Speiser* v. *Randall*,
  357 U.S. 513 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*State ex rel. City of Princeton* v. *Buckner*,
  180 W. Va. 457, 377 S.E.2d 139 (1988). . . . . . . . . . . . . . . . . . . 33, 57

*State* v. *Bailey*,
    209 Conn. 322, 551 A.2d 1206 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . 33

*State* v. *Blocker*,
    291 Or. 255, 630 P.2d 824 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*State* v. *Chandler*,
    5 La. Ann. 489 (1850). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*State* v. *Duke*,
    42 Tex. 455 (1874).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*State* v. *Hogan*,
    63 Ohio St. 202, 58 N.E. 572 (1900). . . . . . . . . . . . . . . . . . . . . . 33, 44

*State* v. *Huntly*,
    25 N.C. (3 Ired.) 418 (1843) . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 44

*State* v. *Jumel*,
    13 La. Ann. 399 (1858) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*State* v. *Kessler*,
    289 Or. 359, 614 P.2d 94 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*State* v. *Langford*,
    10 N.C. (3 Hawks) 381 (1824) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*State* v. *Lanier*,
    71 N.C. 288 (1874) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*State* v. *Reid*,
    1 Ala. 612 (1840) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 37

*State* v. *Rosenthal*,
    55 A. 610 (Vt. 1903) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*State* v. *Schoultz*,
   25 Mo. 128 (1857) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Staub* v. *City of Baxley*,
   355 U.S. 313 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 52, 56

*United States* v. *Bloom*,
   149 F.3d 649 (7th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States* v. *Booker*,
   375 F.3d 508 (7th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States* v. *Carter*,
   669 F.3d 411 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . 13, 18, 60

*United States* v. *Chester*,
   628 F.3d 673 (4th Cir. 2010). . . . . . . . . . . . . . . . . 15, 23, 50, 60, 61

*United States* v. *Cruikshank*,
   92 U.S. 542 (1876). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States* v. *Danielczyk*, No. 11-4667,
   2012 U.S. App. LEXIS 13250 (4th Cir. June 28, 2012). . . . . . . . . . . 30

*United States* v. *Decastro*,
   682 F.3d 160, 2012 U.S. App. LEXIS 11213 (2d Cir. 2012). . . . . 9, 10

*United States* v. *Garvin*, Cr. No. 11-480-01,
   2012 U.S. Dist. LEXIS 76540 (E.D. Pa. May 31, 2012). . . . . 27, 28, 67

*United States* v. *Mahin*,
   668 F.3d 119 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . 13, 18

*United States* v. *Marzzarella*,
   614 F.3d 85 (3d Cir. 2010) . . . . . . . . . . . . . . . . . . . . 15, 19, 23, 51, 60

*United States* v. *Masciandaro*,
638 F.3d 458 (4th Cir. 2011).. . . . . . . . . . . . . 9-11, 14, 15, 18, 59, 60

*United States* v. *Miller*,
307 U.S. 174 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States* v. *Moore*,
666 F.3d 313 (4th Cir. 2011).. . . . . . . . . . . . . . . . . . . . . . . . 12, 18

*United States* v. *Rene E.*,
583 F.3d 8 (1st Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States* v. *Skoien*,
614 F.3d 638 (7th Cir. 2010) (en banc) . . . . . . . . . . . . . . . . . . . 18, 61

*United States* v. *Weaver*, No. 2:09-CR-00222,
2012 U.S. Dist. LEXIS 29613 (S.D. W. Va. Mar. 7, 2012).. . . . . 25, 28

*United States* v. *Williams*,
616 F.3d 685 (7th Cir. 2010).. . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Valley Forge Christian Coll.* v. *Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982) . . . . . . . . . . . . . . . 28

*Williams* v. *State*,
417 Md. 479, 10 A.3d 1167 (2011). . . . . . . . . . . . . . . . . . . . . . . 3

*Wilson* v. *State*,
33 Ark. 557 (1878). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

## Constitutional Provisions

Ala. Const. of 1819, art. I, § 27.. . . . . . . . . . . . . . . . . . . . . . . . 33

Conn. Const. art. I, § 15 (1819).. . . . . . . . . . . . . . . . . . . . . . . . 33

Ky. Const. of 1799, art. XII, cl. 23. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Mo. Const. of 1820, art. XIII, § 3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

N.C. Declaration of Rights § 17 (1776). . . . . . . . . . . . . . . . . . . . . . . . . . 33

Or. Const. art. I, § 27 (1857). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Tenn. Const. of 1796, art. XI, § 26. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

U.S. Const. amend. II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

U.S. Const. art. III, § 2, cl. 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Vt. Const. c. 1, art. 16 (1777) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Statutes and Rules

18 U.S.C. § 922(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

1894 Laws of Maryland, ch. 547 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Alameda County, Cal., Ordinance Code § 9.12.120(f)(3). . . . . . . . . . . 10

Ark. Stat., Ch. 45, § 1907 (1884) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

COMAR § 29.03.02.04(G). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Conn. Gen. Stat. § 29-32b(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

D.C. Code § 22-4504(a) (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fed. R. App. Proc. 43(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Md. Criminal Law Code § 4-203. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Md. Criminal Law Code § 4-203(c)(2)(i). . . . . . . . . . . . . . . . . . . . . . . . . 2

Md. Public Safety Code § 5-301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Md. Public Safety Code § 5-303. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Md. Public Safety Code § 5-306(a)(5)(i). . . . . . . . . . . . . . . . . . . . . . . . 55, 65

Md. Public Safety Code § 5-306(a)(5)(ii). . . . . . . . . . . . . . . . . . . . . . . . . . 2

Md. Public Safety Code § 5-312. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

N.Y. Penal Law § 400.00(2)(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

N.Y. Penal Law § 400.00(2)(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

N.Y. Penal Law § 400.00(2)(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Tex. Act of April 12, 1871. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Tex. Gov't Code § 411.177(a).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Tex. Penal Code § 46.035(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Other Authorities

Abhay Aneja et al., *The Impact of Right-to-Carry Laws and the NRC Report: Lessons for the Empirical Evaluation of Law and Policy*, 13 AM. L. & ECON. REV. 565 (2011). . . . . . . . . . . . . 62

BLACK'S LAW DICTIONARY (6th Ed. 1998). . . . . . . . . . . . . . . . . . . . . . . 29

Brief for English/Early American Historians, *McDonald*, 130 S. Ct. 3020. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Brief of 34 Professional Historians, *McDonald*, 130 S. Ct. 3020. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Brief of Historians on Early American Legal,
      Constitutional and Pennsylvania History,
      *McDonald*, 130 S. Ct. 3020. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Brief of Jack Rakove, et al., *Heller*, 554 U.S. 570. . . . . . . . . . . . . . . . . 48

Charles Humphreys, A COMPENDIUM OF THE COMMON LAW
      IN FORCE IN KENTUCKY (1822).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

COLLECTED WORKS OF JAMES WILSON
      (K. Hall & M. Hall eds., 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Concealed Pistol Licensure, Annual Report, 2010-11*,
      http://www.michigan.gov/documents/msp/2011_
      CPL_Report_376632_7.pdf (last visited July 27, 2012). . . . . . . . . . 64

*Conviction Rates for Concealed Handgun License Holders*,
      http://www.txdps.state.tx.us/RSD/CHL/Reports/
      Conviction RatesReport2011.pdf (last visited July 27, 2012). . . . . . 64

David Caplan, *The Right of the Individual to Bear Arms:*
      *A Recent Judicial Trend*, 4 DET. C. L. REV. 789 (1982) . . . . . . . . . . . 41

David Kopel & Clayton Cramer, *State Court Standards*
      *of Review for the Right to Keep and Bear Arms*,
      50 SANTA CLARA L. REV. 1 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Eugene Volokh, *Implementing the Right to Keep*
      *and Bear Arms for Self-Defense: An Analytic*
      *Framework and a Research Agenda*,
      56 UCLA L. Rev. 1443 (2009).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Eugene Volokh, *State Constitutional Rights to Keep and*
      *Bear Arms*,11 TEX. REV. LAW & POL. 191 (2006). . . . . . . . . . . . . . . . 33

Florenz Plassman & John Whitley,
   *Confirming "More Guns, Less Crime,"*
   55 STAN. L. REV. 1313 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Gary Kleck & Marc Gertz, *Armed Resistance to Crime:*
   *The Prevalence and Nature of Self- Defense with a Gun*,
   86 J. CRIM. L. & CRIMINOLOGY 150 (1995). . . . . . . . . . . . . . . . . . . . . 63

Ian Ayers & John J. Donohue, *Shooting Down the*
   *More Guns, Less Crime Hypothesis*,
   55 STAN. L. REV. 1193 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

John A. Dunlap, THE NEW-YORK JUSTICE (1815) . . . . . . . . . . . . . . . . . 42

Joyce Lee Malcolm, TO KEEP AND BEAR ARMS:
   THE ORIGINS OF AN ANGLO-AMERICAN RIGHT (1994). . . . . . . . . . . . 42

Moody, Carlisle E. et al., *Trust But Verify: Lessons for*
   *the Empirical Evaluation of Law and Policy* (Jan. 25, 2012),
   available at http://ssrn.com/abstract=2026957
   (last visited July 26, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*N.C. Concealed Handgun Permit Statistics by County*,
   http://www.ncdoj.gov/ CHPStats.aspx
   (last visited July 27, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

PAPERS OF THOMAS JEFFERSON (J. Boyd ed., 1950) . . . . . . . . . . . . . . . . 31

Robert J. Cottrol and Raymond T. Diamond,
   *"Never Intended to be Applied to the White Population":*
   *Firearms Regulation and Racial Disparity—the*
   *Redeemed South's Legacy to a National Jurisprudence?*,
   70 CHI.-KENT L. REV. 1307 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 46

St. George Tucker, BLACKSTONE'S COMMENTARIES (1803). . . . . . . . . . . 45

*Tenn. Handgun Carry Permit Statistics*,
   http://www.tn.gov/safety/stats/DL_Handgun/
   Handgun/HandgunReport2011Full.pdf
   (last visited July 27, 2012)................................. 64

THE AMERICAN STUDENTS' BLACKSTONE (G. Chase ed., 1884)........ 39

*Who Are American Citizens?*,
   THE LIBERATOR, Jan. 21, 1859, at 10, col. 2 ................... 21

William Blackstone, COMMENTARIES ON THE
   LAWS OF ENGLAND (1769) ................................... 41

William Hawkins, TREATISE OF THE PLEAS OF THE CROWN (1716)..... 42

William Oldnall Russell, A TREATISE ON CRIMES AND
   INDICTABLE MISDEMEANORS (1826)............................ 43

WORKS OF THE HONOURABLE JAMES WILSON
   (Bird Wilson ed., 1804).................................... 42

APPELLEES' BRIEF

STATEMENT OF ISSUES

1. Does the Second Amendment secure the right to carry handguns in public for self-defense?

2. May licensing authorities condition issuance of handgun carry permits on discretionary assessments of applicants' "good and substantial reason" for exercising the right to bear arms?

STATEMENT OF THE CASE

Defendants determined that Plaintiff Raymond Woollard failed to establish a "good and substantial reason" ("GSR") to carry a handgun for self-defense, and thus declined to renew his handgun carry license. The GSR requirement operates to bar most Marylanders from carrying handguns for self-defense, including many members of Plaintiff Second Amendment Foundation, Inc. ("SAF").

As the Constitution secures a fundamental right to carry handguns for self-defense, Maryland cannot demand that individuals prove sufficient need to do so. Plaintiffs challenge no other aspect of Maryland's regulatory scheme governing the right to carry handguns.

Plaintiffs accept Defendants' account of the case's procedural history.

1.      *The Regulatory Framework*

Maryland generally prohibits the public carrying of handguns without a license. Md. Criminal Law Code § 4-203; Md. Public Safety Code § 5-303. Unlicensed handgun carrying is a misdemeanor offense first punishable by 30 days to 3 years imprisonment and/or fine ranging from $250 to $2500. Md. Criminal Law Code § 4-203(c)(2)(i).

Handgun carry permits are issued by the Secretary of the State Police. Md. Public Safety Code § 5-301. A permit applicant must establish that he or she is an adult; has not been convicted, without pardon, of a felony or misdemeanor for which a term of over 1 year imprisonment has been imposed; has not been convicted of drug crimes; is not an alcoholic or drug addict; and has not exhibited a propensity for violence or instability.

