No. 12-1437

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**RAYMOND WOOLLARD**, *et al.*,

*Plaintiffs-Appellees*,

v.

**DENIS GALLAGHER**, *et al.*,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Maryland
(Benson E. Legg, District Judge)

**OPPOSITION TO MOTION FOR STAY PENDING APPEAL**

Cary Hansel
Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
301.220.2200/301.220.1214

July 31, 2012

Alan Gura
Gura & Possessky, PLLC
101 N. Columbus St., Suite 405
Alexandria, VA 22314
703.835.9085/703.997.7665

Attorneys for Appellees

# TABLE OF CONTENTS

**INTRODUCTION** ...................................................................................... 1

**THE PLAINTIFFS JOIN IN THE DEFENSE** .......................................... 5

**MOTION FOR EXTENSION OF PAGE LIMITS** ................................... 5

**PROCEDURAL BACKGROUND** ............................................................ 6

**STATEMENT OF FACTS** ....................................................................... 6

**ANALYSIS** ................................................................................................ 7

  I. Defendants Cannot Meet the Heavy Burden to qualify for a Stay ........ 7

  II. Defendants Cannot Establish A Strong ................................................ 7

  Likelihood of Success on the Merits .......................................................... 7

    A. The Issue is Whether the Government May Exercise Prior Restraint of a Fundamental Right Absent Showing of a "Good and Substantial" Reason to Exercise that Right. .................................................................. 8

    B. The Defense is Saddled with a High Burden. ................................. 8

    C. The Defense Cannot Meet its Burden to Show a High Likelihood of Success on the Merits. ...................................................................... 10

    D. Defendants Cannot Establish A Showing Of Irreparable Injury If The Stay Were Denied. ......................................................................... 28

    E. Consideration of Any Potential Injury to Other Parties Does Not Favor Granting A Stay. ............................................................................ 31

    F. The Public Interest Does Not Weigh In Favor of a Stay ................. 32

**CONCLUSION** ....................................................................................... 35

# TABLE OF AUTHORITIES

## Cases

*Andrews v. State*, 50 Tenn. 165 (1871) ................................................................16, 17

*Bateman* v. *Perdue*, No. 5:10-CV-265-H, 2012 U.S. Dist. LEXIS 47336 (E.D.N.C.

Mar. 29, 2012): ................................................................................................29

*Cayuga Indian Nation v. Vill. of Union Springs*, 317 F. Supp. 2d 152 (N.D.N.Y. 2004)

.........................................................................................................................4, 10

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..............................................passim

*Doe v. Charleston Area Medical Ctr.*, 529 F.2d 638 (4th Cir. 1977) ...........................34

*Elrond v. Burns*, 427 U.S. 347 (1976) ........................................................................33

*English v. State*, 35 Tex. 455 (1876) .....................................................................15, 16

*Ezell v. Chicago*, 651 F.3d 684 (7th Cir. 2011). .....................................................34, 37

*Fife* v. *State*, 31 Ark. 455 (1876) ...............................................................................16

*Giovani Carandola, Ltd. v. Bason*, 147 F. Supp. 2d 383 (M.D.N.C. 2001) .................32

*Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507 (4th Cir. 2002) ..........................32, 34

*Hague* v. *Committee for Indus. Org.*, 307 U.S. 496 (1937) .........................................28

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) .........................................................9, 11

*Kunz* v. *New York*, 340 U.S. 290 (1951) .......................................................................28

*Legend Night Club v. Miller*, 637 F.3d 291 (4th Cir. 2011) .........................................33

*Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970). ...............................................9, 11

*McDonald v. Chicago*, 130 S. Ct. 3020 (2010). ...........................................20, 22, 28, 29

*National Socialist Party of America v. Skokie*, 432 U.S. 43 (1977)..............................22

*Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249 (4th Cir. 2003) .............32, 34, 35

*Nunn* v. *State*, 1 Ga. 243 (1846)..................................................................................17

*People* v. *Yanna*, No. 304293, 2012 Mich. App. LEXIS 1269 (Mich. App. June 26, 2012) ........................................................................................................................30

*Rex* v. *Knight*, 90 Eng. Rep. 330 (K.B. 1686) ...............................................................15

*Ross v. Meese*, 818 F.2d 1132 (4th Cir. 1997)...............................................................34

*Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969)..........................................28

*St. Agnes Hosp., Inc. v. Riddick*, 751 F. Supp. 75 (D. Md. 1990) ................................12

*State* v. *Chandler*, 5 La. Ann. 489 (1850)......................................................................17

*State v. Reid*, 1 Ala. 612 (1840) ....................................................................................17

*United States* v. *Carter*, 669 F.3d 411 (4th Cir. 2012) .................................................19

*United States* v. *Chester*, 628 F.3d 673 (4th Cir. 2010).........................................20, 21

*United States* v. *Garvin*, Cr. No. 11-480-01, 2012 U.S. Dist. LEXIS 76540 (E.D. Pa. May 31, 2012)..............................................................................................................30

*United States* v. *Mahin*, 668 F.3d 119 (4th Cir. 2012)..................................................19

*United States v. Marzzarella*, 614 F.3d 85 (3rd Cir. 2010) ..........................................20

*United States* v. *Masciandaro*, 638 F.3d 458 (4th Cir. 2011)..................................19, 21

*United States* v. *Moore*, 666 F.3d 313 (4th Cir. 2012) .................................................19

*United States* v. *Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc) ................................19

*United States v. Staten*, 666 F.3d 154 (4th Cir. 2011) ...................................21

*United States* v. *Weaver*, No. 2:09-CR-00222, 2012 U.S. Dist. LEXIS 29613 (S.D.W.

    Va. Mar. 7, 2012).............................................................................29

*Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921 (1958)................................11

*Washington Metropolitan Area Transit Com. v. Holiday Tours, Inc.*, 559 F.2d 841

    (D.C. Cir. 1977) .............................................................................11

*Williford v. Armstrong World Industries, Inc.*, 715 F.2d 124 (4th Cir. 1983)...........4, 10

*Wilson* v. *State*, 33 Ark. 557 (1878).............................................................16

## Statutes

Md. Code Ann., Crim. Law § 4-203 ...............................................................8

Md. Pub. Safety § 5-307(b).........................................................................37

## Other Authorities

1328 English Statute of Northampton.............................................................14

1689 English Bill of Rights.......................................................................14

4 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 148

    (1769)......................................................................................15

David Caplan, *The Right of the Individual to Bear Arms: A Recent Judicial Trend*, 4

    DET. C. L. REV. 789, 795 (1982)....................................................15

Joyce Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-

    AMERICAN RIGHT 104-05 (1994)..................................................15

## Rules

Fed. R. Civ. Proc. 62(c) .................................................................................9

## Treatises

William Hawkins, 1 TREATISE OF THE PLEAS OF THE CROWN, ch. 63, § 9

    (1716).................................................................................................15

## Constitutional Provisions

Second Amendment .................................................................................passim

First Amendment.............................................................................................6

# INTRODUCTION

A single provision of Maryland's licensing scheme for the bearing of arms has been found unconstitutional by the United States District Court for the District of Maryland. This ruling is in keeping with recent rulings of the United States Supreme Court and this Honorable Court, and is consistent with the findings of a growing number of federal courts recognizing the Second Amendment's application under these circumstances. More importantly, the District Court's ruling is mandated by the Second Amendment of the United States Constitution.

