No. 12-1437

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

RAYMOND WOOLLARD, et al.,

Plaintiffs-Appellees

v.

DENIS GALLAGHER, et al.,

Defendants-Appellants

_____

**BRIEF AMICUS CURIAE OF THE CALIFORNIA RIFLE
AND PISTOL ASSOCIATION FOUNDATION,
VIRGINIA SHOOTING SPORTS ASSOCIATION, AND
CENTER FOR CONSTITUTIONAL JURISPRUDENCE
IN SUPPORT OF PLAINTIFFS-APPELLEES
AND IN SUPPORT OF AFFIRMANCE**

_____

Appeal from the United States District Court
for the District of Maryland

_____

Dan M. Peterson                  Stephen P. Halbrook
Dan M. Peterson PLLC             3925 Chain Bridge Road
3925 Chain Bridge Road           Suite 403
Suite 403                        Fairfax, Virginia 22030
Fairfax, Virginia 22030          (703) 352-7276
(703) 352-7276                   Fax (703) 359-0938
Fax (703) 359-0938

Counsel for Amici Curiae
(additional counsel on inside cover)

John C. Eastman
Anthony T. Caso
CENTER FOR CONSTITUTIONAL JURISPRUDENCE
c/o Chapman University School of Law
One University Dr.
Orange, CA 92866
(714) 628-2587
jeastman@chapman.edu

C. D. Michel
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
Tel. No. (562) 216-4444
Fax No: (562) 216-4445
e-mail: cmichel@michellawyers.com
Counsel for California Rifle and Pistol
Association Foundation

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __12-1437__     Caption: __Woollard et al. v. Gallagher et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__California Rifle and Pistol Association Foundation__
(name of party/amicus)

_____

who is _____amicus_____, makes the following disclosure:
          (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                    ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                     ☐ YES ☑ NO
      If yes, identify all such owners:

- 1 -

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)    ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Dan M. Peterson _____    Date: ____August 6, 2012____

Counsel for: Calif. Rifle and Pistol Assoc. Found. ____

## CERTIFICATE OF SERVICE
**************************

I certify that on ____August 6, 2012____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Dan M. Peterson _____              ____August 6, 2012____
        (signature)                                              (date)

07/19/2012                          - 2 -
SCC

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. 12-1437          Caption: Woollard et al. v. Gallagher et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Virginia Shooting Sports Association
(name of party/amicus)


who is _____ amicus _____, makes the following disclosure:
(appellant/appellee/amicus)

1.     Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.     Does party/amicus have any parent corporations?                    ☐ YES ☑ NO
       If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                        ☐ YES ☑ NO
       If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)    ☐YES ☐NO
        If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
        If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Dan M. Peterson                              Date:    August 6, 2012

Counsel for: Virginia Shooting Sports Association

## CERTIFICATE OF SERVICE
**************************

I certify that on    August 6, 2012    the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Dan M. Peterson                                             August 6, 2012
    (signature)                                                 (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __12-1437__     Caption: __Woollard et al. v. Gallagher et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Center for Constitutional Jurisprudence__
(name of party/amicus)

_____

who is _____amicus_____, makes the following disclosure:
      (appellant/appellee/amicus)

1.     Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.     Does party/amicus have any parent corporations?  ☐YES ☑NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☐NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
      If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Dan M. Peterson                          Date:    August 6, 2012

Counsel for: Ctr. for Constitutional Jurisprudence

# CERTIFICATE OF SERVICE
****************************

I certify that on ___August 6, 2012___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Dan M. Peterson                                        August 6, 2012
        (signature)                                           (date)

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

STATEMENT OF INTEREST OF AMICI CURIAE . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT PURSUANT TO RULE 29(c) . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.     THE STATUTE OF NORTHAMPTON DID NOT PROHIBIT
       CARRYING ARMS PEACEABLY IN PUBLIC PLACES . . . . . . . . . . . . 4

II.    THE HISTORIANS' CONTENTIONS REGARDING VIRGINIA
       AND MASSACHUSETTS LAW ARE INACCURATE . . . . . . . . . . . . . 11

III.   THE HISTORIANS' CONTENTION THAT THE RIGHT
       TO BEAR ARMS OUTSIDE THE HOME EXISTED
       PRINCIPALLY IN THE SOUTH IGNORES HISTORY . . . . . . . . . . . . 17

IV.    THE ORDINARY CITIZEN CANNOT OBTAIN A PERMIT
       TO CARRY IN MARYLAND AND IS THUS DEPRIVED
       OF THE RIGHT TO BEAR ARMS FOR DEFENSE . . . . . . . . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES**                                                                        **Page**

*District of Columbia v. Heller*, 554 U.S. 570 (2008) . . . . . . . . . . . . . . . 2,10,18,20

*Judy v. Lashley*, 50 W.Va. 628, 41 S.E. 197 (1902) . . . . . . . . . . . . . . . . . . . . . . 10

*Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75 (K.B. 1686) . . . . . . . . . . . 5

*Mackey v. United States*, 451 A.2d 887 (D.C. 1982) . . . . . . . . . . . . . . . . . . . . . 10

*McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010) . . . . . . . . . . . . . . . . . *passim*

*Onderdonk v. Handgun Permit Review Board*, 407 A.2d 763
(Md. Ct. Spec. App. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*People v. Sturgis*, 427 Mich. 392, 397 N.W.2d 783 (1986) . . . . . . . . . . . . . . . . 10

*Rex v. Smith*, 2 Ir. R. 190 (K.B. 1914) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Rex v. Meade*, 19 L. Times Repts. 540 (1903) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Scherr v. Handgun Permit Review Board*, 880 A.2d 1137
(Md. Ct. Spec. App. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26,27

*Snowden v. Handgun Permit Review Board*, 413 A.2d 295
(Md. Ct. Spec. App. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*State v. Dawson*, 272 N.C. 535, 159 S.E.2d 1 (1968) . . . . . . . . . . . . . . . . . . . . . . 9

*State v. Huntly*, 25 N.C. (3 Ired.) 418 (1843) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011) . . . . . . . . . . . . . . . 17

## CONSTITUTION AND STATUTES

U.S. Const., Amend. II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,18,19,29

U.S. Const., Amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Declaration of Rights, 1 W.&M. Sess.2 c.2 (1689). . . . . . . . . . . . . . . . . . . . . 3,9

An Act Forbidding and Punishing Affrays (1786)
in *A Collection of All Such Acts of the General Assembly
of Virginia, of a Public and Permanent Nature,
as Are Now in Force, ch. 21, at 30 (1803)* . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Certain Offenses of Freedmen, 1865 Miss. Laws
p. 165, § 1, in 1 *Documentary History of
Reconstruction* 289 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Civil Rights Act of 1866, 14 Stat. 27 (1866) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Civil Rights Act of 1871, 42 U.S.C. § 1983, 17 Stat. 13 (1871) . . . . . . . . . . 23,24

Freedmen's Bureau Act, 14 Stat. 173 (1866) . . . . . . . . . . . . . . . . . . . . . . . 20,22

Maryland Code 454 (1860) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Perlman, *Debates of the Maryland Convention
of 1867* 79, 150-51 (1867) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*2 Perpetual Laws of the Commonwealth of Massachusetts* 259 (1801) . . . . . . . . . 9

*Public Laws of the State of South-Carolina* 26-100 (1790) . . . . . . . . . . . . . . . . . 9

Regulations for Freedmen in Louisiana, 1 *Documentary
History of Reconstruction* 279-80 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Statute of Northampton, 2 Edw. III c. 3 (1328), in
5 *The Founders' Constitution*, Amendment II, Document 1 . . . . . . . . . . . . 4,5,6,8,9

iii

## OTHER AUTHORITIES

J. Adams, *Boston* Gazette Sept. 5, 1763, in 3 *The Works of John Adams* 438 (Charles F. Adams ed., 1851) . . . . . . . . . . . . . . . . . . . . . . . 16

3 J. Adams, *A Defence of the Constitutions of Government of the United States of America* 471-72 (1788) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

A. Burleigh, *John Adams* 8-9 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15,16

E. Coke, *Institutes of the Laws of England*, c.73, 161 . . . . . . . . . . . . . . . . . . . . . . . 6

Cong. Globe, 39th Cong., 1st Sess. 337 (1866) . . . . . . . . . . . . . . . . . . . . . . . 19,20

Cong. Globe, 39th Cong., 1st Sess. 2765 (1866) . . . . . . . . . . . . . . . . . . . . . . . . . 21

Cong. Globe, 39th Cong., 2d Sess. 33 (1866) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Cong. Globe, 42nd Cong., 2d Sess. 3584 (1872) . . . . . . . . . . . . . . . . . . . . . . . 24

M. Dalton, *The Country Justice* (1690) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

4 *The Frederick Douglass Papers* 84 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

3 J. Elliot, *Debates in the Several State Conventions* 386 (2d ed. 1836) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Ex. Doc. No. 70, House of Representatives, 39th Cong., 1st Sess. 297 (1866) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Ex. Doc. No. 268, 42nd Cong., 2d Sess. 2 (1872) . . . . . . . . . . . . . . . . . . . . . . . 24

S. Halbrook, *The Founders' Second Amendment* (2008) . . . . . . . . . . . . . . . . 13,17

S. Halbrook, *Freedmen, the Fourteenth Amendment, and the Right to Bear Arms, 1866-1876* (1998). . . . . . . . . . . . . . . . . . . . . . 18,22,23

A. Halsey, Jr., "George Washington's Favorite Guns,"
*American Rifleman* 23  (February 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Harper's Weekly*, Jan. 13, 1866 at 3, col. 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

1 W. Hawkins, *A Treatise of the Pleas of the Crown*,
ch. 63, § 9 at 135-36 (1716) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

T. Jefferson letters to Mr. Verdier and T. Randolph
(Oct. 9, 1803) (digitized manuscript, Library of Congress) . . . . . . . . . . . . . . 13,14

Maryland State Police, *2010 Annual Report* 37 (2011) . . . . . . . . . . . . . . . . . 27,28

*The Oxford English Dictionary* (1933) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,7

2 *Proceedings of the Black State Conventions,*
*1840-1865*, at 302 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

E. Prussing, *The Estate of George Washington, Deceased* (1927) . . . . . . . . . . . 12

*Report of the Joint Committee on Reconstruction*, H.R. Rep.
No. 30, 39th Cong., 1ˢᵗ Sess., pt. 2, at 21 (1866) . . . . . . . . . . . . . . . . . . . . . . . . . 20

"The Right To Keep And Bear Arms," *Report of the*
*Subcommittee on the Constitution of the Committee  on the*
*Judiciary*, United States Senate, 97ᵗʰ Cong., 2d Sess. 3 (1982) . . . . . . . . . . . 11,16

B. Tayloe, *Our Neighbors on LaFayette Square:*
*Anecdotes and Reminiscences* 47 (1872) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

H. Unger, *Lion of Liberty: Patrick Henry*
*and the Call to a New Nation* 30 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## STATEMENT OF INTEREST OF AMICI CURIAE

The California Rifle and Pistol Association (CRPA) Foundation is a non-profit entity classified under section 501(c)(3) of the Internal Revenue Code and incorporated under California law, with headquarters in Fullerton, California.   It is affiliated with the California Rifle and Pistol Association, Inc., which has approximately 50,000 members.