Additionally, the Superintendent must determine that the applicant "has good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger." Md. Public Safety Code § 5-306(a)(5)(ii). Every application calls for consideration of the "[r]easons

given by the applicant as to whether those reasons are good and substantial." COMAR § 29.03.02.04(G). The Code contains no further guidance as to what constitutes a "good and substantial reason." Applying these standards, Maryland's Handgun Permit Review Board may also issue carry permits. Md. Public Safety Code § 5-312.

State courts have authoritatively construed Maryland's code as precluding the possibility that an applicant's assertion of a self-defense interest satisfies the GSR requirement.

> The statute makes clear that it is the Board[,] not the applicant, that decides whether there is "apprehended danger" to the applicant. [Otherwise] there would be no necessity for a review by the Board. Each person could decide for himself or herself that he or she was in danger.

*Scherr* v. *Handgun Permit Review Bd.*, 163 Md. App. 417, 438, 880 A.2d 1137, 1148 (Md. App. 2005) (citation omitted).[1]

2.    *Defendants' Application of the Challenged Provision Against Plaintiffs.*

Raymond Woollard, an honorably-discharged Navy veteran, resides on a farm in a remote part of Baltimore County. JA 19. SAF, a non-

---

[1]*Heller* and *McDonald* would not compel Maryland courts to re-interpret the GSR requirement, as the state's high court does not recognize the Second Amendment extends to carrying handguns for self-defense. *Williams* v. *State*, 417 Md. 479, 10 A.3d 1167 (2011).

profit membership organization, has over 650,000 members and supporters nationwide, including Maryland. SAF's purposes include promotion of the exercise of the right to keep and bear arms; and education, research, publishing and legal action focusing on the right to arms and the consequences of gun control. JA 17.

On Christmas Eve, 2002, Woollard was at his home with his wife, son, daughter, and grandchildren, when an intruder broke into the home by shattering a window. Woollard trained his shotgun on the intruder, but the latter wrested the shotgun away, and a fight broke out between the two. The fight ended when Woollard's son retrieved another gun and restored order pending the police's arrival. JA 19.

Woollard's wife had called the police, but it took the police approximately 2.5 hours to arrive, owing to some confusion on their part as to the county in which Woollard's house was located. The intruder was convicted of first degree burglary, receiving a sentence of three years probation. He violated probation by assaulting a police officer and burglarizing another residence, landing him in prison. *Id*.

Woollard received a handgun carry permit, which was renewed in 2005 shortly after the intruder—who lives approximately three miles

from Woollard—was released from prison. JA 20. Woollard applied to renew his permit a second time, but on February 2, 2009, was advised that his application was incomplete: "Evidence is needed to support apprehended fear (i.e. - copies of police reports for assaults, threats, harassments, stalking)." JA 11, 20.

On April 1, 2009, Defendant Sheridan denied Woollard's handgun carry permit renewal application. JA 12, 20. An informal review resulted in another denial on July 28, 2009. JA 13, 20. Defendant Brown substituted for Sheridan pursuant to Fed. R. App. Proc. 43(c)(2).

Woollard administratively appealed to the Handgun Permit Review Board. In a November 12, 2009 decision by Defendants Gallagher, Goldstein, and Thomas, the Board affirmed the denial of Woollard's application, finding Woollard "has not submitted any documentation to verify threats occurring beyond his residence, where he can already legally carry a handgun." Accordingly, Defendants determined Woollard "has not demonstrated a good and substantial reason to wear, carry or transport a handgun as a reasonable precaution against apprehended danger in the State of Maryland." JA 14-16, 20.

In addition to and quite apart from any threat posed by the man who invaded Woollard's home, Woollard would carry a functional handgun in public for self-defense, but refrains from doing so because he fears arrest, prosecution, fine, and imprisonment as he lacks a license to carry a handgun. JA 20. Owing to its mission, SAF's organizational resources are taxed by inquiries regarding the implementation of Maryland's gun carrying regulations. The challenged practices prevent SAF's other members and supporters from carrying firearms for self-defense. JA 18.

## SUMMARY OF ARGUMENT

The Second Amendment guarantees a fundamental right to carry handguns for self-defense. History and tradition suggest that this right may be regulated as to time, place, and manner; curtailed in sensitive places; limited to those arms, such as handguns, which would be in lawful common use for the relevant use; denied to particularly dangerous individuals; and restricted to lawful purposes.

But when individuals enjoy a constitutional "right" to engage in some activity, a license to engage in that activity cannot be conditioned on the government's subjective determination of their "good and

substantial reason" to do so. Recognition that this is the basic attribute of any right, and thus, of the right to arms, implicates no aspect of Maryland's comprehensive system for regulating the carrying of handguns.

It is not optional to decide this case on the merits. No special Second Amendment rule exempts cases related to this one part of the Constitution from the ordinary operation of the federal court system. This Court is properly cautious in declining to decide unnecessary constitutional questions, but it has never endorsed, even with respect to the Second Amendment, judicial abdication as a response to close or difficult cases.

In any event, this case is neither close nor difficult. The Supreme Court has already held, with reference to the Second Amendment, that "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *District of Columbia* v. *Heller*, 554 U.S. 570, 584 (2008) (citations omitted). In so holding, the Supreme Court endorsed a broad array of historical material, treatises, and precedent that all confirmed—indisputably—the right to arms' extension beyond the home. And it rejected, as it would again in *McDonald* v. *City of Chicago*, 130 S. Ct.

3020 (2010), the interesting historical narratives of Defendants' *amici*. Defendants can offer no alternative definition for the constitutional text, nor can they rebut the overwhelming weight of tradition and precedent that confirm Americans enjoy a fundamental right to carry arms for self-defense.

To decide this case, it is enough to acknowledge what has long been established in our legal system: access to fundamental rights does not turn on some official's whim. No "good and substantial reason" is required to exercise fundamental rights.

Moreover, while some regulations may survive constitutional scrutiny if they permissibly advance a government interest consistent with protection of fundamental rights, interest-balancing cannot determine the content of constitutional rights. History, not social science or debatable notions of public policy, determines whether the Second Amendment protects the right to carry a handgun.

And because history determines that it does, the state lacks any legitimate interest in suppressing the right as an end unto itself. The exercise of constitutional rights simply cannot be against the public interest, and the state cannot satisfy any legitimate interest, however

compelling, by voiding a fundamental right and forcing individuals to prove a special need to exercise it. Debating which standard of review would apply in this circumstance is largely beside the point.

The District Court's decision should be affirmed.

ARGUMENT

I. THIS COURT CANNOT AVOID THE CONSTITUTIONAL QUESTION PROPERLY BEFORE IT.

Defendants suggest that this Court should decline to examine the central issue in this case—whether the Second Amendment secures the right to carry handguns for self-defense—because it did so in *United States* v. *Masciandaro*, 638 F.3d 458 (4th Cir. 2011). Two other courts are alleged to have "declined to address the issue at all." Appellants' Br. 17 (citing *Nordyke* v. *King*, 681 F.3d 1041 (9th Cir. 2012) (en banc); *United States* v. *Decastro*, 682 F.3d 160, 2012 U.S. App. LEXIS 11213 (2d Cir. 2012)).

Defendants misread the precedent. *Nordyke* concerned an ordinance prohibiting or, as reinterpreted following a dozen years of litigation,[2] regulating gun shows on county fairgrounds. The carrying of handguns

_____

[2]*Nordyke*, 681 F.3d at 1045 (O'Scannlain, J., concurring in the judgment).

9

for self-defense was never at issue, as that ordinance exempts individuals "holding a valid license to carry a firearm issued pursuant to" state law. Alameda County, Cal., Ordinance Code § 9.12.120(f)(3).

Decastro, whose gun was found in a home closet, contested the prohibition on residential firearm importation, 18 U.S.C. § 922(a)(3), but lacked standing to challenge his state's handgun license law. *Decastro*, 2012 U.S. App. LEXIS 11213, at *9-10. And Decastro sought to question only New York's licensing requirements to possess handguns at home and work, which, unlike handgun carry licenses, do not require "proper cause." *Compare* N.Y. Penal Law §§ 400.00(2)(a), (b) and (f).[3]

*Masciandaro* simply reflected modest reticence to unnecessarily decide constitutional questions. *Masciandaro*'s majority could plausibly view reaching the carry issue in that case as an advisory opinion, as it

---

[3]"Decastro never applied for and was not issued a license to *possess* a firearm in New York . . ." *Decastro*, at *6 (emphasis added). Decastro attempted to introduce evidence relating to the prevalence of "residential-premises" and "business-premises" licenses, *id.* at *4, but not, apparently, to carry licenses. Section 922(a)(3) does not exempt individuals "licensed to *possess a gun at home,*" and "Decastro did not have a license to *own* a firearm in New York, nor did he apply for one." *Decastro*, at *25 (emphasis added).

concluded that the right would not in any event extend to the specific location at issue: a national park.

In cautioning restraint, this Court chose its words carefully. While "[t]here may or may not be a Second Amendment right in some places beyond the home," courts should consider the issue "only upon necessity and only then by small degree." *Id.* at 475. That "necessity" exists here. Unlike the narrow regulation at issue in *Masciandaro*, the GSR requirement implicates the right to carry handguns for self-defense by all people, in any manner, at all times and at all places throughout Maryland.

Defendants would have this Court opine that regardless of whether a right to carry handguns exists, people must prove that they have a "good and substantial reason" to do so. But claiming that individuals must prove a "good and substantial reason" to do something begs the question of whether they have a *right* to engage in that conduct. As the District Court succinctly held, "[a] citizen may not be required to offer a 'good and substantial reason' why he should be permitted to exercise his rights. The right's existence is all the reason he needs." JA 156. Declaring "the right does not exist" would be a logically coherent, if

erroneous statement. But the Court cannot logically find that people must prove their reasons for carrying guns *regardless* of whether they have a right to do so.

Likewise, determining "whether the right of self-defense outside the home . . . is part of the 'central component' of the Second Amendment" was unnecessary where the individual in question was "far from a law-abiding, responsible citizen." *United States* v. *Moore*, 666 F.3d 313, 320 & n.7 (4th Cir. 2011). Plaintiffs here are among the country's law-abiding, responsible citizens whose exercise of Second Amendment rights offers protection against the law-breaking and the irresponsible.

Moreover, the "degree" to which the Court must act is exceedingly small. Nothing requires this Court to opine as to the constitutionality of any regulation related to time, place, manner, or some other consideration. Plaintiffs challenge no such regulations.

In any event, courts lack discretion to refuse established Article III jurisdiction:

> The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given .

. . All we can do is, to exercise our best judgment, and conscientiously to perform our duty.

*Cohens* v. *Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821).

*Cohens*' admonition regarding "the judiciary" applies to the lower federal courts. The Supreme Court is "one of final review, not of first view," and it does not ordinarily "rush to judgment without a lower court opinion." *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 529 (2009) (citation and internal quotation marks omitted). "Constitutional law is very largely a prediction of how the Supreme Court will decide particular issues when presented to it for decision." *Norris* v. *United States*, 687 F.2d 899, 904 (7th Cir. 1982). This Court surmised that "[t]he Supreme Court did not decide whether, or to what extent, the Second Amendment protects a right to self-defense outside of the home," *United States* v. *Carter*, 669 F.3d 411, 415 (4th Cir. 2011), but this was dictum—Carter sought "to purchase the guns for the lawful purpose of protecting himself and his nephew in his home against those who might intrude." *Carter*, 669 F.3d at 414.[4] In any event, "[w]hen the

---

[4]Similar dictum appears in *United States* v. *Mahin*, 668 F.3d 119, 124 (4th Cir. 2011), where the Court proceeded on the assumption that renting guns at a firing range is protected Second Amendment activity.

Supreme Court says that it is not resolving an issue, it perforce confides the issue to the lower federal courts for the first pass at resolution." *United States* v. *Booker*, 375 F.3d 508, 513 (7th Cir. 2004), *aff'd*, 543 U.S. 220 (2005).