The ruling strikes a requirement that Marylanders demonstrate that they have a "good and substantial reason" prior to the exercise of their constitutional right to bear arms. All other licensing requirements remain in force, including, but not limited to, a full background investigation conducted by the Maryland State Police, an interview by State Police, a criminal background check, surrendering one's fingerprints, revealing any relevant information about the applicant's mental health, and filling a lengthy application under oath.

In striking only a narrow portion of the statute, the ruling brings Maryland more in line with the vast majority of other states in the union and the four other states in this Circuit. However, even after the ruling, Maryland has one of the most restrictive licensing regimes in the country.

Despite the very narrow nature of the ruling, Maryland has applied for a stay pending appeal. The stay should be denied for the same reasons a similar request was denied by the District Court.

The merits of the State's request must be viewed in the context of the heavy burden the State must bear. The State must prove four factors, including a strong likelihood of success on the merits, by a clear and convincing showing. This is, indeed, a "heavy burden." *Cayuga Indian Nation v. Vill. of Union Springs*, 317 F. Supp. 2d 152, 155 (N.D.N.Y. 2004). The applicant for "stay must make out a clear case of hardship or inequity." *Williford v. Armstrong World Industries, Inc.*, 715 F.2d 124, 127 (4th Cir. 1983) (citations omitted).

The Plaintiffs bear no burden here at all. If the matter is a close call, in equipoise, or even if the scales seemed tipped slightly toward the defense, the motion should be denied. A stay is appropriate only if the defense carries its heavy burden to make a clear and convincing showing on all four elements, including a "strong" likelihood of success on the merits.

As the District Court realized, it is the Plaintiffs and not the Defendants who enjoy the advantage of a high likelihood of success. The other three factors, although somewhat ancillary in this case, also weigh heavily in favor of the Plaintiffs. As such, the stay should be denied.

First, there is no harm to the Defendants in granting a stay – let alone the irreparable harm the defense bears the burden of proving. Defendants already enjoy

very broad legislative authority – not challenged by Plaintiffs – to restrict handgun carry permits as to time, place and manner.  Nothing in the ruling below restrains the legislature from enacting new laws if it wishes.  The State's failure to exercise the authority it already possesses, or enact new laws, does not excuse the ongoing deprivation of fundamental constitutional rights.

The ruling is simple to implement.  The entire licensing regime is in place and can remain completely unchanged, with the sole exception that no one should be denied for lack of a "good and substantial reason" to exercise their constitutional rights.  There is no real cost to the State, and no significant administrative burden in making the change; nor would either be sufficient grounds to continue to violate the Constitution.

Any permits issued under the ruling would be easy to recall in the unlikely event that this Honorable Court should rule against application of the Second Amendment.  Maryland law already requires that any permits be surrendered immediately upon the demand of the authorities.  Were Maryland ultimately permitted to decide who has a "good and substantial" reason to exercise Second Amendment rights, then authorities could easily use existing law, together with the extensive biographical information provided by each applicant, to demand return of any permits issued under the ruling.

Arguments based on the supposed general social ills Maryland claims to be associated with firearms have been rejected by the United States Supreme Court.  Moreover, the more persuasive research stands staunchly in favor of the right to keep

and bear arms.  However, the Court need not examine the thousands of pages of social science on the issue.

Simply put, this case is not a constitutional convention.  Our roles are not to debate the wisdom of the Second Amendment.  The policy decisions embodied therein were made at the time of its enactment.   The Court should pay no more heed to hysterical claims of gun violence than countenance arguments about the supposed ill effect of permitting speech protected by the First Amendment.

The Second Amendment is part of the fabric of our constitution and our society.  Whether Maryland might prefer to write it out of the constitution based on faulty pseudo-social science is completely irrelevant.

In stark contrast to the State's inability to demonstrate irreparable harm absent a stay, the Plaintiffs will continue to be denied their right to bear arms if a stay is granted.  The Supreme Court has correctly held that the denial of a constitutional right is, in and of itself and without more, an irreparable injury.  Worse still, individuals would be denied the fundamental right to self defense by a stay – a right which implicates a citizen's personal safety – a matter far more urgent than the theoretical ills cited by the State.

The sole question in the case is whether a citizen should bear the burden of demonstrating a "good and substantial reason" to the government before the citizen is permitted to exercise a fundamental right.  The answer is no.  A "right" which the government claims the discretion to deny at its whim is no right at all, but a mere

privilege.  *See, e.g., District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) ("A constitutional guarantee subject to future…assessments of its usefulness is no constitutional guarantee at all").  Instead, our Constitution secures "the <u>*right*</u> to keep and bear arms." U.S. Const. Amend. II (emphasis added).  Simply put, the Plaintiffs are highly likely to prevail on the merits.

Chief among the reasons to deny Maryland's request for a stay is the simple fact that the provision at issue violates the Constitution of the United States of America. There is no greater legal duty than that owed by a democratic government to its citizens.  When the original social compact between all of us, as citizens, and our government is violated, swift judicial intervention is appropriate.  This ruling - ending government encroachment upon our constitutional rights - is not the proper subject of a stay.  No state is entitled to a reprieve to continue violating the rights of its citizens.

As the District Court so eloquently observed, "[a] citizen may not be required to offer a 'good and substantial reason' why he should be permitted to exercise his rights. The right's existence is all the reason he needs." J.A. 156.

For these and the reasons detailed below, the stay should be denied.

### <u>PLAINTIFFS JOIN DEFENSES' MOTION FOR EXTENSION OF PAGE LIMITS</u>

As a preliminary procedural matter, the Plaintiffs join in the Defendants' motion to extend the pages limits and seek a like extension as reflected herein.

## PROCEDURAL BACKGROUND

Plaintiffs Raymond Woollard and the Second Amendment Foundation ("Plaintiffs") adopt the procedural history found in their Brief on the merits.