The CRPA Foundation seeks to raise awareness about unconstitutional laws, defend and expand the legal recognition of the rights protected by the Second Amendment, promote firearms and hunting safety, protect hunting rights, enhance marksmanship skills of those participating in shooting sports, and educate the general public about firearms. The CRPA Foundation also supports CRPA members, law enforcement, and various charitable, educational, scientific, and other firearms-related public interest activities that support and defend the Second Amendment rights of all law-abiding Americans.

The CRPA Foundation has considerable experience litigating constitutional rights in relation to firearms before federal and state courts, including participation in cases dealing with the right to lawfully carry firearms.

The Virginia Shooting Sports Association (VSSA) is a not-for-profit, 501(c)(4) organization incorporated under Virginia law with headquarters in Orange, Virginia.

1

It has approximately 3500 members. VSSA is the official state association of the National Rifle Association, and is closely affiliated with the Civilian Marksmanship Program, National Shooting Sports Foundation, and the Virginia Gun Collectors Association. The goals of VSSA are to unite shooters, hunters, sportsmen, collectors and all other law abiding firearms enthusiasts to promote the safe and responsible use of firearms; promote the development of the shooting sports; and provide a united voice at all levels of government to defend the shooting sports and firearms ownership. VSSA joined over 40 of its sister state associations in filing amicus briefs in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010).

The Center for Constitutional Jurisprudence was founded in 1999 as the public interest legal arm of The Claremont Institute, a Section 501(c)(3) public policy think tank devoted to restoring the principles of the American founding to their rightful and preeminent authority in our national life. The Center advances this mission by representing clients or appearing as amicus curiae in cases of constitutional significance, including *McDonald*.

## STATEMENT PURSUANT TO RULE 29(c)

No party's counsel authored this brief in whole or in part. No party or party's counsel, and no person other than amici, their members, or their counsel, contributed

money that was intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief.

## ARGUMENT

Contrary to the assertions contained in the Brief of Appellants ("Br. App.") and the Brief Amici Curiae of Legal Historians in Support of Appellants and Reversal ("Br. Hist. Reversal"), the right to bear arms peaceably outside the home was well-established in England. Having arms for defense was protected by the English Declaration of Rights[1] and bearing arms peaceably was not prohibited by the Statute of Northampton, which only prohibited carrying arms in a manner that would terrify the people.

The laws of the founding era in this country did not limit carrying arms in a peaceable manner outside one's property or while traveling, and the right to bear arms was exercised freely. The contention by the Historians for Reversal that support for the right to bear arms "would use the Fourteenth Amendment to incorporate an isolated strand of the slave South's legal vision" is palpably untrue. Br. Hist. Reversal at 23. The history of the Fourteenth Amendment and Reconstruction-era legislation, and the *McDonald* case, make it clear that Congress intended to recognize and enforce

_____

[1]That Declaration confirmed "That the Subjects which are Protestants, may have Arms for their Defence suitable to their Condition, and as allowed by Law...." 1 W.&M. Sess.2 c.2 (1689).

3

the right of all Americans to carry arms, specifically including newly-freed African-Americans.  That right is severely abridged by Maryland's  permit system, which denies to almost all Marylanders the right to carry a handgun for purposes of defense outside the home.

## I.  THE STATUTE OF NORTHAMPTON DID NOT PROHIBIT CARRYING ARMS PEACEABLY IN PUBLIC PLACES.

Appellants quote the English Statute of Northampton, 2 Edw. III c. 3 (1328), as support for their contention that the pre-existing right to keep and bear arms "was not generally understood to extend to the public carry of easily-concealable, highly-lethal firearms without good and substantial reason."  Br. App. at 23.  That is not the question presented by this case, because Maryland's statutes prohibit carry without a permit regardless of whether a particular handgun is easily concealable and without regard to "lethality."  In addition, a fuller quotation shows that Appellants have omitted a critical portion of the statute, italicized below:

> [No] man great nor small . . . be so hardy to come before the King's justices, or other of the King's ministers doing their office, *with force and arms, nor bring no force in affray of the peace*, nor to go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure. [2] (Emphasis added).

---

[2]5 *The Founders' Constitution*, Amendment II, Document 1 (reproduced at http://press-pubs.uchicago.edu/founders/documents/amendIIs1.html).

It has long been held in England and America that only carrying of arms "in affray of the peace," that is, in such manner as would cause fear or terror among the populace, violates the statute. It is a prohibition on conduct likely to produce violence or fear, not on the mere peaceful carrying of arms.

*Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K.B. 1686), dismissed a criminal information alleging that Sir John Knight "did walk about the streets armed with guns" and that he went into a church with a gun, thereby "going or riding armed in affray of peace." At the time the word "affray," used in this manner as a noun, meant "the state produced by sudden disturbance or attack; alarm; fright; terrror. Obs."[3]  In accordance with that accepted usage, "The Chief Justice said, that the meaning of the statute . . . was to punish people who go armed *to terrify the King's subjects*." *Id.*, 3 Mod. 118, 87 Eng. Rep. 76 (emphasis added). *See also* 1 W. Hawkins, *A Treatise of the Pleas of the Crown*, ch. 63, § 9 at 135-36 (1716) (quoted

---

[3]*A New English Dictionary on Historical Principles* 161 (reissued as *The Oxford English Dictionary*, 1933) ("OED").  Under the definition of "affray," cited above, the OED includes two historical examples of the usage "in affray," one exactly contemporaneous with the Statute of Northampton.  The examples are: "**1330 –** *Chron.* 34 Northumberland was in affray for Edred comying . . . . **1523** LD. BERNERS *Froissart* I. ccxv. 271 Wherof the pope and cardynalles were in great affray and drede . . . ."  In the entry for "affray" as a verb, the OED notes: "The [past participle] Affrayed, 'alarmed,' acquired the meaning of 'in a state of fear,' and has since the 16th c. been treated as a distinct word: see Afraid."  Thus, to put the people or the peace "in affray" was to create a state of fear, terror, or being afraid.

in Appellee's Brief at 41-42).  Addendum 1.

The case of Sir Thomas Figett (Br. App. 24), discussed in 3 E. Coke, *Institutes of the Laws of England*, c.73, 161, does not establish that carrying arms in public generally violated the Statute of Northampton.  The offenses charged were that Figett "went armed under his garments, *as well in the palace, as before the justice of the king's bench*; *for both which* upon complaint made, he was arrested [by the Chief Justice of King's Bench]" (emphasis added).  Addendum 4.  Plainly, Figett's offense related to that portion of the Statute that prohibited anyone from coming "before the King's justices, or other of the King's ministers doing their office, with force and arms," not the portion dealing with going or riding armed.

The requirement that an intent to frighten or terrify the public was necessary was carried down to the twentieth century by English courts.  For example, the Statute was held applicable to one who made himself "a public nuisance by firing a revolver in a public place, with the result that the public were frightened or terrorized." *Rex v. Meade*, 19 L. Times Repts. 540, 541 (1903).  But it did not apply to a person who peaceably walked down a public road while armed with a loaded revolver, because the offense was "to ride or go armed without lawful occasion *in terrorem populi* . . . ." *Rex v. Smith*, 2 Ir. R. 190, 204 (K.B. 1914).  The court explained:

> The words "in affray of the peace" in the statute, being read forward into the "going armed," render the former words part of the description of the

statutable offence.   The indictment, therefore, omits two essential elements of the offence – (1) That the going armed was without lawful occasion; and (2) that the act was *in terrorem populi.*

*Id.*

Thus, English law, both before and after the founding period, was perfectly clear that carrying arms peaceably in public was not a crime, but became an offense only if done in such manner as to terrorize the public.

Appellants cite an early New Jersey colonial law stating that "no person . . . shall presume privately to wear any pocket pistol, skeines, stilladers, daggers, or dirks, or other unusual or unlawful weapons within this Province." Br. App. at 25.  But this is a law against *concealed* weapons.  All of the weapons mentioned are small and concealable.[4]  Most importantly, the law forbade carrying such weapons "privately." In the OED, one of the definitions of "private" is "Kept or removed from public view or knowledge; not within the cognizance of people generally; concealed, secret." The definition of "privately" in the OED includes:  "Without publicity; without the . . . cognizance of the public, in private; . . . secretly."

The Appellants' statement that "public carry of weapons remained actionable under the common law, enforced by *American* constables, magistrates, and justices

_____

[4]A "skeine" was "a form of knife or dagger, in former times one of the chief weapons of the Irish kerns . . . ."  OED (definition of "skene").  "Stillader" means "stiletto."

7

of the peace," citing Dalton, *The Country Justice*, is particularly misleading. Br. App. at 26 (emphasis added). The quotation is from an English handbook for Justices of the Peace, printed in London in the 17th century, and contains no expressly American material. The sentence quoted (relating to "so of such as shall carry any Guns, Daggs, or Pistols that be charged") appears in the middle of a discussion *of the Statute of Northampton.* As stated in this handbook, the Statute provides penalties for those who "ride or go armed *offensively*" before the Kings Justices, or other places "in Affray of the Kings people . . . ." Dalton at 37; Addendum 7. No other statutory source is cited. Similarly, the "constable's oath" in New Jersey, recited by Appellants at Br. App. 26-27, required the arrest only of those who "shall ride or go arm'd *offensively*" (emphasis added).