Plaintiffs endorse *Masciandaro*'s concern for treading carefully in the Second Amendment area. "[M]iscalculat[ing] as to Second Amendment rights" might wrongly disarm individuals, leaving them vulnerable to "some unspeakably tragic act of mayhem." *Masciandaro*, 638 F.3d at 475. Alas, the Second Amendment does not "require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise." *McDonald*, 130 S. Ct. at 3050.

But the Constitution requires this Court to resolve this case "arising under [the] Constitution." U.S. Const. art. III, § 2, cl. 1.

II. THE SECOND AMENDMENT SECURES THE RIGHT TO CARRY ARMS IN PUBLIC FOR SELF-DEFENSE.

A. Text and History, Not Political Opinions of Self-Described Experts, Determine the Content of Our Fundamental Constitutional Rights.

"[H]istorical meaning enjoys a privileged interpretative role in the

Second Amendment context." *Masciandaro*, 638 F.3d at 470 (citations omitted). The first step in any Second Amendment case is to conduct an "historical inquiry seek[ing] to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification." *United States* v. *Chester*, 628 F.3d 673, 680 (4th Cir. 2010). Answering whether an activity comes within the Amendment's protection "requires a textual and historical inquiry into original meaning." *Ezell* v. *City of Chicago*, 651 F.3d 684, 701 (7th Cir. 2011).

"*Heller* focused almost exclusively on the original public meaning of the Second Amendment, consulting the text and relevant historical materials to determine how the Amendment was understood at the time of ratification." *Id.* at 700; *United States* v. *Rene E.*, 583 F.3d 8, 12-13 (1st Cir. 2009) (inquiring "whether the Founders would have regarded [the prohibition] as consistent with the Second Amendment right"); *United States* v. *Marzzarella*, 614 F.3d 85, 89-90 (3d Cir. 2010) ("[b]ecause '[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them,' [*Heller*] interpreted the [Second Amendment's] text in light of its meaning at the time of ratification") (citations omitted).

The historical inquiry into the Second Amendment's scope is
conducted to the exclusion of "interest balancing." Whatever utility
means-ends scrutiny holds in measuring the application of
constitutional rights, it plays no role in defining their content.

> We know of no other enumerated constitutional right whose core
> protection has been subjected to a freestanding "interest-balancing"
> approach. The very enumeration of the right takes out of the hands
> of government—even the Third Branch of Government—the power
> to decide on a case-by-case basis whether the right is *really worth*
> insisting upon. A constitutional guarantee subject to future judges'
> assessments of its usefulness is no constitutional guarantee at all . .
> . Like the First, [the Second Amendment] is the very *product* of an
> interest-balancing by the people . . .

*Heller*, 554 U.S. at 635. Judicial assessment of what is optimally

desirable can be a very poor substitute for recognizing rights based on

our nation's historic traditions of liberty. *See, e.g. Buck* v. *Bell*, 274 U.S.

200 (1927).

Under the guise of applying intermediate scrutiny, Defendants and

their *amici* endorse a wide array of social science assertions and policy

opinions as to why people should not enjoy a right to carry handguns.

These arguments are better directed at a constitutional convention.

"[T]he enshrinement of constitutional rights necessarily takes certain

policy choices off the table." *Heller*, 554 U.S. at 636. Professors are

certainly entitled to believe that the Second Amendment right to bear arms is dangerous. They are also entitled to that same belief regarding the exclusionary rule, the right to counsel, or due process. Every aspect of the Constitution finds strong disagreement among some segment of society. But *McDonald*'s instructions bear repeating:

> [T]here is intense disagreement on the question whether the private possession of guns in the home increases or decreases gun deaths and injuries. The right to keep and bear arms, however, is not the only constitutional right that has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category.

*McDonald*, 130 S. Ct. at 3045 (citations omitted).

Text, history, tradition and precedent all confirm that Plaintiffs enjoy a right to publicly carry arms for their defense.

B. The Supreme Court Did Not Limit the Right to Bear Arms to the Home.

Although "the need for defense of self, family, and property is *most acute*" in the home, *Heller*, 554 U.S. at 628 (emphasis added), and the Second Amendment right is secured "*most notably* for self-defense within the home," *McDonald*, 130 S. Ct. at 3044 (emphasis added), the Second Amendment is no different in this respect than other rights.

"[I]t is beyond dispute that the home is entitled to special protection as the center of the private lives of our people." *Minnesota* v. *Carter*, 525 U.S. 83, 99 (1998) (Kennedy, J., concurring). Thus, home protection stands "[a]t the [Fourth Amendment's] very core," *Silverman* v. *United States*, 365 U.S. 505, 511 (1961), and "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton* v. *New York*, 445 U.S. 573, 585 (1980) (quotation omitted). But that does not mean people lack Fourth Amendment rights in public.

This Court's suggestions that the Second Amendment might extend beyond the home, *Masciandaro*, 638 F.3d at 475; *Moore*, 666 F.3d at 320 *n.7, and that the Supreme Court offered no holding on the issue, *Carter*, 669 F.3d at 415; *Mahin*, 668 F.3d at 124, at least exclude the arguments that *Heller* positively limited the right to the home. On this point, other circuits agree. "[T]he Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense. What other entitlements the Second Amendment creates . . . were left open." *United States* v. *Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc).

> *Heller* delineates *some* of the boundaries of the Second Amendment right to bear arms. At its core, the Second Amendment protects the right of law-abiding citizens to possess non-dangerous weapons for self-defense in the home. And certainly, to some degree, it must protect the right of law-abiding citizens to possess firearms for other, as-yet-undefined, lawful purposes.

*Marzzarella*, 614 F.3d at 92 (emphasis added).

To their credit, Defendants refrain from claiming that *Heller* held the right to bear arms limited to the home. Brady, however, declares that the District Court "cannot explain why the Court . . . left untouched the District's laws that barred (and still bar) Mr. Heller from carrying guns in public," and that "the Court's repeated statements that it was only granting him a right to 'carry [] in the home,' against the backdrop of the District's laws, indicates that the right is confined to the home." Brady Br. 17 (citations omitted).

As *amici* know, Heller challenged, among other provisions, former D.C. Code § 22-4504(a) (2008), which had provided that carrying handguns *inside one's home* without a permit was a misdemeanor, apart from the felony offense of carrying a gun in public. The Court left the public carry provision untouched because Heller did not seek a permit to publicly carry a handgun. *Parker* v. *District of Columbia*, 478

F.3d 370, 400 (D.C. Cir. 2007), *aff'd sub nom Heller*. The reference to an in-home carry permit merely tracked Heller's prayer for relief. *See Heller*, 554 U.S. at 630-31. Brady's similar argument that *McDonald* confirmed the right's limitation to the home, because the Supreme Court left unaddressed Illinois laws barring the carrying of handguns, is likewise frivolous. *McDonald* did not challenge any Illinois state laws.

Indeed, the Supreme Court stated that the Second Amendment cannot be limited to *Heller*'s facts. The "policy choices [taken] off the table" by the Second Amendment "*include* the absolute prohibition of handguns held and used for self-defense in the home." *Heller*, 554 U.S. at 636 (emphasis added). "[S]ince this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field . . . ." *Id.* at 635.

C.   The Right to Bear Arms Has Traditionally
     Extended Beyond the Home for Various Purposes,
     Including Self-Defense.

The Supreme Court has always accepted that the right to bear arms, including for the purpose of guarding against confrontation, extends beyond the threshold of one's home.

As early as 1857, the infamous *Dred Scott* opinion reasoned that no Southern state would have adopted a constitution obligating it to respect privileges and immunities of citizenship held by African-Americans, including "the full liberty . . . to keep and carry arms wherever they went." *Scott* v. *Sandford*, 60 U.S. (19 How.) 393, 417 (1857); *McDonald*, 130 S. Ct. at 3068 (Thomas, J., concurring in part and concurring in the judgment).[5] While *Scott*'s odious holding was never correct, the opinion's recognition of citizens' right to publicly carry arms was no aberration.

Reviewing an indictment for violation of the Second Amendment rights of individuals disarmed and murdered while guarding a courthouse, "[w]e described the right protected by the Second Amendment as 'bearing arms for a lawful purpose.'" *Heller*, 554 U.S. at 620 (quoting *United States* v. *Cruikshank*, 92 U.S. 542, 553 (1876))

---

[5]Abolitionists found *Dred Scott*'s enumeration of rights ironically underscored slavery's essential injustice. "[I]t is of these privileges and rights that the colored man is deprived, and it is of that deprivation he complains. I could find, sir, in that very *Dred Scott* decision, an enumeration, by the Supreme Court itself, of the rights guaranteed by the Constitution of the United States . . . Those rights are to bear arms . . . Of all these, in the express terms of the decision, the colored man is deprived . . ." *Who Are American Citizens?*, THE LIBERATOR, Jan. 21, 1859, at 10, col. 2 (quoting Massachusetts State Rep. Wells).

(footnotes omitted). The Court later observed that "during military occupation irreconcilable enemy elements, guerrilla fighters, and 'werewolves' could [not] require the American Judiciary to assure them . . . [the] right to bear arms as in the Second [Amendment] . . ." *Johnson* v. *Eisentrager*, 339 U.S. 763, 784 (1950). The reference was not limited to home self-defense.

The Supreme Court's first foray into Second Amendment law centered around the question of whether individuals had the right to transport a sawed-off shotgun between Oklahoma and Arkansas— plainly, an activity that took place outside the home. *United States* v. *Miller*, 307 U.S. 174, 175 (1939). Whatever else it might have held, *Miller* indicated that the Second Amendment has operative relevance on the highways.

The Supreme Court has also extolled various traditional outdoor firearms activities. The right was valued "for self-defense *and hunting*." *Heller*, 554 U.S. at 599 (emphasis added). "The settlers' dependence on game for food and economic livelihood, moreover, undoubtedly undergirded . . . state constitutional guarantees [of the right to arms]." *McDonald*, 130 S. Ct. at 3042 n.27. "No doubt, a citizen who keeps a

gun or pistol under judicious precautions, *practices in safe places the use of it*, and in due time teaches his sons to do the same, exercises his individual right [to bear arms]." *Heller*, 554 U.S. at 619 (quotation omitted) (emphasis added).

Cognizant that a strict "home-limitation" would exclude traditional activities such as hunting, target practice, and even militia service from the Second Amendment's scope, Defendants aptly note that "[t]he appropriate inquiry [here] is whether the Second Amendment protects" carrying handguns for self-defense, "not whether it extends beyond the home in any form at all." Appellants' Br. 19. Alas, *Heller* "concluded that the Second Amendment codified a pre-existing 'individual right to possess and carry weapons in case of confrontation.'" *Marzzarella*, 614 F.3d at 90 (quoting *Heller*, 554 U.S. at 592). "[T]he core right identified in *Heller* [is] the right of a law-abiding, responsible citizen to possess and carry a weapon *for self-defense*." *Chester*, 628 F.3d at 683 (emphasis added). Considering that "confrontation" arises frequently outside the home, and that self-defense lies at the core of the Second Amendment right, it would be strange if somehow self-defense were the one arms-bearing purpose *not* secured by the Amendment outside the home.

Justice Stevens acknowledged this argument's difficulty:

> Given the presumption that most citizens are law abiding, and the reality that the need to defend oneself may suddenly arise in a host of locations outside the home, I fear that the District's policy choice may well be just the first of an unknown number of dominoes to be knocked off the table.

*Heller*, 554 U.S. at 679-80 (Stevens, J., dissenting); *see also id.* at 677 n.38 (majority secures right to arms for "self-defense, recreation, and other lawful purposes") (Stevens, J., dissenting).

Courts accept that "*Heller* does not preclude Second Amendment challenges to laws regulating firearm possession outside of home." *Peruta* v. *County of San Diego*, 678 F. Supp. 2d 1046, 1051 (S.D. Cal. 2010). For example, the Seventh Circuit enjoined Chicago's ban on the operation of gun ranges upon recognizing a Second Amendment right to practice shooting. "The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use." *Ezell*, 651 F.3d at 704. The Seventh Circuit rejected the notion that "target practice is wholly outside the Second Amendment as it was understood when incorporated as a limitation on the States," *id.* at 706, and enjoined Chicago's ban on gun ranges as "a serious encroachment

on the right to maintain proficiency in firearm use," *id.* at 708, a right that obviously few if any people in Chicago can exercise at home.