## STATEMENT OF FACTS

Plaintiffs hereby adopt the recitation of facts contained in their Brief on the merits, adding only the following in specific response to matters raised in the State's motion:

In an attempt to make its prohibition seem more constitutionally palatable, the State suggests multiple times in its brief that an individual may "wear or carry" a handgun in connection with a limited list of activities and on property owned by the individual or where the individual operates a business. These restrictions do not permit the wear or carry of handguns to and from the stated activities or locations as handguns being transported in a motor vehicle, even for these purposes, must be stored in a separate case and unloaded. Md. Code Ann., Crim. Law § 4-203.

Although Maryland code permits no exceptions to the "good and substantial" requirement, in implementing this undefined standard, the State Police have deemed certain categories of persons to presumptively have a sufficient reason to bear arms. As the law is applied by the Maryland State Police, this limited subset of applicants need not demonstrate a "good and substantial" reason. Such exempt individuals include judges, current and former police officers, public defenders and prosecutors. J.A. 58.

<h1 style="text-align:center">ANALYSIS</h1>

## I. DEFENDANTS CANNOT MEET THE HEAVY BURDEN TO QUALIFY FOR A STAY.

Defendants cannot satisfy any of the four prerequisites of a stay, let alone a compelling combination of these factors.  Consideration of a motion for stay under Fed. R. Civ. Proc. 62(c) requires the Court to balance "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970).

The party seeking a stay must justify it by clear and convincing circumstances outweighing potential harm to the party against whom it is operative. "Defendants, as movants, have the heavy burden of establishing that the aforementioned factors weigh in favor of a stay." *Cayuga Indian Nation v. Vill. of Union Springs*, 317 F. Supp. 2d 152, 155 (N.D.N.Y. 2004).  The applicant for "stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to someone else." *Williford v. Armstrong World Industries, Inc.*, 715 F.2d 124, 127 (4th Cir. 1983) (citations omitted).

## II. DEFENDANTS CANNOT ESTABLISH A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS

A.    THE ISSUE IS WHETHER THE GOVERNMENT MAY EXERCISE
PRIOR RESTRAINT OF A FUNDAMENTAL RIGHT ABSENT
SHOWING OF A "GOOD AND SUBSTANTIAL" REASON TO
EXERCISE THAT RIGHT.

The defense opens its argument by seriously misstating the primary issue before

the Court.  The suggestion is made, at page 8 of the defense brief, that this Honorable

Court is asked to decide whether the Second Amendment secures the right to bear arms

for an individual who "cannot demonstrate a reasonable self-defense or other

justification."  Whether or not an individual can satisfy the government that he or she

has substantial justification to exercise a constitutional right falls well short of the

point.  The issue in this case is whether the government can make such a demand of

individuals seeking to exercise their rights in the first instance.

This fundamental distinction reveals the fallacy in the Defendants' approach to

the entire issue.  The defense starts from the premise that the Second Amendment does

not protect the right to bear arms generally in public (even allowing for reasonable

regulation of time, place and manner).  All of the defense argument thereafter flows

from this fundamental fallacy.

Mistaken as it is in its conclusion, the defense strategy is understandable in that

it is the only real avenue available.  Unless the defense meets its heavy burden of

establishing a high likelihood of success on the merits – which manifestly it cannot -

the requested stay should be denied.

B.    THE DEFENSE IS SADDLED WITH A HIGH BURDEN.

A stay applicant must make "a strong showing that he is likely to succeed on the merits." *Hilton*, 481 U.S. at 776; *Long*, 432 F.2d at 979 ("likely prevail"). "Without such a substantial indication of probable success, there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review." *Washington Metro. Area Transit Com. v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977) (quoting *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (1958)).

It is critical to recognize the full implications of this standard. As the movant, the State bears the full burden of persuasion here. Before a stay can be granted, the State must demonstrate a high likelihood that it will succeed.

In contrast, the Plaintiffs have no burden at all. The Plaintiffs need not make any showing, much less of a high likelihood of success. Hence, if the matter is a close or difficult choice (as the State suggests at times), then the relief sought by the State should be denied.

A related theme in the defense argument is that the contours of the Second Amendment are unsettled. Variations on this theme include arguments that *Heller* did not go as far as the district court in this case and that there is purportedly no decisive ruling from the Supreme Court on the point at issue here. Once again, such arguments fail to meet the high burden the defense must satisfy.

Whether or not the issue has yet been fully and precisely resolved by the Supreme Court has nothing to do with demonstrating, as the defense must, a high

likelihood of success on the merits. Courts have consistently rejected the notion "that every time a case presents difficult questions of law a stay should be entered." *St. Agnes Hosp., Inc. v. Riddick*, 751 F. Supp. 75, 76 (D. Md. 1990) (citations omitted).

C.     THE DEFENSE CANNOT MEET ITS BURDEN TO SHOW A HIGH LIKELIHOOD OF SUCCESS ON THE MERITS.

Properly framed, the present issue is whether the defense has established a high likelihood that it will succeed in defending the requirement that otherwise qualified and well-vetted individuals first show the state a "good and substantial reason" before bearing arms in public.

The import of the issue – indeed, the constitutional proportion of it – irresistibly tempts the parties to offer expansive and detailed briefing. As is often the case, the simple truth of the matter can be lost therein.

The Supreme Court has swept aside any serious argument that the regulation at issue here is constitutional. After *Heller*, there is no longer any debate about a collective versus individual right or about whether the right encompasses self defense or merely military service, nor does recent case law leave any room to dispute whether the Second Amendment applies to the States.

*Heller* recognized an individual right to self defense through ownership of an operable handgun. The right is one of self defense – not defense of home or property. Naturally, the right to defend one's personal safety and security travels with the

person.  It is absurd to suggest, as the defense must, that one's life and physical safety are somehow less important in public than at home.

Certainly, many individual rights find their zenith at home, but the very nature of the right to self defense and the interest in one's physical well being which it implicates demonstrate conclusively that the right to self defense extends beyond the home.

This simple logic is nothing new – it is enshrined in the Constitution itself.  The Framers offered equal protection to the right to "keep and bear arms."  Indeed, the amendment uses the conjunctive and makes reference to both the keeping and bearing of arms as a single, "right."  Viewed in the constitutional landscape established by *Heller*, this language conclusively demonstrates that possession of firearms in the home (keeping arms) and the wearing or carrying of same (bearing arms) are coequal rights.

The Second Amendment protects the right the bear arms, but all of the defense arguments flow from the proposition that it does not.  As the defense position is completely undermined by this fatal flaw, the defense has not established any likelihood of success on the merits – let alone a high likelihood – and the present motion should be denied.