Appellants claim that "[v]ersions of the Statute of Northampton were also expressly incorporated into the laws of Massachusetts, North Carolina, and Virginia," citing two secondary sources. Br. App. at 24. But each of these jurisdictions explicitly provided that the carrying of arms must be to the fear or terror of the country. Merely carrying arms was not prohibited. Virginia's Act Forbidding and Punishing Affrays (1786) recited that no man shall "go nor ride armed . . . in terror of the country. . . ." *A Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force*, ch. 21, at 30 (1803).

8

Addendum 9. The 1795 Massachusetts enactment punished "such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth . . . ." 2 *Perpetual Laws of the Commonwealth of Massachusetts* 259 (1801). Addendum 11.

As noted in the Brief of Appellees, the North Carolina Supreme Court held in 1843 that under the common law application of the Statute of Northampton the mere carrying of a gun is not an offense, but only carrying it in a manner that would terrify the people. *State v. Huntly*, 25 N.C. (3 Ired.) 418 (1843). *State v. Dawson*, 272 N.C. 535, 541 159 S.E.2d 1 (1968), upheld an indictment that charged the "common-law misdemeanor known as going armed with unusual and dangerous weapons to the terror of the people." The Court stressed the distinction between the constitutional right to bear arms generally, and bearing arms to the terror of the people:

> The right of a citizen to keep and bear arms is not at issue in this case. The question is whether he has a right to bear arms to the terror of the people. Our decisions make it quite clear that any statute or construction of a common-law rule, which would amount to a destruction of the right to bear arms would be unconstitutional.

*Id.* at 543.

South Carolina adopted numerous English statutes, but not the Statute of Northampton. *Public Laws of the State of South-Carolina* 26-100 (1790) ("English Statutes Made of Force"). It recognized the English Declaration of Rights, including

its arms guarantee. *Id.*, App. 14.

Other state cases are in accord. "So remote from a breach of the peace is the carrying of weapons, that at common law it was not an indictable offense, nor any offense at all." *Judy v. Lashley*, 50 W.Va. 628, 41 S.E. 197, 200 (1902), citing 5 Am. & Eng. Enc. Law (2d Ed.) 729. And that certainly could not have been true of concealed arms, for that which cannot be seen cannot terrify, and "carrying a concealed weapon was not a crime at common law . . . ." *Mackey v. United States*, 451 A.2d 887 (D.C. 1982); *see also People v. Sturgis*, 427 Mich. 392, 408, 397 N.W.2d 783 (1986) (same).

Appellants and the Historians for Reversal have cited no laws from the founding period that prohibited generally the peaceful carrying of ordinary weapons. The majority opinion in *Heller*, responding to the dissent, reviewed all of the statutes regulating firearms and gunpowder during the colonial and founding periods that the resources of the Supreme Court and dozens of amici could unearth. *Heller*, 554 U.S. at 631-34 (2008). They all related to the misuse of firearms, or to issues of safe storage or fire prevention. Not one was a prohibition on the mere bearing of common arms outside the home by peaceable citizens. That is because, contrary to Appellants and the Historians for Reversal, there were no such laws.

10

## II. THE HISTORIANS' CONTENTIONS REGARDING VIRGINIA AND MASSACHUSETTS LAW ARE INACCURATE.

Under the heading "Virginia and Thomas Jefferson: No Recognition of A Right Outside One's Property," the Historians for Reversal argue that two draft bills by Thomas Jefferson somehow establish that "civilian use of guns outside of the home was subject to greater regulation." Br. Hist. Reversal at 6-7. These two references prove nothing, and one is seriously misstated (*see* Brief of Appellees at 31 and n.9). The actual state of the law in Virginia, and the views and practices of Jefferson and other Virginia founders, show that the contention that there was no recognition of a right to arms "outside one's property" is an illusion.

As a U.S. Senate Subcommittee Report makes clear, colonial Virginia did not restrict firearms. Instead, it required men to have them and to carry them:

> In 1623, Virginia forbade its colonists to travel unless they were "well armed"; in 1631 it required colonists to engage in target practice on Sunday and to "bring their peeces to church." In 1658 it required every householder to have a functioning firearm within his house and in 1673 its laws provided that a citizen who claimed he was too poor to purchase a firearm would have one purchased for him by the government, which would then require him to pay a reasonable price when able to do so.

"The Right To Keep And Bear Arms," *Report of the Subcommittee on the Constitution of the Committee on the Judiciary*, United States Senate, 97th Cong., 2d Sess. 3 (1982) (footnotes omitted) (hereafter *Subcommittee Report*).

Patrick Henry stirred the Virginia Ratification Convention by declaring, "The

great object is, that every man be armed . . . Everyone who is able may have a gun."
3 J. Elliot, *Debates in the Several State Conventions* 386 (2d ed. 1836). That gun was
not just for militia purposes. In Henry's time, carrying firearms for private purposes
was utterly commonplace. As a practicing lawyer in the decade before the
Revolution, Henry's land and home were "just north of Hanover town, but close
enough for him to walk to court, his musket slung over his shoulder to pick off small
game for [his wife] Sarah's table." H. Unger, *Lion of Liberty: Patrick Henry and the
Call to a New Nation* 30 (2010).

George Washington owned perhaps 50 firearms during his life, and some of his
pistols (typically silver mounted), saddle holsters, and fowlers (shotguns) may be seen
today at Mt. Vernon and West Point.[5] The inventory of Washington's estate lists
seven swords and seven guns in the study, "1 pr Steel Pistols" and "3 pr Pistols" in an
iron chest, "1 Old Gun" in the storehouse, and one gun at the River Farm.[6]

Like other Virginians, Washington was entirely free to carry pistols for self-
defense outside his own property. After the Revolutionary war ended, Washington
and his servant Billy were riding on horseback from Mount Vernon to Alexandria.

_____

[5]For photographs and detailed descriptions, see A. Halsey, Jr., "George
Washington's Favorite Guns," *American Rifleman* 23 (February 1968).

[6]E. Prussing, *The Estate of George Washington, Deceased* 416, 418, 486, 441
(1927).

The main road was impassable, so the two had to ride through the farm of a man

described as "a desperado who had committed murder."  The account continues:

> *As was then the custom*, the General had holsters, with pistols in them,
> to his saddle.  On returning to Mount Vernon, as General Washington
> was about to enter on this private road, a stranger on horseback barred
> the way, and said to him, "You shall not pass this way."  "You don't
> know me," said the General.  "Yes, I do," said the ruffian; "you are
> General Washington, who commanded the army in the Revolution, and
> if you attempt to pass me I shall shoot you."  General Washington called
> his servant, Billy, to him, and taking out a pistol, examined the priming,
> and then handed it to Billy, saying, "If this person shoots me, do you
> shoot him;" and cooly passed on without molestation.  (Emphasis
> added).[7]

If there was a prohibition on publicly carrying pistols for defense in post-

revolutionary Virginia, George Washington was not aware of it.

Thomas Jefferson was an avid shooter and gun collector.  His memorandum

books kept between 1768 and 1823 show numerous references to the acquisition of

pistols, guns, muskets, rifles, fusils, gun locks and other gun parts, the repair of

firearms, and the acquisition of ammunition.  Included were a pair of "Turkish pistols

. . .  so well made that I never missed a squirrel at 30 yds. with them."[8]

Jefferson carried one or both of these Turkish pistols on or about his person

---

[7]B. Tayloe, *Our Neighbors on LaFayette Square: Anecdotes and Reminiscences*
47 (1872).

[8]*See* references in S. Halbrook, *The Founders' Second Amendment* 318 n.40
(2008).

when traveling as President of the United States.  In a letter headed "Washington," dated October 9, 1803, Jefferson wrote to a Mr. Verdier, an innkeeper at Orange Courthouse, between Monticello and Washington: "I left at your house, the morning after I lodged there, a pistol in a locked case, which no doubt was found in your bar after my departure. I have written to desire Mr. Randolph or Mr. Eppes to call on you for it, as they come on to Congress, to either of whom therefore be so good as to deliver it."[9]  Addendum 13. Thus, the President of the United States, after traveling with his pistol, called upon either of two sitting Congressmen to pick it up for him and have it brought to the White House.  None of these eminent individuals seems to have been aware that there was no right to carry firearms "outside one's own property."  Br. Hist. Reversal at 5.  It is fantasy to assert that Jefferson believed "that firearms rights did not extend beyond one's property."  Br. Hist. Reversal at 6.

---

[9]On the same day, Jefferson wrote to Thomas Mann Randolph, Jr., "I left at Orange C. H. one of my Turkish pistols, in it's holster, locked. I shall be glad if either yourself or Mr. Eppes can let a servant take it on to this place. It will either bind up in a portmanteau flap, or sling over the back of the servant conveniently."  Addendum 14.   Randolph served two terms in Congress from March 1803 to March 1807, and was later Governor of Virginia.  John Wayles Eppes served five terms in Congress beginning in March 1803, and was later Senator from Virginia.  Both Jefferson letters are available on the Library of Congress website:
http://memory.loc.gov/cgi-bin/ampage?collId=mtj1&fileName=mtj1page029.db&recNum=210, and
http://memory.loc.gov/cgi-bin/ampage?collId=mtj1&fileName=mtj1page029.db&recNum=208

14

The Historians' contention that there was "no right to travel armed recognized" in Massachusetts is equally unsupported.  Br. Hist. Reversal at 7.  They cite only two points.  First, the town of Williamsburgh thought that a provision for keeping arms "in our houses for Our Own Defense" should be added to a statement regarding the common defense in the proposed Massachusetts Constitution.  *Id.* at 8. That does not mean that people could not travel armed.  Second, they allude to language proposed by Samuel Adams as an amendment at the Massachusetts convention.  The amendment was rejected, and the Historians do not bother to inform this Court what the amendment said.  *Id.*  Nothing discussed in that section of the Historians' brief remotely supports a contention that one could not travel armed in Massachusetts.

Our second President, John Adams, had free rein as a boy in Massachusetts to carry his gun with him to and from school.  Adams later recalled that he spent his youth playing games and sports "and, above all, in shooting, to which diversion I was addicted to a degree of ardor which I know not that I ever felt for any other business, study, or amusement."[10]  A biographer states:

> John's zest for shooting prompted him to take his gun to school, secreting it in the entry so that the moment school let out he might dash off to the fields after crows and squirrels. [The schoolmaster's] scolding did not daunt him; he simply began to leave his gun at the home of an

---

[10]A. Burleigh, *John Adams* 8-9 (1969) (quoting III *Diary and Autobiography of John Adams* 257 (1961).