More specifically, a growing number of courts hold that the Second Amendment secures a right to carry handguns for self-defense. The Southern District of West Virginia held that barring the provision of armed security to a prohibited individual satisfied constitutional scrutiny, but rejected the claim that there is no right to carry a gun for self-defense. "[T]he Second Amendment, as historically understood at the time of ratification, was not limited to the home." *United States* v. *Weaver*, No. 2:09-CR-00222, 2012 U.S. Dist. LEXIS 29613, at *13 (S.D. W. Va. Mar. 7, 2012) (citation and footnote omitted). The Eastern District of North Carolina struck down that state's laws forbidding the carrying or transportation of firearms and ammunition during declared "states of emergency." *Bateman* v. *Perdue*, No. 5:10-CV-265-H, 2012 U.S. Dist. LEXIS 47336 (E.D.N.C. Mar. 29, 2012).

> It cannot be seriously questioned that the emergency declaration laws at issue here burden conduct protected by the Second Amendment. Although considerable uncertainty exists regarding the scope of the Second Amendment right to keep and bear arms, it undoubtedly is not limited to the confines of the home.

*Id.* at *10-*11.

"[T]he Second Amendment right to keep and bear arms 'is not strictly limited to the home environment but extends in some form to wherever those activities or needs occur.'" *Id.* at *10 (citation omitted). "Under the laws at issue here, citizens are prohibited from engaging, outside their home, in any activities secured by the Second Amendment. They may not carry defensive weapons outside the home. . . ." *Id.*[6]

These views are not limited to this circuit's courts. "The Second Amendment explicitly protects the right to 'carry' as well as the right to 'keep' arms." *People* v. *Yanna*, No. 304293, 2012 Mich. App. LEXIS 1269, at *11 (Mich. App. June 26, 2012). The Eastern District of Pennsylvania recently denied a motion to suppress introduction of a handgun into evidence, finding the defendant's evasive conduct supported reasonable suspicion of criminal activity. But it rejected the claim that the stop was justified merely by a report of the defendant carrying a handgun:

---

[6]Defendants' claim that *Bateman* did not "involve[] a challenge to a handgun wear-and-carry permit statute," at 38 n.7, is misleading. North Carolina does not require permits to openly carry handguns for self-defense, and the carry prohibition *Bateman* struck down impacted concealed handgun carry permits.

> [A]s some individuals are legally permitted to carry guns pursuant to the Second Amendment of the Constitution, a reasonable suspicion that an individual is carrying a gun, without more, is not evidence of criminal activity afoot. Therefore, the tip alone was not sufficient to support an investigatory stop . . .

*United States* v. *Garvin*, Cr. No. 11-480-01, 2012 U.S. Dist. LEXIS 76540, at *10 (E.D. Pa. May 31, 2012).

As Defendants note, other courts have refused to enforce the Second Amendment outside the home. But these opinions are unpersuasive. One such opinion avers: "[c]ompared to many of this country's constitutional protections, the scope of rights under the Second Amendment is ambiguous and no doubt subject to change and evolution over time." *Richards* v. *County of Yolo*, No. 2:09-CV-01235, 2011 U.S. Dist. LEXIS 51906, *20 (E.D. Cal. May 16, 2011), *appeal pending*, No. 11-16255 (9th Cir. filed May 16, 2011).[7] Another offers that the Second Amendment right is "unlike any other constitutional right" because it relates to firearms. *Piszczatoski* v. *Filko*, No. 10-CV-

---

[7] *Contra Heller*, 554 U.S. at 576 (Second Amendment interpreted per original public meaning); *id.* at 629 n.27 (Second Amendment equal to other enumerated rights); *McDonald*, 130 S. Ct. at 3045.

06110, 2012 U.S. Dist. LEXIS 4293, at*3 (D.N.J. Jan. 12, 2012), *appeal pending*, No. 12-1150 (3d Cir. Jan. 24, 2012).[8]

The appropriate historical inquiry, faithful to the Supreme Court's instruction, reveals the District Court correctly identified the right.

D.     The Second Amendment's Original Public Meaning
       Confirms the Right to Publicly Carry Arms for Self-Defense.

In securing Second Amendment rights beyond the home, *Ezell*, *Garvin*, *Bateman*, *Weaver*, *Yanna*—and the District Court—adhered to the Second Amendment's original public meaning. The Second Amendment's reference to "keep and bear," U.S. Const. amend. II, describes two distinct concepts. "It cannot be presumed that any clause in the constitution is intended to be without effect; and therefore such construction is inadmissible, unless the words require it." *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 174 (1803). "[T]he usual canon of [constitutional] interpretation . . . requires that real effect should be

---

[8]*Contra McDonald*, 130 S. Ct. at 3045 (rejecting argument that "Second Amendment differs from all of the other provisions of the Bill of Rights because it concerns the right to possess a deadly implement and thus has implications for public safety"); *see also Valley Forge Christian Coll.* v. *Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 484 (1982) ("[W]e know of no principled basis on which to create a hierarchy of constitutional values.").

given to all the words it uses." *Myers* v. *United States*, 272 U.S. 52, 151 (1926) (citations omitted).

The Second Amendment's "words and phrases were used in their normal and ordinary as distinguished from technical meaning." *Heller*, 554 U.S. at 576. "[A]n amendment to the Constitution should be read in a 'sense most obvious to the common understanding at the time of its adoption.'" *Adamson* v. *California*, 332 U.S. 46, 63 (1947) (Frankfurter, J., concurring) (quotation omitted), *overruled on other grounds by Malloy* v. *Hogan*, 378 U.S. 1 (1964).

Rejecting an argument that the term "bear arms" indicates an exclusively military undertaking, the Court held that "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Heller*, 554 U.S. at 584 (citations omitted).

> To "bear arms," as used in the Second Amendment, is to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person."

*Id*. (quoting *Muscarello* v. *United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting); BLACK'S LAW DICTIONARY 214 (6th Ed. 1998)). Accordingly, the Court repeatedly referred to "the Second

Amendment right, protecting only individuals' liberty to keep *and carry* arms." *Heller*, 554 U.S. at 604 (emphasis added); *see also id.* at 626.

The Supreme Court's definition of "bear arms" in *Heller* was not dictum. It is well established that

> When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound . . . the principle of *stare decisis* directs us to adhere not only to the holdings of our prior cases, but also to their explications of the governing rules of law . . .

*Seminole Tribe of Fla.* v. *Florida*, 517 U.S. 44, 67 (1996) (citations and internal marks omitted); *United States* v. *Danielczyk*, No. 11-4667, 2012 U.S. App. LEXIS 13250, at *11 (4th Cir. June 28, 2012). Language "explain[ing] the court's rationale . . . is part of the holding." *United States* v. *Bloom*, 149 F.3d 649, 653 (7th Cir. 1998). "[I]t is not substantive discussion of a question or lack thereof that distinguishes holding from dictum, but rather whether resolution of the question is necessary for the decision of the case." *Baraket* v. *Holder*, 632 F.3d 56, 59 (2d Cir. 2011) (citation omitted).

Considering its need to address the District of Columbia's collectivist interpretation of "bear arms," the Court's conclusion that the right to "bear arms" is the right to "carry weapons in case of confrontation" was

essential to *Heller*'s resolution. The question of what "bear arms" means "was before the court...; was argued before the court; and was passed upon by the court." *Pittston Co.* v. *United States*, 199 F.3d 694, 703 (4th Cir. 1999) (citations omitted). The numerous pages describing how that right applies outside the home confirm that the matter received the Court's exhaustive consideration.

Second Amendment author James Madison understood that the "bearing" of arms extended beyond the home. In 1785, Madison introduced in Virginia's legislature a hunting bill drafted by Thomas Jefferson. Regarding "whoever shall offend against this act," it stated:

> [I]f, within twelve months after the date of the *recognizance* he shall *bear a gun* out of his inclosed ground, unless whilst performing military duty, it shall be deemed a breach of the *recognizance*, and be good cause to bind him a new, and every such *bearing of a gun* shall be a breach of the new recognizance. . . .

*A Bill for Preservation of Deer* (1785), in 2 PAPERS OF THOMAS JEFFERSON 443-44 (J. Boyd ed., 1950) (emphases added).[9]

---

[9]Defendants' *amici* Historians, at 6, omit the words "recognizance" and "whoever shall offend" from the bill in falsely stating it applied to "any person," and evinced Jefferson's alleged "view that firearms rights did not extend beyond one's property."

Numerous sources upon which the Supreme Court relied to interpret the Second Amendment likewise reflect the right's inclusion of public self-defense. Had *Heller* intended to limit "bear arms" to the home, it would have been most natural to do so when explaining "that 'bear arms' did not refer only to carrying a weapon in an organized military unit." *Heller*, 554 U.S. at 585. Instead, the Court offered that

> Justice James Wilson interpreted the Pennsylvania Constitution's arms-bearing right . . . as a recognition of the natural right of defense "of one's person *or* house" — what he called the law of "self preservation."

*Id.* (emphasis added) (citing 2 COLLECTED WORKS OF JAMES WILSON 1142, and n.x (K. Hall & M. Hall eds., 2007)) (other citations omitted).

Indeed, *Heller* offered that "state constitutional provisions written in the 18th century or the first two decades of the 19th" were the examples "most prominent [and] most relevant to the Second Amendment" in defining the meaning of "bear arms." *Heller*, 554 U.S. at 584. None of these state constitutional provisions have been interpreted as relating solely to the home, but most, in addition to Pennsylvania's provision as noted by *Heller*, were held to secure the public carrying of arms—often explicitly for the purpose of self-

defense—in at least some manner. *State* v. *Reid*, 1 Ala. 612 (1840) (interpreting Ala. Const. of 1819, art. I, § 27); *State* v. *Bailey*, 209 Conn. 322, 346, 551 A.2d 1206, 1218 (1988) (Conn. Const. art. I, § 15 (1819));[10] *Bliss* v. *Commonwealth*, 12 Ky. 90 (1822) (Ky. Const. of 1799, art. XII, cl. 23); *State* v. *Schoultz*, 25 Mo. 128, 155 (1857) (Mo. Const. of 1820, art. XIII, § 3); *State* v. *Huntly*, 25 N.C. (3 Ired.) 418, 423 (1843) (N.C. Declaration of Rights § 17 (1776)); *Simpson* v. *State*, 13 Tenn. 356 (1833) (Tenn. Const. of 1796, art. XI, § 26); *State* v. *Rosenthal*, 55 A. 610 (Vt. 1903) (Vt. Const. c. 1, art. 16 (1777)).

The same conclusion—that people enjoy a right to publicly carry arms for self-defense—was also reached interpreting state constitutional arms-bearing provisions with predecessors dating to the early republic. *See State* v. *Hogan*, 63 Ohio St. 202, 219, 58 N.E. 572, 575 (1900); *Schubert* v. *De Bard*, 398 N.E.2d 1339, 1341 (Ind. App. 1980). Later state constitutional "bear arms" provisions are likewise understood. *See, e.g. State ex rel. City of Princeton* v. *Buckner*, 180 W.

---

[10]Revised in 1956 to change "defence" to "defense." Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 TEX. REV. LAW & POL. 191, 194 n.10 (2006).

Va. 457, 462, 377 S.E.2d 139, 144 (1988); *City of Las Vegas* v. *Moberg*, 82 N.M. 626, 627-28, 485 P.2d 737, 738-39 (N.M. Ct. App. 1971); *In re Brickey*, 8 Idaho 597, 599, 70 P. 609 (1902).

Particularly instructive is the Oregon Supreme Court's opinion in *State* v. *Blocker*, 291 Or. 255, 630 P.2d 824 (1981). That court previously held that possession of a billy club was secured by the constitutional guarantee that "[t]he people shall have the right to bear arms for the defence of themselves . . ." Or. Const. art. I, § 27 (1857); *see State* v. *Kessler*, 289 Or. 359, 614 P.2d 94 (1980). In *Blocker*, prosecutors argued that the right should be confined to *Kessler*'s facts, relating to home possession of a billy club, and not to its public carrying. The court disagreed:

> The text of the constitution is not so limited; the language is not qualified as to place except in the sense that it can have no effect beyond the geographical borders of this state . . . In *Kessler* we started from the premise that under § 27 a person has a right to bear arms for defense of self . . . We then moved from that general proposition to the more particular one that a person had the constitutional right to have a billy in his home for defense.