The issue is this simple.  To obscure the point, the defense sought an expansion of its page limits and offered dozens of pages of off-base analysis.  Plaintiffs are

compelled to respond in detail, but only after cautioning that the forest is much harder to see if the Court allows itself to be lost in the trees.

### i. The Historical Regulations Cited by the Defense Do Nothing to Meet the Heavy Defense Burden.

The Defendants' citations to historical regulation are unavailing. First, the defense cites the 1328 English Statute of Northampton and the 1689 English Bill of Rights. Neither has any bearing on the 1791 adoption of the Second Amendment or its application today. In fact, the Bill of Rights was adopted in large part as a reaction to English tyranny, so the concept that it should be interpreted by reference to English law of more than a hundred years prior would be as abhorrent to the founders as we should find it today.

Moreover, a long line of scholars have made it clear that the Statute of Northampton limited to prohibit the carrying of arms only with evil intent, "in order to preserve the common law principle of allowing 'Gentlemen to ride armed for their Security.'" David Caplan, *The Right of the Individual to Bear Arms: A Recent Judicial Trend*, 4 DET. C. L. REV. 789, 795 (1982) (citing *Rex* v. *Knight*, 90 Eng. Rep. 330 (K.B. 1686)); see also, 4 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 148 (1769). "[N]o wearing of Arms is within the meaning of this Statute, unless it be accompanied with such circumstances as are apt to terrify the People; from whence it seems clearly to follow, that Persons of Quality are in no Danger of Offending against this Statute by wearing common Weapons . . . for their

Ornament or Defence…."  William Hawkins, 1 TREATISE OF THE PLEAS OF THE CROWN, ch. 63, § 9 (1716); *see* Joyce Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 104-05 (1994). Thus, even what little facially irrelevant authority the defense can muster is readily answered.

Next, the defense cites a few early American state laws governing the carry of firearms, including some appearing to require showings analogous to the "good and substantial reason" at issue here.  In doing so, the defense relies on early state court cases interpreting these laws.  Yet, the defense cannot cite a single instance in which any of these State laws was tested against the United States Constitution in a federal court.

Moreover, when the early cases cited by the defense are examined closely, they provide far less support – and often completely undermine the defense position.  For instance, the defense cites *English v. State*, 35 Tex. 455 (1876) for the proposition that early decisions allegedly "upheld statutes that similarly prohibited the carry of concealable weapons, including handguns."  Defense Motion at 15.  To the contrary, *English* found that the Second Amendment protected "holster pistols" and "side arms." 35 Tex. at 476.

Likewise, the defense citation to *Fife* v. *State*, 31 Ark. 455, 460-61 (1876) is unavailing because *Fife* excluded "army and navy repeaters" from the definition of prohibited "pistol." Indeed, *Fife* was distinguished on this point in a case involving the carrying of an "army" pistol.  "If cowardly and dishonorable men sometimes shoot

unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege." *Wilson* v. *State*, 33 Ark. 557, 560 (1878).

Next, the State cites *Andrews v. State*, 50 Tenn. 165, 188 (1871), wherein the court held that the carry prohibition fails "as to this weapon."

Furthermore, the Plaintiffs could just as easily cite early opinions in their favor. For instance, in 1840, Alabama's high court explained:

> We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defense, would be clearly unconstitutional. But a law which . . . prohibits the wearing of certain weapons in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the Constitution.

*State v. Reid*, 1 Ala. 612, 616-17 (1840).

Likewise, Georgia's Supreme Court followed *Reid*, quashing an indictment for publicly carrying a pistol that failed to specify how the gun was carried: "so far as the act . . . seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void*." *Nunn* v. *State*, 1 Ga. 243, 251 (1846) (emphasis original).

In 1871, Tennessee's Supreme Court held unconstitutional the application of a weapons carrying ban to a man carrying a revolver, declaring:

> If the Legislature think proper, they may by a proper law regulate the carrying of this weapon publicly, or abroad, in such a manner as may be deemed most conducive to the public peace, and the protection and safety of the community from lawless violence. We only hold that, as to this weapon, the prohibition is too broad to be sustained.

*Andrews* v. *State*, 50 Tenn. 165, 187-88 (1871).

Finally, in 1850, the Louisiana Supreme Court held that citizens had a right to carry arms openly: "This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations." *State* v. *Chandler*, 5 La. Ann. 489, 490 (1850).

This historical backdrop does nothing to advance the notion that the defense has a high likelihood of success on the merits.

> ii.    **The Heller Decision Does Not Support the Notion that the Defense has a High Likelihood of success on the Merits.**

The defense treatment of *Heller* ignores many of the key teachings of the case and takes much of the Court's language out of critical context. However, even if accepted wholesale without the rebuttal below, the best the defense can do is to suggest that, "at least to some extent, the passages on which [Judge Niemeyer of this Court and the undersigned] rely do not support Plaintiff's claims." Defense Motion at 16. The

defense goes on to argue that *Heller* did not explicitly recognize the right to bear arms outside the home.

Even if "to at least some extent" *Heller* did not support the Plaintiff's claims, and even if the *Heller* holding were limited to the home, nether assertion would demonstrate a high likelihood that the defense will succeed on the merits in this case.

The *Heller* Court was not squarely faced with the question of carry outside of the home. Hence, to whatever extent that issue was not reached in *Heller*, the case would be irrelevant here. Even if the defense were to establish the irrelevancy of *Heller*, this does not demonstrate a high likelihood that the defense will succeed on the merits – only that the merits would be an open question.

Thus, even at unchallenged face value, the defense position fails. This is to say nothing of what a critical and close reading of *Heller* and other recent precedent actually reveals.

This Court's suggestions that the Second Amendment might extend beyond the home, *United States v. Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011); *United States v. Moore*, 666 F.3d 313, 320 *n.7 (4th 2012), and that the Supreme Court offered no holding on the issue, *United States v. Carter*, 669 F.3d 411, 415 (4th Cir. 2012); *United States v. Mahin*, 668 F.3d 119,124 (4th Cir. 2012), at least exclude the arguments that *Heller* positively limited the right to the home. On this point, other circuits agree. "[T]he Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense. What other entitlements the

Second Amendment creates . . . were left open." *United States* v. *Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc).

In fact, the Supreme Court explicitly noted that, "since this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field . . . ." *Id.* at 635.