15

old woman who lived close by.[11]

Adams also firmly believed that arms were properly used by private individuals for self-defense. "Resistance to sudden violence, for the preservation not only of my person, my limbs and life, but of my property, is an indisputable right of nature which I never surrendered to the public by the compact of society, and which, perhaps, I could not surrender if I would." J. Adams, *Boston Gazette*, Sept. 5, 1763, in 3 *The Works of John Adams* 438 (Charles F. Adams ed., 1851). Adams upheld the right of "arms in the hands of citizens, to be used at individual discretion, . . . in private self-defence . . . ." 3 J. Adams, *A Defence of the Constitutions of Government of the United States of America* 471-72 (1788). It would be illogical that an "indisputable right of nature" to self-defense, which cannot be "surrendered" by a political compact, would be automatically surrendered when one crosses the threshold of one's home into the world at large.

Ownership of arms was required in Massachusetts almost from the founding of the colony. "[T]he first session of the legislature ordered that not only freemen, but also indentured servants own firearms and in 1644 it imposed a stern 6 shilling fine upon any citizen who was not armed." *Subcommittee Report* at 3. Indeed, it was the seizure of citizens' arms in Boston by General Gage that was an immediate cause of

---

[11]*Id.* at 9 (citing III *Diary and Autobiography of John Adams* 258-59 n.6).

16

the Revolutionary War.  Halbrook, *Founders' Second Amendment* ch. 1-4.

### III.  THE HISTORIANS' CONTENTION THAT THE RIGHT TO BEAR ARMS OUTSIDE THE HOME EXISTED PRINCIPALLY IN THE SOUTH IGNORES HISTORY.

The Historians for Reversal claim that in *United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011), Judge Niemeyer relied on scholarship that is "questionable at best, inaccurate at worst." Br. Hist. Reversal at 14.  They claim that the "pre-Civil War American legal practice of treating open carrying of weapons as not only legal but constitutionally protected" rests on "historical mythology" and a "highly selective reading of the evidence," not on "sound historical research." *Id*. at 15.  They contend that "The idea that courts would use the Fourteenth Amendment to incorporate an isolated strand of the slave South's legal vision to recognize a right to public carry turns history on its head." *Id*. at 23.  Relying on the allegation that "Reconstruction era Republicans were strong supporters of generally applicable and racially neutral gun regulations," they assert that the framers and ratifiers of the Fourteenth Amendment would not have embraced the "exceptional" Southern model that the people have a constitutional right to carry arms.  *Id.*

Instead, it is these Historians who propose a tortured interpretation of the right to carry arms.  The Fourteenth Amendment was understood and intended to protect from State infringement the right not only to possess but also to bear or carry arms.

17

Much of that history is discussed in *Heller* and, especially, *McDonald.*

"In the aftermath of the Civil War, there was an outpouring of discussion of the Second Amendment in Congress and in public discourse, as people debated whether and how to secure constitutional rights for newly free slaves." *Heller*, 554 U.S. at 614, citing S. Halbrook, *Freedmen, the Fourteenth Amendment, and the Right to Bear Arms, 1866-1876* (1998).[12]   The Slave Codes were reenacted as the Black Codes, including prohibitions on both the keeping and the carrying of firearms by African Americans.  As Frederick Douglass explained in 1865, "the black man has never had the right either to keep or bear arms."  4 *The Frederick Douglass Papers* 84 (1991), quoted in *McDonald*, 130 S.Ct. at 3083 (Thomas, J., concurring).

The first state law mentioned in *McDonald* as typical of what the Fourteenth Amendment would invalidate was a Mississippi law providing that "no freedman, free negro or mulatto, not in the military service of the United States government, and not licensed so to do by the board of police of his or her county, shall keep or carry fire-arms of any kind . . . ."  Certain Offenses of Freedmen, 1865 Miss. Laws p. 165, § 1, in 1 *Documentary History of Reconstruction* 289 (1950), quoted in *McDonald*,

---

[12]This work has been republished as *Securing Civil Rights: Freedmen, the Fourteenth Amendment, and the Right to Bear Arms* (2010).

130 S.Ct. at 3038.[13]  A press report noted: "The militia of this country have seized every gun and pistol found in the hands of the (so called) freedmen of this section of the country.  They claim that the statute laws of Mississippi do not recognize the negro as having any right to carry arms."  *Harper's Weekly*, Jan. 13, 1866, at 3, col. 2.

A similar South Carolina law led a convention of prominent blacks there to draft a petition stating: "We ask that, inasmuch as the Constitution of the United States explicitly declares that the right to keep and bear arms shall not be infringed . . . that the late efforts of the Legislature of this State to pass an act to deprive us of arms be forbidden, as a plain violation of the Constitution . . . ."  2 *Proceedings of the Black State Conventions, 1840-1865*, at 302 (1980).  Senator Charles Sumner, Republican of Massachusetts, paraphrased the petition as seeking "constitutional protection in keeping arms . . . ."  Cong. Globe, 39th Cong., 1st Sess. 337 (1866) .  *See McDonald*, 130 S.Ct. at 3038 n.18.

Such Second Amendment deprivations were prominently debated in bills

---

[13]*McDonald* further referred to "Regulations for Freedmen in Louisiana," *id.*, which included the following: "No negro who is not in the military service shall be allowed to carry firearms, or any kind of weapons, within the parish, without the written special permission of his employers, approved and indorsed by the nearest and most convenient chief of patrol."  1 *Documentary History of Reconstruction* at 279-80.

leading to enactment of the Freedmen's Bureau Act and the Civil Rights Act of 1866. Rep. Thomas Eliot, Republican of Massachusetts and sponsor of the former, referred to an ordinance of Opelousas, Louisiana, as the type of infringement the Act would nullify,[14] and further quoted from a Freedmen's Bureau report about Kentucky: "The civil law prohibits the colored man from bearing arms . . . ."[15]    *Id.* at 657. Accordingly, the Freedmen's Bureau bill guaranteed the right "to have full and equal benefit of all laws and proceedings for the security of person and estate, including the constitutional right to bear arms." *Id.* at 654.

Yet prohibitions against carrying arms continued to be enforced. A witness testified that "attempts were made in [Alexandria, Va.] to enforce the old law against them in respect to whipping and carrying fire-arms . . . ." *Report of the Joint Committee on Reconstruction*, H.R. Rep. No. 30, 39th Cong., 1st Sess., pt. 2, at 21 (1866).

---

[14]Eliot quoted the following:

> No freedman who is not in the military service shall be allowed to carry fire-arms, or any kind of weapons, within the limits of the town of Opelousas without the special permission of his employer, in writing, and approved by the mayor or president of the board of police.

Penalties included forfeiture of weapons, imprisonment, working on the public streets, and fines. *Id.* at 517.

[15]*See Heller,* 554 U.S. at 614-15.

20

"In debating the Fourteenth Amendment, the 39th Congress referred to the right to keep and bear arms as a fundamental right deserving of protection." *McDonald*, 130 S.Ct. at 3041. Among other documents, a report circulated in Congress from the Freedmen's Bureau stating: "There must be 'no distinction of color' in the right to carry arms, any more than in any other right." Ex. Doc. No. 70, House of Representatives, 39th Cong., 1st Sess. 297 (1866).

Introducing the Fourteenth Amendment in the Senate, Jacob Howard, Republican of Michigan, referred to "the personal rights guaranteed and secured by the first eight amendments of the Constitution; such as freedom of speech and of the press; . . . the right to keep and bear arms . . . ." Cong. Globe, 39th Cong., 1st Sess. 2765 (1866). He averred: "The great object of the first section of this amendment is, therefore, to restrain the power of the States and compel them at all times to respect these great fundamental guarantees." *Id.* at 2766.

The Fourteenth Amendment passed both houses by the necessary two-thirds and was proposed to the States. In support of a bill which required the Southern States to ratify the Amendment, Rep. George W. Julian, Republican of Indiana, argued:

> Although the civil rights bill is now the law, . . . [it] is pronounced void by the jurists and courts of the South. Florida makes it a misdemeanor for colored men to carry weapons without a license to do so from a probate judge, and the punishment of the offense is whipping and the pillory. South Carolina has the same enactments. . . . .

21

*Id.* at 3210.

Court decisions were noted in a report received in Congress from General U.S. Grant stating: "The statute prohibiting the colored people from bearing arms, without a special license, is unjust, oppressive, and unconstitutional." Cong. Globe, 39th Cong., 2d Sess. 33 (1866).

After the Freedmen's Bureau bill was passed and vetoed, it would be passed in override votes by the same two-thirds-plus members of Congress who voted for the Fourteenth Amendment.[16] Section 14 of the Freedmen's Bureau Act declared that in States or districts where ordinary judicial proceedings were not restored, and until such time as such States were restored to the Union and represented in Congress:

> the right . . . to have full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal, including the constitutional right to bear arms, shall be secured to and enjoyed by all the citizens of such State or district without respect to race or color or previous condition of slavery.

14 Stat. 173, 176-77 (1866).

"Section 14 thus explicitly guaranteed that 'all the citizens,' black and white, would have 'the constitutional right to bear arms.'" *McDonald*, 130 S.Ct. at 3040. The term "bear arms" was used, and "[i]t would have been nonsensical for Congress

---

[16]On the roll call votes, see Halbrook, *Freedmen*, 41-43.

22

to guarantee the full and equal benefit of a constitutional right that does not exist."
*Id*. at 3043.[17]

"In sum, it is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *McDonald*, 130 S.Ct. at 3042. As such, the right of a law-abiding person to carry a firearm could not be banned.