*Blocker*, 291 Or. at 259, 630 P.2d at 825-26 (citation and footnote omitted). Likewise, *Heller* announced a general proposition respecting constitutional protection for the possession of handguns, and applied it

to the home-bound facts of the case. *McDonald*'s description of *Heller*

neatly parallels *Blocker*'s description of *Kessler*:

> [I]n [*Heller*], we held that the Second Amendment protects the right
> to keep and bear arms for the purpose of self-defense, and we struck
> down a District of Columbia law that banned the possession of
> handguns in the home.

*McDonald*, 130 S. Ct. at 3020.

E.      Historical Restrictions of the Right to Bear Arms
        Confirm Its Existence.

Debate over the right to bear arms historically concerned not

whether, but how and under what circumstances, the right could be

exercised in public for self-defense. Explaining that this right is "not

unlimited," in that there is no right to "carry any weapon whatsoever in

any manner whatsoever and for whatever purpose," *Heller*, 554 U.S. at

626 (citations omitted), the Court confirmed that there is a right to

carry at least some weapons, in some manner, for some purpose. The

Court then listed as "presumptively lawful," *id.* at 627 n.26, "laws

forbidding the carrying of firearms in sensitive places," *id.*, at 626,

confirming that carrying bans are not presumptively lawful elsewhere.

*Heller*'s discussion of prohibitions on the carrying of concealed

weapons, and prohibitions on carrying dangerous and unusual

weapons, is particularly illuminating. Each doctrine relates to a manner of regulating an established right. Defendants' citations to certain handgun regulations are likewise inapposite.

### 1. *Concealed Carry*

"[T]he right of the people to keep and bear arms (Article 2) is not infringed by laws prohibiting the carrying of *concealed* weapons . . . ." *Robertson* v. *Baldwin*, 165 U.S. 275, 281-82 (1897) (emphasis added). Yet concealed carry bans are only "presumptively" constitutional. *Heller*, 554 U.S. at 627 n.26.

> [N]ot *all* concealed weapons bans are presumptively lawful. *Heller* and the 19th-century cases it relied upon instruct that concealed weapons restrictions cannot be viewed in isolation; they must be viewed in the context of the government's overall scheme.

*Peruta* v. *County of San Diego*, 758 F. Supp. 2d 1106, 1114 (S.D. Cal. 2010), *appeal pending*, No. 10-56971 (9th Cir. filed Dec. 14, 2010).

Concealed carry prohibitions have been upheld as mere regulations of the manner in which arms are carried—with the understanding that a complete ban on the carrying of handguns, openly and concealed, is unconstitutional. *Heller* approvingly discussed four state supreme court opinions referencing this rule.

Upholding a ban on the carrying of concealed weapons, Alabama's high court explained:

> We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defense, would be clearly unconstitutional. But a law which . . . prohibits the wearing of certain weapons in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the Constitution.

*Reid*, 1 Ala. at 616-17.

Georgia's Supreme Court followed *Reid*, quashing an indictment for publicly carrying a pistol that failed to specify how the gun was carried:

> so far as the act . . . seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void*.

*Nunn* v. *State*, 1 Ga. 243, 251 (1846) (emphasis original).[11]

---

[11]*Amici* Historians, at 18, err in suggesting *Nunn*'s view of the right to arms was overruled by *Hill* v. *State*, 53 Ga. 472 (1874). *Hill* cited *Nunn* in presuming handguns fell within the right, albeit secured by the state, not federal constitution. *Id.* at 475. "The people have, or may have the arms the public exigencies require, and being unrestricted in the bearing and using of them, except under special and

Tennessee's Supreme Court held unconstitutional the application of a weapons carrying ban to a man carrying a revolver, declaring:

> If the Legislature think proper, they may by a proper law regulate the carrying of this weapon publicly, or abroad, in such a manner as may be deemed most conducive to the public peace, and the protection and safety of the community from lawless violence. We only hold that, as to this weapon, the prohibition is too broad to be sustained.

*Andrews* v. *State*, 50 Tenn. 165, 187-88 (1871).

Finally, as *Heller* observed,

> the Louisiana Supreme Court held that citizens had a right to carry arms openly: "This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations."

*Heller*, 554 U.S. at 613 (quoting *State* v. *Chandler*, 5 La. Ann. 489, 490 (1850)).

Other decisions confirm that concealed-carry prohibitions were viewed merely as regulating the manner of carrying guns. *See, e.g.,* *State* v. *Jumel*, 13 La. Ann. 399, 400 (1858) (concealed carry prohibition "a measure of police, prohibiting only a *particular mode* of bearing

---

peculiar circumstances, there is no infringement of the constitutional guarantee." *Id.* at 476. *Hill* held carrying guns *into a court* was unprotected.

arms which is found dangerous to the peace of society") (emphasis

original); *Owen* v. *State*, 31 Ala. 387, 388 (1858) (concealed carry ban "a

mere regulation of the manner in which certain weapons are to be

borne").

For supporting the notion that concealed carrying may be banned,

*Heller* further cited to THE AMERICAN STUDENTS' BLACKSTONE 84 n.11

(G. Chase ed., 1884), *Heller*, 554 U.S. at 626, which provides:

> [I]t is generally held that statutes prohibiting the carrying of
> *concealed* weapons are not in conflict with these constitutional
> provisions, since they merely forbid the carrying of arms in a
> particular manner, which is likely to lead to breaches of the peace
> and provoke to the commission of crime, rather than contribute to
> public or personal defence. In some States, however, a contrary
> doctrine is maintained.

This understanding survives. *In re Application of McIntyre*, 552 A.2d

500, 501 n.1 (Del. Super. 1988) ("'the right to keep and bear arms' does

not of necessity require that such arms may be kept concealed").

Legislatures might prefer one form of carrying over another.

Precedent reveals an ancient suspicion of weapons concealment where

social norms viewed the wearing of arms as virtuous. But today, openly

carrying handguns may alarm individuals unaccustomed to firearms.

*See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for*

*Self-Defense: An Analytic Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1523 (2009). A preference for concealed over open carrying has been adopted by some jurisdictions where the public acceptance of gun rights is relatively high. For example, in Texas, where concealed handgun permits are readily available on a "shall issue" basis, Tex. Gov't Code § 411.177(a), a permit holder who "intentionally fails to conceal the handgun" commits a misdemeanor. Tex. Penal Code § 46.035(a).

*Heller*'s recognition of a right to carry a handgun does not force states to allow the carrying of handguns in a manner that may cause needless public alarm, so long as a more socially-conducive option exists to allow people to exercise the right to bear arms.

2.     *Dangerous and Unusual Weapons*.

*Heller* approvingly referenced "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627 (citations omitted). This prohibition does not merely refer to types of weapons, but to types of *conduct* with weapons, reflecting the ancient common law offense of affray. Affray required as an element that arms be used or carried in such manner as to terrorize the population, rather

than in a manner suitable for ordinary self-defense. Early sources, including some referenced by *Heller*, distinguished affrays from the legitimate public exercise of the right to bear arms.[12]

Blackstone offered that "[t]he offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, *by terrifying the good people of the land*." 4 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 148 (1769) (emphasis added). Blackstone referenced the 1328 Statute of Northampton, which, by the time of the American Revolution, had long been limited to prohibit the carrying of arms only with evil intent, "in order to preserve the common law principle of allowing 'Gentlemen to ride armed for their Security.'" David Caplan, *The Right of the Individual to Bear Arms: A Recent Judicial Trend*, 4 DET. C. L. REV. 789, 795 (1982) (citing *Rex* v. *Knight*, 90 Eng. Rep. 330 (K.B. 1686)).

> [N]o wearing of Arms is within the meaning of this Statute, unless it be accompanied with such circumstances as are apt to terrify the People; from whence it seems clearly to follow, that Persons of Quality are in no Danger of Offending against this Statute by wearing common Weapons . . . for their Ornament or Defence, in such Places, and upon such Occasions, in which it is the common Fashion to make use of them, without causing the least Suspicion of

---

[12]*See Heller*, 554 U.S. at 620 ("bearing arms for a lawful purpose").

an intention to commit any Act of Violence or Disturbance of the Peace . . . .

William Hawkins, 1 TREATISE OF THE PLEAS OF THE CROWN, ch. 63, § 9 (1716); *see* Joyce Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 104-05 (1994).

*Heller*'s subsequent sources for the "dangerous and unusual" doctrine, 554 U.S. at 627, are in accord. "[T]here may be an affray, where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, *in such a manner, as will naturally diffuse a terrour among the people.*" 3 WORKS OF THE HONOURABLE JAMES WILSON 79 (Bird Wilson ed., 1804) (footnote omitted) (emphasis added). "It is likewise said to be an affray, at common law, for a man to arm himself with dangerous and unusual weapons, *in such manner as will naturally cause terror to the people.*" John A. Dunlap, THE NEW-YORK JUSTICE 8 (1815) (emphasis added).

> Riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land . . . . But here it should be remembered, that in this country the constitution guarranties [sic] to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily.

Charles Humphreys, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822); *Heller*, 554 U.S. at 588 n.10 (quoting same).

"[T]here may be an affray . . . where persons arm themselves with dangerous and unusual weapons, in such manner as will naturally cause a terror to the people." 1 William Oldnall Russell, A TREATISE ON CRIMES AND INDICTABLE MISDEMEANORS 271 (1826). But:

> it has been holden, that no wearing of arms is within [the meaning of Statute of Northampton] unless it be accompanied with such circumstances as are apt to terrify the people; from whence it seems clearly to follow, that persons of quality are in no danger of offending against the statute by wearing common weapons . . . in such places, and upon such occasions, in which it is the common fashion to make use of them, without causing the least suspicion of an intention to commit any act of violence, or disturbance of the peace.

*Id.* at 272.

The other treatises *Heller* cites in support of the "dangerous and unusual" doctrine are in accord, as are the cases *Heller* cites. *See O'Neill* v. *State*, 16 Ala. 65, 67 (1849) (affray "probable" "if persons arm themselves with deadly or unusual weapons for the purpose of an affray, *and in such manner as to strike terror to the people*") (emphasis added); *State* v. *Lanier*, 71 N.C. 288, 290 (1874) (riding horse through courthouse, unarmed, is "very bad behavior" but "may be criminal or

innocent" depending on whether people alarmed); *State* v. *Langford*, 10 N.C. (3 Hawks) 381, 383-384 (1824) (affray "when a man arms himself with dangerous and unusual weapons, *in such a manner as will naturally cause a terror to the people*") (emphasis added); *English* v. *State*, 35 Tex. 473, 476 (1871) ("terrifying the good people of the land").

Early courts took the view espoused in *Heller*, that securing the right to bear arms in public is consistent with the prohibition on provocative behavior with arms. "[N]either, after so solemn an instrument hath said the people may carry arms, can we be permitted to impute to the acts thus licensed, such a necessarily consequent operation as terror to the people to be incurred thereby." *Simpson*, 13 Tenn. at 360. "A man may carry a gun for any lawful purpose, for business or amusement, but he cannot go about with that or any other dangerous weapon to terrify and alarm a peaceful people." *Hogan*, 63 Ohio St. at 219, 58 N.E. at 575-76.

> But although a gun is an "unusual weapon," it is to be remembered that the carrying of a gun per se constitutes no offence. For any lawful purpose–either of business or amusement–the citizen is at perfect liberty to carry his gun. It is the wicked purpose–and the mischievous result–which essentially constitute the crime.

*Huntly*, 25 N.C. (3 Ired.) at 422-23.

Defendants and their *amici* nonetheless suggest that Blackstone, and the Statute of Northampton, could be interpreted as assuming that the carrying of any arms is inherently terrifying and thus proscribed. As shown *supra*, that understanding eluded virtually all the authorities *Heller* cited—including, apparently, St. George Tucker, in "the most important early American edition of Blackstone's Commentaries." *Heller*, 554 U.S. at 594. Noting that an armed assembly in England "creates a presumption of warlike force," Tucker asked,

> but ought that circumstance, of itself, to create any such presumption in America, where the right to bear arms is recognized and secured in the constitution itself? In many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side.

St. George Tucker, 5 BLACKSTONE'S COMMENTARIES app. B at 19 (1803).