However, the Court did adequately cover the field for the present purposes. For instance, the Court held that, "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Heller*, 554 U.S. at 584. The Court thus repeatedly referred to "the Second Amendment right, protecting only individuals' liberty to keep *and carry* arms." *Heller*, 554 U.S. at 604 (emphasis added); *see also id.* at 626. Moreover, in *Heller*, the Supreme Court "held that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense." *McDonald v. Chicago*, 130 S. Ct. 3020, 3020 (2010).

In tying the right to keep and bear arms to the right of self defense, the Supreme Court more than presaged its likely holding in the present matter. *Heller* "concluded that the Second Amendment codified a pre-existing 'individual right to possess and carry weapons in case of confrontation.'" *United States v. Marzzarella*, 614 F.3d 85,90 (3rd Cir. 2010) (quoting *Heller*, 554 U.S. at 592). "[T]he core right identified in *Heller* [is] the right of a law-abiding, responsible citizen to possess and carry a weapon *for self-defense*." *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (emphasis added).

There is no reason whatsoever to suggest (as the defense must) that the right to self defense would exist only in the home. One's life and personal safety are equally important no matter where the individual is located and the corresponding right to self defense thus travels with the person rather than being shed at the doorway of the home.

Finally, in a last-ditch, one-sentence argument that seems to admit the futility of its prior positions, the State avers that, "A Second Amendment right extending, in some form, to self defense outside the home does not imply a right to wear and carry in public a loaded, readily-concealable handgun…." But, of course, it does. The right to bear arms outside of the home for self defense certainly encompasses the carrying of a loaded and concealable handgun as this is precisely the weapon designed for such purposes. Moreover, the right to self defense requires that the gun be loaded.

Presumably, the State here refers to the legality of carrying long arms, but fails to recognize that the same argument about long guns in the home was rejected in *Heller*. The impracticality of using long guns to defend oneself at home was deemed a constitutionally insufficient substitute for handguns in *Heller*. Given this ruling, it would seem a foregone conclusion that the impracticality of carrying long guns in public will not pass constitutional muster.

        **iii.**      **The State Fails to Show a High Likelihood that the "Good and Substantial" Requirement Can Pass any Level of Constitutional Scrutiny.**

In *Masciandro*, the Court determined that immediate scrutiny is the proper standard of review for issues related to the Second Amendment. *See* 638 F.3d at 470.

Under immediate scrutiny, "the government bears the burden of establishing a reasonable fit between [the challenged statute] and a substantive governmental objective." *United States v. Staten*, 666 F.3d 154, 161 (4th Cir. 2011) (quoting *Chester*, 628 F.3d at 683).

The defense seeks to meet its burden here through citation to purported statistical evidence closely intertwined with blatant fear mongering (including constant references to "highly lethal" hand guns). Although the Plaintiffs will respond to demonstrate that they actually have the better of any statistical argument, it is important to first reiterate that the Supreme Court has repeatedly warned against this type of analysis:

> Justice Breyer is incorrect that incorporation will require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise. As we have noted, while his opinion in *Heller* recommended an interest-balancing test, the Court specifically rejected that suggestion. *See McDonald*, 130 S. Ct. at 3046. "The very enumeration of the right takes out of the hands of government--even the Third Branch of Government--the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Heller*, 554 U.S. at 634.

*McDonald v. Chicago*, 130 S. Ct. 3020, 3050 (2010). Along the same lines, the *McDonald* Court also stated as follows:

> [I]ncorporation of the Second Amendment right will to some extent limit the legislative freedom of the States, but this is always true when a Bill of Rights provision is incorporated. Incorporation always restricts experimentation and local variations, but that has not stopped the Court from incorporating virtually every other provision of the Bill of Rights. "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S., at 636. This conclusion is no more remarkable with respect to the Second

Amendment than it is with respect to all the other limitations on state power found in the Constitution.

*McDonald v. Chicago*, 130 S. Ct. 3020, 3050 (2010).  *McDonald* accurately echoes the

*Heller* Court's warnings against the defense approach:

> We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach.  The very enumeration of the right takes out of the hands of government--even the Third Branch of Government--the power to decide on a case-by-case basis whether the right is really worth insisting upon.  A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.  We would not apply an "interest-balancing" approach to the prohibition of a peaceful neo-Nazi march through Skokie.  *See National Socialist Party of America v. Skokie*, 432 U.S. 43, 97 S. Ct. 2205, 53 L. Ed. 2d 96 (1977) (per curiam).  The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrong-headed views.  The Second Amendment is no different.  Like the First, it is the very product of an interest balancing by the people--which Justice Breyer would now conduct for them anew.  And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.

*District of Columbia v. Heller*, 554 U.S. 570, 634-635 (2008).

Hence, although the Plaintiffs are forced by the defense argument to respond in

kind, the entire war of statistics and purported consequences is inappropriate.  Nothing

about the anecdotal evidence cited by the defense (or even proper empirical evidence if

they had any) modifies the rights long enshrined in the Constitution.  Nevertheless,

even if the ebb and flow of current statistics were permitted to define the contours of a

constitutional right, the Plaintiffs would have the better of the argument for the reasons which follow.

Defendants claim that the purpose of the current permit statute's good-and-substantial reason requirement "is to serve the State's compelling interest in protecting public safety and reducing handgun violence." Defense Motion 18-19. In support, Defendants argue that the "good and substantial" requirement reduces handgun violence and protects police officers, and that it prevents individuals from using handguns to commit crimes. *Id.* at 20-22. But Defendants offer no empirical support for these assertions – they, instead, rest on speculation and belief of a few of state officials. Without such data, Defendants' claims have no merit – much less sufficient merit to meet the high burden of demonstrating a strong likelihood of success on the merits.

What little data the defense does cite does nothing to support its position. First, in the same paragraph citing crime as the need for the challenged requirement, the defense admits that the most recent statistics show overall violent crime and homicide in Maryland at the lowest levels since record keeping began.

Next, the State cites statistics suggesting that handguns are used more often in crimes than long guns. This statistic, standing alone, is meaningless. The State offers no evidence that the "good and substantial" requirement would affect these statistics one way or the other. The State offers no empirical evidence of a causal link between

the issuance of permits to law-abiding citizens and an increase or decrease in gun crime.

In fact, both common sense and empirical evidence suggest that striking the provision at issue here would not increase gun violence. First, those seeking permits must undergo extensive background checks and any criminal applicants are denied as part of this process.

Second, and not surprisingly, permitees are statistically far less likely to commit gun crimes. For example, Michigan issued 87,637 permits for the year ending June 30, 2011. In that time frame, it revoked only 466 permits. *Concealed Pistol Licensure, Annual Report*, http://www.michigan.gov/ documents/msp/2011_CPL_Report_ 376632_7.pdf (last visited July 27, 2012).