Enforcement legislation under the Fourteenth Amendment further substantiates the understanding that carrying arms is constitutionally protected. "[I]n debating the Civil Rights Act of 1871, Congress routinely referred to the right to keep and bear arms and decried the continued disarmament of blacks in the South." *McDonald*, 130 S.Ct. at 3041-42, citing Halbrook, *Freedmen* 120-131. Today's 42 U.S.C. § 1983, the Act provides that any person who, under color of State law, subjects a person "to the deprivation of any rights, privileges, or immunities secured by the Constitution" is

---

[17]The traditional linguistic meaning of "bearing arms" as carrying arms off of one's premises is clear from Maryland history. Antebellum Maryland prohibited slaves and free blacks from carrying a firearm without a license. Maryland Code 454 (1860). At its 1867 constitutional convention, it was moved to add the guarantee that "every citizen has the right to bear arms in defence of himself and the State." Perlman, *Debates of the Maryland Convention of 1867* at 79, 151 (1867). When a delegate moved to insert "white" after "every," another insisted: "Every citizen of the State means every white citizen, and none other." *Id*. at 150-51. When it appeared that no right to "bear arms" would be recognized, it was proposed that "the citizen shall not be deprived of the right to keep arms on his premises," but that too failed. Perlman at 151.

civilly liable.  17 Stat. 13 (1871).

A year after passage, the Civil Rights Act was the subject of a report from President Grant to Congress which stated that parts of the South were under the control of Ku Klux Klan, the objects of which were "to deprive colored citizens of the right to bear arms and of the right to a free ballot . . . ."  Ex. Doc. No. 268, 42nd Cong., 2d Sess. 2 (1872).  In debate on a bill to expand civil rights protection, Senator John Scott, Republican of Pennsylvania, explained how Klansmen seized the firearms of their victims before lynching them.  Cong. Globe, 42nd Cong., 2d Sess. 3584 (1872).  But Senator Pratt observed that the Klansman "fears the gun" of a man in his "humble fortress."  *Id*. at 3587.  The Klan targeted the black who would "tell his fellow blacks of their legal rights, as for instance their right to carry arms and defend their persons and homes."  *Id*. at 3589.

Protection of the right to bear and carry arms was a primary object of the Fourteenth Amendment and enforcement legislation.  Far from being a Southern anomaly, that right was recognized and vigorously protected by "Reconstruction era Republicans."

24

## IV. THE ORDINARY CITIZEN CANNOT OBTAIN A PERMIT TO CARRY IN MARYLAND AND IS THUS DEPRIVED OF THE RIGHT TO BEAR ARMS FOR DEFENSE.

Appellants imply that permits are freely available in Maryland, noting that the approval rate for applications is 93.8%. Br. App. at 7. For reasons discussed below, that figure is misleading. Instead, the "good and substantial reason" requirement, as interpreted by Maryland administrative authorities and the courts, makes it nearly impossible for an ordinary, law-abiding Marylander to obtain a carry permit.

On the application for a handgun permit, the Maryland State Police categorize permits according to whether the application is submitted by a correctional officer, former police officer, private detective, security guard, holder of a special police commission (such as university police), holder of a railroad police commission, or certain other businesses or occupations.[18] Permits for most of these categories are apparently issued routinely and without any particularized proof of danger to the applicant.

Unlike these occupations, the ordinary citizen who desires a permit for "personal protection" must include "documented evidence of recent threats, robberies, and/or assaults, supported by official police reports or notarized statements from

_____

[18]The permit application form is on the MSP website cited by Appellants at http://www.mdsp.org/LinkClick.aspx?fileticket=XA8erY6uESU%3d&tabid=621&mid=1555.

25

witnesses," according to the application form.  Those requirements, which will be impossible for most citizens to meet, have been upheld by the state Handgun Permit Review Board and the Maryland state courts.

In *Scherr v. Handgun Permit Review Board*, 880 A.2d 1137, 1141 (Md. Ct. Spec. App. 2005), the applicant "was a law abiding citizen with an excellent reputation."  Because his application contained "no evidence and/or reference" to previous "assaults, threats, or robberies," the state police asked Scherr to provide such documentation, corroborated by police reports.  Ultimately it was recommended that the permit be denied, *inter alia,* because of the lack of prior robberies, threats, or assaults, and because there was no showing that the applicant's "level of threat and/or danger" was "any greater than that of an *ordinary citizen*."  *Id*. at 1142 (emphasis added).

Because of this lack, the Board concluded that the applicant "has not demonstrated a good and substantial reason to wear, carry or transport a handgun as a reasonable precaution against apprehended danger."  *Id*. at 1143.  At a second hearing, the state police officer responsible for reviewing permit applications testified that "except for former police officers, he had *never* approved an application where the applicant had failed to produce evidence of a threat," and that police reports were generally required.  *Id*. (emphasis added).  The reviewing court noted that if general

26

fears of criminal attack "justified issuance of a handgun permit, it is hard to see how the Review Board could deny any law-abiding citizen a permit." *Id*. at 1148.

In *Snowden v. Handgun Permit Review Board*, 413 A.2d 295 (Md. Ct. Spec. App. 1980), Mr. Snowden was active in community work dealing with drug and crime control. He presented statements to the Board that he had received threats after calling on public officials to engage in a crackdown on drug pushers, and had reported the threats to the county narcotics division and the State's Attorney. *Id.* at 296.

The Board found that he had received threats, but had never actually been assaulted. He had thus not demonstrated a "good and substantial reason." *Id.* The court affirmed, noting that "it is the Board not the applicant" that decides whether there is "apprehended danger." *Id.* at 298. Otherwise, the State Police would become a "rubber stamp," and the legislation would be "rendered absolutely meaningless." *Id. See also Onderdonk v. Handgun Permit Review Board*, 407 A.2d 763 (Md. Ct. Spec. App. 1979) (holding that break-ins at applicant's residence did not justify issuance of permit).

Appellants imply that permits are readily available, stating that "from 2006 through 2010, MSP's Handgun Permit Unit received 22,035 original or renewal applications, and issued 20,674 permits, for an approval rate of 93.8%" Br. App. at 7 (citing MSP, *2010 Annual Report* 37 (2011), and providing website link).

27

Instead, figures in the *2010 Annual Report* confirm that the Maryland scheme is extremely restrictive. According to that Report, 8,536 original and 12,135 renewal permits were issued in the five year period 2006-2010, totaling 20,671 permits. *Id*. The average number of permits issued each year was therefore 4,134. The population of Maryland in 2010 was 5,773,552.[19] For the average year, the ratio of permits issued to population was therefore 0.000716, substantially less than one for every thousand Maryland residents.

Permits issued for personal protection are an insignificant portion of the small number of permits issued overall. Data released by the MSP in 2006 pursuant to a Public Information Act request revealed that 29% of permits had been issued to law enforcement personnel (mostly retired and special police); 37% to corrections, security, judicial, and government personnel; and 32% for business purposes (*e.g.*, merchants who carry large sums of money, and others with occupational need).[20] The "high" approval rate results from the fact that a substantial majority of the applications are renewals, and from the large percentage that go to law enforcement, security, and other favored occupations. Only 1.7% of the permits issued were for personal

---

[19] http://quickfacts.census.gov/qfd/states/24000.html

[20] http://marylandshallissue.org/get-informed/maryland-2nd-amendment-topics/maryland-handgun-permit-information; for raw data see http://marylandshallissue.org/wp-content/uploads/2011/09/msp_ccw_info_p.pdf.

protection or death threats. *Id*.

As Judge Legg held, "A citizen may not be required to offer a good and substantial reason why he should be permitted to exercise his rights. The right's existence is all the reason he needs." JA 156. The government may not attempt to minimize any dangers associated with a right "by means of widespread curtailment of the right itself." *Id.* By requiring a showing of "good and substantial reason" to carry a handgun, Maryland has widely curtailed the exercise of fundamental Second Amendment rights.

## CONCLUSION

The decision of the District Court should be affirmed.

Respectfully submitted,

CALIFORNIA RIFLE AND PISTOL ASSOCIATION FOUNDATION, VIRGINIA SHOOTING SPORTS ASSOCIATION, AND CENTER FOR CONSTITUTIONAL JURISPRUDENCE, AMICI CURIAE


By Counsel

 /s/ Stephen P. Halbrook
Stephen P. Halbrook
3925 Chain Bridge Road
Suite 403
Fairfax, Virginia 22030
(703) 352-7276
Fax: (703) 359-0938
Email:  protell@aol.com


/s/ Dan M. Peterson
Dan M. Peterson
Dan M. Peterson PLLC
3925 Chain Bridge Road
Suite 403
Fairfax, Virginia 22030
(703) 352-7276
Fax: (703) 359-0938
Email: dan@danpetersonlaw.com


Counsel for Amici Curiae

30

John C. Eastman
Anthony T. Caso
CENTER FOR
CONSTITUTIONAL JURISPRUDENCE
c/o Chapman University School of Law
One University Dr.
Orange, CA 92866
(714) 628-2587
jeastman@chapman.edu

C. D. Michel
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
Tel. No. (562) 216-4444
Fax No: (562) 216-4445
e-mail: cmichel@michellawyers.com
Counsel for California Rifle and Pistol
Association Foundation

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. 12-1437        **Caption:** Woollard et al. v. Gallagher et al.

**CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)**
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines.  Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines.  Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the   type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

☑        this brief contains _____6,981_____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐        this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger.  A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☑        this brief has been prepared in a proportionally spaced typeface using
WordPerfect 13.0_____ [*identify word processing program*] in
14 point Times New Roman_____ [*identify font size and type style*]; **or**

☐        this brief has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Dan M. Peterson_____

Attorney for Amici CRPA Foundation et al._____

Dated: August 6, 2012_____

# ADDENDUM

1 W. Hawkins, *A Treatise of the Pleas of the Crown*,
ch. 63, § 9 at 135-36 (1716) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3 E. Coke, *Institutes of the Laws of England*, c.73, 161 (Figett's case) . . . . . . . . . 4

M. Dalton, *The Country Justice* 37 (1690) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*A Collection of All Such Acts of the General Assembly
of Virginia, of a Public and Permanent Nature,
as Are Now in Force*, ch. 21, at 30 (1803) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

2 *Perpetual Laws of the Commonwealth of Massachusetts* 259 (1801) . . . . . . . . 11

Letters from T. Jefferson to Mr. Verdier and T. Randolph
(October 9, 1803) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Appeal: 12-1487    Doc: 82-1    Filed: 08/06/2012    Pg: 47 of 61

*James for Hou bought in 1889*

A *William Blakeney*
*Middle Temple* —

# TREATISE

## OF THE

# PLEAS

## OF THE

# CROWN:

### OR A

System of the Principal Matters relating to that Subject, digested under their proper Heads.