3. *Late Nineteenth-Century Handgun Laws.*

In addition to referencing *concealed* carry bans that merely regulated the manner of carrying arms, laws proscribing guns in particular places, and laws that reflected the common law crime of affray and its requirement that complainants "hav[e] reasonable cause to fear an injury or breach of the peace," Appellants' Br. 26, Defendants

and their *amici* uncritically cite various late nineteenth-century handgun bans as analogous or natural predecessors to Maryland's GSR requirement. But these (mostly Southern) courts and legislatures did not understand "pistol" prohibitions to bar *all* handguns, typically exempting "Army-Navy" models—"render[ing] safe the high quality, expensive, military issue handguns that many former Confederate soldiers still maintained but that were often out of financial reach for cash poor freedmen." Robert J. Cottrol and Raymond T. Diamond, *"Never Intended to be Applied to the White Population": Firearms Regulation and Racial Disparity—the Redeemed South's Legacy to a National Jurisprudence?*, 70 CHI.-KENT L. REV. 1307, 1333 (1995) (footnote omitted).

For example, Defendants endorse Tex. Act of April 12, 1871, which allegedly banned carrying "any pistol." Appellants Br. 28-29 (citing *English*, 35 Tex. 473; *State* v. *Duke*, 42 Tex. 455 (1874)); Historians Br. 13 ("statute banning the public carry of deadly weapons, including handguns"). But *English* found the Second Amendment protected "holster pistols" and "side arms." *English*, 35 Tex. at 476. Likewise, the Arkansas laws Defendants and *amici* cite banned the carrying of

weapons "except such pistols as are used in the army or navy of the United States," Ark. Stat., Ch. 45, § 1907 (1884) (Historians Br. Add. 1), a point of distinction recognized in *Fife* v. *State*, 31 Ark. 455, 460-61 (1876) (distinguishing "army and navy repeaters" from prohibited "pistol"). Indeed, *Fife* was distinguished on this point in a case involving the carrying of an "army" pistol.

> If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege.

*Wilson* v. *State*, 33 Ark. 557, 560 (1878); *see also Andrews*, 50 Tenn. at 188 (carry prohibition fails "as to this weapon"); *Ex parte Thomas*, 21 Okla. 770, 777-78, 97 P. 260, 263 (1908) (protected "arms" included "horseman's pistols").

Defendants' assertion that today's GSR requirement is longstanding because its "reasonable precaution against apprehended danger" language dates to Maryland's 1894 Code misstates the law. Indeed, Defendants' reliance on this provision is self-defeating. The 1894 statute required only those carrying *concealed* arms have "apprehended danger." Separately, the statute proscribed the open carrying of

handguns only by those having "the intent or purpose of injuring any person in any unlawful manner, and not for any *proper purpose of self-protection*." 1894 Laws of Maryland, ch. 547 (emphasis added).

Without question, responsible law-abiding individuals enjoy the right to carry handguns for self-defense. Nonetheless, Defendants and their *amici* historians portray a Second Amendment whose central self-defense interest does not extend to the "bearing" of arms. Three of these four historians note that they were among the *amici* in *Heller* and *McDonald*. Historians Br. 1, 2. These observations are red flags.

In *Heller*, Professors Cornell and Novak argued that "[t]he private keeping of firearms was manifestly not the right that the framers of the Bill of Rights guaranteed in 1789." Brief of Jack Rakove, et al. 2, *Heller*, 554 U.S. 570. In *McDonald*, Professor Finkelman advised that "the Founders codified the right of the people to bear arms collectively . . . [t]he right of individual self-defense was left unchanged by the Second Amendment." Brief of Historians on Early American Legal, Constitutional and Pennsylvania History 2, *McDonald*, 130 S. Ct. 3020. Alongside Professor Cornell, Finkelman claimed that Chicago's handgun ban was "consistent with our nation's historical regulation of

dangerous weapons," and that "[t]he passage of the Fourteenth Amendment did not reduce states' broad authority to regulate possession of arms." Brief of 34 Professional Historians 4, 12, *McDonald*, 130 S. Ct. 3020.

Professor Finkelman also joined Patrick Charles, whose work is relied upon by Defendants and their *amici* historians, Brady, and LCAV, in another *McDonald* brief. This effort asked the Supreme Court to "correct its error" by overruling *Heller*. Brief for English/Early American Historians 3, *McDonald*, 130 S. Ct. 3020. Assailing the "discredited scholarship upon which *Heller* relied," Finkelman and Charles argued that the English right to arms "did not intend to protect an individual's right to possess, own, or use arms for private purposes such as to defend a home against burglars (what, in modern times, we mean when we use the term "self-defense")." *Id*. at 2. "[A]rmed self-defense of the home by individuals acting for private interests was not the right enshrined in the Second Amendment." *Id*. at 4.

Unsurprisingly, Defendants and their *amici*'s historical vision plainly conflicts with *Heller*, *McDonald*, and the sources described therein. It will not be accepted by the Supreme Court. An *amicus* brief

by academics whose Second Amendment scholarship the Supreme

Court endorsed will address Defendants' *amici* in greater detail.

III. MARYLAND'S "GOOD AND SUBSTANTIAL REASON" REQUIREMENT I
IS AN UNCONSTITUTIONAL PRIOR RESTRAINT.

In adopting the now-familiar "two-part approach to Second

Amendment claims," this Court acknowledged that "*Heller* left open the

issue of the standard of review, rejecting only rational-basis review."

*Chester*, 628 F.3d at 680. Notwithstanding the lack of resort to means-

ends scrutiny, *Heller*, as did the D.C. Circuit before it, struck down

Washington, D.C.'s functional firearms ban for conflicting with the

Second Amendment's core self-defense interest, and struck down the

city's handgun ban as barring a category of protected arms.

As with other rights, means-ends scrutiny is thus not the exclusive

method for evaluating Second Amendment claims where more precise

tests are available. Such is the case here. Because the Second

Amendment secures a fundamental right, a license to bear arms cannot

be left to the government's unbridled discretion:

> It is settled by a long line of recent decisions of this Court that an
> ordinance which . . . makes the peaceful enjoyment of freedoms
> which the Constitution guarantees contingent upon the uncontrolled
> will of an official—as by requiring a permit or license which may be

granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.

*Staub* v. *City of Baxley*, 355 U.S. 313, 322 (1958) (citations omitted);

*FW/PBS* v. *City of Dallas*, 493 U.S. 215, 226 (1990) (plurality opinion);

*Shuttlesworth* v. *City of Birmingham*, 394 U.S. 147, 151 (1969).

The prior restraint doctrine's identification with the First Amendment counsels its use here, as this Court looks to First Amendment analytical frameworks in seeking to resolve Second Amendment cases. *Chester*, 628 F.3d at 682.

Because *Heller* is the first Supreme Court case addressing the scope of the individual right to bear arms, we look to other constitutional areas for guidance in evaluating Second Amendment challenges. We think the First Amendment is the natural choice. *Heller* itself repeatedly invokes the First Amendment in establishing principles governing the Second Amendment. We think this implies the structure of First Amendment doctrine should inform our analysis of the Second Amendment.

*Marzzarella*, 614 F.3d at 89 n.4; *Ezell*, 651 F.3d at 703 & 708; *Parker*, 478 F.3d at 399.[13]

---

[13]Courts have long analogized speech and gun rights. *Commonwealth* v. *Blanding*, 20 Mass. 304, 314 (1825); *Republica* v. *Oswald*, 1 U.S. (1 Dall.) 319, 330 n.* (Pa. 1788).

"While prior restraints are not unconstitutional per se, any system of prior restraint comes to the courts bearing a heavy presumption against its constitutional validity." *Clark* v. *City of Lakewood*, 259 F.3d 996, 1005 (9th Cir. 2001) (citation omitted). In *Staub*, the Supreme Court struck down an ordinance authorizing a mayor and city council "uncontrolled discretion," *Staub*, 355 U.S. at 325, to grant or refuse a solicitation permit, as it "makes enjoyment of speech contingent upon the will of the Mayor and Council of the City, although that fundamental right is made free from congressional abridgment by the First Amendment and is protected by the Fourteenth from invasion by state action." *Staub*, 355 U.S. at 325 (citing *Cantwell* v. *Connecticut*, 310 U.S. 296, 307 (1940)); *see also Largent* v. *Texas*, 318 U.S. 418, 422 (1943) (striking down ordinance allowing speech permit where mayor "deems it proper or advisable."); *Child Evangelism Fellowship* v. *Anderson Sch. Dist. Five*, 470 F.3d 1062, 1069-70 (4th Cir. 2006) ("best interest" standard invalid).

"Traditionally, unconstitutional prior restraints are found in the context of judicial injunctions or a licensing scheme that places 'unbridled discretion in the hands of a government official or agency.'"

*Nat'l Fed'n of the Blind* v. *FTC*, 420 F.3d 331, 350 n.8 (4th Cir. 2005)

(citation omitted). Yet

> [t]he existence of standards does not in itself preclude a finding of
> unbridled discretion, for the existence of discretion may turn on the
> looseness of the standards or the existence of a condition that
> effectively renders the standards meaningless as to some or all
> persons subject to the prior restraint.

*Beal* v. *Stern*, 184 F.3d 117, 126 n.6 (2d Cir. 1999). "Unbridled

discretion naturally exists when a licensing scheme does not impose

adequate standards to guide the licensor's discretion." *Id.* (quoting

*Chesapeake B & M, Inc.* v. *Harford County*, 58 F.3d 1005, 1009 (4th Cir.

1995) (en banc)).

Standards governing prior restraints must be "narrow, objective and

definite." *Shuttlesworth*, 394 U.S. at 151. Standards involving

"appraisal of facts, the exercise of judgment, [or] the formation of an

opinion" are unacceptable. *Forsyth County* v. *Nationalist Movement*,

505 U.S. 123, 131 (1992) (quoting *Cantwell*, 310 U.S. at 305).

Public safety is invoked to justify most laws, but where a

fundamental right is concerned, mere incantation of a public safety

rationale does not save arbitrary licensing schemes.

> [W]e have consistently condemned licensing systems which vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places. . . . There are appropriate public remedies to protect the peace and order of the community if appellant's speeches should result in disorder or violence.

*Kunz* v. *New York*, 340 U.S. 290, 294 (1951); *Shuttlesworth*, 394 U.S. at 153. "[U]ncontrolled official suppression of the privilege cannot be made a substitute for the duty to maintain order in connection with the exercise of the right." *Hague* v. *Committee for Indus. Org.*, 307 U.S. 496, 516 (1937) (plurality opinion).

For an example of prior restraint principles applied in the Second Amendment context, the Court need only look to *Heller*. As noted *supra*, Heller challenged application of the District of Columbia's requirement that handguns be carried inside the home only pursuant to a license that the police had "complete discretion to deny." *Parker*, 478 F.3d at 400. The Supreme Court held that the city must issue the permit "[a]ssuming that Heller is not disqualified from the exercise of Second Amendment rights." *Heller*, 554 U.S. at 635.

This is not to say that regulatory standards must predict every precise disqualifying fact pattern. But there must be some definite

standards. And the government, not the individual, must sustain a

burden of proof appropriate for deprivation of fundamental rights.

> [A] constitutional prohibition cannot be transgressed indirectly by
> the creation of a statutory presumption any more than it can be
> violated by direct enactment. The power to create presumptions is
> not a means of escape from constitutional restrictions.

*Speiser* v. *Randall*, 357 U.S. 513, 526 (1958) (citation omitted). Thus,

the Connecticut's "suitable person" requirement Defendants cite "is

expected to apply to matters similar to [ten] specifically enumerated

terms," *Kuck* v. *Danaher*, 822 F. Supp. 2d 109, 129 (D. Conn. 2011)

(citation omitted), and "denial or revocation decisions are subject to de

novo review" to assess whether "there was 'just and proper cause' for

the denial or revocation." *Id.* (quoting Conn. Gen. Stat. § 29-32b(b)).

Connecticut courts determine unsuitability by reference to an

applicant's demonstrated conduct. *Kuck*, at 128-29 (citing cases).

Plaintiffs do not challenge Defendants' discretion to deny handgun

carry licenses where an investigation reveals applicants have

"exhibited a propensity for violence or instability." Md. Public Safety

Code § 5-306(a)(5)(i).