North Carolina has revoked only 1,203 permits out of 228,072, half of one percent, in over 15 years. *N.C. Concealed Handgun Permit Statistics by County*, http://www.ncdoj.gov/CHPStats.aspx (last visited July 27, 2012). In 2011, Tennessee issued 94,975 handgun carry permits, and revoked just 97. *Tenn. Handgun Carry Permit Statistics*, http://www.tn.gov/safety/stats/DL_ Handgun/Handgun/HandgunReport2011Full.pdf (last visited July 27, 2012).

Texas compiles detailed information tracking the proclivity of handgun carry license permit holders to commit crimes. In 2011, of 63,679 serious criminal convictions in Texas, only 120—0.1884%—could be attributed to individuals licensed

to carry handguns, though not all such crimes necessarily utilized guns, or used them in public settings. http://www.txdps.state.tx.us/RSD/CHL/Reports/ConvictionRates Report 2011.pdf (last visited July 27, 2012).

Perhaps the most comprehensive data comes from Florida, which reports having issued 2,227,360 handgun carry licenses since 1987. Concealed Weapon or Firearm License Report, http://licgweb.doacs. state.fl.us/stats/cw_monthly.pdf (last visited July 27, 2012). To date, Florida has only revoked 168 licenses—.00754%— for crimes utilizing firearms. *Id.*

The defense cannot and does not cite similar data to support its position because it is all but beyond dispute that the data show permitees to be law-abiding and upstanding citizens. The closest the defense comes to any rebuttal on this point is the "Violence Policy Center's" claim that there have been 276 non-suicide intentional killings nationwide by permit holders since 2007. This figure fails to parse out how many of these incidents were legally justified, carried out by police officers or otherwise uninstructive. Setting that issue aside, this statistic underscores the Plaintiffs' point and offers no solace to the defense.

While many states do not publish the number of permit holders, available data reflect that Florida, Pennsylvania and Texas alone have over 1.5 million permit holders. With some form of permitting available in 49 states, it is safe to estimate the number of permitees in the millions. 276 incidents in five years, out of millions of

permit holders all across the country, is a miniscule percentage. This proves, once again, that permit holders are law abiding citizens from whom we have nothing to fear.

Instead, the defense relies on the affidavits of a few State officials to suggest, anecdotally, that in their opinions, the "good and substantial" requirement may decrease the likelihood that basic confrontations turn deadly, decrease the availability of firearms to criminals through robbery or theft, or limit the likelihood that victims of violent crime will be killed. These suppositions should be afforded no weight as they are the mere guesswork of officials of the very government which seeks to enforce this unconstitutional provision. Ironically, these same officials are afforded the opportunity to obtain a permit without showing a "good and substantial reason."

To whatever extent these positions are permitted any weight, they are easily debunked by resort to common sense. First, the empirical evidence from "shall issue" states cited above is to the effect that crime by permitees – even without a "good and substantial" requirement – is extraordinarily low. Second, the concerns about the availability of firearms have nothing whatsoever to do with the standards for carrying them. There is no evidence to suggest that if the entire gauntlet of requirements for a permit is left in place, with the sole exception of the "good and substantial" requirement, then the sheer number of guns will increase. Therefore, the State's concerns about the availability or prevalence of guns are misplaced.

The State next makes the chilling argument that the "good and substantial" provision ought to remain in force to limit the number of permitees because lawful

permitees are in danger of unwarranted violence or harassment inflicted by the police. In other words, the State actually argues that our Second Amendment rights should continue to be denied to avoid even greater constitutional transgressions by our government. For example, in language specifically cited by the State from an affidavit it offered, the Commissioner of the Baltimore Police Department states that, "[i]n a confrontation between a police officer and a criminal, an additional person bearing a gun might cause confusion as to which side of the confrontation the person is on…and the potential for innocent victims, including the permit holder [to be injured]." J.A. 6 (cited by the defense in its motion at 22). The same affiant goes on to aver that, "[h]aving more legal carriers of handguns…would also force police officers who spot someone carrying a handgun to choose between creating a potential disturbance by upholstering their own weapon or…approaching the carrier without drawing their weapon." J.A. 6. In its desperation, the State effectively threatens potential violence and harassment by the police as grounds to deny citizens their constitutional rights.

Moreover, it is important to recall that if the convenience of law enforcement officers were permitted to trump our constitutional rights, precious few would survive. With this in mind, the *McDonald* Court instructed as follows:

> [T]here is intense disagreement on the question whether the private possession of guns in the home increases or decreases gun deaths and injuries. The right to keep and bear arms, however, is not the only constitutional right that has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category.

*McDonald*, 130 S. Ct. at 3045 (citations omitted).

Indeed, "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636. The Supreme Court has:

> consistently condemned licensing systems which vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places. . . . There are appropriate public remedies to protect the peace and order of the community if appellant's speeches should result in disorder or violence.

*Kunz* v. *New York*, 340 U.S. 290, 294 (1951); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147,153 (1969). "[U]ncontrolled official suppression of the privilege cannot be made a substitute for the duty to maintain order in connection with the exercise of the right." *Hague* v. *Committee for Indus. Org.*, 307 U.S. 496, 516 (1937).

Next, the State cites a small number of District Court decisions upholding laws similar to Maryland's. These are of no moment here because, as the defense admits at page 23, "none of these challenges have yet been decided by federal appellate courts."

Moreover, the few cases cited by the defense are at odds with *Heller*, *McDonald* and their progeny in district courts around the country. For instance, the Southern District of West Virginia held that barring the provision of armed security to a prohibited individual satisfied constitutional scrutiny, but rejected the claim that there is no right to carry a gun for self-defense. "[T]he Second Amendment, as historically understood at the time of ratification, was not limited to the home." *United States* v. *Weaver*, No. 2:09-CR-00222, 2012 U.S. Dist. LEXIS 29613, at *13 (S.D.W. Va. Mar. 7, 2012) (citation and footnote omitted).

The Eastern District of North Carolina struck down that state's laws forbidding the carrying or transportation of firearms and ammunition during declared "states of emergency." *Bateman* v. *Perdue*, No. 5:10-CV-265-H, 2012 U.S. Dist. LEXIS 47336 (E.D.N.C. Mar. 29, 2012):

> It cannot be seriously questioned that the emergency declaration laws at issue here burden conduct protected by the Second Amendment. Although considerable uncertainty exists regarding the scope of the Second Amendment right to keep and bear arms, it undoubtedly is not limited to the confines of the home….[T]he Second Amendment right to keep and bear arms 'is not strictly limited to the home environment but extends in some form to wherever those activities or needs occur.'" *Id.* at *10 (citation omitted). "Under the laws at issue here, citizens are prohibited from engaging, outside their home, in any activities secured by the Second Amendment. They may not carry defensive weapons outside the home.