---

## BOOK I.

---

By *WILLIAM HAWKINS,*
of the *Inner-Temple,* Efq;

---

In the *SAVOY,*

Printed by **Eliz. Nutt,** ( Executrix of **J. Nutt,** Affignee
of *Edward Sayer,* Efq; ) for **J. Walthoe** in the *Middle-
Temple-Clyfters* ; and **J. Walthoe,** *jun.* againft the
*Royal-Exchange* in *Cornhill.* 1716.

ADDENDUM 1

Digitized

Appeal: 12-1437 Doc: 82-1 Filed: 08/06/2012 Pg: 48 of 61



this Cause such a private Assault seems not to be inquirable in a Court-Leet, as all Affrays certainly are, as being common Nusances.

4 H. 6. 10. a. 8 Ed. 4. 5. b.

*Sect.* 2. Also it is said, That no quarrelsome or threatening Words whatsoever shall amount to an Affray; and that no one can justify laying his Hands on those who shall barely quarrel with angry Words, without coming to blows; yet it seemeth, That the Constable may, at the Request of the Party threatened, carry the Person who threatens to beat him before a Justice of Peace, in Order to find Sureties.

H. P. C. 135. 22 E 4. 45. b. Dal. ch. 8. Lamb. Constable 14.

*Sect.* 3. Also it is certain, That it is a very high Offence to challenge another, either by Word or Letter, to fight a Duel, or to be the Messenger of such a Challenge, or even barely to endeavour to provoke another to send a Challenge, or to fight, as by dispersing Letters to that purpose, full of Reflections, and insinuating a Desire to fight, *&c.*

Poph. 158. 3 Inst. 158. 1 Sid. 186. 1 Keb. 694. Hob. 120, 215. 2 Rol. Ab. 78.

*Sect.* 4. But granting that no bare Words, in the Judgment of Law, carry in them so much Terror as to amount to an Affray; yet it seems certain, That in some Cases there may be an Affray where there is no actual Violence; as where a Man arms himself with dangerous and unusual Weapons, in such a Manner as will naturally cause a Terror to the People, which is said to have been always an Offence at Common Law, and is strictly prohibited by many Statutes: For by 2 *Ed.* 3. 3. it is enacted, *That no Man, great nor small, of what Condition soever he be, except the King's Servants, in his Presence, and his Ministers in executing of the King's Precepts, or of their Office, and such as be in their Company assisting them, and also upon a Cry made for Arms to keep the Peace, and the same in such Places where such Acts happen, be so hardy to come before the King's Justices, or other of the King's Ministers doing their Office, with Force and Arms, nor bring no Force in Affray of Peace, nor to go nor ride armed by Night nor by Day, in Fairs, Markets, nor in the Presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to prison, at the King's Pleasure. And that the King's Justices in their Presence, Sheriffs, and other Ministers in their Bailiwicks, Lords of Franchises, and their Bailiffs in the same, and Mayors and Bailiffs of Cities and Boroughs, within the same Cities and Boroughs, and Borough-holders, Constables and Wardens of the Peace within their Wards, shall have Power to execute this Act: And that the Justices assigned, at their coming down into the Country, shall have Power to enquire how such Officers and Lords have exercised their Offices in this Case, and to punish them whom they find, that have not done that which pertained to their Office*; and this Statute is farther enforced by 7 *Rich.* 2. 13. and 20 *Rich.* 2. 1.

Lamb. 126. 3 Inst. 160. 76. D. 2 Rol. Ab. 78. Pl. 4. H. P. C. 137.

And in the Exposition of it, the following Points have been holden:

*Sect.* 5. I. That any Justice of Peace, or other Person, who is impowered to execute this Statute, may proceed thereon, either *ex Officio*, or by Force of a Writ out of Chancery formed upon the Statute, and that if he find any Person in Arms contrary to the Form of the Statute, he may seize the Arms, and commit the Offender to Prison; and that he ought also to make a Record of his whole Proceeding, and certify the same into the Chancery, where he proceeds by Force of the said Writ, or into the Exchequer, where he proceeds *ex Officio*.

F. N. B. 249. 3 Inst. 161. Dal. ch. 22. Lamb. 168, &c. Dalis. 23. 2 Buls. 330.

*Sect.* 6. II. That where a Justice of Peace, *&c.* proceeds upon the said Writ, he may not only imprison those whom he shall find offending against the Statute in his own View, but also those who shall be found by an Inquest taken before him, to have offended in such Manner in his Absence; and I do not see why he may not do the same where he proceeds *ex Officio*; for seeing the said Writ hath no other Foundation but the

Cro. El. 294. Con. Lamb. 170.



Digitized by Google

the said Statute, and is the most authentick Explication thereof, it seemeth that the Rules therein prescribed, should be the best Direction for all Proceedings upon that Statute.

Cro. El. 294.

Sect. 7.  III. That the Under-Sheriff may execute the said Writ, being directed to the Sheriff, if it name him only by the Name of his Office, and not by his proper Name, and do not expressly command him to act in his proper Person.

24 Ed. 33. a. b.
21 H. 7. 39. a.
3 Inst. 161,
162.
Con. 2. Rol.
78. d.
2 H. 7. 39. a.
3 Inst. 162.

Sect. 8.  That a Man cannot excuse the wearing such Armour in Publick, by alledging that such a one threatened him, and that he wears it for the Safety of his Person from his Assault; but it hath been resolved, That no one shall incur the Penalty of the said Statute for assembling his Neighbours and Friends in his own House, against those who threaten to do him any Violence therein, because a Man's House is as his Castle.

3 Mod. 117,
118.
2 Bulst. 330.

Sect. 9.  V. That no wearing of Arms is within the meaning of this Statute, unless it be accompanied with such Circumstances as are apt to terrify the People; from whence it seems clearly to follow, That Persons of Quality are in no Danger of Offending against this Statute by wearing common Weapons, or having their usual Number of Attendants with them, for their Ornament or Defence, in such Places, and upon such Occasions, in which it is the common Fashion to make use of them, without causing the least Suspicion of an Intention to commit any Act of Violence or Disturbance of the Peace. And from the same Ground it also

Crom. 64. a.

follows, That Persons armed with privy Coats of Mail to the Intent to defend themselves against their Adversaries, are not within the Meaning of this Statute, because they do nothing in terrorem Populi.

Poph. 121,
122.

Sect. 10.  VI. That no Person is within the Intention of the said Statute, who arms himself to suppress Rioters, Rebels, or Enemies, and endeavours to suppress or resist such Disturbers of the Peace or Quiet of the Realm; for Persons who so arm themselves, (seem to be exempted out of the general Words of the said Statute, by that Part of the Exception in the beginning thereof, which seems to allow all Persons to arm themselves upon a Cry made for Arms to keep the Peace, in such Places where such Acts happen.

Lamb. 131.
3 Inst. 158.
H. P. C. 131.
2 Inst. 52.
22 E. 4. 44. b.
Dalt. cap. 8.
Lamb 131.

Sect. 11.  As to the second Point, viz. How far an Affray may be suppressed by a private Person, it seems agreed, That any one who sees others fighting, may lawfully part them, and also stay them till the Heat be over, and then deliver them to the Constable, who may imprison them till they find Surety for the Peace; also it is said, That any private Person may stop those whom he shall see coming to join either Party; and from hence it seems clearly to follow, That if a Man receive a Hurt from either Party in thus endeavouring to preserve the Peace, he shall have his Remedy by an Action against him; also upon the same Ground it seems equally reasonable, That if he unavoidably happen to hurt either Party, in thus doing what the Law both allows and commends, he may well justify it, inasmuch as he is in no Way in Fault; and the Damage done to the other, was occasioned by a laudable Intention to do him a Kindness.

3 Inst. 158.
Con. Lamb.
131.
Dalt. cap. 8.

Lamb. 131.
Dalt. cap 8
3 Inst. 158.
Bro. Faux
Imprison-
ment 35, 44.
H. P. C. 135.
10 H. 7. 20.
2 Inst. 52.

Sect. 12.  However it seems clear, That if either Party be dangerously wounded in such an Affray, and a Standerby, endeavouring to arrest the other, be not able to take him without hurting, or even wounding him, yet he is in no Way liable to be punished for the same, inasmuch as he is bound under Pain of Fine and Imprisonment, to arrest such an Offender, and either detain him till it appear whether the Party will live or die, or carry him before a Justice of Peace, by whom he either is to be bailed or committed, &c.

3                                                    Sect.

# THE
# THIRD PART

## OF THE

## 𝕴𝖓𝖘𝖙𝖎𝖙𝖚𝖙𝖊𝖘 𝖔𝖋 𝖙𝖍𝖊 𝕷𝖆𝖜𝖘 𝖔𝖋 𝕰𝖓𝖌𝖑𝖆𝖓𝖉:

CONCERNING

## HIGH TREASON,

*AND OTHER PLEAS OF THE CROWN.*

AND

## CRIMINAL CAUSES.

---

Eccles. 8. 11.

*Quia non profertur cito contra malos sententia, absque timore ullo filii hominum perpetrant mala.*

*Inertis est nescire quod sibi liceat.*

---

Authore  EDWARDO COKE, Milite, J. C,

Hæc ego grandævus posui tibi, candide lector.



## London:

PRINTED FOR W. CLARKE, AND SONS, LAW-BOOKSELLERS, PORTUGAL-STREET, LINCOLNS INN.

## 1809.

KBS

ADDENDUM 4

## Cap. 73. Againſt going or riding armed.  161

there be three ſpeciall exceptions, yet the law doth make another exception, and that is, to aſſemble force to defend his houſe, as hereafter ſhall be ſaid.