Acknowledging "that courts have often looked to First Amendment law for guidance in navigating uncharted Second Amendment waters," as "the First Amendment undoubtedly provides a useful framework for analysis of laws burdening Second Amendment rights," JA 150-51, the District Court nonetheless hesitated to apply an analytical framework to one right that it believed was designed specifically for another.

But the Supreme Court has never limited "freedoms which the Constitution guarantees," *Staub*, 355 U.S. at 322, to First Amendment rights. *See Kent* v. *Dulles*, 357 U.S. 116, 128-29 (1958) (Fifth Amendment right of international travel: Secretary of State lacks "unbridled discretion to grant or withhold a passport"). And courts have held that officials cannot arbitrarily deny handgun carry licenses, using language that at least suggests prior restraint. "The exercise of a right guaranteed by the Constitution cannot be made subject to the will of the sheriff." *People* v. *Zerillo*, 219 Mich. 635, 639, 189 N.W. 927, 928 (1922). "The [provision] making it a crime for an unnaturalized, foreign-born resident to possess a revolver, unless so permitted by the sheriff, contravenes the guaranty of such right in the Constitution of the State and is void." *Id*. at 642, 189 N.W.2d at 928.

*Schubert*, *supra*, rejected a licensing official's claim that a statutory "proper reason" requirement allowed him to reject handgun carry license applications for an applicant's insufficient self-defense interest. The official lacked "the power and duty to subjectively evaluate an assignment of 'self-defense' as a reason for desiring a license and the ability to grant or deny the license upon the basis of whether the applicant 'needed' to defend himself." *Schubert*, 398 N.E.2d at 1341.

> Such an approach contravenes the essential nature of the constitutional guarantee. It would supplant a right with a mere administrative privilege which might be withheld simply on the basis that such matters as the use of firearms are better left to the organized military and police forces even where defense of the individual citizen is involved.

*Id.* (footnote omitted); *see also Kellogg* v. *City of Gary*, 562 N.E.2d 685, 694 (Ind. 1990); *City of Princeton*, 180 W. Va. at 462, 377 S.E.2d at 144.

Albeit in dicta, Rhode Island's Supreme Court was in accord:

> [T]his Court will not countenance any system of permitting under the Firearms Act that would be committed to the unfettered discretion of an executive agency. . . One does not need to be an expert in American history to understand the fault inherent in a gun-permitting system that would allow a licensing body carte blanche authority to decide who is worthy of carrying a concealed weapon. The constitutional right to bear arms would be illusory, of course, if it could be abrogated entirely on the basis of an unreviewable unrestricted licensing scheme.

*Mosby* v. *Devine*, 851 A.2d 1031, 1050 (R.I. 2004).

In any event, the District Court's ultimate holding captures the essence of prior restraint: "[a] citizen may not be required to offer a 'good and substantial reason' why he should be permitted to exercise his rights. The right's existence is all the reason he needs." JA 156.

Maryland's "good and substantial reason" requirement vests Defendants with "virtually unbridled and absolute power" to deny permits. *Green* v. *City of Raleigh*, 523 F.3d 293, 306 (4th Cir. 2008) (citation omitted). Rather than engage in the less-precise exercise of means-ends review, balancing legislative and individual interests, the narrower, more direct and modest approach is to simply advise Maryland that when it regulates in this area, it must do so objectively, avoiding vague and inchoate concepts like "good and substantial reason," and remembering that it is a right which is being regulated.

IV. MARYLAND'S "GOOD AND SUBSTANTIAL REASON" REQUIREMENT FAILS ANY LEVEL OF MEANS-ENDS SCRUTINY.

Should the Court conduct a means-ends review—under either the Second Amendment or the Equal Protection Clause[14]—it should apply

---

[14]Means-ends scrutiny proceeds identically whether the focus is on the arms right's violation directly, or Defendants' arbitrary

strict scrutiny. However, the selection of a scrutiny standard is largely unimportant, as the GSR requirement plainly fails to advance any valid government interest, and in any event, could not be viewed as anything other than a rationing system.

A. Laws Broadly Restricting the Right of Law-Abiding, Responsible Individuals to Bear Arms Are Subject to Strict Scrutiny.

"[A]s has been the experience under the First Amendment, we might expect that courts will employ different types of scrutiny in assessing burdens on Second Amendment rights, depending on the character of the Second Amendment question presented." *Masciandaro,* 638 F.3d at 470; *United States* v. *Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (no "level of scrutiny applicable to every disarmament challenge . . .").

"[A] severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end," as opposed to "laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than

classification of individuals with respect to their exercise of fundamental rights.

restrict, and modest burdens on the right [that] may be more easily justified." *Ezell*, 651 F.3d at 708; *Marzzarella*, 614 F.3d at 96-97.

"[W]e assume that any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny." *Masciandaro*, 638 F.3d at 470. Where Second Amendment claimants are not law-abiding and/or irresponsible, intermediate scrutiny applies. *Chester*, 628 F.3d at 683; *Carter*, supra, 669 F.3d 411.

*Masciandaro* also held that intermediate scrutiny would govern Second Amendment claims arising outside the home. 638 F.3d at 471. But *Masciandaro* reached its conclusion after focusing in part on time, place and manner restrictions, which are usually thought to trigger intermediate review. *Id.* The GSR requirement does not relate to any time, place, or manner, but broadly, directly restricts the right.

Moreover, *Masciandaro* pointedly declined to examine whether the right to carry guns in public for self-defense is within the Second Amendment's protection. The opinion's internal logic thus cannot exclude a right to carry, if it exists, from the "core" to which strict scrutiny presumptively applies, a result that would be in tension with

this Court's pronouncement that "the core right identified in *Heller* [is] the right of a law-abiding, responsible citizen to possess and *carry* a weapon for self-defense." *Chester*, 628 F.3d at 683 (emphasis added).

"[C]lassifications affecting fundamental rights are given the most exacting scrutiny." *Clark* v. *Jeter*, 486 U.S. 456, 461 (1988) (citation omitted). Absent any reason for reducing the level of scrutiny, strict scrutiny should apply to protection of this fundamental right.[15]

B.    Barring Law-Abiding, Responsible Americans from
      Bearing Arms Serves No Government Interest.

Regardless of the standard utilized, a "good and substantial reason" prerequisite to the exercise of fundamental rights fails for the simple reason that no legitimate government interest is at stake. To be sure, Defendants have a compelling government interest in public safety. And many people sincerely believe that the carrying of handguns, even by responsible, law-abiding individuals, is a social evil. Yet individuals

---

[15]Defendants' "reasonable regulation" test is not recognized, having been unsuccessfully proposed in numerous cases, including *Skoien* (by Brady) and *Ezell* (by the City of Chicago), and most recently rejected as rational basis redux. *Heller* v. *District of Columbia*, 670 F.3d 1244, 1256 (D.C. Cir. 2011). Defendants' assessment of how state courts evaluate arms rights provisions is debatable. *See, e.g.* David Kopel & Clayton Cramer, *State Court Standards of Review for the Right to Keep and Bear Arms*, 50 SANTA CLARA L. REV. 1 (2010).

enjoy a *right* to carry handguns "for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Heller*, 554 U.S. at 584 (citations omitted). The state cannot have an interest in suppressing a fundamental right—even if some people deeply oppose the right's existence. As the District Court found,

> A law that burdens the exercise of an enumerated constitutional right by simply making that right more difficult to exercise cannot be considered "reasonably adapted" to a government interest, no matter how substantial that interest may be . . . Those who drafted and ratified the Second Amendment surely knew that the right they were enshrining carried a risk of misuse, and states have considerable latitude to channel the exercise of the right in ways that will minimize that risk. States may not, however, seek to reduce the danger by means of widespread curtailment of the right itself.

JA 156.

Again, attacking the alleged inherent dangerousness of the right to bear arms is nothing other than an attack on recognizing its status as a right. Such arguments—steeped in scientific controversy—lie well-beyond this Court's adjudicative capacity. *Amici* APHA invoke Abhay Aneja et al., *The Impact of Right-to-Carry Laws and the NRC Report: Lessons for the Empirical Evaluation of Law and Policy*, 13 AM. L. & ECON. REV. 565 (2011)—which other scientists vigorously contest. *See*

Moody, Carlisle E. et al., *Trust But Verify: Lessons for the Empirical Evaluation of Law and Policy* (Jan. 25, 2012), available at http://ssrn.com/abstract=2026957 (last visited July 26, 2012). APHA cite Ian Ayers & John J. Donohue, *Shooting Down the More Guns, Less Crime Hypothesis*, 55 STAN. L. REV. 1193 (2003). Alas, the same volume contains Florenz Plassman & John Whitley, *Confirming "More Guns, Less Crime,"* 55 STAN. L. REV. 1313 (2003).

"[T]here seems little legitimate scholarly reason to doubt that defensive gun use is very common in the U.S., and that it probably is substantially more common than criminal gun use." Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 180 (1995). Plaintiffs' *amici* will fully present the criminological evidence confirming the People's wisdom in ratifying the Second Amendment. But one data set in particular rebuts assertions that shall-issue handgun carry licensing is dangerous: the voluminous evidence as to how such licensees behave.

Michigan issued 87,637 permits for the year ending June 30, 2011. In that time frame, it revoked only 466 permits. *Concealed Pistol*

*Licensure, Annual Report*, http://www.michigan.gov/documents/msp/
2011_CPL_Report_ 376632_7.pdf (last visited July 27, 2012). North
Carolina has revoked only 1,203 permits out of 228,072, half of one
percent, in over 15 years. *N.C. Concealed Handgun Permit Statistics by
County*, http://www.ncdoj.gov/CHPStats.aspx (last visited July 27,
2012). In 2011, Tennessee issued 94,975 handgun carry permits, and
revoked just 97. *Tenn. Handgun Carry Permit Statistics*,
http://www.tn.gov/safety/stats/DL_Handgun/Handgun/HandgunReport
2011Full.pdf (last visited July 27, 2012).

Texas compiles detailed information tracking the proclivity of
handgun carry license permit holders to commit crimes. In 2011, of
63,679 serious criminal convictions in Texas, only 120—0.1884%—
could be attributed to individuals licensed to carry handguns, though
not all such crimes necessarily utilized guns, or used them in public
settings. *Conviction Rates for Concealed Handgun License Holders*,
http://www.txdps.state.tx.us/RSD/CHL/Reports/ConvictionRatesReport
2011.pdf (last visited July 27, 2012).

Perhaps the most comprehensive data comes from Florida, which
reports having issued 2,227,360 handgun carry licenses since 1987.

Concealed Weapon or Firearm License Report, http://licgweb.doacs. state.fl.us/stats/cw_monthly.pdf (last visited July 27, 2012). To date, Florida has only revoked 168 licenses—.00754%— for crimes utilizing firearms. *Id.*

C.  The GSR Requirement Does Not Properly Serve Any
     Regulatory Interest.

Maryland's arbitrary licensing practices are not rationally tailored to any public safety interest under any standard. The GSR requirement

> does not, for example, advance the interests of public safety by ensuring that guns are kept out of the hands of those adjudged most likely to misuse them, such as criminals or the mentally ill. It does not ban handguns from places where the possibility of mayhem is most acute . . . It does not attempt to reduce accidents, as would a requirement that all permit applicants complete a safety course. It does not even, as some other States' laws do, limit the carrying of handguns to persons deemed "suitable" by denying a permit to anyone "whose conduct indicates that he or she is potentially a danger to the public if entrusted with a handgun."

JA 154.[16]

This decision is consistent with those of other courts. Striking down North Carolina's prohibitions on carrying handguns during "states of emergency," *Bateman* found the laws

---

[16]See Md. Public Safety Code § 5-306(a)(5)(i).

do not target dangerous individuals or dangerous conduct. Nor do they seek to impose reasonable time, place and manner restrictions by, for example, imposing a curfew to allow the exercise of Second Amendment rights during circumscribed times. Rather, the statutes here excessively intrude upon plaintiffs' Second Amendment rights by effectively banning them (and the public at large) from engaging in conduct that is at the very core of the Second Amendment at a time when the need for self-defense may be at its very greatest . . . .

*Bateman*, 2012 U.S. Dist. LEXIS 47336 at *17-*18 (citation omitted).