*Id.* at *10-*11. Likewise, "The Second Amendment explicitly protects the right to 'carry' as well as the right to 'keep' arms." *People* v. *Yanna*, No. 304293, 2012 Mich. App. LEXIS 1269, at *11 (Mich. App. June 26, 2012).

The Eastern District of Pennsylvania recently denied a motion to suppress introduction of a handgun into evidence, finding the defendant engaged in evasive conduct supporting the police's reasonable suspicion of criminal activity. But it rejected the claim that a report into the defendant's possible carrying of a handgun justified his stop, finding that, " [a]s some individuals are legally permitted to carry guns pursuant to the Second Amendment of the Constitution, a reasonable suspicion that an individual is carrying a gun, without more, is not evidence of criminal activity afoot." *U.S.* v. *Garvin*, 2012 U.S. Dist. LEXIS 76540, at *10 (E.D. Pa. May 31, 2012).

## D.    DEFENDANTS CANNOT ESTABLISH A SHOWING
## OF IRREPARABLE INJURY IF THE STAY WERE DENIED.

Defendants contend that they will suffer irreparable injuries in the absence of a stay of the district court's ruling.  Defendants offer three agreements in support of this contention: (1) this ruling prevents Defendants from applying the "good and substantial reason" requirement to future permit requests, (2) an injunction prohibiting the enforcement of a statute presumptively constitutes an irreparable injury, and (3) the denial of a stay would impose administrative burdens on the State. Defense Motion at 24 – 27.  These arguments, stated without the fear-mongering language present in the Defendants' motion, clearly do not demonstrate a showing of irreparable harm.

First, Defendants argue that the inability of the State to impose the "good and substantial reason" requirement on individuals seeking permits would irreparably injure Defendants by causing them to "lose an important tool to protect the people of Maryland against…handgun violence."  Defense Motion at 25.

In weighing this claim, it is instructive to first determine the actual scope of the injunctive relief.  The injunction does not prevent the State from enforcing the overall handgun permit licensing scheme.  It does not prevent the State from denying permit requests where the permit applicants are disqualified because of some particular trait, such as a criminal conviction, a drug or alcohol addiction, or a history of exhibiting a propensity for violence or instability.  It does not prevent the State from undertaking measures to reduce or prevent gun violence or to decrease the availability of guns to

criminals. It does not prevent the State from requiring permit applicants to obtain

safety training as a prerequisite for permit eligibility. Instead, the injunction only

prevents the State from enforcing a single provision of its handgun permit scheme.

Importantly, Defendants fail to provide evidence showing that the non-

enforcement of the "good and substantial reason" requirement would significantly

increase the availability of handguns or lead to any of the other claimed ills. Instead,

Defendants' arguments all presuppose an increase of handgun availability as a

consequence of the non-enforcement of the "good and substantial reason" requirement.

Much of Defendants' argument purports to show a relationship between the

prevalence of firearms and other public safety issues, such as the occurrence of

handgun violence or the availability of firearms to criminals, yet a statistical

correlation between the enforcement of the "good and substantial reason" requirement

and the prevalence of firearms is conspicuously absent. This omission is critical when

one recalls that the burden of persuasion rests entirely with the defense.

Next, Defendants argue that there is a presumption of irreparable injury when a

State is enjoined from enforcing a statute. Defense Motion at 26. This argument

merely begs the question, as there can be no irreparable injury to the State in

preventing it from enforcing an unconstitutional statute. Indeed, the Fourth Circuit has

said "that a state is 'in no way harmed by issuance of a preliminary injunction which

prevents the state from enforcing restrictions likely to be found unconstitutional. If

anything, the system is improved by such an injunction.'" *Giovani Carandola, Ltd. v.*

*Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (citing *Giovani Carandola, Ltd. v. Bason*, 147 F. Supp. 2d 383, 395 (M.D.N.C. 2001)); *see also, Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (finding state agency "in no way harmed by issuance of a preliminary injunction which prevents it from enforcing a regulation, which, on this record, is likely to be found unconstitutional.").

Conversely, the Supreme Court and the Fourth Circuit have made it abundantly clear that constitutional violations can constitute *per se* irreparable injury to Plaintiffs for the purpose of determining whether to grant injunctive relief. *See, e.g., Elrond v. Burns*, 427 U.S. 347, 373 (1976) (noting "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"); *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011) (finding violation of First Amendment to be injury of "the sort that could not be remedied absent an injunction").

Lastly, Defendants argue that the denial of a stay would impose administrative burdens on the State and that those administrative burdens constitute irreparable injury. Defense Motion at 27. Defendants suggest that there would be delays in permit processing as a result of an increase of permit applications and that this delay may prevent the permit applicants who have a "demonstrable reason" under current law to wear and carry a handgun from being timely processed. *Id*.

Defendants do not provide any reason beyond mere speculation to believe that there would be a large increase in permit applications as a result of the denial of a stay. Defendants also argue that, if the stay were denied and they were to ultimately prevail

on the merits, there would be significant administrative costs involved with the revocation of permits for individuals who did not provide a good and substantial reason for the permit. However, current Maryland law requires a permit holder to return the permit upon written notice of revocation, and, as the district court suggested, Defendants did not provide any reason to believe that this provision would not be followed by permit holders.

**E.**   CONSIDERATION OF ANY POTENTIAL INJURY TO OTHER PARTIES DOES NOT FAVOR GRANTING A STAY.

In contrast to the minimal administrative costs the State would assume should the stay be denied, there would be serious burdens imposed on Plaintiff's Second Amendment rights if the stay was granted. The Fourth Circuit has held that violations of constitutional rights constitute *per se* irreparable injury. *See, e.g., Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1997) (stating "the denial of a constitutional right, if denial is established, constitutes irreparable harm for purposes of equitable jurisdiction"); *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 511 (4th Cir. 2002); *Doe v. Charleston Area Medical Ctr.*, 529 F.2d 638, 644 (4th Cir. 1977) (finding "denial under color of law of the right to abort [a pregnancy], implicit in the right to be let alone, constitutes irreparable injury"); *Newsom*, 354 F.3d at 261.