*To come before the kings juſtices, or other the kings miniſters doing their office, with force and armes.*] Braction doth notably write of the diverſity of forces, viz. that there is *vis expulſiva, perturbativa, inquietiva, ablativa, compulſiva, &c.* which you may read in him. And then (which is pertinent to our purpoſe) he ſaith : *Eſt etiam vis armata, (armis dejectum dico qualitercunque fuerit vis armata) non ſolum ſi quis venerit cum telis, verum etiam omnes illos dicimus armatos, qui habent cum quo nocere poſſunt. Telorum autem appellatione omnia, in quibus ſinguli homines nocere poſſunt, accipiuntur : ſed ſi quis venerit ſine armis, et ipſa concertatione ligna ſumpſerit, fuſtes, et lapides, talis dicetur vis armata ; ſi quis autem venerit cum armis, armis tamen ad dejiciendum non uſus fuerit, et dejecerit, vis armata dicitur eſſe facta ; ſufficit enim terror armorum ut videatur armis dejeciſſe.* Agreeing with that of the poet,

*Jamque faces et ſaxa volant, furor arma miniſtrat.*

Britton ſaith, *Nous volons, que touts gents pluis uſent judgement, que force.*

*Nor to bring force in affray of the (paiis, i.) countrey.*] This act is notably expounded by the writ in the Regiſter, and F. N. B. for by that writ it appeareth, that if any doth enter into, or detaine with force any houſes, lands, or tenements, the party grieved may have a writ upon this ſtatute, directed to the ſherif, by force of which writ, if the ſherif find the force, then if any after proclamation made, (which proclamation is by reaſonable conſtruction to be made for avoiding of bloodſhed) ſhall diſobey, or if it be found by inquiſition, the ſherif is to ſeize their armes and weapons, and to arreſt and take the offenders and commit them to priſon, &c. But note the ſherif cannot reſtore the party grieved upon this writ to his poſſeſſion, ᵃ no more then he can upon the writ *de vi laica, removenda,* but reſtitution muſt be made by force of the ſtatutes of 8 H. 6. and 21 Jac. ᵇ And yet in ſome caſe a man may not onely uſe force and armes, but aſſemble company alſo. As any may aſſemble his friends and neighbours, to keep his houſe againſt thoſe that come to rob, or kill him, or to offer him violence in it, and is by conſtruction excepted out of this act : and the ſherif, &c. ought not to deal with him upon this act ; for a mans houſe is his caſtle, *et domus ſua cuique eſt tutiſſimum refugium* ; for where ſhall a man be ſafe, if it be not in his houſe ? and in this ſenſe it is truly ſaid,

*Armaque in armatos ſumere jura ſinunt.*

But he cannot aſſemble force, though he be extreamly threatned, to goe with him to church, or market, or any other place, but that is prohibited by this act.

*Nor to goe armed by night, or by day, &c. before the kings juſtices in any place whatſoever.*] Sir Thomas Figett knight went armed under his garments, as well in the palace, as before the juſtice of the kings bench : for both which upon complaint made, he was arreſted by ſir William Shardſhill chiefe juſtice of the kings bench, and being charged therewith, he ſaid that there had been debate between him and ſir John Trevet knight in the ſame week, at Pauls in

Braction, lib. 4. fo. 162.

Virgil.

Britton, 116. a.

See the chapter next before. verb. *Affraye.* Regiſtrum. F. N. B. 249. f. Nota. Vide lib. 5. fo. 9. Semayes caſe. F. N. B. 54.

ᵃ 8 H. 6. cap. 9. 21 Jac. cap. 25. b. 3. E. 3. cor. 303. 305. 26 Aſſ. p. 22. 21 H. 7. 39.

[ 162 ]

21 H. 7. 39. Lib. 5. fo. 91. b. Semaynes caſe.

24 E. 3. fo. 33.

Digitized by Google

in London, who menaced him, &c. and therefore for doubt of danger, and fafeguard of his life, he went fo armed. Notwithftanding the court upon their view awarded, that the armes were forfeited, and thereupon the fame were feifed, and he commanded to ward in the Marfhalfea during the kings pleafure. Sir Thomas prayed to find mainprife, which was denied, untill the pleafure of the king was known, becaufe he was imprifoned during the kings pleafure, according to this ftatute.

24 E. 3. ubi. fupra. Vide the 4 part of the Inftitutes, cap. Leet. 20 R. 2. cap. 1. Vid. in-dorff. clauf. 2 E. 2. 19. 22.

*Upon paine to forfeit their armor, &c.*] It appeareth before by the cafe of fir Thomas Figett, that the offender was to bee punifhed according to this act, but by forfeiture of the armor and imprifonment; but the ftatute of 20 R. 2. cap. 1. doth add fine, and imprifonment.

*And that the kings juftices, in their prefence, &c.*] So did fir William Shardifhill, as is abovefaid.

*And other minifters in their bailiwickes, &c.*] That is to fay, fherifs, bailifs of liberties, &c.

*Lords of franchifes.*] And their bailifs, maiors, and bailifs of cities, and borowes within the fame cities and borowes, and borowholders, conftables, and wardens of the peace within their wards fhall have power to execute this act. And the juftices affigned at their comming down fhall inquire how fuch officers, and lords have exercifed their offices in this cafe, and to punifh them whom they find that have not done that which pertaineth to their office. See 12 R. 2. cap. 6.

Regiftrum. F. N. B. 249. f. 24 E. 3. fo. 33.

It is to be obferved, that upon this ftatute by the refolution of the judges a writ was framed, and inferted into the Regifter, when any with force and armes enter any lands and tenements, or detaine the fame with force and armes, directed to the fherif, reciting the force, and our act, (and faith) *Nos ftatutum prædictum inviolabiliter obfervari, et idem infringentes juxta vim et effectum ejufdem ftatuti caftigare facere volentes et punire, tibi præcipimus, &c. publice proclamari facias, &c.* as in the writ. And here is a fecret in law, that upon any ftatute made for the common peace, or good of the realm, a writ may be devifed for the better execution of the fame, according to the force and effect of the act.

Vide 36 E. 3. ca. 9. fimile.

Note, proclamations are of great force, which are grounded upon the laws of the realme.

# C A P. LXXIV.

## Of Perjury and Subornation of Perjury, and incidently of Oaths.

5 El. ca. 9.

EVERY perfon which fhall unlawfully and corruptly procure any witneffe to commit any wilfull, and corrupt perjury in any matter or caufe depending in fuit, and variance, by any writ, action, bill, complaint, or information in any of the kings courts of chancery, ftar-chamber, or in any of the

Digitized by Google

# The Country Justice:

## CONTAINING THE

# PRACTICE

### OF THE

# Justices of the Peace

#### OUT OF THEIR

# SESSIONS.

### GATHERED

For the better help of Such JUSTICES of Peace,
as have not been much conversant in the Study of the
LAWS of This REALM.

By MICHAEL DALTON of Lincolns-Inn, *Esq*;
And One of the *Masters* in Chancery.

---

To which is now added,

The Duty and Power of JUSTICES of PEACE in Their
SESSIONS;

An Abridgment (under proper Titles) of all STATUTES,
relating thereunto;

A Large TABLE of the Principal Matters herein contained;

WITH

Two other TABLES, One of the CHAPTERS in this Book;
And the Other of such ACTS of Parliament, as concern the Office of a
JUSTICE OF PEACE.

---

*Justice is the Staff of Peace, and the Maintenance of Honour.* Cic.

LONDON,

Printed by *William Rawlins* and *Samuel Roycroft*, Assigns of *Richard* and
*Edward Atkyns*, Esquires; and are to be Sold by *Samuel Keble*, at the
*Turks-Head* near St. *Dunstans* Church in *Fleetstreet*. M DC XC.

ADDENDUM 7

Every Juſtice of Peace (in his own diſcretion, and *ex officio*) may bind all ſuch to the Peace as in his preſence ſhall ſtrike another, or ſhall threaten to hurt another, or ſhall contend only in hot words. *Vide tit. Sureties for the Peace.*

P.Juſt.173.
10H.7.20.
Cromp.
154.

If any perſon be dangerouſly hurt in any Affray (or otherwiſe,) every Juſtice of Peace, within the year and day after ſuch hurt, may commit to the Gaol ſuch Offender, there to remain until the day and year be expired, or that the ſaid Offenders ſhall find Sureties to appear at the next General Gaol delivery, to anſwer to the Felony, if the party hurt, happen to die within a year after the hurt. *Vide Stat.*3 *H.*7.*c.*1. *And by Gods Law Exodus* 21.18,19. *If the party happen to recover, the Offender ſhall pay to the party hurt for loſing his time, and alſo for his healing.*

§. 7.
*Dangerous hurt.*

But where the hurt ſhall be dangerous, or wound mortal, although the Juſtice may bail the offender, living the party ſo hurt; yet it ſhall be better diſcretion for the Juſtice to commit the Offender to the Gaol, there to remain until there ſhall appear ſome good hope of recovery in the other: And ſo Sir *Nicholas Hyde* adviſed at *Cam.* Lent Aſſizes, *An.* 5 *Car.Regis.*

And by the Stat de officio Coronatoris 3 or 4 E. 1. *upon Appeal of Wounds, and ſuch like, eſpecially if the Wounds be mortal, the parties appealed ſhall be taken immediately, and kept till it be known perfectly whether the party hurt ſhall recover or not; and if he die, the Offender ſhall be kept; and if he recover, he ſhall be attached by four or ſix Pledges, as the Wound is great or ſmall: and if it be for a Maim, the Offender ſhall find no leſs than four Pledges; if it be for a ſmall wound or maim, two Pledges ſhall ſuffice.*

5 H.7.6.
Br.Faux.
Imp.41.

If an Affray or Aſſault ſhall be made upon a Juſtice of Peace or a Conſtable, they may not only defend themſelves, but may alſo apprehend and commit the Offenders, until they have found Sureties for the Peace: the Juſtice of Peace may preſently cauſe them to be arreſted, and carried before another Juſtice, who may ſend them to the Gaol: and the Conſtable muſt commit them to the Stocks for the preſent, and after carry them before a Juſtice of Peace, or to the Gaol. *Vide hic poſtea.*

## CHAP. IX.
### *Armour.*

2 E.3.c.3.
P.1.
7 R.2.13.
20R.2.c.1.

IF any perſon ſhall ride or go armed offenſively before the Kings Juſtices, or any other the Kings Officers or Miniſters doing their Office, or in Fairs, Markets, or elſewhere, (by night or by day) in Affray of the Kings people, (Sheriff, and other the Kings Officers) and every Juſtice of Peace (upon his own view, or upon complaint thereof) may cauſe them to be ſtaid and arreſted, and may bind all ſuch to the Peace or Good behaviour, (or, for want of Sureties may commit them to the Gaol :) and the ſaid Juſtice of Peace (as alſo every Conſtable) may ſeize and take away their Armour and other Weapons, and ſhall cauſe them to be appriſed, and anſwered to the King as forfeited. And this the Juſtice of Peace may do by the firſt *Aſſignavimus* in the Commiſſion. See hereof *antea.*

§. 1.