Likewise, Massachusetts' statute disarming legal aliens failed intermediate scrutiny, as it

fail[ed] to distinguish between dangerous non-citizens and those non-citizens who would pose no particular threat if allowed to possess handguns . . . Any classification based on the assumption that lawful permanent residents are categorically dangerous and that all American citizens by contrast are trustworthy lacks even a reasonable basis.

*Fletcher* v. *Haas*, No. 11-10644-DPW, 2012 U.S. Dist. LEXIS 44623, at *46-*47 (D. Mass. Mar. 30, 2012).

Oddly, Defendants accept that most people who would carry arms would be law-abiding—and claim this to be a harm, as it would deny police a pretext to arrest criminals invariably comprising the majority of gun carriers under the GSR regime. Appellants' Br. 49. The argument evinces low regard not only for the Second Amendment, but the Fourth as well, which condemns pretextual searches and seizures.

Americans exercising the right to bear arms are not all incipient criminals. As *Garvin* recognized, law-abiding Americans carry guns every day, and they do not thereby surrender their Fourth Amendment rights.

Defendants further claim the GSR requirement is narrowly tailored because it does not impact the carrying of long guns. They aptly note that *Heller* rejected an argument that long gun availability ameliorates the constitutional violation inherent in banning handguns, Appellants' Br. 42, and indeed, the D.C. Circuit termed the long-arm substitution claim "frivolous. It could be similarly contended that all firearms may be banned so long as sabers were permitted." *Parker*, 478 F.3d at 400; .

Yet Defendants suggest that although handguns are "the quintessential self-defense weapon[s] . . . the analysis changes once the right, and the arms, move outside the home." Appellants' Br. 42-43 (citation omitted). In public, the availability of long arms allegedly suffices. *Id.*

The argument is more frivolous here than it was in *Heller*. Long arms have common defensive application in the home. But it cannot seriously be suggested that Americans going about their daily lives on

the streets of Annapolis lug shotguns for self-defense against prospective muggers and rapists. As Justice Holmes acknowledged in upholding a ban on aliens' possession of shotguns and rifles, "pistols . . . may be supposed to be needed occasionally for self-defence." *Patsone* v. *Pennsylvania*, 232 U.S. 138, 143 (1914). Depriving nearly everyone of the only type of firearm practical for defensive carry is neither narrowly tailored to, nor does it reasonably fit, any governmental interest.

And just as GSR fails to address the alleged dangerousness of particular applicants, Defendants are plainly incapable of predicting who might be victimized and thus have more practical use for firearms. Crime is largely random and unpredictable. The GSR requirement is inherently arbitrary, in classifying applicants, and in classifying their likelihood of suffering criminal violence.

## CONCLUSION

The notion that constitutional rights can only be enjoyed upon proof of a "good and substantial reason" cannot be sustained. The judgment below should be affirmed.

STATEMENT REQUESTING ORAL ARGUMENT

Plaintiffs respectfully request oral argument, which they believe

could aid the Court's determination of this important matter.

Dated: July 30, 2012                    Respectfully submitted,

                                   By: /s/ Alan Gura_____

Cary Hansel                             Alan Gura
Joseph, Greenwald & Laake               Gura & Possessky, PLLC
6404 Ivy Lane, Suite 400                101 N. Columbus St., Suite 405
Greenbelt, MD 20770                     Alexandria, VA 22314
301.220.2200/301.220.1214               703.835.9085/703.997.7665

                                        Attorneys for Appellees

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 12-1437    **Caption:** Raymond Woollard, et al. v. Denis Gallagher, et al.

### CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

☑ this brief contains _____14,000_____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐ this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☑ this brief has been prepared in a proportionally spaced typeface using
WordPerfect X4 _____ [*identify word processing program*] in
Century Schoolbook 14 Point _____ [*identify font size and type style*]; **or**

☐ this brief has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) /s/ Alan Gura _____

Attorney for Appellees _____

Dated: July 30, 2012 _____

ADDENDUM

**U.S. Const. amend. II**:

A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

**Md. Criminal Law Code § 4-203.**
Wearing, carrying, or transporting handgun

(a) Prohibited. --

(1) Except as provided in subsection (b) of this section, a person may not:

(i) wear, carry, or transport a handgun, whether concealed or open, on or about the person;

(ii) wear, carry, or knowingly transport a handgun, whether concealed or open, in a vehicle traveling on a road or parking lot generally used by the public, highway, waterway, or airway of the State;

(iii) violate item (i) or (ii) of this paragraph while on public school property in the State; or

(iv) violate item (i) or (ii) of this paragraph with the deliberate purpose of injuring or killing another person.

(2) There is a rebuttable presumption that a person who transports a handgun under paragraph (1)(ii) of this subsection transports the handgun knowingly.

(b) Exceptions. -- This section does not prohibit:

(1) the wearing, carrying, or transporting of a handgun by a person who is on active assignment engaged in law enforcement, is authorized at the time and under the circumstances to wear, carry, or transport the handgun as part of the person's official equipment, and is:

(i) a law enforcement official of the United States, the State, or a county or city of the State;

(ii) a member of the armed forces of the United States or of the National Guard on duty or traveling to or from duty;

(iii) a law enforcement official of another state or subdivision of another state temporarily in this State on official business;

(iv) a correctional officer or warden of a correctional facility in the State;

(v) a sheriff or full-time assistant or deputy sheriff of the State; or

(vi) a temporary or part-time sheriff's deputy;

(2) the wearing, carrying, or transporting of a handgun by a person to whom a permit to wear, carry, or transport the handgun has been issued under Title 5, Subtitle 3 of the Public Safety Article;

(3) the carrying of a handgun on the person or in a vehicle while the person is transporting the handgun to or from the place of legal purchase or sale, or to or from a bona fide repair shop, or between bona fide residences of the person, or between the bona fide residence and place of business of the person, if the business is operated and owned substantially by the person if each handgun is unloaded and carried in an enclosed case or an enclosed holster;

(4) the wearing, carrying, or transporting by a person of a handgun used in connection with an organized military activity, a target shoot, formal or informal target practice, sport shooting event, hunting, a Department of Natural Resources-sponsored firearms and hunter safety class, trapping, or a dog obedience training class or show, while

the person is engaged in, on the way to, or returning from that activity if each handgun is unloaded and carried in an enclosed case or an enclosed holster;

(5) the moving by a bona fide gun collector of part or all of the collector's gun collection from place to place for public or private exhibition if each handgun is unloaded and carried in an enclosed case or an enclosed holster;

(6) the wearing, carrying, or transporting of a handgun by a person on real estate that the person owns or leases or where the person resides or within the confines of a business establishment that the person owns or leases;

(7) the wearing, carrying, or transporting of a handgun by a supervisory employee:

(i) in the course of employment;

(ii) within the confines of the business establishment in which the supervisory employee is employed; and

(iii) when so authorized by the owner or manager of the business establishment;

(8) the carrying or transporting of a signal pistol or other visual distress signal approved by the United States Coast Guard in a vessel on the waterways of the State or, if the signal pistol or other visual distress signal is unloaded and carried in an enclosed case, in a vehicle; or

(9) the wearing, carrying, or transporting of a handgun by a person who is carrying a court order requiring the surrender of the handgun, if:

(i) the handgun is unloaded;

(ii) the person has notified the law enforcement unit, barracks, or station that the handgun is being transported in accordance with the court order; and

(iii) the person transports the handgun directly to the law enforcement unit, barracks, or station.

(c) Penalty. --

(1) A person who violates this section is guilty of a misdemeanor and on conviction is subject to the penalties provided in this subsection.

(2) If the person has not previously been convicted under this section, § 4-204 of this subtitle, or § 4-101 or § 4-102 of this title:

(i) except as provided in item (ii) of this paragraph, the person is subject to imprisonment for not less than 30 days and not exceeding 3 years or a fine of not less than $ 250 and not exceeding $ 2,500 or both; or

(ii) if the person violates subsection (a)(1)(iii) of this section, the person shall be sentenced to imprisonment for not less than 90 days.

(3) (i) If the person has previously been convicted once under this section, § 4-204 of this subtitle, or § 4-101 or § 4-102 of this title:

1. except as provided in item 2 of this subparagraph, the person is subject to imprisonment for not less than 1 year and not exceeding 10 years; or

2. if the person violates subsection (a)(1)(iii) of this section, the person is subject to imprisonment for not less than 3 years and not exceeding 10 years.

(ii) The court may not impose less than the applicable minimum sentence provided under subparagraph (i) of this paragraph.

(4) (i) If the person has previously been convicted more than once under this section, § 4-204 of this subtitle, or § 4-101 or § 4-102 of this title, or of any combination of these crimes:

1. except as provided in item 2 of this subparagraph, the person is subject to imprisonment for not less than 3 years and not exceeding 10 years; or

2. A. if the person violates subsection (a)(1)(iii) of this section, the person is subject to imprisonment for not less than 5 years and not exceeding 10 years; or

B. if the person violates subsection (a)(1)(iv) of this section, the person is subject to imprisonment for not less than 5 years and not exceeding 10 years.

(ii) The court may not impose less than the applicable minimum sentence provided under subparagraph (i) of this paragraph

## Md. Public Safety Code § 5-303.
Permit required

A person shall have a permit issued under this subtitle before the person carries, wears, or transports a handgun.

## Md. Public Safety Code § 5-306.
Qualifications for permit

(a) In general. -- Subject to subsection (b) of this section, the Secretary shall issue a permit within a reasonable time to a person who the Secretary finds:

(1) is an adult;

(2) (i) has not been convicted of a felony or of a misdemeanor for which a sentence of imprisonment for more than 1 year has been imposed; or

(ii) if convicted of a crime described in item (i) of this item, has been pardoned or has been granted relief under 18 U.S.C. § 925(c);

(3) has not been convicted of a crime involving the possession, use, or distribution of a controlled dangerous substance;

(4) is not presently an alcoholic, addict, or habitual user of a controlled dangerous substance unless the habitual use of the controlled dangerous substance is under legitimate medical direction; and

(5) based on an investigation:

(i) has not exhibited a propensity for violence or instability that may reasonably render the person's possession of a handgun a danger to the person or to another; and

(ii) has good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger.

(b) Applicant under age of 30 years. -- An applicant under the age of 30 years is qualified only if the Secretary finds that the applicant has not been:

(1) committed to a detention, training, or correctional institution for juveniles for longer than 1 year after an adjudication of delinquency by a juvenile court; or

(2) adjudicated delinquent by a juvenile court for:

(i) an act that would be a crime of violence if committed by an adult;

(ii) an act that would be a felony in this State if committed by an adult; or

(iii) an act that would be a misdemeanor in this State that carries a statutory penalty of more than 2 years if committed by an adult.

**Md. Public Safety Code § 5-307**.
Scope of permit


   (a) In general. -- A permit is valid for each handgun legally in the possession of the person to whom the permit is issued.

(b) Limitations. -- The Secretary may limit the geographic area, circumstances, or times of the day, week, month, or year in which a permit is effective.


**Md. Public Safety Code § 5-308.**
Possession of permit required


   A person to whom a permit is issued or renewed shall carry the permit in the person's possession whenever the person carries, wears, or transports a handgun.


**1894 Laws of Maryland, Ch. 547**

Every person not being a conservator of the peace entitled or required to carry such weapon as a part of his official equipment, and not carrying such weapon as a reasonable precaution against apprehended danger, who shall wear or carry any pistol, dirk knife, bowie knife, slung shot, billy, sand club, metal knuckles, razor or any other dangerous or deadly weapon of any kind whatsoever (penknives excepted,) concealed upon or about his person, and every person who shall carry: or wear any such weapon openly, with the intent or purpose of injuring any person in any unlawful manner, and not for any proper purpose of self-protection, shall, upon conviction thereof, be fined not more than one thousand dollars, or be imprisoned not more than two years in jail or in the house of correction ; and the court or jury before whom any such case may be tried shall in all cases have the right to judge of the reasonableness of the carrying of any such weapon, and of the proper occasion therefor, upon satisfactory proof ; and in case, upon

conviction of any offender, the court, in view of the evidence, shall be of the opinion that such weapon was carried with the deliberate purpose of inflicting grievous and unlawful injury to the life or person of another, it shall in that case be the duty of the court to impose the highest sentence of imprisonment hereinbefore prescribed.

# CERTIFICATE OF SERVICE

I certify that on ___July 30, 2012___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Alan Gura
_____
Signature

July 30, 2012
_____
Date