As the district court recognized, irreparable injury resulting from the loss of a Second Amendment right should be assumed for the same reason that irreparable harm is assumed in the context of the First Amendment. Both rights protect "similarly

intangible and unquantifiable interests" and "infringement of th[ese] right[s] cannot be compensated by damages." *Ezell v. Chicago*, 651 F.3d 684, 699 (7th Cir. 2011). Every Marylander is currently subject to the unconstitutional regime at issue and the great weight of so many fundamental rights denied weighs against a stay.

## F.     THE PUBLIC INTEREST DOES NOT WEIGH IN FAVOR OF A STAY.

Defendants present three arguments in support of their contention that a consideration of the public interest weighs in favor of a stay: (1) the "good and substantial reason" requirement advances compelling government interests, (2) the public interest is served by maintaining the status quo until the Supreme Court has had the opportunity to determine the constitutional issues present in this case, and (3) a stay would allow the Maryland General Assembly to consider changes to Maryland law to mitigate any "adverse public safety impact" of the invalidation of the requirement. Defense Motion at 29-30. However, "[s]urely, upholding constitutional rights serves the public interest." *Newsom*, 354 F.3d at 261.

In the proceedings below, the court directed the parties to file supplemental briefs addressing how Maryland's permit scheme, without the "good and substantial reason" requirement, compares with other permit schemes and how gun violence in Maryland compares to gun violence in other states with more liberal regulations. Supp. App. 467. While Maryland's licensing standards allows officials to exercise near-unbridled discretion, thirty-seven other states require officials to issue carry

licenses to applicants who meet objective standards.[1] After reviewing what it described as "commendably thorough research on the subject," the district court found that "the evidence does not point strongly in any one direction" and that it "[could] not say that a stay would demonstrably serve or disserve the State's goal of preventing a potential increase in handgun violence pending appeal." Supp. App. 467-68.

Once again, the defense argument that "the public interest is served by maintaining the status quo until the Supreme Court has had the opportunity to [pass on these issues]" merely begs the question. If the statute in unconstitutional, as has been held, then there are no grounds for a stay,

Finally, no stay is required for the General Assembly to consider new legislation. The Court has not enjoined the General Assembly. Nothing in the Court's decision impedes Maryland's ability to enact further, different restrictions on the right to carry a gun, the constitutionality of which could only be evaluated if and when such restrictions are actually enacted. The Court's decision relates only as to whether

---

[1] Ark. Code Ann. § 5-73-309; Colo. Rev. Stat. Ann. § 18-12-203(1); Conn. Gen. Stat. § 29-32b(b); Fla. Stat. Ann. § 790.06(2); Ga. Code Ann. § 16-11-129(d)(4); Idaho Code Ann. § 18-3302(1); Ind. Code Ann. § 35- 47-2-3(e); Iowa Code Ann. § 724.7(1); Kan. Stat. Ann. § 75-7c03(a); Ky. Rev. Stat. Ann. § 237.110(4); La. Rev. Stat. Ann. § 40:1379.3(A)(1); 25 Me. Rev. Stat. Ann. § 2003(1); Mich. Comp. Laws Ann. § 28.422(3); Minn. Stat. § 624.714, subdiv. 2(b); Miss. Code Ann. § 45-9-101(2); Mo. Ann. Stat. § 571.101(1); Mont. Code Ann. § 45-8-321(1); Neb. Rev. Stat. § 69-2430(3); Nev. Rev. Stat. Ann. § 202.3657(2); N.H. Rev. Stat. Ann. § 159.6(I); N.M. Stat. Ann. § 29-19-4(A); N.C. Gen. Stat. § 14-415.11(b); N.D. Cent. Code § 62.1-04-03(1); Ohio Rev. Code Ann. § 2923.125(D)(1); 21 Okla. Stat. Ann. § 1290.12(A)(12); Or. Rev. Stat. Ann. § 166.291(1); 18 Pa. Cons. Stat. Ann. § 6109(e); R.I. Gen. Laws § 11-47-11(a); S.C. Code Ann. § 23-31-215(A); S.D. Codified Laws § 23-7-7; Tenn. Code Ann. § 39-17-1351(b); Tex. Gov't Code § 411.177(a); Utah Code Ann. § 53-5-704(1)(a); Va. Code Ann. § 18.2-308(D); Wash. Rev. Code Ann. § 9.41.070(1); W. Va. Code Ann. § 61-7-4(f); Wis. Stat. § 175.60(2)(a).

individuals must prove their entitlement, generally, to carry a gun; it holds nothing with respect to how Maryland would otherwise regulate the exercise of this right.

Maryland has long opted to license the carrying of handguns, openly or concealed. If Maryland authorities truly wish to require all handgun carry permit holders to carry their handguns openly, Def. Br., 3/7/12, pp. 12-13, that option is not foreclosed by the Court's opinion. Maryland law already allows Defendant Brown to limit the scope of permits to open or concealed carry. Md. Pub. Safety § 5-307(b).

Notably, the Seventh Circuit rejected a similar claim that individuals should tolerate a Second Amendment violation because the government would be inconvenienced in pursuing its option to re-regulate. Faced with the prospect of losing its total ban on gun ranges, Chicago warned of a "regulatory vacuum" that would be left between an injunction and subsequent regulatory efforts. The court dismissed the concerns. "[W]e note that [Chicago] faced a similar dilemma after the Supreme Court decided *McDonald*. The sky did not fall. The City Council moved with dispatch and enacted the Ordinance just four days later." *Ezell*, 651 F.3d at 711.

The decision was issued months ago and during the legislative session. To whatever extent the Court deems it appropriate that the General Assembly be given the chance to act, they were. Despite the opportunity, the General Assembly failed to step into the fray, nor did the Attorney General or the Governor, whose representatives are frequently in the legislature, request that they do so. As such, this should be no bar to allowing the ruling to stand.

Finally, neither our Constitution, our courts, nor our citizenry should tolerate the sacrifice of constitutional rights to governmental convenience and administrative ease. If we do, we sponsor the undoing of the sacred document and our constitutional democracy itself.

## CONCLUSION

For the reasons stated above, and aptly by the district court, no stay should be granted.

_____/s/_____
Cary Hansel                          Alan Gura
Joseph, Greenwald & Laake, P.A.      Gura & Possessky, PLLC
6404 Ivy Lane, Suite 400             101 N. Columbus St., Suite 405
Greenbelt, MD 20770                  Alexandria, VA 22314
301.220.2200/301.220.1214           703.835.9085/703.997.7665

July 31, 2012                         Attorneys for Appellees


## CERTIFICATE OF SERVICE

I hereby certify that. On this 31st day of July, 2012, I caused the forgoing to be electronically filed with the Clerk of the Court pursuant to the relevant rules.

_____/s/_____
Cary Hansel