One Juſtice

Lam.Offic.
of a Conſt.
13.

So of ſuch as ſhall carry any Guns, Daggs, or Piſtols that be charged, or that ſhall go apparelled with privy Coats or Doublets, the Juſtice may cauſe them to find Sureties for the Peace, and may take away ſuch Weapons, &c. *Vide tit. Surety for the Peace.*

2 E.3.c.3.
Co.5.72.
20 R.2.1.

And yet the King's Servants in his preſence, and Sheriffs, and their Officers, and other the Kings Miniſters, and ſuch as be in their company aſſiſting them in executing the Kings Proceſs, or otherwiſe in executing of

§. 2.

E                                their

# A

# COLLECTION

OF

AL SUCH

# ACTS

OF THE

# GENERAL ASSEMBLY

OF

# VIRGINIA,

OF A PUBLIC AND PERMANENT NATURE, AS
ARE NOW IN FORCE;

WITH A

# NEW AND COMPLETE INDEX.

TO WHICH ARE PREFIXED THE DECLARATION OF RIGHTS,
AND CONSTITUTION, OR FORM OF GOVERNMENT.

PUBLISHED PURSUANT TO AN ACT OF THE GENERAL ASSEMBLY,
PASSED ON THE TWENTY-SIXTH DAY OF JANUARY, ONE
THOUSAND EIGHT HUNDRED AND TWO.

### RICHMOND,

*PRINTED BY SAMUEL PLEASANTS, JUN. AND HENRY PACE.*

M,DCCC,III.

ADDENDUM 9

Digitized by Google

interpofition difarmed of her natural weapons, free argument and debate, errors ceafing to be dangerous when it is permitted freely to contradict them.:

*No man compelled to frequent or fupport any religious worfhip. All men free to profefs, and by argument to maintain their religious opinions.*

II.  *BE it enacted by the General Affembly,* That no man shall be compelled to frequent or fupport any religious worship, place, or Miniftry whatfoever, nor shall be enforced, reftrained, molefted, or burthened in his body or goods, nor shall otherwife fuffer on account of his religious opinions or belief; but that all men shall be free to profefs, and by argument to maintain, their opinions in matters of religion, and that the fame shall in no wife diminish, enlarge, or affect their civil capacities.

*Declaration that the rights by this Act afferted, are of the natural rights of mankind.*

III.  AND though we well know that this Affembly elected by the people for the ordinary purpofes of legiflation only, have no power to reftrain the Acts of fucceeding Affemblies, conftituted with powers equal to our own, and that therefore to declare this Act to be irrevocable, would be of no effect in law; yet we are free to declare, and do declare, that the rights hereby afferted, are of the natural rights of mankind, and that if any Act shall be hereafter paffed to repeal the prefent, or to narrow its operation, fuch Act will be an infringement of natural right.

---

*General Affembly,* begun and held at the Public Buildings, in the City of *Richmond,* on *Monday,* the 16th Day of *October,* in the Year of our Lord, 1786.

---

## CHAP. XXI.
### *An Act forbidding and punifhing Affrays.*†
[Paffed the 27th of November, 1786.‡]

*Punifhment of perfons going armed before Courts of Juftice, or the Minifters of Juftice, or in fairs or markets in terror of the Country.*

BE *it enacted by the General Affembly,* That no man, great nor fmall, of what condition foever he be, except the Minifters of Juftice in executing the precepts of the Courts of Juftice, or in executing of their office, and fuch as be in their company affifting them, be fo hardy to come before the Juftices of any Court, or either of their Minifters of Juftice, doing their office, with force and arms, on pain, to forfeit their armour to the Commonwealth, and their bodies to prifon, at the pleafure of a Court; nor go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the Country, upon pain of being arrested and committed to prifon by any Juftice on his own view, or proof by others, there to abide for fo long a time as a Jury, to be fworn for that purpofe by the faid Juftice, shall direct, and in like manner to forfeit his armour to the Commonwealth; but no perfon shall be imprifoned for fuch offence by a longer fpace of time than one month.

---

## CHAP. XXII.
### *An Act againft Confpirators.*
[Paffed the 27th of November, 1786.‖]

*Who fhall be deemed Confpirators.*

BE *it declared and enacted by the General Affembly,* That Confpirators be they that do confederate and bind themfelves by oath, covenant, or other alliance, that every of them shall aid and bear the other falfely and malicioufly to move or caufe to be moved any indictment or information againft another on the part of the Commonwealth, and thofe who are convicted thereof at the fuit of the Commonwealth, shall be punished by imprifonment and amercement, at the difcretion of a Jury.

---

## CHAP. XXIII.
### *An Act prefcribing the Punifhment of thofe who fell unwholefome Meat or Drink.*
[Paffed the 27th of November, 1786.§]

*Punifhment of thofe who fell unwholefome*

BE *it enacted by the General Affembly,* That a Butcher or other perfon that felleth the flesh of any animal dying otherwife than by flaughter, or flaugh-

† 1786, *ch.* 49.    ‡ *Commenced* 1 *July,* 1787.    ‖ 1786, *ch.* 50.    § 1786, *ch.* 51.

ADDENDUM 10

Digitized by Google

# THE

# 𝕻erpetual 𝕷aws

### OF THE

## COMMONWEALTH  -

### OF

# MASSACHUSETTS,

From the ESTABLISHMENT of its CONSTITUTION,

### IN THE YEAR 1780,

To the END of the YEAR 1800;

### WITH THE

## CONSTITUTIONS of the UNITED STATES of AMERICA,
### and of the COMMONWEALTH, prefixed.

*8064*

### TO WHICH IS ADDED,

## AN APPENDIX,

### CONTAINING

*ACTS AND CLAUSES OF ACTS, FROM THE LAWS OF THE LATE COLONY, PROVINCE AND STATE OF MASSACHUSETTS, WHICH EITHER ARE UNREVISED OR RESPECT THE TITLE TO REAL ESTATE.*

### IN THREE VOLUMES.

## VOL. II.

**C**ontaining the **L**aws from J**une**, 1788, to J**une**, 1798, inclusively.

*Ignorantia legis neminem excusat.*
The Ignorance of Law is an Excuse for no One.

The Law is the Subject's best Birthright.

PRINTED AT *BOSTON,*
By I. THOMAS and E. T. ANDREWS.
**S**old by them, at their Bookstore, No. 45, Newbury-Street ; and by said T**homas,** at his Bookstore, in W**orcester.**
*March,* 1801.

ADDENDUM 11

Digitized by Google

## CHAP. XXIII.

An Act to incorporate certain Persons by the name of The Northwest Congregational Society in Northyarmouth. Passed *June* 26, 1794.

[*S P E C I A L.*]

---

## CHAP. XXIV.

An Act for incorporating certain Land in Dedham and Sharon, in the County of Norfolk, into a Common Field. Passed *January* 22, 1795.

[*S P E C I A L.*]

---

## CHAP. XXV.

An Act for repealing an Act, made and passed in the year of our Lord, one Thousand six Hundred and Ninety two, entitled "An Act for punishing Criminal Offenders," and for reenacting certain Provisions therein.

1. BE it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same, That the said act be, and hereby is repealed, and made wholly null and void.

2. *And be it further enacted by the authority aforesaid,* That every Justice of the Peace, within the county for which he may be commissioned, may cause to be staid and arrested, all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth, or such others as may utter any menaces or threatening speeches, and upon view of such Justice, confession of the delinquent, or other legal conviction of any such offence, shall require of the offender to find sureties for his keeping the Peace, and being of the good behaviour ; and in want thereof, to commit him to prison until he shall comply with such requisition : And may further punish the breach of the Peace in any person that shall assault or strike another, by fine to the Commonwealth, not exceeding *twenty shillings,* and require sureties, as aforesaid, or bind the offender, to appear and answer for his offence at the next Court of General Sessions of the Peace, as the nature or circumstances of the case may require.

[Passed *January* 29, 1795.]

CHAP.

*(margin note: Act repealed.)*

*(margin note: Justices of the Peace empowered.)*

Digitized by Google

[1803, Oct. 9]
435

Sir

Washington Oct. 9. 03.

I left at your house the morning after I lodged there, a pistol in a locked case, which no doubt was found in your bar after my departure. I have written to desire either mr Randolph or mr Eppes to call on you for it, as they come on to Congress, to either of whom therefore be so good as to deliver it. Accept my salutation

Th: Jefferson

Mr. Verdier.

23365
G-42

C1803, Oct.9.

CXX...

Dear Sir                                          Washington Oct. 9. 03.

I have been so closely engaged since I came here that I have not
had time to write any letter which could be postponed. this place is unusually
healthy. some persons from Alexandria have been taken with the fever here &
died, without communicating it: so that we consider our rural situation as per-
-fectly exempt from the danger. it seems to get worse in Alexandria, Philadel-
-phia & New York, & so will continue probably till a frost which infallibly & in
-stantly arrests it. we have no news from Europe but what the newspapers con-
-tain.        I left at Orange C.H. one of my Turkish pistols, in it's holster, locked.
I shall be glad if either yourself or mr Eppes can let a servant take it on to
this place. it will either bind up in a portmanteau flap, or shing over the back
of the servant conveniently. a systematic opposition to the Louisiana purchase
is said to be intended. the party divisions will be 39 & 103. and 9 & 25. but it
is apprehended some Eastern republicans may oppose it. we shall expect you here
in the evening of the 16th or morning of the 17th at farthest. do not make too long
rides. they do you a lasting injury, altho' not sensible of it at the time. you would
not give as much for a horse which has had rides of excessive severity, altho'
they have not done him a visible injury. kiss my dear Martha & the little ones
for me & assure them of my tender love. Affectione to Maria who I presume
is with you. mr Eppes I suppose is below. affectionate salutations to yourself.

                                                              Th Jefferson

23364   TMRandolph.

ADDENDUM 14

# CERTIFICATE OF SERVICE

I certify that on  <u>August 6, 2012</u>  the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Dan M. Peterson

———————————————————           ———————————————————
Signature                                                               Date

August 6, 2012